

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARL BLESSING on Behalf of Himself and All Others Similarly Situated, | |
| Plaintiff, | |
| -against- | |
| SIRIUS XM RADIO INC, | |
| Defendant | |

'09 CIV 10035

Civil No. _____

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED



**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
James J. Sabella
Shelly L. Friedland
485 Lexington Avenue
New York, NY 10017
Tel.: 646-722-8500
Fax: 646-722-8501

- and -

Reuben Guttman
1920 L. Street NW
Suite 400
Washington, DC 20036
Tel.: 202-386-9500

**COOK, HALL & LAMPROS, LLP**
Edward S. Cook
Christopher B. Hall
P. Andrew Lampros
Promenade Two, Suite 3700
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel.: 404 876-8100
Fax: 404 876-3477

**TABLE OF CONTENTS**

**Page**

I.     NATURE OF ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ..................................................... 4

III.   PARTIES ..................................................................................... 4

IV.    BACKGROUND ON SATELLITE RADIO INDUSTRY................. 5
       A.    Before The Merger, The Two Companies Were Competitors................. 6
       B.    Sirius And XM Agree To Merge And Seek Regulatory Approval................ 7
             1.    Department of Justice Makes Erroneous Predictions And
                   Determinations About The Effect Of The Proposed Merger And
                   Closes Its Investigation ................................................................. 7
             2.    Due To Purported Hundreds of Millions Of Dollars In Savings, Sirius
                   and XM Promise That Efficiencies From The Merger Will Benefit
                   Consumers.................................................................................... 9
             3.    FCC Approves License Transfer But Only With Conditions Limiting
                   Price Increases ........................................................................ 11

V.     SIRIUS XM ABUSES ITS MONOPOLY POWER BY RAISING PRICES ................. 13
       A.    Sirius XM Increases Various Subscriber Fees By March 2009........................... 14
             1.    Sirius XM Increases Prices To Multi-Receiver Subscribers By 29%....... 14
             2.    Sirius XM Increases Prices For Internet Access For Existing
                   Subscribers............................................................................... 15
       B.    Sirius Raises Prices Under The Guise Of A Royalty Pass-Through ................... 15
             1.    The Company Committed To Imposing Only A Limited
                   Pass-Through Of Royalty Increases........................................... 16
             2.    Sirius XM's Royalty Fees Are Not Charged At A Consistent Rate, And
                   Therefore Cannot Be Simply A Pass-Through Of Costs.......................... 18
             3.    The Royalty Fees Charged To Subscribers Far Exceed The Actual
                   Increase In Royalties That Sirius XM Is Entitled To Pass Through......... 20
                   a.    Sirius XM Incurred A 0.5% Increase In Sound Recording
                         Royalty Rates ................................................................... 20
                   b.    Sirius XM Incurred Minor Increases in Musical Works Royalty
                         Fees .................................................................................. 21
                   c.    The Royalty Fee Is Greater Than A Pass-Through Of Royalty
                         Cost Increases Since March 20, 2007 ............................... 22
             4.    Sirius XM Makes False And Deceptive Statements  To Its Subscribers
                   And The Public About The Music Royalty Fee....................................... 25

VI.    SIRIUS XM HAS FAILED TO INCREASE CONSUMER CHOICE BY
       ADDING A LA CARTE PROGRAMMING, AS PROMISED....................... 29

VII.  SIRIUS XM HAS A MONOPOLY IN THE U.S. SDARS MARKET, WHICH IT HAS USED TO THE DETRIMENT OF CONSUMERS ........................................................ 30

    A.    The Relevant Product Market Is Satellite Digital Audio Radio Service in the United States ........................................................................................... 31

    B.    Sirius XM Has Profitably Sustained The Increased Prices To SDARS Consumers .......................................................................................... 34

VIII.  NAMED PLAINTIFF SUFFERED DAMAGES DUE TO THE ANTICOMPETITIVE CONDUCT AND FALSE, DECEPTIVE, AND ILLEGAL ACTS OF SIRIUS XM ..... 35

IX.  CLASS ALLEGATIONS ........................................................................ 36

COUNT I .................................................................................................. 39

COUNT II ................................................................................................. 40

COUNT III ................................................................................................ 41

COUNT IV ................................................................................................ 42

PRAYER FOR RELIEF .............................................................................. 48

Plaintiff Carl Blessing, individually and on behalf of all others similarly situated, upon personal knowledge as to his own acts and status, and upon information and belief as to all other matters, makes the following allegations against Sirius XM Radio Inc. ("Sirius XM" or the "Company"), individually, and as the successor-in-interest to Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Holdings Inc. ("XM"):

## I.    NATURE OF ACTION

1.    This is an action brought pursuant to federal antitrust laws, state consumer protection statutes, and state common law against Defendant Sirius XM to remedy its abuse of monopoly power, deceptive practices, and breach of contracts, which have injured consumers. On July 28, 2008, XM and Sirius – the only two providers of satellite digital audio radio service ("SDARS") in the United States – merged to form Sirius XM. The merger provided Sirius XM with monopoly power over SDARS in the United States. Since the merger, Sirius XM has abused its monopoly power by increasing prices above competitive levels, breaching subscriber contracts, and making false and misleading statements to subscribers and the public.

2.    Prior to the merger, Sirius and XM were competitors and the presence of the two companies kept prices stable. In over six years of operation prior to the merger, Sirius never raised its monthly charge, and XM raised its monthly charge only once. Despite this price stability, both companies were growing, with subscribers and revenue increasing, even as the recession was decimating businesses in late 2007 and into 2008.

3.    Federal law required that Sirius and XM get approval from the Federal Communications Commission ("FCC") to transfer to the combined Company the FCC licenses that permitted satellite radio broadcasts. As part of the FCC approval process, Sirius and XM made commitments to the FCC that, if permitted to transfer the licenses and merge the two companies, the combined Company would institute price freezes, offer new programming, and

provide other services to enhance consumer welfare. In addition, Sirius and XM executives pledged that consumers would benefit from *lower* prices once the efficiencies of the merger were realized.

4.      Although the FCC acknowledged that the merger would give monopoly power to the combined Company, the FCC approved the license transfers conditioned on the combined Company complying with the pricing and other pro-consumer commitments. The combined Company, Sirius XM, however, has breached those commitments and abused the monopoly power that it gained from the merger.

5.      Sirius and XM were also required under federal law to obtain clearance to merge from the Department of Justice ("DOJ"). The DOJ closed its investigation into the merger based on its determination that (1) the combined Company, Sirius XM, would not be able to "profitably sustain an increased price to satellite radio consumers"; and (2) efficiencies from the merger would "be passed on to consumers in the form of lower prices." The conduct by Sirius XM since the merger has shown that the DOJ was wrong on both points. Since gaining monopoly power, Sirius XM has profitably sustained multiple price increases to satellite radio consumers, and the supposed efficiencies of the mergers have not been passed on to consumers in the form of lower prices.

6.      Within just six months of the merger and the elimination of competition in the SDARS market, the combined Company announced an increase in monthly charge per additional radio for multi-radio subscribers by nearly 30% (from $6.99 per month for each additional radio to $8.99 per radio). This 30% price increase became effective on March 11, 2009, less than eight months after the merger.

2

7.      Before the merger, Sirius and XM provided its subscribers with free internet access to their programming through a lower-speed connection. But on March 11, 2009, the Company eliminated that option and began to require all subscribers seeking internet access to pay a monthly charge of $2.99.

8.      Effective July 29, 2009 – one year after the merger was finalized – Sirius XM again increased prices by charging an excessive "U.S. Music Royalty Fee" (the "Royalty Fee") of 10% to 28%, which it deceptively represented to customers as a direct pass-through of only increases in the royalty fess since March 20, 2007, that it pays to the music industry, *i.e.*, musicians, record companies, and music publishers.

9.      In sum, between the new fees and rate increases, a subscriber with one additional radio who had accessed the internet service for free previously was paying $19.94 per month and is now paying $27.88 – a 40% increase in total.

10.     Within a year of the merger, Sirius XM subscribers have seen that the Company's commitment to offering competitive prices was illusory. Equally illusory was the Company's commitment to abiding by the conditions Sirius and XM had proposed. Thus, these commitments have provided no effective limitation on the Company's ability to abuse its monopoly power.

11.     The Company's illegal and deceptive conduct has harmed competition and injured consumers in the SDARS market in the United States. Thus, Plaintiff brings claims for violation of the federal antitrust laws and state consumer protection statutes, as well as a state law claim for breach of contract.

3

## II.    JURISDICTION AND VENUE

12.     This is a class action involving more than 100 class members, a member of the Plaintiffs' Class is a citizen of a state different from Defendant, and the amount in controversy, in the aggregate, exceeds the sum of $5,000,000, exclusive of interest and costs.

13.     This Complaint is filed, and these proceedings are instituted, under common law, consumer protection statutes, the Clayton Act, 15 U.S.C. § 12, *et seq.*, and the Sherman Act, 15 U.S.C. § 1, *et seq.* to recover threefold damages and the costs of suit and reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class of direct purchasers of SDARS resulting from Sirius XM's illegal conduct.

14.     The jurisdiction of this Court is based upon 28 U.S. C. §§ 1331, 1332(d), 1337(a), and 15 U.S.C. § 15.

15.     Sirius XM transacts business in and has its principal place of business in this District.  Venue therefore is proper in this District pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391.

## III.    PARTIES

16.     Plaintiff Carl Blessing is a resident of Florida and subscriber of Sirius SDARS in Florida.

17.     Greater than two-thirds of all Class members are residents of states other than the State of New York.

18.     Defendant Sirius XM is a Delaware Corporation with its principal place of business at 1221 Avenue of the Americas, 36th Floor, New York, New York.  It is the successor entity resulting from the merger of Sirius and XM.

19.     Sirius is a former Delaware corporation that merged on July 28, 2008 with XM to form Sirius XM.

4

20.    XM is a former Delaware corporation that merged on July 28, 2008 with Sirius to form Sirius XM.

21.    Sirius XM, Sirius, and XM have been engaged at all relevant times in "commerce" as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12.  Sirius XM's, Sirius's, and XM's general business practices, the merger of Sirius and XM, and the unfair methods of competition alleged herein are acts "in or affecting commerce."

22.    Sirius XM, Sirius, and XM authorized and/or participated in the conduct complained of herein, and are directly liable for the damages incurred by Plaintiff and the proposed Class.

## IV.    BACKGROUND ON SATELLITE RADIO INDUSTRY

23.    Sirius XM broadcasts music, sports, news, talk, entertainment, traffic and weather channels for a subscription through two satellite radio systems – the Sirius system and the XM system.

24.    Sirius XM is the combination of two entities, Sirius and XM, which merged to form Sirius XM on July 28, 2008.[1]  Before the merger created Sirius XM, Sirius and XM were the only providers of SDARS in the United States.

25.    Sirius XM's primary source of revenue is subscription fees, with most of its customers subscribing on an annual, semi-annual, quarterly or monthly basis.

26.    As of September 30, 2009, Sirius XM had 18,515,730 subscribers.

---

[1] The merger took place on July 28, 2008 and the actual name change to Sirius XM Radio Inc. occurred on August 5, 2008.

A.    **BEFORE THE MERGER, THE TWO COMPANIES WERE COMPETITORS**

27.    Before the merger, XM and Sirius each provided SDARS. Each company spent billions of dollars to enter the SDARS market.

28.    In April 1997, XM was one of the winning bidders in the FCC's auction of 25 MHz of spectrum in the S-band allocated to satellite radio, for which XM paid nearly $90 million to the U.S. Treasury. The FCC awarded XM the license to provide satellite radio services in the 2332.5-2345 MHz band. XM's wholly owned subsidiary XM Radio Inc. held the licenses as well as satellite, earth station, and experimental licenses issued by the FCC.

29.    XM began providing SDARS in September 2001. As of December 31, 2006, it provided SDARS to approximately 7.6 million subscribers.

30.    Before merging with Sirius, XM invested over five billion dollars, primarily to: (1) develop and upgrade its network; (2) design chipsets and radios capable of receiving its service; (3) subsidize the cost of such chipsets and radios to encourage their distribution; (4) develop subscriber-based management systems and other information technology; (5) market its brand; and (6) create compelling programming for subscribers.

31.    In April 1997, Sirius paid more than $83 million to the U.S. Treasury at auction for rights to provide satellite radio in the 2320-2332.5 MHz band, and the FCC authorized a Sirius subsidiary to construct, launch, and operate three geostationary satellites. In addition to the satellite radio authorization, Sirius holds related earth station and wireless licenses.

32.    Sirius began providing SDARS in February 2002. As of December 31, 2006, Sirius had approximately 6 million SDARS subscribers in the United States.

33.    Before merging with XM, Sirius invested over five billion dollars, primarily to: (1) develop and upgrade its network; (2) design chipsets and radios capable of receiving its service; (3) subsidize the cost of such chipsets and radios to encourage their distribution; (4)

6

develop subscriber-based management systems and other information technology; (5) market its brand; and (6) create compelling programming for subscribers.

34.    Between February 2002 and July 2008, when both XM and Sirius were operating and providing SDARS to their subscribers, the competition between them kept prices stable. In over six years of operation prior to the merger, Sirius never raised its monthly charge, and XM raised its monthly charge only once. *See* Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 13-14 n. 31 (FCC filing July 24, 2007).

**B.    SIRIUS AND XM AGREE TO MERGE AND SEEK REGULATORY APPROVAL**

**1.    Department of Justice Makes Erroneous Predictions And Determinations About The Effect Of The Proposed Merger And Closes Its Investigation**

35.    On February 19, 2007, Sirius and XM entered a Merger Agreement providing for the conversion of XM stock into a right to receive stock of Sirius. The proposed merger could not close until both the DOJ and the FCC had signed off on the deal.

36.    On March 13, 2007, Sirius and XM filed its pre-merger notification with the DOJ, which gave federal antitrust regulators 30 days to review the merger before its consummation. On April 12, 2007, Sirius and XM received a request for additional information from the DOJ, which extended the waiting period during which the deal could not close. The companies completed their additional submissions in early September 2007.

37.    According to public reports that surfaced late in 2007, the career attorneys and economists at DOJ suggested that the DOJ move to block the merger. On March 24, 2008, however, the DOJ announced its decision to close its investigation into the proposed transaction. The DOJ concluded that the relevant market – for antitrust analysis purposes – was not limited to SDARS. The DOJ explained its conclusion as follows:

7

The Division found that evidence developed in the investigation did not support defining a market limited to the two satellite radio firms, and similarly **_did not establish that the combined firm could profitably sustain an increased price_** to satellite radio consumers.

* * *

The evidence did not demonstrate that the number of current or potential customers that view XM and Sirius as the closest alternatives is large enough to make a price increase profitable. In this regard, the parties do not appear to have the ability to identify and price discriminate against those actual or potential customers that view XM and Sirius as the closest substitutes.

Statement of the DOJ Antitrust Division on its Decision to Close its Investigation of XM Satellite Radio Holdings Inc.'s Merger with Sirius Satellite Radio Inc. (Mar. 24, 2008) (hereafter the "DOJ Statement") (emphasis added).

38.    The DOJ Statement, which closed the investigation into the merger, anticipated that likely efficiencies created by the merger would be passed on to consumers with lower prices.

Likely Efficiencies

To the extent there were some concern [sic] that the combined firm might be able profitably to increase prices in the mass-market retail channel, efficiencies flowing from the transaction likely would undermine any such concern. The Division's investigation confirmed that the parties are likely to realize significant variable and fixed cost savings through the merger. . . [T]he Division estimated the likely variable cost savings – those savings most likely to be passed on to consumers in the form of lower prices – to be substantial. For example, the merger is likely to allow the parties to consolidate development, production and distribution efforts on a single line of radios and thereby eliminate duplicative costs and realize economies of scale. These efficiencies alone likely would be sufficient to undermine an inference of competitive harm.

DOJ Statement.

39.    The DOJ closed its investigation based on two assumptions: (1) that the combined company, Sirius XM, would not be able to "profitably sustain an increased price to satellite radio consumers;" and (2) that efficiencies from the merger would "be passed on to consumers in the

8

form of lower prices." *Id.* Since the merger, the conduct of Sirius XM has proven that the DOJ's determinations were wrong.

> **2. Due To Purported Hundreds of Millions Of Dollars In Savings, Sirius and XM Promise That Efficiencies From The Merger Will Benefit Consumers**

40.    Because the proposed merger involved the transfer of control of FCC licenses, Section 310(d) of the Communications Act of 1934 mandated that an application be made to the FCC for authority to transfer control.  47 U.S.C. § 310(d).  The FCC was prohibited, under Section 310(d), from approving the transfer of control – and hence the merger – unless the Agency found that the transfer would serve the public interest, convenience, and necessity. 47 U.S.C. § 310.

41.    Sirius and XM filed a joint application to the FCC for approval of the transfer and merger on March 20, 2007.  *See* Consolidated Application for Authority to Transfer Control (FCC filing Mar. 20, 2007) (the "Application").

42.    In connection with its license transfer Application, Sirius and XM provided the sworn statement of David Frear, presently the Executive Vice President and Chief Financial Officer of Sirius XM:

> Prior to the announcement of this merger and immediately thereafter, securities analysts estimated that there would be efficiencies from the merger of Sirius and XM Satellite Radio ("XM") on the order of hundreds of millions of dollars annually. . . Sirius' management independently considered the potential for synergies and cost savings from a merger with XM and also believe that there would be hundreds of millions of dollars in annual efficiencies.
>
> * * *
>
> [I]t is my professional opinion and belief that a merger of Sirius and XM will result in significant, ***cognizable synergies in every line item of the income statement that will benefit consumers*** and that are not achievable without this merger.

9

Decl. of Frear ¶ 35, Ex. D to Sirius XM's Joint Opposition to Petitions to Deny and Reply

Comments at 13 (FCC filing July 24, 2007) (emphasis added).  At the time of Frear's

declaration, he was Executive Vice President and Chief Financial Officer of Sirius. *Id.*

43.     The Application predicted that "[t]he synergies resulting from the merger will

allow the combined company to provide consumers *lower prices* and more programming

choices." Application at 9 (emphasis added).

44.     Sirius XM pledged that "no satellite radio subscriber will have to pay more . . . as

a result of the merger."  FCC Memorandum and Order (hereafter "FCC Order" or the "Order") at

11-12 (July 25, 2008); *see also* Sirius XM's Joint Opposition to Petitions to Deny and Reply

Comments at 13 (FCC filing July 24, 2007).

45.     Sirius and XM committed to the FCC that if the merger/transfer of licenses was

approved, the combined company would not raise prices:

> The combined company will not raise the retail price for its basic $12.95 per
> month subscription package, the a la carte programming packages . . . and the new
> programming packages . . . for thirty six months after consummation of the
> merger.

FCC Order at 88 (Appendix B, Applicants Voluntary Commitments submissions, June 13, 2008

letter); *see also* July 25, 2008 letter at 2.

46.     Sirius XM also promised that "[s]ubscribers will also be able to continue their

$6.99 multi-receiver subscriptions." Sirius XM's Joint Opposition to Petitions to Deny and

Reply Comments at 14 (FCC filing July 24, 2007).

47.     Sirius XM committed to the above pricing restrictions in order to persuade the

FCC and the public that the Sirius XM merger would not create a monopoly, lessen competition,

result in increased prices, or otherwise harm the consumer.

48.    In addition, Sirius XM committed to *increasing* subscriber choice. For example, Sirius and XM jointly committed that the merged company would provide an "a la carte" service that would allow subscribers to choose 50 channels (*i.e.*, a subset of the full menu) for a lower monthly fee than subscribers pay for the standard package. Thus, the combined entity was supposed to improve the range of available options at no additional cost to subscribers.

49.    As detailed below, the Company has exploited every opportunity to evade the price restrictions to which it agreed in order to prevent its abuse of monopoly power and has only marginally expanded the variety of choices available to subscribers. It has abused its monopoly power and will continue to do so absent intervention of this Court.

### 3.    FCC Approves License Transfer But Only With Conditions Limiting Price Increases

50.    Numerous parties, including consumer groups, submitted comments to the FCC arguing against approval of the Application. Many commentators noted that the voluntary conditions that Sirius and XM were proposing would be inadequate to protect consumers. As noted by FCC Commissioner Jonathan S. Adelstein, who voted against approval, "consumers [would] get a monopoly with window dressing," given the "gaping loopholes" in the voluntary commitments. FCC Order at 98-99.

51.    Over the objections of two dissenting Commissioners, as well as numerous consumer groups, the FCC approved the Application for the license transfer in the Order adopted on July 25, 2008, effectively clearing the way for the merger. Yet at the time, the FCC acknowledged the potential for abuse of the Company's newly-granted monopoly power:

> Based on the record before us, we conclude that the proposed transfer of control would violate our rule against one licensee controlling both SDARS licenses. We also conclude that, absent Applicants' voluntary commitments and other conditions discussed below, the proposed transaction would increase the likelihood of harms to competition and diversity. As discussed below, assuming a

11

satellite radio product market, ***Applicants would have the incentive and ability to raise prices*** for an extended period of time.

* * *

Applicants, however, have proposed significant voluntary commitments regarding steps the merged company would take to mitigate harms and achieve public interest benefits. ***We find that absent those voluntary commitments and other conditions, the harms of the transaction would outweigh the potential public interest benefits.***

FCC Order at 5 (emphasis added).

