UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CARL BLESSING, EDWARD A. SCERBO,
JOHN CRONIN, CHARLES
BONSIGNORE, BRIAN BALAGUERA,
SCOTT BYRD, GLENN DEMOTT,
ANDREW DREMAK, MELISSA FAST,
JAMES HEWITT, TODD HILL, CURTIS
JONES, RONALD WILLIAM KADER,
EDWARD LEYBA, GREG LUCAS,
JOSHUA NATHAN, JAMES SACCHETTA,
DAVID SALYER, SUSIE STANAJ, JANEL
and KEVIN STANFIELD, PAUL
STASIUKEVICIUS, TODD STAVE, and
PAOLA TOMASSINI, on Behalf of
Themselves and All Others Similarly
Situated,

        Plaintiffs,

  -against-

SIRIUS XM RADIO INC.,

        Defendant

No. 09-CV-10035 (HB)


JURY TRIAL DEMANDED

---

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

I.      NATURE OF ACTION ...................................................................................... 1

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    PARTIES .......................................................................................................... 6

IV.    BEFORE THE MERGER, THE TWO COMPANIES COMPETED VIGOROUSLY ..... 9

V.     THE MERGER OF SIRIUS AND XM THREATENS TO AND ALREADY HAS
        SUBSTANTIALLY LESSENED COMPETITION IN THE SDARS MARKET IN THE
        UNITED STATES ......................................................................................... 11

        A.     Sirius XM Offered Voluntary Restrictions To Gain The FCC's Regulatory
                Approval But Subsequently Evaded These Restrictions, Lessened Competition,
                and Harmed Consumers ....................................................................... 12

        B.     The Relevant Product Market Is SDARS And Geographic Market Is The United
                States. ................................................................................................. 15

                1.     Other Media Are Not Reasonably Interchangeable Substitutes for SDARS
                        and Cannot Constrain Sirius XM From Imposing And Sustaining A
                        SSNIP ...................................................................................... 16

                        a.   Terrerestrial Radio Is Not A Reasonably Interchangeable Subsitute
                        For SDARS  ............................................................................ 16

                        b.   MP3 Players And Other Digital Audio Devices Are Not a Reasonably
                        Interchangeable Substitute For SDARS ................................... 18

                        c.   Internet Radio Is Not a Reasonably Interchangeable Substitute For
                        SDARS ..................................................................................... 18

                2.     High Barriers To Entry Prevent New Competition From Acting As A
                        Constraint On Sirius XM'S Ability To Impose A SSNIP ....................... 19

        C.     Sirius XM Has Raised Prices In Numerous Ways Since the Merger .................. 21

                1.     Sirius XM Has Increased Prices To Multi-Receiver Subscribers By 29% 21

                2.     Sirius XM Has Increased Prices For Internet Access For Existing
                        Subscribers .............................................................................. 22

                3.     Sirius XM Has Imposed New Fees And Has Increased Others ............... 23

i

a.   Sirius XM Imposed New Cancellation And Transfer Fees On XM Subscribers ............................................................................. 23

b.   Sirius XM Eliminated Its Discount For On-Line Activation, Resulting In A 50% Increase In This Fee  ............................................... 23

4.      Sirius XM Has Raised Prices Under The Guise Of A Royalty Pass Through………………………………………………………….…24

D.      Sirius XM Has Profitably Sustained The Increased Prices To SDARS Consumers And Can Profitably Sustain Further Price Increases............................................. 24

E.      Sirius XM Has Failed To Increase Consumer Choice .......................................... 28

1.      Sirius XM Has Failed To Meet Its Commitment  To Add A La Carte Programming, As Promised..................................................................... 28

2.      Sirius XM Has Decreased Consumer Choice By Diminishing Variety and Quality of Programming ................................................................... 30

VI.      SIRIUS XM HAS DECEIVED ITS CUSTOMERS BY PORTRAYING THE ROYALTY FEE AS SIMPLY A  PASS-THROUGH OF ITS INCREASED ROYALTY COSTS ............................................................................................................. 32

A.      Sirius XM's Royalty Fees Are Not Charged At a Consistent  Rate, and Therefore Cannot Be Simply a Pass-Through Of Costs......................................................... 32

B.      Royalties The Company Paid Increased 3% Between 2007 and 2009 ................ 34

C.      The Royalty Fees Sirius XM Charges Far Exceed The 3% Increase In The Royalty Rates The Company Pays........................................................................ 36

D.      Sirius XM Has Made False And Deceptive Statements To  Its Subscribers And The Public About The Music Royalty Fee ........................................................ 38

VII.      NAMED PLAINTIFFS SUFFERED DAMAGES DUE TO THE ANTICOMPETITIVE CONDUCT AND FALSE, DECEPTIVE,  AND ILLEGAL ACTS OF SIRIUS XM..... 42

A.      Carl Blessing Suffered Damages ...................................................................... 42

B.      Edward A. Scerbo Suffered Damages ................................................................ 43

C.      John Cronin Suffered Damages .......................................................................... 44

D.      Charles Bonsignore Suffered Damages .............................................................. 44

E.      Brian Balaguera Suffered Damages.................................................................... 45

F.      Scott Byrd Suffered Damages............................................................................. 45

ii

G.      Glenn Demott Suffered Damages ................................................................ 46

H.      Andrew Dremak Suffered Damages ............................................................ 46

I.      Melissa Fast Suffered Damages .................................................................. 47

J.      James Hewitt Suffered Damages ................................................................. 47

K.      Todd Hill Suffered Damages ...................................................................... 48

L.      Curtis Jones Suffered Damages .................................................................. 49

M.      Ronald William Kader Suffered Damages .................................................. 49

N.      Plantiff Greg Lucas Suffered Damages ...................................................... 50

O.      Joshua Nathan Suffered Damages ............................................................. 50

P.      James Sacchetta Suffered Damages ........................................................... 51

Q.      David Salyer Suffered Damages ................................................................. 52

R.      Susie Stanaj Suffered Damages ................................................................. 53

S.      Janel and Kevin Stanfield Suffered Damages ............................................ 53

T.      Paul Stasiukevicius Suffered Damages ...................................................... 54

U.      Todd Stave Suffered Damages ................................................................... 55

V.      Plaintiffs Paola Tomassini And Edward Leyba Suffered Damages ............ 55

VIII.   CLASS ALLEGATIONS ...................................................................................... 56

COUNT I ....................................................................................................................... 59

COUNT II ...................................................................................................................... 60

COUNT III ..................................................................................................................... 62

COUNT IV...................................................................................................................... 63

PRAYER FOR RELIEF ................................................................................................. 91

Plaintiffs Carl Blessing, Edward A. Scerbo, John Cronin, Charles Bonsignore, Brian

Balaguera, Scott Byrd, Glenn Demott, Andrew Dremak, Melissa Fast, James Hewitt, Todd Hill,

Curtis Jones, Ronald William Kader, Edward Leyba, Greg Lucas, Joshua Nathan, James

Sacchetta, David Salyer, Susie Stanaj, Janel and Kevin Stanfield, Paul Stasiukevicius, Todd

Stave, and Paola Tomassini, individually and on behalf of all others similarly situated, upon

personal knowledge as to their own acts and status, and upon information and belief as to all

other matters, make the following allegations against Defendant Sirius XM Radio Inc. ("Sirius

XM" or the "Company"), individually, and as the successor-in-interest to Sirius Satellite Radio

Inc. ("Sirius") and XM Satellite Holdings Inc. ("XM"):

## I.     NATURE OF ACTION

1.      This is an action to unwind the anticompetitive merger between Sirius and XM

and to compensate the victims of the anticompetitive acts that the merged entity, Sirius XM, has

committed.  The action is brought pursuant to federal antitrust laws, state consumer protection

statutes, and state common law.

2.      Prior to the merger, Sirius and XM were the only competitors in the market to sell

satellite digital audio radio service ("SDARS") in the Unites States.  Vigorous competition

between Sirius and XM kept SDARS prices stable.  In over six years of operation prior to the

merger, Sirius never raised its monthly charge, and XM raised its monthly charge only once.

3.      On July 28, 2008, XM and Sirius – the only two providers of SDARS in the

United States – merged to form Sirius XM.  The merger of Sirius and XM has substantially

lessened competition in the SDARS market in the United States, and in fact, has resulted in the

creation of a monopoly.  Since the merger, Sirius XM has abused its monopoly power by raising

prices and sustaining such price increases, reducing the quantity and quality of programming,

breaching subscriber contracts, and making false and misleading statements to subscribers and the public.

4.     In connection with their applications for regulatory approval of their merger, Sirius and XM predicted that the synergies achieved by the merger would bring cost savings resulting in lower prices to their subscribers and more programming choices.  Now, 18 months after the merger took effect, it is clear that the impact on consumers has not been as predicted – and promised – by Sirius and XM.  While the Company may have benefitted from the merger, subscribers have only been harmed.

5.     In the worst climate for consumer spending since the Great Depression, Sirius XM has substantially increased prices and revenue.  During an analyst conference call discussing the Company's positive results for the second quarter of 2009, Sirius XM's CEO Mel Karmazin bragged about the how the Company was flourishing in the absence of competition:

> Last week marked the one-year anniversary of the merger of Sirius and XM. What the company has accomplished in the last 12 months is extraordinary. . . [and] was all accomplished during the most difficult business environment in recent history. . . .  Sirius XM is truly a cash flow growth story. . . . [A] great story it is.  As you saw in our press release this morning, we increased for the third time since our merger our guidance for 2009 . . . .  We anticipate over $400 million this year, compared with a loss of $136 million in 2008, which is a swing of over $536 million in one year.  I believe you will all agree that will be [an] astonishing performance.

A report issued late in 2009 by Bank of America/Merrill Lynch was "exceptionally bullish" on Sirius XM and predicts a positive EBITDA exceeding $1 billion per year by 2013.  *See* http://seekingalpha.com/article/180735-bank-of-america-issues-exceptionally-bullish-outlook-on-sirius-xm.  This performance was made possible by the elimination of any economically meaningful competition to Sirius XM in the SDARS market.

6.      Since gaining the enhanced market power conferred by the merger, **Sirius XM has profitably sustained multiple price increases, during a severe recession.**  These price increases include:

a.      Within just six months of the merger, the combined Company announced an increase in monthly charge per additional radio for multi-radio subscribers by nearly 30% (from $6.99 per month for each additional radio to $8.99 per additional radio).  This 30% price increase became effective on March 11, 2009, less than eight months after the merger.

b.      Before the merger, both Sirius and XM subscribers received internet access to programming as part of their standard subscription price.  On March 11, 2009, the Company required all subscribers seeking internet access to pay a monthly charge of $2.99.

c.      Effective July 29, 2009 – one year after the merger was finalized – Sirius XM again increased prices by charging a "U.S. Music Royalty Fee" (the "Royalty Fee") of 10% to 28%, which it deceptively represented to customers as a direct pass-through of only *increases* in the royalties that it has paid to the music industry, *i.e.*, musicians, record companies, and music publishers, since March 20, 2007.

d.      Also since the merger, Sirius XM has added or increased various administrative fees.  The Company increased the activation fee for subscribers who sign up online by 50% – from $9.99 to $14.99 for XM subscribers and from $10.00 to $15.00 for Sirius subscribers.  Additionally, Sirius XM added new fees for XM subscribers, who now are

3

charged $75.00 for subscription cancellations and $15.00 to transfer their

accounts from one radio to another.  Before the merger, XM did not

charge its subscribers for these account changes.

7.    In sum, between the new fees and rate increases, a subscriber with one additional

radio who had previously accessed the internet service for free was paying $19.94 per month and

is now paying $27.88 – a 40% increase in total.

8.    At the February 25, 2010, fourth quarter earnings call, Sirius XM CFO David

Frear made clear that the price increases imposed since the merger have allowed Sirius XM to

increase profitability, despite the challenging economic climate:

> Through the worst economic environment in a generation our results are
> phenomenal.
>
> Self-pay churn was under 2% for the second consecutive quarter despite the
> introduction of the U.S. music recovery fee in August.
>
> Revenues for the quarter were $684 million, *up 6%* as subscription and other
> revenues increased with higher ARPU [average revenue per user] and the
> implementation of the music recovery fee. ARPU improved $0.27 or 2.5% to
> $10.92 driven by higher sales of best sub packages *and the rate increases on
> multi-radio subscriptions and internet streaming*.

Sirius XM Radio Q4 2009 Earnings Call Transcript, available at

http://seekingalpha.com/article/190683-sirius-xm-radio-q4-2009-earnings-call-transcript

(emphasis added).

9.    Additionally, the price increases had very little impact on subscriber

deactivations, known as "churn."  At the fourth quarter 2009 earnings call, Karmazin stated that

there was a "lack of discernable impact on churn of the company's passing through the music

royalty fee." *Id.*  Thus, Sirius XM was able to raise prices an average of 15% and experienced no

discernable impact on subscriber deactivations.  It is clear, therefore, that Sirius XM has been

able to impose and profitably sustain a significant non-transitory price increase on SDARS consumers.

10.     Since the merger, Sirius XM subscribers have seen that the Company's commitment to offering competitive prices and improved programming was illusory.  Worse, subscribers have experienced the fallout of the cost-cutting measures.  In an attempt to consolidate supposedly overlapping programming between the two networks, Sirius XM eliminated many subscribers' favorite channels, including eclectic channels that attracted these listeners to satellite radio in the first place.

11.     On the technical side, Sirius XM subscribers have not benefitted from synergies created by the merger, if any.  There are still two separate radio networks, so subscribers still have to choose between Sirius or XM and, with rare exceptions, cannot switch between the two without either buying new equipment or paying a transfer fee.  Thus, for many subscribers, the merger has had no benefit.

12.     The Company's illegal and deceptive conduct has harmed competition and injured consumers in the SDARS market in the United States.  Thus, Plaintiffs bring claims for violation of the federal antitrust laws and state consumer protection statutes, as well as a state law claim for breach of contract.

## II.     JURISDICTION AND VENUE

13.     This is a class action involving more than 100 class members, a member of the Plaintiffs' Class is a citizen of a state different from Defendant, and the amount in controversy, in the aggregate, exceeds the sum of $5,000,000, exclusive of interest and costs.

14.     This Complaint is filed, and these proceedings are instituted, under common law, consumer protection statutes, the Clayton Act, 15 U.S.C. § 12, *et seq.*, and the Sherman Act, 15 U.S.C. § 1, *et seq.* to recover threefold damages and the costs of suit and reasonable attorneys'

fees, for the injuries sustained by Plaintiffs and members of the Class of direct purchasers of SDARS resulting from Sirius XM's illegal conduct.

15.     The jurisdiction of this Court is based upon 28 U.S. C. §§ 1331, 1332(d), 1337(a), and 15 U.S.C. § 15.

16.     Sirius XM transacts business in and has its principal place of business in this District.  Venue therefore is proper in this District pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391.

## III.   PARTIES

17.     Plaintiff Carl Blessing is a resident of Florida and subscriber and direct purchaser of Sirius XM SDARS in Florida.

18.     Plaintiff Edward A. Scerbo is a resident of New Jersey and subscriber and direct purchaser of Sirius XM SDARS in New Jersey.

19.     Plaintiff John Cronin is a resident of New Hampshire and subscriber and direct purchaser of Sirius XM SDARS in New Hampshire.

20.     Plaintiff Charles Bonsignore is a resident of California and subscriber and direct purchaser of Sirius XM SDARS in California.

21.     Plaintiff Brian Balaguera is a resident of Florida and a subscriber and direct purchaser of Sirius XM SDARS in Florida.

22.     Plaintiff Scott Byrd is a resident of New York and a subscriber and direct purchaser of Sirius XM SDARS in New York.

23.     Plaintiff Glenn Demott is a resident of Ohio and a subscriber and direct purchaser of Sirius XM SDARS in Ohio.

24.     Plaintiff Andrew Dremak is a resident of California and a subscriber and direct purchaser of Sirius XM SDARS in California.

25.     Plaintiff Melissa Fast is a resident of Maryland and a subscriber and direct purchaser of Sirius XM SDARS in Maryland.

26.     Plaintiff James Hewitt is a resident of California and a subscriber and direct purchaser of Sirius XM SDARS in California.

27.     Plaintiff Todd Hill is a resident of Maine and a subscriber and direct purchaser of Sirius XM SDARS in Maine.

28.     Plaintiff Curtis Jones is a resident of Florida and subscriber and direct purchaser of Sirius XM SDARS in Florida.

29.     Plaintiff Ronald William Kader is a resident of North Carolina and a subscriber and direct purchaser of Sirius XM SDARS in North Carolina.

30.     Plaintiff Edward Leyba is a resident of Arizona and a subscriber and direct purchaser of Sirius XM SDARS in Arizona.

31.     Plaintiff Greg Lucas is a resident of Washington and a subscriber and direct purchaser of Sirius XM SDARS in Washington.

32.     Plaintiff Joshua Nathan is a resident of Illinois and a subscriber and direct purchaser of Sirius XM SDARS in Illinois.

33.     Plaintiff James Sacchetta is a resident of Pennsylvania and a subscriber and direct purchaser of Sirius XM SDARS in Pennsylvania.

34.     Plaintiff David Salyer is a resident of South Carolina and a subscriber and direct purchaser of Sirius XM SDARS in South Carolina.

35.     Plaintiff Susie Stanaj is a resident of Michigan and a subscriber and direct purchaser of Sirius XM SDARS in Michigan.

36. Plaintiffs Janel and Kevin Stanfield are residents of Kansas and subscribers and direct purchasers of Sirius XM SDARS in Kansas.

37. Plaintiff Paul Stasiukevicius is a resident of Massachusetts and a subscriber and direct purchaser of Sirius XM SDARS in Massachusetts.

38. Plaintiff Todd Stave is a resident of Maryland and a subscriber and direct purchaser of Sirius XM SDARS in Maryland.

39. Plaintiff Paola Tomassini is a resident of Arizona and a subscriber and direct purchaser of Sirius XM SDARS in Arizona.

40. Greater than two-thirds of all Class members are residents of states other than the State of New York.

41. Defendant Sirius XM is a Delaware Corporation with its principal place of business at 1221 Avenue of the Americas, 36th Floor, New York, New York. It is the successor entity resulting from the merger of Sirius and XM. Sirius XM broadcasts music, sports, news, talk, entertainment, traffic and weather channels for a subscription through two satellite radio systems – the Sirius system and the XM system. The vast majority of its programming is offered commercial free on over 100 different channels.

42. Sirius is a Delaware corporation that was merged on July 28, 2008 with XM to form Sirius XM. (The name change did not occur until August 5, 2008). Prior to the merger, Sirius offered SDARS broadcast on over 100 channels, including music, sports, news, talk, entertainment, traffic and weather channels. Sirius sold its service on a subscription basis.

43. XM is a Delaware corporation that was merged on July 28, 2008 with Sirius to form Sirius XM. Prior to the merger, XM offered SDARS broadcast on over 100 channels,

including music, sports, news, talk, entertainment, traffic and weather channels.  XM sold its service on a subscription basis.

44.     Sirius XM, Sirius, and XM have been engaged at all relevant times in "commerce" as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12.  Sirius XM's, Sirius's, and XM's general business practices, the merger of Sirius and XM, and the unfair methods of competition alleged herein are acts "in or affecting commerce."

45.     Sirius XM, Sirius, and XM authorized and/or participated in the conduct complained of herein, and are directly liable for the damages incurred by Plaintiffs and the proposed Class.

## IV.     BEFORE THE MERGER, THE TWO COMPANIES COMPETED VIGOROUSLY

46.     Sirius XM's primary source of revenue is subscription fees, with most of its customers subscribing on an annual, semi-annual, quarterly or monthly basis.  As of December 31, 2009, Sirius XM had 18,772,758 subscribers.  Sirius XM sells its service directly to consumers, who activate the service with Sirius XM and are billed directly for the service by Sirius XM.  Sirius XM customers can manage their accounts themselves directly on the Sirius XM website.  All of Sirius XM's customers are direct purchasers of SDARS from Sirius XM.

47.     Before the merger created Sirius XM, Sirius and XM were the only providers of SDARS in the United States.  Each company spent billions of dollars to enter the SDARS market and once Sirius entered the market in 2002, the two SDARS providers engaged in vigorous competition.

48.     In April 1997, the Federal Communications Commission ("FCC") auctioned 25 MHz of spectrum in the S-band allocated to satellite radio.  XM was one of the winning bidders, and was awarded the license to provide satellite radio services in the 2332.5-2345 MHz band.

Sirius was another winning bidder, and was awarded rights to provide satellite radio in the 2320-2332.5 MHz band.

49.     After being awarded their broadcast licenses, Sirius and XM invested over five billion dollars each, primarily to: (1) develop and upgrade their networks; (2) design chipsets and radios capable of receiving their service; (3) subsidize the cost of such chipsets and radios to encourage their distribution; (4) develop subscriber-based management systems and other information technology; (5) market their brands; and (6) create programming for subscribers.

50.     XM launched its broadcast service in September 2001.  As of December 31, 2006, it provided SDARS to approximately 7.6 million subscribers in the United States.

51.     Sirius began providing SDARS in February 2002.  As of December 31, 2006, it had approximately 6 million SDARS subscribers in the United States.

52.     Between February 2002 and July 2008, when both XM and Sirius were operating and providing SDARS to their subscribers, the two companies competed vigorously for customers on a price and non-price basis.

53.     On a non-price basis, the companies competed by trying to deliver better content. This led to content-provider agreements with Howard Stern and most major sports leagues among numerous others.  Consumers benefitted from this competition as they were given a choice based on their programming preferences.  Also content-related, Sirius launched its music channels as commercial free, which caused XM to subsequently remove commercials from almost all of its music channels.

54.     XM and Sirius also competed in driving innovation in SDARS technology.  Both companies invested in and touted receivers developed to receive their broadcasts based on

appearance, portability, screen size, battery life, etc.  Consumers benefitted from this vigorous non-price competition.

55.     Consumers also benefitted from the strong competition between Sirius and XM in the form of stable pricing.  In over six years of operation prior to the merger, Sirius never raised its monthly charge from $12.95.  XM raised its monthly charge only once, in the second quarter of 2005, when it increased its price from $9.99 to match Sirius at $12.95.  *See* Sirius and XM's Joint Opposition to Petitions to Deny and Reply Comments at 13-14 n.31 (MB Docket No. 07-57, t July 24, 2007) ("Joint Opposition").

56.     Even as the companies added content at significant cost to themselves, subscription costs remained stable.  As Karmazin noted, "Sirius started its subscription service in 2002.  And the price was $12.95.  And has not had a price increase on that $12.95 since then.  After that period of time the company added content like Howard Stern [with a $500 million 5-year contract], and the NFL [with a $220 million 7-year contract], NASCAR, and various other programming elements without changing the price point."  Sirius XM Radio Q2 2009 Earnings Call Transcript.  XM's presence in the market constrained it from being able to do so.

