STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CARL BLESSING ET AL.,                            :
                                                 :
    Plaintiffs,                                 :
                                                 :   09 CV 10035 (HB)
            - against -                        :
                                                 :   OPINION &
SIRIUS XM RADIO INC.,                            :   ORDER
                                                 :
    Defendant.                                  :
------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

    This proposed class action is based on the plaintiffs' purchase of satellite digital audio radio services ("SDARS") – commonly known as "satellite radio" – from the defendant in various locations throughout the United States.  Plaintiffs claim that the 2008 merger of Sirius Satellite Radio, Inc. with XM Satellite Holdings, Inc. created a monopoly in the surviving company, Defendant Sirius XM Radio Inc. ("Defendant" or "Sirius XM"), that violates the anti-trust laws codified in the Clayton Act § 7 and the Sherman Act § 2.   They also allege that, as the only satellite radio provider in the United States, Defendant abused its monopoly power by raising prices in violation of state consumer protection laws, and in violation of the agreement governing the Plaintiffs' subscription for SDARS.  Defendant now moves to dismiss eleven plaintiffs, certain claims under state consumer protection laws, and the contract related claim based on breach of contract and breach of the covenant of good faith and fair dealing.  Plaintiffs move to bifurcate the federal antitrust claims from the state consumer protection and contract-related claims.  For the reasons that follow, Defendant's motion to dismiss is GRANTED in part and DENIED in part.  Plaintiffs' motion to bifurcate is DENIED.

## FACTUAL AND PROCEDURAL BACKGROUND

    The relevant facts reach back to April of 1997, when the Federal Communications Commission ("FCC") auctioned off 25 megahertz of satellite bandwidth. *See* Second Consolidated Amended Class Action Complaint ("SCAC") ¶ 48. The two winning bidders were XM Satellite Holdings, Inc. and Sirius Satellite Radio. *Id.* The companies launched their SDARS businesses in September 2001 and February 2002, respectively.  SCAC ¶¶ 50, 51.  On July 28, 2008 they merged to form Sirius XM. SCAC ¶ 3; Def.'s Mem. Supp. Mot. Dismiss 4. Because this merger involved transferring control of FCC licenses, the parties had applied for FCC

1

approval of the transaction in March 2007. SCAC ¶ 61. In order to obtain FCC approval, Defendant agreed to specific limitations on the exercise of its "enhanced market power" and promised that the merger would result in increased efficiencies that would be passed to the consumer in the form of lower prices. SCAC ¶¶ 63–64.

In support of their antitrust claims, Plaintiffs allege that Sirius XM now controls 100% of the market for SDARS and that there is no economically viable alternative product that is interchangeable with that provided by Sirius XM. SCAC ¶¶ 286, 292–94. The complaint further alleges that the merger was a willful attempt to exert monopolistic control over the SDARS market since the merged companies had been the only SDARS providers, and entry into the SDARS market is prohibitively costly. SCAC ¶¶ 283, 285, 291, 294. The complaint asserts that these actions resulted in artificially inflated, noncompetitive prices, thereby harming the named plaintiffs—Sirius XM subscribers—and all others similarly situated. SCAC ¶¶ 287, 296–97.

In support of their claims for breach of contract and breach of the implied covenant of good faith and fair dealing, Plaintiffs point to the agreements that every consumer entered into with Sirius XM and under which the company agreed to provide SDARS (the "Customer Agreements"). SCAC ¶ 302. Among other things, the Customer Agreements described a U.S. Music Royalty Fee (the "Royalty Fee") that would be charged as part of the overall subscription cost. The complaint alleges that, during the FCC approval process, Sirius XM agreed that such charge would be limited to the amount necessary to "pass through" its own increased costs of royalties paid since the merger, SCAC ¶ 132, and that the Royalty Fee is described to consumers as just that: a simple "pass through." SCAC ¶ 153. Plaintiffs charge that, rather than imposing a "pass through" fee, the Royalty Fee as charged exceeded the amount of the Defendant's increase in royalty obligations. SCAC ¶¶ 132–33. At the heart of Plaintiffs' non-antitrust claims is the allegation that the Customer Agreements provided an inaccurate and deceptive description of the Royalty Fee. SCAC ¶¶ 149–60, 306–446.

Plaintiffs filed several class action lawsuits against Sirius XM, which were joined in a consolidated amended complaint filed March 22, 2010 (the "CAC"). On May 3, 2010, Plaintiffs filed the SCAC, which added eleven new plaintiffs. Defendants now move to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that (1) the eleven plaintiffs first named in the SCAC were added after the Court's deadline for joinder of new parties and should be dismissed, (2) Plaintiffs do not have standing to bring claims under the consumer protection statutes of states in which no plaintiff resides, (3) Plaintiffs fail to state claims for relief under either New York, California, or

2

Massachusetts law, and (4) Plaintiffs fail to state claims for either breach of contract or breach of the covenant of good faith and fair dealing.  Defendant does not challenge the antitrust claims.

