UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
CARL BLESSING ET AL.,                               :
                                                    :
    Plaintiffs,                                    :
                                                    :       09 CV 10035 (HB)
       - against -                               :
                                                    :       OPINION &
SIRIUS XM RADIO INC.,                               :       ORDER
                                                    :
    Defendant.                                      :
------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

        Plaintiffs in this purported class action are purchasers of satellite digital audio radio services ("SDARS") who allege that they have suffered a number of injuries following the 2008 merger between Sirius Satellite Radio, Inc. and XM Satellite Holdings, Inc. – a merger that resulted in the formation of Defendant Sirius XM Radio Inc. ("Defendant" or "Sirius XM"). Plaintiffs bring antitrust claims pursuant to § 2 of the Sherman Act and § 7 of the Clayton Act, as well as a number of state law claims. They allege that, as the only SDARS provider in the United States, Defendant abused its monopoly power by raising prices in a deceptive and anticompetitive manner. On November 17, 2010, this Court granted in part and denied in part Defendant's motion to dismiss, leaving intact Plaintiffs' antitrust claims and the majority of their consumer protection claims. Defendant now moves for summary judgment on Plaintiffs' antitrust and state consumer protection claims. For the reasons that follow, the motion is DENIED in part and GRANTED in part.

BACKGROUND[1]

        When Sirius Satellite Radio, Inc. and XM Satellite Holdings, Inc sought to merge, they were required to transfer their existing satellite radio licenses to the proposed combined entity, Sirius XM. In order to do so, they sought and obtained approval from the Federal Communications Commission ("FCC"). Pl's Resp. 56.1 ¶ 2. In pursuit of FCC approval, Sirius and XM made several "voluntary commitments" regarding their future services and prices. Notably, the companies promised not to raise the base monthly subscription rate of $12.95 for three years following consummation of the merger. FCC Order, Karmazin Decl. Ex. B. Due to significant increases in their royalty costs, however, the companies sought to limit the term of the price-cap to one year only for royalty-related fees. Thus, the combined entity would not raise royalty fees for one year from the date of merger, but after one year, it could "pass through cost increases incurred since the filing of the combined

---

[1] The facts cited in this opinion are undisputed unless otherwise noted.

1

company's FCC merger application as a result of statutorily or contractually required payments to the music, recording and publishing industries." Id.  The voluntary price-cap commitment did not specify a dollar amount for this "pass through." Pl's Resp. 56.1 ¶ 38.  The FCC incorporated into its final order without change the language that the companies proffered in their voluntary commitment letter.  Def's 56.1 ¶ 11; FCC Order ¶ 107.  It also attached the voluntary commitment letter to the FCC Order as Appendix B.  Id. ¶ 13.

Consistent with the voluntary price cap, the combined entity began to impose a royalty-related fee on July 29, 2009, 366 days after the companies merged.  Pl's Resp. 56.1 ¶ 25.  The bulk of the parties' dispute centers on this fee, which was dubbed the U.S. Music Royalty Fee ("MRF") and is charged in addition to the base monthly subscription price.  Sirius XM set the MRF at $1.98 per month for primary radios and $.97 per month for additional radios charged at the reduced subscription price of $8.99. Id.  The primary radio MRF was lowered to $1.40 after December 6, 2010.  Def.'s 56.1 ¶ 31-32.

Plaintiffs base their allegations on a number of factors, including changes in the way Sirius XM opted to calculate the pass through. Initially, Sirius XM planned to calculate the cost of the MRF through a rate-based approach that took into account the difference between RIAA royalty rates in certain years. Pl's 56.1 ¶ 45. They also implemented a "CRB pass-through" plan that created a catch-up pool to recover royalties paid to the music industry between 2007 and 2009. Pl's 56.1 ¶ 47. However, plaintiffs contend that instead of using this rate-based approach, Sirius XM ultimately decided to use a cost-based approach that takes into account increases in total costs attributable solely to increased subscriber volume. Pl's 56.1 ¶¶ 59–67. By using the latter approach, Sirius XM has been able to bill an allegedly inflated MRF for a longer period of time than would have otherwise been necessary under a rate-based approach. Pl's 56.1 ¶¶ 59–60.

