UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CARL BLESSING, EDWARD A. SCERBO, JOHN CRONIN, CHARLES BONSIGNORE, BRIAN BALAGUERA, SCOTT BYRD, GLENN DEMOTT, ANDREW DREMAK, JAMES HEWITT, TODD HILL, CURTIS JONES, RONALD WILLIAM KADER, EDWARD LEYBA, GREG LUCAS, JOSHUA NATHAN, JAMES SACCHETTA, DAVID SALYER, SUSIE STANAJ, JANEL and KEVIN STANFIELD, PAUL STASIUKEVICIUS, TODD STAVE, and PAOLA TOMASSINI, on Behalf of Themselves and All Others Similarly Situated,

                    Plaintiffs,

-against-

SIRIUS XM RADIO INC.,

                    Defendant.

No. 09-cv-10035 (HB)(RLE)

---

## DECLARATION OF SHANNON R. WHEATMAN, PH.D. ON
## ADEQUACY OF NOTICES AND PROPOSED SETTLEMENT NOTICE PLAN

I, Shannon R. Wheatman, Ph.D, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a Vice President of Kinsella Media, LLC ("KM"), an advertising and notification firm in Washington, D.C. specializing in the design and implementation of notification programs.  My business address is 2120 L Street, NW, Suite 860, Washington, D.C. 20037.  My telephone number is (202) 686-4111.

2.      KM is a wholly-owned subsidiary of Rust Consulting, Inc., who is the proposed notice administrator in this case.

3.      This declaration will describe my experience in designing and implementing notices and notice plans, my qualifications to opine on the overall adequacy of the notice plan for this case, as well as describe the notices (the "Notice" or "Notices") and the Notice Plan proposed here for the Settlement in *Blessing v. Sirius XM Radio Inc.* No. 09-CV-10035 HB (S.D.N.Y) ("*Sirius XM* Settlement"), including how it was developed and why I believe it will be effective.

## RELEVANT EXPERIENCE

4.      I have served as a qualified class action notice expert in many major class actions. State and federal courts have accepted my analyses and expert testimony on whether information is effectively communicated to people.  My C.V. is attached as Exhibit 1.

5.      I have been involved in some of the largest and most complex notification programs, including, *In re Katrina Canal Breaches Consolidated Litig.* (a settlement affecting Hurricane Katrina and Rita survivors), No. 05-4182, E.D. La.; *Lockwood v. Certegy Check Services, Inc.* (data theft settlement involving over 37 million consumers), No. 8:07CV-1434, M.D. Fla.; *Grays Harbor Adventist Christian School v. Carrier Corp.* (nationwide multi-million dollar high efficiency furnace settlement), No. 05-05437, W.D. Wash.; *In re Royal Ahold Securities & ERISA Litig.* (the $1.1 billion settlement of the first globally certified and notified

shareholder class), MDL 1539, D. Md., *In re Residential Schools Class Action Litig.* (the approximately $4 billion settlement of numerous class actions involving Aboriginal people), No. 00-cv-192059, Ont. S.C.J.; *Meckstroth v. Toyota Motor Sales USA*, *Inc.* (the oil gel settlement affecting over seven million Toyota/Lexus owners), No. 583-318, 24th Jud. D. Ct. La.; and many others.

6.    Courts have admitted expert testimony from me on quantitative and qualitative evaluations of the effectiveness of notice programs and several courts have commented favorably, on the record, regarding the effectiveness of notice plans I have done.   Selected judicial comments are included in the attached C.V.

7.    My qualifications include leadership in determining the form and content of several model notices.  For example, while serving with the Federal Judicial Center ("FJC"), I collaborated to write and design the illustrative, "model" forms of notice, designed to satisfy the plain language requirements of Federal Rule of Civil Procedure 23(c)(2).  This research formed the basis for my doctoral dissertation, *The Effects of Plain Language Drafting on Layperson's Comprehension of Class Action Notices* (2001) (Ph.D. dissertation, University of Georgia).  To assist judges and attorneys, in state as well as federal courts, the FJC has posted these model notices at www.fjc.gov.

8.    I have authored and co-authored articles on notice and due process in class actions.  I believe effective notice depends on clear communication with the people affected. *See, e.g.,* Shannon R. Wheatman & Terri R. LeClercq, *Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements*, 30 REV. LITIG. 53 (2011); Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language:  A desire to actually inform*, GEO J. LEGAL ETHICS 1359 (2005); and Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process:   The "Desire-to-Inform"*

*Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

## OVERVIEW

9.      In developing the Notice Plan for this case, it was first determined that a comprehensive list of Class Members is available and that it would be reasonable to implement an individual notification effort to reach them.

10.      In order to supplement the reach of the direct notice program, a Summary Notice will be published in *USA Today* and *The Wall Street Journal*.

11.      Coverage will be further enhanced by a case website, which will include a Long Form Notice printed in both English and Spanish.

12.      The various forms of Notice are described below.  All forms of Notice are clear, concise, and in plain, easily understood language.

13.      As detailed below, in my opinion, the Notice Plan represents the best notice practicable under the circumstances.

## NOTICE PLAN SUMMARY

14.      Although each case is unique, the methods and tools used in developing the Notice Plan for the *Sirius XM* Settlement have been employed in many other court-approved notice plans.

15.      In this case, the Notice Plan has been designed to reach the greatest practicable number of Class Members ensuring that they will be exposed to the Notice, to see, review and understand it.

*Individual Notice*

16.     After the Court grants approval to the Notice Plan and Notices, potential Class Members will be sent a Summary Notice in the form of an E-Mail Notice or Postcard Notice (which are attached as Exhibits 2 and 3, respectively), in accordance with the plan set out below.  Sirius XM has provided Rust Consulting Inc. with contact information for approximately 12.9 former and current Sirius XM customers that fit the definition of the Class.  Initially, the E-Mail Notice will be sent to approximately 85% (or 11 million) of the estimated 12.9 million current and former subscribers in the Class for whom Sirius XM has an e-mail address, and the Postcard Notice will be sent to the remaining 15% (or 1.9 million) of the current and former subscribers in the Class for whom Sirius XM has a postal mailing address but not an e-mail address.

17.     Notice will be sent via e-mail to current and former subscribers to Sirius XM's satellite radio service who fit the Class definition and for whom Sirius XM has an e-mail address in its records.

18.     Delivery of the E-mail Notice will be sent in batches that are staggered to avoid triggering SPAM and other blocking filters.

19.     It is my understanding that Rust Consulting Inc. will make two further attempts to deliver an E-mail Notice to any email that bounces back as undelivered.  Rust will also take measures to ensure the maximum deliverability of the emails, including among other things, utilizing a vendor that has contacts with Internet Service Providers ("ISPs") to ensure that the ISPs understand that the emails are non-soliciting.

20.     In instances where Sirius XM does not have an e-mail address but does have a postal mailing address for a potential Class Member, Notice will be sent via First Class U.S. Mail in the form of a postcard.  A Postcard Notice will also be mailed to potential Class

Members where the E-mail Notice bounces back as undelivered.

21.     Prior to mailing, all postal mail addresses will be checked against the National Change of Address ("NCOA")[1] database, which is maintained by the United States Postal Service ("USPS").  In order to ensure the most accurate mailings possible, the administrator will also certify addresses via the Coding Accuracy Support System ("CASS"), and verify them through Delivery Point Validation ("DPV").

22.     Postcard Notices that are returned as non-deliverable will be re-mailed to any address indicated by the postal service in the case of an expired automatic forwarding order.

