UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CARL BLESSING, EDWARD A. SCERBO, JOHN CRONIN, CHARLES BONSIGNORE, BRIAN BALAGUERA, SCOTT BYRD, GLENN DEMOTT, ANDREW DREMAK, MELISSA FAST, JAMES HEWITT, TODD HILL, CURTIS JONES, RONALD WILLIAM KADER, EDWARD LEYBA, GREG LUCAS, JOSHUA NATHAN, JAMES SACCHETTA, DAVID SALYER, SUSIE STANAJ, JANEL and KEVIN STANFIELD, PAUL STASIUKEVICIUS, TODD STAVE, and PAOLA TOMASSINI, on Behalf of Themselves and All Others Similarly Situated,

        Plaintiffs,

    -against-

SIRIUS XM RADIO INC.,

        Defendant.

No. 09-cv-10035 (HB)

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
(Filed Under Seal)

**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Tel.: 646-722-8500
Fax: 646-722-8501

**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
Tel.: 212-594-5300
Fax: 212-868-1229

**COOK, HALL & LAMPROS, LLP**
Promenade Two, Suite 3700
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel.: 404 876-8100
Fax: 404 876-3477

*Interim Class Counsel*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 4

ARGUMENT ........................................................................................................ 6

I.     SXM IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFFS' STATE LAW CONSUMER PROTECTION CLAIMS ..................................... 7

     A.     SXM MADE MISLEADING STATEMENTS TO CONSUMERS AND CONCEALED THE TRUE NATURE OF THE MRF ......................................................... 9

          1.     SXM Deceptively Hid From Subscribers That the MRF Included Backdated "Recoupment" or "Catch Up" Charges .................................... 9

          2.     SXM Attributed the MRF to a Rate Increase Imposed by the Copyright Royalty Board for Payments Due to SoundExchange and Then Deceptively Padded It With ASCAP and BMI Costs, Even Though ASCAP and BMI Rates Had Not Increased ...................... 10

          3.     SXM Deceptively Padded Its MRF With Increased Costs Attributable to Higher Subscriber Volume ................................................ 11

          4.     Reasonable Subscribers Are Deceived by SXM's Misleading Statements and Omissions Relating to the MRF ...................................... 11

     B.     SXM'S MISREPRESENTATIONS AND OMISSIONS WERE MATERIAL ........................ 13

     C.     SXM'S DECEPTIVE CONDUCT CAUSED ECONOMIC INJURY ..................... 17

     D.     SXM'S MOTION IGNORES PLAINTIFFS' ALLEGATIONS OF MATERIAL OMISSIONS ........................................................................................ 19

II.     SXM IS NOT ENTITLED TO SUMMARY JUDGMENT BASED ON ITS FILED RATE DOCTRINE AFFIRMATIVE DEFENSE .................................. 20

     A.     THERE IS NO "FILED RATE" AT ISSUE IN THIS CASE .............................. 20

          1.     The Filed Rate Doctrine Historically Applied Only to Common Carriers ........................................................................................ 21

2.      SXM Does Not Contend That It Is a Common Carrier ...........................21

3.      SXM Admits That the FCC Has No Rate-Making Authority Over
        SXM's Rates ...............................................................................................22

4.      The FCC's Acquiescence in SXM's Voluntary Commitments
        Does Not Create a Special One Time "Filed Rate" ...................................23

5.      SXM Has Engaged in Conduct That Would Be Impermissible
        If the MRF Were Truly a "Filed Rate" .....................................................26

B.      THE FILED RATE DEFENSE DOES NOT APPLY TO PLAINTIFFS' CLAIMS .................27

C.      MULTIPLE ASPECTS OF PLAINTIFFS' CLAIMS ARE UNRELATED TO THE MRF.........28

III.    SXM IS NOT ENTITLED TO SUMMARY JUDGMENT WITH RESPECT
        TO PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF ...........................................29

A.      DIVESTITURE IS THE PRESUMPTIVE REMEDY FOR A MERGER THAT VIOLATES
        THE ANTITRUST LAWS .............................................................................................30

B.      PRIVATE ANTITRUST PLAINTIFFS ARE ENTITLED TO SEEK DIVESTITURE ..............30

C.      PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF IS NOT BARRED BY LACHES .........31

D.      THE QUESTION AS TO WHAT REMEDY IS APPROPRIATE SHOULD NOT BE
        DECIDED IN ADVANCE OF TRIAL.............................................................................34

CONCLUSION...............................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>C</u>ases

*Allen v. Holiday Universal*,
    249 F.R.D. 166 (E.D. Pa. 2008)........................................................................12, 18

*Anderson v. Liberty Lobby, Inc*.,
    477 U.S. 242 (1986).......................................................................................................7

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp*.,
    116 F. Supp. 2d 1159 (C.D. Cal. 2000) ...................................................................29

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig*.,
    No. 02-cv-5575 (SWK), 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2008)..............24

*Argus, Inc. v. Eastman Kodak Co*.,
    552 F. Supp. 589 (S.D.N.Y. 1982), *aff'd*, 801 F.2d 38 (2d Cir. 1986).............................32, 34

*AT&T v. Cent. Office Tel., Inc*.,
    524 U.S. 214 (1998)................................................................................................26, 28

*Binder & Binder PC v. Barnhart*,
    481 F.3d 141 (2d Cir. 2007)........................................................................................7

*Black Radio Network, Inc. v. Nynex Corp.*,
    44 F. Supp. 2d 565 (S.D.N.Y. 1999).......................................................................27, 28

*Broadcom Corp. v. Qualcomm Inc*.,
    501 F.3d 297 (3d Cir. 2007)........................................................................................1

*Brown Shoe Co. Inc. v. United States*,
    370 U.S. 294 (1962)...................................................................................................33

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)......................................................................................... *passim*

*Carey v. Reed Elsevier, Inc.*,
    No. 96-cv-8995, 1998 U.S. Dist. LEXIS 6834 (S.D.N.Y. May 14, 1998) ....................... 24-25

*Chi. Bridge & Iron Co. N.V. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) ...................................................................................35

*Cia. Petrolera Caribe Inc. v. Arco Carribean, Inc.*,
    754 F.2d 404 (1st Cir. 1985)......................................................................................34

*Cirone-Shadow v. Union Nissan of Waukegan*,
   955 F. Supp. 938 (N.D. Ill. 1997) ...................................................................... 15-16, 17, 20

*Commc'ns Network Int'l Ltd. v. MCI WorldCom Commc'ns Inc.*,
   No. 08-cv-7254, 2010 WL 3959601 (S.D.N.Y. Sept. 14, 2010) .............................................24

*Conopco, Inc. v. Campbell Soup Co.*,
   95 F.3d 187 (2d Cir. 1996)................................................................................................32, 34

*Corsello v. Verizon N.Y., Inc.*
   77 A.D.3d 344, 908 N.Y.S.2d 57 (2d Dep't 2010) .................................................................12

*Cullen v. Valley Forge Life Ins. Co.*,
   589 S.E.2d 423 (N.C. Ct. App. 2003) ...............................................................................12, 18

*Dix v. Am. Bankers Life Assurance Co. of Fla.*,
   415 N.W.2d 206 (Mich. 1987) ...............................................................................................18

*Elias v. Ungar's Food Prods., Inc.*,
   252 F.R.D. 233 (D.N.J. 2008) ..........................................................................................14, 18

*In re Evanston Northwestern Healthcare Corp.*,
   No. 9315 (F.T.C. Aug. 6, 2007)...............................................................................................35

*In re Evic Class Action Litig. Farina v. UPS, Inc. King*,
   No. MDL-1339, 2002 WL 1766554 (S.D.N.Y. July 31, 2002) ...............................................24

*In re Facebook PPC Adver. Litig.*,
   No. 09-cv-3042, 2010 WL 3341062 (N.D. Cal. Aug. 25, 2010) .............................................20

*Fax Telecommunicaciones Inc. v. AT&T*,
   138 F.3d 479 (2d Cir. 1998)....................................................................................................23

*Fed. Home Loan Bank Bd. v. Elliott*,
   386 F.2d 42 (9th Cir. 1968) ....................................................................................................29

*Felix v. Mobile Homes For Sale*,
   No. CI-00-2240, 2000 WL 33672907 (Ohio Ct. Com. Pl. Oct. 27, 2000) .......................12, 14

*Ford Motor Co. v. United States*,
   405 U.S. 562 (1972)................................................................................................................30

*FTC v. Verity Int'l, Ltd*,
   443 F.3d 48 (2d Cir. 2006)......................................................................................................24

*Fuchs Sugars & Syrups, Inc. v. Amstar Cor*p.,
   402 F. Supp. 636 (S.D.N.Y. 1975)............................................................................30, 32, 33

*Ginsburg v. InBev NV/SA*,
    623 F.3d 1229 (8th Cir. 2010) ........................................................................29

*Gold v. Deutsche Aktiengesellschaft*,
    365 F.3d 144 (2d Cir. 2004)..........................................................................14

*Gottesman v. General Motors Corp.*,
    414 F.2d 956 (2d Cir. 1969)............................................................................2

*Gutierrez v. Wells Fargo*,
    730 F. Supp. 2d 1080 (N.D. Cal. 2010) .........................................................15

*Hayden Pub. Co. v. Cox Broad. Corp.*,
    730 F.2d 64 (2d Cir. 1984)..............................................................................7

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
    253 F. Supp. 2d 262 (D. Conn. 2003) ...........................................................27

*Julius M. Ames Co. v. Bostitch, Inc.*,
    240 F. Supp. 521 (S.D.N.Y. 1965).........................................................31, 34

*Julius Nasso Concrete Corp. v. DIC Concrete Corp.*,
    467 F. Supp. 1016 (S.D.N.Y. 1979)...............................................................32

*Kraft v. Staten Island Boat Sales, Inc.*
    715 F. Supp. 2d 464 (S.D.N.Y. 2010).............................................................7

*Latman v. Costa Cruise Lines N.V.*,
    758 So.2d 699 (Fla. Dist. Ct. App. 2000) ...................................12, 14, 17, 18

*Lonner v. Simon Property Group, Inc.*,
    57 A.D.3d 100, 866 N.Y.S.2d 239 (2d Dep't 2008) .....................................11

*Louisville & Nashville R.R. v. Maxwell*,
    237 U.S. 94 (1915).........................................................................................21

*Lowden v. Simonds-Shields Lonsdale Grain Co.*,
    306 U.S. 516 (1939).......................................................................................26

*Mack v. United States*,
    814 F.2d 120 (2d Cir. 1987)..........................................................................26

*Marcus v. AT&T Corp.*,
    138 F.3d 46 (2d Cir. 1998)............................................................................24

*McKell v. Washington Mut.*,
    142 Cal. App. 4th 1457 (Cal. Ct. App. 2006) ...................................12, 17, 19

*MD/DC/DE Broadcasters Ass'n v. FCC*,
   253 F.3d 732 (D.C. Cir. 2001) ...................................................................25

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004) ..............................................................29, 32

*Northern Valley Commc'ns, LLC v. AT&T Corp.*,
   659 F. Supp. 2d 1056 (D.S.D. 2009) ........................................................27

*In re Pa. Title Ins. Antitrust Litig.*,
   648 F. Supp. 2d 663 (E.D. Pa. 2009) ..................................................22, 30

*Pappas v. Pella Corp.*,
   363 Ill. App. 3d 795 (Ill. Ct. App. 2006) ................................................19

*PenneCom B.V. v. Merrill Lynch & Co.*,
   372 F.3d 488 (2d Cir. 2004)......................................................................31

*In re Pharm. Indus. Average Wholesale Price Litig.*
   No. 01-cv-12257, 2010 WL 3503986 (D. Mass. Sept. 3, 2010).........................15, 19

*Remington Prods., Inc. v. North Am. Philips Corp.*,
   717 F. Supp. 36 (D. Conn. 1989).............................................................34

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*,
   708 F. Supp. 2d 257 (E.D.N.Y. 2010) .....................................................32

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010) ............................................................20, 23

*Security Servs., Inc. v. Kmart Corp.*,
   511 U.S. 431 (1994).................................................................................22

*South Austin Coalition Cmty. Council v. SBC Commc'ns Inc.*,
   191 F.3d 842 (7th Cir. 1999) ...................................................................28

