UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CORRECTED-JULY 18, 2011**

| | |
|---|---|
| CARL BLESSING, et al., on Behalf of Themselves and All Others Similarly Situated, | |
| Plaintiffs, | No. 09-cv-10035 (HB)(RLE) |
| -against- | |
| SIRIUS XM RADIO INC., | |
| Defendant. | |

**DECLARATION OF JAMES J. SABELLA IN SUPPORT OF
(1) PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF PROPOSED SETTLEMENT AND
(2) CLASS COUNSEL'S APPLICATION FOR AN
<u>AWARD OF ATTORNEYS' FEES AND EXPENSES</u>**

JAMES J. SABELLA hereby declares under penalty of perjury as follows:

1.     I have been a member of the Bar of this Court for over 34 years and am a director of Grant & Eisenhofer P.A. ("Grant & Eisenhofer"), Co-Class Counsel.  I make this declaration in support of Plaintiffs' motion for final approval of proposed settlement resolving all claims of the Class, and Class Counsel's application for an award of attorneys' fees and expenses.

## I.     <u>INTRODUCTION</u>

2.     After several years of hard-fought litigation, including review of millions of pages of documents, the completion of fact and expert discovery, a motion to dismiss, a motion for summary judgment, a motion for class certification, and preparation of trial materials, on the eve of trial the parties reached a Settlement that provides outstanding value to the Class in a case where the risk of no recovery at all was very real.  The terms of the Settlement, which are set forth in the Settlement Agreement filed with the Court on May 13, 2011, provide consideration

to the Class estimated to be worth at least $180 million.  Class Counsel believe that this Settlement is fair and reasonable for the Class and should be granted final approval.

3.       The Settlement Agreement also provides that, subject to the Court's approval, Defendant Sirius XM Radio Inc. ("Sirius XM") will pay to Class Counsel up to $13 million in attorneys' fees and expenses incurred by the lawyers representing the Plaintiffs in this case.  This request, which amounts to approximately 7% of the estimated value of the Settlement, is also fair and reasonable and should be approved, especially considering that such payment would be paid directly by Sirius XM and will not reduce the value of the Settlement to the Class.  The reasonableness of the payment is further underscored by the fact that Plaintiffs' counsel have incurred $3,231,244.24 in out-of-pocket expenses and time charges of $17,384,638.50 − a total of $20,615,881.78.  Thus, far from providing a ***multiple*** of time charges, which courts typically approve when complex cases such as this are settled, the requested fee represents a significant ***reduction*** from lodestar.

## II.      PLAINTIFFS' CLAIMS AGAINST SIRIUS XM

4.       This case arises out of the merger between Sirius Satellite Radio Inc. and XM Satellite Radio Holdings Inc. that created Sirius XM.  The Second Amended Consolidated Complaint (the "Complaint") alleged that this merger violated the federal antitrust laws because it lessened competition, created a monopoly, and led to increased prices for satellite radio services sold by Sirius XM.  In particular, the Complaint alleged that after the merger Defendant increased its prices with respect to various services including: (i) an increase in the monthly charge per additional radio for multi-radio subscribers from $6.99 per month to $8.99; (ii) a

$2.99 monthly fee for Internet streaming; and (iii) a "U.S. Music Royalty Fee" (the "Royalty Fee"), which for most subscribers was set at $1.98 per month.[1]

5.      The Complaint also alleged claims for breach of contract and for violation of state consumer protection laws, asserting that Sirius XM did not calculate the Royalty Fee in a manner consistent with the description thereof contained in its contracts and other published materials. Plaintiffs sought damages and injunctive relief.

## III.   HISTORY OF THE LITIGATION

### A.      The Initial And Amended Complaints

6.      Class Counsel began to develop the facts behind the Action in the fall of 2009. This involved reviewing publicly available information regarding the DOJ and FCC review of the merger application; Sirius and XM subscription charges and channel offerings; royalties paid by Sirius and XM to the music industry; and the history of the satellite radio industry.  Counsel also investigated the relevant market, examining the unique aspects of satellite radio, as well as the extent of competition from other sources of audio entertainment such as AM/FM radio, iPods, Internet radio, and HD radio.

