**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARL BLESSING, *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SIRIUS XM RADIO INC.,<br><br>Defendant. | Case No: 09-cv-10035 (HB) (RLE)<br><br><br>Date:  August 8, 2011<br>Time:  10:00 a.m. |

## OBJECTION OF NICOLAS MARTIN AND NOTICE OF INTENT TO APPEAR

David Stein
SAMUEL & STEIN
38 West 32nd St. Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Email: dstein@samuelandstein.com

Theodore H. Frank (*pro hac vice* pending)
CENTER FOR CLASS ACTION FAIRNESS LLC
1718 M Street NW, No. 236
Washington, DC 20036
Phone: (703) 203-3848
Email: tedfrank@gmail.com

Attorneys for Objector Nicolas Martin

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................I

TABLE OF AUTHORITIES .................................................................................III

INTRODUCTION ....................................................................................................1

I.      Objector Nicolas Martin Is a Class Member. ................................................3

II.     A Court Owes a Fiduciary Duty to Unnamed Class Members. ......................5

        A.      *Grinnell* Is Not By Itself Dispositive. .........................................5

        B.      The Silence of the Class Should Not Be Construed as Acquiescence. ...............6

        C.      The Third *Grinnell* Factor Is Not a Reason to Approve This Settlement. ..........8

        D.      Class Counsel's Recommendation Is Superfluous. ................................8

        E.      The Court Can Apply Section 3.05 of the ALI Principles Consistently With Second Circuit Precedent. ..........................................9

III.    The Settlement Is Unfair Because the Relief to the Class Is Disproportionately Small Relative to Either the Size of the Attorneys' Fees or, in the Alternative, to the Size of the Value of the Case. ..................................................................................9

        A.      Class Counsel Fails to Carry Its Burden to Show That the Injunctive Relief Is Not Worthless. ................................................12

                1.      Sirius XM Is Judicially Estopped From Claiming That It Has the Market Power to Raise Prices. ................................................12

                2.      Market Pressure Has Forced Sirius XM to Engage in Deep Discounting, Demonstrating Both Lack of Market Power and the Worthlessness of the Injunctive Relief. ................................................13

                3.      Class Counsel's Expert Evidence of Injunction Value Flunks *Daubert*. ........14

        B.      The Worthless Injunctive Relief Is Thus Inadequate as a Matter of Law. .......17

        C.      If Sirius XM Has Sufficient Market Power to Make the Injunction Worth More Than Zero, Then the Settlement Is Inadequate. ....................17

IV.     The Fee Arrangement Breaches the Attorneys' Duty to the Class. ..............................18

V.      The Notice Violates Rule 23(h)...........................................................................................20

VI.     The Class Certification Order Violates Rule 23(a)(4),  Rule 23(g), and the
        Constitution................................................................................................................................21

VII.    The Fee Request Does Not Comply With 28 U.S.C. § 1712. ......................................23

CONCLUSION ............................................................................................................................24

PROOF OF SERVICE..................................................................................................................26

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adarand Constructors, Inc. v. Pena,*
   515 U.S. 200 (1995) ...................................................................................22

*Bridgeway Corp. v. Citibank,*
   201 F.3d 134 (2d Cir. 2000) .....................................................................15

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993) ...................................................................................16

*Central States SE & SW Areas Health & Welfare Fund v.*
   *Merck-Medco Managed Care, LLC,*
   504 F.3d 229 (2d Cir. 2007) .......................................................................5

*City of Detroit v. Grinnell Corp.,*
   495 F.2d 448 (2d Cir. 1974) ...................................................5–6, 8, 9, 16, 17

*Daubert v. Merrell Dow Pharmaceuticals,*
   509 U.S. 579 (1993) ..........................................................................1, 15, 17

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) .......................................................................5

*First Savs. Bank, v. U.S. Bancorp,*
   117 F. Supp. 2d 1078 (D. Kan. 2000)......................................................15

*Fleury v. Richemont North Am., Inc.,*
   No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Aug. 6, 2008).............23

*Gen. Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ............................................................................15–16

*Grant v. Bethlehem Steel Corp.,*
   823 F.2d 20 (2d Cir. 1987) ........................................................................5

*Grove v. Principal Mut. Life Ins. Co.,*
   200 F.R.D. 434 (S.D. Iowa 2001)...........................................................6–7

*Grutter v. Bollinger,*
   539 U.S. 306 (2003) ...................................................................................22

*In re Brand Name Prescription Drugs Antitrust Litigation,*
    1999 U.S. Dist. Lexis 550 (N.D. Ill. Jan. 19, 1999),
    *aff'd on other grounds,* 186 F.3d 781 (7th Cir. 1999) ............................................... 15

*In re Corrugated Container Antitrust Litig.,*
    643 F.2d 195 (5th Cir. 1981) ........................................................................................ 7

*In re Dreyfus Aggressive Growth Mut. Fund Litig.,*
    No. 98-cv-4318 (HB), 2001 WL 709262 (S.D.N.Y. June 22, 2001) ............................ 17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ................................................................................ 6–8, 19

*In re GMC Engine Interchange Litig.,*
    594 F.2d 1106 (7th Cir. 1979) ..................................................................................... 7

*In re J.P. Morgan Chase Cash Balance Litig.,*
    242 F.R.D. 265 (S.D.N.Y. 2007) ................................................................................ 21

*In re Mercury Interactive Corp. Sec. Lit.,*
    618 F.3d 988 (9th Cir. 2010) ...................................................................................... 20

*Johnson v. Comerica,*
    83 F.3d 241 (8th Cir. 1996) ........................................................................................ 19

*Kelco Disposal, Inc. v. Browning-Ferris Industries of Vermont, Inc.,*
    845 F. 2d 404 (2d Cir. 1988) ................................................................................ 17–18

