UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARL BLESSING, et al., on Behalf of Themselves and All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>   -against-<br><br>SIRIUS XM RADIO INC.,<br><br>                Defendant. | No. 09-cv-10035 (HB)(RLE) |

**PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO OBJECTIONS
TO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN
AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**


**GRANT & EISENHOFER P.A**.
485 Lexington Avenue
New York, NY  10017
Tel.:  646-722-8500
Fax:  646-722-8501

**MILBERG LLP**
One Penn Plaza
New York, NY  10119
Tel.:  212-594-5300
Fax:  212-868-1229

**COOK, HALL & LAMPROS, LLP**
Promenade Two, Suite 3700
1230 Peachtree Street, N.E.
Atlanta, GA  30309
Tel.:  404-876-8100
Fax:  404-876-3477

*Class Counsel*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

I.     RESPONSES TO PARTICULAR OBJECTIONS ....................................... 2

    A.     Nicolas Martin ............................................................................ 2

        1.     Mr. Martin Is Wrong In Asserting That The Settlement Has No Value ...... 2

        2.     Mr. Martin's Objection Regarding The Requested Attorneys' Fees
               Is Without Merit ................................................................ 6

            a.     The Negotiation Of The Fees Was Proper ...................... 6

            b.     The Court Can Determine The Fee Award Based
               On Current Estimates Of The Settlement's Value .......... 8

        3.     Mr. Martin's Attack On The Class Certification Order Is Baseless ......... 12

    B.     Michael Hartleib ........................................................................ 13

    C.     Marvin Union, Adam Falkner, Jill Piazza, Ken Ward, Ruth Cannata,
        Lee Clanton, Craig Cantrall and Ben and Kim Frampton ..................... 15

    D.     Jason Hawkins, Sheila Massie, John Sullivan ...................................... 17

    E.     Gary, Warren and Sara Sibley ....................................................... 18

    F.     Christopher Batman ..................................................................... 18

    G.     Tom Carder ............................................................................... 19

    H.     The Crutchfield Objectors ............................................................. 19

    I.     Monty Delluomo ........................................................................ 20

    J.     Gregory Gerson .......................................................................... 20

    K.     Brian Goe ................................................................................. 20

    L.     John Ireland .............................................................................. 20

|     | M. | Sherilyn Kindelay ................................................................ | 21 |
|     | N. | Randy Lyons ........................................................................ | 21 |
|     | O. | Linda Mrosko ...................................................................... | 21 |
|     | P. | Donald K. Nace ................................................................... | 21 |
|     | Q. | Page Nash ............................................................................ | 22 |
|     | R. | Marguerite Willis ............................................................... | 22 |
| II. |    | THE PLAGUE OF THE PROFESSIONAL OBJECTOR ............................ | 22 |
|     | A. | Edward F. Siegel ................................................................. | 23 |
|     | B. | Theodore H. Frank ............................................................. | 23 |
|     | C. | Other Lawyers .................................................................... | 25 |

# TABLE OF AUTHORITIES

Page

**CASES**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,*
    271 Fed. App'x 41 (2d Cir. 2008)..................................................................18

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,*
    272 Fed. App'x 9 (2d Cir. 2008)....................................................................16

*In re Agent Orange Prods. Liability Litig.,*
    818 F.2d 179 (2d Cir. 1987).........................................................................13

*In re Auto. Refinishing Paint Antitrust Litig.,*
    No. MDL 1426, 2004 U.S. Dist. LEXIS 29162 (E.D. Pa. Oct. 13, 2004)..............23

*Barnes v. Fleetboston Fin. Corp.,*
    No. 01-cv-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006).................22

*In re Bisys Sec. Litig.,*
    No. 04-cv-3840, 2007 U.S. Dist. LEXIS 51087 (S.D.N.Y. July 16, 2007)......................15, 16

*Browning v. Yahoo! Inc.,*
    No. 04-cv-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007)..................23

*Callahan v. Commonwealth Land Title Ins. Co.,*
    No. 88-cv-7656, 1990 U.S. Dist. LEXIS 14524 (E.D. Pa. Oct. 30, 1990)..........9, 19

*In re Cardinal Health, Inc. Sec. Litig.,*
    550 F. Supp. 2d 751 (S.D. Ohio 2008)..............................................................22

*Carlson v. Xerox Corp.,*
    355 Fed. App'x. 523 (2d Cir. 2009).................................................................15

*In re Cuisinart Food Processor Antitrust Litig.,*
    No. MDL 447, 1983 WL 153 (D. Conn. Oct. 24, 1983)....................................2

*Dewey v. Volkswagen of Am.,*
    728 F. Supp. 2d 546 (D.N.J. 2010)..................................................................24

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
    183 F.3d 1 (1st Cir. 1999)..............................................................................23

*Dupler v. Costco Wholesale Corp.,*
    705 F. Supp. 2d 231 (E.D.N.Y. 2010).......................................................*passim*

*In re Excess Value Ins. Coverage Litig.*,
    No. MDL 1339, 2004 WL 1724980 (S.D.N.Y. July 30, 2004) ...............................8

*In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)....................................................................7, 8, 10

*Grays Harbor Adventist Christian School v. Carrier Corp.*,
    No. 05-cv-05437, 2008 WL 1901988 (W.D. Wash. Apr. 24, 2008) .....................23

*Jermyn v. Best Buy Stores, L.P.*,
    No. 08-cv-00214 (CM), 2010 U.S. Dist. LEXIS 130682 (S.D.N.Y. Dec. 6, 2010) ...............18

*Johnston v. Comerica Mortgage Corp.*,
    83 F.3d 241 (8th Cir. 1996) ................................................................................7

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
    733 F. Supp. 2d 997 (E.D. Wis. 2010)...............................................................16

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
    222 F.3d 1142 (9th Cir. 2002) ............................................................................7

*Lonardo v. Travelers Indemnity Co.*,
    706 F. Supp. 2d 766 (N.D. Ohio 2010)...................................................7, 8, 24

*McBean v. City of New York*,
    233 F.R.D. 377 (S.D.N.Y. 2006) .........................................................................8

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010) .............................................................................15

*In re Mexico Money Transfer Litig.*,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................................6

*In re Mexico Money Transfer Litig.*,
    267 F.3d 743 (7th Cir. 2001) .............................................................................12

*In re Mutual Funds Inv. Litig.*,
    No. 04-md-15863, 2011 U.S. Dist. LEXIS 31787 (D. Md. Mar. 23, 2011)...........25

*New Hampshire v. Maine*,
    532 U.S. 742 (2001).............................................................................................4

*O'Keefe v. Mercedes-Benz USA, LLC*,
    214 F.R.D. 266 (E.D. Pa. 2003)........................................................................22

*In re Rite Aid Corp. Sec. Litig.*,
    269 F. Supp. 2d 603 (E.D. Pa. 2003), *vacated*, 396 F.3d 294 (3d Cir. 2005).........22

*Rodriguez v. West Pub. Corp.*,
   No. 05-cv-3222, 2007 U.S. Dist. LEXIS 74849 (C.D. Cal. Sept. 10, 2007),
   *mod.*, 563 F.3d 948 (9th Cir. 2009)..................................................................16, 17

*Snell v. Allianz Life Ins. Co. of N. Am.*,
   No. 97-cv-2784 RLE, 2000 WL 1336640 (D. Minn. Sept. 8, 2000) ....................................22

*In re Sony SXRD Rear Projection Television Class Action. Litig.*,
   No. 06-cv-5173, 2008 WL 1956267 (S.D.N.Y. May 1, 2008) ................................................8

*Thompson v. Metropolitan Life Ins. Co.*,
   216 F.R.D. 55 (S.D.N.Y. 2003) ......................................................................1, 8, 21, 25

*True v. American Honda Motor Co.*,
   749 F. Supp. 2d 1052 (C.D. Cal. 2010) ...........................................................................10

*In re Tyson Foods Inc.*,
   No. 08-cv-1982, 2010 WL 1924012 (D. Md. May 11, 2010)..................................................8

*Union of Needlestrades, Indus. & Textile Employees v. INS*,
   202 F. Supp. 2d 265 (S.D.N.Y. 2002), *aff'd*, 336 F.3d 200 (2d Cir. 2003) ............................9

*Varacallo v. Mass. Mut. Life Ins. Co.*,
   226 F.R.D. 207 (D.N.J. 2005) .........................................................................................25

*Vaughn v. Am. Honda Motor Co.*,
   627 F. Supp. 2d 738 (E.D. Tex. 2007)...........................................................................8, 19

*Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)..........................................................................................14, 16

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004).....................................25

*In re Western Union Money Transfer Litig.*,
   No. 01-cv-0335 (CPS), 2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004)...........................5-6, 12

