# EXHIBIT 1

DA 11-1273

Federal Communications Commission

Before the
**Federal Communications Commission**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Applications for Consent to the | ) | |
| Transfer of Control of Licenses | ) | |
| | ) | MB Docket No. 07-57 |
| XM Satellite Radio Holdings Inc., | ) | |
| Transferor | ) | |
| | ) | |
| To | ) | |
| | ) | |
| Sirius Satellite Radio Inc., | ) | |
| Transferee | ) | |

## MEMORANDUM OPINION AND ORDER

**Adopted: July 27, 2011**                    **Released:  July 27, 2011**

By the Chief, Media Bureau:

## I.    INTRODUCTION

1.    By this Memorandum Opinion and Order, we find that under present circumstances the record evidence does not support extending beyond its expiration a three-year pricing condition contained in the Commission's July 25, 2008 decision approving the applications of Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Radio Holdings Inc. ("XM" or, jointly, the "Applicants" or "Sirius XM") to transfer control of licenses and authorizations for the provision of satellite digital audio radio service (or "SDARS").[1]

2.    In the *Merger Order*, the Commission accepted the Applicants' voluntary commitment to implement price caps on certain subscription packages for a period of three years after consummation of the merger, a period that expires on July 28, 2011.[2] In assessing potential harms from the proposed

---

[1] *Applications for Consent to the Transfer of Control of Licenses from XM Satellite Radio Holdings Inc., Transferor to Sirius Satellite Radio Inc., Transferee,* MB Docket 07-57, Memorandum Opinion and Order and Report and Order, 23 FCC Rcd 12348 (2008) ("*Merger Order*"). On July 28, 2008, the transaction was consummated, and on August 5, 2008, the merged company was renamed Sirius XM Radio Inc. *See* Letter from Jennifer D. Hinden, Wiley Rein LLP, Counsel, Sirius XM Radio Inc., to Marlene H. Dortch, Secretary, FCC (Aug. 20, 2008).

[2] Specifically, the *Merger Order* states:

Applicants voluntarily commit to not raise the retail prices on their basic $12.95 per month subscription package, their a la carte programming package, their "best of both" programming packages, their "mostly music" and their "news, sports, and talk" programming packages, and their discounted family-friendly programming package. Applicants voluntarily commit to these price caps for at least 36 months after consummation of the merger. Notwithstanding the voluntary commitment, after the first anniversary of the consummation of the merger, the combined company may pass through cost increases incurred since the filing of the merger application as a result of statutorily or contractually required payments to music, (continued....)

merger, the Commission found the record evidence insufficient to define precisely the relevant product and geographic markets.[3]  Because the Applicants bore the burden of proving that the proposed license transfers would serve the public interest, the Commission evaluated "potential horizontal competitive harms under assumptions that maximize the likelihood of harm."[4]  The Commission concluded that under worst-case assumptions "the proposed merger is a merger to monopoly," and "that it is likely that the merged entity will have an increased incentive and ability to raise prices above pre-merger levels."[5]  The Commission found that the Applicants' price cap commitment would "mitigate the harm from any post-merger price increases."[6]  Because it could not predict what the competitive landscape would be in three years, the Commission committed to seek public comment, six months prior to the price cap's expiration, "on whether the cap continues to be necessary in the public interest" and then "determine whether it should be modified, removed, or extended."[7]

    3.   The Media Bureau initiated this review on January 25, 2011 with the release of a Public Notice seeking comment on whether to extend, modify, or remove the price cap.[8]  From those supporting such an extension, the Public Notice asked for specific proposals together with a justification for such proposals.  The Public Notice also sought comment on Sirius XM's January 20, 2011 letter contending that there is no reason to extend or modify the price cap condition, in light of changes in the competitive environment and practical considerations that militate against extension.[9]

    4.   No specific proposals to extend the price cap condition were submitted in response to the Public Notice.  Numerous individual consumers commented, the vast majority stating that the Commission should remove the price cap condition and allow Sirius XM to set the price of its subscription packages in response to market forces.[10]  The WCS Coalition submitted comments, asking

(Continued from previous page) ———————————————————

recording and publishing industries for the performance of musical works and sound recordings or for device recording fees.

*Merger Order*, 23 FCC Rcd at 12394, ¶ 107.

[3] *Id.* at 12372, ¶ 47.

[4] *Id.* at ¶ 48.

[5] *id.* at 12374, ¶ 51, 12394, ¶ 105.

[6] *See id.* at 12394-95, ¶¶ 107-108.

[7] *See id.* at 12395, ¶ 108.  The Commission conditioned its approval of the merger on the Commission's ability to modify or extend the price cap beyond three years. *Id.* at 12395, ¶ 108 n.328.

[8] *See Media Bureau Seeks Comment on Extension, Modification or Removal of Cap on Sirius-XM Retail Prices*, MB Docket No. 07-57, Public Notice, 26 FCC Rcd 540 (MB 2011).

[9] *See* Letter from Robert L. Pettit, Counsel, Sirius XM Radio Inc., to William T. Lake, Chief, Media Bureau (Jan. 20, 2011).

[10] These consumers state that they either would drop the service or utilize other audio alternatives if Sirius XM were to raise its prices to a level they would deem unacceptable. *See, e.g.*, Patrick Sharpless Comments at 2 (filed Feb. 24, 2011); John Lynch Comments, at 1 (filed Feb. 23, 2011). *See also* John Smith Comments at 1 (filed Jan. 27, 2011) (noting "competing service[s]: terrestrial radio, Slacker, Pandora, iPod/iPhone, or CDs"); Zafar Sharif Comments at 1 (Feb. 23, 2011); Vincent Brumfield Comments, at 1 (filed Feb. 23, 2011); Dr. Alan Diaz Comments, at 1 (filed Feb. 23, 2011) (stating that "[w]ith a growing number of free alternatives available, consumers have the final say").  Some of the consumers who oppose extension of the price cap are also Sirius XM investors. *See, e.g.*, Dr. Alan Diaz Comments and John Lynch Comments, *supra*.

the Commission to extend the price cap until the Commission addresses pending petitions for reconsideration in the *Part 27 Proceeding*, which established technical rules to allow mobile broadband services in 25 megahertz of the WCS band and to limit interference to WCS bands from adjacent SDARS terrestrial repeaters.[11]  Plaintiffs' legal counsel in a civil litigation styled *Carl Blessing et al. v. Sirius XM Radio Inc.* ("Blessing Counsel") also submitted comments.[12]  According to Sirius XM, the plaintiffs in the case claim that Sirius XM violates various federal and state statutes in the pass through of performance rights.[13]  The Blessing Counsel asked the Media Bureau to review discovery documents from the litigation and pleadings in the case.  More recently, however, they acknowledged that they are unable to submit discovery documents because of a court-issued protective order.[14]  The Blessing Counsel have not submitted any pleading from the civil case into the record of this proceeding.

## II.   DISCUSSION

5.   The record before us now does not support extending the price cap condition.  Indeed, as discussed below, there is evidence that new competitive alternatives have arisen since 2008.  Accordingly, we find no sufficient basis on this record to extend the price cap condition beyond the three-year time period established in the *Merger Order*.[15]

6.   The evidence produced during the Commission's merger review was inadequate to support any prediction about whether the Sirius-XM transaction would harm competition.  Because the Applicants bore the burden of proof, the Commission assumed all facts against the Applicants and then determined that the proffered conditions would mitigate the presumed harms.[16]  Before us now, in contrast, is the question whether to extend a condition that will expire by its own terms if we do not act affirmatively to extend it.  No commenter submitted a specific proposal to extend the price cap condition or any evidence to support a conclusion that extending the price cap is necessary.[17]  At this juncture, therefore, the record evidence does not provide a basis for concluding that extending the price cap is necessary.  Accordingly, we decline to extend it.

---

[11] *See* WCS Coalition Comments at 5 (Feb. 24, 2011) (contending that because the competition between WCS and SDARS for scarce spectrum and related potential interference issues could impair potential mobile broadband competitors to Sirius XM, the Commission should "defer any decision to lift or modify the price cap until the Commission can address the pending petitions for reconsideration in WT Docket No. 07-293 and IB Docket No. 95-91"); *see also Communications Service in the 2.3 GHz Band, Establishment of Rules and Policies for the Digital Audio Radio Satellite Service in the 2310-2360 MHz Frequency Band*, WT Docket No. 07-293, IB Docket No. 85-91, GEN Docket No. 90-357, RM-8610, Report and Order and Second Report and Order, 25 FCC Rcd 11710 (2010) ("*Part 27 Proceeding*").

[12] *See* Letter from Paul F. Novak, *et al.*, Counsel to Carl Blessing, to William T. Lake, Chief, Media Bureau, FCC at 1 (filed Feb. 24, 2011); Letter from Paul F. Novak, *et al.*, Counsel to Carl Blessing, to William T. Lake, Chief, Media Bureau, FCC at 2 (filed Mar. 3, 2011) ("Blessing Counsel March Letter").

[13] *See* Sirius XM Reply at 10.

[14] *See* Blessing Counsel March Letter at 2 (stating that counsel "do not currently envision providing a submission of underlying discovery materials from the Blessing action to the FCC Media Bureau.").

[15] Because of this decision, we need not address Sirius XM's assertion that the Commission lacks authority to extend the price cap.  *See* Sirius XM Reply at 7.

[16] *See Merger Order*, 23 FCC Rcd at 12366-67, ¶ 35; *see also* note 4, *supra*; 47 U.S.C. § 310(d).

[17] See ¶ 4, *supra*.

7. Although our decision rests on the lack of evidence to support extending the price cap, we note that the marketplace has evolved since the merger closed, and consumers now have additional audio entertainment choices. The Commission stated when it adopted the price cap that "[w]e do not know what the competitive landscape will be like in three years."[18] Sirius XM claims that it "faces intense competition from an array of services including AM/FM radio, HD radio, and iPods[,]" as well as smartphone applications ("apps") that permit consumers to stream Internet-based music services while mobile, including in their automobiles.[19] Indeed, it appears that since the *Merger Order* new audio services have emerged as viable consumer alternatives, including smartphone Internet streaming applications that can be used in mobile environments such as automobiles equipped with user-friendly interfaces. For example, Pandora Media Inc. ("Pandora"), which provides audio services via Internet streaming and smartphone apps, has demonstrated remarkable growth in popularity in the years since the merger.[20] Other examples of apps that have emerged as alternatives since the *Merger Order* include Rhapsody, Slacker, Last.fm, and iheartradio.[21] Ford, Toyota, MINI, GM, Mercedes-Benz, and Hyundai are introducing Internet-based streaming services in their vehicles.[22] In addition, data suggest that HD radio has increased since the merger.[23]

---

[18] *Merger Order*, 23 FCC Rcd at 12395, ¶ 108.

[19] *See* Sirius XM Reply at 2-3.

[20] Pandora introduced the first mobile version of its service primarily for use on cellular phones in May 2007 and the Pandora app for smartphones in July 2008. At the close of fiscal year 2007, Pandora had 10 million registered users. That number grew to 22 million registered users at the end of fiscal year 2008. Pandora now has over 71 million registered users with over 2.6 billion listening hours. *See* Pandora Media, Inc., *SEC Form S-1*, at 43-44 (filed Feb. 11, 2011) *available at* http://www.sec.gov/Archives/edgar/data/1230276/000119312511032963/ds1.htm.

[21] *See* Sirius XM Reply at 4 (stating that Rhapsody is streaming on-demand music subscription service that launched in 2009 and offers unlimited access to a library of digital music for a monthly fee; stating that Slacker offers both free and subscription service accessible over the web and on portable devices and has offered the Slacker Radio app since January 2009; stating that Last.fm launched its first app in 2009 and offers free and paid subscription streaming radio and delivers music recommendations; stating that iheartradio delivers AM and FM stations from across the country and exclusive digital stations to subscribers).

[22] *See* Sirius XM Reply at 4-5; *see also* SNL Kagan, *HD Radio '11 Update:  Automakers Adding More OEMs with Competing Options from Satellite/Internet,* Broadcast Investor: Deals & Finance, Feb. 24, 2011, at 8 ("*HD Radio '11 Auto Update*") (stating that "Ford, General Motors and Volkswagen vehicle lines shown at CES also will offer on-board entertainment and navigation systems that include HD Radio technology, Bluetooth mobile phone integration, Internet apps including Pandora, USB connectivity, Sirius XM satellite radio, real-time traffic navigation and concierge services"). Audio entertainment options in automobiles have increased since 2008, when Chrysler announced plans to be the first company to provide in-car Internet access that year. *See* Washington Post, *Chrysler Plans In-Car Web Access This Year*, Mar. 20, 2008 *available at* http://www.washingtonpost.com/wp-dyn/content/article/2008/03/19/AR2008031903447.html. In addition, since 2008, HD Radio has become available in an increasing number of automobile models. Industry reports indicate that by the end of 2011 OEM HD Radios are expected to be installed at the factory as standard or optional equipment on 109 vehicle models from 17 vehicle brands, compared to seven vehicle models in 2007, 53 vehicle models in 2009, and 80 vehicle models at the end of 2010. *See HD Radio '11 Auto Update* at 8-9. We also note that according to iBiquity Digital Corporation only six automobile manufacturers offered HD Radio receivers on a limited number of models, most as optional equipment, in December 2008. *See* iBiquity Digital Corporation, Reply Comments, MB Docket No. 08-172 (filed Dec. 9, 2008) at 3.

[23] *See, e.g.*, IBOC Digital Radio Broadcasting for AM and FM Radio Broadcast Stations, *available at* http://www.fcc.gov/mb/audio/digital.html (last visited May 3, 2011) (showing that as of May 3, 2011,1,636 FM (continued....)

8.   We decline the request of Blessing Counsel to extend the deadline for filing comments in this proceeding.  We are unable to entertain the request to consider certain litigation discovery documents and pleadings because no such documents were submitted in the record of this proceeding.[24]  We also decline the WCS Coalition's request that we wait until resolution of pending petitions for reconsideration in the *Part 27 Proceeding* before addressing the price cap.  The WCS Coalition previously raised its concerns about the pending *Part 27 Proceeding* in the context of our review and approval of the merger applications.[25]  As the Commission previously found, proposals based on interference concerns were more appropriately addressed in the relevant rulemaking proceeding, and we decline to extend the price cap condition until those issues are resolved.[26]  The WCS Coalition's interference concerns are irrelevant or, at best, tangential to the issue of Sirius XM's pricing and accordingly they will be addressed solely in the separate pending *Part 27 Proceeding*.[27]

9.   Accordingly, for the reasons set forth above, we find on this record that the evidence does not support at this time the extension of the price cap beyond the period the Commission imposed in the *Merger Order* and the condition will therefore expire on July 28, 2011.  Our decision not to extend the price cap does not in any way limit the Commission's ability to take enforcement action for failure to comply with the price cap or any other *Merger Order* condition while it was in effect.

(Continued from previous page) ————————————————

radio stations notified the Commission that they had commenced digital/analog hybrid operations); *see also In re Digital Audio Broadcasting Systems and Their Impact on the Terrestrial Radio Broadcast Service,* MM Docket 99-325, Order, 25 FCC Rcd 1182, 1187 n.32 (2010) (demonstrating that at the end of 2008, 1,372 FM radio stations had notified the Commission that they had commenced digital/analog hybrid operations).  We note that we do not reach a conclusion on whether other audio services are substitutes to SDARS under traditional antitrust analysis.

[24] Blessing Counsel March Letter at 2.  The parties recently stipulated to a settlement agreement that includes an extension of the price cap.  *See* Settlement Agreement, Blessing v. Sirius XM Radio Inc., No. 1:09-cv-10035 (S.D.N.Y. May 13, 2011) (Dkt. No. 96-1).  The presiding judge has preliminarily approved the settlement agreement and scheduled a hearing for August 2011.  *See* Blessing v. Sirius XM Radio Inc., No. 1:09-cv-10035 (S.D.N.Y. May 19, 2011) (Dkt. No. 108).  Nothing in this order is intended to express any opinion on, or otherwise address, the validity of the allegations at issue in that litigation.

[25] *See* Letter from Paul J. Sinderbrand, Counsel to the WCS Coalition, to Helen Domenici, Chief, International Bureau,  FCC and Fred Campbell, Chief, Wireless Telecommunications Bureau, FCC (May 1, 2007); Letter from Paul J. Sinderbrand, Counsel to the WCS Coalition, to Kevin J. Martin, Chairman, FCC (May 30, 2008); Letter from Paul J. Sinderbrand, Counsel to the WCS Coalition, to Marlene H. Dortch, Secretary, FCC (June 10, 2008); Letter from Paul J. Sinderbrand, Counsel to the WCS Coalition, to Marlene H. Dortch, Secretary, FCC (June 13, 2008); Letter from Paul J. Sinderbrand, Counsel to the WCS Coalition, to Marlene H. Dortch, Secretary, FCC (June 16, 2008); Letter from Paul J. Sinderbrand, Counsel to the WCS Coalition, to Marlene H. Dortch, Secretary, FCC (July 22, 2008).

[26] *See Merger Order*, 23 FCC Rcd at 12403-404, ¶ 125.

[27] *See id.*

## III.    ORDERING CLAUSES

10.    Accordingly, having reviewed the record in this matter, IT IS ORDERED, pursuant to sections 1, 4(i), 4(j), 303(r), 309, and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(j), 303(r), 309, 310(d), that this *Memorandum Opinion and Order* IS ADOPTED.


FEDERAL COMMUNICATIONS COMMISSION



William T. Lake
Chief, Media Bureau

# EXHIBIT 2

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Consolidated Application for Authority to | ) | MB Docket No. 07-57 |
| Transfer Control of XM Satellite Radio | ) | |
| Holdings Inc. and Sirius Satellite Radio Inc. | ) | |

**REPLY COMMENTS OF SIRIUS XM RADIO INC.**

Richard E. Wiley
Robert L. Pettit
Jennifer Hindin
Wiley Rein LLP
1776 K Street N.W.
Washington, DC 20006
*Counsel for Sirius XM Radio Inc.*

March 11, 2011

## SUMMARY

The record of this proceeding provides no basis for the Commission to continue to impose a price cap on Sirius XM. The record demonstrates robust and rapidly growing competition for audio entertainment services. Internet-based services in particular have made dramatic gains in popularity since the time of the Sirius-XM merger, in large part due to the advent of smartphone "apps," which allow users to stream Internet-based music services in their cars. Commenters also overwhelmingly agree that Sirius XM's pricing is constrained by the variety of market competitors, making a price cap unnecessary. Moreover, the Administrative Procedure Act requires an agency to offer a factual basis for any regulation it promulgates, and the record in this proceeding contains no information sufficient to support imposing a cap on Sirius XM's rates after July 28, 2011.

The comments filed by the WCS Coalition and the plaintiffs' counsel in the *Carl Blessing et al v. Sirius XM Radio Inc.* litigation represent an attempt to use this proceeding to leverage decisions in unrelated proceedings. The WCS Coalition's comments argue that the FCC should impose a price cap on Sirius XM unless and until the Coalition gets its way in an unrelated proceeding on WCS service rules. The *Blessing* counsel ask the Commission to withhold action in this proceeding until the Commission reviews a myriad of documents relating to irrelevant issues in a wholly unrelated litigation. The Commission should flatly reject the efforts of both the WCS Coalition and the *Blessing* counsel.

No basis exists for imposing a new price cap after July 28, 2011, and the Commission should allow the existing cap to expire as scheduled.

## TABLE OF CONTENTS

Page

I.   THE RECORD OF THIS PROCEEDING PROVIDES NO BASIS FOR
     IMPOSING A FURTHER PRICE CAP BUT INSTEAD
     DEMONSTRATES ROBUST COMPETITION FOR AUDIO
     ENTERTAINMENT ................................................................................................. 1

II.  THE COMMISSION SHOULD NOT ALLOW THE WCS COALITION
     AND PLAINTIFFS' COUNSEL IN THE BLESSING CASE TO USE
     THIS PROCEEDING TO LEVERAGE DECISIONS IN UNRELATED
     PROCEEDINGS ...................................................................................................... 8

III. CONCLUSION ....................................................................................................... 12

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Consolidated Application for Authority to | ) | MB Docket No. 07-57 |
| Transfer Control of XM Satellite Radio | ) | |
| Holdings Inc. and Sirius Satellite Radio Inc. | ) | |

**REPLY COMMENTS OF SIRIUS XM RADIO INC.**

Sirius XM Radio Inc. ("Sirius XM"), by counsel, replies to comments filed in response to the Media Bureau's Public Notice asking whether the FCC should allow Sirius XM's price cap to expire on July 28, 2011, consistent with Sirius XM's voluntary commitment in connection with its merger application filed four years ago.[1] Nothing in the record responding to the Public Notice supports continuing this price cap in any form. Sirius XM respectfully requests that the Commission close this proceeding and take no further action affecting the rates for satellite radio service.

**I.     THE RECORD OF THIS PROCEEDING PROVIDES NO BASIS FOR IMPOSING A FURTHER PRICE CAP BUT INSTEAD DEMONSTRATES ROBUST COMPETITION FOR AUDIO ENTERTAINMENT.**

The existing price cap arose from a voluntary commitment Sirius XM made in the context of its 2007 merger application and applied only to specific Sirius XM

---

[1]     Public Notice, *Media Bureau Seeks Comment on Extension, Modification or Removal of Cap on Sirius XM Retail Prices*, MB Docket No. 07-57 (rel. Jan. 25, 2011) ("*Public Notice*"). Sirius XM voluntarily committed to a price cap in the context of the merger of Sirius Satellite Radio Inc. and XM Satellite Radio Holdings Inc. *Applications for Consent to the Transfer of Control of Licenses From XM Satellite Radio Holdings Inc., Transferor to Sirius Satellite Radio Inc., Transferee*, MB Docket No. 07-57, Memorandum Opinion and Order and Report and Order, 23 FCC Rcd 12348, 12433-41, Appendix B-C (2008) ("*Sirius XM Merger Order*").

programming packages for three years, expiring July 28, 2011.[2] To impose a continuing

price cap, the Commission would need to find that record evidence justifies imposing

such a cap, even before it establishes the appropriate price, extent, and duration of any

cap.[3] The record in this proceeding provides no such evidence. The comments

demonstrate that competition and consumer choice dictate Sirius XM's rates.

The record evidences a market for audio entertainment that is highly competitive

and growing, with new entrants emerging on an almost daily basis. Just as the United

States Department of Justice predicted when it closed its investigation of the Sirius-XM

merger nearly three years ago,[4] Sirius XM today faces intense competition from an array

of services including AM/FM radio, HD radio, and iPods—all of which are available to

consumers with no subscription charges.[5]

---

[2]     The *Public Notice* questioned whether any new price cap should apply to fees
clearly not included in the voluntary price cap, including "rates charged for online access,
additional outlets, or any other fees related to Sirius XM's service." *Public Notice* at 2.
None of the comments addressed this issue, and the Commission should decline to extend
a price cap to these services for the same reasons it should decline to extend the voluntary
price cap.

[3]     The Commission acknowledged in the *Sirius XM Merger Order* that a price cap
of more than three years "is not part of Applicants' voluntary commitment." *Sirius XM
Merger Order* at ¶ 108, n. 328. Any price cap beyond July 28, 2011 would not represent
an "extension" of a voluntary price cap but rather the imposition of an entirely new price
cap by the FCC, the adoption of which would be governed by the requirements of the
Administrative Procedure Act (the "APA"). Necessarily, then, the agency requires record
evidence to justify the imposition of a cap, the choice of a particular price and the
selection of a specific time period. *See infra* at 7-8.

[4]     Press Release, Department of Justice, *Statement of the Department of Justice
Antitrust Division on its Decision to Close its Investigation of XM Satellite Radio
Holdings Inc.'s Merger with Sirius Satellite Radio Inc.*, (Mar. 24, 2008) *available at*
http://www.justice.gov/opa/pr/2008/March/08_at_226.html.

[5]     Letter from Robert L. Pettit, Counsel for Sirius XM Radio Inc., to William Lake,
Chief, Media Bureau, MB Docket No. 07-57 (filed Jan. 20, 2011) ("Sirius XM January
20, 2011 Letter").

Increasingly, however, this competition also includes new Internet-based radio services.  While some of these applications were available on computers prior to the Sirius-XM merger in July 2008, their tremendous growth—and their increasing availability in automobiles and on smartphones—has been driven by the advent of smartphone "apps."[6]  These "apps" allow smartphone users to stream Internet-based music services on the go, including in their cars, through a cellular data network or WiFi network.  Among others, these include:

- **Pandora Media, Inc.**  Pandora is a leader in Internet radio in the United States.[7]  The Pandora "app" for iPhone, released in 2008, became the fourth most popular free "app" on iTunes after only one week.[8]  Pandora still has one of the top five most popular "apps" across all smartphone platforms,[9] and, "[t]hanks to the iPhone, Pandora now has 80 million listeners."[10]

---

[6]     The Apple "app" store was launched in July 2008 and the Android Market was launched in October 2008.  iPod+iTunes Timeline, http://www.apple.com/pr/products/ipodhistory/ (last visited Mar. 8, 2011); Android Market: Now Available for Users, Android Developers Blog, Oct. 22, 2008, http://android-developers.blogspot.com/2008/10/android-market-now-available-for-users.html.

[7]     Pandora, launched in 2005, offers music content both on a free and a paid subscription basis.  Pandora Media, Inc., Registration Statement (Form S-1), at 1-2 (Feb. 11 2011) ("Registration Statement").

[8]     Fred Krueger, *Pandora is the Killer Music App*, AppCraver, July 25, 2008, http://www.appcraver.com/pandora/; Jason Kincaid, *Pandora Usage Stats Prove It's iPhone's Killer App*, TechCrunch, July 15, 2008, http://techcrunch.com/2008/07/15/pandora-usage-stats-prove-its-iphones-killer-app/#; Apple recently listed its most downloaded app and found Pandora to be number one among the free apps for iPad and number two for iPhone.  Additionally, Pandora added 35 million listeners in 2010.  Jefferson Graham, *Pandora Radio App Cruises Into Cars*, USA Today, Jan. 26, 2011 *available at* http://www.usatoday.com/money/industries/technology/2011-01-26-pandora26_ST_N.htm.

[9]     Registration Statement at 1-2.

[10]    Jefferson Graham, *Pandora Radio App Cruises Into Cars*, USA Today, Jan. 26, 2011 *available at* http://www.usatoday.com/money/industries/technology/2011-01-26-pandora26_ST_N.htm.  Pandora's recent Registration Statement, related to an expected

- **Rhapsody International Inc.** Rhapsody is another streaming on-demand music subscription service offering unlimited access to a library of digital music for a monthly fee.[11] Rhapsody launched its smartphone "app" in 2009.[12]

- **Slacker, Inc.** Slacker offers both free and subscription services accessible over the web and on portable devices and has offered the Slacker Radio "app" since January 2009.[13]

- **Last.fm Ltd.** Last.fm offers free and paid subscription streaming radio and delivers music recommendations. A Last.fm "app" for the iPhone was first released in July 2008.[14]

- **iheartradio.** iheartradio delivers AM and FM stations from across the country and exclusive digital stations to subscribers.[15] By the end of 2009, iheartradio had "apps" available for iPhone, Blackberry and Android platforms.[16]

Competition with Sirius XM will continue to increase as automakers, including

Ford, Toyota, MINI, GM, Mercedes-Benz, and Hyundai, introduce features that integrate

---

initial public offering, notes that Pandora competes against a variety of audio entertainment sources, including satellite radio. Registration Statement at 14.

[11]   Eliot Van Buskirk, *Rhapsody Shrugs Off Real, Viacom to Become a Startup*, Wired, Apr. 6, 2010, *available at* http://www.wired.com/epicenter/2010/04/rhapsody-shrugs-off-real-viacom-to-become-a-start-up/#.

[12]   John Cook, Tech Flash, *Rhapsody App Off to a "Good Start" With 200,000 iPhone Downloads*, Oct. 1, 2009 *available at* http://www.techflash.com/seattle/2009/10/real_unveils_rhapsody_app_for_android_updates_iphone_numbers.html.

[13]   Press Release, Slacker, Slacker Introduces Personalized Radio Everywhere, Mar. 15, 2007, http://www.slacker.com/company/pressreleases/03152007.jsp.; *Slacker iPhone App Now Available, Users Go Wild*, Orbitcast, January 14, 2009 *available at* http://www.orbitcast.com/archives/slacker-iphone-app-now-available-users-go-wild.html.

[14]   Posting of Jono Cole to Last.fm—the Blog, http://blog.last.fm/2011/03/03/lastfm-30-for-the-iphone (Mar. 3, 2011).

[15]   FAQ, Help With iheartradio, http://www.iheartradio.com/faq/ (last visited Mar. 8, 2011). Press Release, Clear Channel Radio, iheartradio App Sees One Million iPhone Downloads; Blackberry is Next, Mar. 16, 2009, http://www.clearchannel.com/Radio/PressRelease.aspx?PressReleaseID=2378.

[16]   Andrew Kameka, *Clear Channel's iheartradio App Coming to Android by Christmas*, Androinica, Dec. 4, 2009 *available at* http://androinica.com/2009/12/clear-channels-iheartradio-app-coming-to-android-by-christmas/.

-4-

Internet-based services in vehicles.[17] One of the latest dashboard innovations is the

development of vehicles with their own LTE data connections to enable functions such as

a WiFi hotspot and various Internet applications without relying on a mobile phone for

the in-car data connection.[18] This enables drivers to choose traditional radio, satellite

radio, or Internet radio simply by pushing a dashboard button.

This increasingly competitive landscape for audio entertainment eliminates any

competitive concern.[19] Sirius XM's pricing is constrained by a wide variety of market

---

[17]   Press Release, Ford, Openbeak, Pandora and Stitcher Are First to Use Ford Sync API, Bringing Twitter, Internet Radio Control Into Vehicles (Jan. 7, 2010), http://media.ford.com/article_display.cfm?article_id=31712; Press Release, Toyota Vehicles, Toyota Entune Receives Two Prestigious Awards at 2011 Consumer Electronics Show (Jan. 31, 2011), http://pressroom.toyota.com/pr/tms/toyota/toyota-entune-receives-two-prestigious-191474.aspx; Radio, You-ified, http://www.miniusa.com/#/play/pandora-m (stating Pandora now available in all 2011 MINI models) (last visited Mar. 7, 2011); The collaboration between Pandora and MINI is also highlighted on the front page of the MINI website, http://www.miniusa.com/#/MINIUSA.COM-m (last visited Mar. 8, 2011); Kevin Krolicki, *General Motors Co Will Launch a New System to Stream Online Radio from Pandora in Upcoming Chevrolets Starting with the Volt and Equinox*, Reuters, Feb. 17, 2011; Mercedes Benz Media Interface Plus, http://www.mbusa.com/mercedes/service_and_parts/accessories (last visited Mar. 7, 2011) (describing plug and play entertainment solution that enables Pandora streaming); Press Release, Hyundai, Hyundai Revolutionizes the Coupe with the All-New Velostar at the Detroit International Auto Show (Jan. 10, 2011), http://www.hyundaiusa.com/about-hyundai/news/Veloster_at_detroitautoshow-20110110.aspx.

[18]   Wayne Cunningham, *Alcatel-Lucent Puts Big Data Pipes in Prius*, CNET, Jan. 9, 2010, http://ces.cnet.com/8301-31045_1-10431713-269.html; Christopher Hammerschmidt, *Audi, Alcatel-Lucent demo LTE-equipped car*, EE Times, Feb. 20, 2011, http://www.eetimes.com/electronics-news/4213311/Audi--Alcatel-Lucent-demo-LTE-equipped-car.

[19]   As the Department of Justice stated in 2008:

Any inference of a competitive concern was further limited by the fact that a number of technology platforms are under development that are likely to offer new or improved alternatives to satellite radio. Most notable is the expected introduction within several years of next-generation wireless networks capable of streaming Internet radio to mobile devices.... [A] significant number of consumers in the future are likely to consider one or more of these platforms as an attractive alternative to satellite radio.

competitors. This conclusion is borne out anecdotally by comments filed by consumers in this proceeding.[20] One commenter stated that the price cap on Sirius XM interferes with the free market, harms the public interest, and "serves no legitimate purpose when Sirius XM competes in a marketplace rife with free services provided by other competitors . . . ."[21] In the words of another consumer, if Sirius XM were to raise prices, subscribers and the marketplace would "decide a fair price with a continued subscription, or cancel and use one of the many other up and coming services."[22] One commenter summarized the pricing reality: "[i]n the end, consumers themselves will dictate a fair market value for their Satellite Radio service. With a growing number of free alternatives available, consumers have the final say."[23] Indeed, even those public commenters favoring a continued price cap do not dispute their ability to cancel their satellite radio service or select an alternative listening option.[24]

---

Press Release, Department of Justice, *Statement of the Department of Justice Antitrust Division on its Decision to Close its Investigation of XM Satellite Radio Holdings Inc.'s Merger with Sirius Satellite Radio Inc.*, Mar. 24, 2008 *available at* http://www.justice.gov/opa/pr/2008/March/08_at_226.html. Three years later, the Department's prediction has become a reality.

[20]     A total of 37 separate consumer comments were filed in response to the *Public Notice*; 32 of the commenters opposed any continued price cap.

[21]     Comments of Patrick Sharpless at 3, MB Docket No. 07-57 at 1 (filed Feb. 24, 2011).