52.     Indeed, in light of the potential anticompetitive effect, the FCC conditioned the

approval of the license transfer on Sirius and XM's commitments to cap prices and limit costs

increases, making the merger "one of the most heavily-conditioned in FCC history." FCC Order

at 109.

53.     The FCC Order provides:

For the reasons given above, we assume that the relevant product market may be limited to SDARS, and therefore that it is likely that the merged entity will have an increased incentive and ability to raise prices above pre-merger levels and that this incentive and ability will grow stronger over time.

As discussed above, Applicants have argued, however, that due to the particular nature of demand for satellite radio services, the merged entity will have an incentive instead to lower prices. ***Several commenters dispute this argument, and instead predict that the merged entity will raise prices.*** For example, NAB states that SDARS is the relevant market, that the merger will lead to a monopoly, and that demand is relatively inelastic, so that the merged entity will be able to raise prices profitably. C3SR agrees with a narrow product definition, and raises concerns regarding higher prices, foregone benefits from price competition, increased advertising, and lower value overall. Similar concerns are raised by Common Cause, KEI, and AAI.

To address concerns about such potential price increases, Applicants have voluntarily committed to cap the retail prices on their basic subscription package and on the new programming packages that they voluntarily commit to offer. Specifically, Applicants voluntarily commit to not raise the retail prices on their basic $12.95 per month subscription package, their a la carte programming package, their "best of both" programming packages, their "mostly music" and their "news, sports, and talk" programming packages, and their discounted family-friendly programming package. Applicants voluntarily commit to these

12

price caps for at least 36 months after consummation of the merger. Notwithstanding the voluntary commitment, after the first anniversary of the consummation of the merger, the combined company may pass through cost increases incurred since the filing of the merger application as a result of statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees. The combined company will provide customers, either on individual bills or on the combined company's website, details about the specific costs passed through to consumers pursuant to the preceding sentence.

> ***We accept this voluntary commitment and conclude that it will mitigate the harm from any post-merger price increases***. In addition, Applicants may not reduce the number of channels in either their current packages or their new packages for three years. Some commenters submit that the price cap should be longer than three years, arguing that the potential harms will still remain at the end of the period. We do not know what the competitive landscape will be like in three years. Accordingly, six months prior to the expiration of the commitment period, the Commission will seek public comment on whether the cap continues to be necessary in the public interest. The Commission will then determine whether it should be modified, removed, or extended. ***We also note that Applicants voluntarily commit to a price cap, not a price freeze, and therefore retain sufficient flexibility to flow through to consumers any cost savings or other efficiencies resulting from the merger***.

FCC Order at 47-48 (emphasis added).

54.    The FCC Order thus implemented a self-imposed price cap for 36 months after the July 28, 2008 merger consummation, until July 28, 2011. Sirius XM did not, however, wait long before finding numerous ways to evade these constraints.

## V.    SIRIUS XM ABUSES ITS MONOPOLY POWER BY RAISING PRICES

55.    The merger of XM and Sirius gave Sirius XM monopoly power in the SDARS market in the United States. Sirius XM has abused this power and harmed consumers by substantially and profitably increasing prices three times within one year of the merger (including a price increase announced within six months of the merger). In spite of the FCC's attempts to forestall the inevitable impact of combining the only two companies in the market, the merged entity has already exhibited anticompetitive behavior that has harmed consumers. Plaintiff seeks to remedy this harm and prevent future abuses.

13

A.    **SIRIUS XM INCREASES VARIOUS SUBSCRIBER FEES BY MARCH 2009**

56.    By mid-March 2009, less than a year after the merger was completed, Sirius XM implemented its first price increases. Since the Company was bound by its commitments incorporated in the FCC Order not to increase its monthly base rate above the $12.95 cap, it needed other ways to increase its revenue. It therefore turned to the various fees that were not governed by the FCC Order and raised those instead. As explained below, Sirius XM's newly-acquired monopoly power has enabled the Company to increase prices above competitive levels, thereby harming the Company's subscribers.

1.    **Sirius XM Increases Prices To Multi-Receiver Subscribers By 29%**

57.    Before the merger, Sirius and XM offered multi-receiver subscription discounts that permitted subscribers to pay a reduced fee of $6.99 per month for each additional radio (for up to five total radios), rather than paying the full $12.95.

58.    In its efforts to persuade the FCC to approve the Application, Sirius XM promised not to increase the multi-receiver subscription prices above this level. Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 13 (FCC filing July 24, 2007). This promise was not, however, incorporated into the final conditions the FCC imposed. Thus, Sirius XM readily abandoned it.

59.    On January 25, 2009, just six months after the merger was approved, Sirius XM announced that it would increase the monthly price charged to multi-receiver subscribers. Effective March 11, 2009, Sirius XM increased the price by $2.00 per radio: from $6.99 to $8.99 per radio, a 29% increase.

60.    Upon information and belief, approximately 20% of Sirius XM subscribers are multi-receiver subscribers. Of its approximately 18.5 million subscribers, roughly 3.8 million have therefore been subject to this 29% increase for each additional receiver used. Sirius XM is

14

now earning approximately an additional $7.4 million per month (assuming the multi-receiver subscribers have one additional receiver and pay on a monthly basis), or nearly $89 million annually. Indeed, in Sirius XM's most recent quarterly earnings report, the Company attributes its increased revenues in part to the increase in multi-receiver fees.

**2.    Sirius XM Increases Prices For Internet Access For Existing Subscribers**

61.    Also effective March 11, 2009, Sirius XM began charging $2.99 for all subscribers accessing Sirius or XM programming via the internet. Prior to this time, this fee was only applicable for users accessing the programming via the high-quality 132 bkps connection. Sirius and XM users accessing the programming through the lower-quality 32 bkps or 64 bkps connections could do so for free.

62.    The Company's plan to increase prices was never disclosed to the FCC during proceedings relating to the approval of the merger. And the Company has provided no cost-based justification for the increases. Rather, as conveyed to a subscriber, "[f]or business reasons, XM began charging for the right to listen to our service on the Internet." Email from Joe Sarella, Chief Service Officer, Sirius XM, to Scott Greczkowski, http://www.multichannel.com/blog/The_Satellite_Dish/11674-Some_Sirius_ly_Good_News.php. In other words, the Company decided it could be more profitable by removing the free offering and replacing it with a service costing users another $2.99 per month, thereby increasing price and reducing choice. Sirius XM also attributed its increased revenue to this new fee – additional evidence that the Company possesses market power and has readily abused it.

**B.    SIRIUS RAISES PRICES UNDER THE GUISE OF A ROYALTY PASS-THROUGH**

63.    On July 29, 2009 (one year after the merger), Sirius XM used its monopoly power to raise prices by approximately 10%-28% by imposing a "U.S. Music Royalty Fee," which

Sirius XM's customer contract (the "Customer Agreement") states is a "pass-through" of only

the increase in music royalty fees that occurred during the period March 20, 2007 (when Sirius

and XM filed their request to the FCC to approve the transfer of broadcast licenses to the

combined Company) and July 29, 2009 (one year after the consummation of the merger).

However, the Royalty Fees appearing on subscribers' bills bear little relationship to the increase

in royalty rates that occurring during the period between March 20, 2007 and July 29, 2009.

Moreover, subscribers with different subscription plans are paying different rates, which would

not be the case if the Royalty Fee was simply a pass-through. In reality, Sirius XM has used the

Royalty Fee as a clever artifice to impose unilateral price increases on its subscribers, thereby

boosting its revenue, as evidenced by the fact that Sirius XM includes the Royalty Fees in "Other

revenue" on its consolidated statements of operations. *See* Sirius XM Radio Inc., (Form 10-Q),

at 37 (Nov. 5, 2009) ("Q2 2009 Form 10-Q").

### 1.    The Company Committed To Imposing Only A Limited Pass-Through Of Royalty Increases

64.    Pursuant to the FCC Order, Sirius XM's voluntary price cap leaves the door open

for one type of price increase – a limited pass-through of the *increase* in royalty rates Sirius and

XM paid to various parties in the music industry between the time the companies applied for

FCC approval of the license transfer and the time the license transfer necessary for the merger

was approved. In particular, the Order states:

> Notwithstanding the foregoing [agreement not to raise prices], after the first
> anniversary of the consummation of the merger, the combined company *may pass
> through cost increases* incurred since the filing of the combined company's FCC
> merger application as a result of statutorily or contractually required payments to
> the music, recording and publishing industries for the performance of musical
> works and sound recordings or for device recording fees. The combined company
> will provide customers, either on individual bills or on the combined company's
> website, specific costs passed through to consumers pursuant to the preceding
> sentence.

FCC Order at 88-89 (emphasis added). Purportedly in compliance with these conditions, beginning on July 29, 2009, Sirius imposed the Royalty Fee on all plans initiating or renewing after that date.

65.    The FCC Order refers to music royalties when using the terms (quoted in the preceding paragraph) "payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees." Sirius XM pays two types of music royalties relating to the performance of music on its satellite broadcasts: (1) royalties for the performance of the sound recording ("sound recording royalties"); and (2) royalties for the performance of the musical works, including the lyrics and musical composition ("musical works royalties"). Sirius XM does not pay music royalties for programming that has only incidental (or no) music, such as the shows on talk radio, news, and sports channels, including the talk radio programming that is provided to subscribers of the Sirius XM "Plus" packages.

66.    Section 102 of the Copyright Act of 1976 (the "Copyright Act") identifies various categories of works that are eligible for copyright protection. 17 U.S.C. § 102. These include "musical works" and "sound recordings." *Id.* at §§ 102(a)(2) & 102(a)(7). The term "musical work" refers to the notes and lyrics of a song, while a "sound recording" results from "the fixation of a series of musical, spoken, or other sounds." *Id.* at § 101. Thus, a recorded song will constitute a "sound recording" by the entity that records the performance, and a "musical work" by the songwriter. Typically, a record label owns the copyright in a sound recording and a music publisher owns the copyright in a musical work.

**2.      Sirius XM's Royalty Fees Are Not Charged At A Consistent Rate,
And Therefore Cannot Be Simply A Pass-Through Of Costs**

67.      Sound recording and musical works royalties are paid as a percentage of music-related gross revenue, which generally includes subscription fees and advertising revenue derived from music channels.[2] Thus, for any Sirius or XM subscription plans offering primarily music programming, the royalty rates Sirius and XM pay to the music industry – and hence charge their subscribers via the FCC-sanctioned pass-through – should be a consistent percentage.

68.      However, as shown in the chart below, the current Royalty Fees differ depending on the subscribers' choice of plan.  While subscribers to the Sirius or XM basic plan pay a rate of approximately 15% per month, some subscribers pay a rate as low as roughly 10%, while others pay more than 28%.

---

[2] Sirius and XM also pay royalties relating to the sale of portable recording devices.  These royalties are not part of the Royalty Fee.

**Table 1**
**Royalty Fee and Rates According To Subscription Plan**

| Subscription Plan | Subscription Price ($) | Royalty Fee ($) | Royalty Fee as % of Plan Price |
|---|---|---|---|
| XM Everything (Basic) | 12.95 | 1.98 | 15.29% |
| XM Everything Family Friendly | 11.95 | 1.83 | 15.31% |
| XM Everything Plus* | 16.99 | 1.98 | 11.65% |
| XM Everything Plus Family Friendly* | 14.99 | 1.83 | 12.21% |
| XM Mostly Music | 9.99 | 1.53 | 15.32% |
| XM Multi-Receiver (per add'l radio) | 8.99 | 0.97 | 10.79% |
| Sirius Everything (Basic) | 12.95 | 1.98 | 15.29% |
| Sirius Everything Family Friendly | 11.95 | 1.83 | 15.31% |
| Sirius Everything Plus* | 16.99 | 1.98 | 11.65% |
| Sirius Everything Plus Family Friendly* | 14.99 | 1.83 | 12.21% |
| Sirius Mostly Music | 9.99 | 1.53 | 15.32% |
| Sirius Multi-Receiver (per add'l radio) | 8.99 | 0.97 | 10.79% |
| Sirius A la Carte Gold | 14.99 | 1.98 | 12.21% |
| Sirius A la Carte | 6.99 | 1.98 | 28.33% |

* The Royalty Fees on the "Plus" plans are less than 15.3% of the subscription price *only* because those plans include basic subscription packages with music programming "plus" talk radio shows, which are not subject to the Royalty Fee. Thus, the subscription prices are higher but the dollar amount of the Royalty Fee is not, resulting in a Royalty Fee that is a lower percentage of the total subscription price.[3]

69.    Sirius XM does not provide an explanation why it charges a Royalty Fee of

28.3% of the subscription price of the Sirius A La Carte Plan, while charging a Royalty Fee of

only 12.21% for the A La Carte Gold plan.  Nor does the Company explain why it charges a

Royalty Fee of 15.29% for the Sirius Everything Plan, while charging a Royalty Fee of 10.79%

---

[3] For example, subscribers of the XM Everything Plus and Sirius Everything Plus plans pay $12.95 for the same music programming that is available on the XM Everything and Sirius Everything plans, as well as $4.04 for the non-music talk radio programming, for a total of $16.99.  Because the non-music talk radio programming is not subject to a music royalty fee, Sirius XM cannot apply the Royalty Fee to the $4.04.  Instead, the Royalty Fee is $1.98, the same Royalty Fee that the Company charges for the $12.95 Everything plans.  So, although the percentage of the "Plus" plans' *total* subscription price attributable to the Royalty Fee is only 11.65%, the Royalty Fee as a percentage of the subscription price attributable to music programming (*i.e.*, $12.95) remains 15.3%, *i.e.*, the same percentage as the Everything plans.  Accordingly, even for the "Plus" plans, the Royalty Fees greatly exceed the amounts that Sirius XM is permitted to charge pursuant to its Customer Agreements and the FCC Order.

per additional radio under the Multi-Receiver Plan.[4]  Moreover, as shown below, the Royalty

Fees far exceed the increase in royalty rates that Sirius XM is now paying for sound recording

and musical work royalties.  Thus, the Company is using the new Royalty Fee as a subterfuge to

unilaterally raise subscription prices and, with no other SDARS service providers in the market

to challenge this practice, subscribers have no choice but to pay the supracompetitive prices.

> **3.   The Royalty Fees Charged To Subscribers Far Exceed The Actual Increase In Royalties That Sirius XM Is Entitled To Pass Through**
>
> > **a.   Sirius XM Incurred A 0.5% Increase In Sound Recording Royalty Rates**

70.     Prior to the merger, Sirius and XM both paid the same or substantially the same

sound recording royalties and musical works royalties, which were calculated and paid as a

percentage of music related gross revenue.

71.     Effective January 1, 2007, the royalty rate paid by Sirius and XM for the

performance of sound recordings was 6% of music related gross revenues.  This rate was

established by the Copyright Royalty Board on January 24, 2008.  *See* Determination of Rates

and Terms for Preexisting Subscription Services and SDARS, 73 Fed. Reg. 4080, 4084 (Jan. 24,

2008) ("CRB Determination").

72.     Before the Copyright Royalty Board established the rate for 2007, for accounting

purposes, XM and Sirius established a 2007 royalty rate for the performance of sound recordings

of 4.0% to 4.2%.  *See Id.* at 4098.

73.     Effective January 1, 2009, the royalty rate paid by Sirius XM for the performance

of sound recordings increased to 6.5% of music related gross revenues. *Id.*

---

[4] As discussed above, *see* Section V.A.1, *supra*, the multi-receiver subscription plans had already suffered an increase in price of 29% before the implementation of the Royalty Fee.  The total price increase to multi-
*(Cont'd)*

74.    The increase in royalty rates for sound recordings paid by Sirius and XM between March 20, 2007 and July 29, 2009 was thus only 0.5%.

75.    The 0.5% increase in royalty rates for sound recordings during the period March 20, 2007 and July 29, 2009 is the only royalty rate increase mandated by a decision of the Copyright Royalty Board.

> **b.    Sirius XM Incurred Minor Increases in Musical Works Royalty Fees**

76.    The royalty rates Sirius and XM have paid for the performance of musical works are not set by the Copyright Royalty Board but instead are determined pursuant to private negotiations between the users (*i.e.*, Sirius and XM) and the copyright holders (*i.e.*, the music publishers or songwriters), which are not made public.

77.    On information and belief, in 2007, Sirius and XM paid a musical works royalty fee of approximately 4% of music related gross revenue.

78.    On information and belief, by July 29, 2009, the royalty rate paid by Sirius and XM for the performance of musical works increased to not more than 6.5% of music related gross revenues

79.    The Copyright Royalty Board determined that royalty rates for musical works are generally substantially less than royalty rates for sound recordings. *Id.* at 4089-90. Thus, on information and belief, if the royalty rate was 6.5% for the performance of sound recordings in 2009, the royalty rate for musical works paid by Sirius XM was not more than that amount. *Id.*

---

subscription plans since the merger is 42%.

80.    On information and belief, the increase in royalty rates for the performance of musical works paid by Sirius and XM between March 20, 2007 and July 29, 2009 was thus no more than 2.5%.

### c.    The Royalty Fee Is Greater Than A Pass-Through Of Royalty Cost Increases Since March 20, 2007

81.    Table 2 below summarizes the royalty rates Sirius and XM paid in 2007 and 2009, as detailed above, and the increases from 2007 to 2009.

**Table 2**
**Royalty Rates Paid To Industry**

| Year | Sound Royalty Rate | Musical Works Royalty Rate[5] | Total Royalty Rate |
|------|--------------------|-------------------------------|--------------------|
| 2007 | 6% | 4% | 10% |
| 2009 | 6.5% | 6.5% | 13% |
| | | | |
| **Increase** | **0.5%** | **2.5%** | **3%** |

82.    The combined increase in royalty fees for musical works and sound recordings for the period March 20, 2007 through July 29, 2009 was no more than 3% (0.5% increase for sound recording royalties, and no more than a 2.5% increase for musical works).  Thus, according to its Customer Agreements and commitments to the FCC, Sirius XM is only entitled to charge its subscribers a Royalty Fee equal to 3% of music-related gross revenue.[6]

---

[5] The Musical Works Royalty Rates in Table 2 are set forth on information and belief based on actual information relating to the musical works rates in 2006, actual sound recording royalty rates for 2006-2009, Sirius and XM's accounting practices for the 2007 year before the CRB determination, and the fact that musical works royalty rates generally are less than sound recording royalty rates.

[6] The 2007 sound recording royalty rates were implemented retroactively.  To the extent Sirius XM claims it is entitled to look at the rates that it accounted for before the CRB Determination, the relevant rates were 4%-4.2%. Together with the 4% musical works rate, the total would have been 8%-8.2%.  The increase from these rates to the 2009 total royalty rate of no more than 13% is 4.8%-5%, which is still far less than the increase in royalty rates claimed by Sirius XM when imposing the Royalty Fee.

83.     Sirius XM currently charges Royalty Fees of 10% - 28% of subscription revenue – well above the rates the Company would be charging if it were simply passing through the approximately 3% increase in royalties since March 20, 2007, as set forth in the FCC Order and required by the Customer Agreements.  Indeed, even if Sirius XM were entitled to charge a Royalty Fee equal to *all* the Company's royalties paid to the music industry (as opposed to charging only the increases in such fees paid since March 20, 2007), the Royalty Fee would still be excessive.

84.     Further, the Company pays royalties only on its gross revenue *attributable to music programming*, which differs from the Company's gross revenue.  Gross revenue for purposes of calculating music royalty fees does not include sales and use taxes, shipping and handling, credit card, invoice, and fulfillment service fees.  *See* 37 CFR § 382.11 (identifying those payments and fees that are excluded when calculated gross revenue for purposes of determining royalty fees).  Gross revenue for purposes of calculating music royalty fees also does not include subscription revenue used to pay royalties.[7]  Therefore, to the extent that the subscription prices include amounts to cover expenses for music royalties; sales and use taxes; shipping and handling; and credit card, invoice, and fulfillment fees, Sirius XM would pay no royalties on such amounts and accordingly is not entitled to charge a Royalty Fee on such amounts.  Thus, if the Company uses $1.00 of the $12.95 basic subscription price to pay for music royalties; sales and use taxes; shipping and handling; and credit card, invoice, and fulfillment fees, the $1.98 Royalty Fee charged to subscribers choosing this plan actually

---

[7] Because both Sirius and XM had previously been absorbing the cost of royalty payments, those pre-existing royalty fees – like the various other fees, taxes, and charges – are properly excluded from the gross music-related revenue that is used to calculate the royalty payments due to the music industry, and, accordingly, the Royalty Fees the Company *should* be charging its subscribers.

constitutes 16.6% ($1.98/$11.95) of the music-related revenue – even more than the 15.29% calculated in Table 1 above. As this example shows, the values shown in Table 1 therefore are likely to *understate* the actual percentage of music-related revenue the Company is charging its subscribers. Accordingly, these values also *understate* the magnitude of the overcharge that subscribers are paying with the current Royalty Fees.