57.     The same was true of XM's content agreements.  For example, XM signed an exclusive 11-year agreement with Major League Baseball ("MLB") for $650 million.  It originally added a $10 monthly fee for subscribers who wanted access to the MLB broadcasts.  However, XM later eliminated that additional fee and instead included access to MLB broadcasts in the base cost of the service – due to competition from Sirius.

## V.   THE MERGER OF SIRIUS AND XM THREATENS TO AND ALREADY HAS SUBSTANTIALLY LESSENED COMPETITION IN THE SDARS MARKET IN THE UNITED STATES

58.     The merger of Sirius and XM into Sirius XM threatens to substantially lessen competition in the SDARS market in the United States and in fact has already done so, with the

creation of a monopoly.  The substantial reduction of competition is evident in the unprecedented price increases Sirius XM has imposed on its subscribers since the merger.

59.     The only provider for SDARS in the United States is the merged entity, Sirius XM.  There is no reasonably interchangeable substitute for SDARS that would constrain Sirius XM from imposing a "small-but-significant-and nontransitory-increase-in-price" ("SSNIP").  Moreover, the high barriers to entry prohibit any new competitor who might offer lower cost alternatives from entering the market.

60.     Section 7 of the Clayton Act does not require a showing that Sirius XM has already abused its newly acquired market power.  However, Sirius XM has already shown that it can use its monopoly power to profitably impose a SSNIP and that it intends to raise prices even higher in the future.

### A.     SIRIUS XM OFFERED VOLUNTARY RESTRICTIONS TO GAIN THE FCC'S REGULATORY APPROVAL BUT SUBSEQUENTLY EVADED THESE RESTRICTIONS, LESSENED COMPETITION, AND HARMED CONSUMERS

61.     Because the proposed merger involved the transfer of control of FCC licenses, federal law required Sirius and XM to apply to the FCC for approval of the transfer.  They filed such an application on March 20, 2007.  *See* XM Satellite Radio Holdings Inc., and Sirius Satellite Radio Inc., Consolidated Application for Authority to Transfer Control (MB Docket No. 07-57), filed with the FCC, March 20, 2007 (the "Application").

62.     In concluding its review of the proposed merger, the FCC recognized its anticompetitive potential.  *See* FCC Memorandum Opinion and Order and Report and Order ("FCC Order" or the "Order") at 5 (July 25, 2008).

63.     In an effort to induce the FCC to approve the license transfer, Sirius and XM offered several non-binding conditions, which would impose voluntary constraints on the merged entity's ability to exercise its enhanced market power.  These conditions included a three-year

price freeze on the basic subscription fee, the addition of new programming, and provision of other services that would purportedly enhance consumer welfare.

64.     In addition, Sirius and XM executives pledged that the merger would produce hundreds of millions of dollars in efficiencies, which the merged entity would pass on to consumer in the form of lower prices.  David Frear, presently the Executive Vice President and Chief Financial Officer of Sirius XM, who occupied the same position with Sirius, told the FCC that:

> Prior to the announcement of this merger and immediately thereafter, securities analysts estimated that there would be efficiencies from the merger of Sirius and XM Satellite Radio ("XM") on the order of hundreds of millions of dollars annually. . . Sirius' management independently considered the potential for synergies and cost savings from a merger with XM and also believe that there would be hundreds of millions of dollars in annual efficiencies.
>
> * * * *
>
> [I]t is my professional opinion and belief that a merger of Sirius and XM will result in significant, *cognizable synergies in every line item of the income statement that will benefit consumers* and that are not achievable without this merger.

Decl. of Frear ¶¶ 3, 5, Ex. D to Joint Opposition (emphasis added).

65.     The Application predicted that "[t]he synergies resulting from the merger will allow the combined company to provide consumers *lower prices* and *more* programming choices." Application at 9 (emphasis added).

66.     Sirius XM pledged that "no satellite radio subscriber will have to pay more . . . as a result of the merger."  FCC Order at 11-12; *see also* Joint Opposition at 13.  Sirius and XM specifically committed that "[t]he combined company will not raise the retail price for its basic $12.95 per month subscription package, the a la carte programming packages . . . and the new programming packages . . . for thirty six months after consummation of the merger."  FCC Order at 88, 91.

13

67.     Sirius XM also promised that "[s]ubscribers will also be able to continue their $6.99 multi-receiver subscriptions."  Joint Opposition at 14.

68.     Sirius XM offered the above pricing restrictions in order to persuade the FCC and the public that the Sirius XM merger would not create a monopoly, lessen competition, result in increased prices, or otherwise harm the consumer.  Indeed, the pricing restrictions were particularly persuasive to the FCC, which noted that

> absent Applicants' voluntary commitments . . . the proposed transaction would increase the likelihood of harms to competition and diversity. . . . ***Applicants would have the incentive and ability to raise prices*** for an extended period of time.
>
> * * *
>
> Applicants, however, have proposed significant voluntary commitments regarding steps the merged company would take to mitigate harms and achieve public interest benefits.  ***We find that absent those voluntary commitments and other conditions, the harms of the transaction would outweigh the potential public interest benefits.***

FCC Order at 5.

69.     In addition, Sirius XM committed to *increasing* subscriber choice.  For example, Sirius and XM jointly committed that the merged company would provide an "a la carte" service that would allow subscribers to choose 50 channels (*i.e.*, a subset of the full menu) for a lower monthly fee than subscribers pay for the standard package.  In this way, the combined entity was supposed to improve the range of available options at no additional cost to subscribers.

70.     Although the FCC acknowledged that the merger would give monopoly power to the combined Company, the FCC approved the license transfers in large part because of the voluntary restrictions Sirius XM offered.  These restrictions did not eliminate Sirius XM's ability to harm consumers and competition, but merely limited some of the ways in which such damage could be inflicted.  As noted by Jonathan S. Adelstein, one of the two FCC Commissioners who

14

voted against approval, "consumers [would] get a monopoly with window dressing," given the "gaping loopholes" in the voluntary commitments.  FCC Order at 98-99.  Sadly, Commissioner Adelstein's prediction has proven right.

71.     As detailed below, since the merger, the combined Company has evaded the price restrictions it offered and it has only marginally expanded the variety of choices available to subscribers.  For example, the self-imposed 36-month price cap was to last until July 28, 2011.  Sirius XM did not, however, wait that long before evading the price cap by raising fees on internet access and multi-subscriber accounts and by turning a purported royalty cost pass-through into a revenue generating bonanza.

72.     Indeed, Sirius XM intends to raise the $12.95 subscription price once the voluntary commitment it made has expired.  Karmazin has stated that "[w]e have . . . our commitment . . . we would not raise that basic $12.95 price point.  So that July 28th of 2011, we are hopeful that we have the latitude to do all kinds of pricing initiatives . . . . Until then, what we have done, is we have carved out a mechanism for us to have some tiered pricing . . . .  So by keeping best of, it gives us an opportunity to have this tier, and two years from now, we will look at what other changes we might want to make to our pricing structure."  Sirius XM Q2 2009 Earnings Call Transcript.

## B.     THE RELEVANT PRODUCT MARKET IS SDARS AND GEOGRAPHIC MARKET IS THE UNITED STATES.

73.     The relevant product market in which Sirius XM competes is the market to sell SDARS in the United States.  There is no meaningful economically interchangeable substitute to SDARS that would constrain Sirius XM from imposing and sustaining a 5% SSNIP as defined by the Horizontal Merger Guidelines used by the Department of Justice ("DOJ") and Federal Trade Commission ("FTC").

74.     The geographic market for SDARS is the United States as the Sirius XM SDARS service is sold throughout the United States.  Any other provider, foreign or domestic, could not sell such services in the U.S. unless and until such licenses were to be obtained.

**1.     Other Media Are Not Reasonably Interchangeable Substitutes for SDARS and Cannot Constrain Sirius XM From Imposing And Sustaining A SSNIP**

75.     Although SDARS subscribers can access music, news, and other entertainment through other terrestrial (*i.e.*, AM/FM) radio, portable music players (such as MP3 players), and internet services, none is a reasonably interchangeable substitute for SDARS.  Accordingly, Sirius XM has been able to sustain a substantial price increase of over 5%-10%.

**a.     Terrestrial Radio Is Not A Reasonably Interchangeable Substitute for SDARS**

76.     Terrestrial radio is not a reasonably interchangeable substitute for SDARS, and does not constrain Sirius XM from imposing and sustaining a SSNIP for SDARS.

77.     As an initial matter, the fact that Sirius XM's customers have chosen to pay $12.95 or more a month to receive SDARS is evidence of the lack of economic substitutability of terrestrial radio.  Even though terrestrial radio broadcasts are free, and virtually every adult in the U.S. owns a terrestrial radio, the Sirius XM customer base pays substantial sums for SDARS because they believe it is a superior product compared to terrestrial radio.

78.     There are numerous reasons why Sirius XM customers have chosen to purchase SDARS even though they can receive terrestrial radio for free.  From a technical perspective, SDARS signals cover millions of square miles, provide consumers with better reception and with less distortion (particularly for subscribers in rural areas, where terrestrial radio signals are weak), and enable consumers to listen to programming seamlessly without regard to geographic

borders or remoteness. SDARS also provides numerous benefits in terms of programming, including:

a.  SDARS offers substantial amounts of *commercial-free programming* with fewer interruptions;

b.  SDARS offers superior diversity and variety of programming, including programming dedicated to music (of dozens of types for different eras), children, sports, talk and entertainment, religion, education, news, traffic, weather, adult, emergency services, and television simulcasts;

c.  SDARS offers programming of public importance and interest (for example, during the 2008 presidential campaign, both Sirius and XM had a channel dedicated solely to the campaign and its issues – POTUS '08);

d.  Sirius XM programming is not subject to FCC broadcast content restrictions and thus is able to broadcast programs that appeal specifically to artists with less censorship and their fans;

e.  Sirius XM offers simulcasts of cable television broadcasts, such as CNN and Fox News;

f.  Sirius XM Radio has content relationships with an array of personalities and artists, many of which are exclusive arrangements, including Howard Stern, Martha Stewart, Oprah Winfrey, Jimmy Buffett, Jamie Foxx, Barbara Walters, Opie & Anthony, Bubba the Love Sponge®, The Grateful Dead, Willie Nelson, Bob Dylan, Tom Petty, and Bob Edwards;

g.  Sirius XM is the leader in sports programming as the Official Satellite Radio Partner of the NFL, Major League Baseball®, NASCAR®, NBA,

NHL®, and PGA TOUR®, and premier broadcaster of major college

sports events; and

h.      For more than 80 North American markets, Sirius XM offers the XM

NavTraffic® service for GPS navigation systems, which delivers real-time

traffic information, including updates on accidents and road construction.

### b.      MP3 Players And Other Digital Audio Devices Are Not Reasonably Interchangeable Substitutes for SDARS

79.     MP3 players such as the iPod are not reasonably interchangeable substitutes for

SDARS and do not constrain Sirius XM from imposing and sustaining a SSNIP for SDARS.

80.     MP3 players allow users to listen to an array of music and other content,

including previously broadcast radio programs, books on tape, and recordings of comedy

sketches and routines.  The user is limited, however, to the material he has purchased or

downloaded and then loaded onto the MP3 player.  In contrast, the content available through

SDARS providers is limitless.  The variety of programming and availability of exclusive content

on Sirius XM is unmatched on any other source.

81.     Moreover, the content on SDARS is fresh and constantly changing.  Much of the

non-music content – such as Howard Stern's daily broadcasts, news programming, traffic

updates, and play-by-play sports programming – is generated in real time.  Much of this real-

time content is available only through exclusive arrangements with Sirius or XM.  Thus, the user

of an MP3 player cannot possibly duplicate the content offered through SDARS broadcasts.

### c.      Internet Radio Is Not A Reasonably Interchangeable Substitute For SDARS

82.     Internet radio services are not reasonably interchangeable substitutes for SDARS

and do not constrain Sirius XM from imposing and sustaining a SSNIP for SDARS.

18

83.     Internet radio suffers from some of the same technological limitations as terrestrial radio.  Internet radio is only an option when listeners can receive internet access. Listeners who are driving usually connect to their internet via cell phone, by connecting the phone (often a "smart phone" such as an iPhone) to a jack and then listening to the internet radio through the cell phone's internet connection (provided by the cell phone provider).  But for listeners who are driving in wireless dead zones (such as rural areas or in densely populated urban areas that are prone to service problems), the absence of cell phone service also means the absence of internet radio.  Given that the overwhelming majority of Sirius XM subscribers listen while driving in their cars, this technological limitation is significant.  In contrast, in those same locations, Sirius XM broadcasts strong signals, providing a clear advantage to internet radios.

84.     Further, there is currently no easy way to access internet radio in a car.  Switching on a radio to hear SDARS broadcasts is simple compared to the cumbersome process of connecting to internet radio through a cell phone connected to a car stereo.

85.     In terms of content, Sirius XM is the only source of programming that puts all types of content, such as music, comedy, and news, in one place, *along with* significant proprietary content such as Howard Stern.  By contrast, the most popular internet radio stations such as Mog, Pandora, and Slacker offer only music and are subject to the technological limitations discussed above.

### 2.     High Barriers To Entry Prevent New Competition From Acting As A Constraint On Sirius XM'S Ability To Impose A SSNIP

86.     There are exceedingly high barriers to entry into the market for SDARS due to the great capital expenditures required in the provision of satellites and the need to obtain broadcasting licenses, which the FCC has stated are unavailable.

87.     A potential entrant into the SDARS market could incur costs in the billions of dollars to enter the market.  Before the merger, Sirius and XM *each* invested over five billion dollars, primarily to: (l) develop and launch satellites; (2) develop and upgrade a complex system of ground repeaters so the signals could be received where clear access to the southwestern sky was not available; (3) design chipsets and radios capable of receiving their services; (4) subsidize the cost of such chipsets and radios to encourage their distribution; (5) develop a distribution network by building relationships with automobile manufacturers to pre-install hardware in cars; (6) develop a retail distribution network to ensure SDARS hardware was broadly available; (7) develop subscriber-based management systems and other information technology; (8) market their brands; and (9) create compelling programming for subscribers.

88.     In addition, a prospective competitor could not enter the market on a timely basis even if it could afford to.  It took both XM and Sirius over four years to begin broadcasting after winning their spectrum bids (after waiting five years for the FCC to hold the auction).  This shows that a prospective competitor could not launch a new service to compete with Sirius XM within the next two years.

89.     Further, no potential competitor could currently obtain a broadcast license. SDARS broadcasts over spectrum in the "S" band (2.3 GHz).  XM and Sirius were the only two holders of licenses to broadcast in the "S" band prior to the merger and there is no available spectrum space for a new SDARS provider.

90.     The FCC has made clear that "additional spectrum is not available at this time without spectrum divestiture, which we have determined is inappropriate in light of the considerable financial investment needed to successfully operate an SDARS service, as well as the technical complications that might result from such divestiture. Additionally, *the regulatory*

***and other business aspects involved in the start-up of such a cost-intensive operation make effective competitive entry unlikely within any relevant time horizon.***" FCC Order at 5 (emphasis added).

91.     The high barriers to entry make it impossible, at any time in the next two years, for a competitor to enter the SDARS market in the United States to compete with Sirius XM.

### C.     SIRIUS XM HAS RAISED PRICES IN NUMEROUS WAYS SINCE THE MERGER

92.     By mid-March 2009, less than a year after the merger was completed, Sirius XM implemented its first price increases.  As explained below, Sirius XM's newly-acquired monopoly power has enabled the Company to increase prices above competitive levels, thereby harming the Company's subscribers, including Plaintiffs and the Class.

### 1.     Sirius XM Has Increased Prices To Multi-Receiver Subscribers By 29%

93.     Before the merger, Sirius and XM offered multi-receiver discounts that permitted subscribers to pay $6.99 per month for each additional radio (for up to five total radios), rather than paying the full $12.95 for each additional radio.

94.     In its efforts to persuade the FCC to approve the merger, Sirius XM promised not to increase the multi-receiver subscription prices above this level.  Joint Opposition at 14.

95.     However, on January 25, 2009, just six months after the merger, Sirius XM announced that it would increase the monthly price charged to multi-receiver subscribers. Effective March 11, 2009, Sirius XM increased the price by $2.00 per radio: from $6.99 to $8.99 per radio, a 29% increase.

96.     Upon information and belief, approximately 20% of Sirius XM subscribers are multi-receiver subscribers.  Of its approximately 18.5 million subscribers, roughly 3.8 million have therefore been subject to this 29% increase for each additional receiver used.  Sirius XM is

now earning approximately $7.4 million more per month (assuming the multi-receiver subscribers have one additional receiver and pay on a monthly basis), or nearly $89 million more annually. Indeed, in Sirius XM's most recent quarterly earnings report, the Company attributes its increased revenues in part to the increase in multi-receiver fees. In the results for the fourth quarter reported on February 25, 2010, the Company noted that the increased average revenue per user ("ARPU") to $10.92 "was driven mainly by the sale of 'Best of' programming and increased rates on the company's multi-subscription and Internet packages." Press Release, Sirius XM Reports Full Year and Fourth Quarter 2009 Results (Feb. 25, 2010).

**2. Sirius XM Has Increased Prices
For Internet Access For Existing Subscribers**

97. Also effective March 11, 2009, Sirius XM began charging $2.99 for all subscribers accessing Sirius or XM programming via the internet. Prior to this time, this fee was only applicable for users accessing the programming via the high-quality 132 bkps connection. Sirius and XM users accessing the programming through the lower-quality 32 bkps or 64 bkps connections could do so for free.

98. The Company's plan to increase prices for internet access to programming was never disclosed to the FCC during proceedings relating to the approval of the merger. The Company used its monopoly power to eliminate the choice of the free option and replace it with a higher-cost option, effectively imposing a price increase of $2.99 per month. Prior to the merger, competition between XM and Sirius would have constrained both companies from increasing price and reducing choice in this manner.

### 3.     Sirius XM Has Imposed New Fees And Has Increased Others

#### a.     Sirius XM Imposed New Cancellation
#### And Transfer Fees On XM Subscribers

99.     As a result of the merger, XM subscribers are now subject to various fees that they would not have incurred under XM's subscriber contract.

100.     While XM and Sirius were competitors, Sirius charged its subscribers (with prepaid subscriptions or a committed subscription period) a cancellation fee but XM did not. The absence of a cancellation fee gave XM a competitive advantage when competing against Sirius for new customers.  After the merger and the elimination of competition, however, Sirius XM began to charge a $75 cancellation fee for XM subscribers who cancel a one-year or longer subscription during the first year of service.

101.     Similarly, for over six years before the merger, Sirius charged subscribers a transfer fee to switch a subscription from one radio to another, but XM did not.  But now, after the merger, Sirius XM charges a $15 transfer fee to most XM subscribers and charges a $75 transfer fee for lifetime subscribers – if they are able to transfer their subscriptions at all.  Sirius XM prohibits any transfer of lifetime subscriptions from radios installed by automakers or automotive dealers.  Thus, if a lifetime subscriber decides to buy a new car and wants to continue her subscription, she must pay the $75 cancellation fee *and* forfeit the money paid on the lifetime subscription, even if she is buying a new car from the same manufacturer and is not switching from XM to Sirius (or Sirius to XM).

102.     These new fees raised prices for over 8 million XM subscribers.

#### b.     Sirius XM Eliminated Its Discount For On-Line
#### Activation, Resulting in a 50% Increase In This Fee

103.     Before the merger, both Sirius and XM provided discounted activation fees for subscribers who activated a SDARS receiver online via the internet, rather than by phone.  The

pre-merger activation fees for XM subscribers were $9.99 for online activation, and $14.99 for

activation by phone.  The pre-merger activation fees for Sirius subscribers were $10.00 for

online activation, and $15.00 for activation by phone.  Since the merger, Sirius XM increased the

online activation fee by 50% to $14.99 for XM subscribers and $15.00 for Sirius subscribers.

The lower cost online option was thus eliminated.

### 4.    Sirius XM Has Raised Prices<br>Under The Guise Of A Royalty Pass-Through

104.    On July 29, 2009 (one year after the merger), Sirius XM used its monopoly power

to raise prices by approximately 10%-28% by imposing a "U.S. Music Royalty Fee."  Sirius XM

represents in its customer contract (the "Customer Agreement") that the Royalty Fee is a "pass-

through" of only the increase in music royalties it paid during the period between March 20,

2007 (when Sirius and XM filed their request to the FCC to approve the transfer of broadcast

licenses to the combined Company) and July 29, 2009 (one year after the consummation of the

merger).  Prior to the merger, Sirius and XM both absorbed royalties paid as part of their costs.

105.    Absent the merger, neither company could have profitably raised prices by adding

a Royalty Fee, even if their own royalty expenses had increased.  The history of competition

between Sirius and XM establishes that expenses such as royalties – and increases in such

expenses – were not passed through in the form of higher rates.  Indeed, before the merger, XM

and Sirius both paid music royalties without passing those expenses on to consumers.  However,

now that the merger has eliminated competition in the SDARS market, Sirius XM is free to

exercise its monopoly power to pass on increases in its expenses to consumers.

### D.    SIRIUS XM HAS PROFITABLY SUSTAINED THE INCREASED PRICES TO SDARS CONSUMERS AND CAN PROFITABLY SUSTAIN FURTHER PRICE INCREASES

106.    The DOJ, FTC and courts determine whether a merger may substantially lessen

competition by applying the SSNIP test, *i.e.*, whether the merged entity can profitably sustain a

price increase of five percent for at least two years.  If existing or newly entered competition causes the price increase to be revoked, or else erodes business to the point that the additional revenue generated by the price increase is offset by lost customers, the merger is unlikely to be able to substantially lessen competition.  However, if the merged entity can profit from the price increase for two years – *i.e.*, the additional revenue generated by the price increase exceeds any revenue loss from customers who left because of the price increase – competition is at risk and Section 7 of the Sherman Act is violated.

107.    Before the merger, Sirius XM represented that after the merger it would have an incentive to lower prices.  Specifically, as noted by the FCC Order approving the license transfer, "Applicants [XM and Sirius] have argued, however, that due to the particular nature of demand for satellite radio services, the merged entity will have an incentive instead to lower prices." FCC Order at 47.

108.    Sirius XM's behavior since the merger confirms, through the SSNIP test, that the merger has instead provided the incentive to *raise* prices, and that the merger has, and threatens to further, lessen competition in the market for SDARS in the United States.

109.    Sirius XM believes its price increases will be profitable – *i.e.*, that the extra revenue from the price increase will outweigh any lost revenue from subscribers who cancel their service because they do not want to pay the price increase. Sirius XM President of Operations and Sales James Meyer explained the merged entity's approach:

> [I]n March [2009] we also initiated rate increases to subscribers in two ways, raising our multiradio rate from $6.95 [sic] to $8.99 and charging $2.99 per month for online streaming, which was previously free . . . .  Subscription rates increases are always difficult and do put pressure on subscriber results. ***However, the long-term financial gains associated with the rate increases far exceeds any near-term loss.***

Sirius XM Q1 2009 Earnings Call Transcript (emphasis added).