## DISCUSSION

### A.  Legal Standard

A complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss on this ground, a plaintiff must "plead enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they "plausibly give rise to an entitlement to relief."  *Id.* at 1950.  A court may consider "undisputed documents, such as a written contract attached to, or incorporated by reference in, the complaint."  *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 234 (2d Cir. 2008).

### B.  Standing to bring state law claims

Defendant asserts that the existing Plaintiffs lack standing to bring their consumer protection claims under the laws of states in which they do not reside, and while this may be so it would dismiss the state law claims for all but nine of the states under whose laws claims are brought.  *See* Def.'s Mem., at 8.  The better course at this junction is to let the claims go forward and see what happens on the motion for class certification.   This is consistent with a broad array of precedent and persuasive authority.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin,* 422 U.S. 490, 498 (1975).  It requires that a plaintiff make out "a 'case or controversy' *between himself and the defendant* within the meaning of Article III."  *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422-23 (6th Cir. 1998) (quoting *Warth v. Seldin,* 422 U.S. at 498 (emphasis added)).  What is crucial at this stage is that "each of the named plaintiffs has standing to bring at least some claims."  *In re Buspirone Patent Litigation*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002).

While it is true that standing is generally treated as a threshold issue, the Supreme Court has articulated an exception whereby federal courts may address class certification prior to standing in cases where the certification issues are "logically antecedent to Article III concerns."  *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831 (1999).  Unsurprisingly, this engendered some

3

disagreement among federal courts as to when certification issues are "logically antecedent" to standing. *See, e.g.*, Linda S. Mullenix, *Standing and Other Dispositive Motions after Amchem and Ortiz: The Problem of "Logically Antecedent" Inquiries,* 2004 Mich. St. L.Rev. 703, 729 (2004). While the Second Circuit has not directly addressed the issue, there has been a growing consensus among district courts that class certification is "logically antecedent," where its outcome will affect the Article III standing determination, and the weight of authority holds that in general class certification should come first. *See, e.g.*, *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06 MD 1739 (SWK), 2006 WL 3039993, *2 (S.D.N.Y. Oct. 25, 2006) (examining the "emerging split" in lower court authority and determining that "the better interpretation is to treat class certification as logically antecedent to standing where class certification is the source of the potential standing problems."). *See also Pietra v. RREEF Am., L.L.C.,* No. 09 Civ. 7439 (JGK), 2010 WL 3629597, at *5 n. 1 (S.D.N.Y. Sep. 16, 2010) ("class certification issues are "'logically antecedent' to Article III concerns.") (collecting Southern District cases where courts deferred until class certification defendants' challenges to standing based on the fact that named plaintiffs had purchased some but not all securities at issue in the litigation); *Woodhams v. Allstate Fire and Cas. Co.*, No. 10 Civ. 441(JGK), 2010 WL 3858440, *4 (S.D.N.Y. Sep. 28, 2010) (declining to reach the question of standing to brings consumer protection and breach of contract claims because "standing questions may be deferred until after a class has been certified" but granting the motion to dismiss on other grounds); *Salsitz v. Peltz*, 210 F.R.D. 95, 97 (S.D.N.Y. 2002) ("[C]lass certification issues are ... 'logically antecedent' to Article III concerns ... and pertain to statutory standing, which may properly be treated before Article III standing.") (internal citations omitted).

1

---

[1] A number of opinions in securities-related cases have held otherwise where named plaintiffs brought claims related to securities they did not purchase on the theory that proposed class members had purchased them and would establish standing once joined. *See, e.g.*, *Pub. Emps.' Ret. Sys. v. Merrill Lynch & Co. Inc.*, No. 08 Civ. 10841 (JSR) 2010 WL 2175875, *2-3 (S.D.N.Y. June 1, 2010) (finding standing is antecedent to class certification and agreeing with defendants that "while plaintiffs assert claims based on eighty-four offerings, they lack standing to sue on all but the nineteen offerings in which the named plaintiffs purchased securities.").

However, the weight of authority even in this context finds that class certification may, where appropriate, be resolved prior to standing challenges. *See, e.g.*, *Cornwell v. Credit Suisse Group*, 689 F. Supp. 2d 629, 634 n. 3 (S.D.N.Y. 2010) (deferring to the class certification stage defendants' argument that plaintiffs lacked standing to assert claims on behalf of all United States-based investors in Credit Suisse because plaintiffs purchased ADRs only on the New York Stock Exchange while other United States based investors purchased Credit Suisse shares on the Swiss Stock Exchange) (*citing In re Grand Theft Auto*, 2006 WL 3039993, at *2); *Pietra*, 2010 WL 3629597, at *5 n. 1 (collecting cases); *Hoffman*, 591 F. Supp. 2d at 531-532 (same).