Defendant points to various communications made with its customers regarding the MRF and the rationale for its imposition in order to counter plaintiffs' claims that Sirius XM acted deceptively in its representations. Sirius XM posted answers to FAQs about the MRF on its website, sent e-mails to customers, and included the MRF fees on the bills it sent to customers and on its website. Pl's Resp. 56.1 ¶¶ 29–31. However, plaintiffs contend that Sirius XM omitted or misrepresented certain facts surrounding the true nature of the MRF. Id. For instance, Sirius XM did not disclose the fact that the MRF is composed of two components: a current and prior recovery fee. Pl's 56.1 ¶ 110. Sirius XM further did not disclose that the MRF price is as high as it is partially in order to make up for the fact that not all customers pay it at the same time. Rather, as subscriptions expire, Sirius XM imposes the MRF on top of the renewed subscription prices. Pl's Resp. 56.1 ¶ 25.

2

In addition to the MRF, two other post-merger changes in subscription prices give rise to alleged violations: (1) Sirius XM raised the monthly charge per additional radio by nearly 30%, from $6.99 to $8.99; and (2) Sirius XM began to charge $2.99 per month for internet streaming, which was previously included in the basic subscription price. *See* Pl's 56.1 Statement ¶ 10.

## DISCUSSION

Summary judgment shall be granted in favor of a moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In the summary judgment context, a fact is material "if it might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001) (internal citation omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Burt Rigid Box, Inc. v. Travelers Property Casualty Corp.*, 302 F.3d 83, 90 (2d Cir. 2002) (*quoting Anderson*, 477 U.S. at 247-48). As the Second Circuit has explained, "[t]he party against whom summary judgment is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002).

**I.   The consumer protection claims**

The consumer protection claims relate only to the MRF. *See* Pl. Opp. 3. At the motion to dismiss stage, Plaintiffs had argued that the Defendant used the MRF to generate income in excess of its royalty-related costs – and thus that Defendant's suggestion that the fee was a kind of "pass-through" was misleading. Accepting their allegations as true, I denied the motion. Plaintiffs have not substantiated those allegations with facts; they now premise their consumer protection claims on the more narrow theory that the way Defendant explains the MRF is inconsistent with the way it calculates the MRF. While Plaintiffs invoke consumer protection statutes from numerous states, the parties agree that Plaintiffs must show misleading conduct that was material and resulted in reliance or an injury. Pl. Opp. 9-19; Def.'s Br. 16.

3

*a. Misstatements*

The test used to determine whether an act or practice is deceptive for consumer protection purposes is an objective one, and asks whether the conduct is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *E.g.*, *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995).  There is no dispute that the amount of the MRF was accurately disclosed; the website disclosed the fee and each bill specified the precise amount charged.  Pl.'s Resp. 56.1 ¶¶ 29-31. The plaintiffs instead allege that the explanation of how the MRF was calculated was deceptive. The website explained the MRF in the Frequently Asked Questions section, which answered the query "How is the U.S. Music Royalty Fee calculated?":

> We are passing along the increases in our costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007, the date on which we applied to the FCC to approve the merger.

Sabella Decl. Ex. 9.  Plaintiffs allege that this MRF explanation is deceptive because it would not apprise a reasonable consumer that Defendant calculates the MRF to recover (1) royalty-related cost increases other than those due to rate increases ("non-rate increases"), and (2) royalty-related cost increases incurred by Sirius XM since March 2007 ("recoupment costs").  Pl. Opp. 3.

On its face, the MRF explanation is consistent with the imposition of recoupment costs and non-rate increases.[2]  The MRF explanation does *not* limit the MRF to passing along rate increases, and it makes explicit that the MRF is aimed to offset costs incurred "since March 20, 2007" – the date of the merger application.  Def.'s 56.1 ¶ 31.

Plaintiffs fail to show that the MRF recovers monies beyond Sirius XM's increased royalty costs.  Indeed, they note that  "SXM's decision to recover its total incremental costs – in dollar terms – means that SXM is using the MRF to charge subscribers for cost increases attributable only to the successful growth of SXM's subscriber base."  Pl.'s 56.1 ¶ 23.  However, they argue that the inclusion of increased costs due to increased customers was inconsistent with the MRF explanation, which they interpret as including to increased costs due to rate increases.  *Id.* ¶ 22.  The language of

---

[2] It is also consistent with what the FCC and Sirius agreed to as part of the FCC approval process. The language incorporated into the FCC Order is essentially equivalent:
> [T]he combined company may pass through cost increases incurred since the filing of the merger application as a result of statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees. The combined company will provide customers, wither on individual bills or on the combined company's website, details about the specific costs passed through to consumers pursuant to the preceding sentence.

FCC Order ¶ 107.

4

the MRF explanation does not support this argument because it does not limit the "increase" that would be passed along to *rate* increases – it does not even distinguish between increases due to rate hikes and increases due to additional music demands.  Indeed it is reasonable to conclude that, consistent with the MRF explanation, if more customers meant more royalty costs, those royalty costs would be passed along.