23.     Research has shown that a summary notice is more likely to be read by recipients than a longer form notice.

   a.     The FJC believes that summary notices should be mailed in many class action cases.

      i.     The Class Action Subcommittee of the Civil Rules Advisory Committee asked the FJC to draft model notices in plain language to support the then-pending changes to Rule 23(c), which now requires notices to "concisely and clearly state in plain, easily understood language" the information a class member needs to know. The FJC conducted research to determine the best way to write class action notices to allow people to easily understand all of their rights and options.[2]

      ii.     While I was employed with the FJC we conducted four focus

---

[1] The NCOA database contains records of all permanent changes of address submissions received by the USPS for the last four years.

[2] The research conducted by the FJC is discussed in Shannon Wheatman, *The Effects of Plain Language Drafting on Layperson's Comprehension of Class Action Notices* (2001) (unpublished Ph.D. dissertation, University of Georgia) (on file with the University of Georgia Library).

groups to gather feedback on our draft plain language notices. During the focus group process, we explored recipients' willingness to open and read a class action notice. Many focus group participants complained that it would take too much time out of their schedules to read a detailed notice, which in turn would cause them to skim the notice or throw it away.

iii.     We went on to empirically test the overall effectiveness of the FJC's model securities notice. We collected responses from 229 volunteer participants who were members of 27 investment clubs across the country. Only 2% of participants reported that they would carefully read a long form notice, 59% would glance at it, 12% would file it away, and 27% would throw it away without reading it. However, 43% of participants reported they would carefully read a summary notice; 36% would glance at it; 6% would file it away; and 15% would throw it away.

iv.     Given these findings, the FJC believes that when the case does not involve a serious health or emotional issue, mailing a summary notice will most likely increase the chances it will be read.

b.     The U.S. Postal Service ("U.S.P.S.") research shows that many people scan their mail.[3]

i.     The U.S.P.S. conducts and publishes the results of an annual study (*Household Diary Study*) examining how mail recipients interact with different types of mail. The survey has three main purposes: (a) to measure the mail sent and received by U.S. households, (b) to provide a

---

[3]     U.S.P.S., *Household Diary Study: Mail Use & Attitudes in FY2009*, available at http://www.usps.com/householddiary/welcome.htm (last visited Apr. 10, 2011).

means to track household mail trends over time, and (c) to make comparisons of mail use between different types of households. The survey collects household information on attitudes toward mail and advertising.

ii.     The study examines mail by type, including: correspondence, transactions, advertising, periodicals, packages and unclassified mail. Advertising mail, which can take many forms – "letters, postcards, catalogs and free samples" – is the category for promotional, advertising or sales material.  There is no separate category for legal notices.

iii.     In 2009, 79% of recipients reported that they either "read" or "scan" the advertising mail sent to their households.  In order to decide whether to read or throw away advertising mail, the recipient must look at the envelope or mailer.

24.     Additionally, notice sent via email should _not_ contain an attachment of a Long Form Notice because attachments are more likely to trigger a SPAM filter and thus be returned as undelivered.

25.     KM estimates that Summary Notice in the form of the E-Mail Notice and the Postcard Notice will reach an estimated 85% of potential Class Members with this Notice Plan.

### *Paid Media*

26.     KM has designed a supplemental paid media program to reach Class Members who may not receive direct notice via e-mail or mail.  A draft of the Publication Notice is attached as Exhibit 4.

27.    To design the paid media segment of the notice program, KM analyzed syndicated data available from 2011 Net Gfk MRI Media Fusion (1-11/S10) ("GfK MRI").[4] GfK MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising.   MRI provides a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

28.    Using GfK MRI, KM selected demographics that encompass the characteristics of Class Members.   Media vehicles were then analyzed and selected for their strength in reaching these demographic targets.

29.    KM chose the following primary target audience:  Adults 18 years or older whose household subscribes to satellite radio ("Satellite Radio Subscribers").

30.    As a result of its analysis, as described above, KM recommends incorporating insertions in two national newspapers, *USA Today* and *The Wall Street Journal*, in order to provide potential Class Members with additional opportunities to receive a Summary Notice beyond the direct notice described above.

31.    A Summary Notice will be published as follows:

a.    Two times, as a 1/6th page, in *USA Today*.

b.    One time, as a 1/6th page, in *The Wall Street Journal*.

32.    For the purpose of evaluating the strength of the media, the advertising was

---

[4] GfK MRI surveys a large sample of U.S. adults about the media they see and hear and about the products they use. Participants in the survey are identified by age, occupation, income, and education and by where they live, among other things.  They are asked what magazines and newspapers they read, what TV shows and cable channels they watch, and are asked questions about Internet access and radio formats.  In addition, respondents indicate the consumer products and brands they use from among 500 categories and 6000 consumer brands.

measured against Satellite Radio Subscribers to establish the estimated *reach*[5] of the media program and the estimated *frequency*[6] of exposure to the media vehicles.

33.    An estimated 85.9% of Satellite Radio Subscribers will be reached through direct notice in combination with the supplemental media program, with an average estimated frequency of 1.07 times.

### *Online*

34.    An informational website is a critical component of the Notice Program.  A website is a constant information source instantly accessible to millions.

35.    A website has been established at the URL www.SatelliteRadioSuit.com to enable potential Class Members to get information about the lawsuit, including a copy of the Settlement Agreement and the Long Form Notice, in English and translated into Spanish.

### *Other*

36.    A toll-free phone number will be established allowing Class Members to call and request that a Notice be mailed to them or listen to answers to frequently asked questions.

37.    A post office box will be established to receive Class Member requests for exclusion, as well as requests for Long Form Notices or other information.

### EFFECTIVENESS OF THE NOTICES

38.    Attached as Exhibits 2, 3, 4, and 5 are drafts of the Postcard Notice, E-mail Notice, Publication Notice, and Long Form Notice.

---

[5] Reach is the estimated percentage of a target audience who are exposed to a notice through a specific media vehicle or combination of media vehicles.

[6] Frequency is the estimated average number of opportunities an audience member has to see the notice.

39.     The Notices effectively communicate information about the *Sirius XM* Settlement.

40.     Rule 23(c)(2) of the Federal Rules of Civil Procedure requires class action notices to be written in "plain, easily understood language."  KM applies the plain language requirement in drafting notices in federal and state class actions.  The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

41.     The Summary Notices (Postcard, E-mail, and Publication Notices) are designed to capture the Class Member's attention with clear, concise, plain language.  They direct readers to the case website for more information.  The plain language text provides important information regarding the subject of the litigation, the Class definition, and Class Members' legal rights.

42.     These Summary Notices concisely and clearly state, in plain easily understandable language, all required information, without omitting significant facts that Class Members need to understand their rights.  The Notices refer readers to the availability of a Long Form Notice which is available to those who call the toll-free number or visit the website.

43.     The Long Form Notice (a draft of which is attached as Exhibit 5 hereto) will be available at the website or by calling the toll-free number.  The Long Form Notice provides substantial information, including all specific instructions Class Members need to follow to properly exercise their rights, and background on the issues in the case.  It is designed to encourage readership and understanding, in a well-organized and reader-friendly format.

44.     In preparing the Notices for the *Sirius XM* Settlement, I have used communications methods that are well-established in my field.  I have embraced the high standards embodied in the Advisory Committee's notes accompanying the 2003 changes to Rule 23(c)(2):

*The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members.*

## CONCLUSIONS

45.     In my opinion, the Notices and Notice Plan comport with Rule 23 of the Federal Rules of Civil Procedure and also the guidance for effective notice as articulated in the FJC's *Manual for Complex Litigation, 4th*.