*State Farm Fire & Cas. Co. v. Super. Ct. of L.A. County*,
   45 Cal. App. 4th 1093 (Cal. Ct. App. 1996) ...........................................20

*Stone v. Williams*,
   873 F.2d 620 (2d Cir. 1989), *vacated*, 891 F.2d 401 (2d Cir. 1989) .......................32

*Stratton v. Am. Med. Sec., Inc.*,
   266 F.R.D. 340 (D. Ariz. 2009) ..........................................................11, 18

*Stutman v. Chemical Bank*,
   95 N.Y.2d 24 (2000) ...........................................................................14, 18

*Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*,
    45 F.3d 58 (2d Cir. 1995) ...................................................................23

*Taffet v. Southern Co.*,
    967 F.2d 1483 (11th Cir. 1992) ..........................................................22

*Telecom Int'l Am., Ltd. v. AT&T Corp.*,
    280 F.3d 175 (2d Cir. 2001)................................................................27

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (Cal. 2009)....................................................15, 18, 19

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994)................................................................31

*Tufts v. Newmar Corp.*,
    53 F. Supp. 2d 1171 (D. Kan. 1999) .............................................. 11-12

*United States v. American Cyanamid Co.*,
    719 F.2d 558 (2d Cir. 1983)................................................................30

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961).......................................................................30, 33

*United States v. Ward Baking Co.*,
    376 U.S. 327 (1964).............................................................................34

*Wegoland Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994) ...................................................................23

*York v. InTrust Bank, N.A.*,
    265 Kan. 271, 962 P.2d 405 (1998) ...................................................11

## STATUTES AND RULES

15 U.S.C. § 18...........................................................................................28

15 U.S.C. § 18a(i)(1)...................................................................................1

15 U.S.C. § 26...........................................................................................29

47 U.S.C. § 203(a) ....................................................................................21

47 U.S.C. § 203(c) ....................................................................................21

Federal Communications Act of 1934 § 203 ......................................21, 22

Fed. R. Civ. P. 8(c)(1)..........................................................................31, 32

Fed. R. Civ. P. 30(b)(6) .............................................................................................10

Fed. R. Civ. P. 56(c) ...................................................................................................7

Fed. R. Civ. P. 56(c)(4) .............................................................................................25

47 CFR § 1.1206 .......................................................................................................25

Kan. Stat. Ann. 50-627(b) ........................................................................................20

N.C. Gen. Stat. § 75-1.1 ...........................................................................................18

**OTHER AUTHORITIES**

2 P. Areeda & D. Turner, *Antitrust Law* § 328b (1978) ............................................31

51 Cong. Rec. 14664 (remarks of Senator Reed) .......................................................33

H. Peter Nesvold, Note, *Communication Breakdown: Developing an Antitrust Model for
    Multimedia Mergers and Acquisitions*, 6 Fordham Intell. Prop. Media & Ent. L.J.
    781 (1996) ..........................................................................................................1

## PRELIMINARY STATEMENT

This case concerns a merger to monopoly by Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Holdings Inc. ("XM") that created Defendant Sirius XM Radio, Inc. ("SXM"). SXM is now the only company in the U.S. offering satellite radio services – with approximately 20 million subscribers and generating over $2 billion in annual revenue. Although prior to the merger, Sirius and XM told regulators that the merger would result in lower prices for consumers,[1] promptly after the merger, SXM raised prices up to 40% which, to date, has cost consumers hundreds of millions of dollars, with more damages accruing every day.

Because the Department of Justice ("DOJ") did not block the merger, SXM claims this case is an impermissible attempt at a "do-over."[2] Congress has decided otherwise. The Hart-Scott-Rodino Antitrust Improvements Act of 1976, which requires pre-merger notification to give the DOJ time to decide whether to try to block a merger, made clear that a decision by the DOJ to terminate an investigation has no preclusive effect on subsequent antitrust actions:

> Any action taken by the Federal Trade Commission or the Assistant Attorney General or any failure of the Federal Trade Commission or the Assistant Attorney General to take any action under this section *shall not bar any proceeding or any action with respect to such acquisition at any time* under any other section of this Act or any other provision of law.

15 U.S.C. § 18a(i)(1) (emphasis added). Thus, a decision by the DOJ to not stop a merger "does not preclude [subsequent] independent judicial review." *Broadcom Corp. v. Qualcomm Inc*., 501 F.3d 297, 321 n.12 (3d Cir. 2007).[3] Indeed, it is a complete misnomer to refer, as SXM does, to

---

[1] *See* Plaintiffs' Statement of Additional Facts in Opposition to Defendant's Motion for Summary Judgment ("Pl. 56.1") ¶ 4.

[2] Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment ("SXM Br.") at 1.

[3] *See also* H. Peter Nesvold, Note, *Communication Breakdown: Developing an Antitrust Model for Multimedia Mergers and Acquisitions*, 6 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 781, 802 (1996) ("private plaintiffs may still attack a merger, even if the government has approved or settled the disputed transaction"). As the Second Circuit has noted, far from being disfavored, "Congress has expressed its belief that private antitrust litigation is one

*(Cont'd)*

DOJ "approval" of a merger.[4]  The DOJ merely terminated its investigation of Sirius and XM, largely because it believed that SXM could not "profitably sustain an increased price to satellite radio customers"[5] – a prediction that turned out to be woefully inaccurate.

Now SXM makes the baseless argument that the alleged setting of rates by the Federal Communications Commission ("FCC") implicates the filed rate doctrine and bars Plaintiffs' claims for damages resulting from one (among many) of SXM's post-merger price increases, the U.S. Music Royalty Fee ("MRF").  Yet less than three weeks ago, SXM argued to the FCC that the FCC "has no direct or ancillary authority to regulate satellite radio rates."[6]  Therefore, as a matter of law, the filed rate doctrine is inapplicable.  SXM's attempt to clothe its "voluntary commitment" to cap rates with filed rate doctrine immunity is thus belied by its own admissions. Further undermining SXM's position is that SXM has unilaterally granted certain customers relief from the MRF – a practice wholly inconsistent with the concept of a "filed rate."  And lastly, Plaintiffs' claim does not challenge the FCC Order but is that the MRF is inconsistent with SXM's representations to its customers as to what the MRF is, and that SXM has set its MRF at a level far in excess of what it would have been had competition not been eliminated by the merger.  As SXM knows, the FCC never passed on the accuracy of SXM's disclosures to its customers or on what MRF, if any, would have been charged in a competitive environment.

The filed rate doctrine also cannot bar Plaintiffs' claims for antitrust damages arising from SXM's additional post-merger price hikes – on multi-radio and online listening subscriptions – that are not even mentioned, let alone approved, anywhere in the FCC order.

_____

of the surest weapons for effective enforcement of the antitrust laws." *Gottesman v. General Motors Corp.*, 414 F.2d 956, 961 (2d Cir. 1969) (internal quotations omitted).

[4] *See, e.g.*, SXM Br. at 1, 2.

[5] Pl. 56.1 ¶ 2.

[6] Pl. 56.1 ¶ 88; Declaration of James J. Sabella ("Sabella Decl.") Ex. 12 at 6 n.13.

SXM claims erroneously that the filed rate doctrine would also dispose of these claims because Plaintiffs' multi-radio and online-listening damage claims allegedly depend "on the claimed anticompetitive effect of the MRF."[7]  That is not so.  Plaintiffs' multi-radio and online listening damage claims are clearly independent of, and in addition to, Plaintiffs' MRF damage claims. And Plaintiffs' expert, Dr. James Langenfeld, has demonstrated, on a class-wide basis, the significant overcharge damages that class members have incurred as a result of the anticompetitive multi-radio and online listening price increases.[8]

SXM's defenses to Plaintiffs' state law consumer protection claims arising out of its deceptive MRF are similarly flawed.  SXM's primary argument is that it has made no misleading representations.  Yet, SXM's internal documents demonstrate that it "baited" subscribers to pay the new MRF based upon royalty rate increases imposed by the Copyright Royalty Board ("CRB"), and then "switched" to a grossly inflated charge that was constructed in a manner decidedly different than what SXM systematically describes in writing to its customers.  Among other excesses, the fee SXM actually charged as the MRF was padded with: 1) retroactive costs from past periods (even while SXM described its charge as a "pass through" of its costs); and 2) purported "increases in fees" for royalty collection organizations like ASCAP and BMI, who imposed no such rate increases.  In the process, SXM netted hundreds of millions of dollars in revenue – the difference between the MRF *as described* to customers and the MRF *as implemented*.  SXM's attempt to minimize the significance of this continuing revenue stream as "trivial" is directly contrary to its internal documents and public statements to investors and analysts which lauded the MRF's contribution to SXM's cash flow and bottom line.

---

[7] SXM Br. at 3, 26.
[8] *See* Declaration of Dr. James Langenfeld, Ex. 1 ¶¶ 103-20.

Finally, SXM's contention that Plaintiffs cannot seek post-merger injunctive relief is directly contrary to controlling Supreme Court and Second Circuit authority, which makes plain that post-merger divestiture of assets obtained in a merger, so as to restore competition, is the presumptively proper remedy in a Clayton Act case such as this.

**STATEMENT OF FACTS**

Before the merger, Sirius and XM competed vigorously against each other.  Pl. 56.1 ¶ 5. With the merger's elimination of competition, SXM wasted no time before abusing the monopoly power it now possessed by raising prices in myriad ways, including: (a) raising the monthly charge per additional radio by nearly 30%, from $6.99 per month to $8.99 per month; (b) charging $2.99 per month for internet streaming when internet access to programming was previously part of the basic subscription price; and (c) charging the MRF for purported increases in royalty costs, whereas before the merger, Sirius and XM did not pass on any such expenses to subscribers other than those imbedded in the standard monthly fee.  These rate increases amount to as much as a 40% increase – resulting in hundreds of millions of dollars in revenue to SXM.[9]

These rate increases have been imposed while SXM is constrained (until July 28, 2011) from increasing its base price, due to voluntary commitments made to the FCC in order to persuade the FCC not to block the merger.  Pl. 56.1 ¶¶ 7-8.  Once that limitation is removed, however, SXM will be free to increase its base subscription price, which, discovery shows, it intends to do.  *Id*. ¶¶ 10, 59.

As SXM's motion focuses on the MRF, it is appropriate to provide context.  In July 2009, SXM began charging the MRF of $1.98 – approximately 15% of the $12.95 basic subscription price.  *Id*. ¶¶ 12, 21.  SXM told subscribers that this fee was instituted to pass through ***increased***

---

[9] Langenfeld Decl. Ex. 1 ¶¶ 121-22.

4

costs resulting from a ***rate increase*** established by the CRB, which determines the rates SXM must pay to the Recording Industry Association of America ("RIAA") (via its SoundExchange affiliate) for royalties for sound recordings. *Id*. ¶¶ 94, 118.  SXM did not disclose that:

- At or around the time of the merger in July 2008, Sirius and XM (and then SXM) were planning to impose a so-called "CRB royalty fee" in the range of only $0.50. *Id*. ¶¶ 41-46.  By June 2009, that fee's name had changed and the amount of the "fee," $1.98, had roughly quadrupled. *Id*. ¶¶ 47-70, 120.

- The MRF boosted SXM's average revenue per user ("ARPU") and enhanced SXM's profits.  Internally, SXM considered the MRF as one of its successful "pricing initiatives," along with the increase in the multi-radio price from $6.99 to $8.99 per month, and the new $2.99 fee on internet access (which previously had been free).  The MRF therefore functioned as a disguised price increase at a time when SXM was prohibited from increasing the base price of $12.95, bringing in more than $230 million in additional revenue in 2010. *Id*. ¶¶ 32-36.