7.      Based on this research Class Counsel drafted the initial complaint, filing the first action, *Blessing v. Sirius XM*, on December 7, 2009.  The initial complaint alleged antitrust violations, as well as breach of contract (under New York law), and state consumer protection claims, under N.Y. Gen. Bus. L. § 349 as well as the consumer protection statutes of other states.

8.      Subsequently, three additional complaints were filed on behalf of other Sirius XM subscribers:  by Edward Scerbo, a New Jersey resident, on December 15, 2009; by John Cronin,

---

[1] On December 6, 2010 – after this litigation was commenced – Defendant lowered the Royalty Fee from $1.98 to $1.40 per month.

a New Hampshire resident, on December 23, 2009; and by Charles Bonsignore, a California resident, on January 22, 2010.

9.       On December 30, 2009, Grant & Eisenhofer and Cook Hall & Lampros, LLP ("Cook Hall") filed a motion to consolidate the then-pending cases and for an appointment as interim co-lead counsel.  Following the filing of the *Bonsignore* action, counsel for the various Plaintiffs agreed to a revised proposed leadership proposal whereby Grant & Eisenhofer, Cook Hall and Milberg LLP ("Milberg") would serve as interim co-lead counsel.  By order dated March 17, 2010, this Court appointed Grant & Eisenhofer, Milberg, and Cook Hall interim co-lead counsel, and granted the Plaintiffs' motion to consolidated the four filed cases.

10.      On February 25, 2010, Sirius XM filed a motion to dismiss.

11.      Grant & Eisenhofer, Milberg, and Cook Hall then worked together to draft and file a Consolidated Complaint on March 22, 2010, adding additional plaintiffs who reside in additional states.  The Consolidated Complaint asserted claims under the state consumer protection statutes of each of the states where at least one named plaintiff resides.

12.      On April 12, 2010, Sirius XM filed a motion to dismiss the Consolidated Complaint.  Pursuant to this Court's Individual Practices, Plaintiffs sought to amend the Consolidated Complaint in response to certain arguments raised in Defendant's motion to dismiss.  Defendant took the position that Plaintiffs could not amend the complaint.  To protect against Defendant prevailing on this position, Class Counsel prepared their opposition to the motion to dismiss but also informed the Court of the plans to file an amended complaint in response to Defendant's motion to dismiss.

13.     On May 3, 2010, the Court issued an order indicating that Plaintiffs could amend the complaint and should not file the opposition to the existing motion to dismiss.[2]

14.     Class Counsel revised the complaint in an effort to address purported deficiencies and on May 3, 2010, Plaintiffs filed the Second Amended Consolidated Complaint, adding additional Plaintiffs who reside in additional states.

15.     On May 18, 2010, Defendant moved to dismiss the breach of contract claims and the consumer protection claims under the laws of certain states.  Class Counsel researched the issues and prepared and filed comprehensive papers in opposition.

16.     By Opinion and Order dated November 17, 2010, the Court dismissed the breach of contract claims and certain consumer protection claims, and denied dismissal of the remaining consumer protection claims.

17.     On December 20, 2010, in accordance with this Court's Individual Practices, Class Counsel wrote a letter to the Court expressing their intention to file a motion for leave to amend the Complaint to address the deficiencies in the breach of contract claim on which the Court had based dismissal of that claim.  The next day, December 21, 2010, the Court denied leave to amend.

**B.     Plaintiffs' Extensive Discovery Efforts**

**1.     Document Discovery**

18.     Plaintiffs served their first request for production of documents on January 25, 2010.  This request sought documents Sirius and XM had already produced to the DOJ and/or

---

[2] Pursuant to this Order, Class Counsel have not included time spent drafting the opposition to this motion to dismiss in their cumulative lodestar figure in their application for an award of attorneys' fees and expenses.  It should be noted, however, that much of the work done to draft this brief was then adapted for the opposition to the subsequent motion to dismiss Defendant filed, to which Plaintiffs did have to respond.

FCC in the course of the merger review.  Defendant began producing approximately 10 million pages of documents from the underlying DOJ and FCC merger on April 26, 2010.

19.     At the March 4 conference, the Court issued a scheduling order setting a November 15, 2010 cut-off date for fact discovery.