*Kumho Tire v. Carmichael,*
    526 U.S. 139 (1999) .................................................................................................... 15

*Lobatz v. U.S. West Cellular of Cal., Inc.,*
    222 F.3d 1142 (9th Cir. 2002) .................................................................................... 19

*Major League Baseball Properties v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008) ....................................................................................... 15

*Masters v. Wilhelmina Model Agency Inc.,*
    473 F.3d 423 (2d Cir. 2007) .......................................................................................... 9

*Mirfasihi v. Fleet Mortg. Corp.,*
    356 F.3d 781 (7th Cir. 2004) ........................................................................................ 5

*Mitchell v. Washingtonville Cent. Sch. Dist.,*
    190 F.3d 1 (2d Cir. 1999) ............................................................................................ 13

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ................................................................13

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ................................................................22

*SEC v. Bear, Stearns & Co.,*
    626 F. Supp. 2d 402 (S.D.N.Y. 2009) .....................................9

*Silber v. Mahon,*
    957 F.2d 697 (9th Cir. 1992) ....................................................5

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.,*
    427 F. Supp. 2d 1022 (D. Kan. 2006) ....................................15

*Synfuel Technologies, Inc. v. DHL Express, Inc.,*
    463 F.3d 646 (7th Cir. 2006) ..................................................23

*True v. American Honda Motor Co.,*
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) .................................23

*United States v. Hays,*
    515 U.S. 737 (1995) ...........................................................22–23

*Wal-Mart Stores, Inc. v. Visa USA, Inc.,*
    396 F.3d 96 (2d Cir. 2005) .......................................................5

*Weinberger v. Great N. Nekoosa Corp.,*
    925 F.2d 518 (1st Cir. 1991) ..................................................18

*Weisgram v. Marley Co.,*
    528 U.S. 440 (2000) ...............................................................16

**Rules and Statutes**

28 U.S.C. § 1712 .............................................................1–3, 23, 25

28 U.S.C. § 1712(a) ................................................................24

Fed. R. Civ. Proc. 23 .................................................................1

Fed. R. Civ. Proc. 23(a)(4) ....................................... 2, 19, 21–22

Fed. R. Civ. Proc. 23(e) ............................................... 3, 11

Fed. R. Civ. Proc. 23(e)(2) ........................................................................... 19

Fed. R. Civ. Proc. 23(g) .............................................................................. 21

Fed. R. Civ. Proc. 23(h) ..................................................................... 2, 20, 25

Pub. L. 109-2, § 2(a)(3)(A) ........................................................................ 23

## Other Authorities

AMERICAN LAW INSTITUTE,
 PRINCIPLES OF THE LAW OF AGGREGATE LITIG. Chapter 3 (2010) .............................. 9

AMERICAN LAW INSTITUTE,
 PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05 (2010) ......................... 6, 9, 17

AMERICAN LAW INSTITUTE,
 PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(a) (2010) ............................... 6

AMERICAN LAW INSTITUTE,
 PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(b) (2010) ............................... 6

AMERICAN LAW INSTITUTE,
 PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ............................... 5

AMERICAN LAW INSTITUTE,
 PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05, comment *a* (2010) ... 4, 5, 8–9

*Court Awarded Attorney Fees, Report of the Third Circuit Task Force,*
 108 F.R.D. 237 (1985) ........................................................................ 19

FTC and Dept. of Justice,
 *Horizontal Merger Guidelines* § 2.1.1 (2010) ......................................... 11

FTC and Dept. of Justice,
 *Horizontal Merger Guidelines* § 4.1.1 (2010) ......................................... 10

Frankel, Allison,
 "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and
 Grant & Eisenhofer to Modify Apple Securities Class Action Deal,"
 AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010) ........................................... 3

Jacobson, Jeffrey S.,
    "Defining 'Coupon' Under the Class Action Fairness Act,"
    PRODUCT LIAB. LAW 360 (Jan. 15, 2008) ........................................................................23

Law Professors,
    Letter to Stephen Crane (Sep. 17, 2007) ...........................................................................19

Leslie, Christopher R.,
    *The Significance of Silence: Collective Action Problems and Class Action Settlements*,
    59 FLA. L. REV. 71 (2007) .................................................................................................7

MCARTHUR, TOM, *ed.*,
    THE OXFORD COMPANION TO THE ENGLISH LANGUAGE (1992) .............................11

ORWELL, GEORGE,
    1984 (1948) .....................................................................................................................11

Pettit, Robert L.,
    Letter to William Lake (Jan. 20, 2011)....................................................................... 12–13

Raymond, Nate,
    "Judge's Unusual Order Revives Law Firm Diversity Issue,"
    N.Y.L.J. (Oct. 28, 2010)..................................................................................................22

Reply Comments of Sirius XM Radio Inc. (March 11, 2011) ............................................ 12–13

Silver, Charles,
    *Due Process and the Lodestar Method*,
    74 TULANE L. REV. 1809 (2000) ............................................................................... 18–19

Zahorsky, Rachel M.,
    "Unsettling Advocate," ABA J. (Apr. 2010) .....................................................................3

## INTRODUCTION

This settlement—which provides nothing to the class other than a gratuitous pricing promise, but $13 million of cash to the attorneys—must be rejected for four independent reasons.

*First*, the relief to the class is either entirely illusory or insufficient. The promise not to raise prices is not a benefit to the class unless Sirius/XM has the market power to raise prices—but if Sirius/XM has the market power to raise prices, then the allegations of antitrust violations in the complaint are true, and the settlement cannot be considered adequate. If, on the other hand, Sirius/XM does not have the market power to raise prices (as Sirius/XM has claimed to the Federal Communications Commission in recent filings), then the promise not to raise prices is entirely superfluous. Under either scenario, the proposed settlement relief is inadequate. Sirius XM does not contend that it ***will*** raise prices, only that it is has considered it. The main evidence class counsel presents of settlement value is a conclusory expert report that is inadmissible because it flunks *Daubert*.