*In re Wireless Telephone Federal Cost Recovery Fees Litig.*,
   396 F.3d 922 (8th Cir. 2005) ..........................................................................................11

*In re Wireless Telephone Federal Cost Recovery Fees Litig.*,
   No. MDL 1559, 2004 WL 3671053 (W.D. Mo. Apr. 20, 2004),
   *aff'd*, 396 F.3d 922 (8th Cir. 2005)........................................................................10, 11, 18

## STATUTES AND RULES

15 U.S.C. § 26.................................................................................................................9

28 U.S.C. § 1712...........................................................................................................8

28 U.S.C. § 1712(b) .................................................................................................12

Fed. R. Civ. P. 23(b)(2) ...........................................................................................17

Fed. R. Civ. P. 23(e)(2) ...........................................................................................14

Fed. R. Civ. P. 23(h) ................................................................................7, 8, 15, 16

**OTHER AUTHORITIES**

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 517 (3d ed. 2011) ...................................5

Theodore H. Frank, *Did the Right Make America a Lawsuit Nation? Thomas Geoghegan's See You In Court*, 12 TEX. REV. L. & POL. 477 (2008) ...................................24

MANUAL FOR COMPLEX LITIGATION (Fourth), § 10.224 ................................................13

Rebecca Meiser, *Edward Siegel is on a quest to either stop exorbitant lawyer payouts – or score some easy money*, Cleveland Scene, June 4, 2008 ...................................23

Geoffrey P. Miller, *Non-pecuniary Class Action Settlements*, 60 LAW & CONTEMP. PROBS. 97 (1997) ...........................................................................................6, 9

5 William B. Rubenstein, Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 15:37 (4th ed. 2009)................................................................................23

Plaintiffs submit this memorandum of law in response to objections that have been submitted subsequent to July 14, 2011.

## PRELMINARY STATEMENT

The 49 objections addressed in Plaintiffs' prior briefs[1] and the 18 additional objections addressed herein[2] amount to only 0.0004% of the approximately 15.7 million Class members. The fact that only an infinitesimal percentage of the Class has objected supports approval of the Settlement. *See Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 62 (S.D.N.Y. 2003) (Baer, J.) (the fact that under .05% of the class objected supported approval of the settlement).

Additionally, on July 27, 2011, the Federal Communications Commission (the "FCC" or the "Commission") announced that it would not extend the price cap that had constrained Sirius XM's prices since the merger.[3]  The FCC order is relevant here in several respects.  First, it makes clear that as of July 29, 2011, Sirius XM was free to increase its prices had it not been for the Settlement.  This reinforces that Plaintiffs have obtained a valuable concession as consideration for settling the Action.  Second, the FCC's July 29, 2011 order expresses the view of the FCC (the only agency that had previously expressed any reservation about the merger) that there is sufficient competition so that Sirius XM does not have monopoly power, which underscores the recovery risk that Plaintiffs would have faced if this antitrust case had gone to trial.[4]  This further shows that it was preferable to settle and obtain a significant price concession

---

[1] *See* Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Settlement ("Final App. Br."), at 17-23; Memorandum of Law in Support of Plaintiffs' Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Fee Br."), at 20-23.  To the extent that objections filed after July 14 raise the same arguments that were dealt with in Plaintiffs' previous memoranda, the Court is respectfully referred to such prior memoranda.

[2] For the Court's convenience, a table listing each objection received after July 14, 2011 is attached hereto as Exhibit A.  Copies of the objections are attached to the Reply Declaration of Shelly L. Friedland.

[3] *See* Reply Declaration of James J. Sabella ("Sabella R. Decl.") Ex. 1.

[4] There can be no doubt that it would have been extremely difficult at trial for Plaintiffs to persuade the jury to

*(Cont'd)*

for the Class, rather than move forward with the case and risk obtaining nothing.

Several objectors argue that only a cash award would be acceptable to them.[5]  "[T]he fact that some objectors would have preferred cash cannot be determinative of the issue whether the settlement before the court is reasonable."  *In re Cuisinart Food Processor Antitrust Litig.,* No. MDL 447, 1983 WL 153, at *7 (D. Conn. Oct. 24, 1983) (Cabranes, J.).  Moreover, given that there are 15.7 million Class members, and considering the administrative costs and postage involved in mailing checks,[6] a settlement fund of even $100 million in cash would yield far less than $10 per Class member.  At this level, many Class members would not even bother to cash the checks.[7]  In contrast, each Class member who pays on a monthly or quarterly basis or who renews a longer term subscription will save at least $2.00 per month.[8]  Thus, Class members who pay on a month-to-month basis will save $10.00, and annual subscribers who renew between August and December, 2011 will save $22.00.[9]  Moreover, Plaintiffs assert that the reduction in the Music Royalty Fee has benefitted class members already in the amount $66 million ($.58 per post-renewal month for those subscribers renewing after December 5, 2010).

## I.   RESPONSES TO PARTICULAR OBJECTIONS

### A.   Nicolas Martin

#### 1.   Mr. Martin Is Wrong In Asserting That The Settlement Has No Value

Mr. Martin, represented by Theodore Frank, argues that if Sirius XM lacks market power,

---

ignore the FCC's conclusions and find instead that Sirius XM wields monopoly power.

[5] *See* Batman Obj.; Crutchfield Obj.; Hawkins Obj.; Ireland Obj.

[6] The administrative costs and postage involved in sending checks to a class this size would be approximately $10.35 million or 66 cents per check.  *See* Declaration of Matthew Potter ("Potter Decl.") ¶¶ 4, 5.

[7] For checks less than $10, more than 15% of recipients are likely to not cash the checks.  Potter Decl. ¶ 7.

[8] The savings is actually around $2.20 per month, because the lower subscription fee would also reduce the music royalty fee.

[9] (11 months x $2.00)  Many Class members will receive more.  Since approximately 20% of subscribers have at least one additional radio, a significant portion of Class members will receive an additional benefit by virtue of the price freeze on the multi-radio subscription price.

it would not have raised prices, rendering the Settlement's price freeze valueless.  Conversely, he argues, if Sirius XM has the market power to raise prices, the Settlement has value but Plaintiffs would have won at trial and should not have settled.  This argument has numerous flaws.

Mr. Martin erroneously assumes that there is an ascertainable, absolute truth as to whether Sirius XM has market power, and that it either has no power to implement any price increase at all or that it has infinite power to charge whatever it pleases.  In the real world, whether Sirius XM has market power is not susceptible to absolute certainty.  Indeed, each side disclosed lengthy expert reports addressing this issue and arrived at opposite conclusions.  Plaintiffs do indeed believe that Sirius XM has sufficient market power to profitably implement a $2.00 per month price increase.[10]  While the ability to profitably sustain a small but significant price increase is a test adopted by the Merger Guidelines of the Department of Justice for determining market power, this does not mean that Plaintiffs would definitely have convinced the jury that the merger substantially lessened competition or created a monopoly, due to the various difficulties outlined in the Final Approval Brief, the changing competitive landscape, and the FCC's recent decision not to extend the price cap.

Further, Mr. Martin ignores the evidence that Plaintiffs have submitted on this motion that Sirius XM **had made plans** for the $2.00 per month price increase since shortly after the merger was consummated.  The declaration of Catherine Brooker, Sirius XM's Vice President of Finance, also shows that Sirius XM analyzed the issue and determined it could impose a $2.00 price increase profitably.  Brooker Dec. ¶ 5.

In its submissions to the FCC, Sirius XM did not take the position that it cannot (and therefore would not) increase prices at all; it simply argued that its pricing is "constrained by a

---

[10] Mr. Martin overlooks that the complaint alleges that the three price increases **already implemented** by Sirius XM have been profitable.

wide variety of market competitors."[11]  Indeed, Sirius XM and its expert witness took the

position that its years of multi-billion dollar losses make a price increase inevitable, ***irrespective***

***of market power***.  Similarly, the FCC has not concluded that Sirius XM cannot (and therefore

will not) increase prices at all.  It has simply concluded that "the marketplace has evolved since

the merger closed, and consumers now have additional audio entertainment choices."[12]  Thus,

whether the merger violated the antitrust laws is not dispositive as to Sirius XM's willingness

and ability to raise prices in 2011.

Additionally, Mr. Martin never considers the plausible scenario under which Sirius XM

does increase prices but it ultimately turns out it was not profitable to do so.  Such a price

increase – which the Settlement prevents – would have been costly for the subscribers who

would have paid the higher price, regardless of whether Sirius XM has sufficient market power

to sustain a price increase in the long run.[13]

Mr. Martin's last argument regarding Sirius XM's alleged lack of market power is that

competition has forced Sirius XM to engage in isolated "deep discounting."[14]  Mr. Martin offers

no analysis, expert opinion, or other evidence that competition from other media has materially

---

[11] *See* Reply Comments of Sirius XM Radio Inc. submitted to FCC at 5-6 ("Sirius XM's pricing is constrained by a wide variety of market competitors.") (Sabella R. Decl. Ex. 2).