[22]     Comments of John Lynch, MB Docket No. 07-57 at 1 (filed Feb. 23, 2011). *See also* Comments of Zafar Sharif, MB Docket No. 07-57 at 1 (filed Feb. 23, 2011) ("If it's too expensive consumers have a free choice to just drop the subscription."); Comments of Vincent Brumfield, MB Docket No. 07-57 at 1 (filed Feb. 23, 2011) ("Any consumer that can't afford a long-term contract or is not willing to pay more for this service is free to cancel their subscription at any time. I feel the board of directors will keep this in mind when deciding if, or how much, to raise prices.").

[23]     Comments of Dr. Alan Diaz, MB Docket No. 07-57 at 1 (filed Feb. 23, 2011).

[24]     *See* Comments of Edmund Harris, MB Docket No. 07-57 at 1 (filed Jan. 27, 2011); Comments of Virginia Houser, MB Docket No. 07-57 at 1 (filed Feb. 14, 2011);

Moreover, any decision to impose a continued price cap based on this record

would be legally infirm.  First, as Sirius XM has shown, the FCC fundamentally lacks

authority to impose a cap on Sirius XM's rates.  Congress has not conveyed authority,

express or ancillary, to the FCC to regulate the rates of the satellite radio services offered

by Sirius XM.[25]  Moreover, the APA requires an agency to offer a factual basis for any

regulation it promulgates.  When reviewing the factual basis for an agency's action under

the APA's arbitrary and capricious standard,[26] the "lodestar is the question whether the

record as a whole provides substantial evidence to support the agency action."[27]  "[T]he

court must be able to conclude that the agency examined the relevant data and articulated

a satisfactory explanation for its action including a rational connection between the facts

found and the choice made."[28]  The record contains no information sufficient to support

imposing a cap on Sirius XM's rates after July 28, 2011.[29]

---

Comments of John Pavlica, Jr., MB Docket No. 07-57 at 1 (filed Feb. 24, 2011);
Comments of Albert Morris, MB Docket No. 07-57 at 1 (filed Jan. 31, 2011).

[25]     *See Sirius XM January 20, 2011 Letter* at 6, n. 13.

[26]     Judicial review of agency action includes scrutiny of the agency's asserted factual
predicate because, as the D.C. Circuit has explained, "review would be a relatively futile
exercise in formalism if no inquiry were permissible into the existence or nonexistence of
the condition which the Commission advances as the predicate for its regulatory action.
A regulation perfectly reasonable and appropriate in the face of a given problem may be
highly capricious if that problem does not exist." *City of Chicago v. Fed. Power
Comm'n*, 458 F.2d 731, 742 (D.C. Cir. 1972).  *See also ALLTEL Corp. v. FCC*, 838 F.2d
551, 559 (D.C. Cir. 1988) ("We cannot defer to the Commission's selection of a precise
point on a scale when the scale itself has no relationship to the underlying regulatory
problem.") (internal quotation marks omitted); *Home Box Office, Inc. v. FCC*, 567 F.2d 9,
36 (D.C. Cir. 1977) (same).

[27]     *Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005); *Safe Extensions, Inc. v. FAA*,
509 F.3d 593, 606 (D.C. Cir. 2007) ("In sum, because the agency's decision . . . finds no
support in the evidence the agency considered, we find it arbitrary and capricious.").

[28]     *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dept. of Health &
Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005) (internal quotation marks and
alterations omitted). *See also Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. Aug. 28,
2009) ("We conclude the Commission has failed to examine the relevant data and

## II.    THE COMMISSION SHOULD NOT ALLOW THE WCS COALITION AND PLAINTIFFS' COUNSEL IN THE *BLESSING* CASE TO USE THIS PROCEEDING TO LEVERAGE DECISIONS IN UNRELATED PROCEEDINGS.

Two parties invite the FCC to help them use this proceeding to leverage the outcomes in two unrelated proceedings. The Commission should flatly reject their efforts.

First, some members of the WCS Coalition[30] argue that the FCC should impose a price cap on Sirius XM unless and until the Coalition gets its way in an unrelated proceeding seeking to revamp the WCS service rules in a manner that would cause interference to satellite radio customers.[31] The issues in the WCS Interference Decision have nothing to do with those addressed in the Public Notice. The former proceeding involves modifying the WCS service rules and how to minimize the likelihood these

---

articulate a satisfactory explanation for its action, and hold the 30% subscriber cap is arbitrary and capricious.") (quotation, citation, and alterations omitted).

[29]    Even if the record could support extending a rate cap in the abstract, which it cannot, given the paucity of facts in the record there is no basis on which the Commission could make a principled decision about where to set that cap, which services it should apply to, or how long to keep the cap in place. A typical rate case involves detailed information about a company's costs and what rate of return on those costs is reasonable, *see, e.g., Virgin Islands Tel. Corp. v. FCC*, 989 F.2d 1231, 1235-36 (D.C. Cir. 1993) (discussing rate of return and cost data in determining reasonableness of interim rates); it is obvious that no such data exists in this proceeding. Thus, any rate cap imposed by the Commission would be arbitrary and capricious in the purest sense of that term, because it would be based on nothing more than guesswork and supposition, rather than actual facts in the record.

[30]    Comments of the WCS Coalition, MB Docket No. 07-57 at 3 (filed Feb. 24, 2011) ("Coalition Members' Comments"). According to this pleading, WCS Coalition member AT&T "did not participate in the preparation of, and does not join in . . . these comments." *Id.* at note 1.

[31]    *Communications Services in the 2.3 GHz Band, Establishment of Rules and Policies for the Digital Audio Radio Satellite Service in the 2310-2360 MHz Frequency Band*, WT Docket No. 07-293, IB Docket No. 95-91, GEN Docket No. 90-357, RM-8610, Report and Order and Second Report and Order, FCC 10-82 (May 20, 2010); ("WCS Interference Decision").

changes will interfere with the reception of satellite radio. The issues, which are technically complex and have the potential to affect tens of millions of Sirius XM listeners, were addressed in the WCS Interference Decision, which remains the subject of petitions for reconsideration by both Sirius XM and WCS licensees.[32]

Sirius XM will not burden the record of this proceeding with extended comment on the unrelated WCS interference proceeding.[33] Throughout that proceeding, Sirius XM has urged the Commission to modify its rules to allow mobile use of WCS frequencies only if such changes could be justified through sound engineering analysis, and Sirius XM continues to do so here. The Commission should reject the WCS Coalition

---

[32]     Public Notice, *Petitions for Reconsideration of Action in Rulemaking Proceeding*, Report No. 2917 (Sept. 22, 2010).

[33]     As the Commission is aware, WCS licensees acquired their spectrum nearly 14 years ago and, with the exception of AT&T, have largely let the spectrum lie fallow. By contrast, Sirius XM has invested billions of dollars to develop the satellite radio spectrum, which now serves over 20 million customers. The Reply Comments filed on March 9, 2011 by Patrick Sharpless extensively detail the actions of WCS Coalition members:

> poaching the adjacent bandwidth to SDARS, squatting on the bandwidth for 14 years, refusing to construct mandatory buildouts as required by the substantial service requirements embedded within the license agreements, lying in wait until the sequestered SDARS bandwidth was fully deployed before executing a strategic response which just happens to employ a new technology (WIMAX) and requires the Commission to modify their technical rules for WCS operations in the 2.3 GHz band from fixed terrestrial operations to allow mobile broadband services in 25 MHz of the WCS band (and increasing the interference on adjacent SDARS in the process). . . And now the WCS Coalition argues continuing the price cap scheme is necessary until the WCS Coalition is successful launching their service? A service the WCS Coalition had the opportunity to launch for 14 years now, but squandered every opportunity to do so? . . . And now the WCS Coalition wants the Commission to punish competitors who delivered consumer driven products and services that satisfied the public interest because those competitors (Sirius XM) timely executed an effective business plan, and consumers (over 20 million) are rewarding the company by subscribing to their service.

Reply Comments of Patrick Sharpless, MB Docket No. 07-57 at 2, 7, 9 (filed March 9, 2011).

members' self-serving attempt to induce the FCC to resolve the reconsideration petitions of the WCS Interference Decision on anything other than the merits of the interference potential at issue there. To the extent the WCS Coalition members urge the Commission to promptly address those petitions, Sirius XM agrees.

As further detailed above, with or without whatever services the WCS licensees finally decide to offer, Sirius XM currently faces significant competition from Internet-based service providers and will face increasing competition in the future. Moreover, the 25 MHz of WCS spectrum that the FCC has made available for mobile broadband use in the WCS Interference Decision is a relatively small component of available spectrum compared to the hundreds of megahertz allocated to the commercial mobile services, much of which is farther along in its commercial development than WCS spectrum.[34]

Second, two letters have been filed by interim lead plaintiffs' counsel in *Carl Blessing et al v. Sirius XM Radio Inc.*[35] The *Blessing* case involves claims that certain price increases by Sirius XM, particularly the pass-through of performance rights fees, violated various state and federal statutes. Sirius XM has vigorously contested this

---

[34]   In addition to the hundreds of megahertz of existing allocations, more spectrum is on the way. The National Broadband Plan tasked the Commission with making 500 MHz newly available for broadband use within the next ten years, and President Obama recently set the goal of freeing up 500 MHz of spectrum for everything from smartphones to wireless broadband connectivity for laptops to new forms of machine-to-machine communication within the next decade. *Connecting America: The National Broadband Plan*, Federal Communications Commission, at Chapter 5 (March 2010); Press Release, the White House, President Obama Details Plan to Win the Future Through Expanded Wireless Access, Feb. 10, 2011, *available at* http://m.whitehouse.gov/the-press-office/2011/02/10/president-obama-details-plan-win-future-through-expanded-wireless-access.

[35]   Comments of Paul F. Novak, James J. Sabella, Christopher B. Hall, MB Docket No. 07-57 (filed Feb. 24, 2011); Letter from Paul F. Novak, James J. Sabella, Christopher B. Hall to William Lake, Chief, Media Bureau, FCC, MB Docket No. 07-57 (filed Mar. 3, 2011) ("*Blessing* Counsel Comments").

allegation and will continue to do so. Now, the *Blessing* counsel essentially ask the
Commission to provide leverage to the plaintiffs in the litigation by withholding action in
this proceeding until the Commission reviews various documents related to the *Blessing*
case.[36] Such litigation documents are not germane to the Bureau's request for comments
on "whether to extend, modify, or remove the price cap,"[37] and the *Blessing* counsel offer
no reason for delaying a resolution of the issues raised in the *Public Notice*.

The *Blessing* counsel letters also illustrate why the Commission, through long-
standing precedent, has refused to allow its regulatory processes to advance private
commercial goals. As the FCC has stated repeatedly, the agency "has consistently
refused to interject itself into private matters, finding that a court, and not the
Commission, is the proper forum for resolving such disputes."[38] The *Blessing* case
should not be litigated at the FCC in the guise of a proceeding regarding the Sirius XM
rate cap. As with the Coalition Members' Comments, the Commission should reject the
transparent attempt by the *Blessing* counsel to use the agency's processes to influence the
outcome of unrelated litigation.

---

[36]    In the first letter, the Blessing counsel ask the FCC to hold the Sirius XM rate
proceeding in abeyance while they seek the right to disclose to the Commission
documents filed under seal in the Blessing litigation. In the second letter, Blessing
counsel, reminded that they would be prevented by a protective order that they sought
from sharing any of the documents with anyone, backed off of their original offer, but
nonetheless "invite[d]" the Commission "to review the public filings in connection with
this matter." *Id.*

[37]    *Public Notice* at 1; *see Blessing* Counsel Comments.

[38]    *Vodafone AirTouch, PLC, and Bell Atlantic Corp.*, Memorandum Opinion and
Order, 15 FCC Rcd 16507, 16515 n. 37 (WTB, IB 2000) (citing *Applications of
WorldCom and MCI Communications Corp.*, Memorandum Opinion and Order, 13 FCC
Rcd 18,148 ¶ 214; *PCS 2000, L.P.*, 12 FCC Rcd 1681, 1691 (1997) (citing *United Tel.
Co. of Carolinas v. FCC*, 599 F.2d 720, 732 (D.C. Cir. 1977)).

## III.   CONCLUSION

For all these reasons, Sirius XM respectfully submits that there is no basis for imposing a price cap of any kind after July 28, 2011 and that the FCC should close this proceeding and take no action to impose a the price cap beyond that date.

Respectfully submitted,

_/s/ Jennifer D. Hindin_____

Richard E. Wiley
Robert L. Pettit
Jennifer Hindin
Wiley Rein LLP
1776 K Street N.W.
Washington, DC 20006
*Counsel for Sirius XM Radio Inc.*

March 11, 2011

-12-

# EXHIBIT 3

Jeffrey I. Carton
Michael A. Berg
MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000
Attorneys for Plaintiff Class

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RHONDA DUPLER, on behalf of herself
and all others similarly situated,

                    Plaintiff,

           against                        Civ. No. 06-3141 (JFB) (ETB)

COSTCO WHOLESALE CORPORATION,

                    Defendant.
-----------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF CLASS NOTICE PROCEDURES

the action on a nationwide basis.  As described below, the Settlement includes tangible economic benefits to Settlement Class members whose memberships were affected by the Renewal Policy during the Class Period, and significant economic savings in the future as a result of the Amended Renewal Policy.  Additionally, the Settlement will provide more specific and more widely disseminated disclosure of the Amended Renewal Policy.  A telephonic conference was held regarding the proposed settlement on January 12, 2009, at which time the Court set a date of February 27, 2009 for the filing of this motion for preliminary approval of the proposed Settlement.  The Court subsequently extended that deadline to March 31, 2009.

### B.   Terms of the Proposed Settlement

The complete terms of the Settlement are set forth in the Stipulation.  *See* Notice of Motion, Ex. 1.  In summary, under the Settlement, Costco will provide substantial economic benefits to the Settlement Class members by extending their Costco memberships by one to three months, based on the time between when their membership lapsed and when they renewed.  (Former Costco members will receive Costco shopping privileges of the same duration free of charge).  Under the Settlement, Costco also will limit the scope and impact of the policy in the future.  Further, under the Settlement, Costco will provide non-economic relief by disclosing its Amended Renewal Policy in clear and specific terms.  In return, Costco will receive a nationwide release of all claims relating to its Renewal policy on behalf of the Settlement Class.

### 1.   Economic Consideration

Under the Settlement, Costco will provide nearly $40 million worth of extended membership terms to approximately 5 million members of the Settlement Class, together with a conservative estimate of approximately $70 million in additional savings

11

that will be realized over the next seven years from the Amended Renewal Policy.
Eligible class members will receive one, two, or three months of free membership
privileges, depending on how long a period of membership they previously lost as a
result of the Renewal Policy.  In particular:

- Settlement Class Members whose first late renewal transactions occurred
  22 or more days (but less than two months) after expiration will receive
  one additional month of Costco membership.

- Settlement Class Members whose first late renewal transaction occurred
  two months or more (but less than three months) after expiration will
  receive two additional months of Costco membership.

- Settlement Class Members whose first late renewal transaction occurred
  three months or more after expiration will receive three additional months
  of Costco membership.

The benefits of the Settlement apply equally to individual (Gold Star), business
and executive members.  Class members who were affected by the Renewal Policy
more than once will receive the specified benefit based on the first instance in which the
Renewal Policy was applied to their memberships.  For example, if a given membership
was renewed during the second month after expiration in 2003 and during the fourth
month after expiration in 2006, the membership will be extended by one month to
reflect the benefit associated with the 2003 application of the Renewal Policy.

The Settlement does not provide a direct economic benefit for Class members
for whom the period between expiration and renewal was three weeks or less.  As
noted above, Costco routinely provides up to 30 days of free membership privileges to
all new memberships by setting the expiration date at the end of the month -- not the
actual anniversary of the enrollment date.  For these Costco members, any loss of
membership privileges would have been *de minimis*.  In fact, some Costco members
received a free benefit (up to 30 days of Costco membership) more valuable than any

12

uncompensated loss resulting from the Renewal Policy (no more than 21 days).

The following tables show the number of Settlement Class members who will

receive extended periods of Costco membership as a result of the Settlement, and the

aggregate value of this component of the economic consideration to be provided:

### Non-Executive Members ($50 Membership Fee)

| Time Between Expiration and Post-Expiration Renewal Date | Number of Members | Remedy/Value | Aggregate Value |
|---|---|---|---|
| 22 days or more (but less than 2 months) | 2,126,620 | 1 month / $4.167 | $8,860,917 |
| 2 months or more (but less than 3 months) | 747,091 | 2 months / $8.33 | $6,225,758 |
| 3 months or more | 788,736 | 3 months / $12.50 | $9,859,201 |
| | | subtotal | $24,945,876 |

### Executive Members ($100 Membership Fee)

| Time Between Expiration and Post-Expiration Renewal Date | Number of Members | Remedy / Value | Aggregate Value |
|---|---|---|---|
| 22 days or more (but less than 2 months | 822,612 | 1 month / $8.333 | $6,855,100 |
| 2 months or more (but less than 3 months) | 189,527 | 2 months / $16.667 | $3,158,784 |
| 3 months or more | 155,171 | 3 months / $25.00 | $3,879,275 |
| | | subtotal | $13,893,159 |
| | | combined total | $38,839,035 |

Settlement Class members who are active Costco members at the time of Final

Approval will have their memberships extended automatically.  Settlement Class

members who are not active Costco members when Final Approval is granted will receive temporary membership privileges to shop at Costco for a period of one, two, or three months. The duration, and thus the economic value, of this benefit will be precisely the same as the membership extensions provided to Settlement Class members who are active Costco members at the time of Final Approval. No Settlement Class members will be required to submit claim forms or otherwise prove their entitlement to the benefits afforded by the Settlement.

In total, the economic relief provided directly to Settlement Class Members in the form of additional membership terms is $38.8 million, and will be provided to 4.8 million current and former Costco members nationwide.

The Settlement will provide a further tangible economic benefit to members of the Settlement Class and to Costco members generally. Specifically, the Settlement effects a substantive change in Costco's Renewal Policy and sharply curtails the number of Costco members who will be affected by it. From 2001 to the present, Costco has applied its Renewal Policy to transactions that occur up to five months after the membership expiration date. Pursuant to the Settlement, Costco will only apply the policy to renewals within the first 60 days after expiration. This is a significant and valuable modification in Costco's policy, which will vastly reduce the number of Costco members affected by the policy in the future.

Based on Costco's 2007 membership data, it is estimated that this substantive change in policy will save Settlement Class members and other Costco members nearly $70 million over the next seven years. But in fact that understates the benefit to consumers because of a growing membership base.

In 2007, the Renewal Policy was applied as follows:

|  | 22-31 Days | 2nd Month | 3rd Month | 4th Month | 5th Month |
|---|---|---|---|---|---|
| Executive ($100 fee) | 75,002 | 138,615 | 44,068 $1,101,700 | 16,729 $557,633 | 8,538 $355,749 |
| Non-Exec. ($50 fee) | 251,886 | 615,750 | 274,932 $3,436,650 | 149,006 $2,483,433 | 91,336 $1,902,833 |

Had the Amended Renewal Policy been in effect in 2007, the Renewal Policy would not have applied to the transactions shown in the last three columns (3rd, 4th, and 5th months), saving Costco members $9,837,998. Thus, at 2007 membership levels, the Amended Renewal Policy would save Costco members $68,865,986 over the next seven years.

But there is little chance that the membership base will remain constant; it has been steadily increasing. As reported in Costco's most recent annual report, membership increased substantially – and at an accelerating rate of increase – from 2006 to 2008:

| Year | Membership Base | Increase from Prior Year |
|---|---|---|
| 2006 | 47,700,000 | --- |
| 2007 | 50,400,000 | 5.7% |
| 2008 | 53,500,000 | 6.2% |

At an average growth rate of 5.9%, the Amended Renewal Policy is estimated to save Costco members $10.4 million in 2009, $11.0 million in 2010, $11.7 million in 2011, $12.4 million in 2012, $13.1 in 2013, $13.9 million in 2014, and $14.7 million in 2015 – *a total of $87.2 million over the next seven years.* And even that understates the likely benefit in light of the accelerating rate of growth of Costco's membership. Finally, the seven-year time span is a useful measure because it is comparable to the

Class Period, but in fact the benefits of the Amended Renewal Policy will continue indefinitely.

### 2.    Non-Economic Relief

The Class Representative's goal in filing the Complaint was not solely to recover damages on behalf of the Settlement Class members.  An equally important goal was to obtain clear and specific disclosure of Costco's Renewal Policy.  Through the Settlement, the Parties have agreed on a course of action that achieves that goal. Costco has agreed to include specific language describing the Amended Renewal Policy on its membership applications, renewal forms, and in the Privileges and Conditions (or the equivalent).  This same disclosure will be disseminated in Costco's members services brochures and on its web site, ensuring adequate disclosure of the Amended Renewal Policy.  This disclosure, without more, will be sufficient to ensure that Costco is not committing a deceptive trade practice as alleged in the complaint, and also will make it clear that Costco has specific contractual authorization to apply the Amended Renewal Policy.  Thus, Costco members will receive specific notice of the policy and will assent to it.

### 3.    Enhancement Award

Costco has agreed not to oppose an application to the Court for an Enhancement Award to Ms. Dupler in the amount of $25,000 in recognition of her time, effort, and leadership in directing the course of the litigation, conferring with Class Counsel, reviewing pleadings, participating in discovery, and being deposed by Costco's counsel.  Similarly, Costco has agreed not to oppose an application for an Enhancement Award to Ms. Evans, the California Plaintiff, in the amount of $5,000. Further, Costco has agreed to pay the Enhancement Awards from its own resources, so

# EXHIBIT 4

## SiriusXM Reports Second Quarter 2011 Results

- **Subscribers Exceed 21 Million, an All-Time High**
- **Record Revenue of $744 Million, Up 6% Over Second Quarter 2010**
- **Record Adjusted EBITDA of $185 Million, Up 20% Over Second Quarter 2010**
- **Company Raises Guidance; 1.6 Million Net Subscriber Additions and Free Cash Flow Approaching $400 Million Expected in 2011**

NEW YORK, Aug. 3, 2011 /PRNewswire/ -- Sirius XM Radio (NASDAQ: SIRI) today announced second quarter 2011 results, including revenue of $744 million, up 6% over second quarter 2010 revenue of $700 million, and adjusted EBITDA of $185 million, up 20% from $154 million in the second quarter of 2010.

(Logo:  http://photos.prnewswire.com/prnh/20101014/NY82093LOGO )

"Our results in the second quarter were strong, and we are proud of our record levels of subscribers, revenue, and adjusted EBITDA and growth in free cash flow.  SiriusXM continues to perform well, and we are pleased to raise our subscriber guidance and, for the second time this year, our free cash flow guidance," said Mel Karmazin, Chief Executive Officer, SiriusXM.

Highlights from the quarter include:

- **Subscriber growth continues.** Auto sales growth and higher OEM penetration year-over-year drove ending subscribers as of June 30, 2011 to 21,016,175, up 8% from the 19,527,448 subscribers reported as of June 30, 2010. Self-pay net additions in the second quarter of 2011 were 362,663, up 19% from 304,043 in the second quarter of 2010.
- **Churn stable.** Average self-pay monthly churn was 1.9% in the second quarter 2011, compared to 2.0% in the first quarter 2011 and 1.8% in the second quarter of 2010.
- **SAC improves.** Subscriber acquisition cost (SAC) per gross subscriber addition was $54 in the second quarter of 2011, an 8% improvement from the $59 reported in the second quarter of 2010.

"Demand for satellite radio continues to grow, with gross additions reaching the highest level of any quarter since the merger of Sirius and XM.  Our all-time high OEM penetration rate is a reflection of the automakers' satisfaction and their commitment to offer our service to their customers," said Karmazin. "We intend to drive future growth through innovations to our satellite and internet platforms, with the goal of better delivering our unparalleled content to our valued customers.  We're also excited to launch a variety of additional new music and talk channels later this year."

Free cash flow in the second quarter of 2011 was $165 million, a 53% improvement from the $108 million reported in the second quarter 2010. These improvements were driven by cash received from the Canada merger, a decline in satellite capital expenditures, and improved adjusted EBITDA. Net income in the second quarters of 2011 and 2010 was $173 million and $15 million, respectively, or $0.03 and $0.00 per diluted share, respectively.

"We ended the second quarter with $528 million of cash and cash equivalents after using approximately $75 million to repurchase debt in the second quarter," said David Frear, SiriusXM's Executive Vice President and Chief Financial Officer.  "We continue to make steady progress toward reaching our leverage target. Our net debt to adjusted EBITDA declined to 3.7x at the end of the second quarter of 2011 from 5.2x at the end of the second quarter of 2010.  The company is examining ways to start efficiently returning capital to shareholders beginning in 2012," added Frear.

The discussion of adjusted EBITDA excludes the effects of stock-based compensation and certain purchase price accounting adjustments. A reconciliation of non-GAAP items to their nearest GAAP equivalent is contained in the financial supplements included with this release.

### 2011 GUIDANCE

"With the excellent subscriber performance recorded in the first half of 2011, we are now confident that we will exceed our previously announced 1.4 million net subscriber addition guidance for 2011.  Today we are raising our full-year guidance to a projected 1.6 million net subscriber additions," added Karmazin. "After a strong first half, we now expect free cash flow in 2011 will approach $400 million, up from our prior guidance of approaching $350 million."

In 2011, the company continues to expect full-year revenue of approximately $3 billion. SiriusXM's adjusted EBITDA projection remains at approximately $715 million. Full year self-pay churn and conversion rates for 2011 should be broadly similar to those seen in 2010.

### SECOND QUARTER 2011 RESULTS

*Subscriber Data.*

The following table contains actual subscriber data for the three and six months ended June 30, 2011 and 2010, respectively:

| | Unaudited | | | |
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
|---|---|---|---|---|
| Beginning subscribers | 20,564,028 | 18,944,199 | 20,190,964 | 18,772,758 |
| Gross subscriber additions | 2,179,348 | 2,020,507 | 4,231,715 | 3,741,355 |
| Deactivated subscribers | (1,727,201) | (1,437,258) | (3,406,504) | (2,986,665) |
| Net additions | 452,147 | 583,249 | 825,211 | 754,690 |
| Ending subscribers | 21,016,175 | 19,527,448 | 21,016,175 | 19,527,448 |
| | | | | |
| Self-pay | 17,170,306 | 16,077,714 | 17,170,306 | 16,077,714 |
| Paid promotional | 3,845,869 | 3,449,734 | 3,845,869 | 3,449,734 |
| Ending subscribers | 21,016,175 | 19,527,448 | 21,016,175 | 19,527,448 |
| | | | | |
| Self-pay | 362,663 | 304,043 | 483,507 | 373,782 |
| Paid promotional | 89,484 | 279,206 | 341,704 | 380,908 |
| Net additions | 452,147 | 583,249 | 825,211 | 754,690 |
| | | | | |
| Daily weighted average number of subscribers | 20,715,630 | 19,139,926 | 20,475,720 | 18,962,580 |
| | | | | |
| Average self-pay monthly churn (1) | 1.9% | 1.8% | 1.9% | 1.9% |
| | | | | |
| Conversion rate (2) | 45.2% | 46.7% | 44.9% | 45.9% |

See accompanying footnotes.

*Subscribers.* The improvement in the three months ended June 30, 2011 was due to the 8% increase in gross subscriber additions, primarily resulting from an increase in U.S. light vehicle sales, new vehicle penetration and returning activations.

*Average Self-pay Monthly Churn* increased in the three months ended June 30, 2011 due to changes in vehicle ownership which were offset by reductions in non-pay cancellation rates.

*Conversion Rate.* The decrease in the three months ended June 30, 2011 was primarily due to the changing mix of sales among auto manufacturers.

*Metrics.*

The following table contains our key operating metrics based on our unaudited adjusted results of operations for the three and six months ended June 30, 2011 and 2010, respectively:

| | Unaudited | | | | | | | |
| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
| (in thousands, except for per subscriber amounts) | 2011 | | 2010 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|---|---|
| ARPU (3) | $ | 11.53 | $ | 11.81 | $ | 11.53 | $ | 11.65 |
| SAC, per gross subscriber addition (4) | $ | 54 | $ | 59 | $ | 56 | $ | 59 |
| Customer service and billing expenses, per average subscriber (5) | $ | 1.00 | $ | 1.01 | $ | 1.04 | $ | 1.00 |
| Free cash flow (6) | $ | 165,433 | $ | 108,331 | $ | 148,559 | $ | (18,872) |
| Adjusted total revenue (8) | $ | 747,335 | $ | 705,560 | $ | 1,474,896 | $ | 1,376,122 |
| Adjusted EBITDA (7) | $ | 185,094 | $ | 154,313 | $ | 366,454 | $ | 312,070 |

See accompanying footnotes.

*ARPU* decreased in the three months ended June 30, 2011 by $0.28, primarily as a result of an increase in subscriber retention programs, the number of subscribers on OEM paid promotional plans and the decrease in the U.S. Music Royalty rate, partially offset by an increase in sales of premium services, including "Best of" programming, data services and streaming.

*SAC, Per Gross Subscriber Addition,* decreased in the three months ended June 30, 2011 primarily due to an 8% increase in gross subscriber additions and lower per radio subsidy rates for certain OEMs.

*Customer Service and Billing Expenses, Per Average Subscriber*, decreased in the three months ended June 30, 2011 primarily due to the 8% growth in daily weighted average subscribers relative to a 7% increase in customer service and billing expenses due to higher call volume and handle time per call and personnel costs.

*Free Cash Flow* increased in the three months ended June 30, 2011 principally as a result of improvements in net cash provided by operating activities and decreases in capital expenditures. Net cash provided by operating activities increased $16 million to $195 million for the three months ended June 30, 2011, compared to the $179 million provided by operations for the three months ended June 30, 2010. The increase in net cash provided by operating activities was primarily the result of improved operating performance driving higher adjusted EBITDA, cash received from the Canada merger and higher collections from subscribers and distributors. Capital expenditures for property and equipment for the three months ended June 30, 2011 decreased $30 million to $40 million, compared to $70 million for the three months ended June 30, 2010. The decrease in capital expenditures for the three months ended June 30, 2011 was primarily the result of decreased satellite construction and launch expenditures due to the launch in the fourth quarter of 2010 of our XM-5 satellite. The increase in net cash from restricted and other investment activities was driven by the return of capital resulting from the Canada merger.

*Adjusted Total Revenue.* Set forth below are our adjusted total revenue for the three and six months ended June 30, 2011 and 2010, respectively. Our adjusted total revenue includes the recognition of deferred subscriber revenues acquired in the merger between SIRIUS and XM (the "Merger") that are not recognized in our results under purchase price accounting and the elimination of the benefit in earnings from deferred revenue associated with our investment in XM Canada acquired in the Merger.

| | Unaudited | | | |
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| *(in thousands)* | 2011 | 2010 | 2011 | 2010 |
|---|---|---|---|---|
| Revenue: | | | | |
| Subscriber revenue, including effects of rebates (GAAP) | $ 639,642 | $ 601,630 | $ 1,262,080 | $ 1,181,139 |
| Advertising revenue, net of agency fees (GAAP) | 18,227 | 15,797 | 34,785 | 30,323 |
| Equipment revenue (GAAP) | 17,022 | 18,520 | 32,889 | 32,802 |
| Other revenue (GAAP) | 69,506 | 63,814 | 138,482 | 119,280 |
| Total revenue (GAAP) | 744,397 | 699,761 | 1,468,236 | 1,363,544 |
| Purchase price accounting adjustments: | | | | |
| Subscriber revenue, including effects of rebates | 1,125 | 3,986 | 3,034 | 8,952 |
| Other revenue | 1,813 | 1,813 | 3,626 | 3,626 |
| Adjusted total revenue | $ 747,335 | $ 705,560 | $ 1,474,896 | $ 1,376,122 |

For the three months ended June 30, 2011, the increase in subscriber revenue was primarily attributable to an 8% increase in daily weighted average subscribers and an increase in sales of premium services, including "Best of" programming, data services and streaming. The increase in other revenue was driven by an increase in subscribers subject to the U.S. Music Royalty Fee and increased royalty revenue from Sirius Canada.

*Adjusted EBITDA.* EBITDA is defined as net income (loss) before interest and investment income (loss); interest expense, net of amounts capitalized; income tax expense and depreciation and amortization. Adjusted EBITDA removes the impact of other income and expense, losses on extinguishment of debt as well as certain other charges, such as goodwill impairment; restructuring, impairments and related costs; certain purchase price accounting adjustments and share-based payment expense.

| | Unaudited Adjusted | | | |
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
|---|---|---|---|---|
| Total revenue | $ 747,335 | $ 705,560 | $ 1,474,896 | $ 1,376,122 |
| Operating expenses: | | | | |
| Revenue share and royalties | 147,875 | 134,318 | 284,737 | 257,857 |
| Programming and content | 78,226 | 83,931 | 161,499 | 174,402 |

| | | | | |
|---|---|---|---|---|
| Customer service and billing | 62,284 | 57,763 | 127,772 | 113,340 |
| Satellite and transmission | 18,507 | 19,235 | 36,739 | 38,622 |
| Cost of equipment | 7,601 | 7,805 | 14,006 | 15,724 |
| Subscriber acquisition costs | 126,972 | 130,683 | 253,898 | 237,728 |
| Sales and marketing | 53,646 | 57,076 | 102,802 | 107,018 |
| Engineering, design and development | 12,965 | 9,635 | 22,988 | 19,462 |
| General and administrative | 54,165 | 50,801 | 104,001 | 99,899 |
| Total operating expenses | 562,241 | 551,247 | 1,108,442 | 1,064,052 |
| Adjusted EBITDA | $ 185,094 | $ 154,313 | $ 366,454 | $ 312,070 |

For the three months ended June 30, 2011, the increase in adjusted EBITDA was primarily due to an increase of 6%, or $42 million, in adjusted revenues, partially offset by an increase of 2%, or $11 million, in expenses included in adjusted EBITDA. The increase in adjusted revenue was primarily due to the increase in our subscriber base and by the additional subscribers subject to the U.S. Music Royalty Fee. The increase in expenses was primarily driven by higher revenue share and royalties expenses associated with growth in revenues and increased customer service and billing expenses associated with subscriber growth, partially offset by lower subscriber acquisition costs, sales and marketing expenses, and programming and content costs.