85.    In addition to music programming subscription revenue, gross revenue for the purposes of calculating royalty fees includes advertising revenue generated for music programming. Thus, for example, Sirius XM's gross revenue for purposes of calculating royalty rates includes a small portion of the approximately $47 million in advertising revenue Sirius XM reported in 2008. Most of this advertising revenue is generated from non-music programming (such as the talk radio channels), and therefore should not be included in the gross revenue calculations for determining the royalties owed. However, even adding all that revenue to the gross revenue pool and allocating it among the Company's 18 million subscribers, each subscriber's share of that advertising revenue is only $2.54 annually or roughly 22 cents per month, which would only minimally impact the calculation of the rate each subscriber is paying for her Royalty Fee. In other words, if Sirius XM adds 22 cents to each subscription price to calculate the gross revenue, the same 22 cents should be added to the subscription price to calculate the rate being charged for the Royalty Fee. For example, a subscriber with the basic $12.95 plan paying a $1.98 Royalty Fee would actually be paying the same $1.98 Royalty Fee on a total of $13.17 ($12.95 plus $0.22). Including the advertising revenue, the subscriber would be paying a Royalty Fee of 15.03%, compared to the 15.29% rate the subscriber is paying on the $12.95 base rate alone – a negligible difference. And even with the advertising revenue

included, such a subscriber would still be paying far more than the 3% that the Company is entitled to pass through to the subscribers.

86.     Moreover, the impact of any appropriate upward adjustments to include the advertising revenue in the gross revenue would be mitigated, or even completely reversed, by any appropriate downward adjustments to the total revenue (per subscriber) from the amounts subtracted for the various taxes and fees.

87.     In sum, although the calculated rates for the Royalty Fee in Table 1 may not represent the precise percentage of music-related gross revenue that each subscriber is being charged, any discrepancies would not change the fact that Sirius XM is charging substantially more than the 3% it would be charging for a straight-forward pass-through, and that it is taking advantage of its monopoly status by doing so.

### 4.     Sirius XM Makes False And Deceptive Statements To Its Subscribers And The Public About The Music Royalty Fee

88.     Sirius XM provides in its Customer Agreement and claims to its subscribers and the public that the Royalty Fee is a "pass-through" of costs that is consistent with the FCC Order, which provides that "the combined company may pass through cost *increases* incurred since the filing of the merger application ." FCC Order at 47 (emphasis added).

89.     Sirius XM's billing statements imposing the Royalty Fee direct subscribers to a website, which purports to explain the fee:

> U.S. Music Royalty Fee – Radio subscriptions which include music channels will be charged a fee per paid month of your plan term. For details see FAQs, xmradio.com/usmusicroyalty.

90.     The Sirius XM Customer Agreement states the following:

U.S. Music Royalty Fee: As of July 29, 2009, new and renewing Subscription Packages which include music channels will be charged a U.S. Music Royalty Fee. For further details on how this fee is calculated see FAQs [hyperlink directing subscriber to Sirius XM website U.S. Music Royalty Fee page].

91.    The billing statements and customer agreements provide almost no information about the Royalty Fee other than directing the subscriber to the Sirius XM website.

92.    The Sirius XM website Royalty Fee page, which is incorporated into the Sirius XM Customer Agreements, provides:

**U.S. Music Royalty Fee**

Effective July 29, 2009, a U.S. Music Royalty Fee has been added to subscriber invoices. Details about the specific costs being passed through to subscribers in this U.S. Music Royalty Fee are provided below.

**1. Why does Sirius XM pay music royalties?**

Music royalty rights were established by Congress and are the product of the Copyright Act. Unlike terrestrial radio, both Sirius and XM are required to pay copyright music royalties to recording artists, musicians and recording companies who hold copyrights in sound recordings (the actual recording of a work). These royalties have risen dramatically as a result of a decision of the Copyright Royalty Board. Like terrestrial radio, Sirius and XM must also pay music publishers who hold copyrights in musical compositions (or the lyrics and music) through their collective organizations, ASCAP, BMI and SESAC. These fees have also risen since March 2007. Finally, Sirius and XM must also pay certain copyright owners to facilitate the recording of content on portable devices.

**2. Who is the Copyright Royalty Board?**

The Copyright Royalty Board consists of three Copyright Royalty Judges who determine rates and terms for statutory copyright licenses that are set forth in the Copyright Act. These administrative judges are appointed by the Librarian of Congress.

**3. Who benefits from the U.S. Music Royalty Fee?**

100% of *the U.S. Music Royalty Fee will be used to offset payments* from Sirius and XM to the music industry.

**4. How is the U.S. Music Royalty Fee calculated**?

We are *passing along the increases* in our costs attributable to statutorily or contractually required payments to the music, recording and publishing industries

26

for the performance of musical works and sound recordings or for device recording fees since March 20, 2007, the date on which we applied to the FCC to approve the merger.

**5. Do all Sirius XM subscribers pay the same fee?**

All subscribers who receive a given package containing music pay the same fee. ***We believe charging each Sirius XM subscriber the same fee most equitably apportions the increased fees to subscribers.*** Note: some packages, such as News, Sports and Talk contain little music and are not subject to the U.S. Music Royalty Fee.

**6. How much is the U.S. Music Royalty Fee?**

The fee is $1.98 a month on our base $12.95 subscriptions and $.97 for base plans that are eligible for a second radio discount. Your actual fee may vary depending upon the Package and Plan term you choose.

**7. Will I have to pay the U.S. Music Royalty Fee on the free months I received for buying an annual plan?**

No, free months do not incur any U.S. Music Royalty Fees.

**8. When will I pay the U.S. Music Royalty fee?**

For plans renewing after July 28, 2009, the fee will be automatically added to your next bill. There will be no change to your current plan and that plan will remain in effect without change until your next renewal date.

**9. Is the U.S. Music Royalty Fee applied to activations and other fees?**

No.

**10. Do you anticipate further price increases or additional fees in the near future?**

No. We are committed to providing our customers the best value for their entertainment dollar.

**11. Is this fee consistent with Sirius XM's merger commitment not to raise prices for three years?**

Yes. This fee is consistent with our commitment not to raise the base price of specific service plans for three years after the merger. ***The FCC decision approving the merger between Sirius and XM permits the companies beginning July 29, 2009 to pass through to subscribers any increases in music royalties since March 20, 2007***, the day the companies first asked the FCC to approve the merger. The U.S. Music Royalty Fee implements this FCC decision.

27

http://www.xmradio.com/about/musicroyalty.xmc; and http://www.sirius.com/usmusicroyalty (emphasis added).

93.     The information provided to the public and Sirius XM's customers and incorporated into its Customer Agreements is false, deceptive and misleading because Sirius XM is not "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007." Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007.

94.     Sirius XM's contractual provisions and statements to its subscribers are false and deceptive because not all subscribers receiving more than incidental music content pay the same fee.

95.     Sirius XM's contractual provisions and statements to its subscribers are false and deceptive because the Royalty Fee does not implement the FCC's Order relating to the pass-through of cost increases. The Royalty Fee imposed on Sirius XM customers is substantially greater than the "pass-through" of certain "cost increases" set forth in the FCC Order. *See* FCC Order at 47.

96.     Sirius XM has required its customer service representatives to systematically provide deceptive and erroneous information to subscribers that the Royalty Fee complies with the FCC Order; that Sirius XM has paid and absorbed the royalty fee increases up until July 29, 2009, pursuant to the FCC Order; and that the Royalty Fee is a passing along of the increased royalty fees beginning July 29, 2009 as outlined in the FCC Order.

28

97.     Sirius XM has required its customer service representatives to provide deceptive and false information to customers by informing them that the amount of the Royalty Fee is due to royalty rate increases mandated by the Copyright Royalty Board.  In fact, the royalty increases mandated by the Copyright Royalty Board do not come close to correlating with the increased pricing to Sirius XM customers resulting from the Royalty Fee.

98.     Sirius XM's customer service representatives also have provided information to subscribers that the Royalty Fee is expected to increase by 0.5% each year through 2012; and that under applicable tax regulations, the Royalty Fee is a taxable charge.

## VI.    SIRIUS XM HAS FAILED TO INCREASE CONSUMER CHOICE BY ADDING A LA CARTE PROGRAMMING, AS PROMISED

99.     The FCC Order states that Sirius XM has committed to offer within one year of the merger a $6.99 per month "a la carte" programming option providing 50 channels for both XM and Sirius system users.  FCC Order at 11 (*citing* Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 11-14 (FCC filing July 24, 2007)).  The Company has failed to meet that commitment.  As a result, subscribers have yet to see the increased consumer choice that was promised.  Additionally, the imposition of the Royalty Fee of $1.98 on top of the $6.99 base rate amounts to more than a 28% price increase – another instance of the newly-constituted monopoly's price-gouging.

100.    Thus far, only Sirius subscribers have any a la carte option.  While XM subscribers also should have been offered such plans within one year of the merger, these subscribers are still waiting.

101.    Moreover, the a la carte plan is only available to consumers who purchase one of only two available radio receivers:  the Sirius Starmate 5 and the Stratus 6.  The manufacturers' suggested retail price ("MSRP") for these two models are substantially higher than the prices for

29

other satellite radios. Radios that existed at the time of the merger application, at the time of the

merger approval, and at the time of the merger's closing, cannot receive a la carte programming

and therefore users of such radio cannot take advantage of a la carte pricing. Additionally,

automotive manufacturers ("OEMs") do not install either the Starmate 5 or the Stratus 6 into

their automobiles.

102.    Thus the overwhelming number of subscribers – XM subscribers, those who still

use radios purchased before the merger, those who use radios installed by OEMs, those who

chose to purchase less expensive radios than the Starmate 5 or Stratus 6 – have no access to the a

la carte discounted pricing.

103.    Additionally, Sirius XM agreed to cap the price of the 50-channel a la carte

programming (*i.e.*, the basic a la carte option, compared to the 100-channel "a la carte gold

option") at $6.99 per month with no increase for three years after the merger. But for those

Sirius subscribers who chose the a la carte option when it was introduced in the fall of 2008, that

$6.99 monthly rate was only available until July 2009, before the Company tacked on the $1.98

Royalty Fee, thereby increasing the price of that plan by roughly 28%.

104.    In addition, the la carte programming, in reality, is a tiered bundling of reduced

total programming options, which costs more on a channel-by-channel basis than the packages

offered before the merger.

## VII.    SIRIUS XM HAS A MONOPOLY IN THE U.S. SDARS MARKET, WHICH IT HAS USED TO THE DETRIMENT OF CONSUMERS

105.    The merger of Sirius and XM into Sirius XM constitutes a willful acquisition and

maintenance of monopoly power that was not the result of growth, or development as a

consequence of a superior product, business acumen, or historic accident. The merger created a

monopoly in the market of SDARS in the United States. The only provider of SDARS in the

United States is the merged entity, Sirius XM. The high barriers to entry prohibit any new competitor from offering consumers lower cost alternatives. Contrary to the DOJ's assumption, Sirius XM has proven that it can profitably impose a significant and non-transitory increase in price that is above the competitive level on consumers in the SDARS market.

106. The anticompetitive effects of the merger and monopoly power vested in the combined entity Sirius XM are, among other things:

a. Eliminating the expected actual, direct, and substantial competition between Sirius and XM;

b. Establishing and maintaining Sirius XM's monopoly of SDARS in the United States;

c. Enabling Sirius XM to exercise monopoly power in the relevant market;

d. Eliminating the competitive constraint that competition between Sirius and XM placed (and would have continued to place) on the price of SDARS in the United States; and

e. Substantially increasing the price of SDARS above competitive levels in the United States.

A.    THE RELEVANT PRODUCT MARKET IS SATELLITE DIGITAL AUDIO RADIO SERVICE IN THE UNITED STATES

107. The relevant product market relating to the antitrust claims is the market for SDARS in the United States.

108. SDARS offers consumers superior programming and benefits over terrestrial radio (*i.e.*, traditional AM/FM radio) or mp3 devices. SDARS is not reasonably interchangeable with radio, mp3 devices, or other products that provide music listening functions.

109. SDARS signals cover millions of square miles, provide consumers with better reception and with less distortion, enable consumers to listen to programming seamlessly without

31

regard to geographic borders or remoteness, and provides other superior benefits to the

consumer, including:

- Commercial free programming with fewer interruptions;
- Superior diversity and variety of programming including programming dedicated to music (of dozens of types for different eras), children, sports, talk and entertainment, religion, education, news, traffic, weather, adult, emergency services, and television simulcasts;
- Programming of public importance and interest (for example, during the 2008 presidential campaign, both Sirius and XM had a channel dedicated solely to the campaign and its issues – POTUS '08);
- Programming that has much less censorship; and
- Programming that is a simulcast of cable television broadcasts, such as CNN and Fox News.

110.    Sirius XM Radio has content relationships with an array of personalities and

artists, many of which are exclusive arrangements, including Howard Stern, Martha Stewart,

Oprah Winfrey, Jimmy Buffett, Jamie Foxx, Barbara Walters, Opie & Anthony, Bubba the Love

Sponge®, The Grateful Dead, Willie Nelson, Bob Dylan, Tom Petty, and Bob Edwards.

111.    Sirius XM is the leader in sports programming as the Official Satellite Radio

Partner of the NFL, Major League Baseball®, NASCAR®, NBA, NHL®, and PGA TOUR®,

and broadcasts major college sports.

112.    Sirius XM Radio also offers Sirius Backseat TV, the first ever live in-vehicle rear

seat entertainment featuring Nickelodeon, Disney Channel and Cartoon Network; XM

NavTraffic® service for GPS navigation systems delivers real-time traffic information, including

accidents and road construction, for more than 80 North American markets.

113.    As detailed below, contrary to the prediction contained in the DOJ Statement,

Sirius XM has been able to profitably sustain a significant and nontransitory increase in price in

the SDARS market in the United States, absent price discrimination.

114.    Contrary to the prediction contained in the DOJ Statement, Sirius XM also has been able to profitably impose discriminatory pricing against targeted multi-receiver and OEM subscribers.

115.    The market for SDARS includes high barriers to entry due to the great capital expenditures in the provision of satellites and broadcasting licenses.  It took XM over four years from the $90 million purchase of satellite radio spectrum in April 1997, to the time that XM began broadcasting in September 2001.  It took Sirius almost five years from the $83 million purchase of the satellite radio spectrum in April 1997, to the time that Sirius began broadcasting in February 2002.  Sirius and XM each invested over $5 billion to: (1) develop and upgrade its network and satellites; (2) design chipsets and radios capable of receiving its service; (3) subsidize the cost of such chipsets and radios to encourage their distribution; (4) develop subscriber-based management systems and other information technology; (5) market its brand; and (6) create compelling programming for subscribers.

116.    The FCC Order makes clear that there are significant barriers to entry, including the absence of available spectrum for a potential competitor to acquire:

> As discussed below, assuming a satellite radio product market, *Applicants would have the incentive and ability to raise prices for an extended period of time*.  This is more likely given the spectrum and cost barriers which prevent entry by new SDARS providers that could offer consumers an alternative outlet for satellite radio service.  In particular, additional spectrum is not available at this time without spectrum divestiture, which we have determined is inappropriate in light of the considerable financial investment needed to successfully operate an SDARS service, as well as the technical complications that might result from such divestiture.  Additionally, *the regulatory and other business aspects involved in the start-up of such a cost-intensive operation make effective competitive entry unlikely within any relevant time horizon*.

FCC Order at 5 (emphasis added).

117.    The high barriers to entry make it impossible, at any time in the next four years, for a competitor to enter the market of SDARS in the United States to compete with Sirius XM.

**B.    SIRIUS XM HAS PROFITABLY SUSTAINED THE INCREASED PRICES TO SDARS CONSUMERS**

118.    In evaluating a proposed merger, the DOJ and Federal Trade Commission use guidelines for defining the relevant market, and determining whether the proposed merger would threaten competition by giving the merged entity a significant concentration in the relevant market. In these guidelines, the relevant market is defined as the narrowest group of products that would allow a hypothetical monopolist to profitably impose a "small-but-significant-and-nontransitory-increase-in-price" ("SSNIP"), which is generally a five percent increase. As detailed below, Sirius XM has imposed significant-and-nontransitory-increases-in-prices over the past year, thus confirming that it is indeed a monopolist.

119.    The Company's second quarter ending June 30, 2009, was the first quarter measuring the effects of the internet access and multi-subscription price increases. Additionally, Sirius XM announced during this quarter that it would begin charging the Royalty Fee as of July 29, 2009. Despite these implemented and planned price increases, Sirius XM suffered only a 1% net decline in the number of subscribers, and recorded a 4% increase in revenues. This performance is particularly impressive in light of the condition of the United States economy during this period. In contrast, Sirius XM's advertising revenue decreased 33% during this period when compared to the prior year.

120.    The Company's performance was even better during the third quarter, ending September 30, 2009 – the first quarter measuring effects of the 10%-28% price increases imposed by the Royalty Fee. Sirius XM actually increased subscribers by 0.6% (102,295 subscribers) during this period, and revenues increased by 2% over the previous quarter.

121.    Sirius XM's quarterly report for the period ending September 30, 2009 stated:

34

> The increase in revenue was due mainly to ***increased rates*** on multi-subscription packages, revenues earned on internet packages, ***the introduction of the U.S. Music Royalty Fee*** and the sale of "Best of" programming.

Q2 2009 Form 10-Q at 39 (emphasis added).

122.    Sirius XM also has reduced its equipment subsidies, discounts and promotions since the merger resulting in a substantial reduction in its Subscriber Acquisition Cost. The reduction in subsidies, discounts and promotions effectively increases prices to Sirius XM's subscribers.

123.    Thus despite Sirius XM's various price increases, the Company has enjoyed increased subscribers, increased revenue and increased profitability. In short, Sirius XM has demonstrated that it can – and will – impose a significant price increase (well over the 5% considered by the DOJ in its merger analysis) and remain profitable. Accordingly, Sirius XM has also shown that it has monopoly power in the SDARS market, which it is already using to the detriment of its subscribers.

## VIII.   NAMED PLAINTIFF SUFFERED DAMAGES DUE TO THE ANTICOMPETITIVE CONDUCT AND FALSE, DECEPTIVE, AND ILLEGAL ACTS OF SIRIUS XM

124.    Plaintiff Carl Blessing is a Florida resident who began paying a monthly subscription fee for Sirius SDARS service in January 2006. He subsequently purchased two additional radios (for family members), beginning an annual subscription in March 2006 and another in June 2006.

125.    Blessing subscribes to the $12.95 basic monthly ("Sirius Everything") subscription plan and two multi-receiver plans for two additional radios. The two additional radios renew on an annual basis. Blessing was charged the increased multi-subscription $8.99 pricing when he renewed the two multi-subscription annual plans on March 25, 2009 and June 25, 2009.

126.    Blessing renews his Sirius Everything $12.95 plan monthly.  On or about August 28, 2009, Blessing was charged for and began paying the $1.98 monthly Royalty Fee for his monthly subscription.

127.    Blessing has paid the monthly Royalty Fee as part of his subscription payment since August 2009.

128.    Blessing has suffered damages due to Sirius XM's increased prices and illegal conduct.

## IX.    CLASS ALLEGATIONS

129.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and others similarly situated.  The "Class" is defined as follows:

> All persons or entities who reside in the United States and who were parties to an agreement with Sirius Satellite Radio, Inc., XM Satellite Radio Holdings, Inc., Sirius XM Radio Inc. or their affiliated entities for the provision of satellite digital audio radio services during the relevant period of July 28, 2008 through the present.

130.    The following persons shall be excluded from the Class: (1) all persons or entities that make a timely election to be excluded from the proposed Class; (2) governmental entities; and (3) the judge(s) to whom this case is assigned and any immediate family members thereof.

131.    Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

132.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

133.    **Numerosity Under Rule 23(a)(1):** The members of the Class are so numerous that individual joinder of all the members is impracticable.  Sirius XM reported that, as of September 30, 2009, it had 18,515,730 subscribers.  Upon information and belief, over half of

these subscribers already have been improperly and illegally billed for the Royalty Fee, and have paid the Royalty Fee. Plaintiff believes that approximately 20% of the subscribers are subject to the $2.00 per multi-subscription radio monthly fee implemented in March 2009. Plaintiff believes that thousands of subscribers have been illegally charged $2.99 for internet access.

134. **Commonality Under Rule 23(a)(2):** This action involves common questions of law and fact, including, but not limited to, the following:

a.       Whether the merger resulted in a substantially lessening of competition and/or the possession by Sirius XM of monopoly power;

b.       Whether the definition of the relevant market is SDARS in the United States, or some other relevant market;

c.       Whether, through the conduct alleged herein, Defendants willfully acquired, maintained and enhanced monopoly power over SDARS in the United States;

d.       Whether, and to what extent, Defendants' conduct caused Class members to pay supracompetitive prices and, thereby, to suffer antitrust injuries;

e.       Whether Sirius XM's imposition of the Royalty Fee is a pass-through of cost increases incurred since the filing of the March 20, 2007 merger application as a result of statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees;

f.       Whether Sirius XM breached its contracts, governed under New York law, with subscribers by charging the Royalty Fee;

g.       Whether Sirius XM made material, false, deceptive and/or misleading statements and disclosures about the identity, type, purpose, and method of calculation of the Royalty Fee; and

h.      Whether Sirius XM's conduct constitutes unfair, illegal, deceptive and/or fraudulent business practices.

135.    **Typicality Under Rule 23(a)(3):**  The named Plaintiff's claims are typical of, and not antagonistic to, the claims of the members of the Class.  Plaintiff and the members of the Class he seeks to represent have been deceived and damaged by Sirius XM's unlawful and deceptive conduct.

136.    **Adequacy of Representation under Rule 23(a)(4):** Plaintiff will fairly and adequately protect the interests of the members of the Class, and the representative Plaintiff's interests are coincident with and not antagonistic to those of the other class members he seeks to represent.  Plaintiff has retained competent counsel to represent him and the Class.