110.   Karmazin explained in the Q1 2009 conference call with investors the strategy of

the price increases:

> There is no question that we are running this Company to generate the greatest
> amount of cash flow . . .  Today, with our strong subscriber position . . . our focus
> is on making money.  So as an illustration, we took actions over the last several
> months that we knew would adversely affect some subscribers, but we
> implemented them as it was the right decision from a financial viewpoint.  Our
> charging $2.99 for streaming versus free, our raising prices on family plan to
> $8.99 from $6.95 are examples of these decisions.   These decisions were
> obviously not made to enhance subscriber growth but to enhance profitability. . . .
> Make no mistake, we are very focused on keeping our subscribers very happy and
> growing our subscriber base.   But today, in the current environment, this is
> secondary to growing our profits.

111.   In the Q2 2009 conference call, Karmazin further elaborated:

> So though we certainly would love the idea in this economic time of having
> consumers get [sic] the best price we can afford[,] we think that we have an
> extraordinary value proposition that we are giving to our subscribers . . . .  What
> we know is, that we will be recouping [through the price increases] hundreds of
> millions of dollars of cash.  And that it was the right decision to make. . . .  So we
> remain very optimistic, we expect that churn will increase.  But it was again the
> right decision to do.  And as it applies to ARPU [Average Revenue Per Unit, *i.e.*,
> subscriber], we believe that is something that will continue to grow as we add
> more buyers of our packages, as we are charging for streaming, and various other
> things.

Sirius XM Q2 2009 Earnings Call Transcript.

112.   The Company's second quarter ending June 30, 2009, was the first quarter

measuring the effects of the internet access and multi-subscription price increases. Despite the

price increases, Sirius XM suffered only a 1% net decline in the number of subscribers, and

recorded a 4% increase in revenues.  This performance is particularly impressive in light of the

condition of the United States economy during this period.  In contrast, Sirius XM's advertising

revenue decreased 33% during this period when compared to the prior year.

113.   The Company's performance was even better during the third quarter, ending

September 30, 2009 – the first quarter measuring effects of the 10%-28% price increases

26

imposed by the Royalty Fee. Sirius XM actually increased subscribers by 0.6% (102,295 subscribers) during this period, and revenues increased by 2% over the previous quarter.

114.    Sirius XM's quarterly report for the period ending September 30, 2009 stated: "The increase in revenue was due mainly to **_increased rates_** on **_multi-subscription packages, revenues earned on internet packages, the introduction of the U.S. Music Royalty Fee_** and the sale of 'Best of' programming. Q3 2009 Form 10-Q at 39 (emphasis added).

115.    Indeed, the Company's churn rate – the metric by which customer turnover is measured – actually improved after the price increase. Sirius XM CFO David Frear explained the improvement in churn during the Company's Q2 2009 conference call with analysts:

> As we mentioned on our last call, we began to see an uptick in self-pay churn late in the fourth quarter [2008], as macroeconomic conditions weighed on consumers. . . . But we were pleased to see the sequential improvement from 2.2% we reported in the first quarter [2009]. Particularly in light of the actions taken this year to increase free cash flow growth. That is the $2 per month higher price for family plan subscriptions, the new $3 per month charge for online streaming and the announcement in June of the U.S. music royalty fee.

116.    The positive earnings growth, boosted by the various price increases, continued in the fourth quarter of 2009. For the fourth quarter of 2009, Sirius XM reported revenue of $684 million, up 6% from the fourth quarter of 2008. Significantly, the Company added 250,000 subscribers and reported ARPU growth from $10.65 in the fourth quarter of 2008 to $10.92 in Q4 2009. Sirius XM, Press Release (Feb. 25, 2010). Moreover, the Royalty Fee is not included in Sirius XM's reported ARPU.

117.    It is clear that the various price increases have not seriously affected the Company's customer base. Karmazin specifically pointed out the "lack of discernible impact on churn of the company's passing through the music royalty fee," with churn at less than 2% for the second consecutive quarter. Sirius XM Earnings Q4 2009 Call Transcript.

27

118.   Some analysts have been similarly optimistic as to the Company's ability to profitably impose further price increases.  In J.P. Morgan's February 26, 2010 analyst report Lev Polinsky wrote the following:

> **Operating metrics point in right direction.** Sirius XM appears to be thriving as a joint entity, with subscriber additions (especially on the OEM side) very healthy, and significant room for upside as (1) new car sales improve and (2) the company's efforts in the used car arena start bearing fruit. ***Further, all-in ARPU is rising due to the [Royalty] pass-through fee, and we think recent low levels of churn suggest pricing could further rise once the company gets through the FCC-imposed hike moratorium, due to end in August 2011.***

(emphasis added)

119.   Sirius XM has also reduced its equipment subsidies, discounts and promotions since the merger resulting in a substantial reduction in its Subscriber Acquisition Cost.  The reduction in subsidies, discounts and promotions effectively increases prices to Sirius XM's subscribers.

120.   Despite Sirius XM's various price increases, it has gained more subscribers, increased revenue and increased profitability.  It has done all of this during the steepest economic decline since the Great Depression while selling a product that can hardly be characterized as a necessity.  In short, Sirius XM has demonstrated that it can – and will – impose a significant price increase (well over the 5% considered by the DOJ in its merger analysis) and remain profitable.  Accordingly, Sirius XM has also shown that it has monopoly power in the SDARS market, which it is already using to the detriment of its subscribers.

### E.   SIRIUS XM HAS FAILED TO INCREASE CONSUMER CHOICE

#### 1.   Sirius XM Has Failed To Meet Its Commitment To Add A La Carte Programming, As Promised

121.   The FCC Order states that Sirius XM has committed to offer within one year of the merger a $6.99 per month "a la carte" programming option providing 50 channels for both

XM and Sirius system users.  FCC Order at 11 (*citing* Joint Opposition at 11-14).  The Company has failed to meet that commitment.  As a result, subscribers have yet to see the increased consumer choice that was promised.

122.    Thus far, only Sirius subscribers have any a la carte option.  While XM was to offer its subscribers such plans within one year of the merger, it has not yet offered such a plan.

123.    Moreover, the a la carte plan is only available to consumers who purchase one of only two available radio receivers:  the Sirius Starmate 5 and the Stratus 6.  The manufacturers' suggested retail price ("MSRP") for these two models are substantially higher than the prices for other satellite radios.  Radios that were on the market at the time of the merger application, approval, and closing, are not capable of receiving a la carte programming and therefore subscribers using such radios cannot take advantage of a la carte pricing.  Additionally, automotive manufacturers ("OEMs") do not install either the Starmate 5 or the Stratus 6 into their automobiles.

124.    Thus the overwhelming number of subscribers – XM subscribers, those who still use radios purchased before the merger, those who use radios installed by OEMs, those who chose to purchase less expensive radios than the Starmate 5 or Stratus 6 – have no access to the discounted a la carte pricing.

125.    Additionally, Sirius XM agreed to cap the price of the 50-channel a la carte programming (*i.e.*, the basic a la carte option, compared to the 100-channel "a la carte gold option") at $6.99 per month with no increase for three years after the merger.  But for those Sirius subscribers who chose the a la carte option when it was introduced in the fall of 2008, that $6.99 monthly rate was only available until July 2009, before the Company tacked on the $1.98 Royalty Fee, thereby increasing the price of that plan by roughly 28%.

126.    Further, the a la carte option does not allow subscribers to pick from the full array of Sirius channels.  Certain so-called premium music channels (such as those devoted to the music of a single artist) are not included in the $6.99 rate, but instead cost an additional 25 cents per channel.  Nor are the play-by-play sports channels included.  To add those to the a la carte package, a subscriber would need to pay $11.99 per month.  And to have access to the two Howard Stern channels, a subscriber to an a la carte plan would have to pay $12.95 – the same rate for the Sirius Everything plan.

### 2.    Sirius XM Has Decreased Consumer Choice By Diminishing Variety and Quality of Programming

127.    The consolidation also resulted in decreased choice for many subscribers. Following the merger, the Company changed the channel line-up on both the Sirius and XM networks.  Some of the changes amounted to simple consolidation of duplicate programming, such as the channels featuring music of specific eras (such as hits of the 1950s, 1960s, 1970s, etc.).  However, the efforts to consolidate also resulted in the complete elimination of many channels, including several that were known for their deep playlists and the wide variety of artists and musical styles featured.

128.    For example:

a.    Before the merger, XM offered five Latin music channels; after the consolidation, XM (and Sirius) offered only one (with a second channel available only through the internet, for an extra monthly charge);

b.    Before the merger, XM offered Metropolitan Opera Radio, a channel for opera, as well as Vox, a separate channel featuring a wider variety of vocal music, such as choral music, gospel and religious music, in addition

30

to opera.  *See* http://www.voxfan.com/forum/viewtopic.php?f=5&t+5.

Following the merger, Vox was eliminated.

c.  Before the merger, both XM and Sirius had offered a channel devoted

exclusively to punk rock music.  After the merger, the Company

eliminated these channels, instead offering "Faction," a channel playing

the music of extreme sports, including punk, along with hip hop and hard

rock.

d.  Before the merger, XM offered two channels that featured alternative rock

from the 1980s, Fred and Lucy.  Now XM offers its subscribers only one

choice, "First Wave," the Sirius version of 1980s alternative rock.  Many

XM subscribers view First Wave as an inadequate substitute for Fred and

Lucy.

129.    The termination of many XM programming staff and deejays meant that

[g]one from XM . . . [were] some of the most popular voices and programs
offered by the satellite service, including many of the producers and deejays on
XM's highly creative Decades channels, which, unlike anything on Sirius,
recreate the sounds of radio stations from the 1940s, 50s, 60s and so on.  Also
gone, almost all of the staffers on XM's black music channels, including Soul
Street chief Bobby Bennett, a Washington legend.

Marc Fisher, Raw Fisher Blog, *Washington's Loss: XM Empties Out*, WASH. POST, Oct. 15,

2008.

130.    At the time that Sirius and XM agreed to merge, Sirius provided NBA and college

sports play by play programming.  But since the agreement to merge, Sirius allowed the NBA

play by play programming and much of the college sports programming, such as the

Southeastern Conference games, to transfer to XM.  Those Sirius subscribers who listened to

these broadcasts prior to the merger now must subscribe to the Sirius Everything Plus Best of

31

XM package for $16.99 per month, rather than the $12.95 that these subscribers paid prior to the merger.

131.    In sum, the merger led to a reduction in output and decreased quality – the opposite of the effects Sirius and XM promised to deliver.

## VI.    SIRIUS XM HAS DECEIVED ITS CUSTOMERS BY PORTRAYING THE ROYALTY FEE AS SIMPLY A PASS-THROUGH OF ITS INCREASED ROYALTY COSTS

132.    As a condition of the merger approval, Sirius XM pledged not to raise prices. However, the FCC, in approving the merger, permitted the Company to impose a limited price increase, equal to *only* the increase in the *rate* of royalties paid since filing its merger application in March 2007.  On July 28, 2009, Sirius XM began charging the Royalty Fee.  The Company tells subscribers that the Royalty Fee complies with the FCC Order, *i.e.*, that the Royalty Fee passes through only the *increase* in the royalty rate.

133.    In reality, the Royalty Fee rates far exceed a pass-through of increased royalty costs to Sirius XM.  As explained below, Sirius XM is charging different rates to subscribers with different plans and *all* the rates far exceed the differential between the pre-merger-application rates and the post-merger rates that Sirius and XM pay.  Sirius XM has used the Royalty Fee to disguise price increases that provide substantial revenue to the Company, as evidenced by the fact that Sirius XM includes the Royalty Fees in "Other revenue" on its consolidated statements of operations.  *See* Sirius XM, Form 10-Q, at 37 (Nov. 5, 2009) ("Q3 2009 Form 10-Q").

### A.    SIRIUS XM'S ROYALTY FEES ARE NOT CHARGED AT A CONSISTENT RATE, AND THEREFORE CANNOT BE SIMPLY A PASS-THROUGH OF COSTS

134.    Royalties paid to the music industry are paid as a percentage of music-related gross revenue, which generally includes subscription fees and advertising revenue derived from

music channels.  Thus, for any Sirius or XM subscription plans offering more than incidental music programming, the royalty rates Sirius and XM pay to the music industry – and hence charge their subscribers via the purported pass-through – should be a consistent percentage.

135.   However, as shown in Table 1 below, the current Royalty Fees differ depending on the subscribers' choice of plan.  While subscribers to the Sirius or XM basic plan pay a rate of approximately 15% per month, some subscribers pay a rate as low as roughly 10%, while others pay more than 28%.

**Table 1**
**Royalty Fee and Rates According To Subscription Plan**

| Subscription Plan | Subscription Price ($) | Royalty Fee ($) | Royalty Fee as % of Plan Price |
|---|---|---|---|
| XM Everything (Basic) | 12.95 | 1.98 | 15.29% |
| XM Everything Family Friendly | 11.95 | 1.83 | 15.31% |
| XM Everything Plus* | 16.99 | 1.98 | 11.65% |
| XM Everything Plus Family Friendly* | 14.99 | 1.83 | 12.21% |
| XM Mostly Music | 9.99 | 1.53 | 15.32% |
| XM Multi-Receiver (per add'l radio) | 8.99 | 0.97 | 10.79% |
| Sirius Everything (Basic) | 12.95 | 1.98 | 15.29% |
| Sirius Everything Family Friendly | 11.95 | 1.83 | 15.31% |
| Sirius Everything Plus* | 16.99 | 1.98 | 11.65% |
| Sirius Everything Plus Family Friendly* | 14.99 | 1.83 | 12.21% |
| Sirius Mostly Music | 9.99 | 1.53 | 15.32% |
| Sirius Multi-Receiver (per add'l radio) | 8.99 | 0.97 | 10.79% |
| Sirius A la Carte Gold | 14.99 | 1.98 | 12.21% |
| Sirius A la Carte | 6.99 | 1.98 | 28.33% |

> * The Royalty Fees on the "Plus" plans are less than 15.3% of the subscription price ***only*** because those plans include basic subscription packages with music programming "plus" talk radio shows, which are not subject to the Royalty Fee. Thus, the subscription prices are higher but the dollar amount of the Royalty Fee is not, resulting in a Royalty Fee that is a lower percentage of the total subscription price.[1]

---

[1] For example, subscribers of the XM Everything Plus and Sirius Everything Plus plans pay $12.95 for the same music programming that is available on the XM Everything and Sirius Everything plans, as well as $4.04 for the

*(Cont'd)*

136.    Sirius XM does not provide an explanation why it charges a Royalty Fee of 28.3% of the subscription price of the Sirius A La Carte Plan, while charging a Royalty Fee of only 12.21% for the A La Carte Gold plan.  Nor does the Company explain why it charges a Royalty Fee of 15.29% for the Sirius Everything Plan, while charging a Royalty Fee of 10.79% per additional radio under the Multi-Receiver Plan.[2]  If the Royalty Fee were a straightforward pass-through based on a percentage of the music-related revenue, the *rates* these subscribers are paying would be the same.  Thus, it is clear that the Royalty Fee is *not* merely a pass-through of the incremental rate increase.

## B.    ROYALTIES THE COMPANY PAID INCREASED 3% BETWEEN 2007 AND 2009

137.    Section 102 of the Copyright Act of 1976 (the "Copyright Act") identifies various categories of works that are eligible for copyright protection.  17 U.S.C. § 102.  These include "musical works" and "sound recordings."  *Id.* at §§ 102(a)(2) & 102(a)(7).  The term "musical work" refers to the notes and lyrics of a song, while a "sound recording" results from "the fixation of a series of musical, spoken, or other sounds."  *Id.* at § 101.  Thus, a recorded song will constitute a "sound recording" by the entity that records the performance, and a "musical work" by the songwriter.  Typically, a record label owns the copyright in a sound recording and a music publisher owns the copyright in a musical work.

---

non-music talk radio programming, for a total of $16.99.  Because the non-music talk radio programming is not subject to a music royalty fee, Sirius XM cannot apply the Royalty Fee to the $4.04.  Instead, the Royalty Fee is $1.98, the same Royalty Fee that the Company charges for the $12.95 Everything plans.  So, although the percentage of the "Plus" plans' *total* subscription price attributable to the Royalty Fee is only 11.65%, the Royalty Fee as a percentage of the subscription price attributable to music programming (*i.e.*, $12.95) remains 15.3%, *i.e.*, the same percentage as the Everything plans.  Accordingly, even for the "Plus" plans, the Royalty Fees greatly exceed the amounts that Sirius XM is permitted to charge pursuant to its Customer Agreements and the FCC Order.

[2] As discussed above, *see* Section V.A.1, *supra*, the multi-receiver subscription plans had already suffered an increase in price of 29% before the implementation of the Royalty Fee.  The total price increase to multi-subscription plans since the merger is 42%.

138.   Before the merger, both Sirius and XM paid the same or substantially the same sound recording royalties and musical works royalties, which were calculated and paid as a percentage of music related gross revenue.  Before the Copyright Royalty Board established the rate for 2007, for accounting purposes, XM and Sirius established a 2007 royalty rate for the performance of sound recordings of 4.0% to 4.2%.  *See* Determination of Rates and Terms for Preexisting Subscription Services and SDARS, 73 Fed. Reg. 4080, 4098 (Jan. 24, 2008) ("CRB Determination").

139.   Effective January 1, 2007, the royalty rate paid by Sirius and XM for the performance of sound recordings was 6% of music related gross revenues. This rate was established by the Copyright Royalty Board on January 24, 2008.  *See* CRB Determination at 4084.  Effective January 1, 2009, the royalty rate paid by Sirius XM for the performance of sound recordings increased to 6.5% of music related gross revenues.  *Id.* at 4098.  The increase in royalty rates for sound recordings paid by Sirius and XM between March 20, 2007 and July 29, 2009 was thus only 0.5%.

140.   However, the Royalty Fees of 10%-28% appearing on subscribers' bills bear little relationship to the increase in royalty rates that occurred while the merger was pending.  Table 2 below shows the increase in royalty rates that occurred between 2007 and 2009.

**Table 2**
**Royalty Rates Paid To Industry**

| Year | Sound Royalty Rate | Musical Works Royalty Rate[3] | Total Royalty Rate |
|------|--------------------|-------------------------------|--------------------|
| 2007 | 6.0% | 4.0% | 10% |
| 2009 | 6.5% | 6.5% | 13% |
| | | | |
| **Increase** | **0.5%** | **2.5%** | **3%** |

141.    The combined increase in royalty fees for musical works and sound recordings for the period March 20, 2007 through July 29, 2009 was no more than 3% (0.5% increase for sound recording royalties, and no more than a 2.5% increase for musical works).  Thus, a pure pass-through of this cost-increase would be equal to 3% of music-related gross revenue.[4]

### C.    THE ROYALTY FEES SIRIUS XM CHARGES FAR EXCEED THE 3% INCREASE IN THE ROYALTY RATES THE COMPANY PAYS

142.    Sirius XM currently charges a Royalty Fee of 10%-28% of subscription revenue, which is well above the rates the Company would be charging if it were simply passing through the approximately 3% increase in royalties it has paid since March 20, 2007.  Indeed, even if Sirius XM were purporting to charge a Royalty Fee equal to *all* the Company's royalties paid to the music industry (as opposed to charging only the increases in such fees paid since March 20, 2007), which is 13%, the Royalty Fee still would be excessive.

143.    Further, the Company pays royalties only on its gross revenue *attributable to music programming,* which differs from the Company's gross revenue.  Gross revenue for

---

[3] The Musical Works Royalty Rates in Table 2 are set forth on information and belief based on actual information relating to the musical works rates in 2006, actual sound recording royalty rates for 2006-2009, Sirius and XM's accounting practices for the 2007 year before the CRB determination, and the fact that musical works royalty rates generally are less than sound recording royalty rates.

[4] The 2007 sound recording royalty rates were implemented retroactively.  To the extent Sirius XM claims it is entitled to look at the rates that it accounted for before the CRB Determination, the relevant rates were 4%-4.2%. Together with the 4% musical works rate, the total would have been 8%-8.2%. The increase from these rates to the 2009 total royalty rate of no more than 13% is 4.8%-5%, which is still far less than the increase in royalty rates claimed by Sirius XM when imposing the Royalty Fee.

purposes of calculating music royalty fees does not include sales and use taxes, shipping and handling, credit card, invoice, and fulfillment service fees.  *See* 37 CFR § 382.11 (identifying those payments and fees that are excluded when calculated gross revenue for purposes of determining royalty fees).

144.    Gross revenue for purposes of calculating music royalty fees also does not include subscription revenue used to pay the royalties that Sirius and XM had previously absorbed. Therefore, to the extent that the subscription prices include amounts to cover expenses for music royalties; sales and use taxes; shipping and handling; and credit card, invoice, and fulfillment fees, Sirius XM would pay no royalties on such amounts and accordingly is not entitled to charge a Royalty Fee on such amounts.

145.    For example, if the Company uses $1.00 of the $12.95 basic subscription price to pay for the expenses not properly included in the Royalty Fee calculation discussed above, the $1.98 Royalty Fee charged to subscribers choosing this plan actually constitutes 16.6% ($1.98/$11.95) of the music-related revenue – even more than the 15.29% calculated in Table 1 above.  As this example shows, the values shown in Table 1 likely *understate* the excessive rates the Company is charging its subscribers.  Accordingly, these values also *understate* the magnitude of the overcharge that subscribers are paying with the current Royalty Fees.

146.    In addition to subscription revenue from music programming, gross revenue for the purposes of calculating royalty fees includes advertising revenue generated for music programming from the six XM music programming channels that do include commercials. Thus, for example, Sirius XM's gross revenue for purposes of calculating royalty rates includes a small portion of the approximately $47 million in advertising revenue Sirius XM reported in 2008.  Most of this advertising revenue is generated from non-music programming (such as the

talk radio channels), and therefore should not be included in the gross revenue calculations for determining the royalties owed.  However, even adding the full $47 million advertising revenue to the gross revenue pool and allocating it among the Company's 18 million subscribers, each subscriber's share of that $47 million in advertising revenue is only $2.54 annually or roughly 22 cents per month, which would only minimally impact the calculation of the rate each subscriber is paying for her Royalty Fee.  In other words, if Sirius XM adds 22 cents to each subscription price to calculate the gross revenue, the same 22 cents should be added to the subscription price to calculate the rate being charged for the Royalty Fee.

147.    For example, a subscriber with the basic $12.95 plan paying a $1.98 Royalty Fee would actually be paying the same $1.98 Royalty Fee on a total of $13.17 ($12.95 plus $0.22). Including the advertising revenue, the subscriber would be paying a Royalty Fee of 15.03%, compared to the 15.29% rate the subscriber is paying on the $12.95 base rate alone – a negligible difference.  And even with the advertising revenue included, such a subscriber would still be paying far more than the 3% that the Company is entitled to pass through to the subscribers.