The reason that named plaintiffs in a proposed class action bring claims under consumer protection laws of states where they do not reside is that it allows them to preserve those claims in anticipation of eventually being joined by class members who do reside in the states for which claims have been asserted.  In *Grand Theft Auto* this Court denied a motion to dismiss where the defendants challenged the named plaintiffs' standing to bring claims under the consumer protection laws of states "other than those in which the Named Plaintiffs reside[d] and purchased [the video game at issue]."  *In re Grand Theft Auto(No. II)*, 2006 WL 3039993, at *1.  "The relevant question," the Court opined, "is not whether the Named Plaintiffs have standing to sue Defendants-they most certainly do-but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class action… This question is, at least in the first instance, appropriately answered through the class certification process."  *Id.* at *3.  Thus, while there is no question that plaintiffs in a proposed class action must have standing to sue the defendant on "at least some claims," *In re Buspirone*, 185 F. Supp. 2d at 377, whether they may bring each claim asserted on behalf of the proposed class is properly determined after class certification is decided.

Here, as in *Grand Theft Auto*, there is no question that named plaintiffs have standing to sue.  The class certification process will address whether named plaintiffs' injuries are sufficiently similar to those of the proposed class to justify a nationwide class action, and the answer to that question will determine whether there are plaintiffs with standing to bring claims under the laws of states in which no currently-named plaintiff resides.  Defendant's motion to dismiss state law claims for lack of standing is therefore denied.  If the class certification process changes the premise for the Court's ruling, "the parties are free to make a motion at the appropriate time."  *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118 (VM), 2010 WL 3341636, *16 (S.D.N.Y. Aug. 18, 2010).

### C.  Joinder of new parties on May 3, 2010.

Under the relevant provision of the Pretrial Scheduling Order, the last day to join new parties was May 1, 2010.  That date was a Saturday, and on Monday, May 3, 2010 Plaintiffs filed the SCAC, adding eleven new parties.  Defendants argue that these parties should be dismissed because they were added after the deadline.

Local Civil Rule 6.4 incorporates Fed. R. Civ. P. 6(a), and confirms that "[i]f the last day of the period is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."  The "period" referred to is any

5

amount of time "prescribed or allowed by the Local Civil Rules."  Local Civ. R. 6.4, and not necessarily an amount of time set by court order.  This is consistent the Federal Rules, where the analogous provision applies "only when a time period must be computed . . . [not] when a fixed time to act is set."  Fed. R. Civ. P. 6 Advisory Committee Notes, 2009 Amendments.  As Defendant would have it, the May 1, 2010 deadline provided "a fixed time to act" and precludes application of the "Saturday, Sunday, or legal holiday" extension allowed by the local and federal rules.  Without the extension, they argue, the May 3, 2010 joinder was untimely.

   While Local Civil Rule 6.4 by its terms applies only to periods of time calculated under the rules, the common-sense principle animating that rule is equally useful in clarifying when a document must be submitted or filed under a court-ordered deadline.  While it may not invite wholly exemplary conduct, it has been and continues to be my practice to accept filings on the first business day following a weekend or holiday deadline that I set, and this is consistent with the exhortation to construe and administer the rules so as to secure a "just" determination.  *See* Fed. R. Civ. P. 1.  Because the filing was made on the very next business day following a weekend deadline and Defendant claims to have suffered no prejudice as a result of the two-day delay, I decline to impose the harsh result of dismissing the eleven plaintiffs.

### D.  Claims under New York Law

   Defendants argue that the claims under New York General Business Law § 349 should be dismissed because none of the "properly named" plaintiffs purchased SDARS subscriptions in New York, and even if they had, none were deceived within the meaning of § 349.

   Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business . . . or in the furnishing of any service in this state."  N.Y. Gen. Bus. Law § 349(a) (McKinney 1984).  The statute "is intentionally broad, applying to virtually all economic activity."  *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 (2002) (internal citations omitted).  For a private plaintiff to make out a *prima facie* case under § 349 requires a showing that (1) the defendant's act was misleading in a material way; (2) the act was directed at consumers; and (3) the plaintiff has been injured as a result. *Maurizio v. Goldsmith,* 230 F.3d 518, 521 (2d Cir. 2000). An act is deceptive if it would be misleading to "a reasonable consumer."  *Goshen*, 98 N.Y.2d at 324.  In particular, section 349 provides a means "to vindicate the rights of a class of consumers allegedly subjected to unwarranted fees."  *Negrin v. Nw. Mortg., Inc.*, 263 A.D.2d 39, 49 (1999) (citing cases).  Intended to address "small-money" disputes, the law reflects the wisdom that "[w]hile

6

the individual amount sought may be modest, the rights to be vindicated are far greater." *Id.* at 50.