Plaintiffs point to a number of emails indicating that Sirius XM personnel endeavored to deemphasize the fact that a portion of the MRF was attributable to "increased music royalties incurred in prior period[s]." Pl.'s 56.1 ¶¶ 111 – 116 (e.g. ¶ 112: "I don't think we want to get into the recoupment part of this versus the current charges."); Pl. Opp. 6-8.  As these emails recognize, the MRF explanation does not exactly advertise the fact that the MRF paid by consumers in 2009 would be used to recoup older royalty-related costs.  Nonetheless, the MRF explanation would fairly apprise a reasonably attentive consumer that the MRF was imposed as a result of the increases incurred "since March 20, 2007."

Plaintiffs also point to a draft email in support of its theory that Defendant misleadingly characterized the MRF as comprised only of increases related to royalty rates.  The draft asserts that Sirius XM must pass along royalty costs "principally as a result of a decision made by the Copyright Royalty Board, which is designated by the Library of Congress to set royalty rates . . . ." Sabella Decl. Ex. 110.  It goes on to note that "Unfortunately, we can not control the Copyright Royalty Board's rate increase." *Id.*  Several factors defeat the relevance of this draft email.  Plaintiffs do not show that the draft was ever finalized and sent to customers.  Additionally, while it certainly emphasizes the effect of the CRB rate increase, it also plainly states that "[t]his fee will be used directly to offset increased payments from Sirius XM to the recording industry." *Id.*  This statement does not reasonably suggest that the MRF "pass-through" was limited to CRB rate increases only.  Plaintiffs remaining arguments about allegedly misleading statements are even less persuasive.

Plaintiffs have not adduced material facts showing that there is a genuine issue as to whether statements or conduct by Defendant was "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995).  Further analysis confirms that Defendant is entitled to summary judgment on the consumer protection claims because Plaintiffs have failed to show that the MRF was material or caused an injury.

    b. *Materiality*

Plaintiffs assert that the MRF explanation was material to their decision to purchase SDARS or to refrain from challenging the fee.  Materiality is judged on an "objective standard." *Cirone-*

5

*Shadow v. Union Nissan of Waukegan*, 955 F. Supp. 938, 944 (N.D. Ill. 1997). A misstatement is material if "a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Galvan v. Nw. Mem'l Hosp.*, 888 N.E.2d 529, 539 (Ill. App. Ct. 2008) (internal quotations omitted); s*ee also Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 697 (Cal. Ct. App. 2010). There is no evidence from which a reasonable juror could infer that the alleged misstatements were material to the Plaintiffs in this case, nor that they would be material to a reasonable purchaser.

      The plaintiffs have submitted a number of declarations to the effect that "the truth" about the MRF was material to them. For example, Ms. Stanaj asserts that "If I had known the truth about the Music Royalty Fee at the time I renewed my subscription, I would have called SXM, threatened to cancel my subscription, and asked to have the Music Royalty Fee reduced." Stanaj Decl. ¶ 13. Such statements are unconvincing for several reasons. As an initial matter, five of the ten plaintiffs who submitted declarations in opposition to summary judgment were previously deposed, and their deposition testimony is inconsistent with their declarations. *See* Geremia Reply Decl. Ex. A and accompanying citations. It is settled that "[a] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Neidich v. Estate of Neidich*, 222 F. Supp. 2d 357, 368 (S.D.N.Y. 2002). As discussed above, the "truth" about the MRF was evident from a reasonably attentive reading of the MRF explanation; if indeed Ms. Stanaj and others refrained from challenging the fee because the truth was unknown to them, they have no one to blame but themselves.

      Even if some plaintiffs would have "threatened to cancel" their subscriptions had they been aware of the way the MRF was calculated, nothing suggests that such a course would be the choice of the reasonable consumer. Courts have recognized that ordinary consumers make purchasing decisions based on the price they must pay and the value they expect to receive – not on what the seller does with the money it receives. For instance, the California Court of Appeal dismissed a claim alleging, under California's consumer protection law, that a hotel deceived its guests by imposing a 17 percent room-service charge that, while fully disclosed, was used to pay its servers. *See Searle v. Wyndham Int'l, Inc.*, 126 Cal. Rptr. 2d 231, 233 (Cal. Ct. App. 2002). The plaintiffs objected to the charge because they claimed they would not otherwise have tipped 17 percent. *Id* at 233–34*.* In dismissing the claim, the court explained that "[w]hat a hotel does with the revenue it earns . . . is of no direct concern to hotel guests . . . . Just as the hotel patron has no legitimate interest in what the hotel does with the [premiums it earns on other services], the patron has no legitimate interest in what the hotel does with the service charge." *Id* at 237.