46.     In my opinion, the Notices and Notice Plan will effectively reach at least 85.9% of the Class as described herein, deliver Notices that will capture Class Members' attention, and provide them with the information necessary to understand their rights and options.

47.     In my opinion, the Notice Plan is comprehensive, well suited to the Class, and more than adequate to satisfy due process.

48.     It is my opinion that the reach of our target audience and the number of exposure opportunities to the notice information is the best notice practicable under the circumstances, and is consistent with the standards employed by KM in notification programs designed to reach class members.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Shannon R. Wheatman

Executed in Washington, D.C. this 13th day of May.

# EXHIBIT 1



# Shannon R. Wheatman, Ph.D.

Vice-President, Notice
Kinsella Media, LLC
2120 L Street NW, Suite 860
Washington, DC 20037
2010 - Present

Dr. Wheatman began her class action career in 2000 at the Federal Judicial Center where she was instrumental in the development of model notices to satisfy the plain language amendment to Rule 23. Dr. Wheatman has been involved in over a 125 class actions and has been recognized as a notice expert in state and federal courts across the U.S. and in Canada. Dr. Wheatman specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. She provides testimony on the best notice practicable. Her plain language expertise was advanced by her education, including her doctoral dissertation on plain language drafting of class action notice and her master's thesis on comprehension of jury instructions. Dr. Wheatman's selected case experience includes:

### Antitrust

*Brookshire Bros. v. Chiquita*, No. 05-CIV-21962 (S.D. Fla.).

*Friedman v. Microsoft Corp.*, No. 2000-000722 (Ariz. Super. Ct.).

*Gordon v. Microsoft Corp.*, No. 00-5994 (4th Jud. D. Ct. Minn.).

*Peek v. Microsoft Corp.*, No. CV-2006-2612 (Cir. Ct. Ark.).

*Spence v. Microsoft Corp.,* No. 00-CV-003042 (Cir. Ct. Wis).

### Consumer and Product Liability

*Beringer v. Certegy Check Servs., Inc*., No. 8:07-cv-1434-T-23TGW (M.D. Fla.) (data breach).

*Carnegie v. Household Int'l.,* No. 98-C-2178 (N.D. Ill.) (rapid tax refund loan).

*Ciabattari v. Toyota Motor Sales, U.S.A., Inc.,* No. C-05-04289 (N.D. Cal.) (run flat tires).

*Cotton v. Ferman Mgmt. Servs Corp.,* No. 02-08115 (13th Jud. Cir. Ct. Fla.) (automotive products).

*Davis v. Am. Home Prods. Corp.*, No. 94-11684 (Civ. D. Ct. La.) (Norplant contraceptive).

*Defrates v. Hollywood Video,* No. 02L707 (Cir. Ct. Ill.) (video rentals).

*Ford Explorer Cases*, JCCP Nos. 4226 & 4270 (Cal. Super. Ct.) (consumer fraud).

*Gardner v. Stimson Lumber Co.,* No. 00-2-17633 (Wash. Super. Ct.) (hardboard siding product).

*Grays Harbor v. Carrier Corp.,* No. 05-CIV-21962 (W.D. Wash.) (high efficiency furnace).

*In re Educ. Testing Serv. PLT 7-12 Test Scoring Litig.,* MDL No. 1643 (teacher's testing).

*In re High Sulfur Content Gasoline Prods. Liability Litig.,* MDL No. 1632 (E.D. La.) (tainted gas).

*In re Lupron Marketing & Sales Practices Litig.,* MDL No. 1430 (D. Mass.) (pharmaceutical).

*In re Serzone Prods. Liability Litig.,* MDL No. 1477 (S.D. W. Va.) (pharmaceutical).

*In re TJX Comp. Retail Sec. Breach Litig.*, MDL No. 1838 (D. Mass.) (data breach).

*In re Trans Union Corp. Privacy Litig.*, MDL No. 1350 (N.D. Ill.) (credit report privacy).

*Mantzouris v. Scarritt Motor Group, Inc.,* No. 8:03cv0015 (M.D. Fla) (automotive products).

*Meckstroth v. Toyota Motor Sales, U.S.A., Inc.,* No. 583-318 (24th Jud. D. Ct. La.) (oil gel).

*Nichols v. SmithKline Beecham Corp.,* No. 00-6222 (E.D. Pa.) (Paxil pharmaceutical).

*Palace v. DaimlerChrysler*, No. 01-CH-13168 (Cir. Ct. Ill.) (defective head gasket).

**Environmental**

*Allen v. Monsant Co.*, No. 041465 and *Carter v. Monsanto Co.*, No. 00-C-300 (Cir. Ct. W.V.) (dioxin release).

*Angel v. U.S. Tire Recovery*, No. 06-C-855 (Cir. Ct. W.V.) (tire fire).

*In Re Katrina Canal Breaches Litig.*, No. 05-4182 (E.D. La.). (Hurricanes Katrina and Rita).

*Morrow v. Conoco Inc.,* No. 2002-3860 G and *Thibodeaux v. Conoco Phillips Co.,* No. 2003-481 F (14th J.D. Ct. La.) (air contaminant release).

**Government**

*Tobacco Farmer Transition* Program, U.S. Dept. of Agriculture (tobacco buyout).

*Homeless Shelter Compensation Program*, City of New York.

*In re Residential Schools Class Action Litig.*, No. 00-cv-192059 (Ont. S.C.J.) (Canadian government, aboriginal abuse).



*Insurance*

*Beasley v. Hartford Ins. Co. of the Midwest*, No. CV-2005-58-1 (Cir. Ct. Ark.) (homeowners insurance).

*Bond v. Am. Family Ins. Co.*, No. CV06-01249 (D. Ariz) (property insurance).

*Burgess v. Farmers Ins. Co.*, No. 2001-292 (Dist. Ct. Okla.) (homeowners insurance).

*Desportes v. Am. General Assurance Co.*, No. SU-04-CV-3637 and *Carter v. North Central Life Ins. Co.* (Ga. Super. Ct.) (credit premium insurance).

*First State Orthopaedics et al. v. Concentra, Inc.*, et al., No. 2.05-CV-04951-NS (E.D. Pa.) (PPO).

*Froeber v. Liberty Mutual Fire Ins. Co.,* No. 00C15234 (Cir. Ct. Ore.) (PPO).

*Guidry v. Am. Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.) (cancer insurance).

*Gunderson v. AIG Claim Services, Inc.,* No. 2004-002417 (14th Jud. D. Ct. La.) (PPO).

*Gunderson v. F.A. Richard & Associates, Inc.*, No. 2004-2417-D. (Cir. Ct. 14th Jud. D. Ct. La.) (PPO).

*Hunsucker v. Am. Standard Ins. Co. of Wisc.*, No. CV-2007-155-3 (Cir. Ct. Ark) (bodily injury claims).

*Johnson v. Progressive Casualty Ins.,* Co., No. CV-2003-513 (Cir. Ct. Ark.) (automobile insurance).

*Morris v. Liberty Mutual Fire Ins. Co.*, No. CJ-03-714 (D. Okla.) (homeowners insurance).

*Reynolds v. The Hartford Fin. Servs. Group, Inc.,* No. CV-01-1529-BR (D. Ore) (homeowners insurance).

*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.) (long term care insurance).

*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.) (automotive premiums).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark) (bodily injury claims).

*Zarebski v. Hartford Ins. Co. of the Midwest*, No. CV-2006-409-3 (Cir. Ct. Ark.) (bodily injury claims).