- SXM set the MRF at a level four times the actual incremental cost of the RIAA royalties so it could charge current subscribers for costs unrelated to their own current subscriptions.

    o SXM charges subscribers for royalties incurred and paid in prior periods (referred to internally as the "catch-up" or "recovery" component). *Id*. ¶¶ 14-21, 46-54.

    o Although SXM communicated to subscribers that the MRF represented only the ***incremental cost*** for RIAA royalties, SXM has charged enough to cover ***100%*** of the royalties for each subscriber added since March 2007.  SXM refers at various times to these additional fees as the "volume component," part of which includes royalties paid to ASCAP and BMI (which collect music publishing royalties on behalf of songwriters and publishers). *Id*. ¶¶ 22-25, 59-67.  The subscriber notification, however, mentions only RIAA royalties. *Id*. ¶¶ 94, 118.  Moreover, the ASCAP and BMI royalty rates have not increased since Sirius and XM first launched their service (so there truly is ***no incremental cost*** for royalties paid to these two entities) and the cost of these royalties had already been accounted for in the $12.95 base price. *Id*. ¶ 18.

    o Subscribers who have paid the MRF also bear the incremental royalty costs for other subscribers who are not charged the MRF, such as lifetime subscribers whose subscription fees nonetheless generate royalties, and other subscribers who have purchased new cars and are receiving free service for a trial period while the car manufacturers ("OEMs") pay the subscription fee to SXM.  SXM earns revenue from these OEMs, on which it must pay royalties but neither these subscribers nor the OEMs pay the MRF. *Id*. ¶¶ 102, 136-37.

Aware that full disclosure of how SXM has calculated, collected and used the MRF would be unacceptable, SXM consciously chose to conceal this information from its subscribers (and the public in general). *Id.* ¶¶ 94-137.  In April 2009, Brian Wood of SXM explained to several SXM employees that they had moved away from calling the MRF a "[p]ass-through as it implies a direct relationship between our costs and the charge." *Id.* ¶ 108.  Nonetheless, SXM uses the term "pass through" (or pass along) repeatedly when explaining the MRF to subscribers. *Id.* ¶¶ 101, 104, 108.  Similarly, Wood rejected a draft positioning statement suggesting language that would explain how the fee consisted of two components, with one portion "attributable to passing through the cost of the increased music royalties incurred in ***prior periods***…." *Id.* ¶¶ 110-11 (emphasis added).  Wood's rationale was that SXM did not want to "get into the recoupment part of this versus the current charges." *Id.* ¶ 112.  SXM realized that correct disclosure of its policy would make it apparent that "[n]ew customers [would be] paying royalties for past customers." *Id.* ¶ 113.

Prior to implementing the fee, SXM had planned to charge the catch-up portion of the MRF for only the first year. *Id.* ¶ 114.  SXM's CFO David Frear suggested informing subscribers that the new fee would decrease after a year.  He argued that SXM "should tell customers when [SXM] expect[s] this to go away.  Even though it may seem like a long way out and may not get [them] anything, [Frear didn't] believe it will hurt [SXM] to tell the truth...." *Id.*  Wood successfully counseled against such a plan, recognizing that doing so could "raise more questions than it answers." *Id.*

## ARGUMENT

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The burden is on the

moving party to show entitlement to summary judgment.  *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 256 (1986).  The Court "'is not to weigh the evidence but is instead required to view

the evidence in the light most favorable to the party opposing summary judgment, to draw all

reasonable inferences in favor of that party, and to eschew credibility assessments.'"  *Kraft v.*

*Staten Island Boat Sales, Inc*.  715 F. Supp. 2d 464, 472 (S.D.N.Y. 2010) (quoting *Amnesty Am.*

*v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004)).  "[I]f there is any evidence in the

record from any source from which a reasonable inference in the [nonmoving party's] favor may

be drawn, the moving party simply cannot obtain a summary judgment."  *Binder & Binder PC v.*

*Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotations omitted).  And as the Second

Circuit noted in *Hayden Pub. Co. v. Cox Broad. Corp*., 730 F.2d 64, 67 (2d Cir. 1984),

"summary [judgment] procedures should be used sparingly in complex antitrust litigation"

(internal quotations omitted) (alteration in original) (reversing grant of summary judgment).

      Under the foregoing principles, SXM's motion should be denied.

**I.**      **SXM IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFFS'**
         **STATE LAW CONSUMER PROTECTION CLAIMS**

      SXM portrays Plaintiffs' argument that the MRF was supposed to capture increases in

*royalty rates* as "an invention of plaintiff's attorneys."  SXM Br. at 15-16.  Nonsense.  Plaintiffs'

characterization is based upon SXM's written communications to subscribers that purported to

explain the MRF to induce those subscribers to pay the higher fees.  SXM wrote:

> …we have an important update regarding your Sirius subscription.
>
> Music royalty rights were established by the U.S. Congress as part of the
> Copyright Act.  This Act requires payment of copyright music royalties to
> recording artists musicians and recording companies who hold copyrights in
> sound recordings.
>
> ***These royalties have recently increased dramatically, principally as a result of a***
> ***decision made by the Copyright Royalty Board which is designated by the***
> ***Library of Congress to set royalty rates.***  Beginning on July 29, 2009, a U.S.
> Royalty Fee of $1.98/month for primary subscriptions and $0.97/month for multi-

receiver subscriptions will be effective upon your next renewal.  This fee will be used directly to offset increased payments from Sirius XM to the recording industry.

***Unfortunately, we can not control the Copyright Royalty Board's rate increase....***

Pl. 56.1 ¶ 94; Sabella Decl. Ex. 110 (emphasis added).[10]

In short, SXM told subscribers that it would begin charging the MRF because of a CRB royalty ***rate increase*** that SXM was simply passing on.[11]  Having been caught in a flat out material misrepresentation to its subscribers, SXM moves for summary judgment based upon its own revisionist invention of how the MRF was represented to consumers and implemented.

Discovery in this litigation demonstrates that SXM:

- deliberately hid from current subscribers the fact that the MRF included backdated "recoupment" or "catch up" costs while falsely, and publicly, stating in written communications that the SXM had been "absorbing" these past costs and merely passing through its increased rates (Pl. 56.1 ¶¶ 110-16);

- blamed the CRB royalty ***rate increase*** for Sound Exchange as the reason for the MRF (*id*. ¶¶ 94, 117-19), while also deceptively including additional ASCAP and BMI costs ***even though neither of those organizations had increased their rates*** (*id*. ¶¶ 25, 63-67); and

- padded its MRF with disallowable and undisclosed items, such as volume based costs and "bad debt," that had nothing to do with the rate increases supposedly underlying the MRF (*id*. ¶¶ 22-25, 59-64).

Plaintiffs' state law consumer protection claims are based on SXM's misleading statements and deceptive omissions, which misled subscribers into paying a higher Music Royalty Fee than was warranted.  Compl. ¶¶ 308-440.  SXM challenges Plaintiffs' consumer

---

[10] SXM training documents also required customer service representatives to explain that the MRF was necessary because the "copyright royalty board which sets the rates Sirius XM must pay the music industry has increased the rates dramatically."  Sabella Decl. Ex. 148 (SXM00304255-7.)

[11] Not all customers received the misleading CRB "rate increase" correspondence.  SXM alternatively notified its subscribers about the MRF rate increase with an email notification specifically designed so that the rate increase would go unnoticed.  Pl. 56.1 ¶¶ 95-100.  Aptly titled the "whisper notice" in SXM's internal documents (because the "MRF notification is at the whisper end of the awareness spectrum," SXM intentionally designed an email notice that "buries the MRF message."  *Id*. ¶ 96.

protection claims based upon three factual contentions: 1) that its statements to consumers were

not misleading; 2) that even if misleading, its statements were not material; and 3) even if

material, its misrepresentations did not cause injury.

Plaintiffs respectfully submit that, at the very least, there are genuine issues of material

fact with respect to each of SXM's contentions, thus rendering summary judgment inappropriate.

### A. SXM MADE MISLEADING STATEMENTS TO CONSUMERS AND CONCEALED THE TRUE NATURE OF THE MRF

#### 1. SXM Deceptively Hid From Subscribers That the MRF Included Backdated "Recoupment" or "Catch Up" Charges

Throughout its written communications to subscribers, SXM falsely portrayed the MRF

as a pass-through of *current* costs while deliberately concealing that the MRF also included a

charge for past costs.  Pl. 56.1 ¶¶ 101-16.  Notably, SXM originally planned to truthfully disclose

to subscribers that the MRF "consists of two components" with separate portions attributable to:

1) "*ongoing* collection of increased royalties" and 2) "increased music royalties incurred *in prior

period.*."  *Id*. ¶ 111 (emphasis added).  Yet, in its final characterization of the fee, SXM

jettisoned any references to this second "catch up" component of the fee for prior periods (*id.*

¶¶ 94, 101-02, 115-16) and, indeed, even abandoned informing customers that the fee may be

reduced when the "catch up" had been completed for fear of revealing this component of the fee

to  subscribers (*id*. ¶ 114).  In an email to SXM CFO David Frear, Brian Wood stated:

> The projection that the rate will go down opens the door on why and leads to a
> discussion of nature of the current charge (a portion is due to past periods).

*Id*. ¶ 114; Sabella Decl. Ex. 149 (SXM01867125).  In another email, Wood cautioned:  "I don't

think we want to get into the recoupment part of this versus the current charges."  Pl. 56.1 ¶ 112.

SXM also deceptively represented to subscribers that it was "absorbing" costs from past

periods when it was actually including such costs in its MRF.  SXM training manuals instructed

its customer service representatives to tell customers who called customer service that "[i]f you renew and extend your current subscription before July 29, 2009 *we will continue to absorb these increased royalty costs* until your next renewal date." *Id.* ¶ 115; Sabella Decl. Ex. 148 (SXM 00304255) (emphasis added).  SXM was doing nothing of the sort.  Rather than "absorbing" the costs, it was including them in the MRF that it was forcing subscribers to pay.

**2.**      **SXM Attributed the MRF to a Rate Increase Imposed by the Copyright Royalty Board for Payments Due to SoundExchange and Then Deceptively Padded It With ASCAP and BMI Costs, Even Though ASCAP and BMI Rates Had Not Increased**

As Plaintiffs have pled, "the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007."  Compl. ¶ 155.  One significant example of the way in which the MRF exceeded royalty cost increases relates to SXM's treatment of costs that it paid to two royalty collection organizations, ASCAP and BMI.

SXM made no mention of BMI and ASCAP in its initial disclosure of the MRF to its subscribers.  Pl. 56.1 ¶ 94.  Instead, in correspondence sent to all subscribers that described the MRF's introduction, SXM emphasized the role of the U.S. Copyright Board in increasing the *royalty rates* payable to Sound Exchange and deceptively omitted any reference to ASCAP and BMI costs.  *Id.*.  SXM's website, however, replaced this deceptive omission with something even more misleading:

> Sirius and XM must also pay music publishers who hold copyrights in musical compositions … through their collective organizations, ASCAP, BMI and SESAC.  *These fees have also risen since March 2007*.

Sabella Decl. Ex. 88 (SXM 02045513), at 18 (emphasis added).  However, *there was no ASCAP or BMI rate increase*, *which is the only reason those costs should have been included in the MRF at all.*  SXM's witness designated under Fed. R. Civ. P. 30(b)(6) to testify regarding the MRF stated that she was not aware of any ASCAP or BMI rate increase.  Pl. 56.1 ¶ 64; Sabella

Decl. Ex. 137 (Witz Dep.) at 42-43.  Contracts with BMI and ASCAP similarly confirm that

their rates have not changed.  Pl. 56.1 ¶ 18.  The royalty rate charged by ASCAP and BMI today

is the same rate that they charged prior to their merger.  *Id*. ¶¶ 18, 64.

### 3. SXM Deceptively Padded Its MRF With Increased Costs Attributable to Higher Subscriber Volume

SXM also deceived subscribers by padding the MRF with other costs that were not

attributable to the rate increases mentioned in SXM's correspondence to subscribers and on its

website.[12]  SXM communicated to subscribers that the MRF represented only the ***incremental***

***cost*** for RIAA royalties, but SXM has charged enough to cover ***100%*** of the royalties for each

subscriber added since March 2007.  Pl. 56.1 ¶¶ 22-25, 59-67.  Although the increase in royalties

attributable to subscriber growth did not impact SXM's cost per subscriber or its profitability,

SXM nonetheless added to the catch-up pool 100% of royalties paid to RIAA, ASCAP, and BMI

for the millions of subscribers added since March 2007.  Padding the catch-up pool with volume-

based royalty increases inflated the initial catch-up pool by approximately $90 million.  *Id*.

¶¶ 145-48; Imburgia Decl. Ex. 1 at 43 & Ex. E.  SXM deceptively omitted that these costs were

hidden in its calculation of the MRF charged to subscribers.