20.     In early May 2010, the parties began a meet-and-confer process to determine the scope of Defendant's production in response to Plaintiffs' first request for production.  By letter dated May 25, 2010, Plaintiffs sought Court assistance in resolving certain disputes regarding these issues.  The Court referred the pending dispute to Magistrate Judge Ellis, by Order dated June 8, 2010.

21.     In the meantime, on May 28, 2010, Class Counsel prepared served their second document request.  Defendants also served document requests, to which Class Counsel needed to respond.

22.     In late June 2010, Defendant began production of documents responsive to Plaintiffs' document requests other than those requesting materials previously produced to the DOJ and FCC.  However, from June through August, the parties continued to negotiate the scope of Defendant's production as well as the timing for completion of production, in light of the November 15, 2010 discovery cut-off.  Plaintiffs wrote to Magistrate Ellis several times, and while the parties were able to resolve certain issues with several rounds of meet-and-confer telephone conferences, the intervention of Judge Ellis was requested in September 2010 and again in October and November 2010.

23.     Plaintiffs also served third-party subpoenas on several entities involved in the merger process or other aspects of Sirius XM's business:  JPMorgan and Morgan Stanley, who provided investment banking  services to Sirius and XM to advise them on the merger; ASCAP,

BMI, and SoundExchange/Recording Industry Association of America, the entities that collect music royalties from Sirius XM; Liberty Media, which made a substantial investment in Sirius XM in early 2009; and Odyssey and Ipsos, market research firms engaged by Sirius and XM prior to the merger.

24.     Beginning in May 2010, Class Counsel assembled a team of approximately 25 attorneys, from 11 firms, to review and categorize the 1.3 million documents that Sirius XM and the non-parties produced.  This work continued beyond the November 15, 2010 discovery cut-off, with Defendant continuing to produce responsive documents until December 2010.

**2.     Fact Depositions**

25.     Class Counsel took fact depositions of the following Sirius XM officials:

Mel Karmazin – Chief Executive Officer

David Frear – Chief Financial Officer,  (Mr. Frear was deposed twice:  once in his individual capacity and once as a Rule 30(b)(6) witness)

James Meyer – President-Operations and Sales

Jennifer Witz – Senior Vice President-Finance

Stephen Cook – Group Vice President and General Manager of the Automotive Division

Joseph Zarella – Group Vice President

Catherine Brooker – Vice President

Brian Wood – Senior Advisor

Given the high corporate offices held by these witnesses and the importance of their testimony, preparation for each of these depositions was necessarily extensive.

26.     Class Counsel also defended the depositions of nine named plaintiffs whom Defendant's counsel deposed.

### 3.   Interrogatories And Requests For Admission

27.    Class Counsel prepared and propounded to Defendant two sets of interrogatories.

28.    Defendant propounded to Plaintiffs one set of interrogatories and requests for admissions, which were quite extensive and burdensome to respond to.  Plaintiffs' response was 57 pages long.

### 4.   Expert Discovery

29.    To support Plaintiffs' claims, Class Counsel retained four prominent testifying expert witnesses:

> Hal Singer - Managing Director of Navigant Economics
>
> James Langenfeld – Managing Director of Navigant Economics and adjunct professor at Loyola University Chicago School of Law
>
> Basil Imburgia – Senior Managing Director of FTI Consulting, Inc.
>
> Boris Steffen – Principal and Director of Navigant Economics

30.    Class Counsel worked extensively with each of these experts concerning the preparation of their reports, which in the case of Drs. Singer and Langenfeld included both initial and rebuttal reports, and for Dr. Langenfeld, initial and rebuttal reports in support of Plaintiffs' motion for class certification.  In addition, Class Counsel represented each of these experts at depositions taken by Defendant's counsel.

31.    Defendant disclosed two expert witnesses:

> Michael Baye - Professor of Business Economics and Public Policy at the Indiana University Kelley School of Business
>
> Lauren Stiroh - Senior Vice President of NERA Economic Consulting

32.    Class Counsel spent significant time preparing for and taking the depositions of these two experts.

### C.     Plaintiffs' Motion For Class Certification

33.     On July 30, 2010, Plaintiffs moved for class certification.  The motion involved preparation of a detailed memorandum of law, working with Dr. Langenfeld in the preparation of his economic report concerning class certification issues, and assembling numerous documents supporting class certification.