*Second*, the attorney-fee structure of the settlement should be viewed as a breach of the fiduciary duty to the class, and inherently unfair and unreasonable. If the court reduces the fee request, the difference reverts to the defendant, rather than the class. In conjunction with the "clear sailing" provisions of the settlement, this should be considered an impermissible attempt to protect the fee award at the expense of the class, and should never be permitted in a class action settlement. If the parties do not agree to modify the settlement to provide any reversion of any reduction in the fee request to the class, the settlement

should be rejected.

*Third*, the notice and scheduling of the case violates Fed. R. Civ. Proc. 23(h). Objections are due Tuesday, July 19, 2011, but the legal support for the settlement and the fee request was not filed until Friday, July 15—and was not posted to the settlement website until July 18. Because of the artificial objection deadline, class members have not had a fair opportunity to evaluate the fairness of the fee request.

*Fourth*, the class certification order violates the United States Constitution. The Court required class counsel to "ensure that the lawyers staffed on the case fairly reflect the class composition in terms of relevant race and gender metrics." But to comply with this mandate would require class counsel to base their litigation decisions on the impermissible basis of race and gender, rather than by staffing on the basis of merit and what is best for the class. Class counsel failed to protest or to seek *mandamus* to remove this unconstitutional requirement. Mr. Martin must object on Rule 23(a)(4) grounds if this Court-imposed requirement is not vacated.

If the Court nevertheless approves the settlement, it cannot yet approve the attorneys' fees. True: if the settlement were worth the $180 million that class counsel claims, a $13 million request for fees and expenses would be reasonable. But this is effectively a coupon settlement that requires class members to do continued business with the defendant in order to obtain (as yet uncertain) benefits. As such, the Class Action Fairness Act requires the fees to be based upon the actual value of the coupons redeemed. Until the Court knows how many class members agree to effectively redeem the coupon offer by agreeing to a new subscription under the terms of the Settlement Agreement, and until the Court knows how

much that coupon is actually worth by comparing the coupon offer of the Settlement Agreement with the rates paid by non-class members who were not eligible for the rates made available to class members, the Court cannot set a fee award.

## I.     Objector Nicolas Martin Is a Class Member.

Since June 3, 2010, Objector Nicolas S. Martin (7916 Meadowbrook Dr., Indianapolis, IN 46240-2659, (317) 255-5425) has been a subscriber to the XM Select service offered by Sirius/XM. He has paid the U.S. Music Royalty Fee at least three times. He is thus a member of the class with standing to object to the settlement and fee request. Fed. R. Civ. Proc. 23(e); Dkt. No. 96-1 ¶ 1.

Mr. Martin's attorney, Theodore H. Frank of the non-profit Center for Class Action Fairness LLC, is representing him *pro bono*, has a *pro hac vice* motion pending, and will appear at the Fairness Hearing. Mr. Martin does not plan to attend the Fairness Hearing, or to call any witnesses, but reserves the right to cross-examine any witnesses who testify in support of the settlement.

The Center, founded in 2009, represents class members *pro bono* in class actions where class counsel has acted to benefit themselves at the expense of the class; it has won millions of dollars on behalf of class members. *See, e.g.*, Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010); Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010).

It is perhaps relevant to distinguish the Center's mission from the agenda of those who are often styled "professional objectors." A number of "professional objectors" are for-

profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in good faith. *See* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG § 3.05 comment *a* (2010) (discussing "lawyers who may seek private gain from interposing strategically motivated objections") ("*ALI Principles*"); Dkt. No. 188 at 21-22 (making *ad hominem* attack on objector's counsel as professional objector). This is not the business model of the Center, which is funded entirely through charitable donations and court-awarded attorneys' fees. The Center refuses to engage in *quid pro quo* settlements to extort attorneys; and has never settled an objection in exchange for payment.

Because the Center does not object indiscriminately, it has an excellent track record of success. In 21 cases to date where the Center has objected 22 times, courts have rejected the settlement or materially modified the settlement and fee request ten times; on two other occasions, parties responded to the Center's objection before the fairness hearing to modify settlements to provide millions of dollars more of cash to the class. The Center has lost two objections with finality and has twelve objections pending in trial or appellate courts (including four where its objection was upheld in part).

In short, Mr. Martin brings this objection through the Center in good faith to protect the interests of the class.[1]

---

[1] Nevertheless, it is the experience of the Center that class counsel will often falsely accuse the Center of seeking to extort class counsel. If this Court has any doubt whether Mr. Martin is objecting in good faith, Mr. Martin and the Center are willing to stipulate to an injunction prohibiting them from settling this objection in exchange for a cash payment.

Martin Objection
Case No: 09-cv-10035 (HB) (RLE)      4

## II.     A Court Owes a Fiduciary Duty to Unnamed Class Members.

"In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." *ALI Principles* § 3.05(c) (2010). The burden of proving settlement fairness rests with the moving party. *Id.*

A "district court ha[s] a fiduciary responsibility to the silent class members." *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mahon*, 957 F.2d 697, 701 (9th Cir. 1992).

### A.     *Grinnell* Is Not By Itself Dispositive.

"The current case law on the criteria for evaluating settlements is in disarray." *ALI Principles* § 3.05 comment a at 205. The Second Circuit asks courts to follow a nine-factor test from *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). *See, e.g., Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 117 (2d Cir. 2005). But the Second Circuit has also repeatedly reviewed the approval of class action settlements applying broad notions of fairness without reference to the *Grinnell* factors. *E.g., Central States SE and SW Areas Health and Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229 (2d Cir. 2007) (reviewing settlement and remanding for modification without reference to *Grinnell* factors); *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) (same). Class counsel also argues that this

Court should consider factors not listed in *Grinnell*. Dkt. No. 116 at 16-17.