[12] *See* Memorandum Opinion and Order, July 27, 2011, at 4 (Sabella R. Decl. Ex. 1).

[13] Mr. Martin's argument that Sirius XM's statements to the FCC preclude an argument that it has market power to implement a price increase is meritless.  First, for there to be an estoppel, a party's later position must be "clearly inconsistent" with earlier position."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  As noted above, Sirius XM has not stated that it has no power to increase prices at all.  Further, this Court has previously noted that Sirius XM took different positions before the FCC and before the Court but Sirius XM was not precluded from doing so. *See* Opinion and Order on Summary Judgment, Mar. 29, 2011, at 9.  As noted above, Sirius XM may view its competitors as constraining its behavior yet still be planning a $2.00 price increase on the assumption that an increase of this amount will not be substantial enough to drive away its subscribers.

[14] Mr. Martin's assertion that Sirius XM reduced the U.S. Music Royalty Fee ("the Royalty Fee") in response to competition is incorrect.  As both Plaintiffs and Sirius XM have explained, the Royalty Fee was reduced because Sirius XM had earned enough revenue to pay down the pool of historic royalty costs that Sirius and XM had borne between March 2007 and July 2009.  Moreover, the FCC never approved a ***$1.98*** Royalty Fee; the Commission permitted Sirius XM to charge *some* royalty fee but did not determine the amount.  *See* Opinion and Order on Summary Judgment, Mar. 29, 2011, at 9.

changed Sirius XM's pattern of offering discounts.  While Sirius XM might agree with Mr. Martin's assessment, Plaintiffs' view is that the mere fact that Sirius XM offered discounts to some customers while maintaining its higher rates for the vast majority neither proves, nor disproves, that the company possesses market power.  It merely proves that the company has possessed the ability to engage in price discrimination.  "[P]rice discrimination evidence has very limited utility for proving power."  P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 517, at 150 (3d ed. 2011).  To the extent Sirius XM's discounting practices would have been an issue at trial, which view the jury would have accepted is one of the risks militating in favor of settlement.

If Mr. Martin were correct that Sirius XM does not have any market power to raise prices, that would provide no basis to reject the Settlement, because Plaintiffs could not have prevailed if the case proceeded to trial.  Indeed, in this scenario, the Settlement at least provides value to former subscribers, who will have the opportunity of one month of free service.

Moreover, Mr. Martin's theory as to how parties assess a settlement bears little relation to how complex litigation works in the real world.  He argues that if Plaintiffs and Sirius XM value the price freeze at $180 million, the Settlement is unreasonable because a cash settlement of $120 million would have been preferable to both sides:  He claims that Sirius would have preferred a cash settlement if it had a lower price tag, and Plaintiffs (and Class Counsel) would have preferred cash.  He then concludes that because they did not settle on these terms, one side or the other must not believe that the price freeze is really worth $180 million.

This conclusion is wrong.  First, non-cash settlements can benefit a class precisely because the defendant is typically "willing to provide substantially more value in a [non-cash] settlement than it ever would have agreed to pay in a cash settlement."  *In re Western Union Money Transfer Litig.*, No. 01-cv-0335 (CPS), 2004 WL 3709932, at *12 (E.D.N.Y. Oct. 19,

2004).[15]  As discussed below, the majority of Class members will ***automatically*** be eligible to save approximately $10 apiece, and would have received less in a cash settlement.[16]

Second, Mr. Martin's theoretical argument ignores that it was preferable to Sirius XM to spread out the impact of the Settlement through a price freeze than by paying a lump sum of $120 million, for cash flow purposes as well as to avoid the impact of announcing a payment of $120 million.  Moreover, Plaintiffs were not given the choice of ***any*** cash settlement; the choice was between the price freeze and no Settlement, with the attendant risks of going to trial.  Faced with these options, the Settlement provides meaningful value to the Class.

> **2.    Mr. Martin's Objection Regarding The Requested Attorneys' Fees Is Without Merit**

> **a.    The Negotiation Of The Fees Was Proper**

Mr. Martin argues that it was improper for Class Counsel to negotiate a separate fee amount with Sirius XM.  Mr. Martin urges this Court to adopt a *per se* ban on such arrangements, but he does not cite case law to support his position, let alone any cases in this Circuit, and instead relies only on a letter to the ABA by a group of law professors.  In fact, in another recent matter where Mr. Frank was counsel to the objector and raised the identical objection, the court squarely rejected it, finding

> that the structure proposed in this case is common in class action litigation, that [the objector] ha[d] failed to cite a single case (and the Court . . . found none) where a class action settlement has been rejected on these grounds.

---

[15] *See also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1018-19 (N.D. Ill. 2000) (same); Geoffrey P. Miller, *Non-pecuniary Class Action Settlements*, 60 LAW & CONTEMP. PROBS. 97, 112 (1997) ("The efficiencies of nonpecuniary settlements arise because of benefits such settlements can offer either to the plaintiff, the defendant, or both – benefits that can be shared between the parties, making everyone better off.").

[16] Mr. Martin suggests that a $120 million settlement would have been preferable to all parties.  With the $10.35 million in administrative costs, that would generate a payment of approximately $7 per Class member, if allocated evenly.  Using *pro rata* allocations according to the amount of damages each Class member suffered, many Class members would receive even less.  If attorneys' fees were deducted from the settlement fund (as Mr. Martin argues they should be) rather than separately negotiated, the amount received by Class members would be even less.

\*        \*        \*        \*

> Class Counsel's arguments on this issue are both legally and factually more sound than those of [the objector].  There is no legal authority supporting the bright line rule [the objector] asks the Court to draw and there is substantial case law indicating that it is neither necessary nor appropriate.

*Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 785-86 (N.D. Ohio 2010).[17]

Further, the law professors' letter only addresses situations where there are two payments:  one to the class (or individual plaintiff) and one to plaintiff's attorneys.  The professors argue that in such situations, the two payments should be combined to create one common fund, with the fee then awarded from that fund.  Even in that situation, the law is contrary to the law professors' position.  In fact, an "agreement by a settling party not to oppose a fee application up to a certain amount . . . is worthy of consideration."  Fed. R. Civ. P. 23(h), Advisory Comm. Notes, 2003 amendments ("'Side agreements' regarding fees provide at least perspective pertinent to an appropriate fee award.").  But at bar, there is no common fund, and the law professors do not offer any opinions as to how to set the fee in a case where there is no common fund.  *See Lonardo*, 706 F. Supp. 2d at 789 (noting that percentage of fund method suggested by Mr. Frank is generally not used in case without a common fund).

Further, this Court has already held that when the fee is a separate obligation of the defendant not coming out of the settlement, and is negotiated after the terms of the settlement have been agreed upon – as happened here – the likelihood of a conflict of interest actually

---

[17] Distinguishing the same cases cited by Mr. Martin here, the *Lonardo* court found that "the cases Mr. Frank cites in support of his proposal that independent attorneys' fee agreements should be per se unfair merely stand for the proposition that the Court must review all aspects of a class action settlement agreement, including independent agreements between class counsel and the defendants regarding attorneys' fees…. These cases do not suggest that a settlement agreement is unfair, unreasonable, or inadequate simply because the defendants and class counsel negotiate an independent fund as the source of any attorneys' fee award."  706 F. Supp. 2d at 790-91 (discussing *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820-21 (3d Cir. 1995); *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2002)).

declines. *See Thompson*, 216 F.R.D. at 67 ("the fees were negotiated separately and after the settlement amount had been decided, thus considerably removing the danger that attorneys' fees would unfairly swallow the proceeds that should go to class members").[18]

Mr. Martin (and Objector Marguerite Willis)[19] also asserts that the provision of the Settlement Agreement whereby Sirius XM agreed not to oppose a fee up to $13 million is problematic. As noted previously, however, Sirius XM never offered a cash settlement, and the fee was negotiated after the other terms of the Settlement were fixed. There was nothing bargained away in exchange for Sirius XM's agreement to this provision. Moreover, Sirius XM only agreed not to oppose Class Counsel's motion; the authority to determine the award still rests with this Court. *See* Fed. R. Civ. P. 23(h).[20]

### b.    The Court Can Determine The Fee Award Based On Current Estimates Of The Settlement's Value

Mr. Martin argues that the Settlement is comparable to a coupon settlement, and that pursuant to 28 U.S.C. § 1712, determination of the attorneys' fee must be postponed until the

---

[18] Judge Lynch reached the same conclusion in *McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006) (where "money paid to the attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members"). Other courts have similarly expressed a preference for separately negotiated fees that do not reduce the settlement for the Class. *See, e.g., In re Tyson Foods Inc.*, No. 08-cv-1982, 2010 WL 1924012, at *4 (D. Md. May 11, 2010) (fact that fees were negotiated separately from settlement weighed in favor of approval); *Lonardo*, 706 F. Supp. 2d at 786 n.18; *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 243 (E.D.N.Y. 2010) ("The Court also notes that however large the requested fee, it is not drawn from a common fund but rather is to be paid directly by defendant."); *Vaughn v. Am. Honda Motor Co.*, 627 F. Supp. 2d 738, 743-44 (E.D. Tex. 2007) (where settlement combined cash restitution with lease and warranty extensions, court noted that defendant's agreement to pay costs and attorneys' fees would not reduce benefits available to the class).