**SIRIUS XM RADIO INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | | Unaudited Actual | | |
|---|---|---|---|---|
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| (in thousands, except per share data) | 2011 | 2010 | 2011 | 2010 |
| Revenue: | | | | |
| Subscriber revenue | $ 639,642 | $ 601,630 | $ 1,262,080 | $ 1,181,139 |
| Advertising revenue, net of agency fees | 18,227 | 15,797 | 34,785 | 30,323 |
| Equipment revenue | 17,022 | 18,520 | 32,889 | 32,802 |
| Other revenue | 69,506 | 63,814 | 138,482 | 119,280 |
| Total revenue | 744,397 | 699,761 | 1,468,236 | 1,363,544 |
| Operating expenses: | | | | |
| Cost of services: | | | | |
| Revenue share and royalties | 116,741 | 107,901 | 223,670 | 206,085 |
| Programming and content | 67,399 | 72,019 | 140,358 | 150,452 |
| Customer service and billing | 62,592 | 58,414 | 128,429 | 114,625 |
| Satellite and transmission | 18,998 | 19,982 | 37,558 | 40,100 |
| Cost of equipment | 7,601 | 7,805 | 14,006 | 15,724 |
| Subscriber acquisition costs | 105,162 | 110,383 | 210,432 | 199,762 |
| Sales and marketing | 51,442 | 56,177 | 99,261 | 105,294 |
| Engineering, design and development | 13,939 | 11,247 | 25,074 | 22,684 |
| General and administrative | 60,479 | 59,166 | 116,831 | 116,746 |
| Depreciation and amortization | 67,062 | 69,230 | 135,462 | 139,495 |
| Restructuring, impairments and related costs | - | 1,803 | - | 1,803 |
| Total operating expenses | 571,415 | 574,127 | 1,131,081 | 1,112,770 |
| Income from operations | 172,982 | 125,634 | 337,155 | 250,774 |
| Other income (expense): | | | | |
| Interest expense, net of amounts capitalized | (76,196) | (76,802) | (154,414) | (154,670) |
| Loss on extinguishment of debt and credit facilities, net | (1,212) | (31,987) | (7,206) | (34,437) |
| Interest and investment income (loss) | 80,182 | 378 | 78,298 | (2,892) |
| Other income (loss) | 183 | (485) | 1,799 | 728 |
| Total other income (expense) | 2,957 | (108,896) | (81,523) | (191,271) |
| Income before income taxes | 175,939 | 16,738 | 255,632 | 59,503 |
| Income tax expense | (2,620) | (1,466) | (4,192) | (2,633) |
| Net income | $ 173,319 | $ 15,272 | $ 251,440 | $ 56,870 |
| Net income per common share: | | | | |
| Basic | $ 0.05 | $ 0.00 | $ 0.07 | $ 0.02 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Diluted | $ | 0.03 | $ | 0.00 | $ | 0.04 | $ | 0.01 |

Weighted average common shares outstanding:

| | | | | |
|---|---|---|---|---|
| Basic | 3,744,375 | 3,683,595 | 3,739,731 | 3,682,750 |
| Diluted | 6,804,297 | 6,363,955 | 6,790,729 | 6,357,507 |

## SIRIUS XM RADIO INC. AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEETS

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (unaudited) | |

*(in thousands, except share and per share data)*

### ASSETS

| | | | | |
|---|---|---|---|---|
| Current assets: | | | | |
| Cash and cash equivalents | $ | 528,327 | $ | 586,691 |
| Accounts receivable, net | | 100,834 | | 121,658 |
| Receivables from distributors | | 81,014 | | 67,576 |
| Inventory, net | | 32,317 | | 21,918 |
| Prepaid expenses | | 156,530 | | 134,994 |
| Related party current assets | | 6,264 | | 6,719 |
| Deferred tax asset | | 54,828 | | 44,787 |
| Other current assets | | 5,167 | | 7,432 |
| Total current assets | | 965,281 | | 991,775 |
| Property and equipment, net | | 1,722,673 | | 1,761,274 |
| Long-term restricted investments | | 3,146 | | 3,396 |
| Deferred financing fees, net | | 48,062 | | 54,135 |
| Intangible assets, net | | 2,602,425 | | 2,632,688 |
| Goodwill | | 1,834,856 | | 1,834,856 |
| Related party long-term assets | | 71,323 | | 33,475 |
| Other long-term assets | | 56,019 | | 71,487 |
| Total assets | $ | 7,303,785 | $ | 7,383,086 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | | | | |
|---|---|---|---|---|
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ | 481,977 | $ | 593,174 |
| Accrued interest | | 70,565 | | 72,453 |
| Current portion of deferred revenue | | 1,295,653 | | 1,201,346 |
| Current portion of deferred credit on executory contracts | | 281,071 | | 271,076 |
| Current maturities of long-term debt | | 25,894 | | 195,815 |
| Related party current liabilities | | 15,802 | | 15,845 |
| Total current liabilities | | 2,170,962 | | 2,349,709 |
| Deferred revenue | | 244,573 | | 273,973 |
| Deferred credit on executory contracts | | 361,899 | | 508,012 |
| Long-term debt | | 2,671,770 | | 2,695,856 |
| Long-term related party debt | | 327,296 | | 325,907 |
| Deferred tax liability | | 927,120 | | 914,637 |
| Related party long-term liabilities | | 23,129 | | 24,517 |
| Other long-term liabilities | | 82,425 | | 82,839 |
| Total liabilities | | 6,809,174 | | 7,175,450 |

Commitments and contingencies

Stockholders' equity:

Preferred stock, par value $0.001; 50,000,000 authorized at June 30, 2011 and December 31, 2010:

| | | |
|---|---|---|
| Series A convertible preferred stock; no shares issued and outstanding at June 30, 2011 and December 31, 2010 | — | — |
| Convertible perpetual preferred stock, series B-1 (liquidation preference of $13 at June 30, 2011 and December 31, 2010); 12,500,000 shares issued and outstanding at June 30, 2011 and December 31, 2010 | 13 | 13 |

| | 2011 | 2010 |
|---|---|---|
| Convertible preferred stock, series C junior; no shares issued and outstanding at June 30, 2011 and December 31, 2010 | - | - |
| Common stock, par value $0.001; 9,000,000,000 shares authorized at June 30, 2011 and December 31, 2010; 3,948,913,078 and 3,933,195,112 shares issued and outstanding at June 30, 2011 and December 31, 2010, respectively | 3,949 | 3,933 |
| Accumulated other comprehensive income (loss), net of tax | 288 | (5,861) |
| Additional paid-in capital | 10,449,974 | 10,420,604 |
| Accumulated deficit | (9,959,613) | (10,211,053) |
| Total stockholders' equity | 494,611 | 207,636 |
| Total liabilities and stockholders' equity | $ 7,303,785 | $ 7,383,086 |

## SIRIUS XM RADIO INC. AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Unaudited Actual | |
|---|---|---|
| | For the Six Months Ended June 30, | |
| (in thousands) | 2011 | 2010 |
| **Cash flows from operating activities:** | | |
| Net income | $ 251,440 | $ 56,870 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 135,462 | 139,495 |
| Non-cash interest expense, net of amortization of premium | 19,234 | 22,294 |
| Provision for doubtful accounts | 17,744 | 15,756 |
| Restructuring, impairments and related costs | - | 1,803 |
| Amortization of deferred income related to equity method investment | (1,388) | (2,137) |
| Loss on extinguishment of debt and credit facilities, net | 7,206 | 34,437 |
| Gain on merger of unconsolidated entities | (83,718) | - |
| Loss on unconsolidated entity investments, net | 6,045 | 6,065 |
| Loss on disposal of assets | 269 | (18) |
| Share-based payment expense | 23,591 | 33,083 |
| Deferred income taxes | 2,223 | 2,633 |
| Other non-cash purchase price adjustments | (134,862) | (120,706) |
| Distribution from investment in unconsolidated entity | 4,849 | |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 3,080 | (14,296) |
| Receivables from distributors | (13,438) | (26,655) |
| Inventory | (10,399) | 2,467 |
| Related party assets | 31,076 | (701) |
| Prepaid expenses and other current assets | (20,871) | 10,245 |
| Other long-term assets | 15,974 | 10,947 |
| Accounts payable and accrued expenses | (101,552) | (76,144) |
| Accrued interest | (1,888) | (4,796) |
| Deferred revenue | 63,649 | 105,004 |
| Related party liabilities | (42) | (54,978) |
| Other long-term liabilities | (194) | 319 |
| Net cash provided by operating activities | 213,490 | 140,987 |
| **Cash flows from investing activities:** | | |
| Additions to property and equipment | (75,298) | (169,313) |
| Sale of restricted and other investments | - | 9,454 |
| Release of restricted investments | 250 | - |
| Return of capital from investment in unconsolidated entity | 10,117 | - |
| Net cash used in investing activities | (64,931) | (159,859) |
| **Cash flows from financing activities:** | | |
| Proceeds from exercise of stock options | 6,921 | - |

| | | | |
|---|---:|---:|---|
| Long-term borrowings, net of costs | - | 637,406 | |
| Related party long-term borrowings, net of costs | - | 147,094 | |
| Payment of premiums on redemption of debt | (5,020) | (24,065) | |
| Repayment of long-term borrowings | (208,824) | (810,977) | |
| Repayment of related party long-term borrowings | - | (55,221) | |
| Net cash used in financing activities | (206,923) | (105,763) | |
| Net decrease in cash and cash equivalents | (58,364) | (124,635) | |
| Cash and cash equivalents at beginning of period | 586,691 | 383,489 | |
| Cash and cash equivalents at end of period | $ 528,327 | $ 258,854 | |

## Footnotes

(1) Average self-pay monthly churn represents the monthly average of self-pay deactivations for the quarter divided by the average number of self-pay subscribers for the quarter.

(2) We measure the percentage of owners and lessees of new vehicles that receive our service and convert to become self-paying subscribers after the initial promotion period. We refer to this as the "conversion rate." At the time satellite radio enabled vehicles are sold or leased, the owners or lessees generally receive trial subscriptions ranging from three to twelve months. Promotional periods generally include the period of trial service plus 30 days to handle the receipt and processing of payments. We measure conversion rate three months after the period in which the trial service ends.

(3) ARPU is derived from total earned subscriber revenue, net advertising revenue and other subscription-related revenue, net of purchase price accounting adjustments, divided by the number of months in the period, divided by the daily weighted average number of subscribers for the period. Other subscription-related revenue includes the U.S. Music Royalty Fee. Purchase price accounting adjustments include the recognition of deferred subscriber revenues not recognized in purchase price accounting associated with the Merger. ARPU is calculated as follows (in thousands, except for subscriber and per subscriber amounts):

| | Unaudited | | | |
|---|---:|---:|---:|---:|
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| Subscriber revenue (GAAP) | $ 639,642 | $ 601,630 | $ 1,262,080 | $ 1,181,139 |
| Add: net advertising revenue (GAAP) | 18,227 | 15,797 | 34,785 | 30,323 |
| Add: other subscription-related revenue (GAAP) | 57,642 | 56,694 | 116,173 | 104,641 |
| Add: purchase price accounting adjustments | 1,125 | 3,986 | 3,034 | 8,952 |
| | $ 716,636 | $ 678,107 | $ 1,416,072 | $ 1,325,055 |
| Daily weighted average number of subscribers | 20,715,630 | 19,139,926 | 20,475,720 | 18,962,580 |
| ARPU | $ 11.53 | $ 11.81 | $ 11.53 | $ 11.65 |

(4) Subscriber acquisition cost, per gross subscriber addition (or SAC, per gross subscriber addition) is derived from subscriber acquisition costs and margins from the direct sale of radios and accessories, excluding purchase price accounting adjustments, divided by the number of gross subscriber additions for the period. Purchase price accounting adjustments associated with the Merger include the elimination of the benefit of amortization of deferred credits on executory contracts recognized at the Merger date attributable to an OEM. SAC, per gross subscriber addition, is calculated as follows (in thousands, except for subscriber and per subscriber amounts):

| | Unaudited | | | |
|---|---:|---:|---:|---:|
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| Subscriber acquisition costs (GAAP) | $ 105,162 | $ 110,383 | $ 210,432 | $ 199,762 |
| Less: margin from direct sales of radios and accessories (GAAP) | (9,421) | (10,715) | (18,883) | (17,078) |
| Add: purchase price accounting adjustments | 21,810 | 20,300 | 43,466 | 37,966 |
| | $ 117,551 | $ 119,968 | $ 235,015 | $ 220,650 |
| Gross subscriber additions | 2,179,348 | 2,020,507 | 4,231,715 | 3,741,355 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SAC, per gross subscriber addition | $ | 54 | $ | 59 | $ | 56 | $ | 59 |

(5) Customer service and billing expenses, per average subscriber, is derived from total customer service and billing expenses, excluding share-based payment expense and purchase price accounting adjustments associated with the Merger, divided by the number of months in the period, divided by the daily weighted average number of subscribers for the period. We believe the exclusion of share-based payment expense in our calculation of customer service and billing expenses, per average subscriber, is useful given the significant variation in expense that can result from changes in the fair market value of our common stock, the effect of which is unrelated to the operational conditions that give rise to variations in the components of our customer service and billing expenses. Purchase price accounting adjustments associated with the Merger include the elimination of the benefit associated with incremental share-based payment arrangements recognized at the Merger date. Customer service and billing expenses, per average subscriber, is calculated as follows (in thousands, except for subscriber and per subscriber amounts):

| | Unaudited | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| Customer service and billing expenses (GAAP) | $ | 62,592 | $ | 58,414 | $ | 128,429 | $ | 114,625 |
| Less: share-based payment expense, net of purchase price accounting adjustments | | (308) | | (729) | | (675) | | (1,457) |
| Add: purchase price accounting adjustments | | - | | 78 | | 18 | | 172 |
| | $ | 62,284 | $ | 57,763 | $ | 127,772 | $ | 113,340 |
| Daily weighted average number of subscribers | | 20,715,630 | | 19,139,926 | | 20,475,720 | | 18,962,580 |
| Customer service and billing expenses, per average subscriber | $ | 1.00 | $ | 1.01 | $ | 1.04 | $ | 1.00 |

(6) Free cash flow is calculated as follows (in thousands):

| | Unaudited | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| Net cash provided by operating activities | $ | 195,381 | $ | 178,675 | $ | 213,490 | $ | 140,987 |
| Additions to property and equipment | | (40,315) | | (70,348) | | (75,298) | | (189,313) |
| Restricted and other investment activity | | 10,367 | | 4 | | 10,367 | | 9,454 |
| Free cash flow | $ | 165,433 | $ | 108,331 | $ | 148,559 | $ | (18,872) |

(7) EBITDA is defined as net income before interest and investment income (loss); interest expense, net of amounts capitalized; taxes expense and depreciation and amortization. We adjust EBITDA to remove the impact of other income and expense, loss on extinguishment of debt as well as certain other charges discussed below. This measure is one of the primary Non-GAAP financial measures on which we (i) evaluate the performance of our businesses, (ii) base our internal budgets and (iii) compensate management. Adjusted EBITDA is a Non-GAAP financial performance measure that excludes (if applicable): (i) certain adjustments as a result of the purchase price accounting for the Merger, (ii) goodwill impairment, (iii) restructuring, impairments, and related costs, (iv) depreciation and amortization and (v) share-based payment expense. The purchase price accounting adjustments include: (i) the elimination of deferred revenue associated with the investment in XM Canada, (ii) recognition of deferred subscriber revenues not recognized in purchase price accounting, and (iii) elimination of the benefit of deferred credits on executory contracts, which are primarily attributable to third party arrangements with an OEM and programming providers. We believe adjusted EBITDA is a useful measure of the underlying trend of our operating performance, which provides useful information about our business apart from the costs associated with our physical plant, capital structure and purchase price accounting. We believe investors find this Non-GAAP financial measure useful when analyzing our results and comparing our operating performance to the performance of other communications, entertainment and media companies. We believe investors use current and projected adjusted EBITDA to estimate our current and prospective enterprise value and to make investment decisions. Because we fund and build-out our satellite radio system through the periodic raising and expenditure of large amounts of capital, our results of operations reflect significant charges for depreciation expense. The exclusion of depreciation and amortization expense is useful given significant variation in depreciation and amortization expense that can result from the potential variations in estimated useful lives, all of which can vary widely across different industries or among companies within the same industry. We believe the exclusion of restructuring, impairments and related costs is useful given the nature of these expenses. We also believe the exclusion of share-based payment expense is useful given the significant variation in expense that can result from changes in the fair value as determined using the Black-Scholes-Merton model which varies based on assumptions used for the expected life, expected stock price volatility and risk-free interest rates.

Adjusted EBITDA has certain limitations in that it does not take into account the impact to our statement of operations of certain expenses, including share-based payment expense and certain purchase price accounting for the Merger. We endeavor to compensate for the limitations of the Non-GAAP measure presented by also providing the comparable GAAP measure with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the Non-GAAP measure. Investors that wish to compare and evaluate our operating results after giving effect for these costs, should refer to net income as disclosed in our consolidated statements of operations. Since adjusted EBITDA is a Non-GAAP financial performance measure, our calculation of adjusted EBITDA may be susceptible to varying calculations; may not be comparable to other similarly titled measures of other companies; and should not be considered in isolation, as a substitute for, or superior to measures of financial performance prepared in accordance with GAAP. The reconciliation of net income to the adjusted EBITDA is calculated as follows (in thousands):

| | | Unaudited | | |
| --- | --- | --- | --- | --- |
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| Net income (GAAP): | $ 173,319 | $ 15,272 | $ 251,440 | $ 56,870 |
| Add back items excluded from Adjusted EBITDA: | | | | |
| Purchase price accounting adjustments: | | | | |
| Revenues | 2,938 | 5,799 | 6,660 | 12,578 |
| Operating expenses | (68,623) | (64,857) | (136,595) | (127,467) |
| Share-based payment expense, net of purchase price | | | | |
| accounting adjustments | 10,735 | 16,704 | 23,772 | 34,887 |
| Depreciation and amortization (GAAP) | 67,062 | 69,230 | 135,462 | 139,495 |
| Restructuring, impairments and related costs | - | 1,803 | - | 1,803 |
| Interest expense, net of amounts capitalized (GAAP) | 76,196 | 76,802 | 154,414 | 154,670 |
| Loss on extinguishment of debt and credit facilities, net (GAAP) | 1,212 | 31,987 | 7,206 | 34,437 |
| Interest and investment (income) loss (GAAP) | (80,182) | (378) | (78,298) | 2,892 |
| Other (income) loss (GAAP) | (183) | 485 | (1,799) | (728) |
| Income tax expense (GAAP) | 2,620 | 1,466 | 4,192 | 2,633 |
| Adjusted EBITDA | $ 185,094 | $ 154,313 | $ 366,454 | $ 312,070 |

(8) The following tables reconcile our actual revenues and operating expenses to our adjusted revenues and operating expenses for the three and six months ended June 30, 2011 and 2010:

| | Unaudited For the Three Months Ended June 30, 2011 | | | |
| --- | --- | --- | --- | --- |
| (in thousands) | As Reported | Purchase Price Accounting Adjustments | Allocation of Share-based Payment Expense | Adjusted |
| Revenue: | | | | |
| Subscriber revenue, including effects of rebates | $ 639,642 | $ 1,125 | $ - | $ 640,767 |
| Advertising revenue, net of agency fees | 18,227 | - | - | 18,227 |
| Equipment revenue | 17,022 | - | - | 17,022 |
| Other revenue | 69,506 | 1,813 | - | 71,319 |
| Total revenue | $ 744,397 | $ 2,938 | $ - | $ 747,335 |
| Operating expenses | | | | |
| Cost of services: | | | | |
| Revenue share and royalties | 116,741 | 31,134 | - | 147,875 |
| Programming and content | 67,399 | 11,787 | (960) | 78,226 |
| Customer service and billing | 62,592 | - | (308) | 62,284 |
| Satellite and transmission | 18,998 | 74 | (565) | 18,507 |
| Cost of equipment | 7,601 | - | - | 7,601 |
| Subscriber acquisition costs | 105,162 | 21,810 | - | 126,972 |
| Sales and marketing | 51,442 | 3,818 | (1,614) | 53,646 |
| Engineering, design and development | 13,939 | - | (974) | 12,965 |
| General and administrative | 60,479 | - | (6,314) | 54,165 |
| Depreciation and amortization (a) | 67,062 | - | - | 67,062 |
| Restructuring, impairments and related costs | - | - | - | - |
| Share-based payment expense (b) | - | - | 10,735 | 10,735 |

| | As Reported | Purchase Price Accounting Adjustments | Allocation of Share-based Payment Expense | Adjusted |
|---|---|---|---|---|
| Total operating expenses | $ 571,415 | $ 68,623 | $ - | $ 640,038 |

(a) Purchase price accounting adjustments included above exclude the incremental depreciation and amortization associated with the $785,000 stepped up basis in property, equipment and intangible assets as a result of the Merger. The increased depreciation and amortization for the three months ended June 30, 2011 was $15,000.

(b) Amounts related to share-based payment expense included in operating expenses were as follows:

| | | | | |
|---|---|---|---|---|
| Programming and content | $ 960 | $ - | $ - | $ 960 |
| Customer service and billing | 308 | - | - | 308 |
| Satellite and transmission | 565 | - | - | 565 |
| Sales and marketing | 1,614 | - | - | 1,614 |
| Engineering, design and development | 974 | - | - | 974 |
| General and administrative | 6,314 | - | - | 6,314 |
| Total share-based payment expense | $ 10,735 | $ - | $ - | $ 10,735 |

| | | Unaudited For the Three Months Ended June 30, 2010 | | |
|---|---|---|---|---|
| (in thousands) | As Reported | Purchase Price Accounting Adjustments | Allocation of Share-based Payment Expense | Adjusted |
| Revenue: | | | | |
| Subscriber revenue, including effects of rebates | $ 601,630 | $ 3,986 | $ - | $ 605,616 |
| Advertising revenue, net of agency fees | 15,797 | - | - | 15,797 |
| Equipment revenue | 18,520 | - | - | 18,520 |
| Other revenue | 63,814 | 1,813 | - | 65,627 |
| Total revenue | $ 699,761 | $ 5,799 | $ - | $ 705,560 |
| Operating expenses | | | | |
| Cost of services: | | | | |
| Revenue share and royalties | 107,901 | 26,417 | - | 134,318 |
| Programming and content | 72,019 | 13,702 | (1,790) | 83,931 |
| Customer service and billing | 58,414 | 78 | (729) | 57,763 |
| Satellite and transmission | 19,982 | 303 | (1,050) | 19,235 |
| Cost of equipment | 7,805 | - | - | 7,805 |
| Subscriber acquisition costs | 110,383 | 20,300 | - | 130,683 |
| Sales and marketing | 56,177 | 3,661 | (2,762) | 57,076 |
| Engineering, design and development | 11,247 | 148 | (1,760) | 9,635 |
| General and administrative | 59,166 | 248 | (8,613) | 50,801 |
| Depreciation and amortization (a) | 69,230 | - | - | 69,230 |
| Restructuring, impairments and related costs | 1,803 | - | - | 1,803 |
| Share-based payment expense (b) | - | - | 16,704 | 16,704 |
| Total operating expenses | $ 574,127 | $ 64,857 | $ - | $ 638,984 |

(a) Purchase price accounting adjustments included above exclude the incremental depreciation and amortization associated with the $785,000 stepped up basis in property, equipment and intangible assets as a result of the Merger. The increased depreciation and amortization for the three months ended June 30, 2010 was $17,000.

(b) Amounts related to share-based payment expense included in operating expenses were as follows:

| | | | | |
|---|---|---|---|---|
| Programming and content | $ 1,662 | $ 128 | $ - | $ 1,790 |
| Customer service and billing | 651 | 78 | - | 729 |
| Satellite and transmission | 968 | 82 | - | 1,050 |
| Sales and marketing | 2,643 | 119 | - | 2,762 |
| Engineering, design and development | 1,612 | 148 | - | 1,760 |
| General and administrative | 8,365 | 248 | - | 8,613 |
| Total share-based payment expense | $ 15,901 | $ 803 | $ - | $ 16,704 |

| (in thousands) | As Reported | | Purchase Price Accounting Adjustments | | Allocation of Share-based Payment Expense | | Adjusted | |
|---|---|---|---|---|---|---|---|---|
| | | | **Unaudited For the Six Months Ended June 30, 2011** | | | | | |
| Revenue: | | | | | | | | |
| Subscriber revenue, including effects of rebates | $ | 1,262,080 | $ | 3,034 | $ | - | $ | 1,265,114 |
| Advertising revenue, net of agency fees | | 34,785 | | - | | - | | 34,785 |
| Equipment revenue | | 32,889 | | - | | - | | 32,889 |
| Other revenue | | 138,482 | | 3,626 | | - | | 142,108 |
| Total revenue | $ | 1,468,236 | $ | 6,660 | $ | - | $ | 1,474,896 |
| Operating expenses | | | | | | | | |
| Cost of services: | | | | | | | | |
| Revenue share and royalties | | 223,670 | | 61,067 | | - | | 284,737 |
| Programming and content | | 140,358 | | 24,611 | | (3,470) | | 161,499 |
| Customer service and billing | | 128,429 | | 18 | | (675) | | 127,772 |
| Satellite and transmission | | 37,558 | | 313 | | (1,132) | | 36,739 |
| Cost of equipment | | 14,006 | | - | | - | | 14,006 |
| Subscriber acquisition costs | | 210,432 | | 43,466 | | - | | 253,898 |
| Sales and marketing | | 99,261 | | 7,030 | | (3,489) | | 102,802 |
| Engineering, design and development | | 25,074 | | 31 | | (2,117) | | 22,988 |
| General and administrative | | 116,831 | | 59 | | (12,889) | | 104,001 |
| Depreciation and amortization (a) | | 135,462 | | - | | - | | 135,462 |
| Restructuring, impairments and related costs | | - | | - | | - | | - |
| Share-based payment expense (b) | | - | | - | | 23,772 | | 23,772 |
| Total operating expenses | $ | 1,131,081 | $ | 136,595 | $ | - | $ | 1,267,676 |

(a) Purchase price accounting adjustments included above exclude the incremental depreciation and amortization associated with the $785,000 stepped up basis in property, equipment and intangible assets as a result of the Merger. The increased depreciation and amortization for the six months ended June 30, 2011 was $30,000.

(b) Amounts related to share-based payment expense included in operating expenses were as follows:

| | As Reported | | Purchase Price Accounting Adjustments | | Allocation of Share-based Payment Expense | | Adjusted | |
|---|---|---|---|---|---|---|---|---|
| Programming and content | $ | 3,443 | $ | 27 | $ | - | $ | 3,470 |
| Customer service and billing | | 657 | | 18 | | - | | 675 |
| Satellite and transmission | | 1,113 | | 19 | | - | | 1,132 |
| Sales and marketing | | 3,462 | | 27 | | - | | 3,489 |
| Engineering, design and development | | 2,086 | | 31 | | - | | 2,117 |
| General and administrative | | 12,830 | | 59 | | - | | 12,889 |
| Total share-based payment expense | $ | 23,591 | $ | 181 | $ | - | $ | 23,772 |

| (in thousands) | As Reported | | Purchase Price Accounting Adjustments | | Allocation of Share-based Payment Expense | | Adjusted | |
|---|---|---|---|---|---|---|---|---|
| | | | **Unaudited For the Six Months Ended June 30, 2010** | | | | | |
| Revenue: | | | | | | | | |
| Subscriber revenue, including effects of rebates | $ | 1,181,139 | $ | 8,952 | $ | - | $ | 1,190,091 |
| Advertising revenue, net of agency fees | | 30,323 | | - | | - | | 30,323 |
| Equipment revenue | | 32,802 | | - | | - | | 32,802 |
| Other revenue | | 119,280 | | 3,626 | | - | | 122,906 |
| Total revenue | $ | 1,363,544 | $ | 12,578 | $ | - | $ | 1,376,122 |
| Operating expenses | | | | | | | | |
| Cost of services: | | | | | | | | |
| Revenue share and royalties | | 206,085 | | 51,772 | | | | 257,857 |
| Programming and content | | 150,452 | | 28,850 | | (4,900) | | 174,402 |
| Customer service and billing | | 114,625 | | 172 | | (1,457) | | 113,340 |

| | | | | |
|---|--:|--:|--:|--:|
| Satellite and transmission | 40,100 | 626 | (2,104) | 38,622 |
| Cost of equipment | 15,724 | - | - | 15,724 |
| Subscriber acquisition costs | 199,762 | 37,966 | - | 237,728 |
| Sales and marketing | 105,294 | 7,186 | (5,462) | 107,018 |
| Engineering, design and development | 22,684 | 334 | (3,556) | 19,462 |
| General and administrative | 116,746 | 561 | (17,408) | 99,899 |
| Depreciation and amortization (a) | 139,495 | - | - | 139,495 |
| Restructuring, impairments and related costs | 1,803 | - | - | 1,803 |
| Share-based payment expense (b) | - | - | 34,887 | 34,887 |
| Total operating expenses | $ 1,112,770 | $ 127,467 | $ - | $ 1,240,237 |

(a) Purchase price accounting adjustments included above exclude the incremental depreciation and amortization associated with the $785,000 stepped up basis in property, equipment and intangible assets as a result of the Merger. The increased depreciation and amortization for the six months ended June 30, 2010 was $36,000.

(b) Amounts related to share-based payment expense included in operating expenses were as follows:

| | | | | |
|---|--:|--:|--:|--:|
| Programming and content | $ 4,612 | $ 288 | $ - | $ 4,900 |
| Customer service and billing | 1,285 | 172 | - | 1,457 |
| Satellite and transmission | 1,919 | 185 | - | 2,104 |
| Sales and marketing | 5,198 | 264 | - | 5,462 |
| Engineering, design and development | 3,222 | 334 | - | 3,556 |
| General and administrative | 16,847 | 561 | - | 17,408 |
| Total share-based payment expense | $ 33,083 | $ 1,804 | $ - | $ 34,887 |

## About Sirius XM Radio

Sirius XM Radio is America's satellite radio company.  SiriusXM broadcasts more than 135 satellite radio channels of commercial-free music, and premier sports, news, talk, entertainment, traffic, weather, and data services to over 21 million subscribers. SiriusXM offers an array of content from many of the biggest names in entertainment, as well as from professional sports leagues, major colleges, and national news and talk providers.

SiriusXM programming is available on more than 800 devices, including pre-installed and after-market radios in cars, trucks, boats and aircraft, smartphones and mobile devices, and consumer electronics products for homes and offices. SiriusXM programming is also available at siriusxm.com, and on Apple, BlackBerry and Android-powered mobile devices.

SiriusXM has arrangements with every major automaker and its radio products are available for sale at shop.siriusxm.com as well as retail locations nationwide.

*This communication contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements include, but are not limited to, statements about future financial and operating results, our plans, objectives, expectations and intentions with respect to future operations, products and services; and other statements identified by words such as "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "intend," "plan," "projection," "outlook" or words of similar meaning.  Such forward-looking statements are based upon the current beliefs and expectations of our management and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are difficult to predict and generally beyond our control.  Actual results may differ materially from the results anticipated in these forward-looking statements.*

*The following factors, among others, could cause actual results to differ materially from the anticipated results or other expectations expressed in the forward-looking statement:  our competitive position versus other forms of audio and video entertainment; our ability to retain subscribers and maintain our average monthly revenue per subscriber;  our dependence upon automakers and other third parties; the first quarter tragedy in Japan, which may have certain adverse effects on automakers, radio manufacturers and other third parties; our substantial indebtedness; and the useful life of our satellites, which, in most cases, are not insured.  Additional factors that could cause our results to differ materially from those described in the forward-looking statements can be found in our Annual Report on Form 10-K for the year ended December 31, 2010, which is filed with the Securities and Exchange Commission (the "SEC") and available at the SEC's Internet site (http://www.sec.gov).  The information set forth herein speaks only as of the date hereof, and we disclaim any intention or obligation to update any forward looking statements as a result of developments occurring after the date of this communication.*

Follow SiriusXM on Twitter or  like the SiriusXM page on Facebook.