137.    **The Class Can Be Properly Maintained Under Rules 23(b)(1)(A) and (B):**

Prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

138.    **The Class Can Be Properly Maintained Under Rule 23(b)(2):** Sirius XM has acted or refused to act, with respect to some or all issues presented in this Complaint, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

139.    **The Class Can Be Properly Maintained Under Rule 23(b)(3):** Questions of law common to the members of the Class predominate over any questions affecting only individual members with respect to some or all issues presented in this Complaint.  A class

38

action is superior to other available methods for the fair and efficient adjudication of this

controversy. Individual litigation of the claims of all class members is impracticable because the

cost of litigation would be prohibitively expensive for each class member and would impose an

immense burden upon the courts. Plaintiff has no knowledge of pending litigation already begun

by or against class members asserting the same claims that are asserted herein. The conduct of

this action as a class action, with respect to some or all of the issues presented in this Complaint,

presents fewer management difficulties, conserves the resources of the parties and of the court

system, and is the only means to protect the rights of all class members.

## COUNT I
### (Unlawful Acquisition of Monopoly Power
### in Violation of Clayton Act § 7)

140.    Plaintiff incorporates by reference all allegations of all prior paragraphs as though

fully set forth herein.

141.    This Count I is brought on behalf of the Class.

142.    The merger of Sirius and XM was a stock acquisition within the meaning of

Section 7 of the Clayton Act, 15 U.S.C. § 18.

143.    The effect of this acquisition has been to substantially lessen competition and to

create or maintain a monopoly in SDARS in the United States, in violation of Section 7 of the

Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

144.    SDARS in the United States is the relevant product and geographic market for

determination of violations of the Clayton and Sherman Act counts herein. SDARS is not

reasonably interchangeable with radio, mp3 devices, or other products that provide music

listening functions in the United States.

145.    The high barriers to entry make it impossible, at any time in the next four years,

for a competitor to enter the market of SDARS in the United States to compete with Sirius XM.

146. Sirius XM has and controls 100% market share of the SDARS market in the United States.

147. As a result of Sirius's, XM's, and Sirius XM's conduct in violation of Section 7 of the Clayton Act, Plaintiff and members of the Class have been injured and have paid artificially inflated prices above competitive levels for SDARS in the United States.

### COUNT II
### (Unlawful Acquisition of Monopoly Power in Violation of Sherman Act § 2)

148. Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

149. This Count II is brought on behalf of the Class.

150. Since the July 28, 2008 merger, Sirius XM has had monopoly power in the sale of SDARS in the United States.

151. Sirius XM willfully obtained and maintained its monopoly power by merging the only two providers of SDARS in the United States.

152. SDARS in the United States is the relevant product and geographic market for determination of violations of the Clayton and Sherman Act counts herein. SDARS is not reasonably interchangeable with radio, mp3 devices, or other products that provide music listening functions in the United States.

153. Sirius XM now has and controls 100% market share in the SDARS market in the United States.

154. The high barriers to entry make it impossible, at any time in the next four years, for a competitor to enter the market of SDARS in the United States to compete with Sirius XM.

155.    As a result of securing their monopoly power as described above, Sirius XM was able to, and did, profitably raise the prices of SDARS by substantial amounts to noncompetitive levels and has maintained those prices at or above those levels since 2008.

156.    As a result of Sirius's, XM's, and Sirius XM's illegal conduct, Plaintiff and the Class were injured and paid substantially more than they would have paid in a competitive market for SDARS.

157.    During the relevant period, Plaintiff and other Class members purchased substantial amounts of SDARS.  As a result of Sirius's, XM's, and Sirius XM's illegal conduct alleged herein, Plaintiff and other Class members paid artificially inflated prices for SDARS.

158.    There are no legitimate pro-competitive justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

159.    Sirius XM's acts and practices are anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT III
### (Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing)

160.    Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

161.    This Count III is brought on behalf of the Class.

162.    Each Class member was a party to a Customer Agreement with Sirius XM or its predecessors under which Sirius XM agreed to provide SDARS.  Although the Customer Agreements are form contracts that were revised by Sirius XM from time to time, each of them is substantially in the form of the "Sirius XM Terms and Conditions," attached hereto as Exhibit A.

41

163. Each and every Customer Agreement is governed by a choice of law provision mandating application of the law of the State of New York.

164. Each Sirius XM Customer Agreement incorporates the FAQs of the Sirius XM websites http://www.xmradio.com/about/musicroyalty.xmc; and http://www.sirius.com/usmusicroyalty.

165. Every contract, including each of the Sirius XM Customer Agreements, imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

166. By overbilling the subscribers for the Royalty Fee and providing false and deceptive information about the billing statements, Sirius XM has breached the Sirius XM Customer Agreements.

167. Plaintiff and the Class have suffered monetary damages in the form of such fees and charges described above.

## COUNT IV
### (Breach of State Consumer Protection Statutes)

168. Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

169. This Count IV is brought on behalf of the Class.

170. Plaintiff and the Class are "persons" within the meaning of New York GBL §349(h) and all other relevant consumer protection statutes.

171. GBL §349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

172. As alleged herein, Sirius XM engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in and from New York in violation of GBL §349(a) and all other relevant consumer protection statutes.

42

173.    Sirius XM knew or should have known that its acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiff and the Class.

174.    Plaintiff and the Class have been injured as a result of Sirius XM's violation of GBL § 349(a), and the following other state consumer protection statutes, which also provide a basis for redress to Plaintiff and the Class based on Sirius XM's false, fraudulent, deceptive, unfair and unconscionable acts, practices and conduct:

175.    Sirius XM's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the following jurisdictions:

a.      **Alaska:**  Sirius XM's practices were and are in violation of Alaska's Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq.*

b.      **Arizona:**  Sirius XM's practices were and are in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*

c.      **Arkansas:**  Sirius XM's practices were and are in violation of Arkansas Code Ann. § 4-88-101, *et seq.*

d.      **California:**  Sirius XM's practices were and are in violation of California's Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*, California's False Advertising Act, Business and Professions Code Section 17500, and the California Consumer Legal Remedies Act, Civil Code Section 1750, *et seq.*

e.      **Colorado:**  Sirius XM's practices were and are in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*

f.      **Connecticut:**  Sirius XM's practices were and are in violation of Connecticut's Gen. Stat. § 42-110a, *et seq.*

43

g.    **Delaware:** Sirius XM's practices were and are in violation of Delaware's Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511, *et seq.*; and the Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2531, *et seq.*

h.    **District of Columbia:** Sirius XM's practices were and are in violation of the District of Columbia's Consumer Protection Act, D.C. Code § 28-3901, *et seq.*

i.    **Florida:** Sirius XM's practices were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, F.S.A. §501.201, *et seq.*

j.    **Georgia:** Sirius XM's practices were and are in violation of the Georgia's Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370, *et seq.*

k.    **Hawaii:** Sirius XM's practices were and are in violation of the Hawaii's Uniform Deceptive Trade Practices Act, Haw. Rev. Stat. § 481A-1, *et seq.* and Haw. Rev. Stat. § 480-2.

l.    **Idaho:** Sirius XM's practices were and are in violation of Idaho's Consumer Protection Act, Idaho Code Ann. § 48-601, *et seq.*

m.    **Illinois:** Sirius XM's practices were and are in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2; and the Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2.

n.    **Indiana:** Sirius XM's practices were and are in violation of Indiana's Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*

o.    **Kansas:** Sirius XM's practices were and are in violation Kansas's Consumer Protection Act, Kan. Stat. Ann. § 50-623, *et seq.*

p.    **Kentucky:** Sirius XM's practices were and are in violation of Kentucky's Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*

q.   **Maine:**  Sirius XM's practices were and are in violation of Maine's Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, § 205-A, *et seq.* and Maine's Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. Tit. 10, § 1211, *et seq.*

r.   **Maryland:**  Sirius XM's practices were and are in violation of Maryland's Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq.*

s.   **Massachusetts:**  Sirius XM's practices were and are in violation of Massachusetts' Consumer Protection Act, Mass. Gen. Laws ch. 93A, *et seq.*

t.   **Michigan:**  Sirius XM's practices were and are in violation of Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*

u.   **Minnesota:**  Sirius XM's practices were and are in violation Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*; and the Unlawful Trade Practices law, Minn. Stat. § 325D.09, *et seq.*

v.   **Missouri:**  Sirius XM's practices were and are in violation of Missouri's Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

w.   **Nebraska:**  Sirius XM's practices were and are in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*; and the Uniform Deceptive Trade Practices Act, § 87-302, *et seq.*

x.   **Nevada:**  Sirius XM's practices were and are in violation of Nevada's Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598.0903 and. 41.600.

y.   **New Hampshire:**  Sirius XM's practices were and are in violation of New Hampshire's Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*

z.    **New Jersey:**  Sirius XM's practices were and are in violation of New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*

aa.    **New Mexico:**  Sirius XM's practices were and are in violation of New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*

bb.    **North Carolina:**  Sirius XM's practices were and are in violation of North Carolina's Unfair Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1, *et seq.*

cc.    **North Dakota:**  Sirius XM's practices were and are in violation of North Dakota's Unlawful Sales or Advertising Practices law, N.D. Cent. Code § 51-15-01, *et seq.*

dd.    **Ohio:**  Sirius XM's practices were and are in violation of Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.*; and Ohio's Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01, *et seq.*

ee.    **Oklahoma:**  Sirius XM's practices were and are in violation of Oklahoma's Consumer Protection Act , Okla. Stat. Ann. tit. 15 § 751, *et seq.*, and Oklahoma's Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78 § 51, *et seq.*

ff.    **Oregon:**  Sirius XM's practices were and are in violation of Oregon's Unlawful Trade Practices law, Or. Rev. Stat. § 646.605, *et seq.*

gg.    **Pennsylvania:**  Sirius XM's practices were and are in violation of Pennsylvania's Unfair Trade Practice and Consumer Protection law, 73 Pa. Stat. Ann. § 201-1, *et seq.*

hh.    **Rhode Island:**  Sirius XM's practices were and are in violation of Rhode Island's Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*

ii.    **South Carolina:**  Sirius XM's practices were and are in violation of South Carolina's Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*

   jj. **South Dakota:**  Sirius XM's practices were and are in violation of South Dakota's Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws § 37-24-1, *et seq.*

   kk. **Texas:**  Sirius XM's practices were and are in violation of Texas' Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*

   ll. **Utah:**  Sirius XM's practices were and are in violation of Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.*, and Utah's Truth in Advertising Law, Utah Code Ann. § 13-11a-1, *et seq.*

   mm. **Vermont:**  Sirius XM's practices were and are in violation of Vermont's Consumer Fraud Act, Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

   nn. **Virginia:**  Sirius XM's practices were and are in violation of Virginia's Consumer Protection Act, Va. Code Ann. § 59.1-198, *et seq.*

   oo. **Washington:**  Sirius XM's practices were and are in violation of Washington's Consumer Protection Act, Wash. Rev. Code 19.86, *et seq.*

   pp. **West Virginia:**  Sirius XM's practices were and are in violation of West Virginia's Consumer Credit and Protection Act, W. Va. Code § 46A-1-101, *et seq.*

   qq. **Wisconsin:**  Sirius XM's practices were and are in violation of Wisconsin's Consumer Act, Wis. Stat. §421.101, *et seq.*

   rr. **Wyoming:**  Sirius XM's practices were and are in violation of Wyoming's Consumer Protection Act, Wyo. Stat. Ann. §40-12-101, *et seq.*

 176. Sirius XM violated the aforementioned state unfair and deceptive act and practices laws by charging an excessive fees in violation of their contractual rights and statutory

and common law, and by providing false and deceptive statements and billing statements to Plaintiff and the Class relating to the Royalty Fee.

177.    As a result of Sirius XM's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and the Class were damaged, will continue to be damaged, and are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs, and other injunctive or declaratory relief as deemed appropriate.

178.    As a result of Sirius XM's violations, Sirius XM has been unjustly enriched to the extent that it has collected excessive fees from Plaintiff and members of the Class.  Further, Plaintiff and the members of the Class have suffered monetary damages in the form of such fees and charges described above.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays for relief and judgment as follows:

A.    For an order certifying this action as a class action on behalf of the Class described above;

B.    For restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiff and members of the Class;

C.    For damages according to proof;

D.    For an award of treble damages under applicable law;

E.    For an award of punitive damages under applicable law;

F.    For a preliminary or permanent injunction, as the Court may deem proper;

G.    For an award of attorneys' fees as appropriate pursuant to the above cited statutes;

H.    For costs of suit herein incurred;

I.      For both pre- and post-judgment interest on any amounts awarded;

J.      For corrective advertising to ameliorate consumers' mistaken impressions created by Sirius XM's prior advertising and website statements; and

K.      For such other and further relief as the Court may deem proper.

Dated: December 7, 2009          **GRANT & EISENHOFER P.A.**


Jay W. Eisenhofer
James J. Sabella
Shelly L. Friedland
485 Lexington Avenue
New York, NY 10017
Tel.: 646-722-8500
Fax: 646-722-8501

- and -

Reuben Guttman
1920 L. Street NW
Suite 400
Washington, DC 20036
Tel.: 202-386-9500


**COOK, HALL & LAMPROS, LLP**
Edward S. Cook
Christopher B. Hall
P. Andrew Lampros
Promenade Two, Suite 3700
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel.: 404 876-8100
Fax: 404 876-3477

*Attorneys For Plaintiff*

49

# EXHIBIT A

**En Espanol**

# TERMS AND CONDITIONS

**Last Updated:  October 1, 2009**

Thank you for choosing SIRIUS Satellite Radio ("SIRIUS"). These are the terms and conditions ("Terms"), which apply to your paid, trial or other subscription in the United States ("Subscription") to the SIRIUS Satellite Radio service (the "Satellite Radio Service") and/or SIRIUS Internet Radio ("Internet Radio") and/or any Equipment Technology (as defined below) relating thereto.   The Satellite Radio Service, Internet Radio, our traffic and weather, including marine weather, and any other programming, data and Equipment Technology for radio, television, online, portable, wireless, mobile, and other receivers now known or later developed ("Receivers"), will be collectively referred to herein as the "**Service**." These Terms will remain in effect until modified or terminated.  Services will be provided to you for the period agreed to by you and will continue to renew for additional terms of same length on the same billing terms until canceled, terminated or discontinued by you or by us.   Please keep this copy of these Terms for your records.

Our Privacy Policy governs the treatment by SIRIUS of both anonymous and personally identifiable information that we collect when you use this website or our Internet Radio online media player (the "Site") and when you provide information to us in any medium for our Services, or any other services we may offer.  Be sure to read our Privacy Policy.   Our Privacy Policies for SIRIUS Radio and XM Radio are identical.   For information on how information is gathered and used at **www.sirius.com** or through our Internet Radio Service please see our privacy policy found at **www.sirius.com/privacypolicy**.

PLEASE READ THESE TERMS OF SERVICE CAREFULLY BEFORE ACCESSING OR USING OUR WEBSITE OR OUR SERVICES.  BY ACCESSING OR USING OUR WEBSITE OR SERVICES, YOU AGREE TO BE LEGALLY BOUND BY THESE TERMS OF SERVICE.  PLEASE DO NOT USE OUR WEBSITE OR SERVICE IF YOU DO NOT AGREE WITH THESE TERMS OF SERVICE.

IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR SUBSCRIPTION. IF YOU DO NOT CANCEL YOUR SUBSCRIPTION WITHIN 3 BUSINESS DAYS OF ACTIVATION OF YOUR RECEIVER, IT WILL MEAN THAT YOU AGREE TO THESE TERMS WHICH WILL BE LEGALLY BINDING ON YOU.

**A.  CONTACT INFORMATION**: You may contact SIRIUS Customer Care Monday through Saturday from 8AM through 11PM ET and Sunday from 8AM to 8PM, by calling 1-888 539-7474, or by writing to: SIRIUS XM Radio, 1221 Avenue of the Americas, New York, NY 10020, Attention: Customer Care.

**B.  CHANGES IN TERMS AND SERVICE:**

**1.  Changes To Terms**: SATELLITE AND INTERNET TECHNOLOGY AND THE APPLICABLE LAWS, RULES, AND REGULATIONS CHANGE FREQUENTLY. ACCORDINGLY, WE RESERVE THE RIGHT TO CHANGE THESE TERMS AT ANY TIME. ANY CHANGES OR MODIFICATIONS WILL BE EFFECTIVE UPON POSTING OF THE REVISIONS ON OUR WEBSITE REFLECTING THE NEW EFFECTIVE DATE. YOUR CONTINUED USE OF THE SERVICE FOLLOWING THE POSTING OF THE CHANGES OR MODIFICATIONS ONLINE WILL CONSTITUTE YOUR ACCEPTANCE OF SUCH CHANGES OR MODIFICATIONS. YOU SHOULD FREQUENTLY REVIEW THESE TERMS (INCLUDING THE EFFECTIVE DATE) AND APPLICABLE POLICIES FROM TIME TO TIME TO UNDERSTAND THE TERMS THAT APPLY TO YOUR USE OF THE SERVICE AND/OR USE OF THE WEBSITE.

Other than with respect to programming changes referenced in subsection 2 below, if we make any material changes that, in our judgment, would have an adverse effect on your use of the Service, we will either post a notice on our website that these Terms have changed and the effective date of such change, provide you a notice describing such changes and their effective date, in the manner described in Section J.1. below, or send you revised Terms.  In the event of any potential conflict between these Terms and the terms of any other offer for the Service, these Terms will govern.

**2. Change To Programming:** The Service consists of a wide variety of music, sports, news, talk, children's and other entertainment programming. Many different and changing considerations affect the availability, cost and quality of programming and customer demand. Accordingly, we reserve the unrestricted right to change, rearrange, add, or delete programming, including canceling, moving or adding particular channels, at any time, with or without notice to you. You always have the right to cancel your subscription to the Service if you do not accept any change. Your continued use of the Service following any programming changes will constitute your acceptance of such changes.

**C. <u>USE OF SERVICE</u>:**

**1. Eligibility For Use of Service:** You must be at least 18 years old, or the age of majority, as determined by the laws of your state of residency, to assume the obligations set forth in these Terms.

**2. Service Area:** We offer the Satellite Radio Service solely in the 48 contiguous United States, the District of Columbia, and Puerto Rico (together, our "Service Area"), although we might expand our Satellite Radio Service in the future. This is the Service Area for SIRIUS. XM does not currently broadcast satellite radio service into Puerto Rico. (Satellite radio reception in Puerto Rico is best in the Greater Metropolitan Area of San Juan and may not be available in other areas. Puerto Rico residents should consult SIRIUS Customer Care for the most current reception information. SIRIUS|XM Internet Radio Service is available in all areas of Puerto Rico.) If your address is not in our Service Area, your Receiver will not be able to be activated to receive the Satellite Radio Service. We reserve the right to verify any address you provide. Satellite radio service is also available in Canada; see www.siriuscanada.ca or www.xmradio.ca for details.

**3. Internet Radio:** You may listen to our Internet Radio Service on one single internet enabled device at one time. If you have multiple Subscriptions to the Service, you may be eligible to receive an additional Internet Radio online listening account (username/password) for each such Subscription. You should not provide your username and password to any third party and have the obligation to protect your username and password from unauthorized use. You will not be able to access Internet Radio unless your account for your Subscription is in good standing and you are in compliance with these Terms. Certain devices designed to work with our Internet Radio Service may require a separate subscription. Not all content offered on our Satellite Radio Service is available on our Internet Radio Service and vice versa. We may or may not offer the same content on all of our platforms of the Service. Similarly, not all content offered on any of the XM or SIRIUS Services is available through the other modes of distribution of XM or SIRIUS programming (such as through our internet, satellite TV, wireless, or other distribution affiliates we may engage from time to time). We do not make or install any of the physical equipment, Internet connectivity or web browser software or other hardware or software you may use to receive our Internet Radio Service ("Web Devices"). Our Internet Radio Service may be unavailable or interrupted from time to time for a variety of reasons, such as unavailability or difficulties with the Internet generally or your web browser, computer, home wiring, or Internet service provider and/or other things that we cannot control. Our Internet Radio Service functions best when streamed over a broadband connection. We do not guarantee continuous, uninterrupted or secure access to the Internet Radio Service and are not responsible for any noise and/or interruptions that occur.

**4. Personal Use of the Service:** We provide the Service only for your personal, non-commercial enjoyment. You may not make commercial use of, reproduce, rebroadcast, or otherwise transmit our programming, or record, charge admission for listening to or distribute play lists of our programming. Neither our Internet Radio Service nor any Recorded Content (defined below) is intended for commercial use. If you use any Service for commercial purposes, we reserve the right to charge you our commercial rate retroactively to the beginning of your Subscription. We or any of our programming providers may prosecute violations of the foregoing against you and other responsible parties in any court of competent jurisdiction. You assume all responsibility for use of this website. You agree that any person using your identification issued for the website will be treated by us as having been authorized by you to access your information as contained on the website, and take any other actions on your behalf. You will indemnify and hold harmless SIRIUS XM Radio Inc. and its affiliated companies from all damages, costs, expenses, liabilities

and claims incurred by them arising out of any action taken by any person or entity using your username/password on this website. You also waive all claims against SIRIUS XM Radio Inc., its officers, directors, employees, suppliers and programmers that may arise from the utilization of this website. At the end of each online session you should completely log out of the Service. Should your login ID or username/password be lost, stolen, sold, transferred or otherwise removed from your possession without your permission, contact us immediately so that your personal identifiers may be deactivated and reissued. You also may not attempt to override or circumvent any of our usage rules, limitations, or security measures embedded into our Service or any radio or Receiver.