148.    Moreover, the impact of any appropriate upward adjustments to include the advertising revenue in the gross revenue would be mitigated, or even completely reversed, by any appropriate downward adjustments to the total revenue (per subscriber) from the amounts subtracted for the various taxes and fees.

### D.    SIRIUS XM HAS MADE FALSE AND DECEPTIVE STATEMENTS TO ITS SUBSCRIBERS AND THE PUBLIC ABOUT THE MUSIC ROYALTY FEE

149.    Sirius XM states in its Customer Agreement and claims to its subscribers and the public that the Royalty Fee is a "pass-through" of its increased royalty costs that it incurred since filing its merger application.  Sirius XM also represents that the Royalty Fee is consistent with

the FCC Order, which provides that "the combined company may pass through cost *increases* incurred since the filing of the merger application."  FCC Order at 47 (emphasis added).

150.    Sirius XM's billing statements imposing the Royalty Fee direct subscribers to a website, which purports to explain the Royalty Fee:

> U.S. Music Royalty Fee – Radio subscriptions which include music channels will be charged a fee per paid month of your plan term.  For details see FAQs, xmradio.com/usmusicroyalty.

151.    The Sirius XM Customer Agreement states the following:

> U.S. Music Royalty Fee: As of July 29, 2009, new and renewing Subscription Packages which include music channels will be charged a U.S. Music Royalty Fee. For further details on how this fee is calculated see FAQs [hyperlink directing subscriber to Sirius XM website U.S. Music Royalty Fee page].

152.    The billing statements and customer agreements provide almost no information about the Royalty Fee other than directing the subscriber to the Sirius XM website.

153.    The Sirius XM website Royalty Fee page, which is incorporated into the Sirius XM Customer Agreements, provides:

**U.S. Music Royalty Fee**

Effective July 29, 2009, a U.S. Music Royalty Fee has been added to subscriber invoices. Details about the specific costs being passed through to subscribers in this U.S. Music Royalty Fee are provided below.

**1. Why does Sirius XM pay music royalties?**

Music royalty rights were established by Congress and are the product of the Copyright Act.  Unlike terrestrial radio, both Sirius and XM are required to pay copyright music royalties to recording artists, musicians and recording companies who hold copyrights in sound recordings (the actual recording of a work).  These royalties have risen dramatically as a result of a decision of the Copyright Royalty Board. Like terrestrial radio, Sirius and XM must also pay music publishers who hold copyrights in musical compositions (or the lyrics and music) through their collective organizations, ASCAP, BMI and SESAC.  These fees have also risen since March 2007. Finally, Sirius and XM must also pay certain copyright owners to facilitate the recording of content on portable devices.

**2. Who is the Copyright Royalty Board?**

The Copyright Royalty Board consists of three Copyright Royalty Judges who determine rates and terms for statutory copyright licenses that are set forth in the Copyright Act. These administrative judges are appointed by the Librarian of Congress.

**3. Who benefits from the U.S. Music Royalty Fee?**

100% of **the U.S. Music Royalty Fee will be used to offset payments** from Sirius and XM to the music industry.

**4. How is the U.S. Music Royalty Fee calculated?**

We are **passing along the increases** in our costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007, the date on which we applied to the FCC to approve the merger.

**5. Do all Sirius XM subscribers pay the same fee?**

All subscribers who receive a given package containing music pay the same fee.  *We believe charging each Sirius XM subscriber the same fee most equitably apportions the increased fees to subscribers.*  Note: some packages, such as News, Sports and Talk contain little music and are not subject to the U.S. Music Royalty Fee.

**6. How much is the U.S. Music Royalty Fee?**

The fee is $1.98 a month on our base $12.95 subscriptions and $.97 for base plans that are eligible for a second radio discount.  Your actual fee may vary depending upon the Package and Plan term you choose.

**7. Will I have to pay the U.S. Music Royalty Fee on the free months I received for buying an annual plan?**

No, free months do not incur any U.S. Music Royalty Fees.

**8. When will I pay the U.S. Music Royalty fee?**

For plans renewing after July 28, 2009, the fee will be automatically added to your next bill.  There will be no change to your current plan and that plan will remain in effect without change until your next renewal date.

**9. Is the U.S. Music Royalty Fee applied to activations and other fees?**

No.

**10. Do you anticipate further price increases or additional fees in the near future?**

No.  We are committed to providing our customers the best value for their entertainment dollar.

**11. Is this fee consistent with Sirius XM's merger commitment not to raise prices for three years?**

Yes.  This fee is consistent with our commitment not to raise the base price of specific service plans for three years after the merger.  ***The FCC decision approving the merger between Sirius and XM permits the companies beginning July 29, 2009 to pass through to subscribers any increases in music royalties since March 20, 2007***, the day the companies first asked the FCC to approve the merger.  The U.S. Music Royalty Fee implements this FCC decision.

http://www.xmradio.com/about/musicroyalty.xmc; http://www.sirius.com/usmusicroyalty

(emphasis added).

154.    Sirius XM has required its customer service representatives to represent to subscribers that the Royalty Fee is expected to increase by 0.5% each year through 2012.

155.    The information Sirius XM provides to the public and its customers is false, deceptive and misleading because Sirius XM is not "passing along [only] the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007.

156.    Sirius XM's contractual provisions and statements to its subscribers are false and deceptive because not all subscribers receiving more than incidental music content pay the same fee.

157.    Sirius XM's contractual provisions and statements to its subscribers are false and deceptive because the Royalty Fee does not implement the FCC's Order relating to the pass-through of cost increases.  The Royalty Fee imposed on Sirius XM customers is substantially

41

greater than the "pass-through" of certain "cost increases" set forth in the FCC Order. *See* FCC

Order at 47.

158.    The extent of the deception differs depending on the particular rate plan the

subscriber has chosen.  As shown in the Table 1 above, basic plan subscribers pay a rate of

approximately 15% per month, while other subscribers pay a rate as low as roughly 10% and

others pay more than 28%.

159.    Sirius XM has required its customer service representatives to systematically

provide deceptive and erroneous information to subscribers, including that:  the Royalty Fee

complies with the FCC Order; Sirius XM has paid and absorbed the royalty fee increases up until

July 29, 2009, pursuant to the FCC Order; and the Royalty Fee is a passing along of the

increased royalty fees beginning July 29, 2009 as outlined in the FCC Order.

160.    Sirius XM has required its customer service representatives to provide deceptive

and false information to customers by informing them that the amount of the Royalty Fee is due

to royalty rate increases mandated by the Copyright Royalty Board.  In fact, the Royalty Fee is

far greater than the royalty increases mandated by the Copyright Royalty Board.

**VII.    NAMED PLAINTIFFS SUFFERED DAMAGES DUE TO THE
ANTICOMPETITIVE CONDUCT AND FALSE, DECEPTIVE,
AND ILLEGAL ACTS OF SIRIUS XM**

**A.    CARL BLESSING SUFFERED DAMAGES**

161.    Plaintiff Carl Blessing is a Florida resident.  He is currently a subscriber and

direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Blessing was a Sirius

subscriber, subscribing on a monthly basis starting in January 2006.  He subsequently purchased

two additional radios (for family members), beginning an annual subscription in March 2006 and

another in June 2006.

162.    Blessing subscribes to the $12.95 basic monthly ("Sirius Everything") subscription plan and two multi-receiver plans for two additional radios.  The two additional radios renew on an annual basis.  Blessing was charged the increased multi-subscription $8.99 pricing when he renewed the two multi-subscription annual plans on March 25, 2009 and June 25, 2009.

163.    Blessing renews his Sirius Everything $12.95 plan monthly.  On or about August 28, 2009, Blessing was charged for and began paying the $1.98 monthly Royalty Fee for his monthly subscription.

164.    Blessing has paid the monthly Royalty Fee as part of his subscription payment since August 2009.

165.    Blessing has suffered damages due to Sirius XM's increased prices and illegal conduct.

**B.    EDWARD A. SCERBO SUFFERED DAMAGES**

166.    Plaintiff Edward A. Scerbo is a New Jersey resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger he was an XM subscriber.

167.    Scerbo subscribes to the $12.95 basic ("XM Everything") subscription plan and pays on a quarterly basis.  At each quarterly payment, he pays a total of $38.85, exclusive of taxes and fees, for the XM Everything basic plan.  On or about September 4, 2009, Scerbo was charged for and began paying the $5.94 Royalty Fee (or $1.98 per month for three months) for his subscription.

168.    Scerbo has paid the Royalty Fee as part of his subscription payment since September 4, 2009.

43

169.     Scerbo has suffered damages due to Sirius XM's increased prices and illegal conduct.

### C.     JOHN CRONIN SUFFERED DAMAGES

170.     Plaintiff John Cronin is a New Hampshire resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger he was a Sirius subscriber.

171.     Cronin subscribes to the $12.95 Sirius Everything plan and renews his subscription monthly.

172.     Cronin has also paid for and received internet access for a charge of $2.99 per month.

173.     On or about August 2, 2009, Cronin was charged for and began paying the $1.98 Royalty Fee.

174.     Cronin has paid the monthly Royalty Fee as part of his subscription payment since August 2009.

175.     Cronin has suffered damages due to Sirius XM's increased prices and illegal conduct.

### D.     CHARLES BONSIGNORE SUFFERED DAMAGES

176.     Plaintiff Charles Bonsignore is a California resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, he was an XM subscriber.

177.     In August 2009, Bonsignore was charged for and began paying the monthly Royalty Fee for his monthly subscription.

178.     Bonsignore has paid the monthly Royalty Fee as part of his subscription payment since August 2009.

179.   Bonsignore has suffered damages due to Sirius XM's increased prices and illegal conduct.

### E.   BRIAN BALAGUERA SUFFERED DAMAGES

180.   Plaintiff Brian Balaguera is Florida resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio.  Prior to the merger, he was an XM subscriber.

181.   Balaguera renews his XM subscription monthly.  In August, 2009, Balaguera was charged for and began paying the monthly Royalty Fee.

182.   Balaguera has paid the monthly Royalty Fee as part of his subscription payment since August 2009.

183.   Balaguera has suffered damages due to Sirius XM's increased prices and illegal conduct.

### F.   SCOTT BYRD SUFFERED DAMAGES

184.   Plaintiff Scott Byrd is a resident of New York.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Byrd was an XM subscriber.

185.   Byrd has been a subscriber of XM since May 2008.  He currently subscribes to the XM Everything Plan, which he renews on an annual basis.

186.   On April 1, 2010, Byrd received a notification that his annual subscription will be automatically renewed (by charging his credit card) on May 10, 2010, at which time he will pay $142.45 (*i.e.*, a monthly charge of $12.95 for 11 months, with one month fee) for his annual subscription plus $21.79  for the U.S. Music Royalty Fee (*i.e.*, approximately $1.98 per month for 11 months).

187.   Byrd will suffer damages imminently due to Sirius XM's increased prices and illegal conduct.

### G.   GLENN DEMOTT SUFFERED DAMAGES

188.   Plaintiff Glenn Demott is a resident of Ohio.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Demott was a Sirius subscriber.

189.   Demott and his wife have been subscribers of Sirius since March 2007, purchasing the Sirius Everything plan.  They currently have one subscription, which is in his name.  Subscription payments have been automatically billed to his credit card.

190.   Demott previously paid his subscription on an annual basis but recently changed to paying on a monthly basis, making the first payment on March 25, 2010, when he paid $12.95 for the subscription monthly charge and $1.98 for the first the payment of the U.S. Music Royalty Fee (plus a tax of $1.01).

191.   Demott has suffered damages due to Sirius XM's increased prices and illegal conduct.

### H.   ANDREW DREMAK SUFFERED DAMAGES

192.   Plaintiff Andrew Dremak is a resident of California.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service. Prior to the merger, he was a Sirius subscriber.

193.   Dremak subscribes to the $12.95 Sirius Everything plan and pays his subscription quarterly.

194.   On or about 23, 2009, Dremak was charged for and began paying a $5.94 quarterly Royalty Fee for his quarterly subscription (or $1.98 per month).

195.   Since December 2004, and as part of his standard subscription programming, Dremak has used Sirius internet access.  On or about March 2009, Dremak was charged for and began paying a monthly $2.99 "Sirius Internet Radio Plus" fee.

196.    Plaintiff Dremak has suffered damages due to Sirius XM's new and increased prices and illegal conduct.

### I.    MELISSA FAST SUFFERED DAMAGES

197.    Plaintiff Melissa Fast is a Maryland resident.  She is currently a subscriber and direct purchaser of Sirius XM Satellite Radio.  Prior to the merger, she was a Sirius subscriber.

198.    Fast subscribes to the Sirius Everything plan and renews her subscription annually.  Fast also subscribes to the Mostly Music plan and renews her subscription monthly.

199.    Since August 2009, Fast has paid $1.53 per month ($13.77 total to date) for the Royalty Fee for her Mostly Music subscription.

200.    Fast has suffered damages due to Sirius XM's increased prices and illegal conduct.

### J.    JAMES HEWITT SUFFERED DAMAGES

201.    Plaintiff James Hewitt is a California resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio.  Prior to the merger, he was a Sirius subscriber.

202.    Hewitt subscribes to the $12.95 Sirius Everything plan and renews his subscription annually.  Since he renews his subscriptions annually, XM provides one free month of service, so he is charged for only 11 months service, for the subscriptions and the Royalty Fee.

203.    Since August 2009, Hewitt has paid $21.79 (*i.e.*, $1.98 per month for 11 months) for the Royalty Fee for his subscription.

204.    Since March 2009, Hewitt has also paid $2.99 per month for the Premium Sirius Internet Radio plan.  Prior to March 2009, Hewitt received free internet access to Sirius XM's programming as part of his basic subscription price.

205.    Hewitt has suffered damages due to Sirius XM's increased prices and illegal conduct.

### K.    TODD HILL SUFFERED DAMAGES

206.    Plaintiff Todd Hill is a Maine resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio.  Prior to the merger he was a Sirius subscriber.

207.    Hill has two subscriptions to the Sirius Everything plan.  One is for himself, the other is for his brother, for which he currently pays the $8.99 monthly multi-receiver fee.

208.    Hill first subscribed to Sirius in 2007 and paid a yearly fee of  $142.45.  He initiated the second subscription in October 2007, paying $6.99 per month, which he paid in quarterly installments of $20.97.

209.    Hill renewed his primary subscription annually until January 2010, when he changed to a quarterly rate of approximately $33.67.

210.    On or about April 8, 2009, Hill was charged for and began paying the additional $2.00 for his brother's multi-receiver subscription.  On or about October 8, 2009, Hill was charged for and began paying the $0.97 monthly Royalty Fee as part of his subscription payment since October 2009.  On a quarterly basis, he pays $2.91.

211.    On or about January 20, 2010, Hill was charged for and began paying the $5.15 Royalty Fee for the quarterly payment on his primary subscription.

212.    Until the time of his renewal in January 2010, Hill's subscription included internet access to programming free of charge.

213.    In January 2010, Hill learned that with his renewed subscription he would have to pay $2.99 for internet service he had previously received for free.  He therefore cancelled the internet access.

214.    Hill has suffered damages due to Sirius XM's increased prices and deceptive and illegal conduct.

### L.   CURTIS JONES SUFFERED DAMAGES

215.   Plaintiff Curtis Jones is a Florida resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Jones was a Sirius subscriber.

216.   Jones is a subscriber of the Sirius Everything Plus the Best of XM plan.  On or about December 27, 2009, Jones began paying the Royalty Fee as part of his annual subscription.

217.   Jones chose to subscribe to Sirius before the merger in part because Sirius provided college sports play by play broadcasts of the Southeastern Conference ("SEC") football games.  After the merger agreement between Sirius and XM, the broadcast of SEC football was eliminated from Sirius and instead was provided as part of the XM broadcasting system.  To access SEC football games, Jones must now purchase the Sirius Everything Plus the Best of XM plan at a higher price.

218.   Jones has paid the $21.79 Royalty Fee as part of his subscription payment since December 27, 2009.

219.   Jones has suffered damages due to Sirius XM's increased prices, reduced quality of programming, and illegal conduct.

### M.   RONALD WILLIAM KADER SUFFERED DAMAGES

220.   Plaintiff Ronald William Kader is a resident of North Carolina.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio.  Prior to the merger, he was an XM subscriber.

221.   Kader has been a subscriber of XM since 2008, and now has two subscriptions, both with the XM Everything plan.  Kader first became an XM subscriber when he purchased a Honda Accord in July 2008, which was equipped with an XM radio.  After a three-month free trial period, Kader purchased a one-year subscription in October 2008.  He renewed this

subscription in November 2009, paying $142.45 for the year (which is $12.95 per month for 11 months).  He also paid the U.S. Music Royalty Fee of $21.79, which is approximately $1.98 per month for 11 months.

222.    Kader purchased his second radio in November 2009, when he received a three-month free trial period with the purchase of a new Toyota.  He switched to a paying subscription in January 2010, paying $127.15 for a one-year subscription plus the U.S. Music Royalty Fee of $21.79.

223.    Kader has suffered damages due to Sirius XM's increased prices, reduced quality of programming, and illegal conduct.

### N.    PLANTIFF GREG LUCAS SUFFERED DAMAGES

224.    Plaintiff Greg Lucas is a resident of Washington.  He is a subscriber and direct purchaser of Sirius XM SDARS in Washington.

225.    Lucas subscribes to the Sirius Everything plan and is billed annually, having last renewed his subscription on May 30, 2009.

226.    On or about May30, 2010, Lucas will renew his Sirius subscription, which will be billed automatically to his credit card and will include a charge for the Royalty Fee.

227.    Lucas will suffer damages imminently due to Sirius XM's increased prices and illegal conduct.

### O.    JOSHUA NATHAN SUFFERED DAMAGES

228.    Plaintiff Joshua Nathan is an Illinois resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Nathan was an XM subscriber, purchasing his first subscription in 2004.

229.    Nathan has three subscriptions to the XM Everything plan.  He has a primary subscription, a second subscription for which he pays the multi-receiver rate, and a third subscription for internet access.

230.    Nathan renews each of his subscriptions for two-year periods.  On or about February 10, 2010, Nathan renewed his primary subscription for a total of $245.00 and his internet subscription for a total of $56.81.

231.    On or about February 11, 2010, Nathan renewed his multi-receiver subscription for a total of $188.79, or $8.99 for 21 months (with three free months under the two-year plan).

232.    On or about February 10, 2010, Nathan was charged and began paying the $2.99 per month fee for internet access, which he had previously received for free.

233.    On or about February 11, 2010, Nathan began paying the higher multi-receiver price of $8.99 per month.

234.    On or about February 10, 2010, Nathan was charged and began paying a Royalty Fee of $19.81.  He paid an additional Royalty Fee on or about February 11, 2010, in the amount of $20.39.

235.    Nathan has suffered damages due to Sirius XM's increased prices, reduced quality of programming, and illegal conduct.

**P.    JAMES SACCHETTA SUFFERED DAMAGES**

236.    Plaintiff James Sacchetta is a Pennsylvania resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Sacchetta was a Sirius subscriber.

237.    Sacchetta has three subscriptions to the Sirius Everything plan.  The second and third subscriptions are priced as additional receivers for $8.99 per month.  Two plans are billed on a two-year cycle and one is billed annually.  On or about December 19, 2009, Sacchetta began

51

paying the $1.98 Royalty Fee for his initial subscription.  On or about April 19, 2009, Sacchetta

began paying $8.99 per month, the increased multi-receiver charge for his second subscription.

On or about May 19, 2009, Sacchetta began paying $8.99 per month, the increased multi-

receiver charge for his third subscription.

238.    Sacchetta has paid the $1.98 Royalty Fee as part of his subscription payment since

December 19, 2009 and has paid the additional multi-receiver charge since April 19, 2009.

239.    Sacchetta has suffered damages due to Sirius XM's increased prices and illegal

conduct.

**Q.    DAVID SALYER SUFFERED DAMAGES**

240.    Plaintiff David Salyer is a South Carolina resident.  He is currently a subscriber

and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Salyer was an

XM subscriber since 2002.

241.    Salyer subscribes to the $12.95 XM Everything subscription plan on a multi-year

plan.

242.    Salyer has suffered damages due to the decrease in programming quality since the

merger.  After the merger of Sirius and XM resulted in the elimination of competition, Sirius XM

eliminated various channels from its XM channel lineup, including "XM Comedy," "The

System," and "Soul Street."  These changes resulted in a decrease in the quality of programming

available to Salyer.

243.    Salyer made an informal complaint to Sirius XM on or about July 17, 2009,

indicating that the programming quality since the merger decreased and specifically identified

the elimination of XM Comedy, The System, and Soul Street as examples of the reduction in

quality.  Sirius XM made no substantive response to this informal complaint, and instead sent

what appeared to be a form letter indicating his complaint had been forwarded to the programming department.

244.    Salyer has suffered damages due to the decrease in programming quality caused by the merger and combination of Sirius and XM.

**R.    SUSIE STANAJ SUFFERED DAMAGES**

245.    Plaintiff Susie Stanaj is a Michigan resident.  She is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Stanaj has been a Sirius subscriber since January 2006.

246.    Stanaj subscribes to the Sirius Everything subscription plan and pays $213.66 every eighteen months.

247.    Stanaj listens to Sirius XM in her vehicle, which was pre-installed with a Sirius XM radio.  Prior to the merger, Stanaj listened to Sirius in her vehicle, which was pre-installed with a Sirius radio.

248.    Stanaj pays a Royalty Fee of $32.00 as part of her subscription.  Stanaj began paying the Royalty Fee on or about January 23, 2010.

249.    Stanaj has suffered damages due to Sirius XM's increased prices and illegal conduct.

**S.    JANEL AND KEVIN STANFIELD SUFFERED DAMAGES**

250.    Janel and Kevin Stanfield are residents of the State of Kansas.  They are currently subscribers and direct purchasers of Sirius XM Satellite Radio.  The Stanfields have been subscribers since 2008.

251.    The Stanfields have two subscription to the XM Everything plan, one in each car. They pay $38.85 every three months for one subscription ($12.95 per month) and pay $26.97 every three months for the second subscription at the multi-radio rate of $8.99 per month.

252.    On or about August 1, 2009, the Stanfields were charged for and began paying the Royalty Fee.

253.    Janel and Kevin Stanfield have suffered damages due to Sirius XM's increased prices and illegal conduct.

###    T.    PAUL STASIUKEVICIUS SUFFERED DAMAGES

254.    Plaintiff Paul Stasiukevicius is a Massachusetts resident.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Stasiukevicius was an XM subscriber.

255.    Stasiukevicius subscribes to the $16.99 XM Everything Plus Best of Sirius subscription plan and has two multi-receiver plans for two additional radios, one of which has the XM Everything plan and the other has the XM Everything Plus Best of Sirius plan.  All three subscriptions renew on an annual basis.  Since he renews his subscriptions annually, XM provides one free month of service, so he is charged for only 11 months service, for the subscriptions and the Royalty Fee.