               1.   <u>Applicability of New York law</u>

    The initial thrust of Defendant's challenge is that none of the "properly" named plaintiffs purchased a SDARS subscription in New York, and accordingly § 349 does not apply because it is geographically limited to conduct within New York.  This argument fails because I have concluded that the eleven plaintiffs added in the SCAC were properly joined.  Among them Scott Byrd, a New York resident, allegedly purchased SDARS in New York and may without question invoke the provisions of New York's consumer protection laws.

               2.   <u>Existence of deceptive or misleading business practices</u>

    Defendant next argues that Plaintiffs have alleged no facts supporting the existence of a "deceptive or misleading" practice and thus fail to state a claim.  The SCAC alleges that Byrd received a notification that his annual subscription would be automatically renewed by charging his credit card, and that he would be subjected to a monthly Royalty Fee.  SCAC ¶ 186.

    Defendant reasons that because the fee was disclosed, it could not have been deceptive.  This argument fails for several reasons.  First, "the general rule that consumer fraud claims cannot be predicated on fully disclosed facts does not apply when one party has exploited a disparity of bargaining power."  *Cohen v. J.P. Morgan Chase & Co.*, 608 F.Supp.2d 330, 349 - 350 (E.D.N.Y. 2009); *Negrin*, 263 A.D.2d at 40.  The Customer Agreements at issue are between individual subscribers and the only SDARS provider on the market.  They give the individual no meaningful opportunity to negotiate terms, and allows of two options: agree to the pre-existing terms or forego SDARS.  This indicates the kind of bargaining disparity that vitiates the equality normally achieved through full disclosure.

    Second, Plaintiffs assert that the disclosure of the Royalty Fee itself is inaccurate and deceptive. SCAC ¶¶ 149–60, 306.  In particular, Plaintiffs point to statements made on Defendant's website, which are incorporated into the Customer Agreements. Plaintiffs allege that these statements mislead the customers into believing that the Royalty Fee is a "pass-through" of Defendant's own royalty cost increases, as permitted by the FCC Order governing the transfer of licenses.  For example, the webpage refers to "the specific costs being passed through to subscribers", and goes on to say that "100% of the U.S. Music Royalty Fee will be used to offset payments", and that "[w]e are passing along the increases."  SCAC ¶ 153.   In truth, Plaintiffs allege, the actual fee charged is significantly greater than what Defendant pays in royalty fee

7

increases, and they describe the payment structure in an attempt to show how the Royalty Fees charged to customers are *not* simply a "pass-through." *Id.* ¶¶ 142-60. Accepted as true for purposes of this motion to dismiss, these allegations provide enough factual material to raise the claim above a mere conclusory allegation and thus survive a motion to dismiss. It is less clear that damages have been suffered, but a fuller factual record will determine that issue and in any case plaintiffs have stated a claim for injunctive relief under § 349.

### E.  Claims under California Law

Plaintiffs bring claims under a number of provisions of the California Consumer Legal Remedies Act (CLRA), Cal. Civ. Code § 1750 *et seq*. That law prohibits unfair or deceptive acts in transactions involving "the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a) (West 2009). Defendant seeks dismissal of these claims on the grounds that Plaintiffs have alleged no facts sufficient to state a claim and, in the alternative, that they have failed to make a case for damages because they did not comply with the statutorily required notice provisions.

#### 1.  Plaintiffs' *prima facie* case

To state a claim under the CLRA, "the plaintiff must demonstrate that members of the public are likely to be deceived." *Aron v. U-Haul Co. of Cal.*, 49 Cal. Rptr. 3d 555, 562 (Cal. Ct. App. 2006) (*quoting Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 211 (1983)). The standard is based on "the reasonable consumer." *Id.* (*internal citations omitted*).

Where a business misrepresents the fees or prices charged to consumers, it violates California Law by "[r]epresenting that goods or services have . . . characteristics, . . . uses [or] benefits . . . which they do not have." Cal. Civ. Code § 1770(a)(5). *See Aron*, 49 Cal. Rptr. 3d at 562-63 (finding that allegations that the truck-rental company imposed a "fueling fee" that was not actually used to replace used fuel in rented trucks stated a violation of § 1770(a)(5)). Plaintiffs are consumers who have purchased SDARS, and have alleged that Defendant made written misrepresentations, described above, regarding the Royalty Fee that it imposes as part of its SDARS subscription charge. They further allege that they reasonably relied on Defendant's misrepresentations in purchasing SDARS and paying the Royalty Fee, because the Defendant had exclusive knowledge of the fee structure actually charged. SCAC ¶ 321. As a result of these misrepresentations, California plaintiffs suffered injury by paying a Royalty Fee that was greater than what it would have been had it been calculated as an actual "pass through" of the fee paid by Defendant. *See id.* ¶ 322. This states a claim under § 1770(a)(5).