Plaintiffs' declarations also carefully avoid stating that they actually read the FAQs prior to purchasing SDARS subscriptions. *See, e.g.*, Blessing Decl. ¶ 7; Byrd Decl. ¶¶ 4, 10; Cronin Decl. 2, 11. Indeed, Plaintiffs can only point to Mr. DeMott and Mr. Jones for examples of customers who even read the MRF explanation before speaking with counsel or participating in this lawsuit. However, Mr. DeMott also testified that prior to being in contact with a law firm in connection with this suit, he was not even aware that he was paying the MRF – just that the overall price of his subscription had gone up. *Id.* at 71, 81. The fact that DeMott was concerned with the overall price – and not the MRF explanation – supports the point that a reasonable consumer in this case would have been concerned with the overall cost of SDARS, *not* with the explanation of how the MRF was calculated and what precise business expenses it was used to offset. *See Zuckerman v. BMG Direct Mktg., Inc.*, 737 N.Y.S.2d 14, 15 (1st Dept. 2002) ("As a matter of law, a disclosure that a specified amount will be charged for shipping and handling cannot cause a reasonable consumer to believe that such amount necessarily is equal to or less than the seller's actual shipping and handling costs."); *Taylor v. BMG Direct Mktg., Inc.*, 739 N.Y.S.2d 31, 32 (1st Dept. 2002) (same); *Wayne v. Staples, Inc.*, 37 Cal. Rptr. 3d 544, 558 (Cal. Ct. App. 2006) ("In light of Staples' clear disclosure of the actual price it would charge its customers for declared value coverage prior to any purchase, the trial court properly concluded any ambiguity in the order form as to whether the amount charged includes a 'surcharge' or profit for Staples was not misleading or deceptive."); *Searle v. Wyndham Int'l, Inc.*, 126 Cal. Rptr. 2d 231, 237 (Cal. Ct. App. 2002).

Mr. Jones' declaration also supports the point that the material term – if any – was the overall subscription cost increase, *not* the allegedly misleading MRF explanation. Specifically, he states that "[t]he price increases, coupled with Sirius XM's failure to follow up with me to remedy my January 23 complaints [about price increases] . . . is what caused me to seek a lawyer that may represent me against Sirius." Jones Decl. ¶ 11. He goes on to assert that "I first learned of Sirius XM's misrepresentations when I learned that this lawsuit was filed when searching for legal representation." *Id.* ¶ 12. Plaintiffs have failed to raise any evidence from which a reasonable trier of fact could infer that the allegedly deceptive statements by the Defendant held the requisite materiality to support Plaintiffs claims.

   c. **Reliance and Injury**

Plaintiffs' theory is that the measure of injury here is the amount of the MRF they paid less the amount that they would have paid were the MRF calculated in a manner consistent with how they claim they understood it -- *i.e.* without the recoupment costs accumulated since March 20, 2007, and without costs increases not attributable to royalty rate increases. Plaintiffs support this theory with

7

two arguments, neither of which is persuasive.  The first is based on Florida case-law addressing a cruise-line's "port charge."  *Latman v. Costa Cruise Lines N.V.*, 758 So.2d 699, 703 (Fla. Dist. Ct. App. 2000).  Importantly, in that case the Florida court found that the term "port charge" was deceptive, unlike the case at bar where no material misstatements have been found.  Relying on the deceptive nature of that term, the court held that "[r]eliance and damages are sufficiently shown by the fact that the passenger parted with money for what should have been a 'pass-through' port charge, but the cruise line kept the money." *Id.*  It found the port charge analogous to a state sales tax overcharge, explaining that where a company "pays the state the sales tax that it owes, then keeps the overcharge for itself", there is an "unfair and deceptive trade practice" and it does not matter that "the consumers paid no attention to the sales tax amount." *Id*.  As discussed above, the MRF, unlike the "port charge" and hypothetical sales tax, is not deceptive because it is detailed in plain language by the MRF explanation, and did not cause Plaintiffs to part with money in a manner inconsistent with that explanation.

Second, plaintiffs argue that they need only establish that the defendant's material deception caused them to pay more money than they would otherwise have paid.  In support, they cite *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 30 (2000) ("Plaintiffs need not additionally allege that they would not otherwise have entered into the transaction.").  This argument fails for the same reason noted above:  Plaintiffs have failed to show that the MRF exceeded Sirius XM's royalty cost increases, and have failed to explain how the fee is otherwise in excess of anything but their own self-serving interpretation of the MRF.  Even assuming for arguments' sake that the MRF explanation was deceptive, Plaintiffs paid the same amount as they would have paid had the MRF been explained to their satisfaction, because that amount was the actual amount attributed to Defendant's royalty cost increases.  Reliance on *Stutman* does not help Plaintiffs show the existence of reliance or injury.