*Securities*

*In re Parmalat Securities Litig.*, MDL No. 1653-LAK (S.D. N.Y.).

*In re Royal Ahold Securities and "ERISA" Litig.*, MDL No. 1539 (D. Md.).



***Warnings/Product Recall***

*Bardessono v. Ford Motor Co*., No. 32494 (Wash. Super. Ct.) (15-passenger van rollover warning).

*Kerosene Recall*, Pittsburgh Terminals Corp.

## Articles

Shannon R. Wheatman & Terri R. LeClercq (in press), *Majority of Publication Class Action Notices Fail to Satisfy Rule 23 Requirements*, REV. LITIG.

Shannon R. Wheatman & Katherine K. Kinsella (in press), *International Class Action Notice*, WORLD CLASS ACTIONS.

Katherine Kinsella & Shannon Wheatman (in press), *US Class Action Notice and Administration*, AAI INTERNATIONAL PRIVATE ENFORCEMENT HANDBOOK.

Shannon R. Wheatman & Thomas, E. Willging, *Does Attorney Choice of Forum in Class Action Litigation Really Make a Difference?* 17 CLASS ACTIONS & DERIVATIVE SUITS 1 (2007).

Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make?* NOTRE DAME L. REV., *81* (2), 101, 161 (2006).

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform.* GEO. J. LEGAL ETHICS, 18 (4), 1359-1382 (2005).

Thomas E. Willging & Shannon R. Wheatman, *An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation.* FEDERAL JUDICIAL CENTER (2005).

Elizabeth C. Wiggins & Shannon R. Wheatman, *So what's a concerned psychologist to do? Translating the research on interrogations, confessions, and entrapment into policy* in INTERROGATIONS, CONFESSIONS, AND ENTRAPMENT 265, 280 (2004).



Thomas E. Willging & Shannon R. Wheatman, *Attorneys' Experiences and Perceptions of Class Action Litigation in Federal and State Courts.  A Report to the Advisory Committee on Civil Rules Regarding a Case Based Survey*. FEDERAL JUDICIAL CENTER (2003).

Shannon R. Wheatman, *Survey of Bankruptcy Judges on Effectiveness of Case-Weights*.  FEDERAL JUDICIAL CENTER (2003).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Judicial Evaluation of Bankruptcy Judges*.  FEDERAL JUDICIAL CENTER (2003).

Robert Niemic, Thomas Willging, & Shannon Wheatman, *Effects of Amchem/Ortiz on Filing of Federal Class Actions: Report to the Advisory Committee on Civil Rules*.  FEDERAL JUDICIAL CENTER (2002).

Shannon Wheatman, Robert Niemic  & Thomas Willging, *Report to the Advisory Committee on Civil Rules: Class Action Notices*.  FEDERAL JUDICIAL CENTER (2002).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Implementation of Selected Amendments to Federal Rule of Civil Procedure 26 by United States Bankruptcy Courts*.  FEDERAL JUDICIAL CENTER (2001).

Shannon R. Wheatman & David R. Shaffer, *On finding for defendants who plead insanity: The crucial impact of dispositional instructions and opportunity to deliberate*. LAW AND HUM. BEH., *25*(2), 165, 181 (2001).

Shannon R. Wheatman, *Distance Learning in the Courts*. FEDERAL JUDICIAL CENTER (2000).

David R. Shaffer & Shannon R. Wheatman, *Does personality influence the effectiveness of judicial instructions?* PSYCHOL. PUB. POL'Y & L., 6, 655, 676 (2000).

## Court Testimony

*Guidry v. American Public Life Ins. Co*., No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish).

*Webb v. Liberty Mutual Ins. Co.,* No. CV-2007-418-3 (Cir. Ct. Ark).

*Beasley v. The Reliable Life Insurance Co*., No. CV-2005-58-1 (Cir. Ct. Ark).

## Depositions

*Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).



## Judicial Comments

*In Re Katrina Canal Breaches*, No. 05-4182 (E.D. La.).

The notice here was crafted by Shannon Wheatman, Ph.D., whose affidavit was received as evidence . . . The entire notice was drafted in plain, comprehensible language . . . The Court finds this notice adequately reached the potential class. - Hon. Stanwood R. DuVal, Jr. (2009).

*Jones v. Dominion Transmission Inc.,* No. 2.06-cv-00671 (S.D. W. Va.).

The Parties' notice expert Shannon R. Wheatman, Ph.D. . . . testified that in this case . . . that the mailed notices reached approximately 95.4 percent of the potential class . . . I HOLD that personal jurisdiction exists over the Class Members because notice was reasonable and afforded the Settlement Class an opportunity to be heard and to opt out. - Hon. Joseph R. Goodwin (2009).

*Guidry v. American Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.).

The facts show that the notice plan . . . as adequate to design and implementation . . . Dr. Shannon R. Wheatman, a notice expert, also testified at the fairness hearing as to the sufficiency of the notice plan. Dr. Wheatman testified that the notice form, content, and dissemination was adequate and reasonable, and was the best notice practicable. - Hon. G. Michael Canaday (2008).

*Webb v. Liberty Mutual Ins. Co.,* (March 3, 2008) No. CV-2007-418-3 (Cir. Ct. Ark).

Ms. Wheatman's presentation today was very concise and straight to the point . . . that's the way the notices were . . . So, I appreciate that . . . Having admitted and reviewed the Affidavit of Shannon Wheatman and her testimony concerning the success of the notice campaign, including the fact that written notice reached 92.5% of the potential Class members, the Court finds that it is unnecessary to afford a new opportunity to request exclusion to individual Class members who had an earlier opportunity to request exclusion but failed to do so . . . The Court finds that there was minimal opposition to the settlement.  After undertaking an extensive notice campaign to Class members of approximately 10,707 persons, mailed notice reached 92.5% of potential Class members. - Hon. Kirk D. Johnson (2008).

*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.).

Dr. Wheatman's affidavit was very informative, and very educational, and very complete and thorough about the process that was undertaken here. . . So I have reviewed all of these documents and the affidavit of Dr. Wheatman and based upon the information that is provided . . . and the significant number of persons who are contacted here, 90 percent, the Court will issue the order. - Hon. Mike Salvagni (2008).



*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.).

The Class Notice and the notice methodology implemented pursuant to the Settlement Agreement, as described in part in the Declarations of . . . Shannon Wheatman. constituted the best practicable notice. . . was reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and met all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the Due Process Clauses), the Rules of the Court, and any other applicable law. - Hon. Philip S. Gutierrez (2008).

*Gray's Harbor v. Carrier Corp.*, No. 05-05437(W.D. Wash.).

The Court finds that this notice was the best notice practicable under the circumstances, that it provided due and adequate notice of the proceedings and of the matters set forth therein, and that it fully satisfied all applicable requirements of law and due process. - Hon. Ronald B. Leighton (2008).

*Beringer v. Certegy Check Servs., Inc.*, No. 8.07-cv-1434-T-23TGW (M.D. Fla.).

The proposed form of notice and plan for publishing are reasonable and designed to advise members of the Settlement class of their rights . . . A nationally recognized notice specialist, Hilsoft Notifications, has developed the comprehensive Notice Plan. Here, Notice is reasonably calculated to reach the maximum number of potential Settlement Class Members and, thus, qualifies as the best notice practicable. The Notice Plan here is designed to reach the maximum number of Class Members, and it is Plaintiffs' goal to reach at least 80% of the Class—an extraordinary result in consumer class action litigation. - Hon. Steven D. Merryday (2008).