### 4. Reasonable Subscribers Are Deceived by SXM's Misleading Statements and Omissions Relating to the MRF

The test for determining if an act or practice is deceptive is "an objective [one], which

asks whether the representation or omission (was) likely to mislead a reasonable consumer acting

reasonably under the circumstances."  *Lonner v. Simon Property Group, Inc.*, 57 A.D.3d 100,

110, 866 N.Y.S.2d 239, 247 (2d Dep't 2008) (internal quotations and citations omitted).[13]

---

[12] Additionally, forensic accountant Basil Imburgia's expert report notes that SXM included a hidden adjustment for bad debt which "is unsupported and should be disregarded."  Declaration of Basil Imburgia, Ex. 1 at 39-40.

[13] *See also, e.g.*, *Stratton v. Am. Med. Sec., Inc*., 266 F.R.D. 340, 348 (D. Ariz. 2009); *Tufts v. Newmar Corp*., 53 F.
*(Cont'd)*

Discovery reveals that SXM self-servingly portrayed the MRF as being caused by the CRB's rate increase, and then deceptively padded the charge with a variety of additional costs that had nothing to do with the CRB increase.  This mischaracterization was intentional.  In an internal "MRF Position Statement," SXM stated:  "Deflecting the [MRF] to the CRB allows Sirius XM to avoid the consumers saying that prices are being increased to the thought that the CRB is enforcing a fee that Sirius XM is collecting and passing along."  Pl. 56.1 ¶ 117.  When a merchant describes a charge as pass-through of its "costs," "customers would not reasonably understand that they were being charged a sum 'considerably in excess of defendants' actual … costs.'"  *McKell v. Washington Mut.*, 142 Cal. App. 4th 1457, 1472 (Cal. Ct. App. 2006); *Latman v. Costa Cruise Lines N.V.*, 758 So.2d 699, 703 (Fla. Dist. Ct. App. 2000) (the term "port charges" "necessarily constitutes a representation to a reasonable consumer that these are 'pass-through' charges which the cruise line will pay to the relevant port authorities (and possibly others)."[14]

Here, it is clear that Plaintiffs find SXM's statements misleading:

- By calling the MRF a "U.S. Music Royalty Fee," SXM misled me into believing that the fee was "a government-related fee and … not subject to discussion."  Pl. 56.1 ¶ 128; Stasiukevicius Decl. ¶ 5; *see also* Jones Decl. ¶ 6 (I "relied" on "the website [which] made me believe that the U.S. Music Royalty Fee was similar to a government tax that Sirius XM had to pay relating to my subscription and that was being passed through to me.").

---

Supp. 2d 1171 (D. Kan. 1999); *York v. InTrust Bank, N.A.*, 265 Kan. 271, 962 P.2d 405 (1998); *Cullen v. Valley Forge Life Ins. Co.*, 589 S.E.2d 423 (N.C. Ct. App. 2003); *Corsello v. Verizon N.Y., Inc.* 77 A.D.3d 344, 365, 908 N.Y.S.2d 57, 75 (2d Dep't 2010) (deceptive conduct, "whether misrepresentations or omissions, are governed by an objective standard:  whether they were likely to mislead a reasonable consumer acting reasonably under the circumstances"); *Allen v. Holiday Universal*, 249 F.R.D. 166, 193 (E.D. Pa. 2008).

[14] *See also Felix v. Mobile Homes For Sale*, No. CI-00-2240, 2000 WL 33672907, at *2, 4 (Ohio Ct. Com. Pl. Oct. 27, 2000) (misrepresenting the amount of a pass-through "conveyance fee to be charged plaintiffs by the county in connection with the purchase of ... [a] home as totaling $93.00, when the actual amount of that fee was only $31.00" constitutes a knowing "unfair, deceptive, and/or unconscionable sales practices).

- SXM's FAQs call the MRF a "pass through [and] … *a pass through in my opinion is a dollar-for-dollar exchange*." Sabella Decl. Ex. 136 (Sacchetta Dep.) 92 (emphasis added); *see also* Pl. 56.1 ¶ 129.

- "[The] communications lead me to believe that SXM has paid certain rate increases to these various royalty groups and that they were simply "passing through" these specific costs to subscribers. In other words, if SXM had an increase in their royalty rates of 5%, they were passing through that 5% rate increase to me." Stanaj Decl. ¶ 3.[15]

At the very least, genuine issues of material fact exist as to whether SXM's representations and omissions to Plaintiffs and other reasonable subscribers were misleading.[16]

**B.    SXM'S MISREPRESENTATIONS AND OMISSIONS WERE MATERIAL**

Since there is little doubt that SXM misstated the fee charged to its subscribers, SXM seeks an absurd standard by which to evaluate materiality. SXM argues that the MRF:

> could be material only if an ordinary consumer would somehow be so psychologically displeased with Sirius XM's actual use of the $1.98/$.97 fee or the company's website description of the MRF that he or she might otherwise have refused to purchase satellite radio or canceled his or her subscription.

SXM Br. at 22. This is not the law. It is ironic that a monopolist comforts its customers with the hollow observation that they can always cancel their subscriptions and purchase the service elsewhere – knowing full well that there is nowhere else for the subscribers to go.[17]

Subscribers need not cancel subscriptions (or not subscribe in the first place) in order to

---

[15] *See also* Stasiukevicius Decl. ¶ 12; Byrd Decl. ¶ 7; Hewitt Decl. ¶ 9; Cronin Decl. ¶ 3; Hill Decl. ¶ 3; Blessing Decl. ¶ 11; Jones Decl. ¶ 16; Scerbo Decl. ¶ 4; Pl. 56.1 ¶¶ 125-34.

[16] Plaintiffs' forensic accounting expert Basil Imburgia testified that a pass through is inconsistent with the recoupment of past costs and huge profits generated by the MRF: "From an accounting standpoint, a pass through reflects a current charge for an expense that you're paying on behalf of a customer, and then a current charge back to that customer. So pass-through is not only something that doesn't have profit, but it's something that's occurring currently." Sabella Decl. Ex. 133 (Imburgia Dep.) at 193.

[17] *See, e.g.*, Hewitt Decl. ¶ 2 ("I did not [cancel] because … after the merger between Sirius and XM, there were really no other options"); Stasiukevicius Decl. ¶¶ 2, 26 ("I did not cancel because … "[t]he type of service I get from SXM is not available from anyone else since Sirius and XM merged in 2008."); Stanaj Decl. ¶¶ 2, 16 ("I did not cancel because … I like the advertising free music and some of the programs that aren't available on normal radio or elsewhere, like Howard Stern."); Scerbo Decl. ¶¶ 2, 18 ("I did not cancel because … [SXM's] stations are available wherever I travel, something that is not available through terrestrial radio."); Sabella Decl. Ex. 129 (Bonsignore Dep.) 19-20; Pl. 56.1 ¶ 125.

establish that SXM's misrepresentations and deceptive omissions were material.  *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 30 (2000) ("Plaintiffs need not additionally allege that they would not otherwise have entered into the transaction."); *see also Latman*, 758 So.2d at 703; *Felix*, 2000 WL 33672907; *Elias v. Ungar's Food Prods., Inc.*, 252 F.R.D. 233, 239 (D.N.J. 2008).

Indeed, SXM conveniently neglects to inform the Court that, by the time the MRF had been imposed, SXM had also imposed an "early cancellation fee" of $75.  Compl. ¶¶ 100-01.  Asking subscribers to incur a $75 fee in order to save a monthly fee increase of $2 would be a hefty price to pay in order to meet SXM's made-up lofty materiality standard.

The materiality analysis in this case differs from some consumer fraud cases because this case does not involve misrepresentations made by a merchant in order to induce a consumer to purchase their product.  Rather, it involves misrepresentations by a monopolist to subscribers about why they should pay more for the service than they had already been paying.

SXM's subscribers did not magically decide one day to pay more for SXM's services than they had paid the day before.  Rather, SXM ***induced*** them to pay more through correspondence, billing statements and electronic communications sent to its customers explaining that "[t]hese royalties have recently increased dramatically, principally as a result of a decision made by the Copyright Royalty Board which is designated by the Library of Congress to set royalty rates."  Pl. 56.1 ¶ 94.  "Unfortunately," SXM stated in its correspondence, "we can not control the Copyright Royalty Board's rate increase"  *Id*.  Similar statements were made on the SXM website, which was specifically referenced in each subscriber's contract with SXM.[18]

---

[18] Pl. 56.1 ¶ 101.  SXM's argument that a subscriber must have individually read the reference to the MRF in the billing statement or customer agreement and then followed the link to the SXM website (SXM Br. at 19) is mistaken.  The website "frequently asked questions" are cross-referenced in the subscriber contract itself.  See Compl. Ex. A, Section F.8, U.S. Music Royalty Fee.  Thus, as a matter of contract law, subscribers are "conclusively presumed to know" these contents.  *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004); *see also*
(*Cont'd*)

A reasonable subscriber's "election" to pay the MRF was based upon SXM's explanation for its cost increases and the accuracy of the bills that SXM generates.

SXM's inducement had its desired effect as subscribers paid the requested higher price. "Price is, of course, important, to a transaction." *In re Pharm. Indus. Average Wholesale Price Litig.* ("*AWP*"), No. 01-cv-12257, 2010 WL 3503986, at *12 (D. Mass. Sept. 3, 2010) (holding that, with regard to consumer protection claims under Arizona, Florida, Kansa, Maryland, Michigan, New Jersey, New York, Pennsylvania, Washington, "as a matter of law, a jury would be instructed that [the defendant] made material misrepresentations as they affected" the price consumers paid). SXM concedes that price is material, stating that "[r]easonable consumers care about what they are charged" (SXM Br. at 3), and the cases it relies upon further support this position. *Id.* at 20 n.8 (collecting cases holding that material must be more than "mere opinion or puffery").

Even under California and Illinois law, the primary law upon which SXM relies for its discussion of materiality, SXM is not entitled to summary judgment. Under the ***objective, reasonable person*** standard there is genuine issue of material fact as to whether customers would have done something differently. "***[M]ateriality is generally a question of fact*** unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (Cal. 2009) (emphasis added) (internal quotations and citations omitted). "The standard for materiality … is an objective standard," i.e., whether a "reasonable person could be expected to rely…. ***The conduct of the individual plaintiff is not pertinent***." *Cirone-Shadow v. Union*

_____

*Gutierrez v. Wells Fargo*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010) (finding a violation of California unfair competition law where plaintiff did not recall receiving a copy of the Consumer Account Agreement, but that the agreement "was customarily provided to all Wells Fargo customers when they opened a new account").

*Nissan of Waukegan*, 955 F. Supp. 938, 944 (N.D. Ill. 1997) (emphasis added).

In *Cirone-Shadow*, the court denied defendant's motion for summary judgment, holding there was a material question of fact as to whether consumers would have done something different had the car dealer disclosed that the extended warranty fee it charged was not truly a pass through charge. *Id.* at 944. The court did not require consumers to show that they would not have bought the car had they known the information. The plaintiffs argued that the car dealer deprived consumers of their ability to negotiate over the warranty fee by putting it in the same category as taxes and other fixed, direct-cost fees. *Id.* The court held that, "[u]nder th[e] objective standard, we cannot say that there is not a genuine question of material fact as to the materiality of the misrepresentations." *Id.*

Likewise, the evidence here is clear that price is "important" to reasonable consumers and that they "would have done something differently" or "been influenced by" the information that SXM deceptively concealed:

- "price … is extremely important to me …. [SXM's] promise[] not to increase prices for several years … was important to me." Hewitt Decl. ¶¶ 3-4; *see also* Nathan Decl. ¶ 2; Jones Decl. ¶¶ 8-9; Pl. 56.1 ¶ 126.
- "If I had known the truth about the Music Royalty Fee, I would have called SXM, threatened to cancel my subscription, and asked to have the Music Royalty Fee reduced." Stanaj Decl. ¶ 12; *see also* Byrd Decl. ¶ 18; Stanaj Decl. ¶ 13; Stasiukevicius Decl. ¶ 24; Hill Decl. ¶ 12; Cronin Decl. ¶ 12; Hewitt Decl. ¶ 16; Scerbo Decl. ¶ 13; Pl. 56.1 ¶ 131.
- "Once I learned that SXM was overcharging me, I contacted my attorney and decided to be a plaintiff in this lawsuit." Byrd Decl. ¶ 20; *see also* Hewitt Decl. ¶ 18; Stanaj Decl. ¶ 16; Stasiukevicius Decl. ¶ 26; Cronin Decl. ¶ 14; Hill Decl. ¶ 14; Scerbo Decl. ¶ 18; Nathan Decl ¶ 5; Pl. 56.1 ¶ 133.