34.     After reviewing Defendant's opposition to the motion and preparing Plaintiffs' reply memorandum of law, Class Counsel conducted oral argument of the motion on January 11, 2011.

35.     By Opinion and Order dated March 29, 2011, the Court granted class certification as to the antitrust damage claim and denied class certification as to the consumer protection claims and request for injunctive relief.

### D.     Sirius XM's Motion For Summary Judgment

36.     On January 18, 2011, Defendant moved for summary judgment as to all remaining claims.  The motion raised numerous complicated issues, including novel issues concerning the application of the filed rate doctrine to Plaintiffs' claims.

37.     Class Counsel prepared a comprehensive memorandum of law in opposition to the motion, which was accompanied by over 150 documents and a 77 page statement under Local Rule 56.1.

38.     Class Counsel conducted oral argument of the motion on March 10, 2011.

39.     By Opinion and Order dated March 29, 2011, the Court denied summary judgment as to the antitrust claims and granted summary judgment as to the consumer protection claims.

E.    **Plaintiffs' Preparations For Trial**

40.    On or about March 15, 2011, the Court set a May 2, 2011 trial date and directed that the pretrial order be submitted by April 15, 2011.  Accordingly, it was necessary for Class Counsel to immerse themselves in intensive preparation for trial.

41.    Preparation of the pretrial order required Class Counsel to prepare an exhibit list. This was a daunting task, in light of the fact that millions of pages of documents had been produced by Sirius XM and non-parties.  Class Counsel reviewed all of the documents that had been marked as exhibits at depositions, all of the documents that had been submitted on the class certification and summary judgment motions, all of the documents referred to in Plaintiffs' experts' reports, all of the documents referred to in Plaintiffs' interrogatory answers, and other accumulations of documents in order to prepare a list of several thousand exhibits, which was provided to Defendant's counsel.

42.    Similarly, Defendants' counsel provided to Class Counsel Defendants' lengthy exhibit list.  Class Counsel needed to review each exhibit on Defendant's list in order to decide what objections, if any, to make to the introduction of such exhibits at trial.

43.    At the time the work on the exhibits was taking place, the Court issued its opinion granting summary judgment as to the consumer protection claims.  Class Counsel then had to revisit each exhibit on Plaintiffs' list to determine if the exhibit was still relevant given that the consumer claims were no longer in the case.

44.    As part of the pretrial work, the parties also exchanged motions *in limine*.  Class Counsel prepared and served on Defendant seven such motions, and  Defendant served five such motions on Class Counsel.  Class Counsel was in the process of preparing their opposition to Defendants' motions when the Settlement occurred.

45.     Class Counsel prepared and provided to Defendant's counsel a list of witnesses that Plaintiffs intended to call at trial.  In order to prepare the list, Class Counsel needed to review the various depositions that had been taken, as well as the documents on the draft exhibit list, in order to make sure that witnesses needed for various topics or to get various documents into evidence were on the list.

46.     Class Counsel prepared designations of deposition testimony to be offered into evidence.

47.     Class Counsel prepared proposed stipulations of fact and law.

48.     Class Counsel prepared a draft of Plaintiffs' opening statement.

49.     Class Counsel began preparing draft jury instructions and voir dire questions.

## II.     THE SETTLEMENT

### A.     The Negotiation Process

50.     Initial discussions concerning settlement took place in November 2010.  After an exchange of offers, it was clear that the parties were far apart.  Nevertheless, Class Counsel and counsel for Defendant continued to have meetings and telephone conversations in an effort to reach a resolution of the case.

51.     A wide variety of possible ways of settling the case were explored.  Given the confidentiality that pertains to settlement discussions, I cannot set forth here the various demands and offers that were exchanged.  I believe that it is appropriate to say, however, that counsel for Defendant made it very clear, and never deviated from the position, that a settlement involving a large cash payment to the Class was out of the question.  Therefore, any meaningful settlement had to involve non-cash consideration.