Mr. Martin suggests that some of the *Grinnell* factors are not helpful to evaluating a settlement, not least because the cases gives no guidance to how to weight the various factors. A proper test would be for courts to follow § 3.05 of the American Law Institute's *Principles of the Law of Aggregate Litigation*, which, rather than an indeterminate balancing test of factors, asks courts to submit settlements to several tests that demonstrate unfairness. Under § 3.05(a), there is first an initial four-part test that all settlements must meet: the court must consider whether

> (1) the class representatives and class counsel have been and currently are adequately representing the class;
>
> (2) the relief offered to the class… is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal;
>
> (3) class members are treated equitably (relative to each other) based on their facts and circumstances and are not disadvantaged by the settlement considered as a whole; and
>
> (4) the settlement was negotiated at arm's length and was not the product of collusion.

In addition to these four mandatory requirements, a "settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case." *Id.* § 3.05(b).

## B.    The Silence of the Class Should Not Be Construed as Acquiescence.

*Grinnell* asks courts to consider the class's reaction to the settlement. But a court should not infer anything from the relatively low number of objectors. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001), *citing In re*

*GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 789 (3d Cir. 1995). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007). Without *pro bono* counsel to look out for the interests of the class, filing an objection is economically irrational for any individual. Indeed, because this is a lawsuit over a price increase of a few dollars per class member that wouldn't even add up to $10 once trebled, it is economically irrational even to spend the $0.88 in postage to object *pro se*.

"[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re GMC Pick-Up Litig.*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement).

All of this is especially true in this case, where there is a nationwide class, but any objector wishing to be represented by an attorney must incur the burden of hiring local counsel admitted to the Southern District of New York. Such an expensive burden is unfair to unnamed class members who may have no connection to this venue but are involuntarily

forced to appear in an inconvenient forum by the class action process to preserve their rights. Mr. Martin objects to the lack of a procedure permitting out-of-state objectors in a national class from easily retaining out-of-state *pro bono* counsel.

The reason this case is being pursued as a class action is because individual class members cannot economically pursue this case without aggregation. That there are at least fifty objectors is extraordinary. This is a relatively large number of objections, and the Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors. *GM Pick-Up Trucks*, 55 F.3d at 812-13; *ALI Principles* § 3.05 comment *a* at 206.

## C.    The Third *Grinnell* Factor Is Not a Reason to Approve This Settlement.

The "mere fact that a settlement occurred many months (or even many years) after the case was originally filed does not in itself ensure that the agreement is fair and reasonable." *Id.* While certainly the lack of discovery might be evidence of a shoddy settlement counting against approval (*contra id.* ("an early settlement might reflect a realistic appraisal of a case")), the presence of discovery is not in itself evidence that the parties are treating the class fairly relative to how the parties treat class counsel.

## D.    Class Counsel's Recommendation Is Superfluous.

Class counsel argues that the opinion of experienced counsel who agreed to the settlement is evidence in favor of settlement approval. Dkt. No. 116 at 16-17. But this makes no sense: counsel negotiated the settlement, and are never going to go to the Court and ask them to disregard what they negotiated, regardless of the underlying fairness of the settlement. "[T]he lawyers who negotiated the settlement will rarely offer anything less than a

strong favorable endorsement." *Principles* § 3.05, comment *a*. The fact that class counsel approves of the settlement can hardly be evidence that the settlement fairly treats the class relative to the benefits received by class counsel.

**E.    The Court Can Apply Section 3.05 of the ALI Principles Consistently With Second Circuit Precedent.**

One can use the Section 3.05 standards as a consistent complement to the *Grinnell* nine-factor test, which also asks courts to examine the risks of the case and the reasonableness of the settlement fund in relation to those risks. The Second Circuit has previously endorsed the use of Chapter 3 of the *ALI Principles* with reference to the evaluation of a settlement. *Masters v. Wilhelmina Model Agency Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (taking note the draft of *ALI Principles*); *accord SEC v. Bear, Stearns & Co.*, 626 F. Supp. 2d 402, 416 (S.D.N.Y. 2009). Mr. Martin recognizes that this court is bound by Second Circuit precedent on the question, but asks the Court to adopt ALI's *Principles* § 3.05 in evaluating the settlement, and downplay the importance of *Grinnell* factors that do nothing to distinguish between good settlements and bad ones. That said, the settlement is unfair under *Grinnell.*

**III.    The Settlement Is Unfair Because the Relief to the Class Is Disproportionately Small Relative to Either the Size of the Attorneys' Fees or, in the Alternative, to the Size of the Value of the Case.**

Because of the unique structure of the proposed injunctive relief, there is no state of the world in which the class recovery in the proposed settlement is reasonable.

Certainly, if the value of the successful claim was $260 million, and the parties estimated the chances of success in the 20% range, it would be reasonable to settle for $52

million in cash, with $13 million of that to the attorneys.

But the parties did not settle for cash for the class. They settled for injunctive relief—a promise not to raise prices for a short time—that has only an uncertain and unlikely contingent value. To wit: we do not know for certain (though we can infer from existing evidence and admissions) whether Sirius XM has the market power to raise prices. If Sirius XM does not have that market power, then Sirius XM's promise not to raise prices is gratuitous.