[19] *See* Objection of Marguerite Willis. Ms. Willis also argues that the Settlement does not benefit her because the rates may increase on January 1, 2012. It is unclear whether her argument is that the price freeze is only for five months or that her subscription will not be scheduled for renewal until after the New Year. If it is the latter, she is in fact able to benefit from the price freeze by renewing early to lock in the current rates.

[20] *See In re Excess Value Ins. Coverage Litig.*, No. MDL 1339, 2004 WL 1724980, at *10 (S.D.N.Y. July 30, 2004) ("Nor does the so-called 'clear sailing agreement' by Defendants not to oppose Class Counsel's Fee Application bar approval of the Settlement, where, as here, the Court has strictly scrutinized both the process and substance of the Settlement."); *In re Sony SXRD Rear Projection Television Class Action. Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *15 (S.D.N.Y. May 1, 2008) ("[E]ven where the defendant pays the attorneys' fees, a court must assess the reasonableness of the fee award . . .") (citing *General Motors*, 55 F.3d at 819-20).

parties see what the redemption rate for the so-called coupons is.[21]  This argument fails.

The relief provided here is not comparable to a coupon but rather, as certain other objectors contend,[22] the price freeze is akin to an injunction.  In cases involving antitrust claims, courts look favorably upon settlements based on injunctive relief only,[23] and it is recognized that injunctive relief is different from coupon relief.[24]  Indeed, allowance of attorneys' fees to an antitrust plaintiff who substantially prevails in an action for injunctive relief "is mandatory." *Union of Needlestrades, Indus. & Textile Employees v. INS*, 202 F. Supp. 2d 265, 269 n.3 (S.D.N.Y. 2002), *aff'd*, 336 F.3d 200 (2d Cir. 2003); *see* 15 U.S.C. § 26.

The Settlement here is similar to that in *Dupler*, a case addressing renewal practices for defendant's warehouse stores, which are only open to members.  There, pursuant to the settlement, the defendant provided free membership, with class members automatically receiving either additional months on existing memberships or temporary membership (for those who were no longer members).  705 F. Supp. 2d at 237.  The court in *Dupler* did not treat the settlement as if it were a coupon settlement; it simply looked at the "direct economic benefit of additional membership terms," which was calculated by multiplying the number of class members in each of the various categories by the value of the free membership.  *Id.* at 241.[25]  The court then

---

[21] Several other objectors make a similar argument regarding the timing of consideration of attorneys' fees.  *See* Objections of  Tom Carder; Monty Delluomo; Jason Hawkins *et al.*; Randy Lyons; and Linda Mrosko.

[22] *See* Hawkins Objections.

[23] *See, e.g., Callahan v. Commonwealth Land Title Ins. Co.*, No. 88-cv-7656, 1990 U.S. Dist. LEXIS 14524, at *54-55 (E.D. Pa. Oct. 30, 1990).

[24] In discussing coupon settlements and other "non-pecuniary" settlements, Professor Geoffrey Miller specifically distinguishes settlements providing for injunctive relief as requiring a different analysis.  *See* Miller, *Non-pecuniary Class Action Settlements*, 60 LAW & CONTEMP. PROBS. at 101 ("A nonpecuniary settlement is a settlement of a class action lawsuit in which the defendant, in exchange for a release of legal claims, provides consideration other than an immediate cash payment to defined members of the class.  We exclude from consideration traditional injunctive remedies, which, although nonpecuniary in nature, present considerations different from the ones addressed here.")

[25] The court accepted the plaintiffs' calculations that multiplied the number of months received by one-twelfth of the annual fee for each membership type.  705 F. Supp. 2d at 241 n.7; *see* Sabella R. Decl. Ex. 3 at 11-15

evaluated the fee request in relation to the estimated value of $38.8 million, *id.* at 243-44, and used a lodestar cross-check, *id.* at 244-45, as if it were a common fund case.

See also *In re Wireless Telephone Federal Cost Recovery Fees Litig.*, No. MDL 1559, 2004 WL 3671053 (W.D. Mo. Apr. 20, 2004), *aff'd*, 396 F.3d 922 (8th Cir. 2005), which approved a settlement providing free minutes of cell phone service to current subscribers; free service with activation fee waived or calling card for long distance calls for former subscribers; and rebates to former subscribers who paid early termination fees when terminating contracts due to the federal cost recovery fee at issue in the litigation.  The court stated:  "This is not a 'coupon' settlement.  Class members will not be required to purchase any ***additional*** services or items to receive a benefit") (emphasis added).  2004 WL 3671053, at *4.[26]

As in *Dupler* and *Wireless*, the price freeze here does not require Class members to purchase something from Sirius XM that they would not otherwise purchase.  The relationship between Sirius XM and its subscribers is by nature a continuing one, and the "churn rate" – the percentage of subscribers who decline to renew their Sirius XM subscriptions – is only about 2% per month.[27]  Thus, Class members do not need to buy anything that they would not otherwise be buying in order to benefit from the Settlement.  Because the renewal rate is so high, the concerns in coupon cases that redemption rates would be low because the product was a big ticket item that consumers do not frequently buy, are inapplicable.[28]

---

[26] In a separate opinion issued the same day, the *Wireless* court granted attorneys' fees and did not delay ruling on the fee motion to see how many subscribers took the benefits of the settlement.  *See In re Wireless Telephone Federal Cost Recovery Fees Litig.*, No. MDL 1559, Order (Dkt. no. 247) at 2-5 (W.D. Mo. Apr. 20, 2004).

[27] Dr. Langenfeld's estimates of the value of the Settlement take into account the fact that historically some subscribers do not renew.  In fact, he uses the conservative assumption that 2.5% each month do not renew, whereas the actual figure is below 2%.  *See* Sabella R. Decl. Ex. 4, at 1 (reporting churn at 1.9%).

[28] *See, e.g.*, *General Motors*, 55 F.3d at 807-88 (criticizing coupon settlement where only 14% likely to use it); *True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1074 (C.D. Cal. 2010) (noting that plaintiffs' experts' estimate that 6%-7% would redeem was likely too high).

For former subscribers who take advantage of the month of free service, this offer comes with no strings attached.[29]  These Class members will not have to purchase ***anything*** from Sirius XM at all.  Sirius XM will gain nothing from these individuals (unless they decide to resume their paying subscriptions after the free month), but the Class members will have received a service worth $12.95 for no cost.[30]

Additionally, unlike the situation in the typical coupon case, Class members whose subscriptions come due between August and December 2011 – approximately 60% of the current subscriber base[31] – will not have to do anything out of their normal routine in order to get the benefit of the price freeze.[32]  In essence, as in *Dupler*, they will get the benefit ***automatically***[33] when they renew as their subscription comes due.[34]  For these subscribers, the price freeze is worth $162 million.  *See* Langenfeld Decl. ¶ 5.[35]  From Sirius XM's point of view, the price

---

[29] Several objectors argue that for former subscribers who do not want a free month of satellite radio service, the Settlement has no value.  *See* Objections of Christopher Batman; Monty Delluomo; and John Ireland.  Besides the fact that none of these objectors (as current subscribers) appears to have standing to object on behalf of former subscribers, the fact that some class members may decline to participate in a settlement does not make the consideration valueless.  This is true in coupon settlements and even in cash settlements where some class members choose not to file a claim or not to cash the check.  *See In re Wireless Telephone Federal Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005) (noting that cell phone subscribers who terminate service before receiving benefit of free service provided pursuant to settlement "are no different from other members in a settlement who elect not to claim their settlement benefits").

[30] Given that the standard initiation fee is also waived, the value is actually higher.

[31] *See* Reply Declaration of James Langenfeld, Aug. 3, 2011 ("Langenfeld R. Decl.") ¶ 7.

[32] *See Wireless*, 2004 WL 3671053, at *11 (extra minutes routinely used by large percentage (in excess of 70% of the class) so likely to be used if settlement approved).