**E - SIRI**

Contact Information for Investors and Financial Media:

Investors:

Hooper Stevens
212 901 6718
hooper.stevens@siriusxm.com

Media:

Patrick Reilly
212 901 6646
patrick.reilly@siriusxm.com

SOURCE Sirius XM Radio

News Provided by Acquire Media

# EXHIBIT 5



# RUST
CONSULTING

# Statement

625 MARQUETTE AVENUE, SUITE 880
MINNEAPOLIS, MN 55402
P 612.359.2000  |  F 612.359.2050
WWW.RUSTCONSULTING.COM
FEDERAL ID #: 41-1813634

DATE:          07/28/11
MATTER #:        290100

TO: Patrick L. Donnelly
Sirius XM Radio Inc.
1221 Avenue of the Americas, 36th Floor
New York, NY 10020

TO: Brian K. Grube
Jones Day
North Point--901 Lakeside Ave.
Cleveland, OH 44114-1190
bkgrube@jonesday.com

## PROJECT
*Carl Blessing, et al. v. Sirius XM Radio Inc.*

Invoicing History

| Invoice Date | Invoice # | Amount | Payments | Balance |
|---|---|---|---|---|
| 05/11/11 | 11-1418 | 557,040.00 | (557,040.00) | - |
| 05/11/11 | 4351 | 101,954.49 | (101,954.49) | - |
| 05/17/11 | 11-1419 | 97,617.00 | (97,617.00) | - |
| 06/07/11 | 11-1511 | 712,975.40 | (712,975.40) | - |
| 06/28/11 | 11-1628 | 95,548.87 | - | 95,548.87 |
| 07/15/11 | 11-1711 | 251,481.21 | - | 251,481.21 |

Total Invoiced            $ 1,816,616.97

Total Payments                    $ (1,469,586.89)

Balance Due                          $  347,030.08

**WIRE INFORMATION**
ACCOUNT #: 8093434387
ABA/ROUTING # WIRE or ACH: 111014325
BANK: BANK OF TEXAS, DALLAS, TX 75225
BANK CONTACT: MAYRA LANDEROS  214.987.8817
REFERENCE: INVOICE NUMBER

**PAYMENT TERMS: NET DUE UPON RECEIPT**

# EXHIBIT 6



# FELGOISE LAW FIRM

The Pavilion - Suite 518
261 Old York Road - PO Box 706
Jenkintown, PA 19046
(215) 886-1900

Brian M. Felgoise
James W. Wilson
Jeffrey M. Izes

Members of Pennsylvania
and New Jersey Bars

July 14, 2011

Satellite Radio Exclusions
P.O. Box 2486
Faribault, MN 55021-9186

*Re:*        *Blessing v. Sirius XM Radio, Inc. (SDNY No. 1:09-cv-10035-HB)*

*Our Client:*   *Jeffrey Goe*

Dear Sir or Madam:

Kindly allow this letter to serve as confirmation that this office represents the interests of Jeffrey Goe, who desires to be excluded from Blessing v. Sirius XM Radio, Inc. lawsuit. **Accordingly, please allow this correspondence to serve as notification that Mr. Goe is opting out of that settlement.**

He is the plaintiff in the derivative lawsuit filed against Joan L. Amble, Leon D. Black, Eddy W. Harenstein, James P. Holden, Mel Karmazin, Jack Shaw, Gregory B. Maffei, John C. Malone, David J.A. Flowers, Vanessa A. Wittman, and Carl E. Vogel (SDNY No. 1:11-cv-3506).

Mr. Goe resides at the following address: 11 North Stone Hedge Road, Bedminster, NJ 07921.

Please direct all communication regarding this matter to the undersigned.

Thank you for your attention to this matter.

Sincerely,

Brian M. Felgoise

cc: Jeffrey Goe (via email)
    Todd Geremia (via email)
    Bruce Angiolillo (via email)
    James Sabella (via email)

BMF/gtb

# EXHIBIT 7

1

13adblem
MOTION

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  CARL BLESSING, on behalf of
   himself and all others
4  similarly situated,,

5              Plaintiffs,              New York, N.Y.

6       v.                             09 Civ. 10035 (HB)

7  SIRIUS XM RADIO INC.,

8              Defendants.

9  ------------------------------x

10                                     March 10, 2011
                                       10:09 a.m.
11
   Before:
12
                     HON. HAROLD BAER, JR.,
13
                                       District Judge
14
                     APPEARANCES
15

16 MILBERG LLP
        Attorneys for Plaintiffs
17 BY:  PAUL NOVAK
        NICOLE DUCKETT
18
   GRANT & EISENHOFER
19      Attorneys for Plaintiffs
   BY:  JAMES SABELLA
20
   JONES DAY
21      Attorneys for Defendant
   BY:  THOMAS DEMITRACK
22      JOHN M. MAJORAS
        TODD R. GEREMIA
23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13adblem
MOTION

1   I'm glad to hear the defendant.

2       Let me explain my problem, or one of them.

3       We had an argument, which was helpful to me not only

4   on the class cert. but really in connection with this motion,

5   too.  I'm still a little unclear -- and maybe you all told me

6   once so maybe you'll tell me again and maybe I'll get it:  The

7   injunctive relief concept seems to me to not really mean very

8   much.  I mean, I don't quite understand -- whether it is

9   certified or not, it seems to me that at this juncture it is

10  somewhat moot because the lead plaintiffs, without the class,

11  if they're entitled, then all of the benefits that they are

12  entitled to will devolve onto the class members.

13      So unless I have that wrong, and I don't want to take

14  you out of turn too much, but maybe you would just spend a

15  moment, before you get into the balance of your argument,

16  telling me where you come out on the injunctive relief aspect

17  of this motion and then wander on into wherever you think I

18  would find interest.

19      But it is the defendant's motion so I'll be glad to

20  hear from the defendant first.

21      MR. DEMITRACK:  Good morning, your Honor.

22      THE COURT:  Good morning.

23      MR. DEMITRACK:  My name is Tom Demitrack and I will be

24  addressing all of the issues on summary judgment for SiriusXM,

25  just as I addressed the issues on class certification.

13adblem
MOTION

1          To answer quickly the Court's question about the

2    injunctive relief, your Honor is correct if there was a single

3    plaintiff, you don't need a class in order to have an

4    injunction.   If that is your Honor's question?

5          THE COURT:   That does seem to be true, but I couldn't

6    tell from your papers.   I don't mean to say that in the

7    pejorative.

8          MR. DEMITRACK:   As your Honor knows -- and we'll get

9    to that a little later -- we do not believe that injunctive

10   relief, particularly divestiture, is appropriate here because

11   of the concessions that each one of the named plaintiffs that

12   we deposed made.   But let me leave that to until when we get to

13   that portion of the argument.

14         This case, your Honor, principally is about the music

15   royalty fee.

16         THE COURT:   One second.

17         If the Japanese judges want to sit here in the jury

18   box because they will hear better, you are welcome to come up

19   and sit here.   Everybody will agree that you are not a jury

20         A SPECTATOR:   Thank you.

21         (Pause)

22         MR. DEMITRACK:   As I indicated, this case is

23   principally about the music royalty fee.   This is a fee that

24   SiriusXM disclosed in subscribers' bills, explained in a series

25   of frequently asked questions on its Web site, and described

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# EXHIBIT 8



# EDWARD F. SIEGEL
## ATTORNEY AT LAW

# Practice Areas

- Class Action Objections

- Business and Real Estate Transactions

- Kenmore Group Asset Protection

Edward F. Siegel
27600 Chagrin Blvd Ste 340
Cleveland, Ohio 44122

Office: 216-831-3424
Fax: 216-831-6584
email: efsiegel@efs-law.com

# EXHIBIT 9

SUBSCRIBE TO THE E-NEWSLETTER: [enter your email addres] [subscribe]

LOG IN   REGISTER   CONTACT



Cleveland Scene



Twilight at the ZOO PRESENTED BY SCENE ✦ AUGUST 5th ✦CLEVELANDZOOSOCIETY.ORG Twilight at the ZOO PRESENTED BY SCENE

NEWS » NEWS FEATURES                                                                                                              June 04, 2008

## Edward Siegel is on a quest to either stop exorbitant lawyer payouts — or score some easy money

by Rebecca Meiser



FRANK MILLER
· A New Jersey judge once called Edward Siegel's objections "wasteful litigation."

Frankie Hamilton vs. The Ohio Savings Association was one of the longest-running cases in state history.

In the early 1980s, Francine Hamilton discovered that the bank was overcalculating the interest on her mortgage — and was doing the same to hundreds of others. Though individual customers took a barely noticeable nick, it amounted to a lucrative skim for the bank when spread across its mortgage portfolio.

Hamilton filed suit in 1985. But navigating the morass of the state judicial system would take 22 years before Ohio Savings finally settled for $14 million in 2007.

For her lawyer, Steven Weiss, the long-awaited victory was short-lived. Only a few weeks later, Beachwood lawyer Edward Siegel filed a motion to block the payout. The settlement, he noted, would pay Weiss more than $5 million, while customers only got $60,000 apiece.

In Siegel's eyes, it was a classic case of legal plundering.

He's what's known as a professional objector. They're lawyers who make their money challenging settlements in class-action suits. Their role, ostensibly, is to make sure lawyers aren't screwing their clients with agreements that charge exorbitant legal fees. After all, class-action suits are ripe for rip-offs.

Once a case is settled, competing lawyers suddenly have a mutual interest: They just want it over with. But defense attorneys don't care how the money is distributed. Their concern is the final total — and not getting sued again.

That chumminess allows plaintiffs' lawyers to get creative, sometimes writing in their own fees worth 40 to 50 percent of the total payout. That money, naturally, comes directly from their clients' pockets.

So people like Siegel sweep in, essentially to protect plaintiffs from their own lawyers, serving as the salt that repels the leeches from their skin.

"In theory, the system works," says Theodore Eisenberg, a law professor at Cornell. "In practice, no, it doesn't."

To the rest of the bar, objectors aren't Robin Hoods. They'd be more inclined to use the term "shakedown artists." Objectors jump into cases long after settlements are agreed upon, they say, only to raise last-minute issues in hopes of generating easy fees of their own.

When an objection is filed, the payout is inevitably delayed. And unless a deal is worked out, the case is once again thrown into the court system, where it can languish for years. So a large percentage of lawyers opt for the pain-free solution: Kick the objector some side money, so he — and his objections — goes away.

"The larger the settlement, the more cost-effective it is to pay the objectors, rather than suffer the delay of waiting for an appeal to be resolved," explains U.S. District Judge Nancy Gertner. "Because of these economic realities, professional objectors can levy what is effectively a tax on class-action settlements — a tax which has no benefit to anyone other than the objectors."

Which leaves Edward Siegel, one of the nation's most prolific serial objectors, not exactly popular among members of the bar.

He entered the field four years ago, when his sister received notice saying she was eligible for a settlement. In 2003, FirstEnergy shareholders sued the company, claiming illicit deeds ranging from misleading disclosures to illegal accounting. A separate suit accused officers and directors of negligent management. The company settled.

But the notice Siegel's sister received could have been written in Togolese. She asked her brother to explain. In most cases, says Siegel, those who receive such notices merely throw them away.

The two cases had two sets of lawyers, and they were to receive two separate payouts totaling $26.25 million. Siegel believed they were gouging their clients and objected on his sister's behalf.

Case 1:09-cv-10035-HB-RLE Document 150-1 Filed 08/03/11 Page 58 of 111

Rather than risk further fighting, the lawyers agreed to reduce their fees by 3 percent — resulting in a few extra million for shareholders. The Beachwood lawyer didn't receive payment for his work, but he did find his calling. Even if objectors are mostly unsuccessful, it can still amount to a "nice side source of income," says Siegel.

Last year, wireless insurance company Asurion settled a case in which it was accused of demanding unreasonable deductibles and providing shoddy service. Siegel objected, contending the payout was cheap and lawyers were siphoning too much. He then asked for $24,615 for his own work on the case.

The judge wasn't exactly impressed, calling that work "generic." But Siegel was nonetheless granted $4,742 from the settlement pot.

He estimates that 30 percent of his practice comes from objecting, and he revels in his outsider status. "Lots of people don't like me because of what I do," he says. "I see it as a badge of honor."

In Siegel's eyes, class-action lawyers are the true snake charmers. "I'm the one standing up for the little guy," he says. "I've had judges thank me for bringing things to their attention."

One of Siegel's proudest moments involves a Qwest case in Denver. Lawyers accused the telecommunications giant of intentionally inflating share prices. Qwest agreed to settle for $400 million. But attorneys were scheduled to take a $98 million cut. Siegel and other objectors argued that the fee was too high. The court agreed, slashing it to $60 million.

"That meant an extra $38 million went to the class," Siegel says. "I'm quite proud of that outcome. I believe I added to the case."

The judge, however, didn't see it that way. He refused to award Siegel any fees for his work.

In the past two years, he's had a less-than-stellar success rate. A judge in an AT&T suit in New Jersey called his objection "wasteful litigation." In a Texas case against Allstate, his work was deemed "another attempt by objectors counsel to dip into the attorneys' fee trough."

Moreover, his objections in two recent cases contain eerily similar arguments, as if he simply cut and pasted his case together without bothering to change the language.

In the Ohio Savings case, lawyer Weiss viewed Siegel's interference as "frivolous" and asked the court to impose economic sanctions. Siegel withdrew his objection, and the penalty was dropped.

After 22 years in court, Ohio Savings customers will soon receive payment for the bank's deception. But Edward Siegel has already moved on, searching for new shysters among his fellow barristers.

Like

News Features archives »

# EXHIBIT 10

Home >
# About

Ted Frank is the president of the Center for Class Action Fairness, which he founded in 2009, and an adjunct fellow at the Manhattan Institute. The *Wall Street Journal* calls him a "leading tort-reform advocate." Previously, Mr. Frank clerked for the Honorable Frank H. Easterbrook on the Seventh Circuit Court of Appeals, was a litigator for ten years, served as the first director of the AEI Legal Center for the Public Interest, and was an attorney on the McCain-Palin 2008 campaign. Mr. Frank has written for law reviews, the *Wall Street Journal*, the *Washington Post*, and *The American Spectator* and has testified before Congress multiple times on legal issues. He writes for the award-winning legal blogs PointOfLaw.com (where he became editor-in-chief in 2010) and Overlawyered. In 2008, Mr. Frank was elected to membership in the American Law Institute. He also serves on the Executive Committee of the Federalist Society Litigation Practice Group. Mr. Frank graduated the University of Chicago Law School with high honors and as a member of the Order of the Coif and the Law Review.

Sign in   Recent Site Activity   Terms   Report Abuse   Print page   |  Powered by Google Sites

# EXHIBIT 11

Form **990**

OMB No. 1545-0047

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code
(except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements

**2009**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**For the 2009 calendar year, or tax year beginning** _____ , 2009, and ending _____

| B Check if applicable | | C Name of organization | | | | | D Employer Identification Number |
|---|---|---|---|---|---|---|---|
| ☐ Address change | Please use IRS label or print or type. See specific Instructions. | **Donors Trust, Inc.** | | | | | 52-2166327 |
| ☐ Name change | | Number and street (or P O box if mail is not delivered to street addr) | | Room/suite | | | E Telephone number |
| ☐ Initial return | | **109 North Henry Street** | | | | | (703) 535-3563 |
| ☐ Termination | | City, town or country | | State | ZIP code + 4 | | |
| ☐ Amended return | | **Alexandria** | | **VA** | **22314-2903** | | G Gross receipts $ 19,860,148. |
| ☐ Application pending | F Name and address of principal officer | | | | | | |
| | **Whitney L. Ball 109 North Henry Street Alexndria VA 22314** | | | | | H(a) Is this a group return for affiliates? ☐ Yes ☒ No | |

H(b) Are all affiliates included? ☐ Yes ☐ No
If 'No,' attach a list (see instructions)

| I | Tax-exempt status | ☒ 501(c) ( 3 ) ◄ (insert no ) | ☐ 4947(a)(1) or | ☐ 527 | |
|---|---|---|---|---|---|
| J | Website: ► | **www.donorstrust.org** | | | H(c) Group exemption number ► |
| K | Form of organization | ☒ Corporation ☐ Trust ☐ Association ☐ Other ► | | L Year of Formation **1999** | M State of legal domicile **VA** |

### Part I  Summary

**Activities & Governance**

| | | | |
|---|---|---|---|
| 1 | Briefly describe the organization's mission or most significant activities **SUPPORT CHARITIES & SPONSOR PROGRAMS WHICH ALLEVIATE, THROUGH EDUCATION, RESEARCH & PRIVATE INITIATIVES, SOCIETY'S MOST PERVASIVE AND RADICAL NEEDS, INCLUDING THOSE RELATING TO SOCIAL WELFARE, HEALTH, ENVIRONMENT, ECONOMICS, GOVERNANCE, FOREIGN RELATIONS AND ARTS AND CULTURE.** | | |
| 2 | Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its assets | | |
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 5 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 5 |
| 5 | Total number of employees (Part V, line 2a) | 5 | 4 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 0 |
| 7a | Total gross unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0. |
| b | Net unrelated business taxable income from Form 990-T, line 34 | 7b | |

| | | Prior Year | Current Year |
|---|---|---|---|
| **Revenue** | | | |
| 8 | Contributions and grants (Part VIII, line 1h) | 10,634,041. | 16,778,729. |
| 9 | Program service revenue (Part VIII, line 2g) | 552,242. | 620,820. |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | -160,925. | 25,330. |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 778. | 4,220. |
| 12 | Total revenue — add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 11,026,136. | 17,429,099. |
| **Expenses** | | | |
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | 9,427,072. | 12,641,403. |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | | |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 398,184. | 442,174. |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | | |
| b | Total fundraising expenses (Part IX, column (D), line 25) ► _____ 231,847. | | |
| 17 | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24f) | 1,435,745. | 1,400,796. |
| 18 | Total expenses Add lines 13-17 (must equal Part IX, column (A), line 25) | 11,251,001. | 14,484,373. |
| 19 | Revenue less expenses Subtract line 18 from line 12 | -224,865. | 2,944,726. |

| **Net Assets & Fund Balances** | | Beginning of Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 10,550,875. | 13,798,855. |
| 21 | Total liabilities (Part X, line 26) | 14,035. | 17,864. |
| 22 | Net assets or fund balances Subtract line 21 from line 20 | 10,536,840. | 13,780,991. |

RECEIVED
AUG 17 2010
OGDEN UT

### Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

► [signature]    08/13/10

Signature of officer    Date

► **Whitney L. Ball   President & CEO**

Type or print name and title

**Paid Preparer's Use Only**

| Preparer's signature | ► | | Date | Check if self-employed ☐ | Preparer's identifying number (see instructions) |
|---|---|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP + 4 | ► | | | | |

May the IRS discuss this return with the preparer shown above? (see instructions)

**BAA  For Privacy Act and Paperwork Reduction Act Notice, see the sep...**

Form 990 (2009)   Donors Trust, Inc:                           52-2166327          Page 2

| Part III | Statement of Program Service Accomplishments |
|---|---|

1  Briefly describe the organization's mission

SUPPORT CHARITIES WHICH ALLEVIATE, THROUGH EDUCATION, RESEARCH AND PRIVATE _____
INITIATIVES, SOCIETY'S MOST PERVASIVE AND RADICAL NEEDS, INCLUDING THOSE _____
See Form 990, Page 2, Part III, Line 1 (continued) _____

2  Did the organization undertake any significant program services during the year which were not listed on the prior
Form 990 or 990-EZ?                                                                    [X] Yes  [ ] No
If 'Yes,' describe these new services on Schedule O

3  Did the organization cease conducting, or make significant changes in how it conducts, any program services?   [X] Yes  [ ] No
If 'Yes,' describe these changes on Schedule O

4  Describe the exempt purpose achievements for each of the organization's three largest program services by expenses  Section 501(c)(3)
and 501(c)(4) organizations and section 4947(a)(1) trusts are required to report the amount of grants and allocations to others, the total
expenses, and revenue, if any, for each program service reported

4a (Code _____ ) (Expenses  $  13,117,707. including grants of  $  12,636,917. ) (Revenue  $  15,418,786. )
DAF PROGRAM - A DONOR ADVISED FUND (DAF) PROGRAM ALLOWING DAF CONTRIBUTORS TO _____
ADVISE GRANTS THAT SUPPORT CHARITIES WHICH ALLEVIATE, THROUGH EDUCATION, _____
RESEARCH AND PRIVATE INITIATIVES, SOCIETY'S MOST PERVASIVE AND RADICAL NEEDS, _____
INCLUDING THOSE RELATING TO SOCIAL WELFARE, HEALTH, ENVIRONMENT, ECONOMICS, _____
GOVERNANCE, FOREIGN RELATIONS AND ARTS AND CULTURE; AND WHICH ENCOURAGE _____
PHILANTHROPY AND INDIVIDUAL GIVING AND RESPONSIBILITY AS AN ANSWER TO _____
SOCIETY'S NEEDS, AS OPPOSED TO GOVERNMENTAL INVOLVEMENT. _____

4b (Code _____ ) (Expenses  $  193,795. including grants of  $  0. ) (Revenue  $  176,293. )
NEW PHILANTHROPY STUDIES (NPS). THE PROJECT FOR NEW PHILANTHROPY STUDIES IS A _____
PROGRAM THAT ENGAGES AND ENCOURAGES SCHOLARS AND PRACTITIONERS SEEKING TO _____
BETTER UNDERSTAND THE ROLE OF VOLUNTARY ACTION AND PHILANTHROPY IN _____
ACHIEVING SOCIAL COOPERATION AND DISTRIBUTION OF PRIVATE AND PUBLIC GOODS. _____

4c (Code _____ ) (Expenses  $  522,417. including grants of  $  1,800. ) (Revenue  $  322,000. )
CENTER FOR COLLEGE AFFORDABILITY AND PRODUCTIVITY (CCAP). _____
THE CENTER FOR COLLEGE AFFORDABILITY AND PRODUCTIVITY IS A PROGRAM DESIGNED _____
TO RESEARCH AND STUDY THE ECONOMICS OF HIGHER EDUCATION, IN PARTICULAR, ISSUES _____
OF PRODUCTIVITY, EFFICIENCY, ACCOUNTABILITY, AND TRANSPARENCY. _____

4d Other program services. (Describe in Schedule O )
(Expenses  $  349,120. including grants of  $  2,685. ) (Revenue  $  650,000. )

4e Total program service expenses  ▶  14,183,039.

Form 990 (2009)   Donors Trust, Inc.                                    52-2166327          Page 3

| Part IV | Checklist of Required Schedules | | | |
|---|---|---|---|---|
| | | | Yes | No |
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If 'Yes,' complete Schedule A* | 1 | X | |
| 2 | Is the organization required to complete Schedule B, Schedule of Contributors? | 2 | X | |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If 'Yes,' complete Schedule C, Part I* | 3 | | X |
| 4 | **Section 501(c)(3) organizations** Did the organization engage in lobbying activities? *If 'Yes,' complete Schedule C, Part II* | 4 | | X |
| 5 | **Section 501(c)(4), 501(c)(5), and 501(c)(6) organizations.** Is the organization subject to the section 6033(e) notice and reporting requirement and proxy tax? *If 'Yes,' complete Schedule C, Part III* | 5 | | |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts where donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If 'Yes,' complete Schedule D, Part I* | 6 | X | |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas or historic structures? *If 'Yes,' complete Schedule D, Part II* | 7 | | X |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If 'Yes,' complete Schedule D, Part III* | 8 | | X |
| 9 | Did the organization report an amount in Part X, line 21; serve as a custodian for amounts not listed in Part X, or provide credit counseling, debt management, credit repair, or debt negotiation services? *If 'Yes,' complete Schedule D, Part IV* | 9 | | X |
| 10 | Did the organization, directly or through a related organization, hold assets in term, permanent, or quasi-endowments? *If 'Yes,' complete Schedule D, Part V* | 10 | X | |
| 11 | Is the organization's answer to any of the following questions 'Yes'? *If so, complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable* | 11 | X | |
| | • Did the organization report an amount for land, buildings and equipment in Part X, line 10? *If 'Yes,' complete Schedule D, Part VI* | | | |
| | • Did the organization report an amount for investments— other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If 'Yes,' complete Schedule D, Part VII* | | | |
| | • Did the organization report an amount for investments— program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If 'Yes,' complete Schedule D, Part VIII* | | | |
| | • Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If 'Yes,' complete Schedule D, Part IX* | | | |
| | • Did the organization report an amount for other liabilities in Part X, line 25? *If 'Yes,' complete Schedule D, Part X* | | | |
| | • Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48? *If 'Yes,' complete Schedule D, Part X* | | | |
| 12 | Did the organization obtain separate, independent audited financial statement for the tax year? *If 'Yes,' complete Schedule D, Parts XI, XII, and XIII* | 12 | X | |

| 12A | Was the organization included in consolidated, independent audited financial statement for the tax year? *If 'Yes,' completing Schedule D, Parts XI, XII, and XIII is optional* | Yes | No | |
|---|---|---|---|---|
| | | 12 A | | X |

| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If 'Yes,' complete Schedule E* | 13 | | X |
|---|---|---|---|---|
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? | 14a | | X |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, and program service activities outside the United States? *If 'Yes,' complete Schedule F, Part I* | 14b | | X |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or assistance to any organization or entity located outside the United States? *If 'Yes,' complete Schedule F, Part II* | 15 | | X |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or assistance to individuals located outside the United States? *If 'Yes,' complete Schedule F, Part III* | 16 | | X |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If 'Yes,' complete Schedule G, Part I* | 17 | | X |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If 'Yes,' complete Schedule G, Part II* | 18 | | X |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If 'Yes,' complete Schedule G, Part III* | 19 | | X |
| 20 | Did the organization operate one or more hospitals? *If 'Yes,' complete Schedule H* | 20 | | X |

BAA                              TEEA0103   02/12/10                           Form 990 (2009)

Form 990 (2009)   Donors Trust, Inc.                                52-2166327            Page 4

**Part IV** Checklist of Required Schedules  *(continued)*

| | | Yes | No |
|---|---|:---:|:---:|
| 21 | Did the organization report more than $5,000 of grants and other assistance to governments and organizations in the United States on Part IX, column (A), line 1? *If 'Yes,' complete Schedule I, Parts I and II* ...... **21** | X | |
| 22 | Did the organization report more than $5,000 of grants and other assistance to individuals in the United States on Part IX, column (A), line 2? *If 'Yes,' complete Schedule I, Parts I and III* ...... **22** | | X |
| 23 | Did the organization answer 'Yes' to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If 'Yes,' complete Schedule J* ...... **23** | X | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, and that was issued after December 31, 2002? *If 'Yes,' answer lines 24b through 24d and complete Schedule K. If 'No,' go to line 25* ...... **24a** | | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? ...... **24b** | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? ...... **24c** | | |
| d | Did the organization act as an 'on behalf of' issuer for bonds outstanding at any time during the year? ...... **24d** | | |
| 25a | **Section 501(c)(3) and 501(c)(4) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If 'Yes,' complete Schedule L, Part I* ...... **25a** | | X |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If 'Yes,' complete Schedule L, Part I* ...... **25b** | | X |
| 26 | Was a loan to or by a current or former officer, director, trustee, key employee, highly compensated employee, or disqualified person outstanding as of the end of the organization's tax year? *If 'Yes,' complete Schedule L, Part II* ...... **26** | | X |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor, or a grant selection committee member, or to a person related to such an individual? *If 'Yes,' complete Schedule L, Part III* ...... **27** | | X |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | |
| a | A current or former officer, director, trustee, or key employee? *If 'Yes,' complete Schedule L, Part IV* ...... **28a** | X | |
| b | A family member of a current or former officer, director, trustee, or key employee? *If 'Yes,' complete Schedule L, Part IV* ...... **28b** | | X |
| c | An entity of which a current or former officer, director, trustee, or key employee of the organization (or a family member) was an officer, director, trustee, or direct or indirect owner? *If 'Yes,' complete Schedule L, Part IV* ...... **28c** | | X |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If 'Yes,' complete Schedule M* ...... **29** | X | |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If 'Yes,' complete Schedule M* ...... **30** | | X |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If 'Yes,' complete Schedule N, Part I* ...... **31** | | X |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If 'Yes,' complete Schedule N, Part II* ...... **32** | X | |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If 'Yes,' complete Schedule R, Part I* ...... **33** | X | |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If 'Yes,' complete Schedule R, Parts II, III, IV, and V, line 1* ...... **34** | X | |
| 35 | Is any related organization a controlled entity within the meaning of section 512(b)(13)? *If 'Yes,' complete Schedule R, Part V, line 2* ...... **35** | | X |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If 'Yes,' complete Schedule R, Part V, line 2* ...... **36** | | X |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If 'Yes,' complete Schedule R, Part VI* ...... **37** | | X |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11 and 19? **Note.** All Form 990 filers are required to complete Schedule O ...... **38** | X | |

BAA                                                                          Form 990 (2009)

Form 990 (2009)   Donors Trust, Inc.                                     52-2166327          Page 5

| Part V | Statements Regarding Other IRS Filings and Tax Compliance | | | Yes | No |
|---|---|---|---|---|---|

|  |  |  |  | Yes | No |
|---|---|---|---|---|---|
| 1a Enter the number reported in Box 3 of form 1096, Annual Summary and Transmittal of U S Information Returns  Enter -0- if not applicable | **1a** | 69 |  |  |  |
| b Enter the number of Forms W-2G included in line 1a  Enter -0- if not applicable | **1b** | 0 |  |  |  |
| c Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? |  |  | **1c** | X |  |
| 2a Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | **2a** | 4 |  |  |  |
| 2b If at least one is reported on line 2a, did the organization file all required federal employment tax returns? |  |  | **2b** | X |  |
| **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file this return  (see instructions) |  |  |  |  |  |
| 3a Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? |  |  | **3a** |  | X |
| b If 'Yes' has it filed a Form 990-T for this year? If 'No,' provide an explanation in Schedule O |  |  | **3b** |  |  |
| 4a At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? |  |  | **4a** |  | X |
| b If 'Yes,' enter the name of the foreign country   ▶ |  |  |  |  |  |
| See the instructions for exceptions and filing requirements for Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts |  |  |  |  |  |
| 5a Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? |  |  | **5a** |  | X |
| b Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? |  |  | **5b** |  | X |
| c If 'Yes,' to line 5a or 5b, did the organization file Form 8886-T, Disclosure by Tax-Exempt Entity Regarding Prohibited Tax Shelter Transaction? |  |  | **5c** |  |  |
| 6a Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible? |  |  | **6a** |  | X |
| b If 'Yes,' did the organization include with every solicitation an express statement that such contributions or gifts were not deductible? |  |  | **6b** |  |  |
| 7  Organizations that may receive deductible contributions under section 170(c). |  |  |  |  |  |
| a Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? |  |  | **7a** |  | X |
| b If 'Yes,' did the organization notify the donor of the value of the goods or services provided? |  |  | **7b** |  |  |
| c Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? |  |  | **7c** |  | X |
| d If 'Yes,' indicate the number of Forms 8282 filed during the year | **7d** |  |  |  |  |
| e Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? |  |  | **7e** |  | X |
| f Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? |  |  | **7f** |  | X |
| g For all contributions of qualified intellectual property, did the organization file Form 8899 as required? |  |  | **7g** |  |  |
| h For contributions of cars, boats, airplanes, and other vehicles, did the organization file a Form 1098-C as required? |  |  | **7h** |  |  |
| 8  Sponsoring organizations maintaining donor advised funds and section 509(a)(3) supporting organizations. Did the supporting organization, or a donor advised fund maintained by a sponsoring organization, have excess business holdings at any time during the year? |  |  | **8** |  | X |
| 9  Sponsoring organizations maintaining donor advised funds. |  |  |  |  |  |
| a Did the organization make any taxable distributions under section 4966? |  |  | **9a** |  | X |
| b Did the organization make any distribution to a donor, donor advisor, or related person? |  |  | **9b** |  | X |
| 10  Section 501(c)(7) organizations. Enter |  |  |  |  |  |
| a Initiation fees and capital contributions included on Part VIII, line 12 | **10a** |  |  |  |  |
| b Gross Receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** |  |  |  |  |
| 11  Section 501(c)(12) organizations. Enter |  |  |  |  |  |
| a Gross income from other members or shareholders | **11a** |  |  |  |  |
| b Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them ) | **11b** |  |  |  |  |
| 12a Section 4947(a)(1) non-exempt charitable trusts. Is the organization filing Form 990 in lieu of Form 1041? |  |  | **12a** |  |  |
| b If 'Yes,' enter the amount of tax-exempt interest received or accrued during the year | **12b** |  |  |  |  |

BAA                                                                     Form 990 (2009)

Form 990 (2009) Donors Trust, Inc.       52-2166327      Page 6

## Part VI  Governance, Management and Disclosure For each 'Yes' response to lines 2 through 7b below, and for a 'No' response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.