**5. Recorded Content:** Certain types of our radios and Receivers have the ability to record programming transmitted over the Service ("Recorded Content"). Subject to your radio's restrictions and applicable laws, you may access such Recorded Content only as long as you pay your monthly subscription fee. We reserve the right to change, reduce, eliminate or charge a fee for this and/or related functionality.

**6. Service Interruptions:** Service may be unavailable or interrupted from time to time for a variety of reasons, such as environmental or topographic conditions and other things, many of which we cannot control. Service might also not be available in certain places (e.g., in tunnels, parking garages, or within or next to buildings) or near other technologies. Home, portable and office-based Receivers function best when the antenna is placed in or near a south-facing window with a clear view of the sky. Even if your antenna is near a south-facing window, certain window treatments could interfere with reception. We are not responsible for any noise and/or interruptions of the Service.

**7. Service Cancellation:** We reserve the right to cancel your Subscription at any time if you fail to pay amounts owing to us when due, violate or breach any of these Terms, or for any other reason in our sole discretion. If your Subscription is cancelled, you will still be responsible for payment of all outstanding balances accrued through the cancellation date, including any fees described herein. See also: D.4. "Loss of Equipment," F.2. "Automatic Renewal," F.8. "Cancellation Fee," F.9. "Service Credits," and G. "Cancellation."

**8. Service Choices:** We provide Subscriptions in a variety of programming packages which might suit your listening preferences, and we refer to them throughout as "Packages." Examples of Packages are "SIRIUS Everything PLUS The Best of XM," "Family Friendly," "Mostly Music," and "A La Carte Gold." We also offer Subscriptions in a variety of convenient recurring payment plans which might suit your needs, and we refer to them throughout as "Plans." Examples of our Plans are "Monthly," "Quarterly," "Annual," "Two Year," and "Five Year." Not all Plans are available for all of our Packages but when longer Plans are offered they are often priced to provide a discount.

**9. Lifetime Subscription Plan:** A "Lifetime Subscription" is one that continues for the life of the Receiver equipment. A Lifetime Subscription is not transferable if it is associated with a Receiver installed by an automaker or an automotive dealer in a vehicle, except in the event the original Receiver associated with that Lifetime Subscription is stolen, accidentally damaged or if, in the sole discretion of SIRIUS XM Radio Inc., it is defective. A Lifetime Subscription associated with a home, portable, or dock & play Receiver is transferable from one Receiver to another Receiver, up to a maximum of three (3) times. Each permitted transfer of a Subscription is subject to a transfer fee. If you transfer a Lifetime Subscription from one Receiver to another or from one person to another, you will be charged a transfer fee. The current transfer fee is set forth in these Terms. No transfer fee will be charged for the transfer of a Lifetime Subscription associated with a Receiver installed by an automaker or an automotive dealer if, in the sole discretion of SIRIUS XM Radio Inc., the Receiver is defective. Lifetime Subscriptions are nonrefundable. You may cancel a Lifetime Subscription but if you cancel during the first year of service you will be charged a cancellation fee set forth in these Terms.

**10. Advisory Nature of Services; User Responsibility; User Safety/Reliance; Parental Control:** In your use of the Service it is your responsibility to exercise prudent discretion and observe all safety measures required by law and your own common sense. All actions and judgments taken with respect to the Service are your sole responsibility. You assume the entire risk related to your use of the Service. The Service may include traffic, weather, marine weather, and other content and emergency alert information and data, and you acknowledge and agree that such information and data is not for "safety for life," but is merely supplemental and advisory in nature, and therefore cannot be relied upon as safety-critical in connection with any aircraft, sea craft, automobile, or any other usage. SIRIUS programming and on-air advertising is provided "as is" and "as available" and SIRIUS disclaims any and all warranties, express and/or implied, with respect thereto or the transmission or reception thereof. Neither SIRIUS nor WSI Corporation ("WSI") makes any representations or warranties with respect to the reliability,

predictive value or accuracy of the information contained within the Service, and neither SIRIUS nor WSI shall be responsible for inaccurate, omitted, delayed, or erroneous information, and do not warrant the accuracy, reliability, completeness or timeliness, of any information disclosed on the Service. You further acknowledge and agree that the Service may be interrupted due to adverse weather or other conditions and that neither SIRIUS nor WSI shall have any liability for such interruptions. You are urged to verify the contents of the Service against other sources prior to use. You acknowledge and agree that under no circumstances should a user of this Service make decisions based solely or primarily on traffic or weather information contained within the Service. Neither SIRIUS nor WSI assumes any responsibility for accidents resulting from or associated with use and/or misuse of the Service.

In addition, some programming may include explicit language. It is your responsibility to impose listening restrictions that you consider appropriate on your family members and guests. We are not responsible for content that you or anyone else may find inappropriate. Please contact Customer Care to discuss options for channel blocking.

**11. Business Commercial Subscribers (Radio Service only):** Details for our commercial subscribers can be found in the FAQs area of this website.

**12. Interactive Services:** We may provide an opportunity for users to exchange information, ideas and opinions on our website. Information, ideas and opinions posted by users do not necessarily reflect the views of SIRIUS XM Radio Inc. We do not assume responsibility or accept liability for the accuracy of any information, ideas and opinions posted by users. We are not liable for any claims, damages or losses resulting from any information, ideas and opinions posted by users. You authorize us to use and publish any materials that you post on this website in any manner we choose and without any obligation to compensate you or anyone else. If you post any materials on our website, you will not:

- Harass, defame, intimidate or threaten another user;
- Interfere with another user's rights to privacy;
- Distribute chain letters, surveys or contests;
- Post any material that is defamatory (i.e., disparaging to the reputation of an individual or business);
- Post any material that is obscene or indecent;
- Post any trademarks, logos or copyrighted material without the authorization of the owner;
- Post any materials that may damage the operation of a computer (such as a virus, worm or Trojan horse); or
- Advertise or sell any goods or services.

**D. RECEIVERS AND OTHER EQUIPMENT:**

**1. Authorized Suppliers:** You may access and use the Service only with equipment authorized to receive the Service. However, we do not manufacture or install any of the Receivers or related equipment, including antennas, adapters, adhesive devices, cables, etc. ("Equipment") you must use to receive the Service. You must purchase your Receiver and Equipment, and any repairs, parts, installation or service, from an authorized seller or manufacturer and the Receiver and/or Equipment will be subject to the applicable seller's or manufacturer's return policy and the manufacturer's warranty, if any. We are not liable for any damage to your personal or real property, including without limitation, your vehicle, home or other property, resulting from installation or use of any Receiver or Equipment. Unless you purchased your Equipment or Receiver through one of our direct channels (such as through our website), we are not responsible for the advertising, statements, practices, promises or services of sellers, installers, or manufacturers of Equipment or Receivers. You should consult your owner's manual or the packaging for important information regarding warranties related to Receivers and Equipment. If you have any complaints about your Receiver, Equipment or installation, you should direct them to the seller, manufacturer or installer. Returns of Receivers and Equipment are subject to your authorized seller's, manufacturer's or installer's return policy.

**2. Internet Radio:** We provide only the online Service. You must purchase your computer, laptop, alternate Web Device, modem or router, and Internet service and/or any other appropriate hardware and/or software, from appropriate sellers, resellers, manufacturers or service providers. We are not responsible for and do not warrant any Web Devices in any way whatsoever and are NOT responsible for the advertising, statements, practices, promises, services or warranties of such sellers, manufacturers or installers. If you have any complaints about your Web Device, you should direct them to the applicable seller, reseller, manufacturer, or service provider.

**3. Multiple Receivers:** Each Subscription to the Satellite Radio Service is tied to one Receiver. If you want to have the Satellite Radio Service on multiple Receivers, you must purchase a separate

Subscription for each Receiver although all of your Subscriptions may be combined on a single account.  Such additional subscriptions may be eligible for reduced rates which may be offered by us from time to time and a per radio activation fee may apply.

**4.  Loss of Equipment**: Because your Satellite Radio Service Subscription is tied to a particular Receiver, if your Receiver is lost, stolen, sold or otherwise transferred you must cancel or suspend your Subscription or you will remain responsible for the payment obligations for your Satellite Radio Service under the terms of your Subscription, regardless of your use of the Satellite Radio Service.

**5.  Right to Transfer a Subscription**: Satellite Radio Service Subscriptions (other than Lifetime Subscriptions) are transferable from one Receiver to another. A LIFETIME SATELLITE RADIO SUBSCRIPTION (WHICH IS A SUBSCRIPTION THAT CONTINUES FOR THE LIFE OF THE RECEIVER) IS NOT TRANSFERABLE IF IT IS ASSOCIATED WITH A RECEIVER INSTALLED BY AN AUTOMAKER OR AN AUTOMOTIVE DEALER IN A VEHICLE, EXCEPT IN THE EVENT THE ORIGINAL RECEIVER ASSOCIATED WITH THAT LIFETIME SATELLITE RADIO SUBSCRIPTION IS STOLEN, ACCIDENTALLY DAMAGED OR, IN OUR SOLE DISCRETION, IS DEFECTIVE. A LIFETIME SATELLITE RADIO SUBSCRIPTION ASSOCIATED WITH A HOME, PORTABLE OR DOCK & PLAY RECEIVER IS TRANSFERABLE FROM ONE RECEIVER TO ANOTHER RECEIVER, UP TO A MAXIMUM OF THREE TIMES. Permitted transfers of Satellite Radio Service Subscriptions are subject to a transfer fee, as set forth herein.

**E.  INTELLECTUAL PROPERTY RIGHTS**:

**1.  Technology:**  It is prohibited to, and you agree that you will not, and you agree that you shall not, copy, decompile, disassemble, reverse engineer, make derivative works of or manipulate any technology or data or content stored or incorporated in any equipment (including Receivers) used to receive the Service (collectively, "Equipment Technology"), or otherwise modify or tamper with, any such equipment. You also agree not to upload, post, transmit or otherwise make available any material that contains software viruses or any other computer code, files, or programs designed to interrupt, disable or limit the functionality of this website or the Internet Radio Service. AMBE® voice compression software included in certain products or the Service is protected by intellectual property rights including patent rights, copyrights, and trade secrets of Digital Voice Systems, Inc. The software is licensed solely for use within certain products or the Service.  Furthermore, the music, talk, news, entertainment, data and other content on the Service are protected by copyright and other intellectual property laws and all ownership rights remain with the respective content and data service providers. You are prohibited from any export of the data (or derivative thereof) except in compliance with applicable export laws, rules and regulations.  The user of this or any other software contained in a SIRIUS or XM Radio or our website and/or all hardware and/or software used in connection with either is explicitly prohibited from attempting to copy, decompile, reverse engineer, hack, manipulate or disassemble the object code, or in any other way convert the object code into human-readable form.  You may use the Equipment Technology only for your personal, non-commercial use in connection with the Service.

**2.  Content:**  All music, programming, text, software (including source and object codes), data, information, visual, oral or other digital material, and all other content of any description available on our website or included in any Service we offer and/or in Equipment Technology (collectively, the "Content"), and all worldwide copyrights, trademarks, service marks, patents, patent registration rights, trade secrets, know-how, database rights and all other rights in or relating to the Content (collectively, the "Intellectual Property") are either owned by SIRIUS XM Radio Inc., XM Satellite Radio Inc., or are the property of our licensors and suppliers who have given us permission to use it.  Neither your access to and use of the Service nor these Terms grant you any right, title or interest or license in or to any such Content, and you may not use such Content without the express written permission of the owner(s).   Certain real-time traffic data and map data is provided by NAVTEQ, a service of NAVTEQ North America, LLC, to which the following notice applies:  © 2009 NAVTEQ.  You may download one copy of the Content to any single computer for your personal, non-commercial home use only, provided that you keep intact all copyright and other proprietary notices.  You may not otherwise reproduce, perform, distribute, display or create derivative works from the Content.   You may only use the Content and the Intellectual Property, access our website and use any services we provide through our website as expressly permitted in these Terms of Service and for no other purposes.

**3.  Trademarks**:  SIRIUS Satellite Radio®, the dog logo, and SIRIUS Internet Radio® are trademarks, service marks or registered marks of SIRIUS XM Radio Inc. ("Marks"). Other trademarks, service marks, graphics, logos and domain names appearing on the Service or the website may be the trademarks of third parties. Neither your access to and use of the Service or website nor these Terms grant you any right, title or interest or license to reproduce or otherwise use the Marks or any third-party trademarks, service marks, graphics, logos or domain names. Any goodwill in the Marks generated as a result of your use of the Service will inure to our benefit. You shall not at any time, nor shall you assist others to, challenge our right, title, or interest in or

to, or the validity of, the Marks or any other intellectual property rights of SIRIUS.

**4. Copyright:** If you are authorized to act on behalf of a copyright owner, and any material on our website infringes on the rights of the owner, please notify our designated agent:

> SIRIUS XM Radio Inc.
> Attention:  Legal Department
> 1221 Avenue of the Americas, 37th Floor
> New York, NY 10020
> Fax:  (212) 584-5353

To be effective, your notification must provide us with information that meets the requirements of the U.S. Copyright Act, which are summarized as follows:

- A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;
- A detailed identification of the copyrighted work or works claimed to have been infringed;
- Information sufficient to permit us to locate the allegedly infringing material;
- Information sufficient to permit us to contact you, such as an address, telephone number or email address;
- A statement that you have a good faith belief that the use of the allegedly infringing material in the manner complained of is not authorized by the copyright owner, its agent or the law;
- Your sworn statement that the information in your notification is accurate; and
- Your sworn statement that you are authorized to act on behalf of the copyright owner of the allegedly infringing material.

**5.  Internet Radio:** You may not rebroadcast our Internet Radio Service in any way. You may play our Internet Radio Service through speakers or headphones for your personal listening pleasure. You may not make any recordings of, or otherwise duplicate, the content provided by our Internet Radio Service. In addition, you may not re-transmit or otherwise distribute the content provided by our Internet Radio Service in any way, including online streaming such content or making such content available for download. You may not re-skin, re-package, decompile, reverse engineer, disassemble our Internet Radio Service, or construct a media player or interface that accesses our Internet Radio Service.  In addition, your use of any products or services that access our Internet Radio Service and which are provided by third parties not authorized by us constitutes a violation of these Terms, even if you did not create such product or services and/or do not understand how they were created.

**F.  PAYMENT:** In return for receiving the Service, you agree to pay us as follows:

**1.  Subscription Fee:** You must pay in advance by credit card or debit card. You may also pay in advance by electronic funds transfer ("EFT").  You may combine payment with, as applicable, a SIRIUS or XM Prepaid Subscription card. You may also pay by check or money order. If you pay by check or money order you will receive an invoice by mail and will be required to make your first payment before your Subscription is activated.  Please do not include comments or questions with your check or money order payment.  If paying by check or money order against invoices, mail all payments to the address contained on your invoice and include your SIRIUS Account Number on your check or money order:

> SIRIUS XM Radio Inc.
> PO Box 78211
> Phoenix AZ 85062-8211

By sending your completed, signed check to us, you authorize us to copy your check and to use the account information from your check to make a one-time electronic fund transfer from your account for the same amount as the check.  Funds will be withdrawn from your account within 24 hours and you will not receive your check back from your financial institution.  The electronic fund transfer from your account will be on the account statement you receive from your financial institution.

**2. Automatic Renewal:** Your Subscription will continue for the length of the initial term you select on your Plan ("Subscription Term") and  at the end of your prepaid Subscription Term, it will automatically renew for another prepaid period of the same length unless you choose to cancel

prior to that renewal, or your Service is cancelled, terminated, or discontinued by you or by us, or you select a different Plan.  Your account will automatically be charged (or you will be billed, as applicable) at the rates in effect at the time of renewal.  We may, at our option, process your renewal on a month-to month basis instead of your chosen Subscription Term.

**3.  Changes in Fees**: Our fees and other charges are subject to change without notice.

**4.  Change of Address or Account Information**: You must notify Customer Care immediately of any change in your name, billing address, service address, email address, telephone number, credit card or other account information.

**5.  Statements**: If you are not using an electronic method of payment, we will send you a statement for the billing plan you selected.  If you elect to pay by check or money order, we may charge you a fee of up to $2.00 per invoice.  Otherwise, billing statements will be provided only upon request. If you would like to receive a statement for a particular period, please contact Customer Care. Please include the name and service address on your account in your letter. Statements will show: (1) payments, credits, purchases and any other charges to your account, (2) your account balance, and (3) the payment due date.

**6.  Payments**: All payments must be made in U.S. dollars. We do not accept recurring payment plans from cards issued by Canadian Card Issuers nor any gift cards issued by Visa, MasterCard, American Express or Discover.  These types of cards may only be used for one-time payments to us.  Your outstanding balance is due in full each payment period. Undisputed portions of your account must be paid by the due date to avoid a late fee and possible deactivation of the Service. No "payment in full" notation or other restrictive endorsement written on your payments will restrict our ability to collect all amounts owing to us.  We expect you to pay your account balance on time.  If you are delinquent in any payment to us, we reserve the right to suspend or terminate your Subscription, deactivate your Receiver immediately and report any late payment or non-payment to credit reporting agencies.   If your account is past due, and if we deactivate your Service, we will prorate your Subscription and amounts owed to us and will apply your pre-payments to past due amounts and any remaining credit to future obligations.

**7.  Taxes**: You are responsible for all taxes or other government fees and charges, if any, which are assessed based on the Service address on your account.

**8.  Fees**: We will charge you one or more of the following fees, all of which are subject to change without notice:

- **Activation Fee**:  For each Receiver on your account, we may charge you a one-time fee to activate, reactivate, upgrade or modify your Service.  The fee is payable with your first subscription fee payment.  The activation fee is currently $15.00 for SIRIUS and $14.99 for XM.

- **U.S. Music Royalty Fee**:  As of July 29, 2009, new and renewing Subscription Packages which include music channels will be charged a U.S. Music Royalty Fee.  For further details on how this fee is calculated see FAQs.

- **Invoice Administration Fee**:  If you elect to pay by check or money order, we will charge you an administration fee. The administration fee is currently $2.00 per invoice.

- **Late Fee**:  If we do not receive your payment by the billing due date, we may charge you a late fee. The late fee is currently the lesser of (a) $5.00 or (b) the maximum amount permitted under applicable law per month or partial month until the delinquent amount is paid in full, in each case, subject to applicable law.  We do not extend credit to customers and you acknowledge that this fee is not an interest charge, finance charge, or other such charge or payment of a similar nature and it is reasonably related to the actual expense we incur due to unsatisfied payment and may be subject to limitations set forth by law in your state.

- **Returned Payment Fee**:  If any bank or other financial institution refuses to honor any payment of yours, we may charge you a fee that is the lesser of (i) $20.00 ($15.00 for residents of West Virginia); and (ii) the maximum amount permitted under applicable law.  You acknowledge that this fee is not an interest charge, finance charge, or other such charge or payment of a similar nature and it is reasonably related to the actual expense we incur due to unsatisfied payment.

- **Package Change Fee**:  If you convert your Subscription to a different Package where the fee is less than or equal to the fee for your current Package on the same Receiver, you will be charged a $5.00 fee.

- **A La Carte Channel Change Fee**:  If you have a Subscription Package which is "A La Carte," while there is no fee for the initial selection of channels, for each subsequent change to your channel selections, you will be charged a fee of $5.00.

- **Transfer Fee**:  If you transfer a Subscription from one Receiver to another or from one

person to another, you will be charged a transfer fee of $15 for all but Lifetime Plans. If you transfer a Lifetime Subscription Plan from one Receiver to another or from one person to another the transfer fee is currently $75.00. SATELLITE RADIO SERVICE SUBSCRIPTIONS ARE TRANSFERABLE ONLY TO THE EXTENT PROVIDED FOR HEREIN. A LIFETIME SATELLITE RADIO SUBSCRIPTION IS NOT TRANSFERABLE IF IT IS ASSOCIATED WITH A RECEIVER INSTALLED BY AN AUTOMAKER OR AN AUTOMOTIVE DEALER IN A VEHICLE, EXCEPT IN THE EVENT THE ORIGINAL RECEIVER ASSOCIATED WITH THAT LIFETIME SUBSCRIPTION PLAN IS STOLEN, ACCIDENTALLY DAMAGED OR, IN OUR SOLE DISCRETION, IS DEFECTIVE. No transfer fee will be charged for the transfer of a Lifetime Subscription Plan associated with a Receiver installed by an automaker or an automotive dealer if, in our sole discretion, the Receiver is defective.

- **Cancellation Fee:** You will be charged a cancellation fee if you cancel a one-year or longer Subscription during the first year of service. The standard cancellation fee is currently $75.00. Promotional offers may have different cancellation fees. From time to time, we may offer a Service on a multi-month commitment or promotional basis. In such event, you agree to make payments for Services to be received and that are ordered by you in accordance with the terms of the applicable billing plan and promotion that you agree to, including, without limitation, payments of any early termination fees if you terminate your Services prior to the end of a minimum commitment period.

- **Taxes:** All amounts charged to your account, including fees and shipping charges for Receivers purchased directly from SIRIUS may be subject to tax, which will vary according to your billing or shipping address and applicable law.

We reserve the right to waive any of these fees, in whole or in part, at our discretion. Our failure to enforce any of these fees or any other provisions of these Terms shall not be construed as a waiver of the right to assert any such Terms on any future occasion.