256.    Stasiukevicius was charged the increased multi-subscription $8.99 pricing when he renewed the two multi-subscription annual plans on April 3, 2009 and August 18, 2009.  He has paid a $98.89 (*i.e.*, $8.99 for 11 months) for each of the two multi-radio subscriptions, for a total of $197.78.

257.    On or about August 18, 2009, Stasiukevicius was charged for and began paying the $0.97 monthly Royalty Fee for his second multi-radio subscription, for which he has the XM Everything Plan.

258.    On or about March 10, 2010, Stasiukevicius was charged for and began paying the $1.98 monthly Royalty Fee for his primary subscription, for which he has the XM Everything Plus Best of Sirius Plan.

54

259.     Since August 2009, Stasiukevicius has paid $10.68 (*i.e.*, $0.97 for 11 months) for the multi-receiver Royalty Fee and has paid $21.79 (*i.e.*, $1.98 for 11 months) for the Royalty Fee for his primary subscription.  In total, he has paid $32.47 for the Royalty Fee for these two subscriptions.

260.     Stasiukevicius has suffered damages due to Sirius XM's increased prices and illegal conduct.

### U.     TODD STAVE SUFFERED DAMAGES

261.     Plaintiff Todd Stave is resident of Maryland.  He is currently a subscriber and direct purchaser of Sirius XM Satellite Radio service.  Prior to the merger, Stave was a Sirius subscriber.

262.     Stave has been a subscriber of Sirius since October 2005, and currently has three subscriptions.  He added his second radio in December 2006 and the third in May 2009 (which is currently free, and he will renew it later this month).  For all three radios, he has the Sirius Everything plan, for which the standard monthly charge is $12.95.

263.     Stave renewed his second subscription in December 2009.  On or about December 6, 2009, he paid $98.89 for a one-year plan (at the monthly price of $8.99 for the multi-radio discount) plus a Royalty Fee of $10.68.  Previously, he had paid $83.88 for this subscription (*i.e.*, a one-year subscription at $6.99 per month for 12 months).

264.     Stave has suffered damages due to Sirius XM's increased prices and illegal conduct.

### V.     PLAINTIFFS PAOLA TOMASSINI AND EDWARD LEYBA SUFFERED DAMAGES

265.     Plaintiffs Paola Tomassini and Edward Leyba are residents of Arizona and are married to each other.  They are subscribers and direct purchasers of Sirius XM SDARS in Arizona.  Prior to the merger, Tomassini and Leyba were XM subscribers.

266.    Tomassini and Leyba have three subscriptions to XM, purchasing their first in or about 2005 and adding their third in December 2009, when they purchased a new vehicle for Tomassini.  They subscribe to the XM Everything Plan and for two of their subscriptions they also purchase the XM traffic navigation service, "Nav Traffic."

267.    Tomassini and Leyba renew at least one of their subscriptions on a monthly basis. Beginning in August 2009, Tomassini and Leyba began paying the $1.98 monthly Royalty Fee on at least this account, along with the $12.95 charge for the XM Everything plan.

268.    Tomassini and Leyba have suffered damages due to Sirius XM's increased prices and illegal conduct.

## VIII.   CLASS ALLEGATIONS

269.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and others similarly situated.  The "Class" is defined as follows:

> All persons or entities who reside in the United States and who were parties to an agreement with Sirius Satellite Radio, Inc., XM Satellite Radio Holdings, Inc., Sirius XM Radio Inc. or their affiliated entities for the provision of satellite digital audio radio services during the relevant period of July 28, 2008 through the present.

270.    The following persons shall be excluded from the Class: (1) all persons or entities that make a timely election to be excluded from the proposed Class; (2) Sirius XM and its legal representatives, officers, directors, assignees and successors; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

271.    Plaintiffs reserve the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

272.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

273.   **Numerosity Under Rule 23(a)(1):**  The members of the Class are so numerous that individual joinder of all the members is impracticable.  Sirius XM reported that, as of December 31, 2009, it had 18,772,758 subscribers.  Upon information and belief, over half of these subscribers already have been improperly and illegally billed for the Royalty Fee, and have paid the Royalty Fee.  Plaintiffs believe that approximately 20% of the subscribers are subject to the $2.00 per multi-subscription radio monthly fee implemented in March 2009.  Plaintiffs believe that thousands of subscribers have been illegally charged $2.99 for internet access.

274.   **Commonality Under Rule 23(a)(2):** This action involves common questions of law and fact, including, but not limited to, the following:

a.       Whether the merger substantially lessened competition and/or created a monopoly;

b.       Whether the definition of the relevant market is SDARS in the United States, or some other relevant market;

c.       Whether, through the conduct alleged herein, Defendants willfully acquired, maintained and/or enhanced its monopoly power over SDARS in the United States;

d.       Whether Defendants' conduct caused Class members to suffer antitrust injury and if so, the appropriate measure of damages;

e.       Whether Sirius XM's imposition of the Royalty Fee is actually a pass-through of royalty cost increases the Company has incurred since the filing of the March 20, 2007 merger application;

f.       Whether Sirius XM breached its contracts, governed under New York law, with subscribers by charging the Royalty Fee;

g.      Whether Sirius XM made material, false, deceptive and/or misleading statements and disclosures about the identity, type, purpose, and method of calculation of the Royalty Fee; and

h.      Whether Sirius XM's conduct constitutes unfair, illegal, deceptive and/or fraudulent business practices.

275.    **Typicality Under Rule 23(a)(3):**  The named Plaintiffs' claims are typical of, and not antagonistic to, the claims of the members of the Class.  Plaintiffs and the members of the Class they seek to represent have been deceived and damaged by Sirius XM's unlawful and deceptive conduct.

276.    **Adequacy of Representation under Rule 23(a)(4):**  Plaintiffs will fairly and adequately protect the interests of the Class, and the representative Plaintiffs' interests are coincident with and not antagonistic to those of the other class members they seek to represent. Plaintiffs have retained competent counsel to represent them and the Class.

277.    **The Class Can Be Properly Maintained Under Rules 23(b)(1)(A) and (B):** Prosecuting separate actions by or against individual class members would create a risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

278.    **The Class Can Be Properly Maintained Under Rule 23(b)(2):**  Sirius XM has acted or refused to act, with respect to some or all issues presented in this Complaint, on grounds

58

generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class.

279.     **The Class Can Be Properly Maintained Under Rule 23(b)(3):**  Questions of law common to the members of the Class predominate over any questions affecting only individual members with respect to some or all issues presented in this Complaint.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Individual litigation of the claims of all class members is impracticable because the cost of litigation would be prohibitively expensive for each class member and would impose an immense burden upon the courts.  Plaintiffs have no knowledge of pending litigation already begun by or against class members asserting the same claims that are asserted herein.  The conduct of this action as a class action, with respect to some or all of the issues presented in this Complaint, presents fewer management difficulties, conserves the resources of the parties and of the court system, and is the only means to protect the rights of all class members.

## COUNT I
### (Unlawful Acquisition of Monopoly Power in Violation of Clayton Act § 7)

280.     Plaintiffs incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

281.     This Count I is brought on behalf of the Class.

282.     The merger of Sirius and XM was a stock acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

283.     The effect of this acquisition has been to substantially lessen competition and to tend to create a monopoly in SDARS in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

284.    SDARS in the United States is the relevant product and geographic market. SDARS is not reasonably interchangeable with terrestrial radio, MP3 devices, internet radio, or any other products that provide music listening functions in the United States.  There is no reasonably interchangeable product that would effectively constrain, or has effectively constrained, Sirius XM from imposing and profitably sustaining a small but significant non-transitory price increase.

285.    The high barriers to entry make it impossible, at any time in the next four years, for a competitor to enter the market of SDARS in the United States to compete with Sirius XM.

286.    Sirius XM has and controls 100% market share of the SDARS market in the United States.

287.    As a result of Sirius's, XM's, and Sirius XM's conduct in violation of Section 7 of the Clayton Act, Plaintiffs and the Class have been injured and have paid artificially inflated prices for SDARS in the United States.

## COUNT II
### (Unlawful Acquisition of Monopoly Power
### in Violation of Sherman Act § 2)

288.    Plaintiffs incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

289.    This Count II is brought on behalf of the Class.

290.    Since the July 28, 2008 merger, Sirius XM has had monopoly power in the sale of SDARS in the United States.

291.    Sirius XM willfully obtained and maintained its monopoly power by merging the only two providers of SDARS in the United States.

292.    SDARS in the United States is the relevant product and geographic market. SDARS is not reasonably interchangeable with terrestrial radio, MP3 devices, internet radio, or

any other products that provide music listening functions in the United States.  There is no reasonably interchangeable product that would effectively constrain, or has effectively constrained, Sirius XM from imposing and profitably sustaining a small but significant non-transitory price increase.

293.    Sirius XM has and controls 100% of the SDARS market in the United States.

294.    The high barriers to entry make it impossible, at any time in the next four years, for a competitor to enter the market of SDARS in the United States to compete with Sirius XM.

295.    By eliminating competition and obtaining and maintaining monopoly power over SDARS as described above, Sirius XM was able to, and did, artificially inflate SDARS prices to noncompetitive levels and has maintained those prices at or above those levels since 2009.

296.    As a result of Sirius's, XM's, and Sirius XM's illegal conduct, Plaintiffs and the Class were injured and paid substantially more than they would have paid absent the Company's unlawful and anticompetitive conduct.

297.    During the relevant period, Plaintiffs and the Class purchased substantial amounts of SDARS.  As a result of Sirius's, XM's, and Sirius XM's illegal conduct alleged herein, Plaintiffs and other Class members paid artificially inflated prices for SDARS.

298.    There are no legitimate pro-competitive justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

299.    Sirius XM's acts and practices are anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT III**
**(Breach of Contract and Breach of Implied**
**Covenant of Good Faith and Fair Dealing)**

300.     Plaintiffs incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

301.     This Count III is brought on behalf of the Class.

302.     Each Class member was a party to a Customer Agreement with Sirius XM or its predecessors under which Sirius XM agreed to provide SDARS.  Although the Customer Agreements are form contracts that were revised by Sirius XM from time to time, each of them is substantially in the form of the "Sirius XM Terms and Conditions," attached hereto as Exhibit A.

303.     Each and every Customer Agreement is governed by a choice of law provision mandating application of the law of the State of New York.

304.     Each Sirius XM Customer Agreement incorporates the FAQs of the Sirius XM websites http://www.xmradio.com/about/musicroyalty.xmc; and http://www.sirius.com/usmusicroyalty.

305.     Every contract, including each of the Sirius XM Customer Agreements, imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

306.     By overbilling the subscribers for the Royalty Fee and providing false and deceptive information about the billing statements, Sirius XM has breached the Sirius XM Customer Agreements.

307.     Plaintiffs and the Class have suffered monetary damages in the form of such fees and charges described above.

## COUNT IV
### (Breach of State Consumer Protection Statutes)

308.    Plaintiffs incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

309.    This Count IV is brought on behalf of the Class.

**A.    Arizona**

310.    Sirius XM's practices were and are in violation of Arizona's Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq.*

311.    SDARS sold by Sirius XM is "merchandise" within the meaning of Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq.*

312.    Specifically, as alleged herein, Sirius XM has engaged in deceptive, false and misleading methods, acts or practices in the "sale or advertisement of merchandise" in violation of Arizona's Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq.* by, *inter alia,* representing to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the public and its customers and incorporates into its Customer Agreements is deceptive, false and misleading because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

313.    By including the Royalty Fee misrepresentations in the Customer Agreement, on subscriber billing statements and on its website, Sirius XM intended subscribers and the public to rely on its misrepresentations regarding the Royalty Fee.

314.    Plaintiffs Paola Tomassini and Edward Leyba paid the Royalty Fee in reliance on the accuracy of the terms of their contract.

315.    Plaintiffs Tomassini and Leyba and other Arizona resident class members have suffered consequent and proximate injury and losses as a result of Sirius XM's false, deceptive and misleading conduct alleged herein.

**B.**    **California**

316.    Sirius XM's practices were and are in violation of California Consumer Legal Remedies Act, Civil Code § 1750, *et seq.*, and California's Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*

**i.**    **Violations of the Consumers Legal Remedies Act – California Civil Code §1750, *et seq.***

317.    Plaintiffs Dremak, Bonsignore, and Hewitt are consumers within the meaning of California Civil Code §1761(d).

318.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.* (the "CLRA").  Plaintiffs Dremak, Bonsignore, and Hewitt and others who paid the subject charges in California  are consumers as defined by Cal. Civ. Code §1761(d).  SDARS sold by Sirius XM are "goods" within the meaning of Cal. Civ. Code § 1761(a) and/or "services" within the meaning of Cal. Civ. Code § 1761(b).

319.    Sirius XM violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code §1770(a) in transactions with Plaintiffs

Dremak, Bonsignore, and Hewitt and the Class, which were intended to result in, and did result

in, the sale of SDARS:

> (5)     Representing that goods or services have . . . characteristics, . . . uses [or]
> benefits . . . which they do not have
>
> \*        \*        \*
>
> (7)     Representing that goods or services are of a particular standard, quality, or
> grade . . . if they are of another.
>
> \*        \*        \*
>
> (9)     Advertising goods or services with intent not to sell them as advertised.
>
> \*        \*        \*
>
> (14)    Representing that a transaction confers or involves rights, remedies, or
> obligations which it does not have or involve, or which are prohibited by
> law.
>
> \*        \*        \*
>
> (16)    Representing that the subject of a transaction has been supplied in
> accordance with a previous representation when it has not.
>
> \*        \*        \*
>
> (19)    Inserting an unconscionable provision in the contract.

320.    Sirius XM violated the CLRA by representing through its advertisements,

invoices, and other written materials its goods and services as described above when it knew, or

should have known, that the representations were deceptive, false and misleading.

321.    A reasonable person would have relied on Sirius XM's misrepresentations

regarding the Royalty Fee.  Sirius XM had exclusive knowledge that the Royalty Fee charged to

consumers exceeded its actual increased royalty fee costs.  Plaintiffs Dremak, Bonsignore, and

Hewitt paid the Royalty Fee in reliance on the accuracy of the terms of their contracts.

322.     As a result of Sirius XM's unlawful conduct, Plaintiffs and the Class, including consumers within California, have suffered injury in fact and have lost money or property by being forced to pay a Royalty Fee that is greater than Sirius XM's actual increases in costs attributable to royalties since March 20, 2007.

323.     Pursuant to §1782 of the CLRA, Plaintiffs Dremak, Bonsignore, and Hewitt notified Sirius XM in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that Sirius XM rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

324.     Sirius XM failed, within thirty days after receipt of the CLRA notices from Plaintiffs Bonsignore, Dremak and Hewitt, to adequately respond to the demand to rectify the wrongful conduct described above on behalf of all Class members.  Sirius XM failed to rectify its wrongful conduct and has not offered to compensate Plaintiffs or members of the Class for all damages incurred as a result of the conduct alleged in this Complaint.

325.     Plaintiffs and the Class seek a Court order enjoining the above-described wrongful acts and practices of Sirius XM and for restitution and disgorgement.  Plaintiffs now also seek all available compensatory and punitive damages, costs of litigation, attorneys' fees, and such other relief as authorized under applicable provisions of the CLRA.

      **ii.**     **Violations of California Business & Professions Code Section 17200,** *et seq.*

326.     California Business and Professions Code §17200 prohibits any "unfair, deceptive, untrue or misleading advertising."  For the reasons discussed above, Sirius XM has engaged in unfair, deceptive, untrue and misleading advertising in violation of California Business & Professions Code §17200.

327.    California Business & Professions Code §17200 also prohibits any "unlawful . . . business act or practice."  Sirius XM has violated §17200's prohibition against engaging in unlawful acts and practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating California Civil Code §§1572, 1573, 1709, 1710, 1711, 1770, Business & Professions Code §17200 et seq., Section 7 of the Clayton Act, 15 U.S.C. § 18, Section 2 of the Sherman Act, 15 U.S.C. § 2, and the common law.

328.    Plaintiffs and the Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

329.    California Business & Professions Code §17200 also prohibits any "unfair . . . business act or practice."

330.    Sirius XM's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code §17200, *et seq.*, in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

331.    As stated in this Complaint, Plaintiffs allege violations of consumer protection, unfair competition and truth in advertising laws in California and other states resulting in harm to consumers.  Plaintiffs assert violations of public policy, by engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers.  This conduct constitutes violations of the unfair prong of California Business & Professions Code §17200, *et seq.*

332.    There were reasonably available alternatives to further Sirius XM's legitimate business interests, other than the conduct described herein.

333.    Business & Professions Code §17200 also prohibits any "fraudulent business act or practice."

334.    Sirius XM's claims, nondisclosures and misleading statements, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200.

335.    Sirius XM's acts of unfair competition as alleged herein caused and continue to cause substantial injury to Plaintiffs Dremak, Bonsignore, and Hewitt as well as the other members of the Class.  Plaintiffs Dremak, Bonsignore, and Hewitt have suffered injury in fact and have lost money as a result of Sirius XM's unfair competition.

336.    Sirius XM has thus engaged in unlawful, unfair and fraudulent business acts and practices and false advertising, entitling plaintiffs to judgment and equitable relief against Sirius XM, including the restoration of any money acquired by means of such unfair competition, as set forth in the Prayer for Relief.

337.    Additionally, pursuant to Business & Professions Code §17203, Plaintiffs seek an order requiring Sirius XM to immediately cease such acts of unlawful, unfair and fraudulent business practices and requiring Sirius XM to engage in a corrective advertising campaign.

## C.    Florida

338.    Sirius XM's practices were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*

339.    Fla. Stat. Ann. § 501. 204 states: "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

340.    As alleged herein, Sirius XM engaged in various deceptive and/or unfair acts and practices by its misrepresentations and omissions during the conduct of trade or commerce in Florida in violation of Fla. Stat. Ann. § 501.204.

341.    Specifically, as alleged herein, Sirius XM has engaged in deceptive and/or unfair acts and practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

342.    The acts and practices of Sirius XM, as alleged herein, have injured Plaintiff Carl Blessing, Plaintiff Brian Balaguera, Plaintiff Curtis Jones and the other Florida resident class members, and caused losses as alleged herein.

    **D.**    **Illinois**

343.     Sirius XM's acts and practices, as described herein, were and are in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2; and the Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2.

344.     Specifically, as alleged herein, Sirius XM has engaged in deceptive and/or unfair acts and practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

345.     Sirius XM engaged in the unfair or deceptive acts or practices described herein with intent that others rely upon its concealment, suppression and/or omission of material facts.

346.     Plaintiff Joshua Nathan and other Illinois residents of the Class have suffered actual damages as a result of Sirius XM's acts and practices, as described herein.

347.     Sirius XM's practices were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*

### E.     Kansas

348.     Sirius XM's practices were and are in violation of Kansas's Consumer Protection Act, Kan. Stat. Ann. § 50-623, *et seq.*

349.    Kan. Stat. Ann. § 50-626(a) states: "No supplier shall engage in any deceptive act or practice in connection with a consumer transaction."

350.    Kan. Stat. Ann. § 50-627(a) states: "No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction.  An unconscionable act or practice violates this act whether it occurs before, during or after the transaction."

351.    Sirius XM is a "supplier" within the meaning of Kan. Stat. Ann. § 50-624(l).

352.    Plaintiffs Janel and Kevin Stanfield and other Kansas residents of the Class are "consumers" that engaged in "consumer transactions" with Sirius XM within the meaning of Kan. Stat. Ann. § 50-624(b)-(c).

353.    Specifically, as alleged herein, Sirius XM has engaged in deceptive and/or unfair acts and practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

**F.    Maine**

71

354.     Sirius XM's practices were and are in violation of the Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. Ann. Tit. 5, § 205-A, *et seq.*, and 10 Me. Rev. Stat. Ann. § 1101, *et seq.* (hereinafter referred to as Chapter 201).

355.     Plaintiff Todd Hill and other Maine residents of the Class are "Persons" as defined under Maine's Unfair Trade Practices Act, 5 Me. Rev. Stat. Ann. § 206 (2).

356.     Sirius XM's SDARS is "Trade" or "Commerce" as defined under Maine's Unfair Trade Practices Act.  5 Me. Rev. Stat. Ann. § 206 (3).

357.     Pursuant to 5 Me. Rev. Stat. Ann. § 207, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

358.     As alleged herein, Sirius XM engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in Maine in violation of 5 Me. Rev. Stat. Ann. § 207.

359.     Specifically, as alleged herein, Sirius XM has engaged in deceptive acts and practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual

royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

360.    Sirius XM knew or should have known that its acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiffs and the Class.

361.    On March 23, 2010, Plaintiff Hill made a written demand for relief, pursuant to Me. Rev. Stat. Ann. tit. 5 § 213(1-A).

362.    As of May 3, 2010, Plaintiff Hill had received no response to his March 23, 2010 demand letter from Sirius XM.

### G.    **Maryland**

363.    Sirius XM's practices were and are in violation of Maryland's Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq.*

364.    Plaintiffs Todd Stave and Melissa Fast and other Maryland residents of the Class are "consumers" as defined under Maryland's Consumer Protection Act, Md. Code Ann. Com. Law § 13-101(c).

365.    Pursuant to Md. Code Ann. Com. Law §13-303 "[a] person may not engage in any unfair or deceptive trade practice."  Sirius XM is a "person" as defined under Md. Code Ann. Com. Law §13-101(h).

366.    As alleged herein, Sirius XM has engaged in unfair and/or deceptive trade practices by, inter alia, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive

73

because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007." Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

367. Sirius XM's misrepresentations regarding the Royalty Fee are material because the Royalty Fee represents a price increase to consumers of 10% to 28% of their subscription price. These misrepresentations were made with the intent that consumers would rely on these statements.

368. A reasonable person would have relied on Sirius XM's misrepresentations regarding the Royalty Fee. Sirius XM had exclusive knowledge that the Royalty Fee charged to consumers actually exceeded its increased royalty costs. Plaintiffs Stave and Fast paid the Royalty Fee in reliance on the accuracy of the terms of their contracts.

369. Plaintiffs Stave and Fast and other Maryland residents of the Class have suffered actual damages as a result of Sirius XM's acts and practices, as described herein.

**H. Massachusetts**

370. At all times relevant hereto, Sirius XM was engaged in trade or commerce.

371. Sirius XM's practices, as described herein, were unfair or deceptive acts or practices in violation of Massachusetts' Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2.

372. Specifically, as alleged herein, Sirius XM has engaged in deceptive and/or unfair acts and practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct

74

pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

373.    Sirius XM's unfair or deceptive acts or practices were a willful or knowing violation of Mass. Gen. Laws ch. 93A, § 2.

374.    As a result of the unfair or deceptive acts or practices described herein, Plaintiff Paul Stasiukevicius has suffered injury as alleged herein.