The CLRA also prohibits "[a]dvertising goods or services with intent not to sell them as advertised." § 1770(a)(9). The term "advertising" is construed broadly, and has included information communicated in a variety of forms including loan statements, *Jefferson v. Chase Home Fin.*, No. 06 Civ. 6510, 2008 WL 1883484, *17 (N.D. Cal. Apr. 29, 2008), and information on product labels and websites. *Nagel v. Twin Labs., Inc.*, 109 Cal. App. 4th 39, 52 (Cal. Ct. App. 2003). Information in Defendant's Customer Agreements and website constitutes advertising, particularly in view of the fact that it could reasonably "induce" potential customers into purchasing services. *See Jefferson*, 2008 WL 1883484, *17 (loan statements construed as advertising where they were likely to induce customers to send their money to the bank). The allegations concerning the misrepresented Royalty Fee state a claim under § 1770(a)(9).

The alleged misrepresentations relating to the Royalty Fees also state a claim under § 1770(a)(14), which prohibits representations that a transaction "confers or involves rights remedies or obligations which it does not have or involve, or which are prohibited by law." § 1770(a)(14). The Royalty Fee certainly imposes an "obligation" and the alleged misrepresentation with respect to that fee, as Plaintiffs describe it, suggests that the obligation entails covering a "pass through" of increased royalty obligations when in fact it is a source of additional and "substantial revenue." SCAC ¶ 133.

Plaintiffs fail to state a claim under § 1770(a)(16), which prohibits a business from "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." § 1770(a)(16). This law appears to target not the initial representation in a transaction, but a subsequent representation which is deceptive as to whether, for instance, the delivery of services was made in accordance with the initial representation. While the overall theory is of course that the SDARS was not supplied in accordance with the representations made in the Customer Agreements, Plaintiffs point to no subsequent representation that SDARS had been supplied in accordance with the Customer Agreements.

Plaintiffs also fail to state a claim under § 1770(a)(19), which prohibits the insertion of an "unconscionable" term in a contract. Plaintiffs claim that the Royalty Fee is procedurally and substantively unconscionable. The California Supreme Court has described California's unconscionability doctrine in these terms:

> [T]he doctrine has both a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results. The procedural element of an unconscionable

9

> contract generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it. Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided.

*Discover Bank v. Superior Court*, 113 P.3d 1100, 1108 (Cal. 2005). California courts apply a "sliding scale," so that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required . . . and vice versa." *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 981-82 (9th Cir. 2007).

Here, Plaintiffs charge that the Royalty Fee is procedurally unconscionable because (1) consumers had no meaningful opportunity to negotiate its terms (*i.e.* it is a contract of adhesion); and (2) only the Defendant knew that the Royalty Fee charged exceeded Defendant's increased royalty obligations. Pls.' Mem. Opp'n Mot. Dismiss 16. Plaintiffs claim the Royalty Fee is substantively unconscionable because it is 7%-24% higher than what Defendant should be charging if it were merely passing its own increased royalty costs to the customers. *Id.*

It is true that where, as here, there is no market alternative, a contract of adhesion with no meaningful opportunity for the aggrieved party to bargain indicates a degree of procedural unconscionability. *See Stiener v. Apple Computer, Inc.*, 556 F. Supp. 2d 1016, 1026 (N.D. Cal. 2008). There certainly appears to be an inequality of bargaining power, due to the lack of market alternative for SDARS and the lack of Plaintiffs' knowledge of the Royalty Fee structure. However, the uniqueness of SDARS is mitigated by the existence of FM and AM radio, which, while perhaps not interchangeable with SDARS, do present some market competition. *See Belton v. Comcast Cable Holdings, LLC,* 60 Cal. Rptr. 3d 631, 636-37, 650 (Cal. Ct. App. 2007) (noting FM music as an alternative to Comcast's cable television). Moreover, while Plaintiffs allege that they were unaware of the Royalty Fee calculation structure, the fee comprises a relatively small portion of the overall agreement: generally $1.98 in conjunction with the $12.95 base subscription plan. *See* SCAC ¶ 153. As noted above, no Plaintiff was ultimately charged more than $1.98. Even granting some pricing irregularities, this scheme does not entail the kind of "surprise" or "oppression" indicating unconscionability.