Plaintiffs' remaining arguments concerning their claims of material omissions are unpersuasive.  Regardless of how Sirius XM's conduct is characterized or under what law it is challenged, Plaintiffs have failed to raise any issue of material fact as to the materiality of that conduct or the injury it caused.  As I noted when dismissing the contract claims, the MRF was fully disclosed to all Plaintiffs, the Plaintiffs agreed to pay it, and they have not shown facts from which a reasonable jury could infer that they were charged any amount in excess of it.

## II. The filed rate doctrine does not bar the antitrust claim

Defendant contends that under the filed rate doctrine, the FCC's "approval" of the MRF immunizes it from both the antitrust claims and the consumer protection claims.  This argument fails because the doctrine is inapplicable here, and even if it were applicable here the antitrust claims rest

8

on the price for additional receivers and internet streaming access, not just the MRF.  The filed rate doctrine bars suits against regulated entities grounded on "allegation[s] that the rates charged by the [entity] are unreasonable." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). "Simply stated, the doctrine holds that any 'filed rate' – that is, one approved by the governing regulatory agency – is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Id.*

Unfortunately for Sirius XM, it is unable to show that it is a "regulated entity" subject to the FCC's rate-making authority. The authority for applying the filed rate doctrine in connection with FCC regulations rests on § 203 of the Federal Communications Act of 1934, which provides that every common carrier shall file a schedule showing all charges, and no common carrier shall charge a rate that is different from the filed rate. 47 U.S.C. § 203(a), (c). Sirius XM does not argue that it is a common carrier; it claims it is nonetheless subject to FCC authority because the FCC approved the MRF.  This argument, while creative, misses the point because the FCC did not in fact approve the MRF.  The subject of the FCC's purported approval was a one-year voluntary price cap on raising royalty-related fees.  *See* Def. Reply at 8.  Indeed, the MRF was imposed *after* the price-cap was approved.  Defendant's own briefs are replete with detail on how Sirius XM calculated the MRF.  See Def. Mem. 10-14.  No mention is made of the FCC's involvement in that process.  To be sure, the FCC asked about the rate calculations in an April 12, 2010 letter, *id.* at 13, but Defendant set the rate prior to July 2009 – nearly one year before the FCC's letter.

Strange as it may seem, Sirius XM has itself taken the position that the FCC has no rate-making authority over its rates.  Sabella Decl. Ex. 12; Pl. 56.1 ¶ 88 ("The FCC has no direct or ancillary authority to regulate satellite radio rates.").  "[F]or a court to consider rates filed, and thus protected by the filed rate doctrine, the statutory scheme must provide the regulatory agency with authority to assess rates' compliance with statutory requirements for filed rates." *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 674 (E.D. Pa. 2009); *see also Taffet v. Southern Co.*, 967 F.2d 1483, 1490 (11th Cir. 1992). Sirius XM has failed to show that the FCC has any authority to review the MRF, nor that the filed rate doctrine applies outside a statutory scheme granting such authority.

Finally, Defendant's argument fails because the filed rate doctrine applies only to allegations that a regulated entity's filed rates are unreasonable. *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 573-74 (S.D.N.Y. 1999) (Chin, J.). Because Plaintiffs' do not attack the reasonableness of the MRF, the filed rate doctrine does not apply. *See id.* at 573; *Northern Valley Commc'ns, LLC v. AT&T Corp.*, 659 F. Supp. 2d 1056, 1060 (D.S.D. 2009) (*quoting H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 490 (8th Cir. 1992)).

### III. Injunctive relief

Defendant argues that plaintiffs' requests for injunctive relief should be dismissed because Plaintiffs "slumbered" on any rights to such relief. Def. Br. 34. While this may be true to an extent, here it is essentially a *laches* argument, which is an affirmative defense that was waived because Defendant failed to assert it in its Answer. *See PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004); *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994). Summary judgment is therefore denied, and the matter may proceed, if at all as discussed at some length at oral argument, independently of the class action.

### CONCLUSION

The motion for summary judgment is GRANTED as it pertains to the consumer protection claims, which are hereby dismissed. The motion is otherwise DENIED.

The Clerk of the Court is instructed to close this motion and remove it from my docket.

**SO ORDERED**

March 29, 2011
New York, New York

Hon. Harold Baer, Jr.
U.S.D.J.

10