*Palace v. DaimlerChrysler Corp.,* No. 01-CH-13168 (Cir. Ct. Ill.).

The form, content, and method of dissemination of the notice given to the Illinois class and to the Illinois Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed Settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings, to all Persons entitled to such notice, and said notice fully satisfied the requirements of due process . . . - Hon. Mary Anne Mason (2008).

*Johnson v. Progressive Casualty Ins., Co.,* No. CV-2003-513 (Cir. Ct. Ark.).

Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the manner in which it was disseminated . . . Notice was direct mailed to all Class members whose current whereabouts could be identified by reasonable effort. Notice reached a large majority of the Class members. The Court finds that such notice constitutes the best notice practicable . . . The forms of Notice and Notice Plan satisfy all of the requirements of Arkansas law and due process. - Hon. Carol Crafton Anthony (2007).



*Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).

 [T]he Court has, pursuant to the testimony regarding the notification requirements, that were specified and adopted by this Court, has been satisfied and that they meet the requirements of due process.  They are fair, reasonable, and adequate.  I think the method of notification certainly meets the requirements of due process . . . So the Court finds that the notification that was used for making the potential class members aware of this litigation and the method of filing their claims, if they chose to do so, all those are clear and concise and meet the plain language requirements and those are completely satisfied as far as this Court is concerned in this matter.  - Hon. Joe Griffin (2007).

## Education and Experience

### Education

Ph.D., Social Psychology, 2001; The University of Georgia, Athens, GA

Dissertation Title: *The effects of plain language drafting on layperson's comprehension of class action notices.*

M.S., Social Psychology, 1999; The University of Georgia, Athens, GA

Thesis Title: *Effects of verdict choice, dispositional instructions, opportunity to deliberate, and locus of control on juror decisions in an insanity case.*

M.L.S., Legal Studies, 1996; The University of Nebraska-Lincoln, Lincoln, NE

B.A., Psychology, 1993; Millersville University of Pennsylvania, Millersville, PA

Honor's Thesis Title: *The effects of inadmissible evidence and judicial admonishment in individual versus group decisions in a mock jury simulation.*

### Related Experience

Vice President, Notice Director, Hilsoft Notifications
Souderton, PA
2004-2009

Prior to joining Kinsella Media, Dr. Wheatman was the Vice President and Notice Director at Hilsoft Notifications.  In that capacity, she worked as a notice expert and oversaw all notice programs implemented during her tenure.



Research Associate, Federal Judicial Center
Washington, DC
2000-2004

The Federal Judicial Center is the education and research agency for the Federal Courts. The Research Division performs empirical and explanatory research on federal judicial processes and court management.   Dr. Wheatman worked with the Civil Rules Advisory Committee on a number of class action studies and with the Bankruptcy Administration Committee on judicial evaluations.

### *Supplementary Background*

Dr. Wheatman has a strong statistical background, having completed nine graduate level courses as well as teaching undergraduate statistics at the University of Georgia.  She is also a member of several plain language organizations, including the Center for Plain Language, Clarity, and Scribes.



# EXHIBIT 2

To:
From:  Satellite Radio Class Action Administrator
Subject: Satellite Radio Settlement - Notice to Current and Former Sirius XM Subscribers

### If You Subscribed to Sirius, XM, or Sirius XM Radio
### You Could Get Benefits From a Class Action Settlement

*Para una notificación en Español, llamar 1-800-000-0000 o visitar www.SatelliteRadioSuit.com*

Read this message carefully.  Records show you subscribed to Sirius XM Radio.  We are sending this e-mail to tell you about the proposed settlement of a class action that may affect your legal rights.  Go to www.SatelliteRadioSuit.com for a detailed notice about the proposed settlement.  There is a class action lawsuit (*Blessing v. Sirius XM Radio Inc.*) against Sirius XM concerning the July 29, 2008 merger that created Sirius XM.  The lawsuit claims this merger violated federal antitrust laws and that Sirius XM raised its prices as a result of the merger.  Sirius XM denies it did anything wrong.

**Who's Included?**  You are included in the Class if you were a Sirius, XM, or Sirius XM subscriber anytime from **July 29, 2008 to Month 00, 2011 [opt-out deadline]** and you paid: (1) the U.S. Music Royalty Fee; or (2) a monthly multi-radio charge of $8.99; or (3) a $2.99 monthly Internet access charge if you previously did not pay to access Sirius XM's content over the Internet.

**What Does the Settlement Provide?**  Under this proposed Settlement, Sirius XM has agreed it will not raise the price of its base subscription plan and certain other prices through the end of 2011.  Additionally, subscribers with long term plans (excluding lifetime subscriptions) will be permitted to restart their plan at current rates before December 31, 2011.  After approval of the Settlement, former subscribers will also be permitted to either (a) reconnect their satellite radio without paying a reactivation fee and receive one month of service at no cost; or (b) receive one month of Sirius XM Internet streaming service at no cost.  The estimated value of the Settlement is $180 million.  The Settlement does not provide for cash payments to the Class.

**How to Get Benefits?**  Current subscribers scheduled to renew before December 31, 2011 do not need to do anything.  Current subscribers who are scheduled to renew after December 31, 2011 and who want to restart their long term plan at current rates as well as former subscribers who want to reconnect service or receive streaming service should go to www.siriusxm.com/Question.

**What Are Your Options?**  If you do not want to be legally bound by the Settlement, you must exclude yourself from it.  The deadline to exclude yourself is **Month 00, 2011**.  If you do not exclude yourself, you will release all claims against Sirius XM concerning any conduct arising out of, based on, or relating to the merger that created Sirius XM.  If you stay in the Settlement Class, you may object to it by **Month 00, 2011**.  The detailed notice, available at the website or by calling the toll-free number, tells you how to exclude yourself or object.  The Court will hold a hearing on **Month 00, 0000**, to consider whether to approve the Settlement and a request by Class Counsel for attorneys' fees and costs up to $13 million, plus interest.  You may appear at the hearing, but you don't have to.  You may also hire your own attorney, at your own expense, to appear or speak for you at the hearing, but you don't have to.

**For more information about the Settlement:**      **www.SatelliteRadioSuit.com**      **1-800-000-0000**

# EXHIBIT 3

# If You Subscribed to Sirius, XM, or Sirius XM Radio
# You Could Get Benefits From a Class Action Settlement

Read this message carefully. Records show you subscribed to Sirius XM Radio. We are sending this notice to tell you about the proposed Settlement of a class action that may affect your legal rights. There is a class action lawsuit (*Blessing v. Sirius XM Radio Inc*.) against Sirius XM concerning the July 29, 2008 merger that created Sirius XM. The lawsuit claims this merger violated federal antitrust laws and that Sirius XM raised its prices as a result of the merger. Sirius XM denies it did anything wrong.

**Who's Included?** You are included in the Class if you were a Sirius, XM, or Sirius XM subscriber anytime from **July 29, 2008 to Month 00, 2011** and you paid: (1) the U.S. Music Royalty Fee; or (2) a monthly multi-radio charge of $8.99; or (3) a $2.99 monthly Internet access charge if you previously did not pay to access Sirius XM's content over the Internet.

**What Does the Settlement Provide?** Under this proposed Settlement, Sirius XM has agreed it will not raise the price of its base subscription plan and certain other prices through the end of 2011. Additionally, subscribers with long term plans (excluding lifetime subscriptions) will be permitted to restart their plan at current rates before December 31, 2011. After approval of the Settlement, former subscribers will also be permitted to either (a) reconnect their satellite radio without paying a reactivation fee and receive one month of service at no cost; or (b) receive one month of Sirius XM Internet streaming service at no cost. The estimated value of the Settlement is $180 million. The Settlement does not provide for cash payments to the Class.