SXM cannot provide any evidence to the contrary. SXM merely points out that some subscribers did not cancel their subscriptions to the monopolist provider. That is irrelevant. When the named Plaintiffs learned of SXM's deception, what they did was more aggressive than cancelling their subscriptions: they filed this lawsuit seeking return of their money and a

16

reduction of SXM's unlawful price increase.  That Plaintiffs view satellite radio as without

substitute and have no alternatives to SXM cannot bar them from recovering the overcharges.

## C.   <u>SXM's Deceptive Conduct Caused Economic Injury</u>

Plaintiffs' expert, forensic accountant Imburgia, estimates that SXM's deceptive conduct

has cost SXM subscribers between $164 and $466 million in overcharges.  *See* Imburgia Decl.

Ex. 1 at 46.  This is hardly the "trivial or merely speculative harm[]" portrayed by SXM in its

motion.  SXM Br. at 22-23.

SXM makes two arguments in support of its contention that Plaintiffs cannot establish

causation or injury.  First, SXM contends that, even if customers were misled about the nature of

the MRF, it did not cause any injury because "plaintiffs, were accurately informed of the specific

amount of the MRF [$1.98], agreed to this amount, and were not charged more than this

amount."  *Id.* at 23.  Courts explicitly reject this argument.  *E.g.*, *McKell*, 142 Cal. App. 4th at

1472 ("That the statement … lists the charge imposed does not preclude a finding it is

deceptive."); *Latman*, 758 So.2d at 703 (misrepresenting a fee as a "pass through" is a unfair and

deceptive trade practice regardless of whether consumers are willing to pay the prices charged);

*Cirone-Shadow*, 955 F. Supp. at 944.

> As the *Latman* court stated in rejecting the exact argument SXM makes here:
>
> We conclude that [defendant] read[s] FDUTPA too narrowly and would illustrate
> with the following example.  Suppose that a company systematically overcharges
> its customers on sales tax.  The hypothetical company pays the state the sales tax
> that it owes, then keeps the overcharge for itself.  We would not hesitate to say
> that an intentional overcharge of sales tax, which is kept by the company itself, is
> an unfair and deceptive trade practice and that the consumer must be repaid.  That
> is so even though the consumers clearly were willing to pay the price charged – in
> the hypothetical example, they actually paid the sales tax overcharges – nor would
> it make a difference that the consumers paid no attention to the sales tax amount.

*Latman*, 758 So.2d at 703.

Second, SXM cherry picks the law to assert that Plaintiffs are required to show that "but for any claimed misrepresentation, they would not have subscribed, or continued to subscribe, to Sirius XM's satellite radio service."  SXM Br. at 25.  But this is not the standard in the overwhelming majority of states at issue.  *E.g.*, *Stutman*, 95 N.Y.2d at 30 ("Plaintiffs need not additionally allege that they would not otherwise have entered into the transaction."); *Latman*, 758 So.2d at 702-03 (plaintiffs need not show that they were "influenced in some way by the port charges," when purchasing cruise ship tickets, "nor would it make a difference that the consumers paid no attention to the … amount").[19]

Instead, Plaintiffs need only establish that the defendant's material deception caused them to pay more money than they would otherwise have paid.  *Stutman*, 95 N.Y.2d at 30; *see also*, *e.g.*, *Allen*, 249 F.R.D. at 193 ("[W]here the alleged violation is a uniform policy and practice of charging excessive fees, there is no doubt as to the cause of the ascertainable monetary loss.").

In *Elias*, the court explicitly rejected the defendants' argument that New Jersey's Consumer Fraud Act requires consumers to show that they purchased the products (yogurt), "at least in part, a result of the alleged misstatements of fat and caloric content on the packaging.'" 252 F.R.D. at 239.  The court explained that:

> this argument conflates the traditional formulation of reliance and causation under the NJCFA.  The NJCFA "does not require proof that a consumer has actually relied on a prohibited act in order to recover.  In place of the traditional reliance element of fraud and misrepresentation, we have required that plaintiffs demonstrate that they have sustained an ascertainable loss."  ... They need only establish the causal nexus element.

---

[19] *See also, e.g.*, *Stratton*, 266 F.R.D. at 348 (plaintiff-purchasers demonstrated reliance on the false promises and misrepresentations regarding the nature of health insurance policies by purchasing the product); *Cullen*, 589 S.E.2d at 431 ("the statutory language of N.C. GEN. STAT. § 75-1.1 [does not] require reliance in order to show causation. … our Courts have clearly held that actual deception is not an element necessary under N.C. Gen. Stat. § 75-1.1 to support an unfair or deceptive practices claim.") (citations omitted); *Dix v. Am. Bankers Life Assurance Co. of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987) (in a class action, it is sufficient to show that "a reasonable person would have relied"); *Tobacco II*, 46 Cal. 4th at 327 ("[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material.").

*Id.*

In the remaining few states, it is sufficient to show, as the evidence does here, that plaintiffs relied on the defendant's silence and would have behaved differently had they known the information. *See, e.g., Pappas v. Pella Corp.*, 363 Ill. App. 3d 795, 805 (Ill. Ct. App. 2006) (reliance on silence is sufficient to satisfy proximate cause); Hewitt Decl. ¶ 4 (California Plaintiff was a subscriber prior to the merger, relied on SXM's promise not to raise prices, and paid the MRF through automatic electronic payments in reliance on SXM to honestly and accurately bill him); Nathan Decl. ¶¶ 2-3 (same for Illinois Plaintiff); *see* Point I.B., *supra* and Pl. 56.1 ¶ 132 (Plaintiffs would have done something differently had they known the information that SXM deceptively omitted).[20]

### D.   SXM'S MOTION IGNORES PLAINTIFFS' ALLEGATIONS OF MATERIAL OMISSIONS

As a final matter, SXM's motion for summary judgment of ***all*** Plaintiffs' state law consumer protection claims (Count IV in its entirety) must be denied because the motion challenges only Plaintiffs' allegations of ***affirmative*** misrepresentation.  SXM Br. at 15-25.  *See McKell*, 142 Cal. App. 4th at 1471 ("A perfectly true statement couched in such a manner that is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information," is a fraudulent business practice).  SXM does not challenge Plaintiffs' allegations of omissions or concealment, nor Plaintiffs' claims under statutes prohibiting "unconscionable," "unfair," or "unlawful" practices, which are decided under different standards than affirmative misrepresentations.  Compl. ¶¶ 308-440.  *See AWP*, 2010 WL 3503986, at *11 (different standards apply to determine whether conduct is "false, misleading, or deceptive," as opposed to

---

[20] California requires actual reliance for the named plaintiff only as a matter of standing. *Tobacco II*, 46 Cal. 4th at 326.

"unfair" or "unconscionable"); *Cirone-Shadow*, 955 F. Supp. at 944; *In re Facebook PPC Adver. Litig.* No. 09-cv-3043, 2010 WL 3341062, at *9 (N.D. Cal. Aug. 25, 2010).[21]   Accordingly, these claims must stand regardless of the Court's ruling concerning Plaintiffs' misrepresentation claims.

## II.   SXM IS NOT ENTITLED TO SUMMARY JUDGMENT BASED ON ITS FILED RATE DOCTRINE AFFIRMATIVE DEFENSE

No matter how many times SXM invokes the phrase "filed rate," it cannot create a "filed rate" from the facts of this case, nor can it mold Plaintiffs' claims into the types that could be barred by a "filed rate" defense.  SXM does not, and cannot, point to any statutory authority granting the FCC rate-making power for satellite radio, a necessary predicate for the existence of a "filed rate."  Moreover, Plaintiffs' MRF-related claims are that SXM charges customers the MRF in a manner inconsistent with its representations to its subscribers and at a level far in excess of what it would have charged had competition not been eliminated by the merger. Plaintiffs' claims do not challenge the reasonableness of the FCC Order.  Neither these claims, nor any of the non-MRF aspects of Plaintiffs' claims, are barred by the filed rate doctrine.

### A.   THERE IS NO "FILED RATE" AT ISSUE IN THIS CASE

SXM cites no authority applying the filed rate doctrine to satellite radio and there is no basis to extend the doctrine to satellite radio generally or the Order in particular.

---

[21] For example, SXM does not challenge Plaintiffs' claims under California's § 17200 based on "unfair" or "unlawful" conduct, neither of which require proof of misrepresentation (let alone a material one) or reliance.  *Rubio v. Capital One Bank,* 613 F.3d 1195, 1204-05 (9th Cir. 2010); *State Farm Fire & Cas. Co. v. Super. Ct. of L.A. County*, 45 Cal. App. 4th 1093, 1104 (Cal. Ct. App. 1996) (determine whether conduct is "unfair" by weighing "the utility of the defendant's conduct against the gravity of the harm to the alleged victim").  Neither does SXM challenge Plaintiffs' claims under statutes prohibiting "unconscionable" conduct, which is defined under Kansas law as taking "advantage of the inability of the consumer reasonably to protect the consumer's interest because of the consumer's … ignorance."  KAN. STAT. ANN. 50-627(b).

### 1.      The Filed Rate Doctrine Historically Applied Only to Common Carriers

The filed rate doctrine originated from the interpretation of the Interstate Commerce Act ("ICA") of 1887 as a method of preventing price discrimination among common carriers. *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97 (1915).

The authority for applying the filed rate doctrine to common carriers regulated by the FCC stems from § 203 of the Federal Communications Act of 1934, as amended ("Communications Act"), which provides in relevant part:

> Every common carrier … shall … file with the Commission and print and keep open for public inspection schedules showing all charges … and showing the classifications, practices, and regulations affecting such charges.

47 U.S.C. § 203(a).  Furthermore, Communications Act § 203(c) provides that no common carrier shall charge a rate that is different than the filed rate.  47 U.S.C. § 203(c).

The filed rate doctrine has never been applied to satellite radio rates and it is not applicable here.

### 2.      SXM Does Not Contend That It Is a Common Carrier

SXM does not contend that it is a common carrier subject to § 203, and the FCC has declined to treat it as one.  Perhaps most illustrative on this point is the FCC's response to a request by National Public Radio, Inc ("NPR") in connection with the Sirius/XM merger that:

> [I]f the Commission were to approve a merger-to-monopoly, the Commission should impose comprehensive price and service regulation akin to telecommunications regulation under Title II of the Communications Act, at least until effective competitive [sic] emerges.  Indeed, the Commission might require the merged entity to submit proposed service offerings and pricing options to the Commission for its review and public comment, much in the way the Commission has required monopoly telecommunications providers to submit proposed tariffs.

Sabella Decl. Ex. 3 (NPR Petition to Deny) at 21-22.  The FCC responded that SXM would ***not*** be treated as a common carrier:  "We reject NPR's proposed condition to place the merged entity

under Title II common carrier regulation." *See* FCC Order ¶ 110 n.336 (Sabella Decl. Ex. 1). Because SXM is not a common carrier required to file its rates under the Communications Act, § 203 of the Communications Act provides no authority for a "filed rate" defense.[22]

### 3.  SXM Admits That the FCC Has No Rate-Making Authority Over SXM's Rates

Although in certain limited instances courts have extended the filed rate doctrine beyond the traditional common carrier arena, they have done so under very specific conditions not present here.  As acknowledged in cases cited in SXM's opening brief, "for a court to consider rates filed, and thus protected by the filed rate doctrine, the statutory scheme must provide the regulatory agency with authority to assess rates' compliance with statutory requirements for filed rates."  *See In re Pa. Title Ins. Antitrust Litig.,* 648 F. Supp. 2d 663, 674 (E.D. Pa. 2009). Accordingly, before the filed rate defense will apply, the regulatory scheme must "require[] the filing of rates with a government agency that has legal authority to review those rates."  *Id.; see also Taffet v. Southern Co.*, 967 F.2d 1483, 1490 (11th Cir. 1992) ("the filed rate doctrine recognizes that ***where a legislature has established a scheme for utility rate-making***, the rights of the rate-payer in regard to the rate he pays are defined by that scheme") (emphasis added).