52.     The settlement discussions continued simultaneously with preparation for trial. The negotiations ultimately culminated in the execution of the Settlement Agreement on May 12, 2011.  The consideration to the Class under the Settlement is as follows:

a.  The base prices for monthly, quarterly, semi-annual, annual and other long term subscriptions (but excluding lifetime subscriptions) will remain at or below their current rates through December 31, 2011.

b.  The price for subscriptions (beyond the initial subscription) purchased by multi-radio subscribers will remain at or below the current rate through December 31, 2011.

c.  The price for Internet streaming for subscribers with basic subscriptions will remain at or below $2.99 per month through December 31, 2011.

d.  Defendant will not increase the subscription prices for its "Best of" packages (now known as "premier" packages) prior to December 31, 2011.

e.  The U.S. Music Royalty Fee will remain at or below its current rate through December 31, 2011.

f.  Subscribers will, irrespective of whether their subscription plans come up for renewal prior to December 31, 2011, be permitted to renew their subscriptions prior to December 31, 2011 at the rates currently in effect and be able to subscribe, at the rates existing through December 31, 2011, to a monthly, quarterly, semi-annual, annual or other then-existing long term subscription plans (but excluding lifetime subscriptions) which will keep their rates at then-existing subscription levels through the entire period of their new subscription term.

g.  Defendant will permit former subscribers who terminated their Sirius XM service between July 29, 2009 and the deadline for requesting exclusion from the Class to either (a) reconnect their satellite radio without paying a reactivation fee and receive one month of basic satellite radio service at no cost; or (b) receive Sirius XM Internet streaming service for one month at no cost.

53.     In addition, Defendant agreed to provide notice to the Class and to pay all costs associated with such notice.  Class Counsel prepared the drafts of the Settlement Agreement and supporting documents, such as the notices and proposed preliminary approval and final judgment.

54.     Class Counsel were concerned as to how to value the non-cash consideration, such as a price freeze, that is part of the Settlement.  In light of this concern, Class Counsel insisted that Defendant provide representations as to its plans with respect to raising subscription prices absent the freeze and to provide a calculation of the estimated value.  Thus, the Settlement Agreement provides.

> Defendant will provide support, through declarations or other evidence, that it has contemplated and made plans for raising the prices of its subscription plans and other charges, including the multi-receiver discount, by $2 per month (without an offsetting reduction in other fees) after the price restriction imposed upon it by the Federal Communications Commission expires on July 28, 2011.  Defendant estimates that the value to the Class of not implementing such a rate increase between August 1, 2011 and December 31, 2011 is approximately $180 million.

Settlement Agreement ¶ 2(a).

55.     As noted above, in addition to providing consideration for the Class, the Settlement Agreement provides that Defendant will pay Plaintiffs' attorneys' fees and expenses up to $13 million, subject to the Court's approval.  The amount of such payment was not agreed on until after all of the substantive terms of the Settlement had been negotiated and agreed on.

### B.     The Estimated Value Of The Settlement

56.     The parties have estimated that the value to the Class of the price freeze that is part of the Settlement is at least $180 million.  *See* Declaration of James Langenfeld, submitted herewith; Declaration of Catherine Brooker, submitted herewith.  The primary fact underpinning such estimates of value is the documentary evidence from Sirius XM's files that demonstrates that Sirius XM had contemplated and made plans to increase the base price for its subscriptions by $2.00 per month – from $12.95 to $14.95 per month – after the FCC's price cap expired at the end of July 2011.  This evidence is as follows.

57.     Almost as soon as the merger closed, Sirius XM began planning for a price increase once it was permitted under the FCC order.  In October of 2008, CFO Frear suggested

to CEO Karmazin that Sirius XM should implement a $2.00 price increase in the third quarter of 2011.  *See* attached as Ex. 1.

58.     By the fall of 2009, as Sirius XM was analyzing how to account for the revenue from the Royalty Fee and whether and when to reduce the Royalty Fee, the Company was already assuming that the base price would increase after the FCC order expired in late July 2011.  A September 15, 2009 email indicates that internal plans assumed the primary rate would increase to $14.95 on August 1, 2011.  *See* attached as Ex. 2.  An email and the attached presentation from November 2009 similarly shows plans for an increase to $14.99 and a $1.00 increase in the multi-radio price.  *See* attached as Ex. 3.

59.     A pricing presentation from July 2010 – one of the more recent documents produced by Defendant in this litigation – shows that Sirius XM continued planning for an increase after the FCC price restriction expired in late July 2011, with a plan to increase the base to $14.99.  *See* attached as Ex. 4.