Note that the Declaration of Catherine Brooker does not state that Sirius XM **will** raise prices; it just states that Sirius **contemplated** raising prices and modeled the effect. Dkt. No. 119. The fact that Sirius XM contemplated raising prices is necessary, but not sufficient, to conclude that Sirius XM will raise prices, or would have raised prices absent an injunction. Businesses model possible scenarios all of the time, but do not engage in every strategy they contemplate; rather, they have to respond to market realities. Too, the fact that, as of July 18, the FCC has not yet decided whether to extend the rate freeze suggests that the rates would not have increased August 1: as class counsel admits, Sirius XM "need[s] to know *in advance* of the July 28 expiration of the rate freeze" whether it can raise prices. Sabella Decl. ¶ 62 (Dkt. No. 123).

The only way the promise not to raise prices has value to the class is if Sirius XM has the market power to profitably engage in a "small but significant and nontransitory increase in price"—what the plaintiffs in their Second Amended Complaint call the "SSNIP test." Dkt. No. 46 at, *e.g.*, ¶¶ 59, 106. But if Sirius XM has that market power, then the Sirius XM merger is illegal under the Clayton Act, and the class is entitled to much broader injunctive

relief than what is agreed to here. *Id.* ¶¶ 106, 280-99; *see, e.g.*, FTC and Dept. of Justice, *Horizontal Merger Guidelines* §§ 2.1.1, 4.1.1 (2010). Nowhere in its papers does class counsel address this issue. Rather, class counsel simultaneously asks the Court to believe that it can assume that Sirius XM will raise rates (Langenfeld Decl. ¶ 3 (Dkt. No. 122)), but that settlement is acceptable because it is too risky to try to prove that Sirius XM will have the market power to raise rates (Dkt. No. 116 at 10 and Dkt. No. 118 at 16). This act of simultaneously accepting two mutually contradictory beliefs was called "doublethink" by George Orwell in *1984*. *See* TOM MCARTHUR, *ed.*, THE OXFORD COMPANION TO THE ENGLISH LANGUAGE 321 (1992). We submit that a settlement that requires a court to engage in doublethink to find it has value is inherently unreasonable under Rule 23(e).

The settlement, as structured, is thus by definition inadequate. Class counsel cannot prove that the settlement's injunctive relief has any value unless they engage in the same analysis that they claim is too difficult to prove at trial. Plaintiffs cannot have it both ways: if it is possible to prove the existence of the value of the injunctive relief, then it is possible to prove the violation of the Clayton Act. If class counsel cannot prove the existence of market power permitting a SSNIP such that there is a violation of the Clayton Act, then they cannot carry their burden of demonstrating that the settlement has any value to the class meriting a $13 million attorney fee, and the settlement is thus unfair because class counsel receives 100% of the benefit.

Class counsel might protest that this analysis puts them in a Catch-22 where they can never settle the case, but this is not so. The problem arises solely because of the choice of this particular injunctive relief, which has only uncertain contingent value. The parties can

certainly agree to a compromise settlement—but the compromise has to be pecuniary in nature rather than having value contingent upon the very premises that plaintiffs claim they cannot risk litigating.

## A.   Class Counsel Fails to Carry Its Burden to Show That the Injunctive Relief Is Not Worthless.

Sirius XM's promise not to raise prices only has value if it *can* raise prices. But the evidence shows that it cannot.

### 1.   Sirius XM Is Judicially Estopped From Claiming That It Has the Market Power to Raise Prices.

Sirius XM's filings to this Court have artfully avoided saying that Sirius XM would raise prices; the Brooker declaration only acknowledges that Sirius XM contemplated a price increase. But businesses contemplate strategies all the time without necessarily engaging in them. Given the fact that the parties have the burden of demonstrating the fairness of the settlement, the negative pregnant is dispositive: the refusal of Sirius XM to put forward evidence that they would definitively raise prices in 2011 requires the Court to infer no such evidence exists. But, even if Sirius XM were to belatedly claim otherwise, they are judicially estopped from doing so.

In multiple filings before the Federal Communications Commission, Sirius XM has argued that it does not have the market power to raise prices. *See* January 20, 2011 Letter of Robert L. Pettit to William Lake (attached as Exhibit 1); Reply Comments of Sirius XM Radio Inc. (March 11, 2011) (attached as Exhibit 2) ("Sirius XM's pricing is constrained by a wide variety of market competitors.").

If the FCC extends the price cap over Sirius XM's objection, then the settlement

injunction is of no value, because Sirius XM would not have had the legal power to raise prices. But if the FCC allows the price cap to expire, then Sirius XM is judicially estopped from claiming that it has the market power to raise prices after obtaining favorable action from the FCC based on the claim that it does not have the market power to raise prices.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted). Statements to administrative agencies can give rise to judicial estoppel. *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999). Sirius XM is precluded from arguing to this Court that it has the market power to raise prices; thus, one of the settling parties is communicating to this Court that the injunctive relief is worthless.

### 2. Market Pressure Has Forced Sirius XM to Engage in Deep Discounting, Demonstrating Both Lack of Market Power and the Worthlessness of the Injunctive Relief.

Sirius XM's satellite radio product has already been overtaken by technological innovation. The promise of 180 channels of radio from which one can make personalized choices has been outstripped by the cheap availability of portable music devices that can carry dozens of hours of even more personalized music and podcasts—not to mention free Internet services like Pandora and Last.fm or premium music-on-demand services like Spotify that allow a customer to personalize a playlist from a choice of 13 million songs. *See generally* Jan. 20 Letter (Ex. 1); Reply Comments of Sirius (Ex. 2).

We know that Sirius XM faces market pressure and competition, because it is lowering its prices, rather than keeping them at the maximum that its agreement with the

---

FCC permits. On December 6, 2010, after the merger, as class counsel admits, Sirius XM lowered the Royalty Fee from $1.98 to $1.40 per month. And, as discussions on several Internet bargain-hunter forums such as fatwallet.com discuss, Sirius XM will discount their $12.95/month price to as low as under $3.99/month to anyone who calls up and asks for special offers, a 69% discount. *See* http://is.gd/sirius_discount. Others report the availability of a $77/year price for the premium $16.99/month XM Premier package, a 62% discount. *See* http://is.gd/sirius_discount77. (Including the Royalty Fee, Mr. Martin himself paid only $46.10 for his first ten months of XM Select service.) It is market competition, not the existing voluntary arrangement with the FCC, that is constraining prices; the same will be true if this injunction is issued under the settlement.