[33] *See also Wireless*, 2004 WL 3671053, at *11 ("current customers are entitled to free anytime minutes without the need to fill in any forms, submit any claims, or prove any detrimental reliance on the alleged misleading . . . charge. . . . Rather, these class members will receive this substantial benefit ***without doing anything at all*** except merely using the benefit conferred") (emphasis added).

[34] Other subscribers whose subscriptions come due after January 1 also get the benefit as long as they take the affirmative step of putting in for a renewal prior to January 1, which the Settlement allows them to do.

[35] For primary radio subscribers who are scheduled to renew between August 1, 2011 and December 31, 2011, the savings are estimated at $132 million; for subscriptions on additional (or multiple) radios, the savings are estimated at $30 million.  Langenfeld Decl. ¶ 5.  Dr. Langenfeld used Sirius XM subscription data generated in the spring of 2011 to estimate the subscription volume, and conservatively estimated that there would be ***no*** growth in subscribership between August and December 2011.  *Id.* ¶ 8 n.3; Langenfeld R. Decl. ¶ 4.  Using data for renewal patterns for each type of subscription (*e.g.*, monthly, quarterly, annually, etc.), he then estimated the number of

*(Cont'd)*

11

freeze therefore represents $162 million in foregone revenue, which is "a reasonable approximation of the value of [P]laintiffs' claim." *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001).[36]

Even if the Court were to view the relief here as comparable to a coupon settlement, the Court is not required to defer consideration of the fee application.[37] Because the settlement is worth $162 million for subscribers whose subscriptions come up for renewal prior to January 1, 2012, the Court can evaluate the request for $13 million as a percentage of that amount without even considering how many subscribers will take advantage of the offer to renew early to lock in the current prices or how many former subscribers use the free month. *See Dupler*, 705 F. Supp. 2d at 243-45. At less than 8% of this minimum value, the $13 million is clearly reasonable. *See* Fee Br. at 7-9.

Alternatively, the Court can consider the lodestar. 28 U.S.C. § 1712(b). Under such an approach, given that the attorneys' lodestar plus expenses is approximately $20 million, an award of $13 million for fees and expenses is clearly reasonable.

### 3.    Mr. Martin's Attack On The Class Certification Order Is Baseless

Mr. Martin challenges the Court's March 29, 2011 class certification order insofar as the Court suggested that Class Counsel's staffing on the case reflect race and gender diversity.[38]

---

likely renewals between August 1, 2011 and December, 31, 2011, and assumed for each renewal, the subscriber would save $2.00 due to the price freeze. Langenfeld Decl. Exs. 2, 4.

[36] Sirius XM also bore the costs of notice, approximately $1.8 million. *See* Sabella R. Decl. Ex. 5. When added to the $13 million Sirius XM has agreed to pay for attorneys' fees and costs, the total (excluding the value for long-term subscribers who renew early to lock in the current prices and former subscribers who use the free month) is therefore $194.8 million. *See Western Union*, 2004 WL 3709932, at *11 (calculating value of settlement as total estimated value of coupons, plus costs of notice and attorneys' fees, in comparison to value of claims).

[37] As for the fairness of the Settlement, it bears several attributes of a well-designed coupon settlement: (1) that the service is one Class members are likely to use regardless of the Settlement consideration; (2) that the service is readily available; and (3) that the consideration (*i.e.*, the price freeze or free service) can be used immediately. *See Western Union*, 2004 WL 3709932, at *12.

[38] The attitude of Mr. Martin's lawyer, Mr. Frank, toward this Court's views on diversity are not surprising. Donors *(Cont'd)*

12

Apart from the fact that any request for reconsideration of the class certification order is untimely, it is baseless and scurrilous to suggest that Class Counsel's staffing of the case – which included several women, including some of African-American and Asian descent – "interfere[d] with their ability to provide the best representation for the class."  Martin Obj. at 22.  On the Center for Class Action Fairness Website, Mr. Martin's counsel, Mr. Frank, goes even further and describes this Court's request to demonstrate some ethnic and gender diversity as requiring "class counsel to meet racial quotas as a condition of appointment."  Plaintiffs' counsel have not interpreted the Court's request of making a diversity demonstration as an imposition of "racial quotas," as argued by Mr. Frank, but instead, of simply making a demonstration that the diverse ethnic and racial composition of the Class be similarly reflected in the legal team that represents them.  Far from being a purported unconstitutional requirement, the Court's requested demonstration appears consistent with the MANUAL FOR COMPLEX LITIGATION's instructions in selection of lead counsel to assess "whether designated counsel fairly represent the various interests in the litigation."  MANUAL FOR COMPLEX LITIGATION (Fourth), § 10.224.[39]

## B.   Michael Hartleib

*Pro se* objector Mr. Hartleib complains that the Release is "overly broad" insofar as it might be read to encompass direct and derivative shareholder claims that he has filed against Sirius XM in a case styled *Goe v. Amble*, No. 650606/2011 (Sup. Ct. N.Y. Co.).  As an initial

---

Trust Inc., which funds Mr. Frank's Class Action Fairness Center, also funds the Project on Fair Representation (*see* Sabella R. Decl. Ex. 11 Sch. O), which devotes its efforts to opposing affirmative action and trying to invalidate provisions of the Voting Rights Act.  *See* Sabella R. Decl. Ex. 12.

[39] Mr. Martin's suggestion that Plaintiffs' counsel should have immediately sought mandamus with respect to the lead counsel demonstration requested by the Court is similarly flawed.  "The selection of lead counsel for the plaintiff class is left to the discretion of the district court guided by the best interests of [the class] ....  Unless there are exceptional circumstances, ... the exercise of discretion should be left untouched by the appellate court.  [W]e do not – indeed may not – issue *mandamus* with respect to orders resting in the district court's discretion, save in most extraordinary circumstances."  *In re Agent Orange Prods. Liability Litig.*, 818 F.2d 179, 187 (2d Cir. 1987) (citations and internal quotations omitted).

matter, to the extent that Mr. Hartleib is worried that his direct claims might be released for consideration that he deems inadequate in light of the claims he asserts in his action, he could have opted out.  He chose not to do so.[40]

Mr. Hartleib also overlooks that "[b]road class action settlements are common" and "[t]he law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct."  *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).  Here, consistent with this authority, the Settlement Agreement releases all claims against Sirius XM (and, among others, its officers and directors) "arising out of, based on or relating to the merger that formed Sirius XM Radio Inc." Settlement Agreement § 8(a).  Mr. Hartleib does not address the foregoing controlling Second Circuit authority.  *See also Wal-Mart*, 396 F.3d at 108 ("Class actions may release claims, even if not pled, when such claims arise out of the same factual predicate as settled class claims").

This Court's role on Plaintiffs' motion for final approval is not to offer an advisory opinion on the potential *res judicata* effect of the release, as Mr. Hartleib invites the Court to do. Rather, the question before the Court is whether the Settlement Agreement is "fair, reasonable, and adequate" under Rule 23(e)(2).  Because the release is in full accord with controlling Second Circuit authority addressing the proper scope of a release in a classwide settlement agreement, Mr. Hartleib's objection should be overruled.[41]

---

[40] Mr. Hartleib provides no explanation for his assertion that the settlement "would impair the rights of ***all*** absent plaintiffs qua shareholders, including those who opt out of the class."  Hartleib Obj. at 11 (emphasis in original). Indeed, one of the plaintiffs in one of the other unrelated cases that Mr. Hartleib mentions, *Goe v. Amble*, No. 11-cv-3506 (S.D.N.Y.), has, in fact, opted out of the case at bar.  *See* Sabella R. Decl. Ex. 6.

[41] Mr. Hartleib is incorrect in claiming that Plaintiffs' counsel agreed Sirius XM was not entitled to this Release.

*(Cont'd)*

C.    **Marvin Union, Adam Falkner, Jill Piazza, Ken Ward, Ruth Cannata, Lee Clanton, Craig Cantrall and Ben and Kim Frampton**

These objectors, represented by Edward Siegel, complain that Class members did not have adequate notice of Class Counsel's motion for an award of legal fees, and that the motion therefore did not comply with Fed. R. Civ. P. 23(h).  Mr. Siegel argues that the reference in the Notice that was distributed to Class members in May and June was insufficient, even though it stated that "Class Counsel will ask the Court for attorneys' fees and expenses of up to $13 million plus interest."  He also argues that filing the motion on the ECF system on July 15 and posting it on the case website on July 18 was insufficient, even though objections were not due until July 19.[42]  Mr. Siegel cites no authority for his position, other than a Ninth Circuit case[43] that requires that the motion be made prior to the deadline for objections, which it was here.