### Section A.  Governing Body and Management

| | | Yes | No |
|---|---|---|---|
| 1a Enter the number of voting members of the governing body **1a** 5 | | | |
| b Enter the number of voting members that are independent **1b** 5 | | | |
| 2 Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee or key employee? | 2 | | X |
| 3 Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | 3 | X | |
| 4 Did the organization make any significant changes to its organizational documents since the prior Form 990 was filed? | 4 | | X |
| 5 Did the organization become aware during the year of a material diversion of the organization's assets? | 5 | | X |
| 6 Does the organization have members or stockholders? | 6 | | X |
| 7a Does the organization have members, stockholders, or other persons who may elect one or more members of the governing body? | 7a | | X |
| b Are any decisions of the governing body subject to approval by members, stockholders, or other persons? | 7b | | X |
| 8 Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following | | | |
| a The governing body? | 8a | X | |
| b Each committee with authority to act on behalf of the governing body? | 8b | X | |
| 9 Is there any officer, director or trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? If 'Yes,' provide the names and addresses in Schedule O | 9 | | X |

### Section B.  Policies  (This Section B requests information about policies not required by the Internal Revenue Code )

| | | Yes | No |
|---|---|---|---|
| 10a Does the organization have local chapters, branches, or affiliates? | 10a | | X |
| b If 'Yes,' does the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with those of the organization? | 10b | | |
| 11 Has the organization provided a copy of this Form 990 to all members of its governing body before filing the form? | 11 | | X |
| 11A Describe in Schedule O the process, if any, used by the organization to review this Form 990 | | | |
| 12a Does the organization have a written conflict of interest policy? If 'No,' go to line 13 | 12a | X | |
| b Are officers, directors or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | X | |
| c Does the organization regularly and consistently monitor and enforce compliance with the policy? If 'Yes,' describe in Schedule O how this is done | 12c | X | |
| 13 Does the organization have a written whistleblower policy? | 13 | X | |
| 14 Does the organization have a written document retention and destruction policy? | 14 | X | |
| 15 Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a The organization's CEO, Executive Director, or top management official | 15a | X | |
| b Other officers or key employees of the organization | 15b | X | |
| If 'Yes' to line 15a or 15b, describe the process in Schedule O (See instructions ) | | | |
| 16a Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | 16a | | X |
| b If 'Yes,' has the organization adopted a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and taken steps to safeguard the organization's exempt status with respect to such arrangements? | 16b | | |

### Section C.  Disclosures

17 List the states with which a copy of this Form 990 is required to be filed ► _____

18 Section 6104 requires an organization to make its Forms 1023 (or 1024 if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection Indicate how you make these available. Check all that apply

☐ Own website   ☐ Another's website   ☒ Upon request

19 Describe in Schedule O whether (and if so, how) the organization makes its governing documents, conflict of interest policy, and financial statements available to the public.

20 State the name, physical address, and telephone number of the person who possesses the books and records of the organization:

►Donors Trust _____ 109 N Henry St, ___ Alexandria, __ VA _ 22314-2903 ____ (703) 535-3563

BAA               TEEA0106  02/05/10                     Form 990 (2009)

Form 990 (2009)   Donors Trust, Inc.                                    52-2166327         Page 7

**Part VII** | **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

**Section A.   Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed  Report compensation for the calendar year ending with or within the organizations's tax year  Use Schedule J-2 if additional space is needed

• List all of the organization's current officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid

• List all of the organization's current key employees.  See instructions for definition of 'key employees'

• List the organization's five current highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations

• List all of the organization's former officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations

• List all of the organization's former directors or trustees that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

List persons in the following order  individual trustees or directors, institutional trustees, officers, key employees, highest compensated employees; and former such persons

☐ Check this box if the organization did not compensate any current officer, director, or trustee.

| (A)<br>Name and Title | (B)<br>Average<br>hours<br>per week | (C)<br>Position (check all that apply) | | | | | | (D)<br>Reportable<br>compensation from<br>the organization<br>(W-2/1099-MISC) | (E)<br>Reportable<br>compensation from<br>related organizations<br>(W-2/1099-MISC) | (F)<br>Estimated<br>amount of other<br>compensation<br>from the<br>organization<br>and related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| Whitney L Ball<br>President & CEO | 40.00 | | | X | | X | | 163,314. | 0. | 0. |
| Kimberly O Dennis<br>Chairman | 0.00 | X | | X | | | | 0. | 0. | 0. |
| James Piereson<br>Vice Chairman | 0.00 | X | | X | | | | 0. | 0. | 0. |
| Nathaniel C. Moffat<br>Sec-Treas. | 0.00 | X | | X | | | | 0. | 0. | 0. |
| William J. Hume<br>Director | 0.00 | X | | | | | | 0. | 0. | 0. |
| Melissa Cliett<br>Chief Operating Officer | 40.00 | | | X | | X | | 122,875. | 0. | 0. |
| ALL MAY BE REACHED<br>AT THE ORGANIZATION | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

BAA                                TEEA0107   11/10/09                           Form 990 (2009)

Form 990 (2009) Donors Trust, Inc.                                   52-2166327        Page 8

| Part VII | Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(cont.)* |

| (A)<br>Name and Title | (B)<br>Average<br>hours<br>per week | (C)<br>Position (check all that apply) | | | | | | (D)<br>Reportable<br>compensation from<br>the organization<br>(W-2/1099-MISC) | (E)<br>Reportable<br>compensation from<br>related organizations<br>(W-2/1099-MISC) | (F)<br>Estimated<br>amount of other<br>compensation<br>from the<br>organization<br>and related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| ---------------------------- | | | | | | | | | | |
| **1b Total** | | | | | | | ▶ | 286,189. | 0. | 0. |

2  Total number of individuals (including but not limited to those listed above) who received more than $100,000 in reportable compensation
   from the organization  ▶  2

| | | Yes | No |
|---|---|---|---|
| 3  Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If 'Yes,' complete Schedule J for such individual* | **3** | | X |
| 4  For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If 'Yes' complete Schedule J for such individual* | **4** | X | |
| 5  Did any person listed on line 1a receive or accrue compensation from any unrelated organization for services rendered to the organization? *If 'Yes,' complete Schedule J for such person* | **5** | | X |

**Section B. Independent Contractors**

1  Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization

| (A)<br>Name and business address | (B)<br>Description of Services | (C)<br>Compensation |
|---|---|---|
| Richard Vedder 7464 Ridgeview Circle Athens     OH   45701 | Research, writing, speaking, and administration | 150,000. |
| | | |
| | | |
| | | |

2  Total number of independent contractors (including but not limited to those listed above) who received more than
   $100,000 in compensation from the organization ▶  1

BAA                                          TEEA0108  01/30/10           Form 990 (2009)

Form 990 (2009)  Donors Trust, Inc.                                    52-2166327          Page 9

**Part VIII | Statement of Revenue**

| | | | (A)<br>Total revenue | (B)<br>Related or<br>exempt<br>function<br>revenue | (C)<br>Unrelated<br>business<br>revenue | (D)<br>Revenue<br>excluded from tax<br>under sections<br>512, 513, or 514 |
|---|---|---|---|---|---|---|
| **CONTRIBUTIONS, GIFTS, GRANTS AND OTHER SIMILAR AMOUNTS** | 1a Federated campaigns | 1a | | | | |
| | b Membership dues | 1b | | | | |
| | c Fundraising events | 1c | | | | |
| | d Related organizations | 1d | | | | |
| | e Government grants (contributions) | 1e | | | | |
| | f All other contributions, gifts, grants, and similar amounts not included above | 1f 16,778,729. | | | | |
| | g Noncash contribs included in lns 1a-1f. $ 2,037,340. | | | | | |
| | h **Total.** Add lines 1a-1f ▶ | | 16,778,729. | | | |
| **PROGRAM SERVICE REVENUE** | | Business Code | | | | |
| | 2a Administration services | 561000 | 620,820. | 620,820. | 0. | 0. |
| | b _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| | c _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| | d _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| | e _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| | f All other program service revenue | | | | | |
| | g **Total.** Add lines 2a-2f ▶ | | 620,820. | | | |
| **OTHER REVENUE** | 3 Investment income (including dividends, interest and other similar amounts) ▶ | | 66,109. | 0. | 0. | 66,109. |
| | 4 Income from investment of tax-exempt bond proceeds ▶ | | | | | |
| | 5 Royalties ▶ | | | | | |
| | | (i) Real | (ii) Personal | | | | |
| | 6a Gross Rents | 4,220. | | | | | |
| | b Less  rental expenses | | | | | | |
| | c Rental income or (loss) | 4,220. | | | | | |
| | d Net rental income or (loss) ▶ | | 4,220. | 0. | 0. | 4,220. |
| | | (i) Securities | (ii) Other | | | | |
| | 7a Gross amount from sales of assets other than inventory | 2,390,270. | | | | | |
| | b Less  cost or other basis and sales expenses | 2,431,049. | | | | | |
| | c Gain or (loss) | -40,779. | | | | | |
| | d Net gain or (loss) ▶ | | -40,779. | 0. | 0. | -40,779. |
| | 8a Gross income from fundraising events (not including  $ _____ of contributions reported on line 1c). See Part IV, line 18 a | | | | | |
| | b Less  direct expenses b | | | | | |
| | c Net income or (loss) from fundraising events ▶ | | | | | |
| | 9a Gross income from gaming activities See Part IV, line 19 a | | | | | |
| | b Less: direct expenses b | | | | | |
| | c Net income or (loss) from gaming activities ▶ | | | | | |
| | 10a Gross sales of inventory, less returns and allowances a | | | | | |
| | b Less  cost of goods sold b | | | | | |
| | c Net income or (loss) from sales of inventory ▶ | | | | | |
| | Miscellaneous Revenue | Business Code | | | | |
| | 11a _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| | b _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| | c _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| | d All other revenue | | | | | |
| | e **Total.** Add lines 11a-11d ▶ | | | | | |
| | 12 **Total revenue.** See instructions ▶ | | 17,429,099. | 620,820. | 0. | 29,550. |

BAA                                    TEEA0109   02/12/10                         Form 990 (2009)

Form 990 (2009)   Donors Trust, Inc.                                    52-2166327          Page 10

| Part IX | Statement of Functional Expenses |
|---------|-------------------------------|

**Section 501(c)(3) and 501(c)(4) organizations must complete all columns.**
**All other organizations must complete column (A) but are not required to complete columns (B), (C), and (D).**

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| 1 Grants and other assistance to governments and organizations in the U S See Part IV, line 21 | 12,641,403. | 12,641,403. | | |
| 2 Grants and other assistance to individuals in the U S See Part IV, line 22 | | | | |
| 3 Grants and other assistance to governments, organizations, and individuals outside the U.S. See Part IV, lines 15 and 16 | | | | |
| 4 Benefits paid to or for members | | | | |
| 5 Compensation of current officers, directors, trustees, and key employees | 301,939. | 178,354. | 21,241. | 102,344. |
| 6 Compensation not included above, to disqualified persons (as defined under section 4958(f)(1) and persons described in section 4958(c)(3)(B) | | | | |
| 7 Other salaries and wages | 140,235. | 114,889. | 6,713. | 18,633. |
| 8 Pension plan contributions (include section 401(k) and section 403(b) employer contributions) | | | | |
| 9 Other employee benefits | | | | |
| 10 Payroll taxes | | | | |
| 11 Fees for services (non-employees) | | | | |
| a Management | | | | |
| b Legal | 104,912. | 101,629. | 1,149. | 2,134. |
| c Accounting | 106,261. | 79,695. | 21,218. | 5,348. |
| d Lobbying | | | | |
| e Prof fundraising svcs See Part IV, ln 17 | | | | |
| f Investment management fees | 13,789. | 13,441. | 261. | 87. |
| g Other | 894,247. | 867,301. | 3,008. | 23,938. |
| 12 Advertising and promotion | 49,866. | 1,941. | 0. | 47,925. |
| 13 Office expenses | 14,567. | 11,693. | 1,006. | 1,868. |
| 14 Information technology | 4,102. | 4,091. | 4. | 7. |
| 15 Royalties | | | | |
| 16 Occupancy | 53,851. | 40,471. | 4,683. | 8,697. |
| 17 Travel | 90,323. | 78,276. | 0. | 12,047. |
| 18 Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| 19 Conferences, conventions, and meetings | | | | |
| 20 Interest | | | | |
| 21 Payments to affiliates | | | | |
| 22 Depreciation, depletion, and amortization | 5,954. | 4,820. | 397. | 737. |
| 23 Insurance | 3,200. | 2,400. | 280. | 520. |
| 24 Other expenses Itemize expenses not covered above (Expenses grouped together and labeled miscellaneous may not exceed 5% of total expenses shown on line 25 below ) | | | | |
| a Printing & production | 14,485. | 12,885. | 560. | 1,040. |
| b Postage & delivery | 9,497. | 7,966. | 536. | 995. |
| c Telephone | 7,526. | 5,934. | 557. | 1,035. |
| d Utilities | 5,159. | 3,897. | 442. | 820. |
| e Dues, memberships & subs | 7,853. | 4,121. | 60. | 3,672. |
| f All other expenses | 15,204. | 7,832. | 7,372. | 0. |
| 25 Total functional expenses. Add lines 1 through 24f | 14,484,373. | 14,183,039. | 69,487. | 231,847. |
| 26 Joint costs. Check here ▶ ☐ if following SOP 98-2 Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation | | | | |

BAA                                                                    Form 990 (2009)

Form 990 (2009)   Donors Trust, Inc.                                      52-2166327          Page 11

| Part X | Balance Sheet |
|--------|---------------|

|  |  |  | (A) Beginning of year |  | (B) End of year |
|--|--|--|---|--|---|
| A S S E T S | 1 | Cash — non-interest-bearing | | 1 | |
| | 2 | Savings and temporary cash investments | 8,633,549. | 2 | 12,046,509. |
| | 3 | Pledges and grants receivable, net | | 3 | |
| | 4 | Accounts receivable, net | 75,259. | 4 | 73,165. |
| | 5 | Receivables from current and former officers, directors, trustees, key employees, and highest compensated employees  Complete Part II of Schedule L | | 5 | |
| | 6 | Receivables from other disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B)  Complete Part II of Schedule L | | 6 | |
| | 7 | Notes and loans receivable, net | | 7 | |
| | 8 | Inventories for sale or use | | 8 | |
| | 9 | Prepaid expenses and deferred charges | | 9 | |
| | 10a | Land, buildings, and equipment. cost or other basis | 10a | 68,980. | | | |
| | | Complete Part VI of Schedule D | | | | |
| | b | Less. accumulated depreciation | 10b | 31,525. | 31,980. | 10c | 37,455. |
| | 11 | Investments — publicly-traded securities | 1,556,388. | 11 | 1,638,027. |
| | 12 | Investments — other securities  See Part IV, line 11 | 250,000. | 12 | |
| | 13 | Investments — program-related. See Part IV, line 11 | | 13 | |
| | 14 | Intangible assets | | 14 | |
| | 15 | Other assets  See Part IV, line 11 | 3,699. | 15 | 3,699. |
| | 16 | Total assets. Add lines 1 through 15 (must equal line 34) | 10,550,875. | 16 | 13,798,855. |
| L I A B I L I T I E S | 17 | Accounts payable and accrued expenses | 14,035. | 17 | 17,864. |
| | 18 | Grants payable | | 18 | |
| | 19 | Deferred revenue | | 19 | |
| | 20 | Tax-exempt bond liabilities | | 20 | |
| | 21 | Escrow or custodial account liability  Complete Part IV of Schedule D | | 21 | |
| | 22 | Payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons  Complete Part II of Schedule L | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties | | 23 | |
| | 24 | Unsecured notes and loans payable to unrelated third parties | | 24 | |
| | 25 | Other liabilities. Complete Part X of Schedule D | | 25 | |
| | 26 | Total liabilities. Add lines 17 through 25 | 14,035. | 26 | 17,864. |
| N E T   A S S E T S   O R   F U N D   B A L A N C E S | | Organizations that follow SFAS 117, check here ► [X] and complete lines 27 through 29 and lines 33 and 34. | | | |
| | 27 | Unrestricted net assets | 10,536,840. | 27 | 13,780,991. |
| | 28 | Temporarily restricted net assets | | 28 | |
| | 29 | Permanently restricted net assets | | 29 | |
| | | Organizations that do not follow SFAS 117, check here ► [ ] and complete lines 30 through 34. | | | |
| | 30 | Capital stock or trust principal, or current funds | | 30 | |
| | 31 | Paid-in or capital surplus, or land, building, and equipment fund | | 31 | |
| | 32 | Retained earnings, endowment, accumulated income, or other funds | | 32 | |
| | 33 | Total net assets or fund balances | 10,536,840. | 33 | 13,780,991. |
| | 34 | Total liabilities and net assets/fund balances | 10,550,875. | 34 | 13,798,855. |

BAA                                                                      Form 990 (2009)

TEEA0111   01/30/10

Form 990 (2009)  Donors Trust, Inc.                    52-2166327           Page 12

| **Part XI** | **Financial Statements and Reporting** | | | |
|---|---|---|---|---|
| | | | Yes | No |
| 1 | Accounting method used to prepare the Form 990 ☐ Cash ☒ Accrual ☐ Other | | | |
| | If the organization changed its method of accounting from a prior year or checked 'Other,' explain in Schedule O | | | |
| **2a** | Were the organization's financial statements compiled or reviewed by an independent accountant? | 2a | | X |
| **b** | Were the organization's financial statements audited by an independent accountant? | 2b | X | |
| **c** | If 'Yes' to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | 2c | X | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O | | | |
| **d** | If 'Yes' to line 2a or 2b, check a box below to indicate whether the financial statements for the year were issued on a consolidated basis, separate basis, or both: ☐ Separate basis ☒ Consolidated basis ☐ Both consolidated and separate basis | | | |
| **3a** | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | 3a | | X |
| **b** | If 'Yes,' did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits | 3b | | |

BAA                                                         Form 990 (2009)

TEEA0112  02/05/10

**SCHEDULE A**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

OMB No 1545-0047

**Public Charity Status and Public Support**

Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.

► Attach to Form 990 or Form 990-EZ. ► See separate instructions.

**2009**

Open to Public Inspection

Name of the organization: Donors Trust, Inc.

Employer identification number: 52-2166327

**Part I** | **Reason for Public Charity Status** (All organizations must complete this part.) See instructions

The organization is not a private foundation because it is: (For lines 1 through 11, check only one box )

1. ☐ A church, convention of churches or association of churches described in **section 170(b)(1)(A)(i).**

2. ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E )

3. ☐ A hospital or cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4. ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii)** Enter the hospital's name, city, and state _____

5. ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II )

6. ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7. ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II )

8. ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II )

9. ☐ An organization that normally receives (1) more than 33-1/3 % of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions − subject to certain exceptions, and (2) no more than 33-1/3 % of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975 See **section 509(a)(2).** (Complete Part III )

10. ☐ An organization organized and operated exclusively to test for public safety See **section 509(a)(4).**

11. ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or carry out the purposes of one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2) See **section 509(a)(3).** Check the box that describes the type of supporting organization and complete lines 11e through 11h

   **a** ☐ Type I    **b** ☐ Type II    **c** ☐ Type III − Functionally integrated    **d** ☐ Type III− Other

  **e** ☐ By checking this box, I certify that the organization is not controlled directly or indirectly by one or more disqualified persons other than foundation managers and other than one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2)

  **f** If the organization received a written determination from the IRS that is a Type I, Type II or Type III supporting organization, check this box ☐

  **g** Since August 17, 2006, has the organization accepted any gift or contribution from any of the following persons?

| | | Yes | No |
|---|---|---|---|
| (i) | a person who directly or indirectly controls, either alone or together with persons described in (ii) and (iii) below, the governing body of the supported organization? **11g (i)** | | |
| (ii) | a family member of a person described in (i) above? **11g (ii)** | | |
| (iii) | a 35% controlled entity of a person described in (i) or (ii) above? **11g (iii)** | | |

  **h** Provide the following information about the supported organizations

| (i) Name of Supported Organization | (ii) EIN | (iii) Type of organization (described on lines 1-9 above or IRC section (see instructions)) | (iv) Is the organization in col (i) listed in your governing document? | | (v) Did you notify the organization in col (i) of your support? | | (vi) Is the organization in col (i) organized in the U S ? | | (vii) Amount of Support |
|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | Yes | No | Yes | No | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **Total** | | | | | | | | | |

BAA For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.

Schedule A (Form 990 or 990-EZ) 2009

Schedule A (Form 990 or 990-EZ) 2009   Donors Trust, Inc.                          52-2166327          Page 2

## Part II  Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)

(Complete only if you checked the box on line 5, 7, or 8 of Part I )

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ► | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) 2009 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions and membership fees received (Do not include 'unusual grants.') | 2,805,881. | 4,866,975. | 12,188,446. | 10,634,041. | 16,778,729. | 47,274,072. |
| 2 Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | | |
| 3 The value of services or facilities furnished to the organization by a governmental unit without charge  Do not include the value of services or facilities generally furnished to the public without charge | | | | | | |
| 4 Total. Add lines 1 through 3 | 2,805,881. | 4,866,975. | 12,188,446. | 10,634,041. | 16,778,729. | 47,274,072. |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | 9,361,925. |
| 6 Public support. Subtract line 5 from line 4 | | | | | | 37,912,147. |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ► | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) 2009 | (f) Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4 | 2,805,881. | 4,866,975. | 12,188,446. | 10,634,041. | 16,778,729. | 47,274,072. |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties and income form similar sources | 45,954. | 111,726. | 271,453. | 284,903. | 70,330. | 784,366. |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| 10 Other income  Do not include gain or loss from the sale of capital assets (Explain in Part IV ) | | | | | | |
| 11 Total support. Add lines 7 through 10 | | | | | | 48,058,438. |
| 12 Gross receipts from related activities, etc  (see instructions) | | | | | **12** | |

13 First five years. If the Form 990 is for the organization's first, second, third, fourth,  or fifth tax year as a section 501(c)(3) organization, check this box and stop here  ........................................................................... ► ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 14 Public support percentage for 2009 (line 6, column (f) divided by line 11, column (f) | **14** | 78.89 % |
| 15 Public support percentage from 2008 Schedule A, Part II, line 14 | **15** | 73.79 % |

16a 33-1/3 support test — 2009. If the organization did not check the box on line 13, and the line 14 is 33-1/3 % or more, check this box and stop here. The organization qualifies as a publicly supported organization  ............................................. ► ☒

b 33-1/3 support test — 2008. If the organization did not check a box on line 13, or 16a, and line 15 is 33-1/3% or more, check this box and stop here. The organization qualifies as a publicly supported organization  ................................................. ► ☐

17a 10%-facts-and-circumstances test — 2009 If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the 'facts-and-circumstances' test, check this box and stop here. Explain in Part IV how the organization meets the 'facts-and-circumstances' test.  The organization qualifies as a publicly supported organization  ............. ► ☐

b 10%-facts-and-circumstances test — 2008. If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the 'facts-and-circumstances' test, check this box and stop here. Explain in Part IV how the organization meets the 'facts-and-circumstances' test   The organization qualifies as a publicly supported organization  ............. ► ☐

18 Private foundation. If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions  ...... ► ☐

BAA                                                                                           Schedule A (Form 990 or 990-EZ) 2009

Schedule A (Form 990 or 990-EZ) 2009   Donors Trust, Inc.                    52-2166327          Page 3

## Part III | Support Schedule for Organizations Described in Section 509(a)(2)

(Complete only if you checked the box on line 9 of Part I)

### Section A. Public Support

| Calendar year (or fiscal yr beginning in) ► | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) 2009 | (f) Total |
|---|---|---|---|---|---|---|
| 1  Gifts, grants, contributions and membership fees received (Do not include 'unusual grants.') | | | | | | |
| 2  Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in a activity that is related to the organization's tax-exempt purpose | | | | | | |
| 3  Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| 4  Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 5  The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 6  **Total.** Add lines 1 through 5 | | | | | | |
| 7a Amounts included on lines 1, 2, 3 received from disqualified persons | | | | | | |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of 1% of the amount on line 13 for the year | | | | | | |
| c Add lines 7a and 7b | | | | | | |
| 8  **Public support** (Subtract line 7c from line 6 ) | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ► | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) 2009 | (f) Total |
|---|---|---|---|---|---|---|
| 9  Amounts from line 6 | | | | | | |
| 10a Gross income from interest, dividends, payments received on securities loans, rents, royalties and income form similar sources | | | | | | |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| c Add lines 10a and 10b | | | | | | |
| 11  Net income from unrelated business activities not included inline 10b, whether or not the business is regularly carried on | | | | | | |
| 12  Other income  Do not include gain or loss from the sale of capital assets (Explain in Part IV ) | | | | | | |
| 13  **Total support.** (add lns 9, 10c, 11, and 12) | | | | | | |
| 14  **First five years.** If the Form 990 is for the organization's first, second, third, fourth,  or fifth tax year as a section 501(c)(3) organization, check this box and stop here | | | | | | ► ☐ |

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 15  Public support percentage for 2009 (line 8, column (f) divided by line 13, column (f)) | 15 | % |
| 16  Public support percentage from 2008 Schedule A, Part III, line 15 | 16 | % |

### Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| 17  Investment income percentage for 2009 (line 10c, column (f) divided by line 13, column (f)) | 17 | % |
| 18  Investment income percentage from 2008 Schedule A, Part III, line 17 | 18 | % |

19a **33-1/3 support tests — 2009.** If the organization did not check the box  on line 14, and line 15 is more than 33-1/3%, and line 17 is not more than 33-1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ► ☐

b **33-1/3 support tests — 2008.** If the organization did not check a box on line 14 or 19a, and line 16 is more than 33-1/3%, and line 18 is not more than 33-1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ► ☐

20  **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions ► ☐

BAA                                    TEEA0403   02/15/10                        Schedule A (Form 990 or 990-EZ) 2009

Schedule A (Form 990 or 990-EZ) 2009   Donors Trust, Inc.                52-2166327        Page 4

**Part IV** | **Supplemental Information.** Complete this part to provide the explanations required by Part II, line 10; Part II, line 17a or 17b; and Part III, line 12. Provide any other additional information. See instructions.

| SCHEDULE D (Form 990) | Supplemental Financial Statements | OMB No 1545-0047 |
|---|---|---|
| | ▶ Complete if the organization answered 'Yes,' to Form 990, Part IV, lines 6, 7, 8, 9, 10, 11, or 12. | **2009** |
| Department of the Treasury Internal Revenue Service | ▶ Attach to Form 990.   ▶ See separate instructions | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| Donors Trust, Inc. | 52-2166327 |

## Part I   Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts Complete if the organization answered 'Yes' to Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | 99. | |
| 2 | Aggregate contributions to (during year) | 15,418,786. | |
| 3 | Aggregate grants from (during year) | 12,636,917. | |
| 4 | Aggregate value at end of year | 10,465,260. | |

5  Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control?  [X] Yes  [ ] No

6  Did the organization inform all grantees, donors, and donor advisors in writing that grant funds may be used only for charitable purposes and not for the benefit of the donor or donor advisor or for any other purpose conferring impermissible private benefit??  [X] Yes  [ ] No

## Part II  Conservation Easements Complete if the organization answered 'Yes' to Form 990, Part IV, line 7.

1  Purpose(s) of conservation easements held by the organization (check all that apply)

[ ] Preservation of land for public use (e.g., recreation or pleasure)  [ ] Preservation of an historically important land area

[ ] Protection of natural habitat  [ ] Preservation of certified historic structure

[ ] Preservation of open space

2  Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year

| | | | Held at the End of the Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after 8/17/06 | 2d | |

3  Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶ _____

4  Number of states where property subject to conservation easement is located ▶ _____

5  Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easement it holds?  [ ] Yes  [ ] No

6  Staff and volunteer hours devoted to monitoring, inspecting, and enforcing conservation easements during the year ▶ _____

7  Amount of expenses incurred in monitoring, inspecting, and enforcing conservation easements during the year ▶  $ _____

8  Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and 170(h)(4)(B)(ii)?  [ ] Yes  [ ] No

9  In Part XIV, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements

## Part III  Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets Complete if the organization answered 'Yes' to Form 990, Part IV, line 8.

1 a If the organization elected, as permitted under SFAS 116, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIV, the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under SFAS 116, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items

  (i)  Revenues included in Form 990, Part VIII, line 1  ▶ $ _____

  (ii) Assets included in Form 990, Part X  ▶ $ _____

2  If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under SFAS 116 relating to these items:

a Revenues included in Form 990, Part VIII, line 1  ▶ $ _____

b Assets included in Form 990, Part X  ▶ $ _____

BAA For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.    Schedule D (Form 990) 2009

TEEA3301  02/02/10

Schedule D (Form 990) 2009  Donors Trust, Inc.                              52-2166327        Page 2

## Part III  Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets (continued)

**3** Using the organization's acquisition accession and other records, check any of the following that are a significant use of its collection items (check all that apply):

a ☐ Public exhibition                          d ☐ Loan or exchange programs

b ☐ Scholarly research                         e ☐ Other _____

c ☐ Preservation for future generations

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIV.

**5** During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?     ☐ Yes   ☐ No

## Part IV  Escrow and Custodial Arrangements  Complete if organization answered 'Yes' to Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a** Is the organization an agent, trustee, custodian, or other intermediary for contributions or other assets not included on Form 990, Part X?     ☐ Yes   ☐ No

**b** If 'Yes,' explain the arrangement in Part XIV and complete the following table

| | | Amount |
|---|---|---|
| **c** Beginning balance | 1c | |
| **d** Additions during the year | 1d | |
| **e** Distributions during the year | 1e | |
| **f** Ending balance | 1f | |

**2a** Did the organization include an amount on Form 990, Part X, line 21?     ☐ Yes   ☐ No

**b** If 'Yes,' explain the arrangement in Part XIV

## Part V  Endowment Funds  Complete if organization answered 'Yes' to Form 990, Part IV, line 10.

| | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance | 8,939,680. | 9,448,610. | | | |
| **b** Contributions | 16,592,079. | 10,548,791. | | | |
| **c** Net investment earnings, gains, and losses | 324,215. | -472,097. | | | |
| **d** Grants or scholarships | 12,641,403. | 9,366,969. | | | |
| **e** Other expenditures for facilities and programs | 976,327. | 1,103,256. | | | |
| **f** Administrative expenses | 186,338. | 115,399. | | | |
| **g** End of year balance | 12,051,906. | 8,939,680. | | | |

**2** Provide the estimated percentage of the year end balance held as:

**a** Board designated or quasi-endowment ► _____100.00_%

**b** Permanent endowment ► _____0.00_%

**c** Term endowment ► _____0.00_%

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by

| | | Yes | No |
|---|---|---|---|
| **(i)** unrelated organizations | 3a(i) | | X |
| **(ii)** related organizations | 3a(ii) | | X |
| **b** If 'Yes' to 3a(ii), are the related organizations listed as required on Schedule R? | 3b | | |

**4** Describe in Part XIV the intended uses of the organization's endowment funds.

## Part VI  Investments—Land, Buildings, and Equipment. See Form 990, Part X, line 10.

| Description of investment | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated Depreciation | (d) Book Value |
|---|---|---|---|---|
| **1a** Land | | | | |
| **b** Buildings | | | | |
| **c** Leasehold improvements | | 18,695. | 2,842. | 15,853. |
| **d** Equipment | | 50,285. | 28,683. | 21,602. |
| **e** Other | | | | |

**Total.** Add lines 1a through 1e (Column (d) must equal Form 990, Part X, column (B), line 10(c).)     ►     37,455.

**BAA**                                                                Schedule D (Form 990) 2009

TEEA3302  02/02/10

Schedule **D** (Form 990) 2009   Donors Trust, Inc.                    52-2166327          Page 3

| Part VII | Investments—Other Securities See Form 990, Part X, line 12. | | |
|---|---|---|---|
| **(a)** Description of security or category (including name of security) | **(b)** Book value | **(c)** Method of valuation Cost or end-of-year market value |
| Financial derivatives | | |
| Closely-held equity interests | | |
| Other | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total. *(Column (b) must equal Form 990 Part X, col (B) line 12.)*  ► | | |

| Part VIII | Investments—Program Related (See Form 990, Part X, line 13) | | |
|---|---|---|---|
| **(a)** Description of investment type | **(b)** Book value | **(c)** Method of valuation Cost or end-of-year market value |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total. *(Column (b) must equal Form 990, Part X, Col. (B) line 13.)*  ► | | |

| Part IX | Other Assets (See Form 990, Part X, line 15) | |
|---|---|---|
| **(a)** Description | | **(b)** Book value |
| Deposits | | 3,699. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total. *(Column (b) must equal Form 990, Part X, col (B), line 15)*  ► | | 3,699. |

| Part X | Other Liabilities (See Form 990, Part X, line 25) | |
|---|---|---|
| **(a)** Description of Liability | **(b)** Amount | |
| Federal Income Taxes | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total. *(Column (b) must equal Form 990, Part X, col (B) line 25)*  ► | | |

2. FIN 48 Footnote. In Part XIV, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48

**BAA**                               TEEA3303   02/02/10                    Schedule D (Form 990) 2009

Schedule D (Form 990) 2009  Donors Trust, Inc.                                    52-2166327         Page 4

## Part XI  Reconciliation of Change in Net Assets from Form 990 to Financial Statements

| | | |
|---|---|---:|
| 1 | Total revenue (Form 990, Part VIII, column (A), line 12) | 17,429,099. |
| 2 | Total expenses (Form 990, Part IX, column (A), line 25) | 14,484,373. |
| 3 | Excess or (deficit) for the year  Subtract line 2 from line 1 | 2,944,726. |
| 4 | Net unrealized gains (losses) on investments | 299,425. |
| 5 | Donated services and use of facilities | |
| 6 | Investment expenses | |
| 7 | Prior period adjustments | |
| 8 | Other (Describe in Part XIV) | |
| 9 | Total adjustments (net)  Add lines 4 through 8 | 299,425. |
| 10 | Excess or (deficit) for the year per audited financial statements  Combine lines 3 and 9 | 3,244,151. |

## Part XII  Reconciliation of Revenue per Audited Financial Statements With Revenue per Return

| | | | | |
|---|---|---|---:|---:|
| 1 | Total revenue, gains, and other support per audited financial statements | | 1 | 17,728,524. |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12 | | | |
| a | Net unrealized gains on investments | 2a | 299,425. | |
| b | Donated services and use of facilities | 2b | | |
| c | Recoveries of prior year grants | 2c | | |
| d | Other (Describe in Part XIV) | 2d | | |
| e | Add lines 2a through 2d | | 2e | 299,425. |
| 3 | Subtract line 2e from line 1 | | 3 | 17,429,099. |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1 | | | |
| a | Investments expenses not included on Form 990, Part VIII, line 7b | 4a | | |
| b | Other (Describe in Part XIV) | 4b | | |
| c | Add lines 4a and 4b | | 4c | |
| 5 | Total revenue  Add lines 3 and 4c. (This must equal Form 990, Part I, line 12 ) | | 5 | 17,429,099. |

## Part XIII  Reconciliation of Expenses per Audited Financial Statements With Expenses per Return

| | | | | |
|---|---|---|---:|---:|
| 1 | Total expenses and losses per audited financial statements | | 1 | 14,484,373. |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | |
| a | Donated services and use of facilities | 2a | | |
| b | Prior year adjustments | 2b | | |
| c | Other losses | 2c | | |
| d | Other (Describe in Part XIV) | 2d | | |
| e | Add lines 2a through 2d | | 2e | |
| 3 | Subtract line 2e from line 1 | | 3 | 14,484,373. |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | | |
| a | Investments expenses not included on Form 990, Part VIII, line 7b | 4a | | |
| b | Other (Describe in Part XIV) | 4b | | |
| c | Add lines 4a and 4b | | 4c | |
| 5 | Total expenses  Add lines 3 and 4c  (This must equal Form 990, Part I, line 18 ) | | 5 | 14,484,373. |

## Part XIV  Supplemental Information

Complete this part to provide the descriptions required for Part II, lines 3, 5, and 9, Part III, lines 1a and 4, Part IV, lines 1b and 2b, Part V,
line 4, Part X, line 2, Part XI, line 8, Part XII, lines 2d and 4b, and Part XIII, lines 2d and 4b  Also complete this part to provide any additional
information

------------------------------------------------------------

------------------------------------------------------------

------------------------------------------------------------

------------------------------------------------------------

------------------------------------------------------------

------------------------------------------------------------

------------------------------------------------------------

Schedule **D** (Form 990) 2009   Donors Trust, Inc.                                    52-2166327        Page 5

**Part XIV** Supplemental Information *(continued)*

---

OMB No. 1545-0047

**2009**

**SCHEDULE I**
(Form 990)

Department of the Treasury
Internal Revenue Service

# Grants and Other Assistance to Organizations, Governments and Individuals in the United States

Complete if the organization answered 'Yes,' to Form 990, Part IV, lines 21 or 22.
▶ Attach to Form 990.