**9. Service Credits:** Service credits will not be refunded in cash, but will be honored in the form of Services for the remaining length of the credit. Unused service credits will expire upon termination of your Subscription and may not be transferred to another person or Subscription. If you are cancelling a Subscription that requires payment of an early termination fee if cancelled prior to the end of such commitment, or is subject to any nonrefundable prepayments, you will be responsible for the payment of such fees. Lifetime, automotive pre-packaged, monthly and certain promotional Subscriptions are nonrefundable; if you make changes to such Subscriptions, no service credits will be due on your account. If you change an existing Subscription Package or Plan and keep the same Receiver, we must cancel your existing Subscription, we will charge you for the new Subscription Plan, and you will receive a service credit for the unused prepaid portion of the old Plan. The Plan you give up may also be subject to a cancellation fee. If you change to a less expensive Subscription Package or payment Plan, both the service credit and the fees to make this change will be posted to your account and you may still enjoy a service credit or balance on your account when you begin your new Package or Plan.

**10. Changes to Packages and Plans:** You have the right to change your subscription "Package" (e.g., ask us to change from "SIRIUS Everything" to "SIRIUS Everything PLUS The Best of XM"). You also have the right to change your subscription "Plan" (e.g., ask us to change from a "SIRIUS Everything" Monthly Plan to a "SIRIUS Everything" 3-Year Plan). How the change will affect your account and charges will depend upon the choices you make. Each Subscription to the Satellite Radio Service is tied to one Receiver. You may have multiple Receivers and multiple Subscriptions. All of your Subscriptions may be combined on a single account. Service fees and balances are account-related, with a few exceptions. Sometimes they are Receiver-related. If you add additional Receivers to your account, you must purchase a separate Subscription for each one. For instance, if you would like to add a Subscription to our "Family Friendly" Package for a new Receiver in your home, such additional Subscriptions may be eligible for reduced rates, which may be offered by us from time to time and a per Receiver activation fee may apply.

**11. Customer Care:** If you have a question about your Service, Subscription, Subscription Fees, fees, charges or bill, or if you would like to change or reactivate your Subscription, please contact Customer Care. We will respond to you as promptly as practicable. If you contact SIRIUS Customer Care in writing, please include the following information:

- Your name, service address, and account number;
- The dollar amount in question; and
- The details of your question.

Please do not include any payment with your correspondence. If you wish to dispute any charge, you must contact us by mail or phone (by following the instructions on our website) within 30 days after the date you receive the statement in question. OTHERWISE YOU WAIVE YOUR RIGHT TO DISPUTE THE CHARGE. Undisputed portions of the statement must be paid by the due date to

avoid a late fee and possible deactivation of the Service.

**G.  CANCELLATION**:  The term of your Subscription will automatically renew for additional terms of the same length as your initial Subscription Term or, at our option, on a month-to-month basis until you cancel the Service.  You are responsible for payment of all outstanding balances accrued through that date.  You must comply with all of these Terms of Service and this website or we may cancel your Service.

**1.  Cancellation**: You may cancel your Subscription at any time by notifying Customer Care. Your cancellation will become effective on your next subscription "cycle date," which is the next month anniversary of your initial activation date (i.e., if you activated your Subscription on January 15th and cancel on April 1st your Subscription will end on April 15th). A cancellation fee may apply.

**2.  Refunds:**  LIFETIME, AUTOMOTIVE PRE-PACKAGED, MONTHLY AND CERTAIN PROMOTIONAL SUBSCRIPTIONS ARE NONREFUNDABLE. If you cancel your Subscription prior to its expiration (excluding the aforementioned types of Subscriptions), you will receive a refund of amounts paid directly by the subscriber, if any, on a pro-rata basis, less any applicable fees, unless provided otherwise in any offer for the Service that you accept.  If your subscription was included in the financing of your purchase or lease of a vehicle, any refund will be payable to your finance company unless the finance company has notified us that your loan has been paid in full. Fees attributable to certain promotional offerings or Service received during trial periods may not be refunded.  **IN THE UNLIKELY EVENT THAT WE CEASE BROADCASTING THE SERVICE, WHETHER AS A RESULT OF A LIQUIDATION, BANKRUPTCY, OR OTHERWISE, ALL PREPAID SUBSCRIPTIONS WILL BE TREATED AS NONREFUNDABLE.**

**H.  DISCLAIMERS/LIMITATION OF LIABILITY**:

**1.  Disclaimers:**  YOU UNDERSTAND AND AGREE THAT THIS WEBSITE AND THE CONTENT AND FUNCTIONALITY OF THE SERVICE ARE PROVIDED "AS IS" AND "AS AVAILABLE." SIRIUS AND WSI MAKE NO REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, REGARDING THE SERVICE OR YOUR RECEIVER OR OTHER EQUIPMENT OR THAT YOUR ACCESS TO OR YOUR USE OF THE SERVICE OR WEBSITE WILL BE UNINTERRUPTED OR ERROR FREE OR TIMELY WITH ALL UPDATES. ALL SUCH WARRANTIES (INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT) ARE HEREBY DISCLAIMED.

**2.  Limitations of Liability:**  IN NO EVENT ARE WE, OR WSI, LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, LOST PROFITS,  OR LOSSES RELATING TO THE USE, LOSS OF USE OR DATA, OR PURCHASE OF ANY RECEIVER OR EQUIPMENT OR YOUR PURCHASE OR USE OF THE SERVICE, OR FROM ANY CONTENT POSTED ON OUR WEBSITE BY US OR ANYONE ELSE, WHETHER BASED ON NEGLIGENCE OR OTHERWISE, AND WHETHER OR NOT WE HAVE BEEN ADVISED OF THE POSSIBILITY THEREOF, WHETHER ARISING OUT OF BREACH OF AGREEMENT, TORT OR ANY OTHER CAUSE OF ACTION RELATING TO THE PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT.

IN NO EVENT WILL THE AGGREGATE OF EACH OF SIRIUS' AND WSI'S LIABILITY FOR ANY AND ALL OF YOUR CLAIMS, OR ANY THIRD PARTY CLAIMS, AGAINST US, AND OUR PROGRAMMING OR DATA SUPPLIERS, SERVICE PROVIDERS, MARKETING/DISTRIBUTION SOFTWARE OR INTERNET SUPPLIERS OR HARDWARE OR SOFTWARE MANUFACTURERS, OR SUPPLIERS, CONTRACTORS AND LICENSORS, OR INDEPENDENT SELLERS,  ARISING OUT OF OR RELATED TO, DIRECTLY OR INDIRECTLY, THE PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS PURSUANT TO THESE TERMS OR BY THE NEGLIGENCE, ACTIVE OR PASSIVE, OF SIRIUS AND/OR WSI,  OR YOUR ACCESS TO OR USE OF OR INABILITY TO USE THE SERVICE OR THIS WEBSITE, EXCEED THE PRICE PAID BY YOU TO SIRIUS HEREUNDER FOR THE MOST RECENT SIX MONTHS OF SERVICE IMMEDIATELY PRIOR TO THE SPECIFIC EVENT WHICH GAVE RISE TO THE APPLICABLE DAMAGE OR LOSS. YOU AGREE THAT THIS LIMITATION OF LIABILITY REPRESENTS A REASONABLE ALLOCATION OF RISK.  THIS ALLOCATION OF RISK AND THE DISCLAIMER OF WARRANTIES HEREIN ARE REFLECTED IN OUR PRICES AND ARE A FUNDAMENTAL ELEMENT OF OUR AGREEMENT TO PROVIDE THE SERVICE. YOU MAY HAVE GREATER RIGHTS THAN DESCRIBED ABOVE UNDER YOUR STATE'S LAWS.

**3.  Your Risk:**  YOU AGREE THAT YOUR ACCESS TO AND USE OF, OR INABILITY TO ACCESS OR USE THE SERVICE OR THE WEBSITE IS AT YOUR SOLE RISK. YOU WILL NOT HOLD US, OUR PROGRAMMING OR DATA SUPPLIERS, SERVICE PROVIDERS, MARKETING/DISTRIBUTION, SOFTWARE OR INTERNET SUPPLIERS, OR HARDWARE OR SOFTWARE MANUFACTURERS, OR SUPPLIERS, OR OUR CONTRACTORS OR LICENSORS, AS APPLICABLE, RESPONSIBLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES, OR LOST PROFITS RESULTING FROM YOUR ACCESS TO OR USE OF, OR INTERRUPTIONS IN THE TRANSMISSION OR RECEPTION OF THE SERVICE, THIS WEBSITE, INCLUDING WITHOUT LIMITATION ANY DAMAGE TO ANY OF YOUR COMPUTERS OR DATA,

AND/OR ANY SIRIUS RECEIVER. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY ANY PERSON SHALL CREATE A WARRANTY OR GUARANTEE IN ANY WAY WHATSOEVER RELATING TO THE SERVICE OR WEBSITE.

**4. Third Parties**: THE THIRD PARTY LINKS, SERVICES, GOODS, RESOURCES AND CONTENT AVAILABLE ON THE SERVICE AND THROUGH LINKS ON THIS WEBSITE ARE NOT CONTROLLED BY US. ACCORDINGLY, WE MAKE NO WARRANTIES REGARDING SUCH THIRD-PARTY SERVICES, GOODS, RESOURCES, AND CONTENT, INCLUDING WITHOUT LIMITATION WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND NON-INFRINGEMENT. WE WILL NOT BE LIABLE FOR YOUR ACCESS TO, USE OF OR DOWNLOADING OF CONTENT AVAILABLE ON OR THROUGH, THE SERVICE OR WEBSITE. WE ARE NOT LIABLE FOR ANY DIRECT OR INDIRECT DAMAGES OR LOSSES CAUSED BY YOUR USE OF THIRD-PARTY WEBSITES. YOU ASSUME FULL RESPONSIBILITY WHEN YOU CHOOSE TO FOLLOW ANY LINKS ON THIS WEBSITE THAT LEAD TO THIRD-PARTY WEBSITES.

**5. State Law**: SOME JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OF CERTAIN IMPLIED WARRANTIES OR THE LIMITATION OF CERTAIN DAMAGES, SO SOME OF THE ABOVE DISCLAIMERS, WAIVERS AND LIMITATIONS OF LIABILITY MAY NOT APPLY TO YOU.

**6. Miscellaneous**: UNLESS LIMITED OR MODIFIED BY APPLICABLE LAW, THE FOREGOING DISCLAIMERS, WAIVERS AND LIMITATIONS SHALL APPLY TO THE MAXIMUM EXTENT PERMITTED, EVEN IF ANY REMEDY FAILS ITS ESSENTIAL PURPOSE. OUR LICENSORS AND CONTRACTORS ARE INTENDED THIRD-PARTY BENEFICIARIES OF THESE DISCLAIMERS.

**7. Indemnification:** EXCEPT FOR WILLFUL MISCONDUCT ON THE PART OF SIRIUS AND/OR WSI, YOU AGREE TO DEFEND, INDEMNIFY AND HOLD HARMLESS SIRIUS XM RADIO INC. AND ITS AFFILIATES, SUBSIDIARIES, SHAREHOLDERS, OFFICERS, AGENTS, EMPLOYEES, LICENSORS AND SERVICE PROVIDERS, AND WSI ("INDEMNIFIED PARTIES") FROM ANY AND ALL CLAIMS, LIABILITY AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES), WHETHER IN TORT, CONTRACT OR OTHERWISE, RELATING TO OR ARISING OUT OF YOUR USE OF THE SERVICE AND ANY BREACH OF THESE TERMS OF SERVICE, APPLICABLE LAW OR ANY RIGHT OF THE INDEMNIFIED PARTIES OR ANY THIRD PARTY. THIS INDEMNIFICATION OBLIGATION INCLUDES THE ACTS OR OMISSIONS OF ANYONE ACCESSING THE INTERNET RADIO SERVICE USING YOUR LOGIN ID, WITH OR WITHOUT YOUR PERMISSION.

**I. RESOLVING DISPUTES**:

PLEASE READ THIS PROVISION OF THIS SECTION CAREFULLY. IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR, OR A PANEL OF ARBITRATORS, INSTEAD OF A JUDGE OR JURY. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE TO HAVE ANY DISPUTES RESOLVED THROUGH ARBITRATION.

In order to expedite and control the cost of disputes, you agree that any legal or equitable claim relating to the Service, the Website, your Subscription or these Terms (a "Claim"), will be resolved as follows:

**1. Informal Claim Resolution**: To initiate an informal resolution to a Claim, you must send a notice by first class United States mail to SIRIUS XM Radio Inc., 1221 Avenue of the Americas, New York, NY 10020, Attention: SIRIUS Customer Care (a "Notice"). Neither of us may start a formal proceeding (except for Claims described in subsection 3 below) for at least 60 days after one of us notifies the other of a Claim in writing. If we initiate a Claim, we will send our notice to the billing address on file with us.

**2. Formal Resolution:** If we cannot resolve a Claim informally, including any Claim between us, and any Claim by either of us against any agent, employee, successor, or assign of the other, including, to the full extent permitted by applicable law, third parties who are not signatories to this agreement, whether related to this agreement or otherwise, including past, present, and future Claims and disputes, and including any dispute as to the validity or applicability of this arbitration clause, then these Claims shall be resolved, upon election by either party, exclusively and finally by binding arbitration.

The party initiating arbitration must choose one of the two arbitration firms listed below and follow its rules and procedures in effect at the time the Claim is filed. You may obtain copies of the current rules of each of the arbitration firms and forms and instructions for initiating an arbitration by contacting them.

American Arbitration Association
1633 Broadway, 10th Floor
New York, New York 10019
Web site: www.adr.org
(800) 778-7879

National Arbitration Forum
P.O. Box 50191
Minneapolis, MN 55405-0191
Web site: www.adrforum.com
(800) 474-2371

This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act ("FAA"), and not by any state law concerning arbitration.

**3. Exceptions:** Notwithstanding the foregoing, any dispute involving a violation of the Communications Act of 1934, 47 U.S.C. §605, or the Electronic Communications Privacy Act, 18 U.S.C. §§2510-2521, may be decided only by a court of competent jurisdiction.

**4. Small Claims:** Instead of proceeding to arbitration, either you or we have the option to pursue a Claim in small claims court (or the equivalent) so long as 1) the Claim remains in that court, and 2) is made solely on our behalf (if brought by us), or on your behalf.  However, if that Claim is transferred or appealed to a different court, we reserve our right to elect arbitration.

**5. Individual Claims:** If either of us elects to resolve a claim by arbitration, that Claim shall be arbitrated on an individual basis. There shall be no right or authority for any claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Subscribers or persons similarly situated.  The arbitrator's authority to make awards is limited to awards to you and us alone. Furthermore, Claims brought by you and against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless agreed to in writing by all parties.  'Claim' (as defined in this section above) does not include any challenge to the validity and effect of the class action waiver in this subsection 5, which must be decided by a court.

**6. Severability:** If any portion of this arbitration agreement cannot be enforced, that portion will be severed, and the rest of the arbitration agreement will continue to apply, provided that the entire arbitration agreement shall be null and void if the class action waiver in subsection 5 above is held to be invalid with respect to any class or representative Claim, subject to any right to appeal such holding.

**7. Binding Effect:** In the arbitration proceeding, the arbitrator must follow applicable law, and any award may be challenged, as set forth in the FAA.  Any court with jurisdiction may enter judgment upon the arbitrator's award.  The arbitrator's decision is final and binding on all parties and may be enforced in any federal or state court with jurisdiction.

**J. MISCELLANEOUS:**

**1. Notices:** Notices to you will be deemed given when deposited in the mail or when sent by email. Notices may be included in statements or other communications to you. We may also provide notice to you by telephone, which will be deemed given when a message is left with you, someone answering the telephone at your residence or on an answering machine or voice mail system at your phone number on record with us. Your notices to us will be deemed given when we receive them at the telephone number or, in writing at the address, set forth above at "CONTACT INFORMATION."

**2. Assignment of Account:** We may assign your account and all rights and/or obligations hereunder to any third party without notice for any purpose, including, without limitation, collection of unpaid amounts, in the event of an acquisition, corporate reorganization, merger or sale of substantially all of our assets to another entity. You hereby consent to such assignment. You must continue making all required payments to us in accordance with your billing statement, unless notified otherwise.

**3. Termination:**  We may terminate your right to use our website at any time and without notice.  We will terminate your right to use our website if you violate any of these Terms of Service or any other policy posted on our website, or if we become aware that you are a copyright infringer.

**4. Full Agreement:** These Terms constitute the entire agreement between us concerning your access to and use of the Service or website and may be modified by the unilateral amendment of these Terms and the posting by us of such amended version. No salesperson or other representative is authorized to change it for you.  If any provision is declared by a competent authority to be invalid, that provision will be deleted or modified to the extent necessary, and the rest of these Terms will remain enforceable. Any specific Terms that expressly or by their nature survive termination shall continue thereafter until fully performed. A waiver of any of these Terms or any breach thereof, in any one instance, will not waive such term or condition or any subsequent breach thereof.

**5. Applicable Law:** The interpretation and enforcement of these Terms shall be governed by the rules and regulations of the State of New York and other applicable federal laws.  These Terms are subject to modification if required by such laws.  Notwithstanding the foregoing, Section I. shall be governed by the Federal Arbitration Act without reference to state law.

**THANK YOU FOR CHOOSING SIRIUS RADIO.**

© 2009 SIRIUS XM Radio Inc. SIRIUS, XM and all related marks and logos are trademarks of SIRIUS XM Radio Inc. and its subsidiaries.

**En Espanol**

## TERMS AND CONDITIONS / CUSTOMER AGREEMENT

**Last Updated:  October 1, 2009**

Thank you for choosing XM Satellite Radio ("XM"). These are the terms and conditions ("Terms" or "Customer Agreement"), which apply to your paid, trial or other subscription in the United States ("Subscription") to the XM Satellite Radio service (the "Satellite Radio Service") and/or XM Internet Radio ("Internet Radio") and/or any Equipment Technology (as defined below) relating thereto.   The Satellite Radio Service, Internet Radio, our traffic and weather, including marine weather, and any other programming, data and Equipment Technology for radio, television, online, portable, wireless, mobile, and other receivers now known or later developed ("Receivers"), will be collectively referred to herein as the **"Service."** These Terms will remain in effect until modified or terminated.  Services will be provided to you for the period agreed to by you and will continue to renew for additional terms of same length on the same billing terms until canceled, terminated or discontinued by you or by us.   Please keep this copy of these Terms for your records.

Our Privacy Policy governs the treatment by XM of both anonymous and personally identifiable information that we collect when you use this website or our Internet Radio online media player (the "Site") and when you provide information to us in any medium for our Services, or any other services we may offer.  Be sure to read our Privacy Policy.   Our Privacy Policies for XM Radio and SIRIUS Radio are identical.   For information on how information is gathered and used at **www.xmradio.com** or through our Internet Radio Service please see our privacy policy found at **www.xmradio.com/privacypolicy.**

PLEASE READ THESE TERMS OF SERVICE CAREFULLY BEFORE ACCESSING OR USING OUR WEBSITE OR OUR SERVICES.  BY ACCESSING OR USING OUR WEBSITE OR SERVICES, YOU AGREE TO BE LEGALLY BOUND BY THESE TERMS OF SERVICE.  PLEASE DO NOT USE OUR WEBSITE OR SERVICE IF YOU DO NOT AGREE WITH THESE TERMS OF SERVICE.

IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR SUBSCRIPTION. IF YOU DO NOT CANCEL YOUR SUBSCRIPTION WITHIN 3 BUSINESS DAYS OF ACTIVATION OF YOUR RECEIVER, IT WILL MEAN THAT YOU AGREE TO THESE TERMS WHICH WILL BE LEGALLY BINDING ON YOU.

**A.  CONTACT INFORMATION**: You may contact XM Listener Care Monday through Saturday from 8AM through 11PM ET and Sunday from 8AM to 8PM, by calling 1-800-XM-RADIO (1-800-967-2346), or by writing to: XM Satellite Radio Inc., P.O. Box 33174, Detroit, MI 48232, Attention: Listener Care.

**B.  CHANGES IN TERMS AND SERVICE:**

**1.   Changes To Terms:** SATELLITE AND INTERNET TECHNOLOGY AND THE APPLICABLE LAWS, RULES, AND REGULATIONS CHANGE FREQUENTLY. ACCORDINGLY, WE RESERVE THE RIGHT TO CHANGE THESE TERMS AT ANY TIME. ANY CHANGES OR MODIFICATIONS WILL BE EFFECTIVE UPON POSTING OF THE REVISIONS ON OUR WEBSITE REFLECTING THE NEW EFFECTIVE DATE. YOUR CONTINUED USE OF THE SERVICE FOLLOWING THE POSTING OF THE CHANGES OR MODIFICATIONS ONLINE WILL CONSTITUTE YOUR ACCEPTANCE OF SUCH CHANGES OR MODIFICATIONS. YOU SHOULD FREQUENTLY REVIEW THESE TERMS (INCLUDING THE EFFECTIVE DATE) AND APPLICABLE POLICIES FROM TIME TO TIME TO UNDERSTAND THE TERMS THAT APPLY TO YOUR USE OF THE SERVICE AND/OR USE OF THE WEBSITE.

Other than with respect to programming changes referenced in subsection 2 below, if we make any material changes that, in our judgment, would have an adverse effect on your use of the Service, we will either post a notice on our website that these Terms have changed and the effective date of such change, provide you a notice describing such changes and their effective date, in the manner described in Section J.1. below, or send you revised Terms.  In the event of any potential conflict between these Terms and the terms of any other offer for the Service, these Terms will govern.