375.    Other Massachusetts residents similarly situated to Plaintiff Stasiukevicius have suffered similar injuries.

376.    Plaintiff Stasiukevicius will adequately and fairly represent such other similarly situated Massachusetts residents.

377.    Without conceding that such demand is required under the circumstances of this case, pursuant to Massachusetts General Laws, ch. 93A, Section 9, on March 22, 2010 Plaintiff Stasiukevicius made a written demand for relief as outlined in that statute.

378.    As of May 3, 2010, Plaintiff Stasiukevicius had received no response to his March 22, 2010 demand letter from Sirius XM.

## I.      Michigan

379.     Sirius XM's practices were and are in violation of Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*

380.     Specifically, as alleged herein, Sirius XM has engaged in unfair, unconscionable or deceptive methods, acts or practices in the conduct of trade or commerce in violation of Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*, by, *inter alia*, representing to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the public and its customers and incorporates into its Customer Agreements is unfair, unconscionable or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

381.     Sirius XM provides SDARS to consumers primarily for personal, family, or household purposes.

382.     By including the Royalty Fee misrepresentations in the Customer Agreement, on subscriber billing statements and on its website, Sirius XM intended to and did deceive subscribers and the public regarding the Royalty Fee.

383.     Sirius XM's misrepresentations regarding the Royalty Fee are material because the Royalty Fee represents a price increase to consumers of 10% to 28% of their subscription plan price.

76

384. A reasonable person would have relied on Sirius XM's misrepresentations regarding the Royalty Fee. Sirius XM had exclusive knowledge that the Royalty Fee charged to consumers actually exceeded its increased royalty costs. Plaintiff Susie Stanaj paid the Royalty Fee in reliance on the accuracy of the terms of her contract.

385. As a result of Sirius XM's unlawful conduct, Plaintiff Stanaj and other Michigan residents of the Class have suffered monetary loss by being forced to pay a Royalty Fee that is greater than Sirius XM's actual increases in costs attributable to royalties since March 20, 2007.

### J. **New Hampshire**

386. Sirius XM's practices were and are in violation of New Hampshire's Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*

387. Plaintiff John Cronin and other New Hampshire resident members of the Class are "Persons" as defined under New Hampshire's Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. Ann. § 358-A:1(I).

388. Sirius XM's SDARS is "Trade" or "Commerce" as defined under New Hampshire's Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. Ann. § 358-A:1(II).

389. N.H. Rev. Stat. Ann. § 358-A:2 states: "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

390. As alleged herein, Sirius XM engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in New Hampshire in violation of N.H. Rev. Stat. Ann. § 358-A:2.

391.     Specifically, as alleged herein, Sirius XM has engaged in deceptive and/or unfair acts and practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

392.     Sirius XM knew or should have known that its acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiffs and the Class.

**K.     New Jersey**

393.     Sirius XM's practices were and are in violation of New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*

394.     N.J. Stat. Ann. § 56:8-2 states:  "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission or any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . is declared to be an unlawful practice."

395. As alleged herein, Sirius XM engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in New Jersey in violation of N.J. Stat. Ann. § 56:8-2.

396. Specifically, as alleged herein, Sirius XM has engaged in deceptive and/or unfair acts and practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007. The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007." Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

397. Sirius XM knew or should have known that its acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiff Edward Scerbo and the other New Jersey resident members of the Class.

**L.** **New York**

398. Sirius XM's practices were and are in violation of New York's Gen. Bus. Law § 349.

399. Specifically, as alleged herein, Sirius XM has engaged in deceptive acts and practices under N.Y. Gen. Bus. Law § 349 by, *inter alia*, misrepresenting to consumers that the

79

Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

400.    Sirius XM targeted New York consumers with its deceptive acts and practices.

401.    Sirius XM's deceptive acts and practices adversely affect the public interest in the State of New York.

402.    By incorporating the Royalty Fee misrepresentations in Customer Agreements, on subscriber billing statements and on its website, Sirius XM intended to and did deceive subscribers and the public regarding the Royalty Fee.  Plaintiff Scott Byrd and Class members residing in New York were deceived by Defendant's misrepresentations in New York.

403.    Sirius XM's misrepresentations regarding the Royalty Fee are material because the Royalty Fee represents a price increase to consumers of 10% to 28% of their subscription plan price.

404.    As a proximate result of Sirius XM's unlawful conduct, Plaintiffs and the Class, including consumers within New York, have suffered injury in fact and have lost money or property by being forced to pay a Royalty Fee that is greater than Sirius XM's actual increases in costs attributable to royalties since March 20, 2007.

M.     **North Carolina**

405.     Sirius XM's practices were and are in violation of North Carolina's Unfair Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1, *et seq.*

406.     N.C. Gen. Stat. Ann. § 75-1.1(a) states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

407.     As alleged herein, Sirius XM engaged in various unfair or deceptive acts and practices by its misrepresentations and omissions during the conduct of business in North Carolina in violation of N.C. Gen. Stat. Ann. § 75-1.1.

408.     Specifically, as alleged herein, Sirius XM has engaged in unfair and/or deceptive practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

409.     A reasonable person would have relied on Sirius XM's misrepresentations regarding the Royalty Fee.  Sirius XM had exclusive knowledge that the Royalty Fee charged to

consumers actually exceeded its increased royalty costs. Plaintiff Kader paid the Royalty Fee in reliance on the accuracy of the terms of his contract.

410. Sirius XM's unfair or deceptive acts and practices as alleged herein caused and continue to cause injury to Plaintiff Kader, as well as other North Carolina resident Class members. Plaintiff Kader has suffered an actual injury as a result of Sirius XM's actions.

**N.** **Ohio**

411. Sirius XM's practices were and are in violation of Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.* and Ohio's Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01, *et seq.*

412. Ohio Rev. Code Ann. § 1345.02(A) states: "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

413. Ohio Rev. Code Ann. § 1345.03(A) states: "No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

414. Sirius XM is a "supplier" as defined in Ohio Rev. Code Ann. § 1345.01.

415. Plaintiff Demott and other Ohio resident class members are "consumers" who engaged in "consumer transactions" with Sirius XM as defined under Ohio Rev. Code Ann. § 1345.01.

416. Sirius XM provides SDARS to consumers primarily for personal, family, or household purposes.

417.    Sirius XM acted in the face of prior notice that its conduct was deceptive, unfair, or unconscionable because its conduct was substantially similar to acts and practices that were previously declared to be deceptive.  Indeed, it is well established in Ohio's Consumer Sales Protection Act jurisprudence that material omissions and misrepresentations concerning a product constitute a violation of the statute.

418.    Specifically, as alleged herein, Sirius XM has engaged in unfair and/or deceptive trade practices by, inter alia, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

419.    The acts and practices of Sirius XM, as alleged herein, have injured Plaintiff Demott and other Ohio resident class members and caused the losses as alleged herein.

**O.    Pennsylvania**

420.    Sirius XM's practices were and are in violation of Pennsylvania's Unfair Trade Practice and Consumer Protection law, 73 Pa. Stat. Ann. § 201-1, *et seq.*

83

421.    As alleging herein, Sirius XM was engaged in "Trade" or "Commerce" as defined under Pennsylvania's Unfair Trade Practice and Consumer Protection law, 73 Pa. Stat. Ann. § 201-2(3).

422.    Pennsylvania's Unfair Trade Practice and Consumer Protection law, 73 Pa. Stat. Ann. § 201-2(4)(xxi) defines "Unfair methods of competition" and "unfair or deceptive acts or practices" to include "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

423.    Pennsylvania's Unfair Trade Practice and Consumer Protection law, 73 Pa. Stat. Ann. § 201-3 states:  "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) or clause (4) of section 2 of this act . . . are hereby declared unlawful."

424.    As alleged herein, Sirius XM engaged in unfair or deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in Pennsylvania in violation of Pa. Stat. Ann. § 201-3.

425.    Specifically, as alleged herein, Sirius XM has engaged in deceptive and/or unfair acts and practices by, *inter alia*, misrepresenting to consumers that the Royalty Fee is a direct pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March 20, 2007.  The information Sirius XM provides to the general public and its customers and incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive because Sirius XM is not merely "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual

royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial revenue to the Company.

426.   Plaintiff James Sacchetta and other Pennsylvania residents of the Class are "Persons" as defined under Pennsylvania's Unfair Trade Practice and Consumer Protection law, 73 Pa. Stat. Ann. § 201-2(2).

427.   Sirius XM knew or should have known that its acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiffs and the Class.

428.   A reasonable person would have relied on Sirius XM's misrepresentations regarding the Royalty Fee.  Sirius XM had exclusive knowledge that the Royalty Fee charged to consumers actually exceeded its increased royalty costs.  Plaintiff James Sacchetta and other Pennsylvania residents of the Class paid the Royalty Fee in reliance on the accuracy of the terms of their contracts.

429.   As described herein, Plaintiff James Sacchetta purchased services primarily for personal, family or household purposes and thereby suffered ascertainable loss of money as a result of the use or employment by Sirius XM of the methods, acts or practices declared unlawful by Pa. Stat. Ann.  § 201-3 and described herein.

430.   Specifically, as a result of Sirius XM's unlawful conduct, James Sacchetta and other Pennsylvania residents of the Class have suffered monetary loss by being forced to pay a Royalty Fee that is greater than Sirius XM's actual increases in costs attributable to royalties since March 20, 2007.

P.    **Washington**

431.    Sirius XM's practices were and are in violation of Washington Consumer

Protection Act, Wash. Rev. Code Ann. §19.86, *et seq.*

432.    The Washington Consumer Protection Act provides Washington consumers with

a comprehensive procedure for redressing the violations and actions of Defendant as set forth

herein.

433.    As alleged herein, Sirius XM engaged in deceptive acts and practices in the form

of misrepresentations and omissions during the conduct of business in Washington in violation

of Wash. Rev. Code Ann. §19.86, *et seq.*

434.    Specifically, as alleged herein, Sirius XM has engaged in deceptive and/or unfair

acts and practices by, inter alia, misrepresenting to consumers that the Royalty Fee is a direct

pass-through of only increases in the royalty fee costs that Sirius XM has incurred since March

20, 2007.  The information Sirius XM provides to the general public and its customers and

incorporates into its Customer Agreements is unfair, unconscionable, fraudulent and/or deceptive

because Sirius XM is not merely "passing along the increase in [its] costs attributable to

statutorily or contractually required payments to the music, recording and publishing industries

for the performance of musical works and sound recordings o for device recording fees since

March, 2007."  Instead, the Royalty Fee charged by Sirius XM is much greater than the actual

royalty fee cost increases incurred by Sirius XM since March 20, 2007 and provides substantial

revenue to the Company.

435.    The Washington Consumer Protection Act authorizes private citizens to enforce

its prohibitions and Plaintiff Greg Lucas and other Washington residents of the Class are

"Person[s]" as defined under Wash. Rev. Code Ann. §19.86.010.(1).

436.    Sirius XM knew or should have known that its acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiffs and the Class and result in injury to the Plaintiffs.

437.    A reasonable person would have relied on Sirius XM's misrepresentations regarding the Royalty Fee.  Sirius XM had exclusive knowledge that the Royalty Fee charged to consumers actually exceeded its increased royalty costs.  Plaintiff Lucas and other Washington residents of the Class paid the Royalty Fee in reliance on the accuracy of the terms of their contracts.

438.    Further, the acts alleged herein and throughout this complaint were unfair and deceptive, in trade or commerce in Washington that impacted the public interest and caused injury to Plaintiffs and the class in their business or property.

439.    Sirius XM's acts alleged are/were injurious to the public interest as defined in Wash. Rev. Code Ann. §19.86.093.

440.    As described herein, as a result of Sirius XM's unlawful conduct, Plaintiff Lucas and other Washington residents of the Class have suffered monetary loss including being forced to pay a Royalty Fee that is greater than Sirius XM's actual increases in costs attributable to royalties since March 20, 2007.

Q.    **Additional State Law Violations**

441.    Plaintiffs and the Class have been injured as a result of Sirius XM's violation of the above-referenced state statutes and the following other state consumer protection statutes, which also provide a basis for redress to Plaintiffs and the Class based on Sirius XM's false, fraudulent, deceptive, unfair and unconscionable acts, practices and conduct:

442.     Sirius XM's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the following jurisdictions:

a.      **Alaska:**  Sirius XM's practices were and are in violation of Alaska's Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq.*

b.      **Arkansas:**  Sirius XM's practices were and are in violation of Arkansas Code Ann. § 4-88-101, *et seq.*

c.      **Colorado**:  Sirius XM's practices were and are in violation of Colorado's Consumer Protection Act, Colo. Rev. Stat. §§ 61-1-101, *et seq.*

d.      **Connecticut:**  Sirius XM's practices were and are in violation of Connecticut's Gen. Stat. § 42-110a, *et seq.*

e.      **Delaware:**  Sirius XM's practices were and are in violation of Delaware's Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511, *et seq.*; and the Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2531, *et seq.*

f.      **District of Columbia:**  Sirius XM's practices were and are in violation of the District of Columbia's Consumer Protection Act, D.C. Code § 28-3901, *et seq.*

g.      **Hawaii:**  Sirius XM's practices were and are in violation of the Hawaii's Uniform Deceptive Trade Practices Act, Haw. Rev. Stat. § 481A-1, *et seq.* and Haw. Rev. Stat. § 480-2.

h.      **Idaho:**  Sirius XM's practices were and are in violation of Idaho's Consumer Protection Act, Idaho Code Ann. § 48-601, *et seq.*

i.      **Indiana:**  Sirius XM's practices were and are in violation of Indiana's Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*

j.  **Kentucky:**  Sirius XM's practices were and are in violation of Kentucky's Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*

k.  **Minnesota:**  Sirius XM's practices were and are in violation Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*; and the Unlawful Trade Practices law, Minn. Stat. § 325D.09, *et seq.*

l.  **Missouri:**  Sirius XM's practices were and are in violation of Missouri's Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

m.  **Nebraska:**  Sirius XM's practices were and are in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*; and the Uniform Deceptive Trade Practices Act, § 87-302, *et seq.*

n.  **Nevada:**  Sirius XM's practices were and are in violation of Nevada's Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598.0903 and 41.600.

o.  **New Mexico:**  Sirius XM's practices were and are in violation of New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*

p.  **North Dakota:**  Sirius XM's practices were and are in violation of North Dakota's Unlawful Sales or Advertising Practices law, N.D. Cent. Code § 51-15-01, *et seq.*

q.  **Oklahoma:**  Sirius XM's practices were and are in violation of Oklahoma's Consumer Protection Act , Okla. Stat. Ann. tit. 15 § 751, *et seq.*, and Oklahoma's Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78 § 51, *et seq.*

r.  **Oregon:**  Sirius XM's practices were and are in violation of Oregon's Unlawful Trade Practices law, Or. Rev. Stat. § 646.605, *et seq.*

s.  **Rhode Island:**  Sirius XM's practices were and are in violation of Rhode Island's Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*

t.    **South Dakota:**  Sirius XM's practices were and are in violation of South Dakota's Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws § 37-24-1, *et seq.*

u.    **Texas:**  Sirius XM's practices were and are in violation of Texas' Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*

v.    **Utah:**  Sirius XM's practices were and are in violation of Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.*, and Utah's Truth in Advertising Law, Utah Code Ann. § 13-11a-1, *et seq.*

w.    **Vermont:**  Sirius XM's practices were and are in violation of Vermont's Consumer Fraud Act, Vt. Stat. Ann. tit. 9 § 2451, *et seq.*

x.    **West Virginia:**  Sirius XM's practices were and are in violation of West Virginia's Consumer Credit and Protection Act, W. Va. Code § 46A-1-101, *et seq.*

y.    **Wisconsin:**  Sirius XM's practices were and are in violation of Wisconsin's Consumer Act, Wis. Stat. §421.101, *et seq.*

z.    **Wyoming:**  Sirius XM's practices were and are in violation of Wyoming's Consumer Protection Act, Wyo. Stat. Ann. §40-12-101, *et seq.*

443.    Sirius XM violated the aforementioned state unfair and deceptive act and practices laws by charging an excessive fees in violation of their contractual rights and statutory and common law, and by providing false and deceptive statements and billing statements to Plaintiffs and the Class relating to the Royalty Fee.

444.     As a result of Sirius XM's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiffs and the Class were damaged, and will continue to be damaged.

445.     As a result of Sirius XM's violations, Sirius XM has been unjustly enriched to the extent that it has collected excessive fees from Plaintiffs and members of the Class.  Further, Plaintiffs and the members of the Class have suffered monetary damages in the form of such fees and charges described above.

446.     Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiffs and the Class are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray for relief and judgment as follows:

A.     For an order certifying this action as a class action on behalf of the Class described above;

B.     For restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiffs and members of the Class;

C.     For damages according to proof;

D.     For an award of treble damages where permitted under applicable law;

E.     For an award of punitive damages where permitted under applicable law;

F.     For preliminary and permanent injunctive relief, including an injunction prohibiting Sirius XM from taking further steps to combine the two pre-merger entities;

G.      For an award of attorneys' fees as appropriate pursuant to the above cited statutes;

H.      For costs of suit herein incurred;

I.      For both pre- and post-judgment interest on any amounts awarded;

J.      For corrective advertising to ameliorate consumers' mistaken impressions created

by Sirius XM's prior advertising and website statements; and

K.      For such other and further relief as the Court may deem proper.

Dated: May 3, 2010

**GRANT & EISENHOFER P.A.**


*James J. Sabella*
_____
Jay W. Eisenhofer
Richard S. Schiffrin
James J. Sabella
Shelly L. Friedland
485 Lexington Avenue
New York, NY 10017
Tel.: 646-722-8500
Fax: 646-722-8501

- and -

Reuben Guttman
1920 L. Street NW
Suite 400
Washington, DC 20036
Tel.: 202-386-9500

**COOK, HALL & LAMPROS, LLP**
Edward S. Cook
Christopher B. Hall
P. Andrew Lampros
Promenade Two, Suite 3700
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel.: 404 876-8100
Fax: 404 876-3477

*Attorneys For Plaintiffs Carl Blessing, Scott
Byrd, Glenn Demott, Curtis Jones, Ronald
William Kader, James Sacchetta, David
Salyer, Paul Stasiukevicius, and Todd Stave,
and Interim Class Counsel*

**MILBERG LLP**
Herman Cahn
Peter Safirstein
Anne Fornecker
One Pennsylvania Plaza
New York, NY 10119
Tel.: 212-594-5300
Fax.: 212-868-1229

Paul F. Novak
Milberg LLP
One Kennedy Square
777 Woodward Avenue
Suite 890
Detroit, MI 48826
Tel.: 313-309-1760

Nicole Duckett
Milberg LLP
300 S. Grand Avenue, 39th Floor
Los Angeles, CA 90071
Tel.: 213-617-1200
Fax: 213-617-1975

*Interim Class Counsel*

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
Tel.: 201-567-7377
Fax: 201-567-7337

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Shane T. Rowley
369 Lexington Avenue
New York, NY 10017
Tel.: 212-983-9330
Fax: 212-983-9331

*Attorneys for Plaintiff Edward A. Scerbo*

**ABBEY SPANIER RODD & ABRAMS, LLP**
Jill Abrams
Natalie Marcus
212 East 39th Street
New York, NY 10016
Tel.: 212-889-3700
Fax: 212-684-5191

**SHAHEEN & GORDON, P.A.**
Christine Craig
140 Washington Street
Dover, NH 03821
Tel.: 603-749-5000
Fax: 603-749-1838

*Attorneys for Plaintiff John Cronin and Todd Hill*

94

**SCOTT+SCOTT LLP**
Joseph P. Guglielmo
500 Fifth Avenue
New York, NY 10110
Tel.: 212-223-6444

and

Christopher M. Burke
600 B Street, Suite 1500
San Diego, CA 92101
Tel.: 619-233-4565

**LEOPOLD~KUVIN, P.A.**
William C. Wright
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel.: 561-935-4801

**BERGER & MONTAGUE, P.C.**
Merrill G. Davidoff
Michael Dell'Angelo
1622 Locust Street
Philadelphia, PA 19103
Tel.: 215-875-3000

*Attorneys for Plaintiff Brian Balaguera*

**LEXINGTON LAW GROUP**
Howard Hirsch
Mark Todzo
1627 Irving Street
San Francisco, CA 94122
Tel.: 415-759-4111
Fax: 415-759-4112

*Counsel for Plaintiffs Melissa Fast and James
Hewitt*

**FREED & WEISS LLC**
Jeffrey A. Leon
Eric D. Freed
111 West Washington Street
Suite 1331
Chicago, IL 60602
Tel.: 312-220-0000

**CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN**
James E. Cecchi
Lindsey Taylor
5 Becker Farm Road
Roseland, NJ 07068
Tel.: 973-994-1700
Fax: 973-994-1744

**SEEGER WEISS LLP**
Stephen A. Weiss
James A. O'Brien, III
One William Street
New York, NY 10004
Tel.: 888-584-0411

**LAYTIN VERNER LLP**
Jeffrey L. Laytin
Richard B. Verner
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Tel.: 212-631-8695
Fax: 212-273-4306

**BLOOD HURST & O'REARDON LLP**
Timothy G. Blood
Thomas P. O'Reardon, II
600 B Street, Suite 1550
San Diego, CA 92101
Tel.: 619-338-1100
Fax: 619-338-1101

**ADEMI & O'REILLY, LLP**
Shpetim Ademi
Guri Ademi
David J. Syrios
3620 East Layton Ave.
Cudahy, WI 53110
Toll Free: 866-264-3995
Fax: 414-482-8001

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 3 2010, the Second Consolidated Amended Class action Complaint was filed with the Court. A copy of this filing was served via email to the following parties:

Edward S. Cook, Esq.
Christopher B. Hall, Esq
Cook Hall & Lampros LLP
Promenade Two, Suite 3700
1230 Peachtree Street, NE
Atlanta, Georgia 30309

*Plaintiffs Interim Class Co-Counsel*

Herman Cahn, Esq.
Anne Fornecker, Esq.
Paul Novak, Esq.
Peter Safirstein, Esq.
Milberg LLP
One Pennsylvania Plaza, 49th Fl.
New York, New York 10119

*Plaintiffs Interim Class Co-Counsel*

Thomas Demitrack, Esq.
Todd R. Geremia, Esq.
Brian K. Grube, Esq.
John M. Majoras, Esq.
Jones Day
222 East 41st Street
New York, New York 10017

*Counsel For Defendant Sirius XM*

James J. Sabella
James J. Sabella

# EXHIBIT A

**En Espanol**

# TERMS AND CONDITIONS

**Last Updated:  May 3 , 2010**

Thank you for choosing SIRIUS satellite radio ("**SIRIUS**").  These are the terms and conditions ("**Terms**"), which apply to your paid, trial or other subscription ("**Subscription**") in our Service Area (defined below) to the SIRIUS Satellite Radio service ("**Satellite Radio**") and/or Internet Radio service ("**Internet Radio**") and/or any Equipment Technology (defined below) relating thereto.   The Satellite Radio service, Internet Radio service, our traffic and weather services, including marine weather, and any other programming or data for Equipment Technology for radio, television, online, portable, wireless, mobile, and other receivers now known or later developed ("**Receivers**"), will be collectively referred to here as the "**Service**."  **These Terms will remain in effect until modified or terminated.  Services will be provided to you for the period agreed to by you and will continue to renew for additional terms of same length on the same billing terms you selected until canceled, terminated or discontinued by you or by us.**  Please read these Terms and keep this copy of these Terms for your records.