On California's sliding scale, without some showing of substantive unconscionability, this is not enough to make out a prima facie case. I find no substantive unconcionability, since the Royalty Fee, while potentially deceptive or misleading, has not been shown to be

10

"unreasonably favorable to the other party" or "[u]nexpectedly harsh [as] manifested in the form of price disparity." *Truta v. Avis Rent A Car System, Inc.*, 193 Cal. App. 3d 802, 821 (1st Dist. 1987) (superseded by statute on other grounds). For example, in *Truta* the fee charged in relation to rental car insurance was found to be "more than double" the amount of insurance actually provided and "unreasonably high." *Id.* at 820. Here, the Royalty Fee calls for an amount that is 7%-24% higher than what Plaintiffs allege would be the appropriate rate, and constitutes a small monthly charge in relation to the overall cost of the subscription. Under these circumstances the Royalty Fee is not unconscionable and I must dismiss Plaintiffs claim under § 1770(a)(19).

Finally, Defendant has moved to dismiss the claim under § 1770(a)(7). Because this portion of Defendant's motion is unopposed, it will be granted. Plaintiffs may proceed only under Cal. Civ. Code §§ 1770(a)(5), (9), and (14).

### 2. Adequacy of Plaintiffs' notice

Under the CLRA, a plaintiff must provide notice that he anticipates instituting a suit for damages 30 days before commencing such suit. Cal. Civ. Code § 1782(a); *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1120 (C.D. Cal. 2008). "[F]ailure to give notice before seeking damages necessitates dismissal with prejudice." *Cattie v. Wal-mart Stores, Inc.*, 504 F. Supp. 2d 939, 950 (S.D. Cal. 2007) (citing cases). The prevailing law requires strict application of this provision, and a plaintiff cannot cure an initial deficiency by amendment. *Id.* In an action for injunctive relief only, a plaintiff need not provide such notice. § 1782(d). A plaintiff who initially sought only injunctive relief may amend to add a claim for damages, provided 30 days notice is given to the defendant prior to the filing of the amended complaint. *Id.*[2]

While § 1782's notice requirements are strictly imposed, Courts have allowed plaintiffs some leeway in coming into compliance. *See, e.g. Keilholtz v. Lennox Hearth Prods., Inc.*, No. 08 Civ. 0836, 2009 WL 2905960, *3 (N.D. Cal. Sep. 8, 2009) (granting plaintiffs a second opportunity to provide proper notice after filing complaint for damages under the CLRA); *Galindo v. Financo Financial, Inc.*, No. 07 Civ. 03991, 2008 WL 4452344, *5 (N.D.Cal. Oct. 3, 2008) (dismissing a claim without prejudice because dismissal with prejudice is an unnecessary and "draconian" result).

---

[2] § 1782 (d) reads: "An action for injunctive relief brought under the specific provisions of Section 1770 may be commenced without compliance with subdivision (a). Not less than 30 days after the commencement of an action for injunctive relief, and after compliance with subdivision (a), the consumer may amend his or her complaint without leave of court to include a request for damages."

11

The record here is complicated by the fact that the three named California plaintiffs – Andrew Dremak, Charles Bonsignore and Jamew Hewitt – were added at different times. Moreover, the various complaints use sweeping language that could be read to assert damages under any of the state law claims including the California claims. If Plaintiffs sought damages without notice, they are foreclosed from seeking damages now. On the other hand, if they merely sought injunctive relief, they may take advantage of § 1782(d) and amend their claim to assert damages after proper notice.

The complaint filed on December 7, 2009 alleged damages as to all state law claims including those under the CLRA. *See* Compl. ¶ 177. The Consolidated Amended Complaint ("CAC"), filed on March 22, 2010, for the first time named California Plaintiffs Andrew Dremak and Charles Bonsignore. It alleged broadly that damages were suffered as a result of the Defendant's "illegal conduct." CAC ¶¶ 169, 178. *See also id.* ¶¶ 343-45 ("As a result of Sirius XM's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiffs and the Class were damaged . . . have suffered monetary damages . . . and are entitled to recover."). However, it also cited § 1782 in seeking non-damages relief, and asserted that Plaintiffs had complied with the notice requirements. *See id.* ¶¶ 270-71. Also on March 22, 2010, Plaintiffs sent the required notice, pursuant to § 1782, in a letter on behalf of Bonsignore and Dremak. *See* Sabella Decl. Ex. B. These two facts make clear that the Plaintiffs were aware of their notice obligations under § 1782 and attempted to comply therewith in anticipation of claiming damages in the SCAC, which was filed more than 30 days later on May 3, 2010. Plaintiff James Hewitt was first named in the SCAC; more than 30 days prior to being added, he provided § 1782 notice, dated March 30, 2010. *See* Decl. James A. Sabella Opp'n Def.'s Mot. Dismiss Ex. A.