**How to Get Benefits?** Current subscribers scheduled to renew before December 31, 2011 do not need to do anything. Current subscribers who are scheduled to renew after December 31, 2011 and who want to restart their long term plan at current rates as well as former subscribers who want to reconnect service or receive streaming service should go to siriusxm.com/Question.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself from it. The deadline to exclude yourself is **Month 00, 2011**. If you do not exclude yourself, you will release all claims against Sirius XM concerning any conduct arising out of, based on, or relating to the merger that created Sirius XM. If you stay in the Settlement Class, you may object to it by **Month 00, 2011**. The detailed notice, available at the website or by calling the toll-free number, tells you how to exclude yourself or object. The Court will hold a hearing on **Month 00, 2011**, to consider whether to approve the Settlement and a request by Class Counsel for attorneys' fees and costs up to $13 million, plus interest. You may appear at the hearing, but you don't have to. You may also hire your own attorney, at your own expense, to appear or speak for you at the hearing, but you don't have to.

**For more information about the Settlement:**   **www.SatelliteRadioSuit.com**   **1-800-000-0000**

*Court-Ordered Legal Notice*

**CLAIMS ADMINISTRATOR**
**PO BOX 0000**
**MINNEAPOLIS, MN 00000-0000**

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
Rust Consulting, Inc.

**Important Notice About Satellite Radio Settlement**

*Para una notificación en Español, llamar 1-800-000-0000 o visitar www.SatelliteRadioSuit.com*

NAME
ADDRESS
CITY STATE ZIP CODE

# EXHIBIT 4

# If You Subscribed to Sirius, XM, or Sirius XM Radio

## You Could Get Benefits From a Class Action Settlement

There is a class action lawsuit (*Blessing v. Sirius XM Radio Inc*.) against Sirius XM concerning the July 29, 2008 merger that created Sirius XM. The lawsuit claims this merger violated federal antitrust laws and that Sirius XM raised its prices as a result of the merger. Sirius XM denies it did anything wrong.

### Who's Included?

You are included in the Class if you were a Sirius, XM, or Sirius XM subscriber anytime from **July 29, 2008 to Month 00, 2011 [opt-out deadline]** and you paid: (1) the U.S. Music Royalty Fee; or (2) a monthly multi-radio charge of $8.99; or (3) a $2.99 monthly Internet access charge if you previously did not pay to access Sirius XM's content over the Internet.

### What Does the Settlement Provide?

Under this proposed Settlement, Sirius XM has agreed it will not raise the price of its base subscription plan and certain other prices through the end of 2011. Additionally, subscribers with long term plans (excluding lifetime subscriptions) will be permitted to restart their plan at current rates before December 31, 2011. After approval of the Settlement, former subscribers will also be permitted to either (a) reconnect their satellite radio without paying a reactivation fee and receive one month of service at no cost; or (b) receive one month of Sirius XM Internet streaming service at no cost. The estimated

value of the Settlement is $180 million. The Settlement does not provide for cash payments to the Class.

### How to Get Benefits?

Current subscribers scheduled to renew before December 31, 2011 do not need to do anything. Current subscribers who are scheduled to renew after December 31, 2011 and who want to restart their long term plan at current rates as well as former subscribers who want to reconnect service or receive streaming service should go to siriusxm.com/Question.

### Your Rights May Be Affected.

If you do not want to be legally bound by the Settlement, you must exclude yourself from it. The deadline to exclude yourself is **Month 00, 2011**. If you do not exclude yourself, you will release all claims against Sirius XM concerning any conduct arising out of, based on, or relating to the merger that created Sirius XM. If you stay in the Settlement Class, you may object to it by **Month 00, 2011**. The detailed notice, available at the website or by calling the toll-free number, tells you how to exclude yourself or object.

The Court will hold a hearing on **Month 00, 2011** to consider whether to approve the Settlement and a request for attorneys' fees, and costs up to $13 million, plus interest. You may appear at the hearing, but you don't have to. You may also hire your own attorney, at your own expense, to appear or speak for you at the hearing, but you don't have to.

**For more information about the Settlement:**
**www.SatelliteRadioSuit.com or 1-800-000-0000**

# EXHIBIT 5

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

# If You Subscribed to Sirius, XM, or Sirius XM Radio at Anytime from July 28, 2008 to Month 00, 2011 [deadline for requesting exclusion from the Class], You Could Benefit From a Class Action Settlement.

*A court authorized this notice.  This is not a solicitation from a lawyer.*

- There is a class action lawsuit (*Blessing v. Sirius XM Radio Inc.*) against Sirius XM concerning the July 29, 2008 merger that created Sirius XM.  The lawsuit claims this merger violated federal antitrust laws and that Sirius XM raised its prices as a result of the merger.  Sirius XM denies it did anything wrong.

- The Settlement includes individuals who subscribed to Sirius, XM, or Sirius XM satellite radio at any time between July 28, 2008 and **Month 00**, 2011 **[deadline for requesting exclusion from the Class]**.

- As part of the Settlement, Sirius XM has agreed not to raise prices through the end of 2011.  Former subscribers can re-subscribe with a month's free service (see Questions 8 and 9).

**Your legal rights are affected even if you do nothing.  Read this Notice carefully.**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **GET BENEFITS** | Current subscribers scheduled to renew their plans before December 31, 2011 do not need to do anything.  Current subscribers scheduled to renew after December 31, 2011 and who want to restart their long term plan at current rates should go to www.siriusxm.com/Question.  Former subscribers who want to reconnect their satellite radio and receive one month of basic service at no cost or receive one month of Internet streaming service at no cost should go to www.siriusxm.com/Question after approval of the Settlement. |
| **ASK TO BE EXCLUDED BY [INSERT DATE]** | If you ask to be excluded from this lawsuit, you won't share in benefits.  But, you will keep any rights to sue Sirius XM on your own about the legal claims in this lawsuit, and you will not be bound by any orders or judgments entered by the Court in this case.  *See* the answer to Question 14 below. |
| **OBJECT BY [INSERT DATE]** | Tell the Court if you do not like the Settlement. |
| **DO NOTHING** | Participate in the Settlement and get benefits as explained above.   Give up your rights to sue Sirius XM concerning the merger that formed Sirius XM. |

- These rights and options--**and the deadlines to exercise them**--are explained in this notice.

- The Court presiding over this case still has to decide whether to approve the Settlement with Sirius XM.

**QUESTIONS? CALL TOLL-FREE 1-800-000-0000 OR VISIT WWW.SATELLITERADIOSUIT.COM**

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION** .................................................................. **PAGE 3**
- 1. Why was this Notice issued?
- 2. What is this lawsuit about?
- 3. Why is this lawsuit a class action?
- 4. Why is there a Settlement?

**WHO IS IN THE SETTLEMENT?** ................................................ **PAGE 4**
- 5. How do I know if I am part of the Settlement?
- 6. Are there exceptions to being included in the Settlement?
- 7. What if I am not sure whether I am included in the Settlement?

**THE SETTLEMENT BENEFITS** .................................................... **PAGE 5**
- 8. What does the Settlement provide to current subscribers?
- 9. What does the Settlement provide to former subscribers?

**HOW TO GET BENEFITS** ............................................................ **PAGE 5**
- 10. How do I get benefits?
- 11. What am I giving up as part of the Settlement?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ...................... **PAGE 6**
- 11. If I exclude myself, can I benefit from this Settlement?
- 12. If I don't exclude myself, can I sue Sirius XM for the same thing later?
- 13. How do I exclude myself from the Settlement?