SXM fails to cite any such statutory or regulatory scheme applicable to satellite radio, and there is none.  To the contrary, SXM has categorically taken the position that the FCC has ***no*** authority over SXM's rates.  Just a few weeks ago, in a January 20, 2011 submission to the FCC, SXM stated:

---

[22] Additionally, SXM could not meet its burden to show that the Order or the MRF comply with the requirements of § 203 because, *inter alia*, the Order does not contain "schedules showing all charges," show "the classifications, practices, and regulations affecting such charges," or constitute a "public" schedule as only a redacted version was ever made available to the public.  *See* FCC Order ¶ 107 (Sabella Decl. Ex. 1). *See Security Servs., Inc. v. Kmart Corp.*, 511 U.S. 431, 440 (1994) (carrier cannot rely on filed rate doctrine where "in effect it had no rates on file.").

The FCC has no direct or ancillary authority to regulate satellite radio rates.  As the Supreme Court has recognized, "an agency literally has no power to act ... unless and until Congress confers power upon it." …. The *Sirius XM Merger Order* cited no direct statutory authority for the Commission to regulate satellite radio rates, and there appears to be none.  Likewise, there appears to be no underlying basis for the agency to assert ancillary authority to regulate satellite radio rates.[23]

SXM's explicit denial of any legislative grant of rate-making authority to the FCC is fatal to its "filed rate" defense.[24]

### 4.    The FCC's Acquiescence in SXM's Voluntary Commitments Does Not Create a Special One Time "Filed Rate"

Citing no statutory authority for the FCC to regulate the rates charged by satellite radio providers, SXM's argument is apparently that the Order created a special one-time "filed rate" based on the FCC's purported approval of the MRF.  This is nonsense.

The MRF is not a "filed rate" simply because the FCC accepted SXM's voluntary pricing commitments.  In every instance where the Second Circuit has applied the filed rate doctrine, the legislature had clearly granted rate-making authority to the agency at issue.  *See, e.g., Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 488 (2d Cir. 1998) (applying common carrier provisions of the Communications Act); *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 45 F.3d 58, 60 (2d Cir. 1995) (applying filed rate doctrine where Arizona Corporation Commission was vested with "full power to ... prescribe ... just and reasonable rates and charges") (omissions

---

[23] Sabella Decl. Ex. 12; Pl. 56.1 ¶ 88 (citations and quotations omitted) (first omission in original).  SXM's CFO similarly admitted in his deposition that the FCC does not have the authority to regulate the prices of satellite radio. Id. ¶ 89.

[24] SXM's reliance on the Second Circuit's *dicta* in *Wegoland Ltd.  v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994), is misplaced and an attempt to distort the contours of the filed rate doctrine.  *Wegoland* does not, as SXM implies, stand for the proposition that **any** agency approval triggers the filed rate doctrine; it simply acknowledges that a **filed rate** approved by the governing regulatory agency is subject to the filed rate doctrine.  *Wegoland,* 27 F.3d at 18.  The court in *Wegoland* prefaced its opinion on the particular facts before it and all parties conceded the rate at issue was a "filed rate"; the issue before the court was solely the existence of a "fraud on the agency" exception to the filed rate doctrine.  *Id.* at 20 ("Plaintiffs do not, nor could they, quarrel with the general applicability of the filed rate doctrine.  Instead they argue that there should be an exception to the filed rate doctrine where there are allegations of fraud upon the regulatory agency.").

in original).[25]  SXM admits that the FCC has no rate-regulating authority here, notwithstanding the existence of the voluntary commitments.[26]

Nor is the MRF transformed into a "filed rate" simply because the FCC has not yet raised any objections to the MRF or otherwise deemed the MRF in violation of the Order.  SXM Br. at 30.  Silence does not equal approval.  *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig*., No. 02-cv-5575 (SWK), 2006 U.S. Dist. LEXIS 78101, at *14-15 (S.D.N.Y. Sept. 28, 2008) ("acquiescence [which is the most that a failure to object shows] is not the same thing as 'prior approval'") (internal quotations omitted) (alteration in original).  Moreover, SXM's response to the FCC's MRF inquiry concealed so many key aspects of the MRF calculations and subscriber communications that the FCC's silence cannot be reasonably read as approval.  Pl. 56.1 ¶ 86; *see* Plaintiffs' Response to Defendant's Statement of Undisputed Facts ("SXM's 56.1") ¶ 44.

SXM even argues that the FCC affirmatively approved the MRF during *ex parte* discussions between SXM and FCC Chairman Martin.  *See* SXM's 56.1 ¶¶ 7-11 (citing Karmazin Decl. ¶¶ 6-9, 11, 13).  The Karmazin Declaration should be disregarded by the Court.  First, the Declaration contains inadmissible hearsay statements of what Karmazin was purportedly told by Martin.  As this Court has held, such hearsay statements may not form the basis of deciding a summary judgment motion.  *Carey v. Reed Elsevier, Inc.*, No. 96-cv-8995,

---

[25] *See also FTC v. Verity Int'l, Ltd*, 443 F.3d 48, 61 (2d Cir. 2006) (noting that "[the filed-rate doctrine] is grounded statutorily in the Communications Act's requirement that all common carriers file a schedule of their rates, *i.e.*, a tariff, for FCC approval" and declining to apply filed rate doctrine to non-common carrier services not included in tariff); *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1998) (applying the filed rate doctrine to tariff filings required by the Communications Act).

[26] The District Courts in this Circuit have similarly held that the legislature must have granted rate-making authority to the agency at issue before the filed rate doctrine can be applied.  *See, e.g., In re Evic Class Action Litig. Farina v. UPS, Inc. King,* No. MDL-1339, 2002 WL 1766554, at *6 (S.D.N.Y. July 31, 2002) (rate making authority from the Motor Carrier Act warranted imposition of filed rate doctrine "when a 'tariff' has been filed with the governing regulatory agency in accordance with a legal obligation and when the underlying rate(s) have been approved by that agency"); *see also Commc'ns Network Int'l Ltd. v. MCI WorldCom Commc'ns Inc.*, No. 08-cv-7254, 2010 WL 3959601, at *4 (S.D.N.Y. Sept. 14, 2010) (quoting *Marcus,* 138 F.3d at 58) (applying filed rate doctrine to communications common carrier under the Communications Act).

1998 U.S. Dist. LEXIS 6834, at *12-13 (S.D.N.Y. May 14, 1998) (Baer, J.).  But, even assuming

the truth of Karmazin's purported *ex parte* conversations with one of five FCC Commissioners,

such a statement cannot form the basis for determining what the FCC's position was, or is.  It is a

fundamental axiom of administrative law that an agency speaks through its orders, not the

private informal pronouncements of individual commissioners spoken behind "closed doors."[27]

Stunningly, Karmazin's hearsay statements about what FCC Chairman Martin

purportedly said (and/or did not say) about the royalty cost "pass-through" in private were

apparently communicated at meetings at which Karmazin was not even present.  *See* Karmazin

Decl. ¶ 9 (referring generally to Spring 2008 meetings attended by Sirius and XM – but not

Karmazin).[28]  In fact, documents that log the *ex parte* meetings and communications that

occurred between Sirius, XM and FCC in the Spring of 2008 show that Chairman Martin met

numerous times with FCC counsel for Sirius and XM – but never with Karmazin – during the

Spring of 2008.[29]  Karmazin's declaration is double hearsay.  And, he declares as to

communications that he apparently just learned about.  At his deposition just this past November,

Karmazin testified under oath that he did not the details regarding the conversations with the

FCC concerning the MRF.  Sabella Decl. Ex. 134 (Karmazin Dep.) at 192-95.  The discrepancy

between Karmazin's Declaration, his deposition testimony and the logs of *ex parte*

communications  further render Karmazin's hearsay statements about what a single FCC

---

[27] "The Federal Communications Commission is a collegial body, however; it speaks through its orders, not through counsel's filings."  *MD/DC/DE Broadcasters Ass'n v. FCC,* 253 F.3d 732, 735 (D.C. Cir. 2001) (discounting the views expressed by a single FCC Commissioner in a press release).

[28] Nor does Karmazin base his Declaration solely on personal knowledge, as required by Fed. R. Civ. P. 56(c)(4). Instead, Karmazin's Declaration is also based on "information that has been made available to me in the regulatory course of [his] duties", *i.e.*, it is based on hearsay other people told him.  Karmazin Decl. ¶ 1.

[29] *See, e.g.*, Plaintiffs' Response to SXM's 56.1 ¶ 7.  Any *ex parte* communication or meeting that occurred between SXM or its representatives and the FCC in connection with the license transfer application would have to have been disclosed in the public record pursuant to 47 CFR § 1.1206.  There appears to be nothing in the public record that confirms the information contained in Karmazin's Declaration.

Commissioner purportedly said or did with respect to the MRF inadmissible.  *See Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").[30]

Even if the FCC had affirmatively (or even implicitly) blessed the MRF during *ex parte* meetings – and there is no admissible evidence that it did – that would not create a "filed rate" or insulate SXM's conduct in abusing its monopoly power and misleading consumers.

### 5.    SXM Has Engaged in Conduct That Would Be Impermissible If the MRF Were Truly a "Filed Rate"

Until bringing the instant motion, SXM itself acted wholly inconsistently with the notion that the MRF is a "filed rate."  Not only has SXM explicitly disclaimed the FCC's authority to regulate its rates, it has also waived the MRF when that suited its purposes.  Such waivers are inconsistent with the concept of a "filed rate."  True filed rates bind both "carriers and [customers] with the force of law," *Lowden v. Simonds-Shields Lonsdale Grain Co.,* 306 U.S. 516, 520 (1939), and the rights and liabilities defined by the filed tariff cannot be "varied or enlarged by either contract or tort of the carrier."  *AT&T v. Cent. Office Tel., Inc.,* 524 U.S. 214, 227 (1998) (quoting *Keogh v. Chicago & Nw. Ry.,* 260 U.S. 156, 163 (1922)).  Thus:

> The filed tariff doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 577, 69 L.Ed.2d 856, 101 S.Ct. 2925

---

[30] Documentary evidence also contradicts Karmazin's Declaration.  Karmazin states in his Declaration that at the time Sirius and XM met with the FCC to discuss the voluntary commitments, SXM intended the royalty cost "pass through" provision of the Order to permit SXM to recover all of the costs that it is currently recovering via the MRF, including, *e.g.*, royalty costs attributable to ASCAP, BMI and the increased number of subscribers.  Karmazin Decl. ¶¶ 8-9.  SXM's documents, however, show that at the time the voluntary commitments were being negotiated with the FCC, Sirius and XM were only planning to charge a so-called "CRB pass-through" in the range of $0.50, which did *not* include the recoupment of  royalties attributable to ASCAP, BMI or an increased number of subscribers.  *See* Pls.' 56.1 ¶¶ 41-45.  SXM continued to alter its MRF methodology and calculations during the period from Summer 2008 through June 2009, as it sought ways to increase the amount of royalty costs to charge subscribers.  *Id.* ¶¶ 46-69.

> (1981).  For purposes of the filed rate doctrine, discounted rates are not the only
> discriminatory and illegal "privileges."  *See AT & T v. Cent. Office Tel., Inc.,* 524
> U.S. 214, 224, 141 L.Ed.2d 222, 118 S.Ct. 1956 (1998).  A preference [and] a
> rebate . . . [are] unenforceable or violative of the filed tariff doctrine.  *See United*
> *States v. Wabash R. Co.,* 321 U.S. 403, 412-13, 88 L.Ed. 827, 64 S.Ct. 752
> (1944); *Davis v. Cornwell,* 264 U.S. 560, 562, 68 L.Ed. 848, 44 S.Ct. 410 (1924);
> *Chicago & Alton R. Co. v. Kirby,* 225 U.S. 155, 165-66, 56 L.Ed. 1033, 32 S.Ct.
> 648, (1912).

*Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 193 (2d Cir. 2001).