60.     A spreadsheet calculating the projected revenue from the Royalty Fee, generated in August 2010, shows Sirius XM initiating a $2.00 price increase in August 2011.  *See* attached as Ex. 5.

61.     Sirius XM's statements to investors also indicate that Sirius XM was awaiting the expiration of the FCC price cap and would then soon raise prices.  In the February 15, 2011 investor conference call discussing results from the fourth quarter of 2010, Karmazin noted that one "should assume that the Company is going to increase prices in the future."  Q4 2010 Sirius XM Radio Earnings Conference Call, Feb. 15, 2011, attached as Ex. 6.  A few weeks later Frear implied that a price increase was in the works.  He explained that the Company was expecting the FCC price cap to expire in July, and noted the Sirius price has remained at $12.95 since its

launch in 2002 and that a lot of content had been added over the years.  Sirius XM Radio at

Deutsche Bank Securities Inc. Media and Telecom Conference, Mar. 9, 2011, attached as Ex. 7.

62.     Sirius XM's communications with the FCC further indicate that the Company was

planning to implement a price increase once the price cap expires.  Given that Sirius XM would

have needed to know *in advance* of the July 28 expiration of the rate freeze in order to

implement an August 1 price increase, in several letters to the FCC documenting *ex parte*

communications, counsel for Sirius XM urged the FCC to "act quickly" on the issue of whether

to extend the rate freeze "in a way that would allow the existing rate freeze to expire by its own

terms."  *See* April 27, 2011 letter from Robert L. Pettit, Wiley Rein LLP to Marlene H. Dortch,

FCC, attached as Ex. 8.

63.     Sirius XM estimates that the value of the price freeze under the Settlement is

approximately $180 million.  *See* Declaration of Catherine Brooker.

64.     Plaintiffs' expert, James Langenfeld, estimates the value of the price freeze under

the Settlement is approximately $200 million.  *See* Declaration of James Langenfeld.

65.     Plaintiffs' damages expert has estimated that the maximum potential total

damages in this case (assuming that Plaintiffs prevailed both on liability and on Defendant's

various challenges to damages summarized above) amount to approximately $445 million.  At

the low end, Plaintiffs' damages expert estimated antitrust damages at $208 million.  Thus, the

value of the price freeze represents 40% to 86% of the plaintiffs' estimated damages.

66.     These estimates do not purport to include the value from the provision in the

Settlement Agreement that allows former subscribers to have one free month of service, with no

reconnection charge.  As the a month of service is worth $12.95 and the reconnection charge is

$15.00, this amounts to a value of $27.95 for each subscriber who takes advantage of it.  As there

are approximately six million former subscribers eligible to take advantage of this part of the Settlement, the additional value to the Class could be very large.  *See* Declaration of James Langenfeld ¶ 7.

## III.   THE RISKS FACED BY PLAINTIFFS IF THE CASE CONTINUED

67.   Balanced against the value of the Settlement are the risks of continued litigation. There were considerable barriers to recovery in this case, and there was a substantial chance that no recovery at all would have been achieved if the case had proceeded to trial.

68.   The fact that the Court dismissed the breach of contract claims and granted summary judgment as to the consumer protection claim greatly increased the risk that there would be no recovery if the case went to trial.  Those claims involved facts that were much easier for a jury to understand than the antitrust claims that remained in the case.  The theory behind those state law claims was straightforward, *i.e.*, that the Royalty Fee was being calculated in a manner different from the way described by Sirius XM in its contracts or other communications with subscribers.

69.   In contrast, the antitrust claims required the jury to weigh competing expert testimony regarding matters such as relevant market and competitive behavior in the absence of the merger – including in the absence of the FCC price cap that has artificially constrained prices since that time, involving complex antitrust theories that would be difficult for a layperson to comprehend.  Plaintiffs would have had to demonstrate that the relevant market for antitrust purposes is the market for satellite radio, not the broader market for audio entertainment, and that rapidly evolving audio technology (such as Internet radio and improved in-dashboard access to Internet and iPod controls) does not present a significant competitive threat to Sirius XM.