The injunctive relief requires Sirius XM to offer current subscribers renewals at current rates. But if current subscribers and class members (such as Mr. Martin) can continue to obtain deep discounts through negotiation with Sirius XM, then the injunctive relief does not provide any benefit to them. Class counsel has failed to present any evidence that Sirius XM will end its existing discounting program, and thus has failed to prove that the injunctive relief is not entirely superfluous.

### 3.   Class Counsel's Expert Evidence of Injunction Value Flunks *Daubert*.

The only evidence to the contrary presented to the Court is the Langenfeld Declaration—but Langenfeld provides no basis for the claim. He simply ***assumes*** that Sirius XM will raise prices: "It is my understanding." Langenfeld Decl. ¶ 3. But he gives no basis for that conclusory understanding, and neither does class counsel. Nor does Langenfeld even acknowledge the existence of the discounting offers in his analysis, meaning that it is based

entirely on an incorrect view of the world. Garbage in, garbage out: an expert opinion that assumes the conclusion and provides no evidence for the bases of its premises does not meet *Daubert* standards, and cannot be evidence of the value of the settlement.

Such a flimsy economic model would not pass muster in peer-reviewed economic literature, and, after *Daubert* and *Kumho Tire*, it does not pass muster in federal court, either. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993); *Kumho Tire v. Carmichael*, 526 U.S. 139 (1999); *Major League Baseball Properties v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (conclusory expert opinion not admissible); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000) (same); *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006) (excluding economic expert testimony calculating damages where entire calculation based on "underlying assumptions" without independent analysis of basis for assumptions); *First Savs. Bank, v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084 (D. Kan. 2000) (excluding expert testimony on damages where expert "based his opinion on an assumption of the very fact that his report is intended to prove").

Simply claiming one's expertise and then asserting a conclusion without performing the economic analysis that experts in the field would perform precludes admission of proposed expert evidence—even if the testifying expert is a Nobel Prize winner. *In re Brand Name Prescription Drugs Antitrust Litigation*, 1999 U.S. Dist. Lexis 550 (N.D. Ill. Jan. 19, 1999) (excluding testimony of Nobel Prize-winning economist Robert Lucas when opinions not based on evidence), *aff'd on other grounds*, 186 F.3d 781 (7th Cir. 1999); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by

the *ipse dixit* of the expert").

Expert testimony that is speculative is not competent proof and contributes "nothing to a 'legally sufficient evidentiary basis.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 445, 454 (2000) (*citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Group Ltd.*, 509 U.S. at 242.

Moreover, Langenfeld's testimony is wildly implausible and inadmissible for a second independent reason. We know with certainty that the settlement is not actually worth $180 million in cash. Why? Because if this settlement were actually worth $180 million in cash, both Sirius XM and class counsel would have preferred a different settlement. If the settlement at bar were worth $180 million in cash, the two sides would have preferred to agree to an actual settlement of $120 million in cash as a common fund.[2] Sirius XM would have preferred the $120 million common fund because it would be $60 million cheaper; class counsel would have preferred the $120 million common fund because then they could have asked for a percentage of the common fund that would give them more than $13 million. To claim that this settlement is worth $180 million is to claim that sophisticated lawyers on both sides left tens of millions of dollars on the table. The claim is insulting to the intelligence of class members and the Court. There "is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. at 146.

---

[2] Class counsel essentially concedes that Sirius XM could pay $180 million in cash by asking the Court to disregard the *Grinnell* factor of whether Sirius XM "may have possessed some ability to pay more." Dkt. No. 116 at 13.

Dr. Langenfeld's testimony does not meet *Daubert* standards, and is not admissible. It cannot be used to claim that the injunctive relief has any value.

**B.    The Worthless Injunctive Relief Is Thus Inadequate as a Matter of Law.**

The settlement is structured to make an illusory claim of $180 million value to the class, when the entire cost is actually $13 million to be received by class counsel. Here, the evidence shows that Sirius XM faces extensive competition, and is forced into deep discounting, and that the proposed injunctive relief will have no effect on Sirius XM's pricing behavior. The total settlement is thus worth only $13 million—and class counsel is to receive all of that $13 million. A settlement where class counsel receives all of the economic value and their clients receive none is by definition unfair and inadequate, under the ALI Principles, under *Grinnell*, or under any other meaningful standard.

Note that Mr. Martin is not claiming that the parties are required to provide $180 million in cash, or even $18 million in cash. In the abstract, the parties are entitled to propound a settlement with $13 million value, as they have here: but if they do, the class is entitled to the majority of that amount, rather than zero. *Cf. e.g.*, *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-cv-4318 (HB), 2001 WL 709262, at *6 (S.D.N.Y. June 22, 2001) (reducing fee from requested 30% to 15% of common fund).

**C.    If Sirius XM Has Sufficient Market Power to Make the Injunction Worth More Than Zero, Then the Settlement Is Inadequate.**

If, notwithstanding the evidence and admission of a lack of market power, the Court finds that Sirius XM has sufficient market power to make the injunction worth more than zero, then the settlement is inadequate because it settles the case too cheaply. One can win a

cause of action for Sherman Act monopolization on the theory that *years* of predatory price *decreases* can sustain a lifetime of monopoly profits. *Kelco Disposal, Inc. v. Browning-Ferris Industries of Vermont, Inc.,* 845 F. 2d 404 (2d Cir. 1988). A five-month forbearance from raising prices to permanently preclude class members from seeking an injunction against an illegal monopoly is small potatoes by comparison. This Court cannot find that the injunctive relief has value unless it finds that Sirius XM has market power—but if it finds that Sirius XM has market power, then it must also find that the merger is illegal and that a five-month injunction against price increases is an inadequate settlement of that claim.