Mr. Siegel has made this same rote objection in other cases, unsuccessfully.  Most notably, Mr. Siegel neglects to mention that he made these same arguments unsuccessfully in the Second Circuit in *Carlson v. Xerox Corp.*, 355 Fed. App'x. 523 (2d Cir. 2009) (summary order).  In that case, the Second Circuit held that since the notice stated that plaintiffs' counsel would seek attorneys' fees up to 20% of the settlement fund, informed class members of their right to object and how to do so and of their right to appear at the fairness hearing, Rule 23(h) was satisfied even though the notice did not include the date the motion for fees would be filed or describe how class members could access the motion document.  *Id*. at 525.

Judge Rakoff reached the same conclusion in *In re Bisys Sec. Litig*., No. 04-cv-3840, 2007 U.S. Dist. LEXIS 51087 (S.D.N.Y. July 16, 2007), where the notice stated that counsel

Hartleib Obj. at 5-6.  Plaintiffs' counsel simply told Mr. Hartleib that it was Sirius XM's counsel who wanted the broad language in the Release.

[42] Since there is no legal requirement that class counsel establish a website and post settlement papers there, Mr. Siegel's argument that the motion needed to be posted there earlier lacks force.

[43] *In re Mercury Interactive Corp. Sec. Litig*., 618 F.3d 988 (9th Cir. 2010).

would apply for fees not greater than one-third of the settlement fund, and the actual motion for fees was not filed until after the deadline for objections had elapsed.  The court held that because "members of the class were plainly on notice that the attorneys' fees might be as much as one-third of the fund and so had every reason to raise an objection if they thought this was excessive … the Court finds that there was been adequate compliance with Rule 23(h)."  *Id*. at *5-6.

As for Mr. Siegel's argument that filing the motion on the Court's ECF docket does not satisfy Rule 23(h), that argument was rejected in *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig*., 733 F. Supp. 2d 997, 1013 n.12 (E.D. Wis. 2010), another case in which Mr. Siegel unsuccessfully represented objectors.

These objectors also argue that the release is too broad because it may release claims that Class members might want to bring in the future alleging that the merger resulted in future price increases.  It is entirely appropriate for a release to include such claims, and antitrust cases could not be settled if it were otherwise.  As noted above, the law is well settled all claims that arise from the same factual predicate as the settled class claims may properly be released on a classwide basis.  *See Wal-Mart*, 396 F.3d at 108 ("Class actions may release claims, even if not pled, when such claims arise out of the same factual predicate as settled class claims"); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 272 Fed. App'x 9, 13 (2d Cir. 2008) (summary order) (claims that share a "common factual predicate" with, or are "based on the same core facts" as, settled class claims were properly released in a class action settlement, even if the released claims would "require[] proof of additional facts").

Directly in point is *Rodriguez v. West Pub. Corp.*, No. 05-cv-3222, 2007 U.S. Dist. LEXIS 74849 (C.D. Cal. Sept. 10, 2007), *mod. on other grounds*, 563 F.3d 948 (9th Cir. 2009), a case in which Mr. Siegel represented some of the objectors.  The complaint included claims

16

under Sherman Act § 2 and Clayton Act § 7 relating to a merger, and the settlement included a broad release releasing all claims that class members "ever had, now has or hereafter can, shall or may have concerning or relating to any conduct alleged" in the complaint.  *Id*. at *15-16.  The court rejected the objection that the release was too broad, noting that the release "language is typical and has been approved by many courts."  *Id*. at *66-67.

Mr. Siegel's clients also complain that the fee is excessive, arguing that Class Counsel did not submit evidence as to the risks of litigation (that would justify the requested fee).  But the Fee Brief explicitly discussed these points.  Further, as discussed above, the FCC's decision not to extend the price cap underscores the risk that Plaintiffs would have lost at trial.[44]

### D.  Jason Hawkins, Sheila Massie, John Sullivan

These objectors, represented by Robert Erlanger, complain that the Settlement amounts to a "self-imposed injunction" that "frustrate[s]" the Court's March 29, 2011 Order denying Fed. R. Civ. P. 23(b)(2) certification of an injunction class.[45]  They cite no authority holding that a party cannot voluntarily agree in a settlement to freeze its prices if a court has previously denied Rule 23(b)(2) certification.  Moreover, at the hearing on March 10, 2011, the Court agreed that if there was a single plaintiff who demonstrated entitlement to injunctive relief, "you don't need a class in order to have an injunction."[46]  As the Court put it, if the named plaintiffs show entitlement to injunctive relief, "then all of the benefits that they are entitled to will devolve onto the class members."[47]  The settlement here does not "frustrate" the Court's class certification decision.

---

[44] Mr. Siegel's clients also argue that Class Counsel did not provide evidence of a fee agreement with any lead plaintiffs, but such evidence is not necessary.  Moreover, their version of the burden of proof is backwards.  Class Counsel have the burden of proving the requested $13 million is fair and reasonable, which they have done; Class Counsel does not have to prove a negative, *i.e.*, that some other fee is not unjust.

[45] The Crutchfield objectors, represented by Mr. Weiss, raise a similar point.

[46] Transcript of argument on Mar. 10, 2011, at 4 (Sabella R. Decl. Ex. 7).

[47] *Id*. at 3.

These objectors also question the Settlement's value, arguing that it be "objectively valued" but failing to say why the declarations and documents already submitted are insufficient. *See In re Wireless*, 2004 WL 3671053, at *11 ("objectors failed to provide to the Court with any estimate of the value apart from mere conclusory statements that the benefits were illusory."). Additionally, many of their arguments are based on incorrect assumptions.[48]

### E.    Gary, Warren and Sara Sibley

These objectors assert that notice was insufficient because they allegedly did not personally receive notice.  Notice was sent to these individuals' e-mail accounts, however.[49] Indeed, as the Court is aware, notice was emailed to all Class members for whom Sirius XM has email addresses.  In the absence of email addresses, or if the emails bounced back, notice was mailed to Class members with mailing addresses.  In addition, notice was published in several newspapers.  "[F]or due process to be satisfied, not every class member need receive actual notice, as long as class counsel acted reasonably in selecting means likely to inform persons affected."  *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 271 Fed. App'x 41, 44 (2d Cir. 2008) (internal quotations omitted); *accord Jermyn v. Best Buy Stores, L.P.*, No. 08-cv-00214 (CM), 2010 U.S. Dist. LEXIS 130682, at *7 (S.D.N.Y. Dec. 6, 2010).

### F.    Christopher Batman

Mr. Batman's primary objection is that the price freeze maintains the prices that Plaintiffs allege were anticompetitive.  However, as noted above, Plaintiffs did not challenge the legality

---

[48] These objectors are not correct that the freeze simply perpetuates the illegal prices.  The $12.95 base price has not changed since prior to the merger and Plaintiffs do not allege that it is an anticompetitive or monopolistic price.  Additionally, former subscribers who choose to avail themselves of the offer for one free month are not required to pay anything at all to receive this service, nor are they required to affirmatively terminate the service.  This offer is therefore not a "negative option."

[49] The Notice Administrator reports that it successfully sent the email notice to Sara Sibley at sibleysara@yahoo.com and to Gary Sibley at G@JURIS.CC.

of the $12.95 base price that has been in effect since before the merger.  Moreover, the Music Royalty Fee has already been reduced from $1.98 to $1.40.  He also argues that former subscribers are not adequately compensated, an argument addressed above.

### G.      Tom Carder

Represented by Charles Thompson, Mr. Carder argues that the valuation of $180 million comes from "out of thin air," but both Plaintiffs and Sirius XM have provided analyses showing that the Settlement is worth at least $180 million.  Nor is it necessary to discount this value because the price freeze purportedly provides a marketing benefit.  Plaintiffs' expert has already assumed that the level of customer turn-over will be **_higher_** than has been standard, so the calculations are already conservative.[50]  Mr. Carder also argues that the consideration of the attorneys' fees should be delayed because the Settlement is like a coupon settlement, an argument addressed above.

### H.      The Crutchfield Objectors

The Crutchfield Objectors, represented by Weiss & Associates,[51] argue that the Settlement provides injunctive relief, not damages for past violations.  Since most Sirius XM subscribers renew their subscriptions, they clearly stand to benefit from a price freeze.  These objectors also complain that all Sirius XM subscribers (_i.e._, not just Class members) will benefit from the price freeze, but this would be true whenever injunctive relief is the remedy and supports rather than undercuts the Settlement.  _See, e.g._, _Callahan_, 1990 U.S. Dist. LEXIS 14524, at *56.[52]  These objectors' arguments regarding the value of the Settlement and whether it

---

[50] Langenfeld Decl. ¶ 8 n.3; Langenfeld R. Decl. ¶ 4.

[51] This group includes Steven Crutchfield, Scott D. Krueger, Asset Strategies, Inc., Charles B. Zuravin, and Jennifer Deachin.