Open to Public Inspection

Name of the organization

Donors Trust, Inc.

Employer identification number

52-2166327

## Part I General Information on Grants and Assistance

1 Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? ... ☒ Yes ☐ No

2 Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States

## Part II Grants and Other Assistance to Governments and Organizations in the United States. Complete if the organization answered 'Yes' to Form 990, Part IV, line 21 for any recipient that received more than $5,000. Check this box if no one recipient received more than $5,000. Use Part IV and Schedule I-1 (Form 990) if additional space is needed ... ▶ ☐

| 1 (a) Name and address of organization or government | (b) EIN | (c) IRC section if applicable | (d) Amount of cash grant | (e) Amount of non-cash assistance | (f) Method of valuation (book, FMV, appraisal, other) | (g) Description of non-cash assistance | (h) Purpose of grant or assistance |
|---|---|---|---|---|---|---|---|
| See schedule attached | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

2 Enter total number of section 501(c)(3) and government organizations ................................. ▶

3 Enter total number of other organizations .................................................................. ▶

BAA For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.          TEEA3901  02/10/10          Schedule I (Form 990) 2009

Schedule I (Form 990) 2009   Donors Trust, Inc.   52-2166327   Page 2

**Part III** **Grants and Other Assistance to Individuals in the United States.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 22.
Use Part IV and Schedule I-1 (Form 990) if additional space is needed.

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of non-cash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of non-cash assistance |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part IV** **Supplemental Information.** Complete this part to provide the information required in Part I, line 2, and any other additional information.

Pt I Line 2 ____ The Organization sends each grant recipient a letter stating by accepting

Pt I Line 2 ____ the grant, grantee will not be used to benefit any disqualified person. All grants

Pt I Line 2 ____ are made to U.S. public charities. In most cases, the Organization relies upon the

Pt I Line 2 ____ oversight provided by United States and individual states' rules and regulations

Pt I Line 2 ____ applicable to such charities. In some cases, a report of use of funds is request.

BAA                                    TEEA3902   02/10/10                       Schedule I (Form 990) 2009

| SCHEDULE J<br>(Form 990) | Compensation Information | OMB No 1545-0047 |
|---|---|---|
| | For certain Officers, Directors, Trustees, Key Employees, and Highest<br>Compensated Employees | **2009** |
| Department of the Treasury<br>Internal Revenue Service | ► Complete if the organization answered 'Yes' to Form 990, Part IV, line 23.<br>► Attach to Form 990.  ► See separate instructions. | Open to Public<br>Inspection |

| Name of the organization | Employer identification number |
|---|---|
| Donors Trust, Inc. | 52-2166327 |

## Part I | Questions Regarding Compensation

|  | | Yes | No |
|---|---|---|---|
| **1a** Check the appropriate box(es) if the organization provided any of the following to or for a person listed in Form 990, Part VII, Section A, line 1a  Complete Part III to provide any relevant information regarding these items | | | |

| | First-class or charter travel | | Housing allowance or residence for personal use |
|---|---|---|---|
| | Travel for companions | | Payments for business use of personal residence |
| | Tax indemnification and gross-up payments | | Health or social club dues or initiation fees |
| | Discretionary spending account | | Personal services (e g , maid, chauffeur, chef) |

|  | | Yes | No |
|---|---|---|---|
| **b** If any of the boxes on line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If 'No,' complete Part III to explain | **1b** | | |
| **2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all officers, directors, trustees, and the CEO/Executive Director, regarding the items checked in line 1a? | **2** | X | |

**3** Indicate which, if any, of the following the organization uses to establish the compensation of the organization's CEO/Executive Director  Check all that apply

| | | | | |
|---|---|---|---|---|
| X | Compensation committee | | | Written employment contract |
| | Independent compensation consultant | X | | Compensation survey or study |
| | Form 990 of other organizations | X | | Approval by the board or compensation committee |

|  | | Yes | No |
|---|---|---|---|
| **4** During the year, did any person listed in Form 990, Part VII, Section A, line 1a with respect to the filing organization or a related organization | | | |
| **a** Receive a severance payment or change-of-control payment? | **4a** | | X |
| **b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? | **4b** | | X |
| **c** Participate in, or receive payment from, an equity-based compensation arrangement? | **4c** | | X |
| If 'Yes' to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III | | | |

**Only section 501(c)(3) and 501(c)(4) organizations must complete lines 5-9.**

|  | | Yes | No |
|---|---|---|---|
| **5** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of | | | |
| **a** The organization? | **5a** | | X |
| **b** Any related organization? | **5b** | | X |
| If 'Yes' to line 5a or 5b, describe in Part III | | | |
| **6** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of. | | | |
| **a** The organization? | **6a** | | X |
| **b** Any related organization? | **6b** | | X |
| If 'Yes' to line 6a or 6b, describe in Part III | | | |
| **7** For person listed in Form 990, Part VII, Section A, line 1a, did the organization provide any non-fixed payments not described in lines 5 and 6? If 'Yes,' describe in Part III | **7** | | X |
| **8** Were any amounts reported in Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regs  section 53 4958-4(a)(3)? If 'Yes,' describe in Part III | **8** | | X |
| **9** If 'Yes' to line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53 4958-6(c)? | **9** | | |

BAA  For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.          Schedule J (Form 990) 2009

Schedule J (Form 990) 2009    Donors Trust, Inc.    52-2216327    Page 2

## Part II  Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees. Use Schedule J-1 if additional space is needed.

For each individual whose compensation must be reported in Schedule J, report compensation from the organization on row (i) and from related organizations described in the instructions on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.

Note. The sum of columns (B)(i)-(iii) must equal the applicable column (D) or column (E) amounts on Form 990, Part VII, line 1a.

| (A) Name | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation reported in prior Form 990 or Form 990-EZ |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus and incentive compensation | (iii) Other reportable compensation | | | | |
| Whitney L Ball | (i) | 163,314. | 0. | 0. | 15,750. | 0. | 179,064. | 0. |
| | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |

BAA    TEEA4102  02/02/10    Schedule J (Form 990) 2009

Schedule J (Form 990) 2009   Donors Trust, Inc.                                      52-2166327                     Page 3

**Part III  Supplemental Information**

Complete this part to provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 4c, 5a, 5b, 6a, 6b, 7, and 8. Also complete this part for any additional information.

BAA                                                                                          TEEA4103   05/23/09                      Schedule J (Form 990) 2009

**SCHEDULE L**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Transactions with Interested Persons

► Complete if the organization answered
'Yes' on Form 990, Part IV, line 25a, 25b, 26, 27, 28a, 28b, or 28c,
or Form 990-EZ, Part V, line 38a or 40b.
► Attach to Form 990 or Form 990-EZ. ► See separate instructions.

OMB No 1545-0047

## 2009

**Open to Public
Inspection**

| Name of the organization | Employer identification number |
|---|---|
| Donors Trust, Inc. | 52-2166327 |

**Part I**  **Excess Benefit Transactions** (section 501(c)(3) and section 501(c)(4) organizations only).
Complete if the organization answered 'Yes' on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 | (a) Name of disqualified person | (b) Description of transaction | (c) Corrected? | |
|---|---|---|---|---|
| | | | Yes | No |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

2  Enter the amount of tax imposed on the organization managers or disqualified persons during the year under
section 4958 ......................................... ► $ _____

3  Enter the amount of tax, if any, on line 2, above, reimbursed by the organization ................ ► $ _____

**Part II**  **Loans to and/or From Interested Persons.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 26 or Form 990-EZ, Part V, line 38a.

| (a) Name of interested person and purpose | (b) Loan to or from the organization? | | (c) Original principal amount | (d) Balance due | (e) In default? | | (f) Approved by board or committee? | | (g) Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|
| | To | From | | | Yes | No | Yes | No | Yes | No |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **Total** | | | ► $ | | | | | | | |

**Part III**  **Grants or Assistance Benefitting Interested Persons.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount and type of assistance |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**Part IV**  **Business Transactions Involving Interested Persons.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction $ | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| Melissa Cliett | Former COO | 11,250. | Consulting pursuant to written contract | | X |
| | | | | | |
| | | | | | |
| | | | | | |

**BAA For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990
or 990-EZ.**

Schedule L (Form 990 or 990-EZ) 2009

TEEA4501  01/30/10

| SCHEDULE M<br>(Form 990) | **Noncash Contributions**<br>► Complete if the organizations answered 'Yes'<br>on Form 990, Part IV, lines 29 or 30.<br>► Attach to Form 990. | OMB No 1545-0047<br>**2009** |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service | | **Open To Public<br>Inspection** |

| Name of the organization | Employer identification number |
|---|---|
| Donors Trust, Inc. | 52-2166327 |

## Part I   Types of Property

| | | **(a)**<br>Check if<br>applicable | **(b)**<br>Number of<br>Contributions | **(c)**<br>Revenues reported<br>on Form 990,<br>Part VIII, line 1g | **(d)**<br>Method of determining<br>revenues |
|---|---|---|---|---|---|
| 1 | Art—Works of art | | | | |
| 2 | Art—Historical treasures | | | | |
| 3 | Art—Fractional interests | | | | |
| 4 | Books and publications | | | | |
| 5 | Clothing and household goods | | | | |
| 6 | Cars and other vehicles | | | | |
| 7 | Boats and planes | | | | |
| 8 | Intellectual property | | | | |
| 9 | Securities—Publicly traded | X | 19 | 587,340. | Avg value day receipt |
| 10 | Securities—Closely held stock | | | | |
| 11 | Securities—Partnership, LLC, or trust interests | | | | |
| 12 | Securities—Miscellaneous | | | | |
| 13 | Qualified conservation contribution—<br>Historic structures | | | | |
| 14 | Qualified conservation contribution—Other | | | | |
| 15 | Real estate—Residential | X | 1 | 1,450,000. | Sales price 2 months |
| 16 | Real estate—Commercial | | | | after receipt |
| 17 | Real estate—Other | | | | |
| 18 | Collectibles | | | | |
| 19 | Food inventory | | | | |
| 20 | Drugs and medical supplies | | | | |
| 21 | Taxidermy | | | | |
| 22 | Historical artifacts | | | | |
| 23 | Scientific specimens | | | | |
| 24 | Archeological artifacts | | | | |
| 25 | Other ► (_____) | | | | |
| 26 | Other ► (_____) | | | | |
| 27 | Other ► (_____) | | | | |
| 28 | Other ► (_____) | | | | |

| | | | Yes | No |
|---|---|---|---|---|
| 29 | Number of Forms 8283 received by the organization during the tax year for contributions for which the organization completed Form 8283, Part IV, Donee Acknowledgement | **29** | | |
| 30a | During the year, did the organization receive by contribution any property reported in Part I, lines 1-28 that it must hold for at least three years from the date of the initial contribution, and which is not required to be used for exempt purposes for the entire holding period? | **30a** | | X |
| | **b** If 'Yes,' describe the arrangement in Part II | | | |
| 31 | Does the organization have a gift acceptance policy that requires the review of any non-standard contributions? | **31** | X | |
| 32a | Does the organization hire or use third parties or related organizations to solicit, process, or sell noncash contributions? | **32a** | | X |
| | **b** If 'Yes,' describe in Part II | | | |
| 33 | If the organization did not report revenues in column (c) for a type of property for which column (a) is checked, describe in Part II. | | | |

BAA For Privacy Act and Paperwork Reduction Act Notice, see the instructions for Form 990.       Schedule M (Form 990) 2009

Schedule M (Form 990) 2009  Donors Trust, Inc.                    52-2166327       Page 2

**Part III** **Supplemental Information.** Complete this part to provide the information required by Part I, lines 30b, 32b, and 33. Also complete this part for any additional information.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

| SCHEDULE O (Form 990) | Supplemental Information to Form 990 | OMB No 1545-0047 |
|---|---|---|
| | | **2009** |
| Department of the Treasury Internal Revenue Service | Complete to provide information for responses to specific questions on Form 990 or to provide any additional information. ► Attach to Form 990. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| Donors Trust, Inc. | 52-2166327 |

Pt III, Line 2    THE ORGANIZATION STARTED 3 NEW PROGRAMS, CCAF, SPFA

Pt III, Line 2    AND TM, DURING 2009. THESE PROGRAMS ARE DESCRIBED IN

Pt III, Line 2    PART III ON LINE 4.

Pt III, Line 3    THE ORGANIZATION TERMINATED 3 PROGRAMS THAT WERE REPORTED

Pt III, Line 3    ON ITS FORM 990, PART III, LINE 4 DURING THE 2008 TAX YEAR:

Pt III, Line 3    THE PROJECT OF PERCEPTIONS OF AMERICANS ABROA (PPAA),

Pt III, Line 3    GOVERNMENT & GROWTH (G&G) AND THE HOLLYWOOD PROJECT (HPP).

Pt III, Line 3    A DESCRIPTION OF PPAA & G&G ARE AVAILABLE ON THE ORGANIZATION'S

Pt III, Line 3    2008 FORM 990, LINE 4, PART III. A DESCRIPTION OF HPP

Pt III, Line 3    CAN BE FOUND ON LINE 4, PART III OF THIS RETURN.

Pt VI-C, Line 19   IF REQUIRED TO BE DISCLOSED BY APPLICABLE STATUTE,

Pt VI-C, Line 19   REGULATION OR OTHER ADMINISTRATIVE RULE, AVAILABLE BY

Pt VI-C, Line 19   REQUEST AT ORGANIZATION'S OFFICE.

Pt VI-B, Line 11A FORM 990 REVIEWED BY PRESIDENT & CFO PRIOR TO FILING.

Pt VI-B, Line 11A IN ADDITION, FORM 990 IS DISTRIBUTED TO ALL BOARD MEMBERS

Pt VI-B, Line 11A AND OFFICERS SHORTLY AFTER FILING FOR THEIR REVIEW AND

Pt VI-B, Line 11A COMMENTS. IF ANY ISSUES ARE RAISED, APPROPRIATE

Pt VI-B, Line 11A REMEDIAL ACTION IS TAKEN, INCLUDING FILING AN AMENDED

Pt VI-B, Line 11A FORM 900 IF NECESSARY.

Pt VI-A, Line 3    SOME PROGRAMS LISTED AT PART III USE INDEPENDENT CONTRACTORS.

Pt VI-A, Line 3    DIRECT SUPERVISION OF INDEPENDENT CONTRACTORS CARRYING OUT

Pt VI-A, Line 3    RESEARCH, WRITING AND OTHER ACTIVITY ASSOCIATED WITH CERTAIN

Pt VI-A, Line 3    PROGRAMS IS THE RESPONSIBILITY OF AN INDEPENDENT CONTRACTOR MANAGING

Pt VI-A, Line 3    THE PROGRAM WHO HAS EXPERIENCE & EXPERTISE IN THE AREA OF RESEARCH OR

Pt VI-A, Line 3    ACTIVITY. EACH OF THESE CONTRACTORS IS DIRECTLY SUPERVISED BY THE

Pt VI-A, Line 3    ORGANIZATION'S OFFICERS. THE PROGRAMS WITH INDEPENDENT

Schedule O (Form 990) 2009                                                                    Page 2

| Name of the organization | Employer identification number |
|---|---|
| Donors Trust, Inc. | 52-2166327 |

Pt VI-A, Line 3   CONTRACTORS THAT OVERSEE OTHER INDEPENDENT CONTRACTORS

Pt VI-A, Line 3   ARE: NPS, CCAP, AND PFR.  SEE PART II, LINE 4 FOR DESCRIPTION

Pt VI-A, Line 3   OF EACH PROGRAM LISTED HERE.

Pt VI-C, Line 17  AK,AL,AR,AZ,CA,CO,CT,DC,FL,GA,IL,KS,KY,MA,MD,ME,MI,

Pt VI-C, Line 17  MN,MO,MS,NC,ND,NH,NJ,NM,NY,OH,OK,OR,PA,RI,SC,TN,

Pt VI-C, Line 17  UT,VA,WA,WI,WV.

BAA                                                                    Schedule O (Form 990) 2009

TEEA4902   07/17/09

Schedule R (Form 990) 2009  Donors Trust, Inc.                                      52-2166327                Page 3

## Part V | Transactions With Related Organizations (Complete if the organization answered 'Yes' to Form 990, Part IV, line 34, 35, or 36.)

Note. Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|---|---|
| 1 During the tax year did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| a Receipt of (i) interest (ii) annuities (iii) royalties (iv) rent from a controlled entity | 1a | | X |
| b Gift, grant, or capital contribution to other organization(s) | 1b | X | |
| c Gift, grant, or capital contribution from other organization(s) | 1c | X | |
| d Loans or loan guarantees to or for other organization(s) | 1d | | X |
| e Loans or loan guarantees by other organization(s) | 1e | | X |
| | | | |
| f Sale of assets to other organization(s) | 1f | | X |
| g Purchase of assets from other organization(s) | 1g | | X |
| h Exchange of assets | 1h | | X |
| i Lease of facilities, equipment, or other assets to other organization(s) | 1i | | X |
| | | | |
| j Lease of facilities, equipment, or other assets from other organization(s) | 1j | | X |
| k Performance of services or membership or fundraising solicitations for other organization(s) | 1k | X | |
| l Performance of services or membership or fundraising solicitations by other organization(s) | 1l | | X |
| m Sharing of facilities, equipment, mailing lists, or other assets | 1m | X | |
| n Sharing of paid employees | 1n | | X |
| | | | |
| o Reimbursement paid to other organization for expenses | 1o | | X |
| p Reimbursement paid by other organization for expenses | 1p | X | |
| | | | |
| q Other transfer of cash or property to other organization(s) | 1q | | X |
| r Other transfer of cash or property from other organization(s) | 1r | | X |

2  If the answer to any of the above is 'Yes,' see the instructions for information on who must complete this line, including covered relationships and transaction thresholds

| (A)<br>Name of other organization | (B)<br>Transaction<br>type (a-r) | (C)<br>Amount involved |
|---|---|---|
| (1) N/A - No controlled entities as defined by IRC sec 512(b)(13). | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |

BAA                                          TEEA5003   02/26/10                          Schedule R (Form 990) (2009)

Schedule R (Form 990) 2009  Donors Trust, Inc.                                                52-2166327                Page 4

**Part VI** | **Unrelated Organizations Taxable as a Partnership** (Complete if the organization answered 'Yes' to Form 990, Part IV, line 37.)

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total asset or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships

| (A)<br>Name, address, and EIN of entity | (B)<br>Primary activity | (C)<br>Legal domicile<br>(state or foreign<br>country) | (D)<br>Are all partners<br>section<br>501(c)(3)<br>organizations? | | (E)<br>Share of end-of-year<br>assets | (F)<br>Dispropor-<br>tionate<br>allocations? | | (G)<br>Code V-UBI amount<br>in box 20 of<br>Schedule K-1<br>Form (1065) | (H)<br>General or<br>managing<br>partner? | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | | Yes | No | | Yes | No |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

BAA                                        TEEA5004   02/05/10                                    Schedule R (Form 990) (2009)

Donors Trust, Inc.          52-2166327                                                    1

Schedule O (Form 990), Supplemental Information to Form 990
**Form 990, Page 2, Part III, Line 1 (continued)**

Briefly describe the organization's mission:
RELATING TO SOCIAL WELFARE, HEALTH, ENVIRONMENT, ECONOMICS, GOVERNANCE,
FOREIGN RELATIONS AND ARTS AND CULTURE; AND WHICH ENCOURAGE PHILANTHROPY
AND INDIVIDUAL GIVING AND RESPONSIBILITY AS AN ANSWER TO SOCIETY'S NEEDS, AS
OPPOSED TO GOVERNMENTAL INVOLVEMENT.

Schedule O (Form 990), Supplemental Information to Form 990
**Form 990, Page 2, Part III, Line 4d (continued)**

**4d** Describe the exempt purpose achievements for each of the organization's other program
services. Section 501(c)(3) and (4) organizations and 4947(a)(1) trusts are required to
report the amount of grants and allocations to others, the total expenses, and revenue, if any, for
each program service reported.

| Code· | Description: | THE PROJECT ON FAIR REPRESENTATION (PFR). |
|---|---|---|
| Expenses | 134,244. | THE PROJECT ON FAIR REPRESENTATION WORKS TO EFFECT CHANGE |
| Grants Of | 0. | IN LAW AND PUBLIC POLICY THROUGH A COMBINATION OF |
| Revenue | 150,000. | RESEARCH, LITIGATION, AND PUBLIC EDUCATION IN THE |
| | | FOUR AREAS WHERE RACIAL DISCRIMINATION IS THE MOST |
| | | ENTRENCHED: VOTING, EDUCATION, PUBLIC CONTRACTING, AND |
| | | EMPLOYMENT. |
| Code. | Description. | THE SUPPLY SIDE PROJECT (SSP). |
| Expenses | 107,306. | THE SUPPLY SIDE PROJECT DEVELOPS AND ADVANCES |
| Grants Of | 0. | FUNDAMENTAL MARKET-BASED REFORM PROPOSALS FOR |
| Revenue | 100,000. | SOCIAL SECURITY, MEDICADE, MEDICARE, WELFARE AND |
| | | HEALTH CARE. |
| Code. | Description: | CENTER FOR CLASS ACTION FAIRNESS (CCAF). |
| Expenses | 54,898. | THROUGH PRO BONO REPRESENTATION OF CONSUMERS, CCAF |
| Grants Of | 0. | SEEKS TO INCREASE NET AWARDS TO MEMBERS OF CLASS ACTION |
| Revenue | 150,000. | LAWSUITS THROUGH OBJECTIONS TO SETTLEMENTS PRODUCING |
| | | EXCESSIVE ATTORNEY FEES. AN ADDITIONAL GOAL IS A |
| | | REDUCTION IN MERITLESS CLASS ACTION SUITS AS TRIAL |
| | | ATTORNEYS AWARENESS OF CCAF's WATCHDOG ROLE INCREASES. |
| Code: | Description: | STUDENT FREE PRESS ASSOCIATION (SFPA). THE STUDENT FREE |
| Expenses | 0. | PRESS ASSOCIATION IS AN ORGANIZATION RUN BY |
| Grants Of | 0. | VETERAN JOURNALISTS FOR THE BENEFIT OF BEGINNING |
| Revenue | 75,000. | JOURNALISTS. IT IDENTIFIES AND SUPPORTS COLLEGE |
| | | STUDENTS SEEKING TO IMPROVE CAMPUS JOURNALISM, |
| | | EXPLORE MEDIA CAREERS, AND COMMIT THEMSELVES TO THE |
| | | PRINCIPLES OF A FREE SOCIETY. THE SFPA BEGINNING IN DEC. |
| Code: | Description: | TALENT MARKET (TM). A FREE TALENT RECRUITMENT PROGRAM |
| Expenses | 49,987. | AVAILABLE TO CHARITIES WHOSE MISSION ALIGN WITH |
| Grants Of | 0. | DONORSTRUST'S CHARITABLE MISSION. |
| Revenue | 175,000. | |
| Code: | Description· | THE HOLLYWOOD PROJECT (HPP). TERMINIATED DURING 2009. |
| Expenses | 2,685. | THE PROJECT AIMED TO ADVANCE LIBERTY AND VIRTUE |
| Grants Of | 2,685. | IN AMERICA AND GLOBALLY BY TOUCHING CREATIVE |
| Revenue | 0. | PROFESSIONALS AT THE FULCRUM OF WORLD VISUAL |
| | | MEDIA: HOLLYWOOD. |

Donors Trust, Inc.    52-2166327

**Supporting Statement of:**

Form 990 p 9/Noncash

| Description | Amount |
|---|---|
| Publicly traded securities | 587,340. |
| Real estate | 1,450,000. |
| Total | 2,037,340. |

**Supporting Statement of:**

Form 990 p 9/Line 2f Oth Rel/Exmpt -1

| Description | Amount |
|---|---|
| Aministration services provided to supporting organization | 620,820. |
| Total | 620,820. |

**Supporting Statement of:**

Form 990 p 9/Line 3 Column D

| Description | Amount |
|---|---|
| Interest and dividends | 66,109. |
| Total | 66,109. |

**Supporting Statement of:**

Form 990 p 9/Real Gross Rents

| Description | Amount |
|---|---|
| Rent on donated real property received prior to property sale | 4,220. |
| Total | 4,220. |

**Supporting Statement of:**

Form 990 p 9/Line 6d Column D

| Description | Amount |
|---|---|
| Non-trade or business rental income | 4,220. |
| Total | 4,220. |

Donors Trust, Inc.      52-2166327                                          3

**Supporting Statement of:**

Form 990 p 9/Sales of Securities

| Description | Amount |
|---|---|
| Proceeds from sale of marketable securities | 2,389,730. |
| Recovery of expensed cost on sale of donated real property | 540. |
| Total | 2,390,270. |

**Supporting Statement of:**

Form 990 p 9/Gross Basis Amount

| Description | Amount |
|---|---|
| Basis of marketable securities sold | 2,431,049. |
| Total | 2,431,049. |

**Supporting Statement of:**

Form 990 p 9/Line 6d Column D

| Description | Amount |
|---|---|
| Loss on sale of marketable securities | -40,779. |
| Total | -40,779. |

**Supporting Statement of:**

Form 990 p 10/Line 1 col (B)

| Description | Amount |
|---|---|
| Cash grants to US tax exempt entities | 12,641,403. |
| Total | 12,641,403. |

**Supporting Statement of:**

Form 990 p 11/Line 11, column (A)

| Description | Amount |
|---|---|
| Publicly traded mutual funds | 1,325,501. |
| 2000 shrs Walgreen | 49,340. |
| 600 shrs Resmed | 22,488. |
| 2500 shrs Roper Inds | 120,246. |

Donors Trust, Inc.      52-2166327                                    **4**

Continued

**Supporting Statement of:**

Form 990 p 11/Line 11, column (A)

| Description | Amount |
|---|---|
| 1000 shrs Forest Labs | 25,470. |
| 250 shrs Abbott Labs | 13,343. |
| Total | 1,556,388. |

**Supporting Statement of:**

Form 990 p 11/Line 11, column (B)

| Description | Amount |
|---|---|
| Various publicly traded mutual funds | 1,542,114. |
| 2000 Shrs Walgreens | 73,440. |
| 80 Shrs BP | 4,638. |
| 40 Shrs XOM | 2,728. |
| 300 Shrs RAX | 6,255. |
| 120 Shrs CRM | 8,852. |
| Total | 1,638,027. |

**Supporting Statement of:**

Sch D, page 2/Part V, line 1e col (a)

| Description | Amount |
|---|---|
| Program related direct expenses | 976,327. |
| Total | 976,327. |

**Supporting Statement of:**

Sch D, page 2/Part V, line 1e col (b)

| Description | Amount |
|---|---|
| Program related direct expenses | 1,103,256. |
| Total | 1,103,256. |

**DONORS TRUST, INC**

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2166327

| (a) Grantees | (i) | (j) | (k) | (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 250.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 250.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 250.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 250.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 300.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 400.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 500.00 | to qualify for matching funds challenge |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 1,000.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 1,000.00 | in response to Rudy Carrasco's letter |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 1,000.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 1,700.00 | to sponsor a student at Acton University |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 2,500.00 | to sponsor a student at Acton University |
| Acton institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 2,500.00 | for general operations |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 5,000.00 | Lord Acton Circle table 2009 |
| Acton Institute | 161 Ottawa NW, Suite 301 | Grand Rapids | MI | 49503 | 38-2926822 | 5,000.00 | for general operations |
| Africa Fighting Malaria Int, Inc. | 1050 17th Street, NW, Suite 520 | Washington | DC | 20036 | 30-0162292 | 5,000.00 | for general operations |
| Africa Fighting Malaria Int, Inc | 1050 17th Street, NW, Suite 520 | Washington | DC | 20036 | 30-0162292 | 18,000.00 | for general operations |
| American Border Patrol | 2160 East Fry Blvd , #428 | Sierra Vista | AZ | 85635- | 42-1542666 | 2,000.00 | for general operations |
| American Border Patrol | 2160 East Fry Blvd , #428 | Sierra Vista | AZ | 85635- | 42-1542666 | 2,000.00 | for general operations |
| American Border Patrol | 2160 East Fry Blvd , #428 | Sierra Vista | AZ | 85635- | 42-1542666 | 2,500.00 | for general operations |
| American Conservative Union Foundation | 1007 Cameron Street | Alexandria | VA | 22314 | 52-1294680 | 1,000.00 | for CPAC |
| American Conservative Union Foundation | 1007 Cameron Street | Alexandria | VA | 22314 | 52-1294680 | 1,000.00 | for general operations |
| American Conservative Union Foundation | 1007 Cameron Street | Alexandria | VA | 22314 | 52-1294680 | 7,500.00 | for general operations |
| American Council on Science & Health | 1995 Broadway, 2nd Floor | New York | NY | 10023- | 13-2911127 | 10,000.00 | for general operations |
| American Council on Science & Health | 1995 Broadway, 2nd Floor | New York | NY | 10023- | 13-2911127 | 198,000.00 | for general operations |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 250.00 | for general operations |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 500.00 | for general operations |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 1,000.00 | for Tom Donnelly's Center for Defense Studies |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 1,000.00 | for Tom Donnelly's Center for Defense Studies |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 1,000.00 | for Tom Donnelly's Center for Defense Studies |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 1,000.00 | Studies |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 1,000.00 | for general operations |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 1,000.00 | for Tom Donnelly's Center for Defense Studies |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 1,000.00 | for general operations |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 1,500.00 | in response to Arthur Brooks' letter |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 5,000.00 | 2009 Annual Dinner - Table |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 7,000.00 | for general operations |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 10,000.00 | for general operations |
| American Enterprise Institute | 1150 Seventeenth Street, NW | Washington | DC | 20036 | 53-0218495 | 50,000.00 | for general operations |
| American Heart Association | 7272 Greenville Avenue | Dallas | TX | 75231 | 13-5613797 | 250.00 | for general operations |
| American Humanist Association | 1777 T Street, NW | Washington | DC | 2009- | 94-6168317 | 200.00 | for general operations |
| American Majority | 117 North 21st Street, Suite 4 | Purcellville | VA | 20132 | 26-1501154 | 6,500.00 | for advertising |
| American Majority | 117 North 21st Street, Suite 4 | Purcellville | VA | 20132 | 26-1501154 | 7,500.00 | for general operations |
| American Majority | 117 North 21st Street, Suite 4 | Purcellville | VA | 20132 | 26-1501154 | 17,550.00 | to experiment with achieving growth |