**2.  Change To Programming:** The Service consists of a wide variety of music, sports, news, talk, children's and other entertainment programming. Many different and changing considerations affect the availability, cost and quality of programming and customer demand. Accordingly, we reserve the unrestricted right to change, rearrange, add, or delete programming, including

canceling, moving or adding particular channels, at any time, with or without notice to you. You always have the right to cancel your subscription to the Service if you do not accept any change. Your continued use of the Service following any programming changes will constitute your acceptance of such changes.

**C.  UNDERLINE USE OF SERVICE:**

**1.   Eligibility For Use of Service:**  You must be at least 18 years old, or the age of majority, as determined by the laws of your state of residency, to assume the obligations set forth in these Terms.

**2.  Service Area:**  We offer the Satellite Radio Service solely in the 48 contiguous United States and the District of Columbia (together, our "Service Area"), although we might expand our Satellite Radio Service in the future. (This is the Service Area for XM.  SIRIUS does currently broadcast satellite radio service into Puerto Rico.  However, SIRIUS satellite radio reception in Puerto Rico is best in the Greater Metropolitan Area of San Juan and may not be available in other areas.  SIRIUS|XM Internet Radio Service is available in all areas of Puerto Rico.)  If your address is not in our XM Service Area, your Receiver will not be able to be activated to receive the Satellite Radio Service. We reserve the right to verify any address you provide. Satellite radio service is also available in Canada; see www.xmradio.ca or www.siriuscanada.ca for details.

**3.  Internet Radio:** You may listen to our Internet Radio Service on one single internet enabled device at one time.  If you have multiple Subscriptions to the Service, you may be eligible to receive an additional Internet Radio online listening account (username/password) for each such Subscription. You should not provide your username and password to any third party and have the obligation to protect your username and password from unauthorized use. You will not be able to access Internet Radio unless your account for your Subscription is in good standing and you are in compliance with these Terms. Certain devices designed to work with our Internet Radio Service may require a separate subscription. Not all content offered on our Satellite Radio Service is available on our Internet Radio Service and vice versa.  We may or may not offer the same content on all of our platforms of the Service. Similarly, not all content offered on any of the XM or SIRIUS Services is available through the other modes of distribution of XM or SIRIUS programming (such as through our internet, satellite TV, wireless, or other distribution affiliates we may engage from time to time).  We do not make or install any of the physical equipment, Internet connectivity or web browser needed or other hardware or software you may use to receive our Internet Radio Service ("Web Devices").  Our Internet Radio Service may be unavailable or interrupted from time to time for a variety of reasons, such as unavailability or difficulties with the Internet generally or your web browser, computer, home wiring, or Internet service provider and/or other things that we cannot control. Our Internet Radio Service functions best when streamed over a broadband connection.  We do not guarantee continuous, uninterrupted or secure access to the Internet Radio Service and are not responsible for any noise and/or interruptions that occur.

**4.  Personal Use of the Service:** We provide the Service only for your personal, non-commercial enjoyment. You may not make commercial use of, reproduce, rebroadcast, or otherwise transmit our programming, or record, charge admission for listening to or distribute play lists of our programming.  Neither our Internet Radio Service nor any Recorded Content (defined below) is intended for commercial use.  If you use any Service for commercial purposes, we reserve the right to charge you our commercial rate retroactively to the beginning of your Subscription. We or any of our programming providers may prosecute violations of the foregoing against you and other responsible parties in any court of competent jurisdiction.  You assume all responsibility for use of this website.   You agree that any person using your identification issued for the website will be treated by us as having been authorized by you to access your information as contained on the website, and take any other actions on your behalf.  You will indemnify and hold harmless SIRIUS XM Radio Inc. and its affiliated companies from all damages, costs, expenses, liabilities and claims incurred by them arising out of any action taken by any person or entity using your username/password on this website.  You also waive all claims against SIRIUS XM Radio Inc., its officers, directors, employees, suppliers and programmers that may arise from the utilization of this website. At the end of each online session you should completely log out of the Service. Should your login ID or username/password be lost, stolen, sold, transferred or otherwise removed from your possession without your permission, contact us immediately so that your personal identifiers may be deactivated and reissued. You also may not attempt to override or circumvent any of our usage rules, limitations, or security measures embedded into our Service or any radio or Receiver.

**5.  Recorded Content:**  Certain types of our radios and Receivers have the ability to record programming transmitted over the Service ("Recorded Content"). Subject to your radio's restrictions and applicable laws, you may access such Recorded Content only as long as you pay your monthly subscription fee.  We reserve the right to change, reduce, eliminate or charge a fee

for this and/or related functionality.

**6. Service Interruptions**: Service may be unavailable or interrupted from time to time for a variety of reasons, such as environmental or topographic conditions and other things, many of which we cannot control. Service might also not be available in certain places (e.g., in tunnels, parking garages, or within or next to buildings) or near other technologies. Home, portable and office-based Receivers function best when the antenna is placed in or near a south-facing window with a clear view of the sky. Even if your antenna is near a south-facing window, certain window treatments could interfere with reception. We are not responsible for any noise and/or interruptions of the Service.

**7. Service Cancellation**: We reserve the right to cancel your Subscription at any time if you fail to pay amounts owing to us when due, violate or breach any of these Terms, or for any other reason in our sole discretion.  If your Subscription is cancelled, you will still be responsible for payment of all outstanding balances accrued through the cancellation date, including any fees described herein.  See also: D.4.  "Loss of Equipment," F.2. "Automatic Renewal," F.8. "Cancellation Fee," F.9. "Service Credits," and G. "Cancellation."

**8. Service Choices**: We provide Subscriptions in a variety of programming packages which might suit your listening preferences, and we refer to them throughout as "Packages." Examples of Packages are "XM Everything PLUS The Best of SIRIUS," "Family Friendly," and "Mostly Music." We also offer Subscriptions in a variety of convenient recurring payment plans which might suit your needs, and we refer to them throughout as "Plans." Examples of our Plans are "Monthly," "Quarterly," "Annual," "Two Year," and "Five Year." Not all Plans are available for all of our Packages but when longer Plans are offered they are often priced to provide a discount.

**9. Lifetime Subscription Plan**: A "Lifetime Subscription" is one that continues for the life of the Receiver equipment. A Lifetime Subscription is not transferable if it is associated with a Receiver installed by an automaker or an automotive dealer in a vehicle, except in the event the original Receiver associated with that Lifetime Subscription is stolen, accidentally damaged or if, in the sole discretion of SIRIUS XM Radio Inc., it is defective. A Lifetime Subscription associated with a home, portable, or dock & play Receiver is transferable from one Receiver to another Receiver, up to a maximum of three (3) times. Each permitted transfer of a Subscription is subject to a transfer fee. If you transfer a Lifetime Subscription from one Receiver to another or from one person to another, you will be charged a transfer fee. The current transfer fee is set forth in these Terms. No transfer fee will be charged for the transfer of a Lifetime Subscription associated with a Receiver installed by an automaker or an automotive dealer if, in the sole discretion of SIRIUS XM Radio Inc., the Receiver is defective. Lifetime Subscriptions are nonrefundable. You may cancel a Lifetime Subscription but if you cancel during the first year of service you will be charged a cancellation fee set forth in these Terms.

**10.  Advisory Nature of Services; User Responsibility; User Safety/Reliance; Parental Control:**  In your use of the Service it is your responsibility to exercise prudent discretion and observe all safety measures required by law and your own common sense.   All actions and judgments taken with respect to the Service are your sole responsibility.  You assume the entire risk related to your use of the Service. The Service may include traffic, weather, marine weather, and other content and emergency alert information and data, and you acknowledge and agree that such information and data is not for "safety for life," but is merely supplemental and advisory in nature, and therefore cannot be relied upon as safety-critical in connection with any aircraft, sea craft, automobile, or any other usage.  XM programming and on-air advertising is provided "as is" and "as available" and XM disclaims any and all warranties, express and/or implied, with respect thereto or the transmission or reception thereof.  Neither XM nor WSI Corporation ("WSI") makes any representations or warranties with respect to the reliability, predictive value or accuracy of the information contained within the Service, and neither XM nor WSI shall be responsible for inaccurate, omitted, delayed, or erroneous information, and do not warrant the accuracy, reliability, completeness or timeliness, of any information disclosed on the Service.  You further acknowledge and agree that the Service may be interrupted due to adverse weather or other conditions and that neither XM nor WSI shall have any liability for such interruptions.  You are urged to verify the contents of the Service against other sources prior to use.  You acknowledge and agree that under no circumstances should a user of this Service make decisions based solely or primarily on traffic or weather information contained within the Service.  Neither XM nor WSI assumes any responsibility for accidents resulting from or associated with use and/or misuse of the Service.

In addition, some programming may include explicit language.  It is your responsibility to impose listening restrictions that you consider appropriate on your family members and guests.  We are not responsible for content that you or anyone else may find inappropriate.  Please contact

Listener Care to discuss options for channel blocking.

**11. Business Commercial Subscribers (Radio Service only):** Details for our commercial subscribers can be found in the FAQs area of this website.

**12. Interactive Services:** We may provide an opportunity for users to exchange information, ideas and opinions on our website. Information, ideas and opinions posted by users do not necessarily reflect the views of SIRIUS XM Radio Inc. We do not assume responsibility or accept liability for the accuracy of any information, ideas and opinions posted by users. We are not liable for any claims, damages or losses resulting from any information, ideas and opinions posted by users. You authorize us to use and publish any materials that you post on this website in any manner we choose and without any obligation to compensate you or anyone else. If you post any materials on our website, you will not:

- Harass, defame, intimidate or threaten another user;
- Interfere with another user's rights to privacy;
- Distribute chain letters, surveys or contests;
- Post any material that is defamatory (i.e., disparaging to the reputation of an individual or business);
- Post any material that is obscene or indecent;
- Post any trademarks, logos or copyrighted material without the authorization of the owner;
- Post any materials that may damage the operation of a computer (such as a virus, worm or Trojan horse); or
- Advertise or sell any goods or services.

**D. RECEIVERS AND OTHER EQUIPMENT:**

**1. Authorized Suppliers:** You may access and use the Service only with equipment authorized to receive the Service. However, we do not manufacture or install any of the Receivers or related equipment, including antennas, adapters, adhesive devices, cables, etc. ("Equipment") you must use to receive the Service. You must purchase your Receiver and Equipment, and any repairs, parts, installation or service, from an authorized seller or manufacturer and the Receiver and/or Equipment will be subject to the applicable seller's or manufacturer's return policy and the manufacturer's warranty, if any. We are not liable for any damage to your personal or real property, including without limitation, your vehicle, home or other property, resulting from installation or use of any Receiver or Equipment. Unless you purchased your Equipment or Receiver through one of our direct channels (such as through our website), we are not responsible for the advertising, statements, practices, promises or services of sellers, installers, or manufacturers of Equipment or Receivers. You should consult your owner's manual or the packaging for important information regarding warranties related to Receivers and Equipment. If you have any complaints about your Receiver, Equipment or installation, you should direct them to the seller, manufacturer or installer. Returns of Receivers and Equipment are subject to your authorized seller's, manufacturer's or installer's return policy.

**2. Internet Radio:** We provide only the online Service. You must purchase your computer, laptop, alternate Web Device, modem or router, and Internet service and/or any other appropriate hardware and/or software, from appropriate sellers, resellers, manufacturers or service providers. We are not responsible for and do not warrant any Web Devices in any way whatsoever and are NOT responsible for the advertising, statements, practices, promises, services or warranties of such sellers, manufacturers or installers. If you have any complaints about your Web Device, you should direct them to the applicable seller, reseller, manufacturer, or service provider.

**3. Multiple Receivers:** Each Subscription to the Satellite Radio Service is tied to one Receiver. If you want to have the Satellite Radio Service on multiple Receivers, you must purchase a separate Subscription for each Receiver although all of your Subscriptions may be combined on a single account. Such additional subscriptions may be eligible for reduced rates which may be offered by us from time to time and a per radio activation fee may apply.

**4. Loss of Equipment:** Because your Satellite Radio Service Subscription is tied to a particular Receiver, if your Receiver is lost, stolen, sold or otherwise transferred you must cancel or suspend your Subscription or you will remain responsible for the payment obligations for your Satellite Radio Service under the terms of your Subscription, regardless of your use of the Satellite Radio Service.

**5. Right to Transfer a Subscription:** Satellite Radio Service Subscriptions (other than Lifetime Subscriptions) are transferable from one Receiver to another. A LIFETIME SATELLITE RADIO SUBSCRIPTION (WHICH IS A SUBSCRIPTION THAT CONTINUES FOR THE LIFE OF THE RECEIVER) IS NOT TRANSFERABLE IF IT IS ASSOCIATED WITH A RECEIVER INSTALLED BY AN AUTOMAKER OR AN AUTOMOTIVE DEALER IN A VEHICLE, EXCEPT IN THE EVENT THE ORIGINAL RECEIVER

ASSOCIATED WITH THAT LIFETIME SATELLITE RADIO SUBSCRIPTION IS STOLEN, ACCIDENTALLY DAMAGED OR, IN OUR SOLE DISCRETION, IS DEFECTIVE. A LIFETIME SATELLITE RADIO SUBSCRIPTION ASSOCIATED WITH A HOME, PORTABLE OR DOCK & PLAY RECEIVER IS TRANSFERABLE FROM ONE RECEIVER TO ANOTHER RECEIVER, UP TO A MAXIMUM OF THREE TIMES. Permitted transfers of Satellite Radio Service Subscriptions are subject to a transfer fee, as set forth herein.

E. **INTELLECTUAL PROPERTY RIGHTS**:

**1. Technology**: It is prohibited to, and you agree that you will not, and you agree that you shall not, copy, decompile, disassemble, reverse engineer, make derivative works of or manipulate any technology or data or content stored or incorporated in any equipment (including Receivers) used to receive the Service (collectively, "Equipment Technology"), or otherwise modify or tamper with, any such equipment. You also agree not to upload, post, transmit or otherwise make available any material that contains software viruses or any other computer code, files, or programs designed to interrupt, disable or limit the functionality of this website or the Internet Radio Service.  AMBE® voice compression software included in certain products or the Service is protected by intellectual property rights including patent rights, copyrights, and trade secrets of Digital Voice Systems, Inc. The software is licensed solely for use within certain products or the Service. Furthermore, the music, talk, news, entertainment, data and other content on the Service are protected by copyright and other intellectual property laws and all ownership rights remain with the respective content and data service providers. You are prohibited from any export of the data (or derivative thereof) except in compliance with applicable export laws, rules and regulations.  The user of this or any other software contained in an XM or SIRIUS Radio or our website and/or all hardware and/or software used in connection with either is explicitly prohibited from attempting to copy, decompile, reverse engineer, hack, manipulate or disassemble the object code, or in any other way convert the object code into human-readable form.  You may use the Equipment Technology only for your personal, non-commercial use in connection with the Service.

**2. Content**:  All music, programming, text, software (including source and object codes), data, information, visual, oral or other digital material, and all other content of any description available on our website or included in any Service we offer and/or in Equipment Technology (collectively, the "Content"), and all worldwide copyrights, trademarks, service marks, patents, patent registration rights, trade secrets, know-how, database rights and all other rights in or relating to the Content (collectively, the "Intellectual Property") are either owned by SIRIUS XM Radio Inc., XM Satellite Radio Inc., or are the property of our licensors and suppliers who have given us permission to use it.  Neither your access to and use of the Service nor these Terms grant you any right, title or interest or license in or to any such Content, and you may not use such Content without the express written permission of the owner(s).   Certain real-time traffic data and map data is provided by NAVTEQ, a service of NAVTEQ North America, LLC, to which the following notice applies:  © 2009 NAVTEQ.  You may download one copy of the Content to any single computer for your personal, non-commercial home use only, provided that you keep intact all copyright and other proprietary notices.  You may not otherwise reproduce, perform, distribute, display or create derivative works from the Content.   You may only use the Content and the Intellectual Property, access our website and use any services we provide through our website as expressly permitted in these Terms of Service and for no other purposes.

**3. Trademarks**:  XM Radio® and XM®, and the XM logo are trademarks, service marks or registered marks of XM Satellite Radio Inc. ("Marks"). Other trademarks, service marks, graphics, logos and domain names appearing on the Service or the website may be the trademarks of third parties. Neither your access to and use of the Service or website nor these Terms grant you any right, title or interest or license to reproduce or otherwise use the Marks or any third-party trademarks, service marks, graphics, logos or domain names. Any goodwill in the Marks generated as a result of your use of the Service will inure to our benefit. You shall not at any time, nor shall you assist others to, challenge our right, title, or interest in or to, or the validity of, the Marks or any other intellectual property rights of XM.

**4. Copyright**:  If you are authorized to act on behalf of a copyright owner, and any material on our website infringes on the rights of the owner, please notify our designated agent:

    SIRIUS XM Radio Inc.
    Attention:  Legal Department
    1221 Avenue of the Americas, 37th Floor
    New York, NY 10020
    Fax:  (212) 584-5353

To be effective, your notification must provide us with information that meets the requirements of

the U.S. Copyright Act, which are summarized as follows:

- A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;
- A detailed identification of the copyrighted work or works claimed to have been infringed;
- Information sufficient to permit us to locate the allegedly infringing material;
- Information sufficient to permit us to contact you, such as an address, telephone number or email address;
- A statement that you have a good faith belief that the use of the allegedly infringing material in the manner complained of is not authorized by the copyright owner, its agent or the law;
- Your sworn statement that the information in your notification is accurate; and
- Your sworn statement that you are authorized to act on behalf of the copyright owner of the allegedly infringing material.

**5. Internet Radio**: You may not rebroadcast our Internet Radio Service in any way. You may play our Internet Radio Service through speakers or headphones for your personal listening pleasure. You may not make any recordings of, or otherwise duplicate, the content provided by our Internet Radio Service. In addition, you may not re-transmit or otherwise distribute the content provided by our Internet Radio Service in any way, including online streaming such content or making such content available for download. You may not re-skin, re-package, decompile, reverse engineer, disassemble our Internet Radio Service, or construct a media player or interface that accesses our Internet Radio Service. In addition, your use of any products or services that access our Internet Radio Service and which are provided by third parties not authorized by us constitutes a violation of these Terms, even if you did not create such product or services and/or do not understand how they were created.

**F. PAYMENT**: In return for receiving the Service, you agree to pay us as follows:

**1. Subscription Fee**: You must pay in advance by credit card or debit card. You may also pay in advance by electronic funds transfer ("EFT"). You may combine payment with an XM Prepaid Subscription card. You may also pay by check or money order. If you pay by check or money order you will receive an invoice by mail and will be required to make your first payment before your Subscription is activated. Please do not include comments or questions with your check or money order payment. If paying by check or money order against invoices, mail all payments to the address contained on your invoice and include your XM Account Number on your check or money order:

    XM Satellite Radio Inc.
    P. O. Box 9001399
    Louisville, KY 40290-1399

By sending your completed, signed check to us, you authorize us to copy your check and to use the account information from your check to make a one-time electronic fund transfer from your account for the same amount as the check. Funds will be withdrawn from your account within 24 hours and you will not receive your check back from your financial institution. The electronic fund transfer from your account will be on the account statement you receive from your financial institution.

**2. Automatic Renewal**: Your Subscription will continue for the length of the initial term you select on your Plan ("Subscription Term") and at the end of your prepaid Subscription Term, it will automatically renew for another prepaid period of the same length unless you choose to cancel prior to that renewal, or your Service is cancelled, terminated, or discontinued by you or by us, or you select a different Plan. Your account will automatically be charged (or you will be billed, as applicable) at the rates in effect at the time of renewal. We may, at our option, process your renewal on a month-to month basis instead of your chosen Subscription Term.

**3. Changes in Fees**: Our fees and other charges are subject to change without notice.

**4. Change of Address or Account Information**: You must notify Listener Care immediately of any change in your name, billing address, service address, email address, telephone number, credit card or other account information.

**5. Statements**: If you are not using an electronic method of payment, we will send you a statement (via electronic mail unless otherwise requested) for the billing plan you selected. If you elect to pay by check or money order, we may charge you a fee of up to $2.00 per invoice.

Otherwise, billing statements will be provided only upon request. If you would like to receive a statement for a particular period, please contact Listener Care. Please include the name and service address on your account in your letter. Statements will show: (1) payments, credits, purchases and any other charges to your account, (2) your account balance, and (3) the payment due date.

**6. Payments:** All payments must be made in U.S. dollars. We do not accept recurring payment plans from cards issued by Canadian Card Issuers nor any gift cards issued by Visa, MasterCard, American Express or Discover. These types of cards may only be used for one-time payments to us. Your outstanding balance is due in full each payment period. Undisputed portions of your account must be paid by the due date to avoid a late fee and possible deactivation of the Service. No "payment in full" notation or other restrictive endorsement written on your payments will restrict our ability to collect all amounts owing to us. We expect you to pay your account balance on time. If you are delinquent in any payment to us, we reserve the right to suspend or terminate your Subscription, deactivate your Receiver immediately and report any late payment or non-payment to credit reporting agencies. If your account is past due, and if we deactivate your Service, we will prorate your Subscription and amounts owed to us and will apply your pre-payments to past due amounts and any remaining credit to future obligations.

**7. Taxes:** You are responsible for all taxes or other government fees and charges, if any, which are assessed based on the Service address on your account.