Our Privacy Policy governs the treatment by SIRIUS of both anonymous and personally identifiable information that we collect when you use this website or our Internet Radio online media player (the "**Site**") and when you provide information to us in any medium for the Service, or any other services we may offer.  Be sure to read our Privacy Policy.  For information on how information is gathered and used at **www.sirius.com** or through our Internet Radio service please see our privacy policy found at **www.sirius.com/privacypolicy**.

PLEASE READ THESE TERMS CAREFULLY BEFORE ACCESSING OR USING THE SITE OR SERVICE. BY ACCESSING OR USING THE SITE OR SERVICE, YOU AGREE TO BE LEGALLY BOUND BY THESE TERMS.  PLEASE DO NOT USE THE SITE OR SERVICE IF YOU DO NOT AGREE WITH THESE TERMS.

IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR SUBSCRIPTION.  IF YOU DO NOT CANCEL YOUR SUBSCRIPTION WITHIN 3 BUSINESS DAYS OF ACTIVATION OF YOUR RECEIVER, IT WILL MEAN THAT YOU AGREE TO THESE TERMS WHICH WILL BE LEGALLY BINDING ON YOU.

**A.  CONTACT INFORMATION**: You may contact SIRIUS Customer Care Monday through Saturday from 8AM through 11PM ET and Sunday from 8AM to 8PM ET, by calling 1-888 539-7474, or by writing to: SIRIUS XM Radio, 1221 Avenue of the Americas, New York, NY 10020, Attention: Customer Care.

**B.  CHANGES IN TERMS AND SERVICE:**

**1.  Changes To Terms**:  WE RESERVE THE RIGHT TO CHANGE THESE TERMS AT ANY TIME. ANY CHANGES WILL BE EFFECTIVE UPON POSTING OF THE REVISIONS ON THE SITE REFLECTING THE NEW EFFECTIVE DATE.  YOUR CONTINUED USE OF THE SERVICE FOLLOWING THE POSTING OF THE CHANGES ONLINE WILL CONSTITUTE YOUR ACCEPTANCE OF SUCH CHANGES.  YOU SHOULD FREQUENTLY REVIEW THESE TERMS (INCLUDING THE EFFECTIVE DATE) AND APPLICABLE POLICIES FROM TIME TO TIME TO UNDERSTAND THE TERMS THAT APPLY TO YOUR USE OF THE SERVICE AND/OR USE OF THE SITE.

Other than with respect to programming changes referenced in subsection 2 below, if we make any material changes that, in our sole judgment, would have an adverse effect on your use of the Service, we will either post a notice on our the Site that these Terms have changed and the effective date of such change, provide you a notice describing such changes and their effective date, in the manner described in Section J.1. below, or send you revised Terms.  In the event of any potential future conflict between these Terms and the terms of any offer for the Service, these Terms will govern.

**2.  Change To Programming**: The Service consists of a variety of music, sports, news, and entertainment programming.We reserve the right to change, rearrange, add, or delete programming, including canceling, moving or adding particular channels, at any time, with or

without notice to you. Your continued use of the Service following any programming changes will constitute your acceptance of such changes.

C. **USE OF SERVICE**:

**1.  Eligibility For Use of Service**:  You must be at least 18 years old, or the age of majority, as determined by the laws of your state of residency, to assume the obligations set forth in these Terms.

**2.  Service Area**:  We offer the SIRIUS Satellite Radio Service solely in the 48 contiguous United States, the District of Columbia, and Puerto Rico, and we offer the SIRIUS Internet Radio Service in Alaska and Hawaii as well (together, our "**Service Area**").[1]  If your address is not in our satellite Service Area, your Receiver will not be activated to receive the Satellite Radio Service. We reserve the right to verify any address you provide.  Satellite Radio Service is also available in Canada; see www.siriuscanada.ca or www.xmradio.ca for details.  Data for our other Services, including traffic and weather, is not available in all markets in the Service Area.  Please consult our FAQs or contact us to find out if those Services include data for your market.

**3.  Internet Radio**:  You may listen to our Internet Radio Service on one single Internet enabled device at one time.  If you have multiple Subscriptions to the Service, you may be eligible to receive an additional Internet Radio online listening account (username/password) for each such Subscription.  You should not provide your username and password to anyone and have the obligation to protect your username and password from unauthorized use.  You will not be able to access Internet Radio unless your account for your Subscription is in good standing and you are in compliance with these Terms.  Certain devices designed to work with our Internet Radio Service may require a separate subscription.  Not all content offered on our Satellite Radio Service is available on our Internet Radio Service and vice versa.  Similarly, not all content offered on any of the XM or SIRIUS Services is available through the other modes of distribution of XM or SIRIUS programming (such as through our Internet, satellite TV, wireless, or other distribution affiliates we may engage in from time to time).  We do not make or install any of the physical equipment, Internet connectivity or web browser software or other hardware or software you may need to use to receive our Internet Radio Service ("**Web Devices**").  Our Internet Radio Service may be unavailable or interrupted from time to time for a variety of reasons, such as unavailability or difficulties with the Internet generally or your web browser, computer, home wiring, or Internet service provider and/or other things that we cannot control.  Our Internet Radio Service functions best when streamed over a broadband connection.  We do not guarantee continuous, uninterrupted or secure access to the Internet Radio Service and are not responsible for any noise and/or interruptions that occur.

**4.  Personal Use of the Service**: We provide the Service only for your personal, non-commercial enjoyment.  You may not make commercial use of, reproduce, rebroadcast, or otherwise transmit our programming, or record, charge admission for listening to or distribute play lists of our programming.  Neither our Internet Radio Service nor any Recorded Content (defined below) is intended for commercial use.  If you use any Service for commercial purposes, we reserve the right to charge you our commercial rate retroactively to the beginning of your Subscription.  We or any of our programming providers may prosecute violations of the foregoing against you and other responsible parties in any court of competent jurisdiction.  You assume all responsibility for use of the Site.   You agree that any person using your identification issued for the Site will be treated by us as having been authorized by you to access your information as contained on the Site, and take any other actions on your behalf.  You will indemnify and hold harmless SIRIUS XM Radio Inc. and its affiliates from all damages, costs, expenses, liabilities and claims incurred by them arising out of any action taken by any person or entity using your username/password on the Site.  You also waive all claims against SIRIUS XM Radio Inc., its officers, directors, employees, suppliers and programmers that may arise from the utilization of the Site.  At the end of each online session you should completely log out of the Service.  Should your login ID or username/password be lost, stolen, sold, transferred or otherwise removed from your possession without your permission, contact us immediately so that your personal identifiers may be

---

[1]  Satellite radio reception in Puerto Rico is best in the Greater Metropolitan Area of San Juan and may not be available in other areas.  Puerto Rico residents should consult SIRIUS Customer Care for the most current reception information. Internet Radio Service is available in all areas of Puerto Rico.

deactivated and reissued.  You also may not attempt to override or circumvent any of our usage rules, limitations, or security measures embedded into the Service or any Receiver.

**5.  Recorded Content:**  Certain types of our Receivers have the ability to record programming transmitted over the Service ("**Recorded Content**").  Subject to your Receiver's restrictions and applicable laws, you may access such Recorded Content only as long as you pay your subscription fee.  We reserve the right to change, reduce, eliminate or charge a fee for this and/or any related functionality.

**6.  Service Interruptions**: The Service may be unavailable or interrupted from time to time for a variety of reasons, such as environmental or topographic conditions, many of which we cannot control.  The Service might also not be available in certain places (e.g., in tunnels, parking garages, or within or next to buildings) or near other technologies.  Home, portable and office-based Receivers function best when the antenna is placed in or near a south-facing window with a clear view of the sky.  Even if your antenna is near a south-facing window, certain window treatments could interfere with reception.  We are not responsible for any noise and/or interruptions of the Service.

**7.  Service Cancellation**: We reserve the right to cancel your Subscription at any time if you fail to pay amounts owing to us when due, violate or breach any of these Terms, or for any other reason in our sole discretion.  If your Subscription is cancelled, you will still be responsible for payment of all outstanding balances accrued through the cancellation date, including any fees described herein.   See also:  D.4. "Loss of Receiver Equipment," F.2. "Automatic Renewal," F.8. "Cancellation Fee,"  F.9. "Service Credits," and G. "Cancellation."

**8.  Service Choices:**  We provide Subscriptions in a variety of programming packages which might suit your listening preferences, and we refer to them throughout as "**Packages.**"  We also offer Subscriptions in a variety of recurring payment plans which might suit your needs, and we refer to them throughout as "**Plans**."  Examples of our Plans are "Monthly," "Quarterly," "Annual," "Two Year," and "Five Year."  Not all Plans are available for all of our Packages.

**9.  Lifetime Subscription Plan**: A "Lifetime Subscription" is one that continues for the life of the Receiver equipment.  Lifetime Subscriptions are nonrefundable. You may cancel a Lifetime Subscription but if you cancel during the first year of service you will be charged a cancellation fee set forth in these Terms.  <u>Non Automotive Receivers</u>:  A Lifetime Subscription associated with a home, portable, or dock & play Receiver is transferable from one Receiver to another Receiver, up to a maximum of three (3) times.  For each permitted transfer of a subscription from one Receiver to another or from one person to another you will be charged a transfer fee set forth in these Terms.  <u>Automotive Receivers</u>:  A Lifetime Subscription is not transferable if it is associated with a Receiver installed by an automaker or an automotive dealer in a vehicle, except in the event the original Receiver associated with that Lifetime Subscription is stolen, accidentally damaged or if, in the sole discretion of SIRIUS, it is defective.  For each permitted transfer of a subscription from one person to another based upon a stolen or accidentally damaged Receiver you will be charged a transfer fee set forth in these Terms.  No transfer fee will be charged for the transfer of a Lifetime Subscription associated with a Receiver installed by an automaker or an automotive dealer if, in the sole discretion of SIRIUS, the Receiver is defective.

**10.  Advisory Nature of Services; User Responsibility; User Safety/Reliance; Parental Control:**  In your use of the Service it is your responsibility to exercise prudent discretion and observe all safety measures required by law and your own common sense.   All actions and judgments taken with respect to the Service are your sole responsibility.  You assume the entire risk related to your use of the Service.  The Service may include traffic, weather, marine weather, and other content and emergency alert information and data, and you acknowledge and agree that such information and data is not for "safety for life," but is merely supplemental and advisory in nature, and therefore cannot be relied upon as safety-critical in connection with any aircraft, sea craft, automobile, or any other usage.

Some programming may include explicit language.  It is your responsibility to impose listening restrictions that you consider appropriate on your family members and guests.  We are not responsible for content that you or anyone else may find inappropriate.

**11.  Business Establishment Subscriptions (Internet Radio Service Only):**  Details for our commercial subscribers can be found in the FAQs area of the Site.

**12.  Interactive Services:**  You acknowledge and agree that (a) we are not responsible for material submitted to us or posted to the Site by users ("**user content**"); (b) we may not pre-screen, monitor, review or edit any user content; (c) we, or our designees have the right (but not

the obligation) in our sole discretion to refuse or remove any user content that, in our judgment, does not comply with these Terms or is otherwise undesirable, inappropriate or inaccurate; (d) user content you view, submit or post is at your own discretion and risk, including any reliance on the accuracy, completeness, or usefulness of such user content; (e) user content does not necessarily reflect the views of Sirius; and (f) we may preserve user content and may disclose user content if required to do so by law or in the good faith belief that such disclosure is reasonably necessary to (i) comply with legal process; (ii) enforce these Terms; (iii) respond to claims that any user content violates the rights of third-parties; or (iv) protect the rights, property, or personal safety of Sirius, its users or the public.

You represent, warrant and agree that you will not post user content which is harassing, abusive, vulgar, hateful, defamatory, sexually explicit, inflammatory, profane, racially or ethnically objectionable, religious or political, or that encourages inappropriate or unlawful conduct or imposes an unreasonable or disproportionately large load on the Site or otherwise interferes with the Site or infringes the rights of any third party. We may, at our sole discretion, immediately terminate your access to the Site should your conduct fail to conform with these Terms. We do not solicit nor do we wish to receive any confidential, secret or proprietary information or other material through the Site or mail, or in any other way. Any user content posted or material submitted or sent to SIRIUS will be deemed not to be confidential or secret. By posting user content, or sending any other material to us ("**material**") you represent and warrant that the material is original to you and that no other party has any rights to the material and you grant SIRIUS the royalty-free, unrestricted, world-wide, perpetual, irrevocable, non-exclusive and fully sub-licensable right and license to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, perform and display such material (in whole or part), including any information, suggestions, ideas, drawings or concepts contained in such material, worldwide and/or to incorporate it in other works in any form, media, or technology now known or later developed. You are and will remain responsible for the accuracy, copyright compliance, legality, decency, or any other aspect of such material.

**D.  RECEIVERS AND OTHER EQUIPMENT**:

**1.  Authorized Suppliers**: You may access and use the Service only with equipment authorized to receive the Service. We do not manufacture or install any of the Receivers or related equipment, including antennas, adapters, adhesive devices or cables ("**Accessories**") you must use to receive the Service. You must purchase your Receiver and Accessories, and any repairs, parts, installation or service, from an authorized seller or manufacturer and the Receiver and/or Accessories will be subject to the applicable seller's or manufacturer's return policy and the manufacturer's warranty, if any. We are not liable for any damage to your personal or real property, including your vehicle, home or other property, resulting from installation or use of any Receiver or Accessories. Unless you purchased your Receiver or Accessories through the Site, we are not responsible for the advertising, statements, practices, promises or services of sellers, installers, or manufacturers of Receivers or Accessories. You should consult your owner's manual or the packaging for important information regarding warranties related to Receivers and Accessories. If you have any complaints about your Receiver, Accessories or installation, you should direct them to the seller, manufacturer or installer. Returns of Receivers and Accessories are subject to your authorized seller's, manufacturer's or installer's return policy.

**2.  Internet Radio:**  We provide only the online Service. You must purchase your computer, laptop, alternate Web Device, modem or router, and Internet service and/or any other appropriate hardware and/or software, from appropriate sellers, resellers, manufacturers or service providers. We are not responsible for and do not warrant any Web Devices in any way whatsoever and are NOT responsible for the advertising, statements, practices, promises, services or warranties of such sellers, manufacturers or installers. If you have any complaints about your Web Device, you should direct them to the applicable seller, reseller, manufacturer, or service provider.

**3.  Multiple Receivers**: Each Subscription to the Satellite Radio Service is tied to one Receiver. If you want to have the Satellite Radio Service on multiple Receivers, you must purchase a separate Subscription for each Receiver although all of your Subscriptions may be combined on a single account. Such additional subscriptions may be eligible for reduced rates which may be offered by us from time to time and a per Receiver activation fee may apply.

**4.  Loss of Receiver Equipment**:  If your Receiver is lost, stolen, sold or otherwise transferred you must cancel or suspend your Subscription or you will remain responsible for the payment obligations for your Satellite Radio Service under the terms of your Subscription.

**5.  Right to Transfer a Subscription**:  Satellite Radio Service Subscriptions (other than Lifetime Subscriptions) are transferable from one Receiver to another. A LIFETIME SATELLITE RADIO SUBSCRIPTION (WHICH IS A SUBSCRIPTION THAT CONTINUES FOR THE LIFE OF THE RECEIVER) IS NOT TRANSFERABLE IF IT IS ASSOCIATED WITH A RECEIVER INSTALLED BY AN AUTOMAKER OR AN AUTOMOTIVE DEALER IN A VEHICLE, EXCEPT IN THE EVENT THE ORIGINAL RECEIVER

ASSOCIATED WITH THAT LIFETIME SATELLITE RADIO SUBSCRIPTION IS STOLEN, ACCIDENTALLY DAMAGED OR, IN OUR SOLE DISCRETION, IS DEFECTIVE.  A LIFETIME SATELLITE RADIO SUBSCRIPTION ASSOCIATED WITH A HOME, PORTABLE OR DOCK & PLAY RECEIVER IS TRANSFERABLE FROM ONE RECEIVER TO ANOTHER RECEIVER, UP TO A MAXIMUM OF THREE TIMES.  Permitted transfers are subject to a transfer fee set forth in these Terms.

**E.  INTELLECTUAL PROPERTY RIGHTS**:

**1.  Technology**:  It is prohibited to, and you agree that you will not, and you agree that you shall not, copy, decompile, disassemble, reverse engineer, make derivative works of or manipulate any technology or data or content stored or incorporated in any equipment (including Receivers) used to receive the Service (collectively, "**Equipment Technology**"), or otherwise modify or tamper with, any such equipment. You also agree not to upload, post, transmit or otherwise make available any material that contains software viruses or any other computer code, files, or programs designed to interrupt, disable or limit the functionality of the Site or the Internet Radio Service.  AMBE® voice compression software included in certain products or the Service is protected by intellectual property rights including patent rights, copyrights, and trade secrets of Digital Voice Systems, Inc.  The software is licensed solely for use within certain products or the Service.  Furthermore, the music, talk, news, entertainment, data and other content on the Service are protected by copyright and other intellectual property laws and all ownership rights remain with the respective content and data service providers. You are prohibited from any export of the data (or derivative thereof) except in compliance with applicable export laws, rules and regulations.  The user of software contained in the Equipment Technology or the Site is explicitly prohibited from attempting to copy, decompile, reverse engineer, hack, manipulate or disassemble the object code, or in any other way convert the object code into human-readable form.  You may use the Equipment Technology only for your personal, non-commercial use in connection with the Service.

**2.  Content**:  All music, programming, text, software (including source and object codes), data, information, visual, oral or other digital material, and all other content of any description available on the Site or included in any Service and/or in Equipment Technology (collectively, the "**Content**"), and all worldwide copyrights, trademarks, service marks, patents, patent registration rights, trade secrets, know-how, database rights and all other rights in or relating to the Content (collectively, the "**Intellectual Property**") are owned by SIRIUS XM Radio Inc., XM Satellite Radio Inc., or are the property of our licensors and suppliers who have given us permission to use it.  Neither your access to and use of the Service nor these Terms grant you any right, title or interest or license in or to any such Content, and you may not use such Content without the express written permission of the owner(s).  You may not reproduce, perform, distribute, display or create derivative works from the Content.  You may only use the Content and the Intellectual Property, access the Site and use any Services we provide as expressly permitted in these Terms and for no other purpose.

**3.  Trademarks**:  SIRIUS Satellite Radio®, the dog logo, and SIRIUS Internet Radio® are trademarks, service marks or registered marks of SIRIUS XM Radio Inc. ("**Marks**"). Other trademarks, service marks, graphics, logos and domain names appearing on the Service or the Site may be the trademarks of third parties.  Neither your access to and use of the Service or the Site nor these Terms grant you any right, title or interest or license to reproduce or otherwise use the Marks or any third-party trademarks, service marks, graphics, logos or domain names.  Any goodwill in the Marks generated as a result of your use of the Service will inure to our benefit.  You shall not at any time, nor shall you assist others to, challenge our right, title, or interest in or to, or the validity of, the Marks or any other intellectual property rights of ours.

**4.  Copyright:**  If you are authorized to act on behalf of a copyright owner, and any material on the Site infringes on the rights of the owner, please notify us:

> SIRIUS XM Radio Inc.
> Attention:  Legal Department
> 1221 Avenue of the Americas, 37th Floor
> New York, NY 10020
> Fax:  (212) 584-5353

To be effective, your notification must provide us with information that meets the requirements of the U.S. Copyright Act, which are summarized as follows:

- A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;
- A detailed identification of the copyrighted work or works claimed to have been infringed;

- Information sufficient to permit us to locate the allegedly infringing material;
- Information sufficient to permit us to contact you, such as an address, telephone number or email address;
- A statement that you have a good faith belief that the use of the allegedly infringing material in the manner complained of is not authorized by the copyright owner, its agent or the law;
- Your sworn statement that the information in your notification is accurate; and
- Your sworn statement that you are authorized to act on behalf of the copyright owner of the allegedly infringing material.

**5. Internet Radio**:  You may not rebroadcast our Internet Radio Service in any way.  You may play our Internet Radio Service through speakers or headphones for your personal listening pleasure.  You may not make any recordings of, or otherwise duplicate, the content provided by our Internet Radio Service.  In addition, you may not re-transmit or otherwise distribute the content provided by our Internet Radio Service in any way, including online streaming such content or making such content available for download.  You may not re-skin, re-package, decompile, reverse engineer, disassemble our Internet Radio Service, or construct a media player or interface that accesses our Internet Radio Service.  In addition, your use of any products or services that access our Internet Radio Service and which are provided by third parties not authorized by us constitutes a violation of these Terms, even if you did not create such product or services and/or do not understand how they were created.

**F. PAYMENT**: In return for receiving the Service, you agree to pay us as follows:

**1.  Subscription Fee**: You must pay in advance by credit card or debit card.   You may combine payment with a SIRIUS|XM Prepaid Subscription card.  You may also pay by check or money order.  If you elect to receive an invoice or you request an invoice, you will be required to pay an invoice fee on each invoice rendered.  Please do not include comments or questions with your check or money order payment.  If paying by check or money order against invoices, mail all payments to the address contained on your invoice and include your SIRIUS Account Number on your check or money order.  Payment can be sent to:

> SIRIUS XM Radio Inc.
> PO Box 78211
> Phoenix AZ 85062-8211

By sending your completed, signed check to us, you authorize us to copy your check and to use the account information from your check to make a one-time electronic fund transfer from your account for the same amount as the check.  Funds will be withdrawn from your account within 24 hours and you will not receive your check back from your financial institution.  The electronic fund transfer from your account will be on the account statement you receive from your financial institution.

**2. Automatic Renewal**:  Your Subscription will continue for the length of the initial term you select on your Plan ("**Subscription Term**") and at the end of your prepaid Subscription Term, it will automatically renew for another prepaid period of the same length unless you choose to cancel prior to that renewal, or your Service is cancelled, terminated, or discontinued by you or by us, or you select a different Plan.  Your account will automatically be charged (or you will be billed, as applicable) at the rates in effect at the time of renewal.  We may, at our option, process your renewal on a month-to month basis instead of your chosen Subscription Term.

**3. Changes in Fees**: Our fees and other charges are subject to change without notice.

**4. Change of Address or Account Information**:  You must notify Customer Care immediately of any change in your name, billing address, service address, email address, telephone number, credit card or other account information.