These facts present two issues complicating a finding that notice was proper: first, the overbroad drafting in the CAC, which could be read as asserting damages claims under the CLRA on behalf of Bonsignore and Dremak; second, the argument that § 1782 requires notice 30 days prior to the "commencement" of an action, and not the date any particular California plaintiff was added. Bonsignore and Dremak made what appear to be good faith attempts to comply with § 1782: by sending a notice letter and asserting their compliance in the CAC. These communicative acts are sufficient to overcome any ambiguities in the language because they put the Defendant on notice. Whatever questions Defendant may have been left with after reading the CAC, the notice letter clarified that damages would be sought following 30 days if no other resolution was reached.

12

Although the CAC and SCAC amended earlier complaints and did not technically "commence" an action, they were the initial filings on behalf of named California Plaintiffs. Ordinarily an amendment made on proper notice cannot cure a previous deficiency in notice, because § 1782 requires notice prior to "commencement" of a suit. *See Galindo*, 2008 WL 4452344, at *5. However, it seems improbable that such a rule would apply where a new plaintiff joins an action subsequent to commencement. Indeed, it would be unjust and impractical to conclude that a plaintiff in a proposed class action must account for each procedural requirement conceivably applicable to as-yet unnamed plaintiffs. *Cf. Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1196 n. 6 (S.D. Cal. 2005) (noting that the dismissal of claims due to failure to meet the notice requirement applied only to named plaintiffs). Such a rule would promote the filing of multiple individual lawsuits, rather than the joinder of new plaintiffs to existing suits, and result in an unnecessary drain on judicial resources.

In this case the notice provided achieved the Act's goals of at least making available the option of "expeditious remediation before litigation." *Laster*, 407 F. Supp. 2d at 1196. Despite the broad language in the complaint, notice *was* provided to the Defendant and Defendant therefore had the opportunity to address the problem directly with each California plaintiff prior to being sued for damages. Because the underlying purpose of the notice requirement was satisfied, I decline to dismiss the damages claims for lack of notice.

### F.  Claims under Massachusetts Law

Defendant argues that the Massachusetts claims, like the California damages claims, must be dismissed for lack of adequate notice. Massachusetts law requires a written demand for relief be made at least thirty days prior to the filing of an action for "unfair or deceptive" acts under Mass. Gen. Laws. Ann. ch. 93A, § 9 (West 2004). However, that requirement "shall not apply if . . . the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth." § 9(3).  If, on summary judgment, the Defendant can show facts supporting the applicability of the notice requirement under Massachusetts law, the question of whether the requirement was met will be ripe for decision.[3]

---

[3] Defendant claims that Massachusetts law requires a plaintiff to plead that he has complied with the notice requirement, but cites only cases in which the notice requirement was applicable. *See Kanamaru v. Holyoke Mut. Ins. Co.*, 892 N.E.2d 759, 768 (Mass. App. Ct. 2008); *McMahon v. Digital Equip. Corp.*, 944 F. Supp. 70, 77 (D. Mass. 1996); *Ball v. Wal-Mart, Inc.*, 102 F. Supp. 2d 44, 54 (D. Mass. 2000). To the extent such a pleading requirement applies to all actions brought under Mass. Gen. Laws. Ann. ch. 93A notwithstanding the applicability of the notice requirement, I note that Massachusetts plaintiff Paul Stasiukevicius sent a notice letter on March 22, 2010. Asserting that the notice provision was inapplicable, Stasiukevicius sent the letter in "an abundance of caution" that he was wrong on that score. *See* Sabella Dec. Ex. C. This notice letter would likely satisfy both the notice

13

### G. Breach of contract

Plaintiffs' breach of contract claim centers on those sections of the Customer Agreements and the incorporated web page content which address the Royalty Fee. They allege that, as discussed above, "the Royalty Fee charged by Sirius XM is much greater than the actual royalty-related cost increases incurred by Sirius XM [and] not all subscribers receiving more than incidental music content pay the same fee." SCAC ¶¶ 155-56. They contend that these billing practices violate the Customer Agreements. SCAC ¶ 306.

"To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterlin Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). Here, Plaintiffs have failed to establish the existence of damages because the amount paid under the Royalty Fee provision did not exceed the amount stated on the website. As alleged, the website states that the Royalty Fee would be "$1.98 a month" for the base subscription plans and "$.97" for base plans eligible for the "second radio discount." SCAC ¶ 153. Plaintiffs concede that under no plan was the Royalty Fee more than $1.98. *Id.* ¶135. Because no Plaintiff paid more than the amount stated in the Customer Agreement and website, Plaintiffs have not established that they suffered damages.