**THE LAWYERS REPRESENTING YOU** ......................................... **PAGE 7**
- 14. Do I have a lawyer in this case?
- 15. How will the lawyers be paid?

**OBJECTING TO OR COMMENTING ON THE SETTLEMENT** ............... **PAGE 7**
- 16. How do I tell the Court that I do not like the settlement with Sirius XM?
- 17. What is the difference between objecting and asking to be excluded?

**THE COURT'S FAIRNESS HEARING** .......................................... **PAGE 8**
- 18. When and where will the Court decide whether to approve the Settlement?
- 19. Do I have to come to the hearing?
- 20. May I speak at the fairness hearing?

**IF YOU DO NOTHING** ................................................................ **PAGE 9**
- 21. What happens if I do nothing at all?

**GETTING MORE INFORMATION** ................................................. **PAGE 9**
- 22. How do I get more information about the Settlement?

# BASIC INFORMATION

## 1. Why was this Notice issued?

A Court authorized this notice because you have a right to know about the proposed Settlement in this class action lawsuit and about all of your options before the Court decides whether to give "final approval" to the Settlement. This notice explains the legal rights and options that you may exercise before the Court decides whether to approve the Settlement with Sirius XM.

The Honorable Harold Baer, Jr., United States District Judge in the United States District Court for the Southern District of New York, is presiding over this case. The case is known as *Blessing v. Sirius XM Radio Inc.*, No 09-CV-10035 HB (S.D.N.Y.). The people who sued are called the Plaintiffs. Sirius XM Radio Inc. ("Sirius XM") is the Defendant.

## 2. What is this lawsuit about?

The lawsuit claims that the July 28, 2008 merger of a subsidiary of Sirius Satellite Radio Inc. with XM Satellite Radio Holdings Inc. violated federal antitrust laws. Specifically, the Class claims that, as a result of the merger, Sirius XM increased prices by: (1) charging a U.S. Music Royalty Fee for as much as $1.98 per month, (2) increasing the charge for additional radios from $6.99 to $8.99 per month, and (3) charging a $2.99 per month charge for Internet streaming. The Class had asked the Court to award the Class damages (or money), plus interest, attorney's fees, and costs.

The Class claims that Sirius XM violated federal antitrust laws, specifically Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. These are called the "Class Claims" in this notice.

Sirius XM denies that it did anything wrong. Sirius XM denies that the merger was anticompetitive and that the price increases that are the basis for Plaintiffs' claims violated the federal antitrust laws.

## 3. Why is this lawsuit a class action?

In a class action, one or more people called "Class Representatives" sue on behalf of all people who have similar claims. Such people together are the "Class" or "Class Members." In this case, the Class Representatives are Carl Blessing, Edward A. Scerbo, John Cronin, Brian Balaguera, Scott Byrd, Glenn Demott, James Hewitt, Todd Hill, Curtis Jones, Ronald William Kader, Edward Leyba, Greg Lucas, Joshua Nathan, James Sacchetta, David Salyer, Susie Stanaj, Janel and Kevin Stanfield, Paul Stasiukevicius, and Paola Tomassini. In a class action lawsuit, one action resolves the issues for everyone in the Class, except for those people who choose to exclude themselves from the Class, as described in the answer to Question 14 below.

**4.  Why is there a Settlement?**

The Court did not decide whether Sirius XM violated the federal antitrust laws.  Instead, both sides have agreed to a Settlement.  The Settlement does not mean that any law was broken or that Sirius XM did anything wrong.  The Class Representatives and their lawyers think the settlement is best for all Class members.

# WHO IS IN THE SETTLEMENT?

You need to decide whether you are included in the Settlement.

**5.  How do I know if I'm included in the Settlement?**

The Settlement includes:

> *All persons or entities who reside in the United States who contracted with Sirius Satellite Radio Inc., XM Satellite Radio Inc., XM Satellite Radio Holdings Inc., Sirius XM Radio Inc. or their affiliated entities for the provision of satellite digital audio radio services who, during the relevant period of July 29, 2008 through **Month 00**, 2011 [deadline for requesting exclusion from the class]: (1) paid the U.S. Music Royalty Fee; (2) own and activated additional radios ("multi-radio subscribers") and paid the increased monthly charge of $8.99 per additional radio; or (3) did not pay to access the content available on the 32 bkps or 64 bkps connections on the Internet but are now paying the Internet access monthly charge of $2.99.*

**6.  Who is not included in the Settlement?**

The Settlement does not include: (1) persons who exclude themselves from the Settlement (*see* answer to Question 14 below); (2) Sirius XM and its legal representatives, officers, directors, assignees, and successors; (3) governmental entities; and (4) the judges to whom this case is assigned and their immediate family members.

**7.  What if I am not sure whether I am included in the Settlement?**

If you are not sure whether you are included in the Settlement, you may get free help by calling or writing to the lawyers for the Class in this case at the telephone numbers or addresses listed in the answer to Question 15 below.

# THE SETTLEMENT BENEFITS

The estimated value to the Class of the Settlement is approximately $180 million.  The Settlement does not provide for cash payments to Class members.

### 8.   What does the Settlement provide to current subscribers?

Sirius XM had contemplated and made plans to raise the price of its subscription plans and other charges, including the multi-receiver discount, by $2 per month after July 28, 2011 (which is when the price restriction imposed upon Sirius XM by the Federal Communications Commission expires).  However, as part of the Settlement, Sirius XM will agree to hold the base price at or below current rates through December 31, 2011 for monthly, quarterly, semi-annual, and other long-term subscriptions (but excluding lifetime subscriptions) for "mostly music," "news sports and talk," "a la carte," and what are now known as the "select" and "select family friendly" packages (but were formerly known as "everything," "everything family friendly" or "family friendly" packages).

Sirius XM has also agreed to keep the prices at or below current rates through December 31, 2011, for multi-radio subscriptions, Internet streaming, "Best of" plans (now known as the "premier" and "premier family friendly" packages), and the U.S. Music Royalty Fee.

Additionally, subscribers with long term plans (excluding lifetime subscriptions) will be permitted to lock in the current rates by renewing their subscriptions before December 31, 2011.  This will keep rates at the existing subscription levels through the entire period of the new subscription term.

### 9.   What does the Settlement provide to former subscribers?

Sirius XM has also agreed to allow former subscribers who cancelled their Sirius XM service between July 29, 2009 and **Month 00**, 2011 **[deadline for requesting exclusion from the Class]** to (a) reconnect their satellite radio without paying a reactivation fee and receive one month of basic satellite radio service at no cost; or (b) receive one month of Sirius XM Internet streaming service at no cost.   To get these benefits former subscribers should go to www.siriusxm.com/Question after approval of the Settlement.

# HOW TO GET BENEFITS

### 10.   How do I get benefits?

Current subscribers who are scheduled to renew their plans before December 31, 2011 do not need to do anything.  Their plans will automatically renew at current prices.  Current subscribers who are not scheduled to renew until after December 31, 2011 and who want to restart their long term plan before December 31, 2011 at current rates should go to www.siriusxm.com/Question. Former subscribers who want to reconnect their satellite radio and receive one month basic service at no

cost or receive one month of Internet streaming service at no cost should also go to www.siriusxm.com/Question after approval of the Settlement.

| 11.  What am I giving up as part of the Settlement? |
|---|

If the Settlement becomes final, Class members will be releasing Sirius XM from all claims arising out of, based on, or relating to the merger that formed Sirius XM.  The released claims are described and identified in further detail in Section 8 of the Settlement Agreement.   The Settlement Agreement is available at www.SatelliteRadioSuit.com.   The Settlement Agreement describes the released claims in necessarily accurate legal terminology, so read it carefully.   You can talk to one of the lawyers listed in response to Question 15 as "Class Counsel" for free or you can, of course, talk to your own lawyer if you have questions about the released claims or what the release in the Settlement Agreement means.