SXM, however, did not consider itself bound to charge the MRF; in fact, SXM routinely

waived the MRF for complaining customers.  Pl. 56.1 ¶¶ 90-93.  Such selective waiver is

inconsistent with the concept of a filed rate.

### B.  THE FILED RATE DEFENSE DOES NOT APPLY TO PLAINTIFFS' CLAIMS

Separate and apart from the fact that the MRF is not a "filed rate," SXM's filed rate

defense fails for an independent reason:  Plaintiffs' claims are not the types barred by the filed

rate doctrine.  Alternatively known as the "filed tariff doctrine," the filed rate defense bars claims

alleging that a regulated entity's filed rates are unreasonable.  *Black Radio Network, Inc. v.*

*Nynex Corp.*, 44 F. Supp. 2d 565, 573-74 (S.D.N.Y. 1999).  Where, as here, Plaintiffs are not

challenging the reasonableness of a filed rate, the filed rate doctrine does not apply.  *See, e.g.,*

*Black Radio Network*, 44 F. Supp. 2d at 573 (RICO, breach of contract, fraud, and other claims

not barred by filed rate doctrine); *Northern Valley Commc'ns, LLC v. AT&T Corp.,* 659 F. Supp.

2d 1056, 1060 (D.S.D. 2009) ("doctrine does not apply where the claim does 'not attack the rate

itself' or does 'not require the court to "second-guess" the rate-making agency'") (quoting *H.J.*

*Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 490 (8th Cir. 1992)); *Ice Cream Liquidation,*

*Inc. v. Land O'Lakes, Inc*., 253 F. Supp. 2d 262, 276 (D. Conn. 2003) (antitrust claim not barred

because plaintiff was not challenging rates set by the USDA, but rather "wholesale prices …

never approved by the USDA.").  As in the above cases, Plaintiffs herein are not second-

guessing the FCC's Order or the reasonableness of the rates it allows; rather, as set forth herein, Plaintiffs allege that SXM made multiple misrepresentations to its customers concerning the MRF. Such claims are not barred by the filed rate doctrine.[31]

Claims such as Plaintiffs' do not implicate the filed rate doctrine because they do not invoke the policies behind it. As Judge Chin explained in *Black Radio Network*, and as SXM concedes, courts have identified two principles for applying the filed rate doctrine – the "nonjusticiability strand" (developed on the theory that courts are not best equipped to decide retrospectively what rates were reasonable) and the "nondiscrimination strand" (developed to prevent price discrimination between ratepayers). 44 F. Supp. 2d at 574. The "nonjusticiability strand" is not implicated here because Plaintiffs are not questioning the reasonableness of the FCC's Order; they simply allege that SXM made multiple misrepresentations concerning the nature of the MRF charged to its customers. The "nondiscrimination strand" is also not triggered because Plaintiffs are not asking for differential treatment for themselves or for any group. As neither underlying policy rationale is implicated by Plaintiffs' claims, SXM cannot meet its burden to show the filed rate doctrine applies.[32]

## C.   MULTIPLE ASPECTS OF PLAINTIFFS' CLAIMS ARE UNRELATED TO THE MRF

SXM asserts flatly that the filed rate doctrine would dispose of the antitrust damages claims in their entirety,[33] but that is simply untrue. Plaintiffs' antitrust claims seek damages not

---

[31] *See also AT&T Co. v. Central Office Tel., Inc.,* 524 U.S. at 230-31 (Rehnquist, J. concurring) ("The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff. It does not serve as a shield against all actions based on state law.").

[32] The upshot of SXM's argument is that the FCC has spoken and there should be no further review of SXM's anti-competitive activity. Such is clearly not the law. "The Supreme Court [has] held that the FCC's views are informative but not conclusive.... A few agencies have the power to insulate mergers from antitrust suits, *see* 15 U.S.C. § 18; the FCC is not among them." *South Austin Coalition Cmty. Council v. SBC Commc'ns Inc.*, 191 F.3d 842, 844 (7th Cir. 1999) (citing *United States v. Radio Corp. of Am.*, 358 U.S. 334 (1959)).

[33] SXM Br. at 2, 26.

only based on the MRF but also based on price increases for second subscriptions and for internet streaming.  Langenfeld Decl. Ex. 1 ¶¶ 103-20.  SXM does not argue that these charges are in any way addressed by the FCC such that the filed rate doctrine could come into play.  Accordingly, these aspects of Plaintiff's claims must stand, regardless of the Court's ruling concerning the applicability of the filed rate defense to the MRF-based claims.

## III.    SXM IS NOT ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF

Clayton Act § 16, 15 U.S.C. § 26, explicitly authorizes private plaintiffs to obtain injunctive relief.  The Complaint explicitly seeks such relief,[34] and the named Plaintiffs have stated that they desire such relief to restore competition.[35]  Nevertheless, relying solely on cases from outside this Circuit, which, according to LEXIS, have never been cited by the Second Circuit or any District Court in the Southern District of New York, SXM argues that Plaintiffs cannot obtain injunctive relief because they did not seek such relief either before the merger was completed or immediately thereafter.  Regardless of whether SXM has accurately presented the law in other Circuits,[36]  SXM's argument is flatly contrary to the law in this Circuit.

---

[34] *See* Compl. at 91-92.

[35] *See* Pl. 56.1 ¶ 134.

[36] The cases cited by SXM are clearly distinguishable.  *See Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1234 (8th Cir. 2010) (plaintiffs were indirect purchasers and the court noted that a federal court has never "ordered divestiture at the request of a private party who was **neither a customer** nor a competitor of the merging parties") (emphasis added); *Midwestern Machinery Co. v. Northwest Airlines, Inc*., 392 F.3d 265, 276, 277 (8th Cir. 2004) (suit filed 11 years after the challenged merger; the court also noted that "the statute of limitations does not begin to run until the plaintiff suffers injury." and that "[w]hether a statute of limitations would bar  a comparable action at law is one consideration in determining whether the length of delay was unreasonable and whether the potential for prejudice was great") (citations and internal quotations omitted); *Fed. Home Loan Bank Bd. v. Elliott*, 386 F.2d 42 (9th Cir. 1968) (shareholder suit, and not an antitrust case, seeking an injunction, and not divestiture, to prevent consummation of a merger that already happened; therefore the requested relief was not available; to the extent the complaint sought to set aside the merger, it was barred by the specific application of laches to shareholders since rights acquired by others would be prejudiced); *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp*., 116 F. Supp. 2d 1159, 1171-73 (C.D. Cal. 2000) (court focused on language in *California v. Am. Stores Co.*, 495 U.S. 271 (1990), from Justice Kennedy's concurrence (California could have filed sued several months earlier to enjoin the merger and must accept the consequences of its choice) and dicta (laches may protect consummated transaction from belated attacks by private parties when it would not be too late for the Government to vindicate the public

*(Cont'd)*

A. **DIVESTITURE IS THE PRESUMPTIVE REMEDY FOR A MERGER THAT VIOLATES THE ANTITRUST LAWS**

SXM argues that equitable relief must be sought prior to the closing of a merger.  The Supreme Court, however, held to the contrary in *United States v. E.I. du Pont de Nemours & Co*., 366 U.S. 316, 329, 323 (1961), where it stated that divestiture – which is by definition a ***post-merger*** remedy – is the "natural remedy" for a merger that violates the Clayton Act, intended "to pry open to competition" the markets that have been impacted by an illegal acquisition. Divestiture "should always be in the forefront of a court's mind when a violation of § 7 has been found." *Id.* at 330-31; *see also Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) ("divestiture is particularly appropriate where asset or stock acquisitions violate the antitrust laws"); *United States v. American Cyanamid Co*., 719 F.2d 558, 565 (2d Cir. 1983) ("divestiture is not uncommonly the appropriate relief when a Section 7 violation is proven"); *Am. Stores*, 495 U.S. at 284 ("Congress also made express its view that divestiture was the most suitable remedy in a suit for relief from a § 7 violation").

B. **PRIVATE ANTITRUST PLAINTIFFS ARE ENTITLED TO SEEK DIVESTITURE**

Similarly without merit is SXM's suggestion that the fact that the plaintiff is a private party makes divestiture unavailable.  SXM again fails to cite any caselaw from the Second Circuit in support of this proposition, and, in fact, the law in this Circuit (as well as from the Supreme Court) decisively rejects SXM's argument.  It has long been the law in this Circuit that "divestiture is a potential remedy for private parties injured by violations of the Clayton Act." *Fuchs Sugars & Syrups, Inc. v. Amstar Cor*p., 402 F. Supp. 636, 640 (S.D.N.Y. 1975); *see also*

---

interest); court stated that if plaintiffs had filed suit "just one to three days before the merger was consummated, it is quite possible that their failure to taken any action for months after knowing about the merger may still have proven fatal to their claims for equitable relief."  Taking the court's reasoning to its logical conclusion, divestiture would ***never*** be available since divestiture is a post-merger remedy.

*Julius M. Ames Co. v. Bostitch, Inc*., 240 F. Supp. 521, 526 (S.D.N.Y. 1965) (rejecting

defendant's argument that a private plaintiff cannot obtain divestiture under Clayton Act § 16

where the transaction is completed).  The Supreme Court confirmed such teaching in *Am. Stores*,

495 U.S. at 295, which held that "a district court has the power to order divestiture in appropriate

cases brought under § 16 of the Clayton Act."  The Supreme Court noted that "[o]f the very few

litigated § 7 cases which have been reported, most decreed divestiture as a matter of course.

Divestiture has been called the most important of antitrust remedies."  *Id*. at 281.  Thus,

"divestiture is the normal and usual remedy against an unlawful merger, whether sued by the

government or by a private plaintiff."  2 P. Areeda & D. Turner, *Antitrust Law* § 328b (1978)

(footnotes omitted), *quoted with approval in Am. Stores*, 495 U.S. at 295.  In fact, Congress and

the Supreme Court both recognize that a private cause of action is essential to protect

competition.  *See Am. Stores,* 495 U.S. at 284 ("The Act's other provisions manifest a clear

intent to encourage vigorous private litigation against anticompetitive mergers .…  Private

enforcement of the Act was in no sense an afterthought; it was an integral part of the

congressional plan for protecting competition.").

## C.   PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF IS NOT BARRED BY LACHES

SXM has waived any right to complain about Plaintiffs' alleged delay in suing for

injunctive relief.  Laches is an affirmative defense.  *PenneCom B.V. v. Merrill Lynch & Co*., 372

F.3d 488, 493 (2d Cir. 2004); *see* Fed. R. Civ. P. 8(c)(1).  Because SXM's Answer does not

assert such affirmative defense, the defense is waived.  *See Travellers Int'l, A.G. v. Trans World*

*Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994) ("a failure to plead an affirmative defense results in a waiver"); Fed. R. Civ. P. 8(c)(1).[37]

Furthermore, in this Circuit, the law is clear that laches will not bar a private plaintiff's claim for divestiture if the claim is asserted within the Clayton Act's four-year statute of limitations period for damages claims. *See Rite Aid Corp. v. Am. Express Travel Related Servs. Co*., 708 F. Supp. 2d 257, 272 (E.D.N.Y. 2010); *Argus, Inc. v. Eastman Kodak Co*., 552 F. Supp. 589, 599-600 (S.D.N.Y. 1982), *aff'd*, 801 F.2d 38 (2d Cir. 1986); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) ("When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show … circumstances exist which require the application of the doctrine of laches.") (citation omitted) (omission in original).  The first complaint at bar seeking injunctive relief was filed in 2009 – well within the four-year period.[38]

Moreover, in a case seeking equitable relief under the Clayton Act, "[t]he doctrine of laches bars a claim only where the delay in filing suit prejudices a defense available to a party opponent." *Julius Nasso Concrete Corp. v. DIC Concrete Corp*., 467 F. Supp. 1016, 1024 (S.D.N.Y. 1979); *accord Argus*, 552 F. Supp. at 599-600; *Fuchs Sugars & Syrups*, 402 F. Supp. at 640.  The defendant bears the burden of proof to demonstrate prejudice, i.e., that the "defendant has changed [its] position in a way that would not have occurred if the plaintiff had not delayed." *See Conopco*, 95 F.3d at 192 (internal quotations and citation omitted).  Indeed, divestiture was held proper in a case filed 10 years after the acquisition, because there was no

---

[37] Obviously cognizant that the laches defense is waived, SXM's brief avoids using the word, instead asserting that Plaintiffs allegedly "'slumbered on [their] rights.'"  SXM Br. at 34 (quoting *Midwestern Machinery*, 392 F.3d at 277).  But laches is the same thing as sleeping on one's rights.  *Stone v. Williams*, 873 F.2d 620, 623 (2d Cir. 1989), *vacated on other grounds*, 891 F.2d 401 (2d Cir. 1989).  Indeed, on the very page from *Midwestern Machinery* that SXM quotes, the Eighth Circuit explicitly noted that what was involved was laches.