70.   In addition, the risk that the antitrust claims would fail was exacerbated by the fact that after extensive analysis of the proposed merger, neither the Department of Justice nor

16

the Federal Communications Commission had sought to block it.  Indeed, the DOJ stated when it closed its investigation that "the evidence does not demonstrate that the proposed merger of XM and Sirius is likely to substantially lessen competition."[3]  To prevail at trial, Plaintiffs faced the prospect of having to convince the jury that the DOJ and FCC were wrong.  Although the law is clear that a decision by a government agency not to block a merger does not negate a post-merger challenge, the jury may well have been influenced by what the DOJ and FCC did and did not do.  Further, if (as expected) the FCC decides to lift the price cap that expires at the end of July, Plaintiffs would have had to deal with the fact that a governmental agency that had asserted jurisdiction over the Sirius XM merger had concluded that a price freeze was no longer in the public interest.

71.     Even if Plaintiffs were successful in establishing that Sirius XM had antitrust liability, they faced serious issues as to damages.  For example, if Plaintiffs succeeded in proving that absent the merger, Sirius and XM would not have charged a Royalty Fee of $1.98, they would still have had to prove that Plaintiffs had suffered damages.  Prof. Langenfeld estimated the Royalty Fee-related damages under the antitrust claims could be as low as $88 million.

72.     Plaintiffs also faced risks in proving damages with respect to the increase in the multi-radio price from $6.99 to $8.99.  Plaintiffs faced the challenge of proving that Sirius and XM would not have increased the multi-radio price (*i.e.*, the family discount) above $6.99 in the but-for world.  In this regard, internal XM and Sirius documents created prior to the announcement of the Sirius and XM merger showed XM and Sirius each planned to raise this price to $7.99, *see* attached as Ex. 10, and in the Canadian market, where Sirius and XM had

---

[3] *See* Department of Justice press release dated Mar. 24, 2008, attached as Ex. 9.

remained separate companies, Sirius Canada had increased its multi-radio subscription price by C$2.00 in March of 2009.

73.     Thus, there were substantial risks that Sirius XM would have no liability or that any liability imposed would be small.

74.     There was also a substantial risk that any judgment would prove uncollectible due to Sirius XM's financial condition.  The financial difficulties that Sirius, XM and the merged company have faced are well known.  Until 2010, they had lost money every year, with total losses of close to $10 billion.  *See* Sirius and XM Form 10-Ks for 2007, and 2008, respectively attached as Exs. 11 and 12.  In 2010, Sirius XM's net income was only approximately $43 million.  *See* Sirius XM Form 10-K for 2010 at 24, attached as Ex. 13.  In addition, the Sirius XM balance sheet is burdened with over a billion dollars of debt.  *Id*.  Thus, if Plaintiffs had gone to trial and won a verdict of several hundred million dollars, which would be trebled under the antitrust laws, the resulting judgment may well have surpassed the ability of Sirius XM to pay. There loomed, then, the possibility that Sirius XM would have sought protection under the bankruptcy laws (which Sirius XM considered even prior to the filing of this lawsuit, in early 2009 as a result of financial distress at the time).  *See* January 25, 2010 Lazard Capital Markets report at 1, attached as Ex. 14.  The judgment could have become uncollectible.

IV.     **CLASS COUNSEL' FEE AND EXPENSE APPLICATION**

75.     Class Counsel seeks an order directing Sirius XM to pay to Class Counsel $13 million for Plaintiffs' attorneys' fees and expenses.  As set forth in the accompanying memorandum of law, this request is justified under the standards used in this Circuit for awards of fees and expenses.

76.     Class Counsel undertook the prosecution of this case entirely on a contingent-fee basis and assumed significant risk in bringing these claims.  From the outset, Class Counsel

understood that they were embarking on a complex and expensive litigation with no guarantee of being compensated for the enormous investment of time and money the case would require.  In undertaking that responsibility, Class Counsel were obligated to ensure that they dedicated sufficient resources to the prosecution of this litigation, and that funds were available to compensate staff and to cover the considerable out-of-pocket costs that a case such as this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Class Counsel have received no compensation during the course of this litigation and have incurred many millions of dollars in out-of-pocket expenses in prosecuting this action for the benefit of the class.

77.     Because Class Counsel understood that there was the possibility that they would not receive any compensation for their time or reimbursement of their expenses, they were motivated to, and did, take steps to minimize expenses whenever practicable, and to litigate the case as efficiently as possible while avoiding unnecessary duplication of work.  Toward that end, Class Counsel conducted weekly conference calls to ensure that all litigation team members were fully apprised of each other's activities and progress, and to coordinate efforts to avoid duplication.