## IV.   The Fee Arrangement Breaches the Attorneys' Duty to the Class.

By virtue of the notice provided to the class, Sirius XM understood that they were agreeing to a settlement that might require them to pay up to $13 million in attorneys' fees and expenses, indicating that this was money that they were willing to pay to settle the case. They further agreed to a "clear sailing" provision not to challenge the request, a sign that the settlement requires additional scrutiny. *Weinberger v. Great Northern Nekoosa Corp.,* 925 F. 2d 518, 525 (1st Cir. 1991). But under this settlement, if the Court reduces the attorneys' fee request in any way, the money reverts to the defendants, rather than to the class. Class counsel breached their duty to the class by segregating the potential fee award.

Such an arrangement has three purposes: (1) to inflate the fee at the class's expense; (2) to discourage class-member objections to the fee award; and (3) to reduce the court's incentive to carefully scrutinize the fee for unreasonableness, since any reduction benefits *only* the defendant. Indeed, class counsel explicitly makes this last argument, demonstrating the improper purpose of the arrangement. Dkt. No. 118 at 6. Professor Charles Silver has

stated that this type of fee arrangement is "a strategic effort to insulate a fee award from attack." *Due Process and the Lodestar Method*, 74 TULANE L. REV. 1809, 1839 (2000).

Any fee that a defendant agrees to pay directly to class counsel is an amount that it would have been willing to include as part of the payment to the class. The arrangement effectively reduces the recovery that the class would have received. "The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source." *GM Pickup Truck Litig.*, 55 F.3d at 820-21. "[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case." *Id.* at 821. "[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal." *Johnson v. Comerica*, 83 F.3d 241, 246 (8th Cir. 1996).

Courts have recognized that "such an agreement has the potential to enable a defendant to pay class counsel excessive fees and costs, in exchange for counsel accepting an unfair settlement on behalf of the class." *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2002). Even where, as here, there is no explicit collusion against the class, "[e]ven if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985). While some district court decisions cited by class counsel have *ipse dixit* dicta to the contrary, they do not explain why they value form

over economic reality, nor do they mention (much less explain why they disagree with) contrary authority: they cannot be considered persuasive.

Negotiating a settlement that elevates an attorney's financial interests over that of the class—no matter how much money is involved—cannot be a "fair" or "adequate" settlement under Rule 23(e)(2); at a minimum, it is a breach of the Rule 23(a)(4) requirement that "the representative parties … fairly and adequately protect the interests of the class." Twenty law professors have argued in a letter to the ABA that the arrangement should be considered *per se* unethical. Law Professors Letter to Stephen Crane (Sep. 17, 2007) (attached as Ex. 3). This Court should follow their lead. (Class counsel incorrectly state that the letter is concerned only with agreements contingent upon approval of the fee request and the simultaneous negotiation of fees with relief. Dkt. No. 118 at 22-23. This is not so. *See* Law Professors at 3 ("It is *per se* unethical for plaintiffs' attorneys to agree to any provision in such agreements that in any way compromises the right of the clients or classes to recover fees deemed excessive or unethical by such review.").)

## V.    The Notice Violates Rule 23(h).

Under the plain language of Fed. R. Civ. Proc 23(h), class counsel is required to submit their basis for attorneys' fees well before objections are due so that the class has a full and fair opportunity to address the claims made. *In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988 (9th Cir. 2010). (Mr. Martin incorporates by reference and joins Section I of the objection of Lange Thomas. Dkt. No. 120 Ex. 43.) Objections were due Tuesday, July 19, but the legal basis and evidence for the settlement and fee request was not filed until late in the day Friday, July 15. Class counsel's argument that notice is sufficient fails to explain why

this Court should disregard *Mercury Interactive.*

Mr. Martin was actually prejudiced by the sandbagging. Class counsel did not file their evidence in support of their attorney fee until Friday, July 15, giving Mr. Martin effectively one business day to respond with his objections. (Moreover, the materials were not made available on the settlement website until July 18, and S.D.N.Y. PACER was unavailable for much of July 17.) Had Mr. Martin had a reasonable time to respond, he would have been able to scrutinize the lodestar evidence; he might also have chosen to retain an economic expert to more fully demonstrate why Dr. Langenfeld's declaration was unreasonable.[3] The Court cannot approve the settlement because of the failure to meet due process requirements.

## VI.    The Class Certification Order Violates Rule 23(a)(4), Rule 23(g), and the Constitution.

Mr. Martin objects to the class certification order, which requires class counsel to "ensure that the lawyers staffed on the case fairly reflect the class composition in terms of relevant race and gender metrics. *See In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 277 (S.D.N.Y. 2007)." Dkt. No. 85 at 14. *J.P. Morgan* requires class counsel to appoint members of the litigation team on the basis of race and gender. In an antitrust case, this is not a "matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," and is thus an impermissible requirement under Fed. R. Civ. Proc. 23(g). The

---

[3] Mr. Martin submits, however, that the Court can read paragraph 3 of the Langenfeld Declaration and see on its face that it is assuming without any evidentiary basis the controversial premise on which its conclusions rest, and is thus inadmissible. But if the Court were to nevertheless credit the Langenfeld Declaration, Mr. Martin would have been prejudiced by his inability to secure expert testimony with one day's notice.

interests of the class are to obtain the best result possible at the lowest cost in attorneys' fees. The fact that class counsel must comply with quotas and choose case staffing based on race or gender rather than merit and the best interests of the class may interfere with their ability to provide the best representation for the class, and thus brings into question the Rule 23(a)(4) adequacy of class counsel.