[52] _See also Vaughn_, 627 F. Supp. 2d at 743-44, 747 (defendant agreed to extend leases and warranties of **_all_** owners and lessees of certain model cars and to change design of odometers).

is comparable to a coupon settlement have been addressed above.

The Crutchfield Objectors' argument that fees should be based on what they erroneously call the cash portion of the Settlement, *i.e.*, the $13 million committed for attorneys' fees and expenses, is unsupported by any authority. Numerous courts have awarded fees when the class does not receive a cash payment. The proposed fee here is reasonable, whether measured as a percentage of the value of the price freeze or in comparison to Class Counsel's lodestar.

### I.  **Monty Delluomo**

Mr. Delluomo's main argument is that the Settlement is comparable to a coupon settlement and that the fee award should therefore be delayed until after Sirius XM determines the extent of use by Class members.[53] This argument has been addressed above.

### J.  **Gregory Gerson**

Mr. Gerson's objection that the Settlement consideration is insufficient is dealt with above and in the Final Approval Brief.

### K.  **Brian Goe**

Mr. Goe's objections are the same as Mr. Hartleib's.

### L.  **John Ireland**

Mr. Ireland's primary arguments are that the Settlement is like a coupon settlement and that the $180 million valuation has not been established to his satisfaction. These arguments have been addressed above. Mr. Ireland also second-guesses Counsel's conduct of this litigation, arguing that 37,000 hours "seems excessive," and that the "risk of litigation appears insignificant." The Court is far more familiar than Mr. Ireland as to the work Plaintiffs' counsel

---

[53] Mr. Delluomo's argument that the Settlement provides nothing for subscribers of "premier," "all access" and "all-in-one" packages is simply wrong. The Settlement is not limited to plans mentioned therein. Mr. Delluomo also argues that there is no evidence of the reactivation rate, but Dr. Langenfeld does include that information. *See* Langenfeld Decl. ¶ 8 n.3; Langenfeld R. Decl. ¶ 4.

needed to perform to move this complex case from its commencement to the eve of trial.[54]  As for Mr. Ireland's suggestion that the case would have been easily won, "[s]uch assumption cannot stand as a proper basis to evaluate the proposed settlement's fairness."  *Thompson*, 216 F.R.D. at 66.  Plaintiffs have already explained above and in their opening brief the substantial obstacles to Plaintiffs' success at trial.

**M.    Sherilyn Kindelay**

Ms Kindelay's concern that the Settlement will hurt Sirius XM is not relevant on this motion.  *See* Final Approval Br. at 21-22.

**N.    Randy Lyons**

Mr. Lyons' arguments that the Settlement amounts to a coupon benefit and therefore that the award of attorneys' fees should be delayed have been addressed above.

**O.    Linda Mrosko**

Ms. Mrosko's arguments that the Settlement amounts to a coupon settlement, that the award of attorneys' fees should be delayed, that injunctive relief is inappropriate here, and that notice was inadequate, have been addressed above.

**P.    Donald K. Nace**

Mr. Nace's arguments that this is a coupon settlement and that the release is too broad are addressed above.  He also argues that the pre-lawsuit landscape has not been changed, but he is incorrect.  We now know that Sirius XM had planned for a price increase after August 1, 2011 (assuming the FCC did not extend the price cap – which is what has happened).[55]

---

[54] Class Counsel will provide the daily time records of each firm involved on behalf of Plaintiffs, if the Court wishes to review them.

[55] In addition, the Music Royalty Fee was reduced after the litigation was commenced.

### Q.   **Page Nash**

Ms. Nash's objections regarding the value of the Settlement have been addressed above.[56]

### R.   **Marguerite Willis**

Ms. Willis's objections have been addressed at p. 8 & n.19, *supra*.

## II.   **THE PLAGUE OF THE PROFESSIONAL OBJECTOR**

In considering the objections, it is important for the Court to understand that many of the

objectors' counsel may appropriately be deemed "professional objectors."

"Federal courts are increasingly weary of professional objectors."  *O'Keefe v. Mercedes-*

*Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003).  As stated in *In re Cardinal Health,*

*Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 754 (S.D. Ohio 2008):

> [C]lass actions also attract those in the legal profession who subsist primarily off
> of the skill and labor of, to say nothing of the risk borne by, more capable
> attorneys.  These are the opportunistic objectors.  Although they contribute
> nothing to the class, they object to the settlement, thereby obstructing payment to
> lead counsel or the class in the hope that lead plaintiff will pay them to go away.
> Unfortunately, the class-action kingdom has seen a Malthusian explosion of these
> opportunistic objectors, which now seem to accompany every major securities
> litigation.

*See also In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603, 610 n.9 (E.D. Pa. 2003), *vacated*

*on other grounds*, 396 F.3d 294 (3d Cir. 2005) (criticizing a "professional gadfly" who had

"become a twelfth-hour squeaky wheel").[57]  An increased level of skepticism is warranted when

---

[56] Ms. Nash also asserted that she reserved her rights to file an amended petition regarding the request for attorneys' fees, but Plaintiffs are unaware of any amended filing on her behalf as of August 3, 2011.

[57] Courts have noted that often objections are "to extort the parties … into ransoming a settlement that could otherwise be undermined by a time-consuming appeals process."  *Snell v. Allianz Life Ins. Co. of N. Am.*, No. 97-cv-2784 RLE, 2000 WL 1336640, at *9 (D. Minn. Sept. 8, 2000).  "Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements. . . . Because of these economic realities, professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose behalf the appeal is purportedly raised, gains nothing."  *Barnes v. Fleetboston Fin. Corp.*, No. 01-cv-10395-NG, 2006 U.S. Dist. LEXIS 71072, at *3-4 (D. Mass. Aug. 22, 2006).  A "class member and his or her attorney conceivably could object to a proposed settlement solely to set up

*(Cont'd)*

reviewing an objection submitted by a professional objector.  *See* 5 William B. Rubenstein, Alba

Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 15:37 (4th ed. 2009).

### A.   Edward F. Siegel

Several objectors – Marvin Union, Adam Falkner, Jill Piazza, Ken Ward, Ruth Cannata,

Lee Clanton, Craig Cantrall and Ben and Kim Frampton – are represented by Edward F. Siegel,

an attorney who specializes in filing objections.  Indeed, until recently he boasted on his website,

www.efs-law.com, that "Class Action Objections" is one of his principal practice areas.[58]  Courts

have recognized that Mr. Siegel is a professional objector, *see In re Auto. Refinishing Paint*

*Antitrust Litig.*, No. MDL 1426, 2004 U.S. Dist. LEXIS 29162, at *12-13 (E.D. Pa. Oct. 13,

2004), and generally reject his objections. [59]

### B.   Theodore H. Frank

Theodore H. Frank has filed objections on behalf of Nicolas Martin.  Mr. Frank's

principal occupation, as the website for the self-anointed "Class Action Fairness Center" plainly

reveals, appears to be objecting to class action settlements.[60]  Courts have criticized Mr. Frank as

---

an appeal designed to obtain a nuisance value recovery and/or advantageous fee arrangement."  *Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 6-7 (1st Cir. 1999).

[58] *See* Sabella R. Decl. Ex. 8.  Mr. Siegel has now edited his website to delete the word "Objections."

[59] *See, e.g., Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-cv-05437, 2008 WL 1901988, at *4-6 (W.D. Wash. Apr. 24, 2008); *Browning v. Yahoo! Inc.*, No. 04-cv-01463 HRL, 2007 WL 4105971, at *5-8 (N.D. Cal. Nov. 16, 2007).  A recent article examining Mr. Siegel's practice states in relevant part:

> In the past two years, he's had a less-than-stellar success rate.  A judge in an AT&T suit in New Jersey called his objection "wasteful litigation."  In a Texas case against Allstate, his work was deemed "another attempt by objectors counsel to dip into the attorneys' fee trough."

> Moreover, his objections in two recent cases contain eerily similar arguments, as if he simply cut and pasted his case together without bothering to change the language.

> In the Ohio Savings case,[other lawyers] viewed Siegel's interference as "frivolous" and asked the court to impose economic sanctions.  Siegel withdrew his objection, and the penalty was dropped.

Rebecca Meiser, *Edward Siegel is on a quest to either stop exorbitant lawyer payouts – or score some easy money*, Cleveland Scene, June 4, 2008 (Sabella R. Decl. Ex. 9).