SCHEDULE I (Form 990)

Part II, Line 1

Page 1 of 12

**DONORS TRUST, INC**

**EIN: 52-2163327**

SCHEDULE I (Form 990)
Part II, Line 1

| (a) Grantee | (i) | (j) | (k) | (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| American Majority | 117 North 21st Street, Suite 4 | Purcellville | VA | 20132 | 26-1501154 | 501(c)(3) | 35,000.00 for general operations |
| American Spectator Educational Foundation | 1611 N. Kent Street, Suite 901 | Arlington | VA | 22209 | 23-7002632 | 501(c)(3) | 5,000.00 for general operations |
| American Spectator Educational Foundation | 1611 N. Kent Street, Suite 901 | Arlington | VA | 22209 | 23-7002632 | 501(c)(3) | 10,000.00 for general operations |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 800.00 for general operations |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 1,200.00 for the card check project |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 1,500.00 for Washington State start-up |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 2,500.00 for general operations |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 5,000.00 for general operations |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 7,500.00 for AFPF Kansas |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 15,250.00 to experiment with achieving growth |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 25,000.00 support Eric Telford's internet project |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 50,000.00 support policy work |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 82,000.00 for the "RightOnLine" effort |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 272,000.00 for Patents United project |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 272,000.00 for Patents United project |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 400,000.00 for general operations |
| Americans for Prosperity Foundation | 2111 Wilson Blvd, Ste. 350 | Arlington | VA | 20001 | 52-1527294 | 501(c)(3) | 400,000.00 for general operations |
| Americans for Tax Reform Foundation | 722 12th Street, NW, Suite 400 | Washington | DC | 20005 | 52-1400492 | 501(c)(3) | 10,000.00 for general operations |
| Americans for Tax Reform Foundation | 722 12th Street, NW, Suite 400 | Washington | DC | 20005 | 52-1400492 | 501(c)(3) | 20,050.00 for general operations |
| ASU Foundation, School of Earth & Space E | PO Box 871404 | Tempe | AZ | 85287 | 86-6051042 | 501(c)(3) | 5,000.00 for the Origins Initiative |
| ASU Foundation, School of Earth & Space E | PO Box 871404 | Tempe | AZ | 85287 | 86-6051042 | 501(c)(3) | 5,000.00 for the Institute of Human Origins |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 1,000.00 for general operations |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 1,000.00 for general operations |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 1,000.00 for general operations |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 1,000.00 for general operations |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 2,500.00 for general operations |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 5,000.00 and Jagral — FBO Center in Mongolia run by Batbold |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 5,000.00 — FBO Imani Center (Franklin Cudjoe, Accra, Ghana) |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 5,000.00 Mngardi — FBO Instituto Bruno Leoni (Alberto |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 5,000.00 for Tom Palmer program |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 5,000.00 for general operations |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 5,000.00 Louw — for the Free Market Foundation in South Africa run by Eustace Davies and Leon |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 5,000.00 2009 Freedom Dinner |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | $1,000 for The Liberty Forum and $5,000 |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 6,000.00 for general operations |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 10,000.00 to support a fellowship to fund Deroy Murdock's research, writing, and speaking |
| Atlas Economic Research Foundation | 1201 L Street, NW | Washington | DC | 20005 | 94-2763845 | 501(c)(3) | 50,000.00 to support the Rule of Law program |
| Ave Maria University | 5050 Ave Maria Boulevard | Ave Maria | FL | 34142 | 03-0482006 | 501(c)(3) | 10,000.00 support (specifically a research assistant) for Michael Novak's research project |

Part II, Line 1

SCHEDULE I (Form 990)

DONORS TRUST, INC

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2166327

| (a) Grantee | (i) | (j) | (k) | (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| Bill of Rights Institute | 200 N. Glebe Road, Suite 200 | Arlington | VA | 22203 48-0891418 | 501(c)(3) | 100 00 for general operations | |
| Bill of Rights Institute | 200 N. Glebe Road, Suite 200 | Arlington | VA | 22203 48-0891418 | 501(c)(3) | 1,000 00 for general operations | |
| Bill of Rights Institute | 200 N. Glebe Road, Suite 200 | Arlington | VA | 22203 48-0891418 | 501(c)(3) | 5,000 00 for general operations | |
| Bill of Rights Institute | 200 N. Glebe Road, Suite 200 | Arlington | VA | 22203 48-0891418 | 501(c)(3) | 5,000 00 for general operations | |
| Bill of Rights Institute | 200 N. Glebe Road, Suite 200 | Arlington | VA | 22203 48-0891418 | 501(c)(3) | 6,000 00 for general operations | |
| Bill of Rights Institute | 200 N. Glebe Road, Suite 200 | Arlington | VA | 22203 48-0891418 | 501(c)(3) | 5,000 00 Bill of Rights Institute dinner | |
| Bill of Rights Institute | 200 N. Glebe Road, Suite 200 | Arlington | VA | 22203 48-0891418 | 501(c)(3) | 6,000 00 for the Wakefield school project | |
| | | | | | | | to establish the JMC-Veritas Higher |
| Boston College | 140 Commonwealth Avenue | Chestnut Hill | MA | 02467 04-2103545 | 501(c)(3) | 85,000 00 Education chair | |
| Brighter Choice Foundation | 250 Central Avenue | Albany | NY | 12206 14-1825626 | 501(c)(3) | 250,000 00 for general operations | |
| | | | | | | | for Pietro Nivola's project - The |
| Brookings Institution - Governance Studie | 1775 Massachusetts Ave., NW | Washington | DC | 20036 53-0196577 | 501(c)(3) | 11,000 00 Governance Studies Project | |
| Capital Research Center | 1513 16th Street, NW | Washington | DC | 20036-52-1289734 | 501(c)(3) | 500 00 for general operations | |
| Capital Research Center | 1513 16th Street, NW | Washington | DC | 20036-52-1289734 | 501(c)(3) | 3,500 00 for general operations | |
| Capital Research Center | 1513 16th Street, NW | Washington | DC | 20036-52-1289734 | 501(c)(3) | 4,000 00 for general operations | |
| Capital Research Center | 1513 16th Street, NW | Washington | DC | 20036-52-1289734 | 501(c)(3) | 5,000 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 200 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 250 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 250 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 250 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 250 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 500 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 500 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 500 00 for general operations | |
| | | | | | | | in response to the organization's climate |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 1,000 00 change ad | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 1,000 00 for the healthcare ad campaign | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 1,000 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 1,000 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 2,500 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 5,000 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 5,000 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 5,000 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 5,000 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 5,000 00 Sponsorship for Friedman Dinner | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 5,000 00 for general operations | |
| Cato Institute | 1000 Massachusetts Avenue, NW | Washington | DC | 20001- 23-7432162 | 501(c)(3) | 6,000 00 for general operations | |
| Center for Competitive Politics | 124 South West Street, #201 | Alexandria | VA | 22314 20-3676886 | 501(c)(3) | 1,000 00 for general operations | |
| Center for Competitive Politics | 124 South West Street, #201 | Alexandria | VA | 22314 20-3676886 | 501(c)(3) | 2,000 00 for general operations | |
| Center for Competitive Politics | 124 South West Street, #201 | Alexandria | VA | 22314 20-3676886 | 501(c)(3) | 5,000 00 for general operations | |
| Center for Competitive Politics | 124 South West Street, #201 | Alexandria | VA | 22314 20-3676886 | 501(c)(3) | 5,000 00 for general operations | |
| Center for Competitive Politics | 124 South West Street, #201 | Alexandria | VA | 22314 20-3676886 | 501(c)(3) | 7,000 00 for general operations | |
| | | | | | | | to support Foundation Management |
| Center for First Principles | 2615 O Street, NW | Washington | DC | 20007 52-2154862 | 501(c)(3) | 2,000 00 Institute | |
| Center for First Principles | 2615 O Street, NW | Washington | DC | 20007 52-2154862 | 501(c)(3) | 5,000 00 for general operations | |
| | | | | | | | for Professor Smith's Economic Science |
| Chapman University, Economic Science Inst | One University Drive | Orange | CA | 92866 95-1643982 | 501(c)(3) | 6,500 00 Institute | |

SCHEDULE I (Form 990)

Part II, Line 1

Page 3 of 12

DONORS TRUST, INC

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2216327

| (a) Grantee | (i) | (j) | (k) | (l) EIN | (e) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| Charles Schwab Gift Fund | 101 Montgomery Street | San Francisco | CA | 94104 31-1640316 | 501(c)(3) | 46,881.30 | for general operations |
| Christian Freedom International | PO Box 560 | Sault Ste. Marie | MI | 49783 52-1283394 | 501(c)(3) | 30,000.00 | for general operations |
| Church of the Redeemer | 379 Hammond Street | Chestnut Hill | MA | 02467 04-2103997 | 501(c)(3) | 12,500.00 | for general operations |
| Citizens in Charge Foundation | 2050 Old Bridge Raod, Suite 103 | Lake Ridge | VA | 22192 13-4070270 | 501(c)(3) | 6,500.00 | for advertising |
| Citizens in Charge Foundation | 2050 Old Bridge Raod, Suite 103 | Lake Ridge | VA | 22192 13-4070270 | 501(c)(3) | 15,000.00 | for general operations |
| Clare Boothe Luce Policy Institute | 112 Elden Street, Suite P | Herndon | VA | 20170 54-1672138 | 501(c)(3) | 5,000.00 | for general operations |
| Clare Boothe Luce Policy Institute | 112 Elden Street, Suite P | Herndon | VA | 20170 54-1672138 | 501(c)(3) | 10,000.00 | for general operations |
| Coalition on Urban Renewal and Education | 722 12th Street, NW, 4th Floor | Washington | DC | 20005 31-1467594 | 501(c)(3) | 3,000.00 | for general operations |
| Cold Spring Harbor Laboratory | PO Box 100 | Cold Spring Harbor | NY | 11724 11-2013303 | 501(c)(3) | 25,000.00 | for general operations |
| Committee for a Constructive Tomorrow | 621 Harvest Court | Bel Air | MD | 21014 52-1462893 | 501(c)(3) | 500.00 | for general operations |
| Committee for a Constructive Tomorrow | 621 Harvest Court | Bel Air | MD | 21014 52-1462893 | 501(c)(3) | 1,000.00 | for the Environmental Education Fund |
| Committee for a Constructive Tomorrow | 621 Harvest Court | Bel Air | MD | 21014 52-1462893 | 501(c)(3) | 24,750.00 | for the Environmental Education Fund |
| Committee for a Constructive Tomorrow | 621 Harvest Court | Bel Air | MD | 21014 52-1462893 | 501(c)(3) | 197,444.70 | for general operations |
| Committee for a Constructive Tomorrow | 621 Harvest Court | Bel Air | MD | 21014 52-1462893 | 501(c)(3) | 196,000.00 | to hire staff |
| Committee for a Constructive Tomorrow | 621 Harvest Court | Bel Air | MD | 21014 52-1462893 | 501(c)(3) | 200,000.00 | for general operations |
| Committee for a Constructive Tomorrow | 621 Harvest Court | Bel Air | MD | 21014 52-1462893 | 501(c)(3) | 262,500.00 | for the Environmental Education Fund |
| Committee to Reduce Infection Deaths, Inc | 185 E. 85th Street, Suite 35B | New York | NY | 10028 20-2479678 | 501(c)(3) | 10,000.00 | for general operations |
| Committee to Reduce Infection Deaths, Inc | 185 E. 85th Street, Suite 35B | New York | NY | 10028 20-2479678 | 501(c)(3) | 10,000.00 | for general operations |
| Commonwealth Foundation for Public Policy | 225 State Street, Suite 302 | Harrisburg | PA | 17101 23-2473845 | 501(c)(3) | 34,000.00 | to support John Lott's projects |
| Commonwealth Foundation for Public Policy | 225 State Street, Suite 302 | Harrisburg | PA | 17101 23-2473845 | 501(c)(3) | 40,000.00 | to support John Lott's projects |
| Competitive Enterprise Institute | 1899 L Street, NW, 12th FL | Washington | DC | 20036 52-1351785 | 501(c)(3) | 100.00 | for general operations |
| Competitive Enterprise Institute | 1899 L Street, NW, 12th FL | Washington | DC | 20036 52-1351785 | 501(c)(3) | 200.00 | for general operations |
| Competitive Enterprise Institute | 1899 L Street, NW, 12th FL | Washington | DC | 20036 52-1351785 | 501(c)(3) | 500.00 | for general operations |
| Competitive Enterprise Institute | 1899 L Street, NW, 12th FL | Washington | DC | 20036 52-1351785 | 501(c)(3) | 2,000.00 | for general operations |
| Competitive Enterprise Institute | 1899 L Street, NW, 12th FL | Washington | DC | 20036 52-1351785 | 501(c)(3) | 3,000.00 | for general operations |
| Conservative Agenda Project | 1025 Thomas Jefferson St, NW, Ste | Washington | DC | 20007 26-4029303 | 501(c)(3) | 27,000.00 | for general operations |
| Conservative Agenda Project | 1025 Thomas Jefferson St, NW, Ste | Washington | DC | 20007 26-4029303 | 501(c)(3) | 35,000.00 | for general operations |
| Conservative Agenda Project | 1025 Thomas Jefferson St, NW, Ste | Washington | DC | 20007 26-4029303 | 501(c)(3) | 35,000.00 | for general operations |
| Conservative Agenda Project | 1025 Thomas Jefferson St, NW, Ste | Washington | DC | 20007 26-4029303 | 501(c)(3) | 62,000.00 | for general operations |
| CSC Media Education Fund, Inc. | PO Box 5331 | New York | NY | 10185- 26-4129605 | 501(c)(3) | 100,000.00 | for general operations |
| CSC Media Education Fund, Inc | PO Box 5331 | New York | NY | 10185- 26-4129605 | 501(c)(3) | 25,000.00 | for general operations |
| Diocese of Stockton (CA) | 2800 West March Lane, Ste 475 | Stockton | CA | 95219 | 501(c)(3) | 10,000.00 | for the "Church of Tomorrow Campaign" |
| Discovery Community Church | P.O Box 111840 | Tacoma | WA | 98411 | 501(c)(3) | 20,000.00 | for general operations |
| Duke University | PO Box 90204 | Durham | NC | 27708 56-0532129 | 501(c)(3) | 25,000.00 | to establish the JMC–Veritas Higher Education Initiative Post-Doctoral Fellowship |
| E Plunbus Unum Films | 2247 15th Avenue West | Seattle | WA | 98119- 91-2053400 | 501(c)(3) | 3,000.00 | for EconomicThinking.org |
| E Plunbus Unum Films | 2247 15th Avenue West | Seattle | WA | 98119- 91-2053400 | 501(c)(3) | 5,000.00 | for EconomicThinking.org |
| East Harlem Churches & Community Urban Ce | 325 East 101st Street | New York | NY | 10029 13-2765924 | 501(c)(3) | 10,000.00 | for the Booker T. Washington Learning Center |
| East Harlem Churches & Community Urban Ce | 325 East 101st Street | New York | NY | 10029 13-2765924 | 501(c)(3) | 12,000.00 | for general operations |
| Emory University | 1599 Clifton Road NE 4th FL | Atlanta | GA | 30322 58-0566256 | 501(c)(3) | 25,000.00 | to establish the JMC-Veritas Higher Education Initiative Post-Doctoral Fellowship |
| Ernest Martin Hopkins Institute | 841 E Palace Avenue | Santa Fe | NM | 87501 13-3351125 | 501(c)(3) | 27,653.00 | for general operations |
| Ethics & Public Policy Center | 1730 M Street, NW, Suite 910 | Washington | DC | 20036 52-1162185 | 501(c)(3) | 25,000.00 $10,000.00 to support Jim Bowman research | $10,000 for general operating funds, |

SCHEDULE I (Form 990)

Part II, Line 1

**DONORS TRUST, INC**

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2166327

| (a) Grantee | (i) | (j) | (k) | (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| Ethics & Public Policy Center | 1730 M Street, NW, Suite 910 | Washington | DC | 20036 52-1162185 | 501(c)(3) | 130,000.00 | to support the research of Stanley Kurtz |
| Evergreen Freedom Foundation | PO Box 552 | Olympia | WA | 98507-94-3136961 | 501(c)(3) | 5,000.00 | for general operations |
| Evergreen Freedom Foundation | PO Box 552 | Olympia | WA | 98507-94-3136961 | 501(c)(3) | 15,000.00 | for the capital campaign |
| Falls Church Episcopal Church | 115 East Fairfax Street | Falls Church | VA | 22046 31-1629166 | 501(c)(3) | 6,000.00 | for Timothy's Fund |
| Federalist Society for Law & Public Polic | 1015 18th Street, NW, Suite 425 | Washington | DC | 20036 36-3235550 | 501(c)(3) | 1,000.00 | for general operations |
| Federalist Society for Law & Public Polic | 1015 18th Street, NW, Suite 425 | Washington | DC | 20036 36-3235550 | 501(c)(3) | 3,000.00 | for general operations |
| Federalist Society for Law & Public Polic | 1015 18th Street, NW, Suite 425 | Washington | DC | 20036 36-3235550 | 501(c)(3) | 10,000.00 | for general operations |
| Foreign Policy Research Institute | 1528 Walnut Street, Suite 610 | Philadelphia | PA | 19102 23-1731998 | 501(c)(3) | 12,927.83 | for general operations |
| Foreign Policy Research Institute | 1528 Walnut Street, Suite 610 | Philadelphia | PA | 19102 23-1731998 | 501(c)(3) | 15,000.00 | for general operations |
| Forum for Scriptural Christianity, Inc | 308 East Main Street, Box 150 | Wilmore | KY | 40390 36-2680478 | 501(c)(3) | 27,000.00 | to support the Coalition to United Methodist Accountability |
| Forum for Scriptural Christianity, Inc. | 308 East Main Street, Box 150 | Wilmore | KY | 40390 36-2680478 | 501(c)(3) | 77,000.00 | to support the Coalition for United Methodist Accountability |
| Foundation for Cultural Review | 900 Broadway, Suite 602 | New York | NY | 10003 13-3108424 | 501(c)(3) | 5,000.00 | to underwrite expenses of a lunch in honor of Andrew Roberts |
| Foundation for Cultural Review | 900 Broadway, Suite 602 | New York | NY | 10003 13-3108424 | 501(c)(3) | 7,500.00 | for a special issue of The New Criterion of "The Fall of Communism after 20 years" |
| Foundation for Cultural Review | 900 Broadway, Suite 602 | New York | NY | 10003 13-3108424 | 501(c)(3) | 10,000.00 | for general operations |
| Foundation for Cultural Review | 900 Broadway, Suite 602 | New York | NY | 10003 13-3108424 | 501(c)(3) | 10,000.00 | for the Encounter/Alexander Hamilton Institute collaboration |
| Foundation for Economic Education | 30 South Broadway | Irvington-on-Huds | NY | 10533- 13-6006960 | 501(c)(3) | 200.00 | for general operations |
| Foundation for Economic Education | 30 South Broadway | Irvington-on-Huds | NY | 10533- 13-6006960 | 501(c)(3) | 250.00 | for general operations |
| Foundation for Economic Education | 30 South Broadway | Irvington-on-Huds | NY | 10533- 13-6006960 | 501(c)(3) | 250.00 | for general operations |
| Foundation for Economic Education | 30 South Broadway | Irvington-on-Huds | NY | 10533- 13-6006960 | 501(c)(3) | 500.00 | for the matching challenge grant |
| Foundation for Economic Education | 30 South Broadway | Irvington-on-Huds | NY | 10533- 13-6006960 | 501(c)(3) | 1,000.00 | for general operations |
| Foundation for Economic Education | 30 South Broadway | Irvington-on-Huds | NY | 10533- 13-6006960 | 501(c)(3) | 1,000.00 | for general operations |
| Foundation for Economic Education | 30 South Broadway | Irvington-on-Huds | NY | 10533- 13-6006960 | 501(c)(3) | 3,000.00 | for general operations |
| Foundation for Economic Education | 30 South Broadway | Irvington-on-Huds | NY | 10533- 13-6006960 | 501(c)(3) | 6,000.00 | for general operations |
| Foundation for Ethics in Public Service | 333 Sayetlville Street | Raleigh | NC | 27601 28-4505642 | 501(c)(3) | 50,000.00 | for general operations |
| Foundation for Rational Economics & Educa | PO Box 1776 | Lake Jackson | TX | 77566 74-2066841 | 501(c)(3) | 100.00 | for general operations |
| Foundation for Rational Economics & Educa | PO Box 1776 | Lake Jackson | TX | 77566 74-2066841 | 501(c)(3) | 100.00 | for general operations |
| Foundation for Rational Economics & Educa | PO Box 1776 | Lake Jackson | TX | 77566 74-2066841 | 501(c)(3) | 5,000.00 | for general operations |
| Foundation for Teaching Economics | 260 Russell Boulevard | Davis | CA | 95616- 51-0183347 | 501(c)(3) | 500.00 | for general operations |
| Foundation for Teaching Economics | 260 Russell Boulevard | Davis | CA | 95616- 51-0183347 | 501(c)(3) | 1,000.00 | in response to the May 30th mailing |
| Foundation for Teaching Economics | 260 Russell Boulevard | Davis | CA | 95616- 51-0183347 | 501(c)(3) | 1,000.00 | for general operations |
| Foundation for Teaching Economics | 260 Russell Boulevard | Davis | CA | 95616- 51-0183347 | 501(c)(3) | 5,000.00 | for general operations |
| Fourth Presbyterian Church | 5500 River Road | Bethesda | MD | 20816 53-0196534 | 501(c)(3) | 15,000.00 | for computer equipment |
| Fourth Presbyterian Church | 5500 River Road | Bethesda | MD | 20816 53-0196534 | 501(c)(3) | 15,000.00 | for the Building Campaign |
| Fractured Atlas Productions, Inc. | 248 W. 35th Street, Suite 1202 | New York | NY | 10001- 11-3451703 | 501(c)(3) | 9,700.00 | for the benefit of the Press & Public Project |
| Franklin Center | 547 South 7th Street #176 | Bismarck | ND | 58504 26-4066298 | 501(c)(3) | 16,050.00 | to experiment with achieving growth |
| Franklin Center | 547 South 7th Street #176 | Bismarck | ND | 58504 26-4066298 | 501(c)(3) | 17,750.00 | for general operations |
| Fred Hutchinson Cancer Research Center | 1100 Fairview Avenue, North | Seattle | WA | 98109 91-1540426 | 501(c)(3) | 250.00 | for general operations |
| FREE | 662 Ferguson Road | Bozeman | MT | 59718 94-3170425 | 501(c)(3) | 5,000.00 | for general operations |
| FREE | 662 Ferguson Road | Bozeman | MT | 59718 94-3170425 | 501(c)(3) | 5,000.00 | for counterintuitive conference in response to Dick Armey's Tea Party |
| Freedom Works Foundation | 601 Pennsylvania Ave., NW, #700 | Washington | DC | 20004 52-1526916 | 501(c)(3) | 1,000.00 | Momentum" mailing |

**DONORS TRUST, INC**

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2166327

| (a) Grantees | (f) | (g) | (k) | (i) (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| Freedom Works Foundation | 601 Pennsylvania Ave., NW, #700 | Washington | DC | 20004 52-1526916 | 501(c)(3) | 1,000.00 | to support the organization's healthcare project |
| Freedom Works Foundation | 601 Pennsylvania Ave., NW, #700 | Washington | DC | 20004 52-1526916 | 501(c)(3) | 2,000.00 | for general operations |
| Freedom Works Foundation | 601 Pennsylvania Ave., NW, #700 | Washington | DC | 20004 52-1526916 | 501(c)(3) | 5,000.00 | for general operations |
| Freedom Works Foundation | 601 Pennsylvania Ave., NW, #700 | Washington | DC | 20004 52-1526916 | 501(c)(3) | 10,000.00 | for general operations |
| Fund for American Studies | 1706 New Hampshire Ave., NW, Ste. | Washington | DC | 20009 13-6223604 | 501(c)(3) | 100.00 | for general operations |
| Fund for American Studies | 1706 New Hampshire Ave., NW, Ste. | Washington | DC | 20009 13-6223604 | 501(c)(3) | 200.00 | for general operations |
| Fund for American Studies | 1706 New Hampshire Ave., NW, Ste | Washington | DC | 20009 13-6223604 | 501(c)(3) | 500.00 | for general operations |
| Fund for American Studies | 1706 New Hampshire Ave., NW, Ste | Washington | DC | 20009 13-6223604 | 501(c)(3) | 500.00 | for general operations |
| Fund for American Studies | 1706 New Hampshire Ave., NW, Ste | Washington | DC | 20009 13-6223604 | 501(c)(3) | 1,000.00 | for general operations |
| Fund for American Studies | 1706 New Hampshire Ave., NW, Ste | Washington | DC | 20009 13-6223604 | 501(c)(3) | 4,000.00 | for general operations |
| Fund for American Studies | 1706 New Hampshire Ave., NW, Ste | Washington | DC | 20009 13-6223604 | 501(c)(3) | 5,000.00 | for general operations |
| Furman University | 3300 Poinsett Highway | Greenville | SC | 29613-57-0314395 | 501(c)(3) | 5,000.00 | FBO the Tocqueville Program |
| Furman University | 3300 Poinsett Highway | Greenville | SC | 29613-57-0314395 | 501(c)(3) | 10,000.00 | FBO the Tocqueville Program |
| Furman University | 3300 Poinsett Highway | Greenville | SC | 29613-57-0314395 | 501(c)(3) | 11,873.00 | FBO the Tocqueville Program |
| Furman University | 3300 Poinsett Highway | Greenville | SC | 29613-57-0314395 | 501(c)(3) | 30,000.00 | FBO the Tocqueville Program |
| Georgetown University | 675 Intercultural Center, 37th and O S | Washington | DC | 20057 53-0196603 | 501(c)(3) | 55,000.00 | to establish the JMC-Vertias Higher Education Initiative Post-Doctoral Fellowship |
| Georgetown University | 675 Intercultural Center, 37th and O S | Washington | DC | 20057 53-0196603 | 501(c)(3) | 100,000.00 | for the Tocqueville Forum |
| GMU Foundation | 4400 University Drive, #MS 1A3 | Fairfax | VA | 22030-54-1603842 | 501(c)(3) | 4,000.00 | for Statistical Assessment Service |
| GMU Foundation | 4400 University Drive, #MS 1A3 | Fairfax | VA | 22030-54-1603842 | 501(c)(3) | 5,000.00 | for general operations |
| GMU Foundation | 4400 University Drive, #MS 1A3 | Fairfax | VA | 22030-54-1603842 | 501(c)(3) | 7,500.00 | for Statistical Assessment Service |
| GMU Foundation | 4400 University Drive, #MS 1A3 | Fairfax | VA | 22030-54-1603842 | 501(c)(3) | 10,000.00 | for general operations |
| GMU Foundation | 4400 University Drive, #MS 1A3 | Fairfax | VA | 22030-54-1603842 | 501(c)(3) | 25,000.00 | for general operations |
| GMU Foundation (Law & Econ Center) | 3301 North Fairfax Drive, MS 1G3 | Arlington | VA | 22201-54-1603842 | 501(c)(3) | 250.00 | for general operations |
| GMU Foundation (Law & Econ Center) | 3301 North Fairfax Drive, MS 1G3 | Arlington | VA | 22201-54-1603842 | 501(c)(3) | 2,000.00 | for general operations |
| GMU Foundation (Law & Econ Center) | 3301 North Fairfax Drive, MS 1G3 | Arlington | VA | 22201-54-1603842 | 501(c)(3) | 5,000.00 | for general operations |
| GMU Foundation (Law & Econ Center) | 3301 North Fairfax Drive, MS 1G3 | Arlington | VA | 22201-54-1603842 | 501(c)(3) | 50,000.00 | for general operations |
| GMU Foundation (Law & Econ Center) | 3301 North Fairfax Drive, MS 1G3 | Arlington | VA | 22201-54-1603842 | 501(c)(3) | 50,000.00 | for the Law and Economics Center |
| GMU Foundation (School of Law) | 3301 Fairfax Drive | Arlington | VA | 22201 54-1603842 | 501(c)(3) | 20,000.00 | to support the general operations of the School of Law |
| Graduate Center Foundation, Inc. (CUNY) | 365 Fifth Avenue, Room 9113 | New York | NY | 10016-13-3219419 | 501(c)(3) | 6,000.00 | Robert Fiedlhoffer's research |
| Grassroot Institute of Hawaii | 1314 S. King Street, #1163 | Honolulu | HI | 96814 99-0354937 | 501(c)(3) | 1,500.00 | in support of donor eductation meetings |
| Grassroot Institute of Hawaii | 1314 S. King Street, #1163 | Honolulu | HI | 96814 99-0354937 | 501(c)(3) | 20,000.00 | for general operations |
| GWU-Cheney Cardiovascular Institute | 2150 Pennsylvania Avenue, NW site f | Washington | DC | 20037 54-0196584 | 501(c)(3) | 25,000.00 | for the Cheney Cardiovascular Institute to establish the JMC-Veritas Higher Education Initiative Post-Doctoral |
| Harvard University | 1737 Cambridge Street, Room 417 | Cambridge | MA | 02138 53-0199180 | 501(c)(3) | 25,000.00 | Fellowship |
| Heartland Institute | 19 South LaSalle Street, Suite 903 | Chicago | IL | 60603-36-3309812 | 501(c)(3) | 250.00 | for general operations in response to the organization's stated |
| Heartland Institute | 19 South LaSalle Street, Suite 903 | Chicago | IL | 60603-36-3309812 | 501(c)(3) | 1,000.00 | emphasis on marketing of research |
| Heartland Institute | 19 South LaSalle Street, Suite 903 | Chicago | IL | 60603-36-3309812 | 501(c)(3) | 1,000.00 | for general operations |
| Heartland Institute | 19 South LaSalle Street, Suite 903 | Chicago | IL | 60603-36-3309812 | 501(c)(3) | 3,000.00 | for general operations |
| Heartland Institute | 19 South LaSalle Street, Suite 903 | Chicago | IL | 60603-36-3309812 | 501(c)(3) | 5,000.00 | for general operations |
| Heartland Institute | 19 South LaSalle Street, Suite 903 | Chicago | IL | 60603-36-3309812 | 501(c)(3) | 6,500.00 | for advertising |

SCHEDULE I (Form 990)

Part II, Line 1

DONORS TRUST, INC

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2166327

| (a) Grantee | (i) | (j) | (k) | (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| Heartland Institute | 19 South LaSalle Street, Suite 903 | Chicago | IL | 60603-36-3309812 | 501(c)(3) | 500,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 100.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 250.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 250.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 1,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 1,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 1,000.00 for defense policy studies | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 1,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 1,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 2,500.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 2,500.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 5,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 5,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 10,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 10,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 10,000.00 for general operations | |
| Heritage Foundation | 214 Massachusetts Avenue, NE | Washington | DC | 20002-23-7327730 | 501(c)(3) | 10,915.45 | in memory of grandparents Nicholas H. Noyes and Marguerite L. Noyes |
| HI Society of the Sons of the American Re | 745 Fort Street, Suite 311 | Honolulu | HI | 96813-53-0116355 | 501(c)(3) | 10,000.00 for general operations | |
| Hillsdale College | 33 East College | Hillsdale | MI | 49242-38-1374230 | 501(c)(3) | 250.00 for general operations | |
| Hillsdale College | 33 East College | Hillsdale | MI | 49242-38-1374230 | 501(c)(3) | 500.00 for general operations | |
| Hillsdale College | 33 East College | Hillsdale | MI | 49242-38-1374230 | 501(c)(3) | 1,000.00 for general operations | |
| Hillsdale College | 33 East College | Hillsdale | MI | 49242-38-1374230 | 501(c)(3) | 1,000.00 for general operations | |
| Hillsdale College | 33 East College | Hillsdale | MI | 49242-38-1374230 | 501(c)(3) | 1,000.00 for general operations | |
| Hillsdale College | 33 East College | Hillsdale | MI | 49242-38-1374230 | 501(c)(3) | 1,500.00 for general operations | |
| Hillsdale College | 33 East College | Hillsdale | MI | 49242-38-1374230 | 501(c)(3) | 10,000.00 for the president's discretionary fund | |
| Hillsdale College | 33 East College | Hillsdale | MI | 49242-38-1374230 | 501(c)(3) | 104,000.00 for general operations | |
| Hoover Institution-Stanford University | 434 Galvz Mall | Stanford | CA | 94305-94-1156365 | 501(c)(3) | 500.00 for general operations | |
| Hoover Institution-Stanford University | 434 Galvz Mall | Stanford | CA | 94305-94-1156365 | 501(c)(3) | 10,000.00 for general operations | |
| Hotchkiss School | PO Box 800 | Lakeville | CT | 06039-06-0647018 | 501(c)(3) | 1,000.00 Fund Campaign (Prep Class Family) | for the organization's 2009-2010 Parent |
| Hotchkiss School | PO Box 800 | Lakeville | CT | 06039-06-0647018 | 501(c)(3) | 8,000.00 for general operations | |
| Hotchkiss School | PO Box 800 | Lakeville | CT | 06039-06-0647018 | 501(c)(3) | 12,000.00 for general operations | |
| Hudson Institute | 1015 15th Street, NW, Sixth Floor | Washington | DC | 20005-13-1945157 | 501(c)(3) | $5,000.00 for general operations and $5,000 | $5,000.00 to support Martin Wooster projects |
| Illinois Policy Institute | 190 South LaSalle St., Ste. 2130 | Chicago | IL | 60603-41-2057028 | 501(c)(3) | 5,000.00 for general operations | |
| Illinois Policy Institute | 190 South LaSalle St., Ste. 2130 | Chicago | IL | 60603-41-2057028 | 501(c)(3) | 5,000.00 for general operations | |
| Illinois Policy Institute | 190 South LaSalle St., Ste. 2130 | Chicago | IL | 60603-41-2057028 | 501(c)(3) | 5,000.00 for general operations | |
| Illinois Policy Institute | 190 South LaSalle St., Ste. 2130 | Chicago | IL | 60603-41-2057028 | 501(c)(3) | 25,000.00 for general operations | |
| Independent Women's Forum | 4400 Jenifer Street, NW, Ste., 240 | Washington | DC | 20015-54-1670627 | 501(c)(3) | 20,000.00 for general operations | |
| Independent Women's Forum | 4400 Jenifer Street, NW, Ste., 240 | Washington | DC | 20015-54-1670627 | 501(c)(3) | 100,000.00 for general operations | |
| Independent Women's Forum | 4400 Jenifer Street, NW, Ste., 240 | Washington | DC | 20015-54-1670627 | 501(c)(3) | 750,000.00 for general operations | |
| Independent Women's Forum | 4400 Jenifer Street, NW, Ste., 240 | Washington | DC | 20015-54-1670627 | 501(c)(3) | 950,000.00 for general operations | |
| Institute for American Values | 1841 Broadway, Suite 211 | New York | NY | 10023-13-3400377 | 501(c)(3) | 1,200,000.00 to support the work of Claire Guaddani | |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 75,000.00 | |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 100.00 for general operations | |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 100.00 for general operations | |