**8. Fees:** We will charge you one or more of the following fees, all of which are subject to change without notice:

- **Activation Fee:** For each Receiver on your account, we may charge you a one-time fee to activate, reactivate, upgrade or modify your Service. The fee is payable with your first subscription fee payment. The activation fee is currently $14.99 for XM and $15.00 for SIRIUS.
- **U.S. Music Royalty Fee:** As of July 29, 2009, new and renewing Subscription Packages which include music channels will be charged a U.S. Music Royalty Fee. For further details on how this fee is calculated see **FAQs**.
- **Invoice Administration Fee:** If you elect to pay by check or money order, we will charge you an administration fee. The administration fee is currently $2.00 per invoice.
- **Late Fee:** If we do not receive your payment by the billing due date, we may charge you a late fee. The late fee is currently the lesser of (a) $5.00 or (b) the maximum amount permitted under applicable law per month or partial month until the delinquent amount is paid in full, in each case, subject to applicable law. We do not extend credit to customers and you acknowledge that this fee is not an interest charge, finance charge, or other such charge or payment of a similar nature and it is reasonably related to the actual expense we incur due to unsatisfied payment and may be subject to limitations set forth by law in your state.
- **Returned Payment Fee:** If any bank or other financial institution refuses to honor any payment of yours, we may charge you a fee that is the lesser of (i) $20.00 ($15.00 for residents of West Virginia); and (ii) the maximum amount permitted under applicable law. You acknowledge that this fee is not an interest charge, finance charge, or other such charge or payment of a similar nature and it is reasonably related to the actual expense we incur due to unsatisfied payment.
- **Package Change Fee:** If you convert your Subscription to a different Package where the fee is less than or equal to the fee for your current Package on the same Receiver, you will be charged a $5.00 fee.
- **A La Carte Channel Change Fee:** If you have a Subscription Package which is "A La Carte," while there is no fee for the initial selection of channels, for each subsequent change to your channel selections, you will be charged a fee of $5.00.
- **Transfer Fee:** If you transfer a Subscription from one Receiver to another or from one person to another, you will be charged a transfer fee of $15 for all but Lifetime Plans. If you transfer a Lifetime Subscription Plan from one Receiver to another or from one person to another the transfer fee is currently $75.00. SATELLITE RADIO SERVICE SUBSCRIPTIONS ARE TRANSFERABLE ONLY TO THE EXTENT PROVIDED FOR HEREIN. A LIFETIME SATELLITE RADIO SUBSCRIPTION IS NOT TRANSFERABLE IF IT IS ASSOCIATED WITH A RECEIVER INSTALLED BY AN AUTOMAKER OR AN AUTOMOTIVE DEALER IN A VEHICLE, EXCEPT IN THE EVENT THE ORIGINAL RECEIVER ASSOCIATED WITH THAT LIFETIME SUBSCRIPTION PLAN IS STOLEN, ACCIDENTALLY DAMAGED OR, IN OUR SOLE DISCRETION, IS DEFECTIVE. No transfer fee will be charged for the transfer of a Lifetime Subscription Plan associated with a Receiver installed by an automaker or an automotive dealer if, in our sole discretion, the Receiver is defective.
- **Cancellation Fee:** You will be charged a cancellation fee if you cancel a one-year or longer Subscription during the first year of service. The standard cancellation fee is

currently $75.00. Promotional offers may have different cancellation fees. From time to time, we may offer a Service on a multi-month commitment or promotional basis. In such event, you agree to make payments for Services to be received and that are ordered by you in accordance with the terms of the applicable billing plan and promotion that you agree to, including, without limitation, payments of any early termination fees if you terminate your Services prior to the end of a minimum commitment period.

- **Taxes:** All amounts charged to your account, including fees and shipping charges for Receivers purchased directly from XM may be subject to tax, which will vary according to your billing or shipping address and applicable law.

We reserve the right to waive any of these fees, in whole or in part, at our discretion. Our failure to enforce any of these fees or any other provisions of these Terms shall not be construed as a waiver of the right to assert any such Terms on any future occasion.

**9. Service Credits:** Service credits will not be refunded in cash, but will be honored in the form of Services for the remaining length of the credit. Unused service credits will expire upon termination of your Subscription and may not be transferred to another person or Subscription. If you are cancelling a Subscription that requires payment of an early termination fee if cancelled prior to the end of such commitment, or is subject to any nonrefundable prepayments, you will be responsible for the payment of such fees. Lifetime, automotive pre-packaged, monthly and certain promotional Subscriptions are nonrefundable; if you make changes to such Subscriptions, no service credits will be due on your account. If you change an existing Subscription Package or Plan and keep the same Receiver, we must cancel your existing Subscription, we will charge you for the new Subscription Plan, and you will receive a service credit for the unused prepaid portion of the old Plan. The Plan you give up may also be subject to a cancellation fee. If you change to a less expensive Subscription Package or payment Plan, both the service credit and the fees to make this change will be posted to your account and you may still enjoy a service credit or balance on your account when you begin your new Package or Plan.

**10. Changes to Packages and Plans:** You have the right to change your subscription "Package" (e.g., ask us to change from "XM Everything" to "XM Everything PLUS The Best of SIRIUS"). You also have the right to change your subscription "Plan" (e.g., ask us to change from a "XM Everything" Monthly Plan to a "XM Everything" 3-Year Plan). How the change will affect your account and charges will depend upon the choices you make. Each Subscription to the Satellite Radio Service is tied to one Receiver. You may have multiple Receivers and multiple Subscriptions. All of your Subscriptions may be combined on a single account. Service fees and balances are account-related, with a few exceptions. Sometimes they are Receiver-related. If you add additional Receivers to your account, you must purchase a separate Subscription for each one. For instance, if you would like to add a Subscription to our "Family Friendly" Package for a new Receiver in your home, such additional Subscriptions may be eligible for reduced rates, which may be offered by us from time to time and a per Receiver activation fee may apply.

**11. Listener Care:** If you have a question about your Service, Subscription, Subscription Fees, fees, charges or bill, or if you would like to change or reactivate your Subscription, please contact Listener Care. We will respond to you as promptly as practicable. If you contact XM Listener Care in writing, please include the following information:

- Your name, service address, and account number;
- The dollar amount in question; and
- The details of your question.

Please do not include any payment with your correspondence. If you wish to dispute any charge, you must contact us by mail or phone (by following the instructions on our website) within 30 days after the date you receive the statement in question. OTHERWISE YOU WAIVE YOUR RIGHT TO DISPUTE THE CHARGE. Undisputed portions of the statement must be paid by the due date to avoid a late fee and possible deactivation of the Service.

**G. <u>CANCELLATION</u>:** The term of your Subscription will automatically renew for additional terms of the same length as your initial Subscription Term or, at our option, on a month-to-month basis until you cancel the Service. You are responsible for payment of all outstanding balances accrued through that date. You must comply with all of these Terms of Service and this website or we may cancel your Service.

**1. Cancellation:** You may cancel your Subscription at any time by notifying Listener Care. Your cancellation will become effective on your next subscription "cycle date," which is the next month anniversary of your initial activation date (i.e., if you activated your Subscription on January 15th and cancel on April 1st your Subscription will end on April 15th). A cancellation fee may apply.

**2. Refunds:** LIFETIME, AUTOMOTIVE PRE-PACKAGED, MONTHLY AND CERTAIN PROMOTIONAL

SUBSCRIPTIONS ARE NONREFUNDABLE. If you cancel your Subscription prior to its expiration (excluding the aforementioned types of Subscriptions), you will receive a refund of amounts paid directly by the subscriber, if any, on a pro-rata basis, less any applicable fees, unless provided otherwise in any offer for the Service that you accept.  If your subscription was included in the financing of your purchase or lease of a vehicle, any refund will be payable to your finance company unless the finance company has notified us that your loan has been paid in full. Fees attributable to certain promotional offerings or Service received during trial periods may not be refunded.  **IN THE UNLIKELY EVENT THAT WE CEASE BROADCASTING THE SERVICE, WHETHER AS A RESULT OF A LIQUIDATION, BANKRUPTCY, OR OTHERWISE, ALL PREPAID SUBSCRIPTIONS WILL BE TREATED AS NONREFUNDABLE.**

**H.  DISCLAIMERS/LIMITATION OF LIABILITY**:

**1.  Disclaimers:**  YOU UNDERSTAND AND AGREE THAT THIS WEBSITE AND THE CONTENT AND FUNCTIONALITY OF THE SERVICE ARE PROVIDED "AS IS" AND "AS AVAILABLE." XM AND WSI MAKE NO REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, REGARDING THE SERVICE OR YOUR RECEIVER OR OTHER EQUIPMENT OR THAT YOUR ACCESS TO OR YOUR USE OF THE SERVICE OR WEBSITE WILL BE UNINTERRUPTED OR ERROR FREE OR TIMELY WITH ALL UPDATES. ALL SUCH WARRANTIES (INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT) ARE HEREBY DISCLAIMED.

**2.  Limitations of Liability:**  IN NO EVENT ARE WE, OR WSI, LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, LOST PROFITS,  OR LOSSES RELATING TO THE USE, LOSS OF USE OR DATA, OR PURCHASE OF ANY RECEIVER OR EQUIPMENT OR YOUR PURCHASE OR USE OF THE SERVICE, OR FROM ANY CONTENT POSTED ON OUR WEBSITE BY US OR ANYONE ELSE, WHETHER BASED ON NEGLIGENCE OR OTHERWISE, AND WHETHER OR NOT WE HAVE BEEN ADVISED OF THE POSSIBILITY THEREOF, WHETHER ARISING OUT OF BREACH OF AGREEMENT, TORT OR ANY OTHER CAUSE OF ACTION RELATING TO THE PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT.

IN NO EVENT WILL THE AGGREGATE OF EACH OF XM'S AND WSI'S LIABILITY FOR ANY AND ALL OF YOUR CLAIMS, OR ANY THIRD PARTY CLAIMS, AGAINST US, AND OUR PROGRAMMING OR DATA SUPPLIERS, SERVICE PROVIDERS, MARKETING/DISTRIBUTION SOFTWARE OR INTERNET SUPPLIERS OR HARDWARE OR SOFTWARE MANUFACTURERS, OR SUPPLIERS, CONTRACTORS AND LICENSORS, OR INDEPENDENT SELLERS,  ARISING OUT OF OR RELATED TO, DIRECTLY OR INDIRECTLY, THE PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS PURSUANT TO THESE TERMS OR BY THE NEGLIGENCE, ACTIVE OR PASSIVE, OF XM AND/OR WSI,  OR YOUR ACCESS TO OR USE OF OR INABILITY TO USE THE SERVICE OR THIS WEBSITE, EXCEED THE PRICE PAID BY YOU TO XM HEREUNDER FOR THE MOST RECENT SIX MONTHS OF SERVICE IMMEDIATELY PRIOR TO THE SPECIFIC EVENT WHICH GAVE RISE TO THE APPLICABLE DAMAGE OR LOSS. YOU AGREE THAT THIS LIMITATION OF LIABILITY REPRESENTS A REASONABLE ALLOCATION OF RISK. THIS ALLOCATION OF RISK AND THE DISCLAIMER OF WARRANTIES HEREIN ARE REFLECTED IN OUR PRICES AND ARE A FUNDAMENTAL ELEMENT OF OUR AGREEMENT TO PROVIDE THE SERVICE. YOU MAY HAVE GREATER RIGHTS THAN DESCRIBED ABOVE UNDER YOUR STATE'S LAWS.

**3.  Your Risk**: YOU AGREE THAT YOUR ACCESS TO AND USE OF, OR INABILITY TO ACCESS OR USE THE SERVICE OR THE WEBSITE IS AT YOUR SOLE RISK. YOU WILL NOT HOLD US, OUR PROGRAMMING OR DATA SUPPLIERS, SERVICE PROVIDERS, MARKETING/DISTRIBUTION, SOFTWARE OR INTERNET SUPPLIERS, OR HARDWARE OR SOFTWARE MANUFACTURERS, OR SUPPLIERS, OR OUR CONTRACTORS OR LICENSORS, AS APPLICABLE, RESPONSIBLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES, OR LOST PROFITS RESULTING FROM YOUR ACCESS TO OR USE OF, OR INTERRUPTIONS IN THE TRANSMISSION OR RECEPTION OF THE SERVICE, THIS WEBSITE, INCLUDING WITHOUT LIMITATION ANY DAMAGE TO ANY OF YOUR COMPUTERS OR DATA, AND/OR ANY XM RECEIVER. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY ANY PERSON SHALL CREATE A WARRANTY OR GUARANTEE IN ANY WAY WHATSOEVER RELATING TO THE SERVICE OR WEBSITE.

**4.  Third Parties:**  THE THIRD PARTY LINKS, SERVICES, GOODS, RESOURCES AND CONTENT AVAILABLE ON THE SERVICE AND THROUGH LINKS ON THIS WEBSITE ARE NOT CONTROLLED BY US. ACCORDINGLY, WE MAKE NO WARRANTIES REGARDING SUCH THIRD-PARTY SERVICES, GOODS, RESOURCES, AND CONTENT, INCLUDING WITHOUT LIMITATION WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND NON-INFRINGEMENT. WE WILL NOT BE LIABLE FOR YOUR ACCESS TO, USE OF OR DOWNLOADING OF CONTENT AVAILABLE ON OR THROUGH, THE SERVICE OR WEBSITE. WE ARE NOT LIABLE FOR ANY DIRECT OR INDIRECT DAMAGES OR LOSSES CAUSED BY YOUR USE OF THIRD-PARTY WEBSITES.  YOU ASSUME FULL RESPONSIBILITY WHEN YOU CHOOSE TO FOLLOW ANY LINKS ON THIS WEBSITE THAT LEAD TO THIRD-PARTY WEBSITES.

**5. State Law:**  SOME JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OF CERTAIN IMPLIED WARRANTIES OR THE LIMITATION OF CERTAIN DAMAGES, SO SOME OF THE ABOVE DISCLAIMERS, WAIVERS AND LIMITATIONS OF LIABILITY MAY NOT APPLY TO YOU.

**6. Miscellaneous:**  UNLESS LIMITED OR MODIFIED BY APPLICABLE LAW, THE FOREGOING DISCLAIMERS, WAIVERS AND LIMITATIONS SHALL APPLY TO THE MAXIMUM EXTENT PERMITTED, EVEN IF ANY REMEDY FAILS ITS ESSENTIAL PURPOSE. OUR LICENSORS AND CONTRACTORS ARE INTENDED THIRD-PARTY BENEFICIARIES OF THESE DISCLAIMERS.

**7. Indemnification:**  EXCEPT FOR WILLFUL MISCONDUCT ON THE PART OF XM AND/OR WSI, YOU AGREE TO DEFEND, INDEMNIFY AND HOLD HARMLESS SIRIUS XM RADIO INC. AND ITS AFFILIATES, SUBSIDIARIES, SHAREHOLDERS, OFFICERS, AGENTS, EMPLOYEES, LICENSORS AND SERVICE PROVIDERS, AND WSI ("INDEMNIFIED PARTIES") FROM ANY AND ALL CLAIMS, LIABILITY AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES), WHETHER IN TORT, CONTRACT OR OTHERWISE, RELATING TO OR ARISING OUT OF YOUR USE OF THE SERVICE AND ANY BREACH OF THESE TERMS OF SERVICE, APPLICABLE LAW OR ANY RIGHT OF THE INDEMNIFIED PARTIES OR ANY THIRD PARTY.  THIS INDEMNIFICATION OBLIGATION INCLUDES THE ACTS OR OMISSIONS OF ANYONE ACCESSING THE INTERNET RADIO SERVICE USING YOUR LOGIN ID, WITH OR WITHOUT YOUR PERMISSION.

**I.  RESOLVING DISPUTES:**

PLEASE READ THIS PROVISION OF THIS SECTION CAREFULLY.  IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION.  ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.  IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR, OR A PANEL OF ARBITRATORS, INSTEAD OF A JUDGE OR JURY.  THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE TO HAVE ANY DISPUTES RESOLVED THROUGH ARBITRATION.

In order to expedite and control the cost of disputes, you agree that any legal or equitable claim relating to the Service, the Website, your Subscription or these Terms (a "Claim"), will be resolved as follows:

**1. Informal Claim Resolution:** To initiate an informal resolution to a Claim, you must send a notice by first class United States mail to SIRIUS XM Radio Inc., 1221 Avenue of the Americas, New York, NY 10020, Attention:  XM Listener Care (a "Notice").  Neither of us may start a formal proceeding (except for Claims described in subsection 3 below) for at least 60 days after one of us notifies the other of a Claim in writing.  If we initiate a Claim, we will send our notice to the billing address on file with us.

**2. Formal Resolution:** If we cannot resolve a Claim informally, including any Claim between us, and any Claim by either of us against any agent, employee, successor, or assign of the other, including, to the full extent permitted by applicable law, third parties who are not signatories to this agreement, whether related to this agreement or otherwise, including past, present, and future Claims and disputes, and including any dispute as to the validity or applicability of this arbitration clause, then these Claims shall be resolved, upon election by either party, exclusively and finally by binding arbitration.

The party initiating arbitration must choose one of the two arbitration firms listed below and follow its rules and procedures in effect at the time the Claim is filed. You may obtain copies of the current rules of each of the arbitration firms and forms and instructions for initiating an arbitration by contacting them.

> American Arbitration Association
> 1633 Broadway, 10th Floor
> New York, New York 10019
> Web site: www.adr.org
> (800) 778-7879

> National Arbitration Forum
> P.O. Box 50191
> Minneapolis, MN 55405-0191
> Web site: www.adrforum.com
> (800) 474-2371

This arbitration agreement is made pursuant to a transaction involving interstate commerce and

shall be governed by the Federal Arbitration Act ("FAA"), and not by any state law concerning arbitration.

**3. Exceptions:** Notwithstanding the foregoing, any dispute involving a violation of the Communications Act of 1934, 47 U.S.C. §605, or the Electronic Communications Privacy Act, 18 U.S.C. §§2510-2521, may be decided only by a court of competent jurisdiction.

**4. Small Claims:** Instead of proceeding to arbitration, either you or we have the option to pursue a Claim in small claims court (or the equivalent) so long as 1) the Claim remains in that court, and 2) is made solely on our behalf (if brought by us), or on your behalf.  However, if that Claim is transferred or appealed to a different court, we reserve our right to elect arbitration.

**5. Individual Claims:** If either of us elects to resolve a claim by arbitration, that Claim shall be arbitrated on an individual basis. There shall be no right or authority for any claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Subscribers or persons similarly situated.  The arbitrator's authority to make awards is limited to awards to you and us alone. Furthermore, Claims brought by you and against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless agreed to in writing by all parties.  'Claim' (as defined in this section above) does not include any challenge to the validity and effect of the class action waiver in this subsection 5, which must be decided by a court.

**6. Severability:** If any portion of this arbitration agreement cannot be enforced, that portion will be severed, and the rest of the arbitration agreement will continue to apply, provided that the entire arbitration agreement shall be null and void if the class action waiver in subsection 5 above is held to be invalid with respect to any class or representative Claim, subject to any right to appeal such holding.

**7. Binding Effect:** In the arbitration proceeding, the arbitrator must follow applicable law, and any award may be challenged, as set forth in the FAA.  Any court with jurisdiction may enter judgment upon the arbitrator's award.  The arbitrator's decision is final and binding on all parties and may be enforced in any federal or state court with jurisdiction.

**J. MISCELLANEOUS:**

**1.  Notices:** Notices to you will be deemed given when deposited in the mail or when sent by email. Notices may be included in statements or other communications to you. We may also provide notice to you by telephone, which will be deemed given when a message is left with you, someone answering the telephone at your residence or on an answering machine or voice mail system at your phone number on record with us. Your notices to us will be deemed given when we receive them at the telephone number or, in writing at the address, set forth above at "CONTACT INFORMATION."

**2. Assignment of Account:** We may assign your account and all rights and/or obligations hereunder to any third party without notice for any purpose, including, without limitation, collection of unpaid amounts, in the event of an acquisition, corporate reorganization, merger or sale of substantially all of our assets to another entity. You hereby consent to such assignment. You must continue making all required payments to us in accordance with your billing statement, unless notified otherwise.

**3. Termination:**  We may terminate your right to use our website at any time and without notice.  We will terminate your right to use our website if you violate any of these Terms of Service or any other policy posted on our website, or if we become aware that you are a copyright infringer.

**4. Full Agreement:**  These Terms constitute the entire agreement between us concerning your access to and use of the Service or website and may be modified by the unilateral amendment of these Terms and the posting by us of such amended version. No salesperson or other representative is authorized to change it for you.  If any provision is declared by a competent authority to be invalid, that provision will be deleted or modified to the extent necessary, and the rest of these Terms will remain enforceable. Any specific Terms that expressly or by their nature survive termination shall continue thereafter until fully performed. A waiver of any of these Terms or any breach thereof, in any one instance, will not waive such term or condition or any subsequent breach thereof.

**5. Applicable Law:**  The interpretation and enforcement of these Terms shall be governed by the rules and regulations of the State of New York and other applicable federal laws.  These Terms are subject to modification if required by such laws.  Notwithstanding the foregoing, Section I. shall be

governed by the Federal Arbitration Act without reference to state law.

**THANK YOU FOR CHOOSING XM RADIO.**

© 2009 SIRIUS XM Radio Inc. SIRIUS, XM and all related marks and logos are trademarks of SIRIUS XM Radio Inc. and its subsidiaries.