**5. Statements**:  If you are not using an electronic method of payment, we will send you a paper statement for the billing plan you selected.  If you receive an invoice or you request an invoice, we will charge you an invoice administration fee on each invoice rendered.  Billing statements will be provided only upon request.  If you would like to receive a paper statement for a particular period, please contact Customer Care.  Please include the name and service address on your account in your letter. Statements will show: (1) payments, credits, purchases and any other charges to your account, (2) your account balance, and (3) the payment due date.

**6. Payments**:  All payments must be made in U.S. dollars.  We do not accept recurring payment plans from cards issued by Canadian Card Issuers nor any gift cards issued by Visa, MasterCard, American Express or Discover.  These types of cards may only be used for one-time payments to

us.  Your outstanding balance is due in full each payment period.  Undisputed portions of your account must be paid by the due date to avoid a late fee and possible deactivation of the Service. No "payment in full" notation or other restrictive endorsement written on your payments will restrict our ability to collect all amounts owing to us.  We expect you to pay your account balance on time.  If you are delinquent in any payment to us, we reserve the right to suspend or terminate your Subscription, deactivate your Receiver and report any late payment or non-payment to credit reporting agencies.  If your account is past due, and if we deactivate your Service, we will prorate your Subscription and amounts owed to us and will apply your pre-payments to past due amounts and any remaining credit to future obligations.

**7.  Taxes**:  You are responsible for all taxes or other government fees and charges, if any, which are assessed based on the Service address on your account.

**8.  Fees**:  We will charge you one or more of the following fees, all of which are subject to change without notice:

- **Activation Fee**:  For each Receiver on your account, we may charge you a one-time fee to activate, reactivate, upgrade or modify your Service.  The fee is payable with your first subscription fee payment.  For audio Service, the activation fee is currently $15.00for SIRIUS and $14.99 for XM.
- **U.S. Music Royalty Fee:**  As of July 29, 2009, new and renewing Subscription Packages which include music channels will be charged a U.S. Music Royalty Fee.  For further details on how this fee is calculated see [FAQs](#).
- **Invoice Administration Fee**:  If you elect to receive an invoice or you request an invoice, we will charge you an invoice administration fee on each invoice rendered.  The invoice administration fee is currently $2.00 per invoice.
- **Late Fee**:  If we do not receive your payment by the billing due date, we may charge you a late fee.  The late fee is currently the lesser of (a) $5.00 or (b) the maximum amount permitted under applicable law per month or partial month until the delinquent amount is paid in full, in each case, subject to applicable law.  We do not extend credit to customers and you acknowledge that this fee is not an interest charge, finance charge, or other charge of a similar nature and it is reasonably related to the actual expense we incur due to unsatisfied payment and may be subject to limitations set forth by law in your state.
- **Returned Payment Fee**:  If any bank or other financial institution refuses to honor any payment of yours, we may charge you a fee that is the lesser of (i) $20.00 ($15.00 for residents of West Virginia); and (ii) the maximum amount permitted under applicable law.  You acknowledge that this fee is not an interest charge, finance charge, or other charge of a similar nature and it is reasonably related to the actual expense we incur due to unsatisfied payment.
- **Package Change Fee**:  If you convert your Subscription to a different Package where the fee is less than or equal to the fee for your current Package on the same Receiver, you will be charged a $5.00 fee.
- **A La Carte Channel Change Fee**:  If you have an "A La Carte" Package, while there is no fee for the initial selection of channels, for each subsequent transaction to change your channel selections, you will be charged a fee of $5.00.
- **Transfer Fee**:  If you transfer a Subscription from one Receiver to another or from one person to another, you will be charged a transfer fee of $15 for all but Lifetime Plans.  If you transfer a Lifetime Subscription Plan from one Receiver to another or from one person to another the transfer fee is currently $75.00.  SATELLITE RADIO SERVICE SUBSCRIPTIONS ARE TRANSFERABLE ONLY TO THE EXTENT PROVIDED FOR HEREIN.  A LIFETIME SATELLITE RADIO SUBSCRIPTION IS NOT TRANSFERABLE IF IT IS ASSOCIATED WITH A RECEIVER INSTALLED BY AN AUTOMAKER OR AN AUTOMOTIVE DEALER IN A VEHICLE, EXCEPT IN THE EVENT THE ORIGINAL RECEIVER ASSOCIATED WITH THAT LIFETIME SUBSCRIPTION PLAN IS STOLEN, ACCIDENTALLY DAMAGED OR, IN OUR SOLE DISCRETION, IS DEFECTIVE.  No transfer fee will be charged for the transfer of a Lifetime Subscription Plan associated with a Receiver installed by an automaker or an automotive dealer if, in our sole discretion, the Receiver is defective.
- **Cancellation Fee**:  You will be charged a cancellation fee if you cancel a one-year or longer Subscription during the first year of service.  The cancellation fee is currently $75.00.  Promotional offers may have different cancellation fees.  From time to time, we may offer a Service on a multi-month commitment or promotional basis.  In such event, you agree to make payments for the Service to be received and  ordered by you in accordance with the terms of the applicable billing plan and promotion that you agree to, including payments of any early termination fees if you terminate the Service prior to the end of a minimum commitment period.
- **Taxes**:  All amounts charged to your account, including fees and shipping charges for

Receivers purchased directly from SIRIUS, may be subject to tax, which will vary according to your billing or shipping address and applicable law.

We reserve the right to waive any of these fees, in whole or in part, at our discretion.  Our failure to enforce any of these fees or any other provisions of these Terms shall not be construed as a waiver of the right to assert any such Terms on any future occasion.

**9.  Service Credits**:  If you change an existing Subscription Package or Plan and keep the same Receiver, we must cancel your existing Subscription, we will charge you for the new Subscription, and you will receive a Service credit for the unused prepaid portion of the old Subscription.  A Subscription you give up may be subject to fees to make a change, early cancellation fees, or nonrefundable prepayments.  You will be responsible for the payment of such fees, which will be posted to your account, but you may still enjoy a Service credit or balance on your account when you begin your new Package or Plan.  SERVICE CREDITS WILL NOT BE REFUNDED IN CASH, BUT WILL BE HONORED IN THE FORM OF SERVICE FOR THE REMAINING LENGTH OF THE CREDIT. UNUSED SERVICE CREDITS WILL EXPIRE UPON TERMINATION OF YOUR SUBSCRIPTION AND MAY NOT BE TRANSFERRED TO ANOTHER PERSON OR SUBSCRIPTION.  Lifetime, automotive pre-packaged, monthly and certain promotional Subscriptions are nonrefundable; if you make changes to such Subscriptions, no Service credits will be due on your account.

**10.  Changes to Packages and Plans**: You have the right to change your subscription "Package" (e.g., ask us to change from "SIRIUS Everything" to "SIRIUS Everything PLUS The Best of XM"). You also have the right to change your subscription "Plan" (e.g., ask us to change from a "SIRIUS Everything" Monthly Plan to a "SIRIUS Everything" 3-Year Plan). How the change will affect your account and charges will depend upon the choices you make.  Each Subscription to the Satellite Radio Service is tied to one Receiver.  You may have multiple Receivers and multiple Subscriptions.  All of your Subscriptions may be combined on a single account. Service fees and balances are account-related, with a few exceptions.  Sometimes they are Receiver-related.  If you add additional Receivers to your account, you must purchase a separate Subscription for each one.

**11.  Customer Care**:  If you have a question about the Service, Subscription, Subscription Fees, fees, charges or bill, or if you would like to change or reactivate your Subscription, please contact Customer Care.   If you contact SIRIUS Customer Care in writing, please include the following information:

- Your name, service address, and account number;
- The dollar amount in question; and
- The details of your question.

Please do not include any payment with your correspondence.  If you wish to dispute any charge, you must contact us by mail or phone (by following the instructions in these Terms) within 30 days after the date you receive the statement in question.  OTHERWISE YOU WAIVE YOUR RIGHT TO DISPUTE THE CHARGE.  Undisputed portions of the statement must be paid by the due date to avoid a late fee and possible deactivation of the Service.

**G.  CANCELLATION**:  The term of your Subscription will automatically renew for additional terms of the same length as your initial Subscription Term or, at our option, on a month-to-month basis until you cancel the Service.  You are responsible for payment of all outstanding balances accrued through that date.  You must comply with these Terms  or we may cancel the Service.

**1.  Cancellation**: You may cancel your Subscription at any time by notifying Customer Care. Your cancellation will become effective on your next Subscription "cycle date," which is the next month anniversary of your initial activation date (i.e., if you activated your Subscription on January 15th and cancel on April 1st your Subscription will end on April 15th).  A cancellation fee may apply.

**2.  Refunds**:  LIFETIME, AUTOMOTIVE PRE-PACKAGED, MONTHLY AND CERTAIN PROMOTIONAL SUBSCRIPTIONS ARE NONREFUNDABLE.  If you cancel your Subscription prior to its expiration (excluding the aforementioned types of Subscriptions), you will receive a refund of amounts you paid directly, if any, on a pro-rata basis, less any applicable fees, unless provided otherwise in any offer for the Service that you accept.  If your subscription was included in the financing of your purchase or lease of a vehicle, any refund will be payable to your finance company unless the finance company has notified us that your loan has been paid in full.  Fees attributable to certain promotional offerings or Service received during trial periods may not be refunded.  **IN THE UNLIKELY EVENT THAT WE CEASE BROADCASTING THE SERVICE, WHETHER AS A RESULT OF A LIQUIDATION, BANKRUPTCY, OR OTHERWISE, ALL PREPAID SUBSCRIPTIONS WILL BE TREATED AS NONREFUNDABLE.**

**H.  DISCLAIMERS/LIMITATION OF LIABILITY**:

1.  **Disclaimers**:  YOU UNDERSTAND AND AGREE THAT THE SITE AND THE CONTENT AND FUNCTIONALITY OF THE SERVICE, INCLUDING PROGRAMMING AND ON-AIR ADVERTISING, ARE PROVIDED "AS IS" AND "AS AVAILABLE."  SIRIUS AND WSI CORPORATION ("**WSI**") MAKE NO REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, REGARDING THE SERVICE, THE RELIABILITY, PREDICTIVE VALUE, COMPLETENESS, TIMELINESS, RELIABILITY, OR ACCURACY OF THE INFORMATION CONTAINED WITHIN THE SERVICE, YOUR RECEIVER OR OTHER EQUIPMENT, OUR TRANSMISSION, YOUR RECEPTION, OR THAT YOUR ACCESS TO OR YOUR USE OF THE SERVICE OR SITE WILL BE UNINTERRUPTED, ERROR FREE OR TIMELY WITH ALL UPDATES.  ALL SUCH WARRANTIES (INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT) ARE HEREBY DISCLAIMED.

YOU ACKNOWLEDGE AND AGREE THAT UNDER NO CIRCUMSTANCES SHOULD A USER OF THE SERVICE MAKE DECISIONS BASED SOLELY OR IN PART ON TRAFFIC, WEATHER, OR OTHER INFORMATION CONTAINED WITHIN THE SERVICE.  NEITHER SIRIUS NOR WSI ASSUMES ANY RESPONSIBILITY FOR ACCIDENTS, DAMAGES OR OTHER LOSSES RESULTING FROM OR ASSOCIATED WITH USE AND/OR MISUSE OF THE SERVICE.

2.  **Limitations of Liability**:  IN NO EVENT ARE WE, OR WSI, LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, LOST PROFITS, OR LOSSES RELATING TO THE USE, LOSS OF USE OR DATA, OR PURCHASE OF ANY RECEIVER OR EQUIPMENT, OR YOUR PURCHASE OR USE OF THE SERVICE, OR FROM ANY CONTENT POSTED ON THE SITE BY US OR ANYONE ELSE, WHETHER BASED ON NEGLIGENCE OR OTHERWISE, AND WHETHER OR NOT WE HAVE BEEN ADVISED OF THE POSSIBILITY THEREOF, WHETHER ARISING OUT OF BREACH OF AGREEMENT, TORT OR ANY OTHER CAUSE OF ACTION RELATING TO THE PERFORMANCE OR NON-PERFORMANCE OF THESE TERMS.

IN NO EVENT WILL THE AGGREGATE OF EACH OF SIRIUS' AND WSI'S LIABILITY FOR ANY AND ALL OF YOUR CLAIMS, OR ANY THIRD PARTY CLAIMS, AGAINST US AND OUR PROGRAMMING OR DATA SUPPLIERS, SERVICE PROVIDERS, MARKETING/DISTRIBUTION SOFTWARE OR INTERNET SUPPLIERS OR HARDWARE OR SOFTWARE MANUFACTURERS, OR SUPPLIERS, CONTRACTORS AND LICENSORS, OR INDEPENDENT SELLERS, ARISING OUT OF OR RELATED TO, DIRECTLY OR INDIRECTLY, THE PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS PURSUANT TO THESE TERMS OR BY THE NEGLIGENCE, ACTIVE OR PASSIVE, OF SIRIUS AND/OR WSI, OR YOUR ACCESS TO OR USE OF OR INABILITY TO USE THE SERVICE OR SITE, EXCEED THE PRICE PAID BY YOU TO SIRIUS HEREUNDER FOR THE MOST RECENT SIX MONTHS OF SERVICE IMMEDIATELY PRIOR TO THE SPECIFIC EVENT WHICH GAVE RISE TO THE APPLICABLE DAMAGE OR LOSS.  YOU AGREE THAT THIS LIMITATION OF LIABILITY REPRESENTS A REASONABLE ALLOCATION OF RISK. THIS ALLOCATION OF RISK AND THE DISCLAIMER OF WARRANTIES HEREIN ARE REFLECTED IN OUR PRICES AND ARE A FUNDAMENTAL ELEMENT OF THESE TERMS.  YOU MAY HAVE GREATER RIGHTS THAN DESCRIBED ABOVE UNDER YOUR STATE'S LAWS.

3.  **Your Risk**:  YOU AGREE THAT YOUR ACCESS TO AND USE OF, OR INABILITY TO ACCESS OR USE THE SERVICE OR THE SITE IS AT YOUR SOLE RISK.  YOU WILL NOT HOLD US, OUR PROGRAMMING OR DATA SUPPLIERS, SERVICE PROVIDERS, MARKETING/DISTRIBUTION, SOFTWARE OR INTERNET SUPPLIERS, OR HARDWARE OR SOFTWARE MANUFACTURERS, OR SUPPLIERS, OR OUR CONTRACTORS OR LICENSORS, AS APPLICABLE, RESPONSIBLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES, OR LOST PROFITS RESULTING FROM YOUR ACCESS TO OR USE OF, OR INTERRUPTIONS IN THE TRANSMISSION OR RECEPTION OF THE SERVICE OR SITE, INCLUDING ANY DAMAGE TO ANY OF YOUR COMPUTERS OR DATA, AND/OR ANY RECEIVER.  NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY ANY PERSON SHALL CREATE A WARRANTY OR GUARANTEE IN ANY WAY WHATSOEVER RELATING TO THE SERVICE OR SITE.

4.  **Third Parties**:  THE THIRD PARTY LINKS, SERVICES, GOODS, RESOURCES AND CONTENT AVAILABLE ON THE SERVICE AND THROUGH LINKS ON THE SITE ARE NOT CONTROLLED BY US. ACCORDINGLY, WE MAKE NO WARRANTIES REGARDING SUCH THIRD-PARTY SERVICES, GOODS, RESOURCES, AND CONTENT, INCLUDING WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND NON-INFRINGEMENT.  WE WILL NOT BE LIABLE FOR YOUR ACCESS TO, USE OF OR DOWNLOADING OF CONTENT AVAILABLE ON OR THROUGH, THE SERVICE OR SITE.  WE ARE NOT LIABLE FOR ANY DIRECT OR INDIRECT DAMAGES OR LOSSES CAUSED BY YOUR USE OF THIRD-PARTY WEBSITES.  YOU ASSUME FULL RESPONSIBILITY WHEN YOU CHOOSE TO FOLLOW ANY LINKS ON THE SITE THAT LEAD TO THIRD-PARTY WEBSITES.

5.  **State Law**:  SOME JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OF CERTAIN IMPLIED WARRANTIES OR THE LIMITATION OF CERTAIN DAMAGES, SO SOME OF THE ABOVE DISCLAIMERS, WAIVERS AND LIMITATIONS OF LIABILITY MAY NOT APPLY TO YOU.

**6.  Miscellaneous**:  UNLESS LIMITED OR MODIFIED BY APPLICABLE LAW, THE FOREGOING DISCLAIMERS, WAIVERS AND LIMITATIONS SHALL APPLY TO THE MAXIMUM EXTENT PERMITTED, EVEN IF ANY REMEDY FAILS ITS ESSENTIAL PURPOSE. OUR LICENSORS AND CONTRACTORS ARE INTENDED THIRD-PARTY BENEFICIARIES OF THESE DISCLAIMERS.

**7.  Indemnification:**  EXCEPT FOR WILLFUL MISCONDUCT ON THE PART OF SIRIUS AND/OR WSI, YOU AGREE TO DEFEND, INDEMNIFY AND HOLD HARMLESS SIRIUS XM RADIO INC. AND ITS AFFILIATES, SUBSIDIARIES, SHAREHOLDERS, OFFICERS, AGENTS, EMPLOYEES, LICENSORS AND SERVICE PROVIDERS, AND WSI ("**INDEMNIFIED PARTIES**") FROM ANY AND ALL CLAIMS, LIABILITY AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES), WHETHER IN TORT, CONTRACT OR OTHERWISE, RELATING TO OR ARISING OUT OF YOUR USE OF THE SERVICE AND ANY BREACH OF THESE TERMS, APPLICABLE LAW OR ANY RIGHT OF THE INDEMNIFIED PARTIES OR ANY THIRD PARTY.  THIS INDEMNIFICATION OBLIGATION INCLUDES THE ACTS OR OMISSIONS OF ANYONE ACCESSING THE  SERVICE USING YOUR LOGIN ID, WITH OR WITHOUT YOUR PERMISSION.

**I.  RESOLVING DISPUTES**:

PLEASE READ THIS PROVISION OF THIS SECTION CAREFULLY.  IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION.  ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY.  IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR, OR A PANEL OF ARBITRATORS, INSTEAD OF A JUDGE OR JURY.  THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE (BY THEIR ACCEPTANCE OF THESE TERMS, IN ACCESSING OR USING THE SERVICE OR THE SITE) TO HAVE ANY DISPUTES RESOLVED THROUGH ARBITRATION.

In order to expedite and control the cost of disputes, you agree that any legal or equitable claim relating to the Service, the Site, your Subscription or these Terms (a "**Claim**"), will be resolved as follows:

**1.  Informal Claim Resolution**:  To initiate an informal resolution to a Claim, you must send a notice by first class United States mail to SIRIUS XM Radio Inc., 1221 Avenue of the Americas, New York, NY 10020, Attention:  SIRIUS Customer Care (a "**Notice**").  Neither of us may start a formal proceeding (except for Claims described in subsection 3 below) for at least 60 days after one of us notifies the other of a Claim in writing.  If we initiate a Claim, we will send our notice to the billing address on file with us.

**2.  Formal Resolution:**  If we cannot resolve a Claim informally, including any Claim between us, and any Claim by either of us against any agent, employee, successor, or assign of the other, including, to the full extent permitted by applicable law, third parties who are not signatories to this agreement, whether related to this agreement or otherwise, including past, present, and future Claims and disputes, and including any dispute as to the validity or applicability of this arbitration clause, then these Claims shall be resolved, upon election by either party, exclusively and finally by binding arbitration.

The party initiating arbitration must follow the rules and procedures of the American Arbitration Association in effect at the time the Claim is filed.  You may obtain copies of the current rules , forms and instructions for initiating an arbitration by contacting:

> American Arbitration Association
> 1633 Broadway, 10th Floor
> New York, New York 10019
> Web site: www.adr.org
> (800) 778-7879

This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act ("**FAA**"), and not by any state law concerning arbitration.

**3.  Exceptions:**  Notwithstanding the foregoing, any dispute involving a violation of the Communications Act of 1934, 47 U.S.C. §605, the Electronic Communications Privacy Act, 18 U.S.C. §§2510-2521, or a violation of our intellectual property rights may be decided only by a court of competent jurisdiction.

**4.  Small Claims:**  Instead of proceeding to arbitration, either you or we have the option to pursue a Claim in small claims court (or the equivalent) so long as 1) the Claim remains in that court, and 2) is made solely on our behalf (if brought by us), or on your behalf.  However, if that Claim is transferred or appealed to a different court, we reserve our right to elect arbitration.

**5.  Severability:**  If any portion of this arbitration agreement cannot be enforced, that portion will be severed, and the rest of the arbitration agreement will continue to apply.

**6.  Binding Effect:**  In the arbitration proceeding, the arbitrator must follow applicable law, and any award may be challenged, as set forth in the FAA.  Any court with jurisdiction may enter judgment upon the arbitrator's award.  The arbitrator's decision is final and binding on all parties and may be enforced in any federal or state court with jurisdiction.

**J.  <u>MISCELLANEOUS</u>:**

**1.  Notices**:  Notices to you will be deemed given when deposited in the mail or when sent by email.  Notices may be included in statements or other communications to you.  We may also provide notice to you by telephone, which will be deemed given when a message is left with you, someone answering the telephone at your residence or on an answering machine or voice mail system at your phone number on record with us.  Your notices to us will be deemed given when we receive them at the telephone number or, in writing at the address, set forth above at "CONTACT INFORMATION."

**2.  Assignment of Account**:  We may assign your account and all rights and/or obligations hereunder to any third party without notice for any purpose, including, without limitation, collection of unpaid amounts, in the event of an acquisition, corporate reorganization, merger or sale of substantially all of our assets to another entity.  You hereby consent to such assignment. You must continue making all required payments to us in accordance with your billing statement, unless notified otherwise.

**3.  Termination:**  We may terminate your right to use the Site at any time and without notice. We will terminate your right to use the Site if you violate any of these Terms or any other policy posted on the Site.

**4.  Full Agreement**:  These Terms constitute the entire agreement between us concerning your access to and use of the Service or Site and may be modified by the unilateral amendment of these Terms and the posting by us of such amended version.  No salesperson or other representative is authorized to change it for you.  If any provision is declared by a competent authority to be invalid, that provision will be deleted or modified to the extent necessary, and the rest of these Terms will remain enforceable.  Any specific Terms that expressly or by their nature survive termination shall continue thereafter until fully performed.  A waiver of any of these Terms or any breach thereof, in any one instance, will not waive such term or condition or any subsequent breach thereof.

**5.  Applicable Law:**  The interpretation and enforcement of these Terms shall be governed by the rules and regulations of the State of New York and other applicable federal laws.  Notwithstanding the foregoing, Section I. shall be governed by the FAA without reference to state law.

**THANK YOU FOR CHOOSING SIRIUS RADIO.**

© 2010 SIRIUS XM Radio Inc. SIRIUS, XM and all related marks and logos are trademarks of SIRIUS XM Radio Inc. and its subsidiaries.