Plaintiffs argue that the Customer Agreements and website describe a method for calculating the Royalty feee, and the proper measure of damages is the difference between the result of this calculation and the actual fees charged. However, they do not say what that difference is, nor explain why the alleged calculation method differs or takes precedence over the straightforward dollar amount as stated on the website. The parties agreed to this term and Plaintiffs have not alleged any payment in excess of it. The breach of contract claim is dismissed.

### H. Breach of the implied covenant of good faith and fair dealing

Under New York law, a cause of action for breach of the implied covenant of good faith and fair dealing should be dismissed where it is "duplicative of the insufficient breach of contract claim." *Jacobs Private Equity, LLC v. 450 Park LLC*, 803 N.Y.S.2d 14, 15 (N.Y. App. Div. 1st Dept. 2005); *Triton Partners LLC v. Prudential Secs., Inc.*, 752 N.Y.S.2d 870, 870 (N.Y. App. Div. 1st Dept. 2003). Plaintiffs concede that the same conduct gives rise to both the claims for breach of contract and the claims for breach of the implied covenant of good faith and fair

---

requirement as well as any pleading requirement. *See Int'l Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (even "when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies . . . the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss.").

dealing. Pl.'s Mem. 24. However, they argue that the two theories may be litigated in the alternative. *Id.* Under Second Circuit precedent, where, as here, "the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract," the claim for breach of the implied covenant will be dismissed. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2003). The conduct here is the same for both claims and, in any case, the good faith and fair dealing claim would suffer from the same shortcomings with respect to damages that require dismissal of the contract claim.

### I.  Plaintiffs' motion to bifurcate

Plaintiffs seek to bifurcate the federal antitrust claims from the state consumer protection and contract-related claims. A district court may order bifurcation in the interests of "convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). Bifurcation is the exception, not the rule, *L-3 Commc'ns Corp. v. OSI Sys., Inc.*, 418 F. Supp. 2d 380, 382 (S.D.N.Y. 2005), and the party seeking it bears the burden of establishing that it is warranted. *Dallas v. Goldberg*, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001).

Plaintiffs do not assert that a single trial would cause prejudice, and their arguments that bifurcation would increase the speed or efficiency of this action are unpersuasive. For instance, in support of the alleged efficiencies, Plaintiffs note that if the jury in an antitrust trial found that the Royalty Fees were an abuse of market power, the issue of whether they were properly characterized "would be rendered moot" and a second trial on non-antitrust claims "would likely not be needed." Pl. Reply Supp. Mot. Bifurcate 2. On the very next page, countering Defendant's claim that a bifurcated trial could prejudice its Seventh Amendment right to a jury, Plaintiffs argue that "juries deciding the Antitrust and the Non-Antitrust Claims will be asked to examine vastly different – not the same – issues." *Id.* 3.

In short, all claims involve fact issues related to the Royalty Fee, and while those issues may vary slightly in their focus and import, holding two trials would entail unnecessary duplication for all concerned.. Plaintiffs argue that discovery is more advanced as to the antitrust claims, and the simpler class certification questions on the antitrust claims could be expedited. However, Plaintiffs do not propose an expedited schedule, nor do they suggest that the ultimate resolution of the case would be hastened. Moreover, it does not follow that early resolution of class certification for the antitrust claims would save work on class certification for the non-antitrust claims. Quite the contrary, while perhaps resolving the simple portion of the case more quickly, bifurcation would entail a revision of the pretrial scheduling order, two hearings on class

certification, two submissions of pretrial materials involving inevitable redundancies, two trials for which at least some of the testimony and witnesses will be identical, twice the number of jurors, and likely two rounds of post-trial briefing.

## CONCLUSION

The motion to dismiss is GRANTED in part and DENIED in part. For the reasons given above, I find that the eleven plaintiffs named on May 3, 2010 were timely joined. Plaintiffs have stated claims under New York Gen. Bus. Law § 349 and Cal. Civ. Code §§ 1770(a)(5), (9), and (14), and provided sufficient notice as to damages. Likewise, Plaintiffs are not in breach of the notice requirements of Mass. Gen. Laws Ann. ch. 93A, § 9, and the Massachusetts claims may proceed. Claims under Cal. Civ. Code §§ 1770(a)(7), (16) and (19) are dismissed, as are the claims for breach of contract and breach of the covenant of good faith and fair dealing.

The portion of Defendant's motion to dismiss that attacks Plaintiffs' standing to bring certain state law claims is DENIED, but may be renewed following my decision on the class certification motion if Article III standing concerns remain.

The motion to bifurcate is DENIED.

The Clerk of the Court is instructed to close this motion and remove it from my docket.

SO ORDERED
November 17, 2010
New York, New York

_____
Hon. Harold Baer, Jr.
U.S.D.J.

16