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you want to keep the right to start your own lawsuit against Sirius XM over any claims arising out of, based on, or relating to the merger that formed Sirius XM, then you must take steps to get out of the Settlement.  This is called asking to be excluded from— also sometimes called "opting out" of—the Class.

| 12.  If I exclude myself, can I benefit from this Settlement? |
|---|

If you ask to be excluded, you may not receive the pricing benefits being made available by the Settlement.  If you are a former subscriber, you will not receive the opportunity provided by the Settlement to reactivate your satellite radio and receive one month of basic service or one month of Internet streaming service at no cost.

| 13.  If I don't exclude myself, can I sue Sirius XM for the same thing later? |
|---|

**No.**  Unless you exclude yourself, you will give up the right to sue Sirius XM yourself for the Class Claims and the released claims (*see* Question 11).   You must exclude yourself from *this* Class to start your own lawsuit against Sirius XM for the Class Claims or any claims arising out of, based on, or relating to the merger that formed Sirius XM.

If you exclude yourself so that you can start your own lawsuit against Sirius XM, you should talk to your own lawyer soon, because your claims are subject to a time limitation.

| 14.  How do I exclude myself from the Settlement? |
|---|

To exclude yourself, send a letter that says you want to be excluded from the Settlement in *Blessing v. Sirius XM Radio Inc*. Include your name, address, and signature.  You must mail your Exclusion Request postmarked by **Month 00, 2011**, to:

> Satellite Radio Exclusions

P.O. Box _____,
City, St 00000

**You cannot exclude yourself by telephone or e-mail.**  No request for exclusion will be considered valid unless it is made in a timely manner and in compliance with the procedure set out above.  The Court will automatically grant all timely requests for exclusion.


# THE LAWYERS REPRESENTING YOU

| **15.  Do I have a lawyer in this case?** |
|---|

Yes. The Court appointed the following law firms as "Class Counsel":

| GRANT & EISENHOFER, P.A.<br>485 Lexington Avenue<br>New York, NY 10017<br>Telephone: 646-722-8500<br>Fax: 646-722-8501 | MILBERG LLP<br>One Penn Plaza<br>New York, NY 10119<br>Telephone: 212-594-5300<br>Fax: 212-868-1229 | COOK, HALL, &<br>LAMPROS, LLP<br>Promenade Two, Suite 3700<br>1230 Peachtree Street, NE<br>Atlanta, GA 30309<br>Telephone: 404-876-8100<br>Fax: 404-876-3477 |
|---|---|---|

You will not be charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

| **16.  How will the lawyers be paid?** |
|---|

Class Counsel will ask the Court for attorneys' fees and expenses of up to $13 million, plus interest, if the Settlement is approved.  If the Court grants Class Counsel's requests, the fees and expenses will be paid separately by Sirius XM.


# OBJECTING TO OR COMMENTING ON THE SETTLEMENT

You can tell the Court that you don't agree with the Settlement or some part of it.

| **17.  How do I tell the Court that I do not like the Settlement with Sirius XM?** |
|---|

If you are a Class Member (and have not excluded yourself), you can object to the Settlement if you do not like any part of it.  You can give reasons why you think the Court should not approve it.  The Court will consider your views.  To object, you must send a letter via First Class U.S. mail stating that you object to the proposed Settlement in *Blessing v. Sirius XM Radio Inc.*, Civil Action No 09-CV-10035 HB.  Be sure to include your name, address, telephone number, your signature, and the reasons you object to the Settlement (and any evidence in support of your objection).  Mail the objection to each of the following:

| CLASS COUNSEL | DEFENSE COUNSEL | COURT CLERK |
|---|---|---|
| James J. Sabella, Esq.<br>GRANT & EISENHOFER,<br>P.A.<br>485 Lexington Avenue<br>New York, NY 10017 | Todd Geremia, Esq.<br>JONES DAY<br>22 East 41 Street<br>New York, NY 10017-6702 | Clerk of the United States<br>District Court for the Southern<br>District of New York<br>500 Pearl Street<br>New York, NY 10007-1312 |

Your objection must be postmarked no later than **Month 00, 2011.**

**18.  What is the difference between objecting and asking to be excluded?**

Objecting is simply telling the Court that you don't like something about the Settlement. You can object only if you don't exclude yourself from the Class.  Excluding yourself is telling the Court that you don't want to be part of the Class.  If you exclude yourself, you have no basis to object because the case no longer affects you.


# THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement with Sirius XM.  You may attend and you may ask to speak, but you do not have to.

**19.  When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Fairness Hearing at **time** on **Month 00, 2011**, in Courtroom 23B at the United States Courthouse for the Southern District of New York, 500 Pearl Street, New York, New York 10007-1312.  At this hearing, the Court will consider whether the Settlement with Sirius XM is fair, reasonable, and adequate.  If there are objections, the Court will consider them and will listen to people who have asked to speak at the hearing.  The Court may also decide how much to pay Class Counsel.  After the hearing, the Court will decide whether to approve the Settlement.  We do not know how long these decisions will take.

**20.  Do I have to attend the hearing?**

No.  Class Counsel (*see* answer to Question 15 above) will answer any questions that the Court may have regarding the terms of the Settlement.  But, you or your own lawyer are welcome to attend at your expense.  If you send an objection, you do not have to come to Court to talk about it.  As long as you mailed your written objection on time, the Court will consider it.  You may also have your own lawyer attend, but it is not necessary.

**21.  May I speak at the hearing?**

You may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter via First Class U.S. mail stating that it is your "Notice of Intention to Appear in *Blessing v. Sirius XM Radio Inc.*, Civil Action No 09-CV-10035 HB."  Be sure to include your name,

address, telephone number, and your signature.   Your Notice of Intention to Appear must be postmarked no later than **Month 00, 2011**, and must be sent to the Clerk of the Court, Class Counsel, and Defense counsel at the addresses set forth in the response to Question 17.   You cannot speak at the hearing if you excluded yourself as a Class Member.

# IF YOU DO NOTHING

| 22.  What happens if I do nothing at all? |
|---|

If you are a member of the Class as defined in the answer to Question 5 above and you do nothing, you will remain in the Class.   You will keep the right to receive the benefits that will come from the proposed Settlement with Sirius XM.   However, unless you exclude yourself, you won't be able to start a lawsuit, or be part of any other lawsuit against Sirius XM about the Class Claims or any claims arising out of, based on, or relating to the merger that formed Sirius XM.

# GETTING MORE INFORMATION

| 23.  How do I get more information? |
|---|

This notice summarizes the proposed Settlement.   If you have any questions concerning the matters contained in this Notice, you can get more information at www.SatelliteRadioSuit.com, by calling toll free at 1-800-000-0000, or by writing to Satellite Radio Class Action, P.O. Box 0000, City, ST 00000.

**PLEASE DO NOT WRITE OR CALL THE COURT OR THE CLERK'S OFFICE FOR INFORMATION ABOUT THIS LAWSUIT**

Dated: May ___, 2011                                      BY ORDER OF THE COURT
                                                                             Honorable Harold Baer, Jr.
                                                                             United States District Judge