[38] The merger was approved in July 2008.  The increases in the multi-radio discount and the Internet access fee were in March 2009 and the music royalty fee was imposed in July 2009.

prejudice.  *See Fuchs Sugars & Syrups*, 402 F. Supp. at 640.  SXM has made no showing of

prejudice[39] as there is no indication of what aspects of Sirius and XM were integrated and at

what cost, and it is too late for SXM to attempt to do so in its reply papers.  In fact, despite the

pendency of this lawsuit and Plaintiffs' request for equitable relief, SXM only recently integrated

major systems of the two companies.[40]  Any suggestion that SXM would have delayed

integrating the two companies if Plaintiffs had filed suit sooner is belied by the facts.

Further, before the merger, Sirius and XM represented that the merger would lead to

lower, not higher, prices.  Only after the merger – when SXM raised prices 40% – could

Plaintiffs have known the falsity of those promises and filed suit seeking injunctive relief to

prevent further anticompetitive effects.

SXM makes the last ditch argument that Plaintiffs cannot obtain injunctive relief because

their claims are fully compensable with monetary damages.  SXM Br. at 33-34.  This is wrong.

Because of the incipiency nature of Clayton Act § 7,[41] Plaintiffs can prove a violation if the

merger has caused anticompetitive effects and/or if anticompetitive effects are likely to occur in

the future.  Thus, Plaintiffs can obtain, and have sought, both damages for the anticompetitive

price increases that have already occurred and injunctive relief to prevent further anticompetitive

---

[39] *See also United States v. E.I. du Pont*, 366 U.S. at 326-27 ("Those who violate the Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience.").

[40] *See* Sabella Decl. Ex. 132 at 206-07, 211-12, 297-300 (Frear Dep. 11/15/10).  *See also* Sabella Decl. Ex. 28 (SXM00031234 email from David Frear dated March 15, 2010).

[41] The Senate Report on § 7 stated: "'A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints.'"  *Brown Shoe Co. Inc. v. United States*, 370 U.S. 294, 323 n.39 (1962) (quoting S. Rep. No.1775, 81st Cong., 2d Sess. 6, 1950 U.S.C.C.A.N. 4293, 4298); *see* 51 Cong. Rec. 14464 (remarks of Senator Reed)); *see also Brown Shoe*, 370 U.S. at 317 ("a keystone in the erection of a barrier to what Congress saw as the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency").

effects in the future, *e.g.*, further price hikes when the price cap expires in July 2011.[42]  Because damages for past overcharges will not prevent future anticompetitive effects, Plaintiffs are entitled to all available remedies, including damages ***and*** injunctive relief.[43]

### D.  THE QUESTION AS TO WHAT REMEDY IS APPROPRIATE SHOULD NOT BE DECIDED IN ADVANCE OF TRIAL

Whatever the appropriate relief for SXM's antitrust violations may be, it raises a host of factual issues that cannot be resolved on summary judgment, such as the extent of the continuing harm from the merger and what measures would be necessary to restore competition.[44]

It should be noted that while full divestiture – unwinding a merger – is one form of post-merger injunctive relief, it is not the only form.  "A range of injunctive relief is possible and, like all equitable remedies, the relief ordered is highly dependent upon the proof adduced at trial.  We note only that '[t]he key to the whole question of an antitrust remedy is of course the discovery of measures effective to restore competition.'"  *Cia. Petrolera Caribe Inc. v. Arco Carribean, Inc.*, 754 F.2d 404, 430 (1st Cir. 1985) (alteration in original) (quoting *United States v. E.I. du*

---

[42] Discovery indicates that almost as soon as the merger was consummated, SXM began planning to raise prices once the price cap expired in July 2011. Pl. 56.1 ¶ 10.

[43] Furthermore, if the Court were to consider a laches affirmative defense, the Court must consider the public's interest in having effective competition when determining whether Plaintiffs' right to seek divestiture is barred.  The "public good is of paramount importance when considering the equitable defense of laches." *Conopco*, 95 F.3d at 193 (citation omitted).  The private enforcement of antitrust laws to protect competition, and thus the public, is integral. *Am. Stores*, 495 U.S. at 284.

[44] A "full exploration of facts is usually necessary in order [for the District Court] properly to draw [an antitrust] decree so as to prevent future violations and eradicate existing evils." *United States v. Ward Baking Co.*, 376 U.S. 327, 330-31 (1964) (internal quotations omitted) (alteration in original).  "It would be a rare case where all the facts necessary for a trial court to decide whether a disputed item of relief was warranted could be determined without an 'opportunity to know the record.'" *Id.* at 331; *see also Julius M. Ames Co.*, 240 F. Supp. at 526 (the nature and extent of the remedy to be ordered in an antitrust case "is a question for the trial court, to be determined after all the evidence is in.  The court should not attempt to determine it in advance of trial upon a motion."); *Remington Prods., Inc. v. North Am. Philips Corp.*, 717 F. Supp. 36, 49 (D. Conn. 1989) ("the determination of a remedy is to be decided by a trial court after all the evidence has been reviewed").  Similarly, if SXM had tried to show the prejudice necessary to invoke a laches defense, that would only raise more factual issues for trial. *See Argus*, 552 F. Supp. at 600 (denying defendants' motion for summary judgment with respect to equitable relief under the Clayton Act because they "failed to establish the absence of genuine issues of fact with respect to whether defendants were prejudiced in their defense" by the delay in seeking injunctive relief).

*Pont*, 366 U.S. at 326); *see also Am. Stores*, 495 U.S. at 284 ("We have recognized when

construing § 16 that it was enacted not merely to provide private relief, but … to serve as well

the high purpose of enforcing the antitrust laws.  We have accordingly applied the section with

this purpose in mind, and with the knowledge that the remedy it affords, like other equitable

remedies, is flexible and capable of nice adjustment and reconciliation between the public

interest and private needs as well as between competing private claims.") (internal quotations

and citations omitted) (omission in original).  Thus, injunctive relief does not necessarily involve

unwinding a merger or requiring the company "to be split into two equal halves."  *Chi. Bridge &

Iron Co. N.V. v. FTC*, 534 F.3d 410, 441 (5th Cir. 2008).  Injunctive relief in this case could

involve extending the freeze on increases in the base subscription price, which is now scheduled

to expire in July 2011, until competitive conditions in the industry are restored.  The Court can

order merely a sufficient divestiture of assets – i.e., the sale of one or more satellites – in order to

create a new competitor.  *See id.* (approving in a Clayton Act § 7 case "a divestiture of assets to

create a competitor … capable of competing on an 'equal footing'").  Or, SXM could be ordered

to establish separate and independent management teams that will set subscriptions prices and

negotiate contracts.  *See, e.g., In re Evanston Northwestern Healthcare Corp.*, No. 9315, at 90

(F.T.C. Aug. 6, 2007) (requiring the establishment of separate and independent negotiating teams

to re-inject competition between hospitals).[45]  Thus, the decision as to what relief is most

appropriate should await the trial.

## CONCLUSION

　　SXM's motion should be denied in all respects.

---

[45] In fact, SXM already is familiar with such a corporate structure as exemplified by the operations of Sirius Canada and XM Canada.  While SXM currently has an ownership interest in each entity, Sirius Canada and XM Canada currently maintain separate capital structures, separate shareholder bases, separate services and do not coordinate on pricing.  *See* Sabella Decl. Ex. 132 at 329-30 (Frear 30(b)(6) dep.).

Dated:  February 8, 2011

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

*James J. Sabella*

Jay W. Eisenhofer
Richard S. Schiffrin
James J. Sabella
Shelly L. Friedland
485 Lexington Avenue
New York, NY 10017
Tel.:  646-722-8500
Fax:  646-722-8501
        and
Mary S. Thomas
1201 N. Market Street
Wilmington, DE 19801
Tel.: 302-622-7000
        and
Reuben Guttman
1920 L Street, N.W.
Suite 400
Washington, DC  20036
Tel.:  202-386-9500

**MILBERG LLP**

*Peter Safirstein*

Herman Cahn
Peter Safirstein
Anne Fornecker
One Pennsylvania Plaza
New York, NY 10119
Tel.:  212-594-5300
Fax:  212-868-1229
        and
Paul F. Novak
One Kennedy Square
777 Woodward Avenue
Suite 890
Detroit, MI 48826
Tel.:  313-309-1760
        and
Nicole Duckett
300 S. Grand Avenue, 39th Floor
Los Angeles, CA 90071
Tel.:  213-617-1200

**COOK, HALL & LAMPROS, LLP**

*Christopher Hall*

Edward S. Cook
Christopher B. Hall
P. Andrew Lampros
Promenade Two, Suite 3700
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel.:  404 876-8100
Fax:   404 876-3477

*Attorneys For Plaintiffs Carl Blessing, Charles Bonsignore, Scott Byrd, Glenn Demott, Andrew Dremak, Curtis Jones, Ronald William Kader, Edward Leyba, James Sacchetta, David Salyer, Susie Stanaj, Paul Stasiukevicius, Todd Stave, and Paola Tomassini, and Interim Class Counsel*

**ABBEY SPANIER RODD & ABRAMS, LLP**
Jill Abrams
Natalie Marcus
212 East 39th Street
New York, NY 10016
Tel.:  212-889-3700

**SHAHEEN & GORDON, P.A.**
Christine Craig
140 Washington Street
Dover, NH 03821
Tel.:  603-749-5000

*Attorneys for Plaintiff John Cronin and Todd Hill*

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
Tel.:  201-567-7377

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Shane T. Rowley
369 Lexington Avenue
New York, NY 10017
Tel.:  212-983-9330

*Attorneys for Plaintiff Edward A. Scerbo*

**FREED & WEISS LLC**
Jeffrey A. Leon
Eric D. Freed
111 West Washington Street
Suite 1331
Chicago, IL 60602
Tel.:  312-220-0000

**CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN**
James E. Cecchi
Lindsey Taylor
5 Becker Farm Road
Roseland, NJ 07068
Tel.:  973-994-1700

**SEEGER WEISS LLP**
Stephen A. Weiss
James A. O'Brien, III
One William Street
New York, NY 10004
Tel.:  888-584-0411

**LAYTIN VERNER LLP**
Jeffrey L. Laytin
Richard B. Verner
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Tel.:  212-631-8695

*Additional Counsel for Plaintiffs*

**SCOTT+SCOTT LLP**
Joseph P. Guglielmo
500 Fifth Avenue
New York, NY 10110
Tel.:  212-223-6444
     and
Christopher M. Burke
600 B Street, Suite 1500
San Diego, CA 92101
Tel.:  619-233-4565

**THE WRIGHT LAW OFFICE, P.A.**
William C. Wright
301 Clematis Street, Suite 3000
West Palm Beach, FL 33401
Tel.:  561-514-0904

**BERGER & MONTAGUE, P.C.**
Merrill G. Davidoff
Michael Dell'Angelo
1622 Locust Street
Philadelphia, PA 19103
Tel.:  215-875-3000

*Attorneys for Plaintiff Brian Balaguera*

**BLOOD HURST & O'REARDON LLP**
Timothy G. Blood
Thomas J. O'Reardon, II
600 B Street, Suite 1550
San Diego, CA 92101
Tel.: 619-338-1100

**ADEMI & O'REILLY, LLP**
Shpetim Ademi
Guri Ademi
David J. Syrios
3620 East Layton Ave.
Cudahy, WI 53110
Tel.: 866-264-3995

*Additional Counsel for Plaintiffs*

**LEXINGTON LAW GROUP**
Howard Hirsch
1627 Irving Street
San Francisco, CA  94122
Tel.: 415-759-4111

*Attorneys for Plaintiff James Hewitt*

38