78.     As discussed above, the benefit to the Class from the price freeze contained in the Settlement Agreement is estimated to be approximately $180 million.  Furthermore, as discussed above, the former subscribers in the Class will benefit from being able to obtain a month of free service, with no reconnection fee.

79.     In addition, there is one other way in which Class Counsel contends the Class has benefitted from Class Counsel's efforts.  During  the litigation in December 2010, Sirius XM

reduced the Royalty Fee from $1.98 to $1.40, which Plaintiffs' expert, Prof. Langenfeld,

estimates has reduced what subscribers had to pay in this period by approximately $66 million.

Sirius XM documents created before the litigation show that the Company planned to reduce the

Royalty Fee in or about *August 2011*.  *See*, *e.g.*, May 2009 long range planning document,

attached as Ex.15; September 2009 email attached as Ex. 16; see Ex. 5. *See also* excerpt of

Transcript of Deposition of Jennifer Campbell Witz, October 26, 2010 attached as Ex. 17.   Then,

in October 2010, in a Rule 30(b)(6) deposition addressing this topic, Sirius XM disclosed that it

would reduce the Royalty Fee in *December 2010*.  Plaintiffs believe that the Court can take this

reduction into account in evaluating the fee request.  It should be noted, however, that Sirius XM

contends that its decision to reduce the Royalty Fee in December 2010 was not influenced by the

litigation in any way and does not provide a net benefit to subscribers.

80.     Attached hereto as Exhibit 18 is a table providing the hours worked and billing

rates for Class Counsel and all of the other firms that performed services for Plaintiffs in this

case, as reflected in the books and records of the various firms representing Plaintiffs in this case,

which are summarized in the billing records attached as Exhibit 19.  As shown therein, counsel

for Plaintiffs worked approximately 37,568.07 hours on this case, and the total lodestar comes to

$17,384,638.50.[4]  It is generally not possible to segregate time spent only in connection with the

antitrust claims from time spent on the breach of contract claims that were dismissed or the

consumer fraud claims for which summary judgment was granted in Defendant's favor, since so

much time – such as time spent reviewing documents and taking depositions – related to all then

pending claims.

---

[4] These figures exclude time spent on Class Counsel's motion for an award of attorneys' fees and
reimbursement of expenses.  They also exclude time spent preparing the opposition to
Defendant's initial motion to dismiss.

81.     The hourly rates are commensurate with the hourly rates typically charged by lawyers and legal assistants performing similar services in New York City.  *See National Law Journal* samplings of billing rates from 250 largest U.S. law firms in 2008, 2009 and 2010, attached hereto as Exhibits 20, 21, and 22.

82.     Attached hereto as Exhibit 23 is a table showing the expenses incurred by Plaintiffs' counsel in the prosecution of this litigation, as reflected in the books and records of the various firms representing Plaintiffs in this case, which are summarized in the billing records attached as Exhibit 19.  In order to efficiently handle paying expenses, Class Counsel established a Litigation Fund, to which they made contributions and out of which most sizable expenses were paid.  The expenses paid by the Litigation Fund are shown on Exhibit 24.  In total, Plaintiffs' counsel have incurred a total of $3,231,244.24 in expenses.  Below is a summary of these expenses, by category:

| | |
|---|---|
| Expert witnesses | $2,442,482.94 |
| Computerized research | $111,555.94 |
| Document management services | $312,955.50 |
| Photocopying | $110,764.53 |
| Court reporting and transcription services | $54,786.82 |
| Travel/local transportation/working meals | $163,730.89 |
| Filing fees | $2,785.01 |
| Service fees | $1,868.08 |
| Telephone/fax | $5,419.53 |
| Postage/express mail/hand delivery | $5,438.26 |
| Miscellaneous | $19,455.74 |
| **TOTAL** | **$3,231,244.24** |

83.     The foregoing expenses were reasonable and necessary to the prosecution of this action, and are the type of expenses that plaintiffs' counsel typically incur in class action litigation and for which plaintiffs' counsel typically are reimbursed when the litigation settles.

Done at New York, New York this 15th day of July, 2011.

_____/s/ James J. Sabella_____
James J. Sabella