Moreover, the requirement is simply unconstitutional. Facial racial classifications imposed by federal entities are subject to strict-scrutiny review. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). A race-based classification to reflect the racial makeup of the community is not a sufficiently compelling interest to survive strict scrutiny; only "remedying the effects of past intentional discrimination" justifies a cure of racial quotas. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007). "[D]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Adarand*, 515 U.S. at 214 (internal quotation marks omitted). While the Supreme Court has held that promoting diversity is a permissible rationale for affirmative action, this only permits the consideration of race as a "plus factor"; it does not permit quotas. *Grutter v. Bollinger*, 539 U.S. 306 (2003).

Mr. Martin agrees with Stuart Grant, founder of class counsel law firm Grant & Eisenhofer: "I think the judge's heart is in the right spot, but I don't think he has the authority and I don't think he's going to accomplish the goal he's trying to achieve." Nate Raymond, "Judge's Unusual Order Revives Law Firm Diversity Issue," N.Y.L.J. (Oct. 28, 2010). As a class member, Mr. Martin is entitled to representation that is absent of illegal racial classifications. *Cf. United States v. Hays*, 515 U.S. 737 (1995) (voters in racially

gerrymandered district have standing to challenge its constitutionality without showing of personal harm). He thus requests that the Court vacate that part of its class certification order as unconstitutional.

## VII.   The Fee Request Does Not Comply With 28 U.S.C. § 1712.

Congress has expressed its distaste for coupon settlements in the Class Action Fairness Act. Pub. L. 109-2, § 2(a)(3)(A); *Synfuel Technologies, Inc. v. DHL Express, Inc.*, 463 F.3d 646, 654 (7th Cir. 2006).

The injunctive relief is an offer by Sirius XM to provide particular pricing to class members who do future business with it. It is thus indistinguishable from a coupon settlement. Although the proposed settlement carefully avoids calling the offer a "coupon," the injunctive relief offers identically to that disfavored instrument: that is, the only beneficial use of the injunctive relief lies in a class member supposedly getting a lower price for Sirius XM services. The relief is thus "coupon" relief. *See True v. American Honda Motor Co.,* 749 F. Supp. 2d 1052, 1069 (C.D. Cal. 2010) (a coupon settlement's relief consists of "a discount on another product or service offered by the defendant in the lawsuit" (*quoting Fleury v. Richemont North Am., Inc.*, No. C-05-4525 EMC, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008)); Jeffrey S. Jacobson, "Defining 'Coupon' Under the Class Action Fairness Act," PRODUCT LIAB. LAW 360 (Jan. 15, 2008) ("If class members can receive nothing more than the ability to buy a new product from the defendant at a discounted price, that is clearly a 'coupon settlement.'"). Indeed, the only difference between a coupon and the injunctive relief here is that the injunctive relief is *worse* than a coupon: a coupon is an unmistakable discount, while here there is no information how much Sirius XM will raise its prices, or

even cognizable evidence that Sirius XM will raise its prices or cease offering discount programs with lower prices than the injunctive relief offers.

Because this is a coupon settlement, attorneys' fees "***shall*** be based on the value to class members of the coupons that are redeemed" rather than the theoretical value of the coupons available for redemption. 28 U.S.C. § 1712(a) (emphasis added). But we can only know that value when we know (1) the number of class members who subscribe to Sirius XM using the injunctive relief; and (2) the amount by which Sirius XM raises its prices on January 1, 2012. (The Court also needs to know (3) whether Sirius XM ceases its discounting program between now and December 31, 2011. If Sirius XM continues its discounting program to subscribers who ask the right salespeople the right questions, then the coupons are superfluous, because better prices are available to class members without the injunctive relief.) Without that knowledge, we cannot ascribe a redemption value to the coupons, and attorneys' fees cannot be legally calculated. The fee request cannot be approved until after this information is available in January, and calculations can be made. Mr. Martin strongly suspects that if the Court were to wait for that information, the ultimate redemption value will be zero: competition will require Sirius XM to continue to offer deep discounts to customers and class members who have the savvy to negotiate such rates.

## CONCLUSION

The parties have failed to carry their burden that the injunctive relief has any value; the only evidence in support is an expert report that assumes its conclusion. One hundred percent of the settlement value is going to the class counsel (with no hope of reversion of

excessive fees to the class), and that is inherently unfair and unreasonable. Moreover, the failure to provide reasonable Rule 23(h) notice and the unconstitutionality of the class certification order each require rejection of the settlement.

Should the Court nevertheless approve the settlement, it must adhere to 28 U.S.C. § 1712, and calculate the attorneys' fees only when the redemption value of the *de facto* coupons is known.

Dated: July 19, 2011

Respectfully submitted,

*/s/ David Stein*
David Stein
SAMUEL & STEIN
38 West 32nd St. Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Email: dstein@samuelandstein.com

*/s/ Theodore H. Frank*
Theodore H. Frank (*pro hac vice* pending)
CENTER FOR
CLASS ACTION FAIRNESS LLC
1718 M Street NW, No. 236
Washington, DC 20036
Telephone: (703) 203-3848
Email: tedfrank@gmail.com

Attorneys for Nicolas Martin

## PROOF OF SERVICE

The undersigned hereby certifies that on this date, I caused the foregoing document to be served upon all counsel of record via ECF, and that I additionally caused the foregoing document to be served by first class mail on July 18, 2011 upon the following:

James J. Sabella, Esq.                     Clerk of the United States District Court
Grant & Eisenhofer P.A.                    Southern District of New York
485 Lexington Avenue                       500 Pearl Street
New York, NY  10017                        New York, NY  10007

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
David Stein

Dated:  July 18, 2011