[60] *See* www.centerforclassactionfairness.blogspot.com.  Among the numerous cases in which Mr. Frank has filed objections are *In re HP Inkjet Printer Litig.*, No. 05-cv-3580 (N.D. Cal.); *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06-md-01739 (S.D.N.Y.); *Lonardo v. Travelers Indemnity Co.*, No. 06-cv-00962 (N.D. Ohio);

*(Cont'd)*

a "professional objector"[61] whose briefs were "long on ideology and short on law."[62]

Mr. Frank seeks to distinguish his activities from those of other professional objectors, *see* Martin Obj. at 3-4, but his history merely demonstrates that he is a different kind of professional objector – a political objector.  Mr. Frank's goal, and the goal of his organization, appears to be to make prosecuting class action litigation on behalf of injured consumers and shareholders so difficult and unrewarding that such class actions become extinct.  Mr. Frank purports to be a "leading tort-reform advocate"[63] who has complained about the cost to companies from products liability litigation."[64]  Further illustrating that his objection is designed to advance a political agenda is his attack on this Court's March 29, 2011 class certification order, discussed above.

Furthermore, Mr. Frank is not entirely forthcoming when he describes the Center for Class Action Fairness as being "funded entirely through charitable donations and court-awarded attorneys' fees."  Martin Obj. at 4.  Documents filed with the IRS reveal that the Center is merely a program of a much larger entity called Donors Trust Inc., which provides funding to a range of political agenda-driven groups.[65]  The identity of the funders of Donors Trust is not made public.

---

*Draucker Dev. & True Commc'ns Inc. v. Yahoo! Inc.*, No. 06-cv-02737 (C.D. Cal.); *Bronster v. AOL, LLC*, No. 09-cv-03568 (C.D. Cal.); *Bachman v. A.G. Edwards, Inc.*, No. 09-cv-00057 (E.D. Mo.); *In re Apple Inc. Sec. Litig.*, No. 06-cv-05208 (N.D. Cal.); *In re Bluetooth Headset Prods. Liab. Litig.*, No. 07-md-01822 (C.D. Cal.); *In re TD Ameritrade Accountholder Litig.*, No. 07-cv-02852 (N.D. Cal.); *Robert F. Booth Trust v. Crowley*, No. 09-cv-05314 (N.D. Ill.); *True v. Am. Honda Motor Co.*, No. 07-cv-00287 (C.D. Cal.); *In re Classmates.com Consol. Litig.*, No. 09-cv-00045 (W.D. Wash.).

[61] *See Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 574-75 & n.18 (D.N.J. 2010) (rejecting Mr. Frank's objections and including him among a group of attorneys that "have been described as 'professional objectors'").

[62] *Lonardo*, 706 F. Supp. 2d at 785 (internal quotations omitted).

[63] *See* Sabella R. Decl. Ex. 10.  Recently, Mr. Frank appears to have deleted this reference from his Internet bio.

[64] Theodore H. Frank, *Did the Right Make America a Lawsuit Nation? Thomas Geoghegan's See You In Court*, 12 TEX. REV. L. & POL. 477, 516-17 (2008).

[65] *See* Sabella R. Decl. Ex. 11.  The Chairman of Donors Trust is Kimberly O. Dennis, President of the Searle Freedom Trust, and the Vice Chairman is James Pierson, President of the William E. Simon Foundation.

### C.    **Other Lawyers**

Other lawyers representing objectors also fall into this category.  Lange M. Thomas is represented by John J. Pentz, whose history as a professional objector is set forth in the Fee Brief at 21-23.  Tom Carder is represented by Charles M. Thompson, a lawyer familiar to this Court by virtue of his unsuccessful objection to a settlement in another case,[66] and who has even represented Mr. Carder on objections in other cases.[67]  Jason Hawkins, Sheila Massie and John Sullivan are represented by Robert Erlanger, whose objection in this case includes large portions apparently copied from objections he filed in another case.[68]  Page Nash is represented by Thomas L. Cox, Jr., a "frequent and professional objector."[69]  Randy Lyons is represented by R. Stephen Griffis, who also has been characterized as a professional objector.[70]  Linda Mrosko is represented by Robert E. Margulies, no stranger to the class action settlement objection business.[71]  The Crutchfield Objectors are represented by Weiss & Associates, a firm whose major area of practice appears to be dealing with traffic tickets[72] but which also files class action settlement objections.[73]

---

[66] *See Thompson*, 216 F.R.D. 55.

[67] *See* Sabella R. Decl. Ex. 13.

[68] *See* Sabella Decl. Ex. 14.

[69] *In re Mutual Funds Inv. Litig.*, No. 04-md-15863, 2011 U.S. Dist. LEXIS 31787, at *33 n.1 (D. Md. Mar. 23, 2011) (citing numerous cases where Mr. Cox's objections were rejected).

[70] *See Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 241 n.22 (D.N.J. 2005); *see also In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) (finding the objections "without merit").

[71] *See* Sabella R. Decl. Ex. 15.

[72] *See* Sabella R. Decl. Ex. 16.

[73] *See* Sabella R. Decl. Ex. 17 at 2 n.1.

Dated:  August 3, 2011

**GRANT & EISENHOFER P.A.**

/s/ James J. Sabella
Jay W. Eisenhofer
Richard S. Schiffrin
James J. Sabella
Shelly L. Friedland
485 Lexington Avenue
New York, NY  10017
Tel.:  646-722-8500
Fax:  646-722-8501
        and
Mary S. Thomas
1201 N. Market Street
Wilmington, DE  19801
Tel.: 302-622-7000
        and
Reuben Guttman
1920 L Street, N.W., Suite 400
Washington, DC  20036
Tel.:  202-386-9500

Respectfully submitted,

**MILBERG LLP**

/s/ Paul F. Novak
Herman Cahn
Peter Safirstein
Anne Fornecker
One Penn Plaza
New York, NY  10119
Tel.:  212-594-5300
Fax:  212-868-1229
        and
Paul F. Novak
One Kennedy Square
777 Woodward Avenue, Suite 890
Detroit, MI  48826
Tel.:  313-309-1760
        and
Nicole Duckett
300 S. Grand Avenue, 39th Floor
Los Angeles, CA  90071
Tel.:  213-617-1200

**COOK, HALL & LAMPROS, LLP**

/s/ Christopher B. Hall
Edward S. Cook
Christopher B. Hall
P. Andrew Lampros
Promenade Two, Suite 3700
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel.:  404 876-8100
Fax:   404 876-3477

*Class Counsel*

26

**ABBEY SPANIER RODD & ABRAMS, LLP**
Jill Abrams
Natalie Marcus
212 East 39th Street
New York, NY 10016
Tel.: 212-889-3700

**SHAHEEN & GORDON, P.A.**
Christine Craig
140 Washington Street
Dover, NH 03821
Tel.: 603-749-5000

*Attorneys for Plaintiff John Cronin and Todd Hill*

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
Tel.: 201-567-7377

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Shane T. Rowley
369 Lexington Avenue
New York, NY 10017
Tel.: 212-983-9330

*Attorneys for Plaintiff Edward A. Scerbo*

**SCOTT+SCOTT LLP**
Joseph P. Guglielmo
500 Fifth Avenue
New York, NY 10110
Tel.: 212-223-6444
        and
Christopher M. Burke
600 B Street, Suite 1500
San Diego, CA 92101
Tel.: 619-233-4565

**FREED & WEISS LLC**
Jeffrey A. Leon
Eric D. Freed
111 West Washington Street, Suite 1331
Chicago, IL 60602
Tel.: 312-220-0000

**CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN**
James E. Cecchi
Lindsey Taylor
5 Becker Farm Road
Roseland, NJ 07068
Tel.: 973-994-1700

**SEEGER WEISS LLP**
Stephen A. Weiss
James A. O'Brien, III
One William Street
New York, NY 1 0004
Tel.: 888-584-0411

**LAYTIN VERNER LLP**
Jeffrey L. Laytin
Richard B. Verner
One Pennsylvania Plaza, 48th Floor
New York, NY 10119
Tel.: 212-631-8695

*Additional Counsel for Plaintiffs*

**BLOOD HURST & O'REARDON LLP**
Timothy G. Blood
Thomas J. O'Reardon, II
600 B Street, Suite 1550
San Diego, CA 92101
Tel.: 619-338-1100

**THE WRIGHT LAW OFFICE, P.A.**
William C. Wright
301 Clematis Street, Suite 3000
West Palm Beach, FL  33401
Tel.:  561-514-0904

**ADEMI & O'REILLY, LLP**
Shpetim Ademi
Guri Ademi
David J. Syrios
3620 East Layton Avenue
Cudahy, WI  53110
Tel.:  866-264-3995

*Additional Counsel for Plaintiffs*

**BERGER & MONTAGUE, P.C.**
Merrill G. Davidoff
Michael Dell'Angelo
1622 Locust Street
Philadelphia, PA  19103
Tel.:  215-875-3000

*Attorneys for Plaintiff Brian Balaguera*

**LEXINGTON LAW GROUP**
Howard Hirsch
503 Divisadero Street
San Francisco, CA  94117
Tel.:  415-913-7800

*Attorneys for Plaintiff James Hewitt*