SCHEDULE I (Form 990)

Part II, Line 1

DONORS TRUST, INC

**SCHEDULE I (Form 990)**
**Part II, Line 1**

EIN: 52-2166327

| (a) Grantee | (i) | (j) | (k) | (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 250.00 | for general operations |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 1,000.00 | for general operations |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 1,000.00 | for general operations |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 1,000.00 | for general operations |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 2,500.00 | for general operations |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 5,000.00 | for general operations |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 5,000.00 | for general operations |
| Institute for Humane Studies | 3301 North Fairfax Drive, Suite 440 | Arlington | VA | 22201-94-1623852 | 501(c)(3) | 8,000.00 | for general operations |
| Institute for Justice | 901 N Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 100.00 | for general operations |
| Institute for Justice | 901 N Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 500.00 | for general operations |
| Institute for Justice | 901 N. Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 500.00 | for general operations |
| Institute for Justice | 901 N. Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 1,000.00 | for general operations |
| Institute for Justice | 901 N. Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 1,000.00 | for general operations |
| Institute for Justice | 901 N. Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 1,000.00 | for general operations |
| Institute for Justice | 901 N Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 2,000.00 | for general operations |
| Institute for Justice | 901 N Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 2,000.00 | for general operations |
| Institute for Justice | 901 N Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 2,000.00 | for general operations |
| Institute for Justice | 901 N. Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 2,500.00 | for general operations |
| Institute for Justice | 901 N. Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 2,500.00 | for general operations |
| Institute for Justice | 901 N Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 3,000.00 | for general operations |
| Institute for Justice | 901 N Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 5,000.00 | for general operations |
| Institute for Justice | 901 N Glebe Road, Suite 900 | Arlington | VA | 22203 52-1744337 | 501(c)(3) | 5,000.00 | for general operations |
| Institute for World Politics | 1521 16th Street, NW | Washington | DC | 20036 52-1699641 | 501(c)(3) | 1,000.00 | for general operations |
| Institute for World Politics | 1521 16th Street, NW | Washington | DC | 20036 52-1699641 | 501(c)(3) | 1,000.00 | for general operations |
| Institute for World Politics | 1521 16th Street, NW | Washington | DC | 20036 52-1699641 | 501(c)(3) | 10,000.00 | for general operations |
| International Policy Network US, Inc | 214 Massachusetts Avenue, NE | Washington | DC | 20002 52-2363626 | 501(c)(3) | 1,500.00 | for the EUREKA Project |
| International Policy Network US, Inc. | 214 Massachusetts Avenue, NE | Washington | DC | 20002 52-2363626 | 501(c)(3) | 5,000.00 | for general operations |
| International Policy Network US, Inc. | 214 Massachusetts Avenue, NE | Washington | DC | 20002 52-2363626 | 501(c)(3) | 20,000.00 | for general operations |
| International Policy Network US, Inc. | 214 Massachusetts Avenue, NE | Washington | DC | 20002 52-2363626 | 501(c)(3) | 20,000.00 | for general operations |
| James Partnership | 9302-C Old Keene Mill Road | Burke | VA | 22015 26-2521115 | 501(c)(3) | 40,000.00 | for general operations |
| James Partnership | 9302-C Old Keene Mill Road | Burke | VA | 22015 26-2521115 | 501(c)(3) | 40,000.00 | for general operations |
| James Randi Educational Foundation | 201 SE 12th Street | Fort Lauderdale | FL | 33316 65-0649443 | 501(c)(3) | 2,000.00 | for Project Gamma |
| James Randi Educational Foundation | 201 SE 12th Street | Fort Lauderdale | FL | 33316 65-0649443 | 501(c)(3) | 5,000.00 | for general operations |
| John Adams Center | c/o Brigham Young University, 750 SI Provo | Provo | UT | 84602 27-0151485 | 501(c)(3) | 15,000.00 | for the inaugural conference on Religion and Philosophy in the Public Sq |
| John K. Maclver Institute for Public Poli | PO Box 510564 | New Berlin | WI | 53151 26-2639114 | 501(c)(3) | 14,500.00 | to experiment with achieving growth |
| Johns Hopkins University | 600 N. Wolfe Street - Dept. of Neuros | Baltimore | MD | 21287 52-0595110 | 501(c)(3) | 8,000.00 | for Dr. Henry Brem's research |
| Judicial Watch | 501 School Street, SW, Suite 700 | Washington | DC | 20024 52-1885088 | 501(c)(3) | 100.00 | for general operations |
| Judicial Watch | 501 School Street, SW, Suite 700 | Washington | DC | 20024 52-1885088 | 501(c)(3) | 1,000.00 | for general operations |
| Judicial Watch | 501 School Street, SW, Suite 700 | Washington | DC | 20024 52-1885088 | 501(c)(3) | 2,000.00 | for general operations |
| Judicial Watch | 501 School Street, SW, Suite 700 | Washington | DC | 20024 52-1885088 | 501(c)(3) | 5,000.00 | for general operations |
| Keren Yehoshua v'Yisrael, Inc. | 1022 East 10th Street | Brooklyn | NY | 11230 22-3209160 | 501(c)(3) | 10,000.00 | Chief of the "Jewish World Review" to support Benyamin L. Jolkovsky, Editor-in- |
| Leadership Institute | 1101 North Highland Street | Arlington | VA | 22201 51-0235174 | 501(c)(3) | 500.00 | for general operations |
| Leadership Institute | 1101 North Highland Street | Arlington | VA | 22201 51-0235174 | 501(c)(3) | 1,000.00 | for the Campus Reform Now project |
| Leadership Institute | 1101 North Highland Street | Arlington | VA | 22201 51-0235174 | 501(c)(3) | 1,000.00 | for general operations |

SCHEDULE I (Form 990)

Part II, Line 1

DONORS TRUST, INC

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2166327

| (a) Grantee | (i) | (j) | (k) | (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| Leadership Institute | 1101 North Highland Street | Arlington | VA | 22201 51-0235174 | 501(c)(3) | 1,000.00 | for general operations |
| Leadership Institute | 1101 North Highland Street | Arlington | VA | 22201 51-0235174 | 501(c)(3) | 1,000.00 | for general operations |
| | | | | | | | for the distribution of National Review |
| Leadership Institute | 1101 North Highland Street | Arlington | VA | 22201 51-0235174 | 501(c)(3) | 162,514.00 | subscriptions on college campuses |
| Lucy Burns Institute | 301 S Bedford Street, Suite 6 | Madison | WI | 53703- 20-8036372 | 501(c)(3) | 3,000.00 | for grant administration |
| Lucy Burns Institute | 301 S Bedford Street, Suite 6 | Madison | WI | 53703- 20-8036372 | 501(c)(3) | 7,500.00 | for general operations |
| Lucy Burns Institute | 301 S Bedford Street, Suite 6 | Madison | WI | 53703- 20-8036372 | 501(c)(3) | 14,350.00 | to experiment with achieving growth |
| Lucy Burns Institute | 301 S Bedford Street, Suite 6 | Madison | WI | 53703- 20-8036372 | 501(c)(3) | 38,750.00 | for general operations |
| Manhattan Institute For Policy Research | 52 Vanderbilt Avenue | New York | NY | 10017 13-2912529 | 501(c)(3) | 1,000.00 | for general operations |
| Manhattan Institute For Policy Research | 52 Vanderbilt Avenue | New York | NY | 10017 13-2912529 | 501(c)(3) | 5,000.00 | for general operations |
| Manhattan Institute For Policy Research | 52 Vanderbilt Avenue | New York | NY | 10017 13-2912529 | 501(c)(3) | 10,000.00 | for the Alexander Hamilton Dinner |
| Manhattan Institute For Policy Research | 52 Vanderbilt Avenue | New York | NY | 10017 13-2912529 | 501(c)(3) | 10,000.00 | for general operations |
| Manhattan Institute For Policy Research | 52 Vanderbilt Avenue | New York | NY | 10017 13-2912529 | 501(c)(3) | 10,000.00 | for general operations |
| Manhattan Institute For Policy Research | 52 Vanderbilt Avenue | New York | NY | 10017 13-2912529 | 501(c)(3) | 12,000.00 | for general operations |
| Manhattan Institute For Policy Research | 52 Vanderbilt Avenue | New York | NY | 10017 13-2912529 | 501(c)(3) | 50,000.00 | general support for the American University |
| Marijuana Policy Project Foundation | Capitol Hill, PO Box 77492 | Washington | DC | 20013 52-1975211 | 501(c)(3) | 250.00 | for general operations |
| Marijuana Policy Project Foundation | Capitol Hill, PO Box 77492 | Washington | DC | 20013 52-1975211 | 501(c)(3) | 4,000.00 | for general operations |
| Marijuana Policy Project Foundation | Capitol Hill, PO Box 77492 | Washington | DC | 20013 52-1975211 | 501(c)(3) | 5,000.00 | for general operations |
| Massachusetts Charter School Assoc | 10 Tremont Street, 6th floor | Boston | MA | 02108 04-3559305 | 501(c)(3) | 7,500.00 | for general operations |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 500.00 | for general operations |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 500.00 | for general operations |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 1,000.00 | for general operations |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 1,000.00 | for general operations |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 1,000.00 | for the Rush Limbaugh project |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 1,000.00 | for general operations |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 2,500.00 | Bronze Sponsorship for the 2009 Gala |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 5,000.00 | for general operations |
| Media Research Center | 325 S Patrick Street | Alexandria | VA | 22314 54-1429009 | 501(c)(3) | 300,000.00 | for general operations |
| Mercatus Center, GMU | 3301 North Fairfax Drive, Suite 450 | Arlington | VA | 22201- 54-1436224 | 501(c)(3) | 100.00 | for general operations |
| Mercatus Center, GMU | 3301 North Fairfax Drive, Suite 450 | Arlington | VA | 22201- 54-1436224 | 501(c)(3) | 200.00 | for general operations |
| Mercatus Center, GMU | 3301 North Fairfax Drive, Suite 450 | Arlington | VA | 22201- 54-1436224 | 501(c)(3) | 1,000.00 | for the 2009 Annual Fund |
| Mercatus Center, GMU | 3301 North Fairfax Drive, Suite 450 | Arlington | VA | 22201- 54-1436224 | 501(c)(3) | 1,000.00 | for general operations |
| Mercatus Center, GMU | 3301 North Fairfax Drive, Suite 450 | Arlington | VA | 22201- 54-1436224 | 501(c)(3) | 1,000.00 | for general operations |
| Mercatus Center, GMU | 3301 North Fairfax Drive, Suite 450 | Arlington | VA | 22201- 54-1436224 | 501(c)(3) | 100,000.00 | to support state outreach program |
| Middle East Forum | 1500 Walnut Street, Ste. 1050 | Philadelphia | PA | 19102 23-7748796 | 501(c)(3) | 10,500.00 | for general operations |
| Moving Windmills Project, Inc | 41 Madison Avenue, Suite 4000 | New York | NY | 10010- 26-2381809 | 501(c)(3) | 11,250.00 | for general operations |
| Museum of the Rockies | 600 West Kagy Boulevard | Bozeman | MT | 59717 81-6016828 | 501(c)(3) | 30,000.00 | for "Jack Horner Fund" for Mongolia Project |
| Museum of the Rockies | 600 West Kagy Boulevard | Bozeman | MT | 59717 81-6016828 | 501(c)(3) | 1,000.00 | for general operations |
| Museum of the Rockies | 600 West Kagy Boulevard | Bozeman | MT | | | | for the organization's grass roots health |
| National Center for Policy Analysis | 12770 Coit Road, Suite 800 | Dallas | TX | 75251- 75-1804932 | 501(c)(3) | 2,000.00 | campaign |
| National Center for Policy Analysis | 12770 Coit Road, Suite 800 | Dallas | TX | 75251- 75-1804932 | 501(c)(3) | 5,000.00 | for general operations |
| National Legal & Policy Center | 107 Park Washington Court | Falls Church | VA | 22046 52-1750186 | 501(c)(3) | 600.00 | for general operations |
| National Legal & Policy Center | 107 Park Washington Court | Falls Church | VA | 22046 52-1750186 | 501(c)(3) | 600.00 | for general operations |
| National Legal & Policy Center | 107 Park Washington Court | Falls Church | VA | 22046 52-1750186 | 501(c)(3) | 1,000.00 | for general operations |

SCHEDULE I (Form 990)

Part II, Line 1

**DONORS TRUST, INC**

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2166327

| (a) Grantee | (i) | (j) | (k) | (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| National Legal & Policy Center | 107 Park Washington Court | Falls Church | VA | 22046 52-1750188 | 501(c)(3) | 1,000.00 | for general operations |
| National Legal & Policy Center | 107 Park Washington Court | Falls Church | VA | 22046 52-1750188 | 501(c)(3) | 4,000.00 | for general operations |
| National Right to Work Foundation | 8001 Braddock Road, Ste. 500 | Springfield | VA | 22151- 59-1588825 | 501(c)(3) | 10,000.00 | for general operations |
| National Right to Work Foundation | 8001 Braddock Road, Ste. 500 | Springfield | VA | 22151- 59-1588825 | 501(c)(3) | 20,000.00 | for general operations |
| National Right to Work Foundation | 8001 Braddock Road, Ste. 500 | Springfield | VA | 22151- 59-1588825 | 501(c)(3) | 100.00 | for general operations |
| National Right to Work Foundation | 8001 Braddock Road, Ste. 500 | Springfield | VA | 22151- 59-1588825 | 501(c)(3) | 500.00 | for general operations |
| National Right to Work Foundation | 8001 Braddock Road, Ste. 500 | Springfield | VA | 22151- 59-1588825 | 501(c)(3) | 3,000.00 | for general operations |
| National Right to Work Foundation | 8001 Braddock Road, Ste. 500 | Springfield | VA | 22151 59-1588825 | 501(c)(3) | 2,500.00 | for general operations |
| National Tax Limitation Foundation | 151 N. Sunrise Ave., Ste. 901 | Roseville | CA | 95661 51-0208455 | 501(c)(3) | 15,200.00 | for general operations |
| Network 20/20, Inc. | 850 7th Avenue, Ste. 1300 | New York | NY | 10019 34-1983612 | 501(c)(3) | 7,000.00 | for general operations |
| New Atlantic Initiative | 3105 Woodley Road, NW | Washington | DC | 20008- 20-2636767 | 501(c)(3) | 22,000.00 | for general operations |
| New Atlantic Initiative | 3105 Woodley Road, NW | Washington | DC | 20008- 20-2636767 | 501(c)(3) | 25,000.00 | for general operations |
| New Atlantic Initiative | 3105 Woodley Road, NW | Washington | DC | 20008- 20-2636767 | 501(c)(3) | 25,000.00 | for general operations |
| New York Academy of Sciences | 7 World Trade Center, 250 Greenwich | New York | NY | 10007 13-1773840 | 501(c)(3) | 12,000.00 | for general operations |
| New York Historical Society | 170 Central Park West | New York | NY | 10024 13-1624124 | 501(c)(3) | 1,000.00 | for the Glider Challenge |
| New York Historical Society | 170 Central Park West | New York | NY | 10024 13-1624124 | 501(c)(3) | 5,000.00 | for general operations |
| New York Historical Society | 170 Central Park West | New York | NY | 10024 13-1624124 | 501(c)(3) | 5,000.00 | for the 2009 History Makers Gala |
| New York Historical Society | 170 Central Park West | New York | NY | 10024 13-1624124 | 501(c)(3) | 10,000.00 | for general operations |
| NumbersUSA | 1601 North Kent Street, Suite 1100 | Arlington | VA | 22209 47-0865426 | 501(c)(3) | 1,000.00 | for general operations |
| NumbersUSA | 1601 North Kent Street, Suite 1100 | Arlington | VA | 22209 47-0865426 | 501(c)(3) | 1,000.00 | for general operations |
| NumbersUSA | 1601 North Kent Street, Suite 1100 | Arlington | VA | 22209 47-0865426 | 501(c)(3) | 2,000.00 | for general operations |
| NumbersUSA | 1601 North Kent Street, Suite 1100 | Arlington | VA | 22209 47-0865426 | 501(c)(3) | 5,000.00 | for general operations |
| Pacific Legal Foundation | 3900 Lennane Drive, Suite 200 | Sacramento | CA | 95834 94-2197343 | 501(c)(3) | 250.00 | for general operations |
| Pacific Legal Foundation | 3900 Lennane Drive, Suite 200 | Sacramento | CA | 95834 94-2197343 | 501(c)(3) | 500.00 | for general operations |
| Pacific Legal Foundation | 3900 Lennane Drive, Suite 200 | Sacramento | CA | 95834 94-2197343 | 501(c)(3) | 1,000.00 | for general operations |
| Pacific Legal Foundation | 3900 Lennane Drive, Suite 200 | Sacramento | CA | 95834 94-2197343 | 501(c)(3) | 1,000.00 | for general operations |
| Pacific Research Institute for Public Pol | One Embarcadero Center, Ste 350 | San Francisco | CA | 94111 94-2528433 | 501(c)(3) | 5,000.00 | Host Committee Silver Sponsor 2009 |
| Pacific Research Institute for Public Pol | One Embarcadero Center, Ste 350 | San Francisco | CA | 94111 94-2528433 | 501(c)(3) | 1,000.00 | for general operations |
| Pacific Research Institute for Public Pol | One Embarcadero Center, Ste 350 | San Francisco | CA | 94111 94-2528433 | 501(c)(3) | 1,000.00 | for general operations |
| Pacific Research Institute for Public Pol | One Embarcadero Center, Ste 350 | San Francisco | CA | 94111 94-2528433 | 501(c)(3) | 3,000.00 | for general operations |
| Pacific Research Institute for Public Pol | One Embarcadero Center, Ste 350 | San Francisco | CA | 94111 94-2528433 | 501(c)(3) | 10,000.00 | for general operations |
| PERC | 2048 Analysis Drive, Suite A | Bozeman | MT | 59718 81-0393444 | 501(c)(3) | 250.00 | for general operations |
| PERC | 2048 Analysis Drive, Suite A | Bozeman | MT | 59718 81-0393444 | 501(c)(3) | 500.00 | for general operations |
| PERC | 2048 Analysis Drive, Suite A | Bozeman | MT | 59718 81-0393444 | 501(c)(3) | 1,000.00 | for general operations |
| PERC | 2048 Analysis Drive, Suite A | Bozeman | MT | 59718 81-0393444 | 501(c)(3) | 1,000.00 | for general operations |
| PERC | 2048 Analysis Drive, Suite A | Bozeman | MT | 59718 81-0393444 | 501(c)(3) | 5,000.00 | for general operations |
| Philanthropy Roundtable | 1150 17th Street, NW, Suite 503 | Washington | DC | 20036 13-2943020 | 501(c)(3) | 100.00 | for general operations |
| Philanthropy Roundtable | 1150 17th Street, NW, Suite 503 | Washington | DC | 20036 13-2943020 | 501(c)(3) | 3,000.00 | for general operations |
| Philanthropy Roundtable | 1150 17th Street, NW, Suite 503 | Washington | DC | 20036 13-2943020 | 501(c)(3) | 5,000.00 | Program support |
| Philanthropy Roundtable | 1150 17th Street, NW, Suite 503 | Washington | DC | 20036 13-2943020 | 501(c)(3) | 5,000.00 | for general operations |
| Pioneer Institute for Public Policy Resea | 85 Devonshire Street, 8th Floor | Boston | MA | 2109 22-2632081 | 501(c)(3) | 100,000.00 | for general operations |
| Prometheus Institute | 82 Clouds View | Irvine | CA | 92603 20-3658542 | 501(c)(3) | 18,900.00 | for achieving greater reach by drawing attention to your work through online advertising |
| Providence St. Joseph Foundation | 501 South Buena Vista Street | Burbank | CA | 91505 95-3544877 | 501(c)(3) | 5,000.00 | for general operations |
| Randolph Bourne Institute, Inc | 1017 El Camino Real, #306 | Redwood City | CA | 94063 71-0929026 | 501(c)(3) | 25,000.00 | for general operations |
| Randolph Bourne Institute, Inc | 1017 El Camino Real, #306 | Redwood City | CA | 94063 71-0929026 | 501(c)(3) | 50,000.00 | for general operations |

SCHEDULE I (Form 990)

Part II, Line 1

**DONORS TRUST, INC**

**SCHEDULE I (Form 990)**
**Part II, Line 1**

EIN: 52-2166327

| (e) Grantee | (f) | (i) | (k) | (j) | (l) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|---|
| Rhodes College | 200 N Parkway | Memphis | TN | 38112 | 62-0476301 | 501(c)(3) | 25,000.00 | to establish the JMC-Veritas Higher Education Initiative Post-Doctoral Fellowship |
| Rockefeller University | 1230 York Avenue | New York | NY | 10021 | 13-1624158 | 501(c)(3) | 10,000.00 | for general operations |
| Salvation Army - Massachusetts | 147 Berkeley Street | Boston | MA | 02467 | 22-2406433 | 501(c)(3) | 5,000.00 | for general operations |
| Salvation Army-DC | PO Box 269 | Alexandria | DC | 22313 | 22-2406433 | 501(c)(3) | 200.00 | for general operations |
| Salvation Army-DC | PO Box 269 | Alexandria | DC | 22313 | 22-2406433 | 501(c)(3) | 400.00 | for general operations |
| Salvation Army-DC | PO Box 269 | Alexandria | DC | 22313 | 22-2406433 | 501(c)(3) | 500.00 | to support the National Capital Area Command |
| Salvation Army-Roseville, MN | PO Box 131240 | Roseville | MN | 55113 | 22-2406433 | 501(c)(3) | 100.00 | for general operations |
| Salvation Army-Tucson | 218 E Prince Road | Tucson | AZ | 85705 | 22-2406433 | 501(c)(3) | 1,000.00 | for general operations |
| Sam Adams Alliance | 400 West Erie, Suite #407 | Chicago | IL | 60654 | 20-5792227 | 501(c)(3) | 5,000.00 | content/portal for comprehensive Kansas state legislative |
| Sam Adams Alliance | 400 West Erie, Suite #407 | Chicago | IL | 60654 | 20-5792227 | 501(c)(3) | 250,000.00 | for general operations |
| Science Festival Foundation | 230 West 41st Street, Ste 1600 | New York | NY | 10036 | 43-2095418 | 501(c)(3) | 10,000.00 | for general operations |
| Seligman Historical Society | P O Box 51 | Seligman | AZ | 86337 | 86-0686270 | 501(c)(3) | 5,000.00 | for the organization's Route 66 Preservation Project |
| Shimer College | 3424 S State Street | Chicago | IL | 60616 | 36-2167921 | 501(c)(3) | 10,000.00 | for general operations |
| Shimer College | 3424 S State Street | Chicago | IL | 60616 | 36-2167921 | 501(c)(3) | 125,000.00 | for general operations |
| Shimer College | 3424 S. State Street | Chicago | IL | 60616 | 36-2167921 | 501(c)(3) | 200,000.00 | for general operations |
| Shimer College | 3424 S. State Street | Chicago | IL | 60616 | 36-2167921 | 501(c)(3) | 250,000.00 | for general operations |
| Shriners Hospitals for Children | PO Box 31356 | Tampa | FL | 33631 | 36-2193608 | 501(c)(3) | 10,000.00 | for general operations |
| Skeptics Society | 2761 N Marengo Avenue | Pasadena | CA | 91001 | 95-4550781 | 501(c)(3) | 6,000.00 | for general operations |
| Southeastern Legal Foundation | 6100 Lake Forrest Drive, Ste. 520 | Atlanta | GA | 30328 | 58-1247027 | 501(c)(3) | 15,000.00 | to support the organization's work with the assistance of Bert Rein |
| St Ann's Roman Catholic Church | 5300 North 10th Street | Arlington | VA | 22205 | | 501(c)(3) | 8,000.00 | for general operations |
| St. Ann's Roman Catholic Church | 5300 North 10th Street | Arlington | VA | 22206 | | 501(c)(3) | 5,000.00 | for general operations |
| St Bernard's School | 4 East 98th Street | New York | NY | 10029 | 13-1265270 | 501(c)(3) | 10,000.00 | for general operations |
| State Policy Network | 2020 North 14th Street | Arlington | VA | 22201 | 57-0952531 | 501(c)(3) | 200.00 | for annual fund for the current year |
| State Policy Network | 2020 North 14th Street | Arlington | VA | 22201 | 57-0952531 | 501(c)(3) | 500.00 | Annual Membership |
| State Policy Network | 2020 North 14th Street | Arlington | VA | 22201 | 57-0952531 | 501(c)(3) | 1,000.00 | for general operations |
| State Policy Network | 2020 North 14th Street | Arlington | VA | 22201 | 57-0952531 | 501(c)(3) | 1,000.00 | in response to the organization's upcoming annual meeting |
| State Policy Network | 2020 North 14th Street | Arlington | VA | 22201 | 57-0952531 | 501(c)(3) | 2,000.00 | for general operations |
| Sutherland Institute | 307 West 200 South, Suite 5005 | Salt Lake City | UT | 84101 | 87-0531727 | 501(c)(3) | 10,000.00 | for general operations |
| Texas Public Policy Foundation | 900 Congress Avenue, Suite 400 | Austin | TX | 78701 | 74-2524057 | 501(c)(3) | 235,000.00 | for general operations |
| The James Partnership | 9302-C Old Keene Mill Road | Burke | VA | 22015 | 26-2521115 | 501(c)(3) | 10,000.00 | for the Center for Education Policy |
| The James Partnership | 9302-C Old Keene Mill Road | Burke | VA | 22015 | 26-2521115 | 501(c)(3) | 45,000.00 | for general operations |
| The James Partnership | 9302-C Old Keene Mill Road | Burke | VA | 22015 | 26-2521115 | 501(c)(3) | 58,000.00 | for general operations |
| The James Partnership | 9302-C Old Keene Mill Road | Burke | VA | 22015 | 26-2521115 | 501(c)(3) | 75,000.00 | for general operations |
| The Science Network (Salk Institute - CNL) | 10010 N Torrey Pines Rd. | La Jolla | CA | 92037 | 81-0639470 | 501(c)(3) | 5,000.00 | for general operations |
| The Science Network (Salk Institute - CNL) | 10010 N Torrey Pines Rd. | La Jolla | CA | 92037 | 81-0639470 | 501(c)(3) | 5,000.00 | for general operations |
| Thomas Jefferson Institute | 9035 Golden Sunset Lane | Springfield | VA | 22153 | 51-0280185 | 501(c)(3) | 2,500.00 | for general operations |
| Thomas More Law Center | 24 Frank Lloyd Wright Drive, PO # 39 Ann Arbor | Ann Arbor | MI | 48105 | 38-3448297 | 501(c)(3) | 2,500.00 | for general operations |
| Thomas More Law Center | 24 Frank Lloyd Wright Drive, PO # 39 Ann Arbor | Ann Arbor | MI | 48105 | 38-3448297 | 501(c)(3) | 5,000.00 | for general operations |
| Trustees of Dartmouth College | 6108 Silsby Hall | Hanover | NH | 3755 | 02-0222111 | 501(c)(3) | 10,356.63 | for the "Class of '66 Lodge Fund." |
| University at Buffalo Foundation (SUNY) | 520 Park Hall (North Campus) | Buffalo | NY | 14260 | 16-0865182 | 501(c)(3) | 7,000.00 | for the Department of Political Science |

**DONORS TRUST, INC**

SCHEDULE I (Form 990)
Part II, Line 1

EIN: 52-2166327

| (a) Grantee | (f) | (j) | (k) | (i) (b) EIN | (c) IRC | (g) Amount | (h) Purpose |
|---|---|---|---|---|---|---|---|
| University of Arizona Foundation | PO Box 210027 | Tucson | AZ | 85721 86-6050388 | 501(c)(3) | 76,000.00 | FBO Center for the Philosophy of Freedom support research & teaching in the |
| University of CA Regents-Berkeley | 793 Simon Hall, MC 7200 | Berkeley | CA | 94720- 94-3067788 | 501(c)(3) | 60,000.00 | Berkeley Program in Law & Economics |
| University of Maine | 5754 North Stevens Hall, Rm 229 | Orono | ME | 04469- 01-6000769 | 501(c)(3) | 16,000.00 | Department of Political Science lectures |
| University of Notre Dame | 110 Grace Hall | Notre Dame | IN | 46556 35-0868188 | 501(c)(3) | 65,000.00 | to establish the JMC-Veritas Higher Education Initiative Post-Doctoral Fellowship |
| University of Richmond | 28 Westhampton Way | Richmond | VA | 23173 | 501(c)(3) | 15,000.00 | to establish the JMC-Veritas Higher Education Initiative Post-Doctoral Fellowship |
| University of Texas - Austin | 1 University Station C4100 | Austin | TX | 78712 74-6000203 | 501(c)(3) | 55,000.00 | to establish the JMC-Veritas Higher Education Initiative Post-Doctoral Fellowship |
| University of Virginia Foundation | Dept. of Politics, PO Box 400787 | Charlottesville | VA | 22904- 54-1682176 | 501(c)(3) | 55,000.00 | to support research activities of Professor Jim Puntio at the University |
| University System of Maryland Foundation | A.V Williams Building | College Park | MD | 20742 52-1125663 | 501(c)(3) | 3,000.00 | to support research activities of Professor Puntio at the University |
| University System of Maryland Foundation | A.V Williams Building | College Park | MD | 20742 52-1125663 | 501(c)(3) | 6,500.00 | for general operations |
| US English Foundation | 1747 Pennsylvania Ave. NW, Suite 11 | Washington | DC | 20006 52-1524976 | 501(c)(3) | 250.00 | for general operations |
| US English Foundation | 1747 Pennsylvania Ave. NW, Suite 11 | Washington | DC | 20006 52-1524976 | 501(c)(3) | 10,000.00 | for general operations |
| Villanova University | 800 Lancaster Avenue | Villanova | PA | 19805 23-1352688 | 501(c)(3) | 25,000.00 | to establish the JMC-Veritas Higher Education Initiative Post-Doctoral Fellowship |
| Williams College | 75 Park Street | Williamstown | MA | 01267 04-2104847 | 501(c)(3) | 11,000.00 | for Parents Fund, class of 2011 |
| Young America's Foundation | 110 Elden Street, Suite A | Herndon | VA | 20170- 23-7042029 | 501(c)(3) | 100.00 | for general operations |
| Young America's Foundation | 110 Elden Street, Suite A | Herndon | VA | 20170- 23-7042029 | 501(c)(3) | 1,000.00 | for general operations |
| Young America's Foundation | 110 Elden Street, Suite A | Herndon | VA | 20170- 23-7042029 | 501(c)(3) | 1,000.00 | for the Reagan Ranch |
| Young America's Foundation | 110 Elden Street, Suite A | Herndon | VA | 20170- 23-7042029 | 501(c)(3) | 10,000.00 | for general operations |
| Young America's Foundation | 110 Elden Street, Suite A | Herndon | VA | 20170- 23-7042029 | 501(c)(3) | 25,000.00 | for general operations |

SCHEDULE I (Form 990)

Part II, Line 1

Donors Trust, Inc.   ·   52-2166327                                    5

**Supporting Statement of:**

Schedule R/Total Income-1

| Description | Amount |
|---|---|
| Contribution received at fair market value | 1,450,000. |
| Total | 1,450,000. |

**Supporting Statement of:**

Schedule R/Total Income-2

| Description | Amount |
|---|---|
| Contributions received(cash) | 175,000. |
| Total | 175,000. |

**Supporting Statement of:**

Schedule R/Total Income-3

| Description | Amount |
|---|---|
| Contributions received (cash) | 322,000. |
| Total | 322,000. |