# EXHIBIT 10

July 15, 2011

Dear Class Counsel I Sherilyn Kindelay object to the XM Radio lawsuit Settlement, I object because I want the XM to continue their Services. Having the radio was a moment in my life that was truly priceless.
My address
P.O Box 521
Bylas Arizona
85530
my telephone message # 9284754189


Sincerly

Sherilyn Kindelay

Sherilyn Kindelay

# EXHIBIT 11

1  R. Stephen Griffis, PC
R. Stephen Griffis
2  2100 Riverhaven Drive, Suite 1
3  Hoover, AL 35244
4  Ph: 205-402-7476 (ext 6)
Fax: 205-402-7292
5  rsglaw@bellsouth.net
6
7  Attorney for Objector:
8
9
                 UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
10

| | |
|---|---|
| 11  Carl Blessing, Individually and on behalf of<br>12  all others similarly situated,<br><br>13<br><br>14             Plaintiff,<br><br>15<br><br>16  v.<br><br>17  Sirius XM Radio, Inc.<br><br>18           Defendant.<br>19 | CASE No : 09 – CV- 10035 HB (S.D.N.Y.)<br><br>OBJECTION TO PROPOSED<br>SETTLEMENT, NOTICE OF APPEARANCE<br>AND INTENT TO BE HEARD<br><br>Date:  August 8, 2011<br>Time:  10:00 a.m.<br>Judge:  Harold Baer, Jr. |

20
21
22      COMES NOW, Randy Lyons ("Objector") by and through his undersigned attorney and
23  files this Objection to the Proposed Settlement in this matter. In support thereof, Objector states
24  as follows:
25      1.   Your Objector is a Member of the Class, having subscribed to Sirius/XM in excess
26  of two years and your Objector currently maintains a subscription. For purposes of this
27
28

Objection the address and telephone number of the Objector should be in care of the undersigned.

2.      Pursuant to the Federal Rules of Civil Procedure and applicable law, any Proposed Settlement of a class action must be a fair, adequate and reasonable to the Class Members.

3.      The Court has preliminarily approved an agreement between Defendant and certain class representatives to settle this matter (the "Proposed Settlement").

4.      Objector, through undersigned counsel, now enters an appearance in this cause to participate in further proceedings in this Court and to prosecute this action to the end purpose that any a settlement or resolution proposed or approved by the Court is, in all respects, fair, adequate and reasonable.

5.      On the basis of the information ascertained from the Proposed Settlement conditionally approved by the Court, your Objector alleges that the settlement as proposed is not fair, adequate or reasonable for the following reasons:

(a)      The underlying lawsuit is based on an allegation that the merger between XM Radio and Sirius to create Defendant Sirius/XM violated federal antitrust laws. The primary purported benefit to Class Members who are current subscribers, is that they will not be subject to any base price increase through December 31, 2011, (a date that is only 156 days from the date of the Fairness Hearing). Additionally, a purported benefit is the ability of current subscribers to lock in current rates by renewing their subscriptions before December 31, 2011. Finally, a purported benefit is that former customers who cancelled between July 2009 and July 2011 can reactivate their account without paying a reactivation fee and they receive one month of basic satellite radio free or former subscribers can receive one month of Sirius/XM internet streaming for free. For former subscribers to receive a benefit they will have to undertake monitoring the settlement and if it is approved they can go online to register. This will result in minimal participation by former subscribers.

(b)   The Proposed Settlement is a classic example of a coupon settlement in that the only benefits available are typical of the type of marketing promotions and techniques utilized in the industry to provide a marketing incentive to maintain status as a customer or to lure former customers back into the fold. For instance, ATT recently offered Internet at approximately 50% off of regular rates for a one year marketing promotion (*See*, attached Exhibit "A"). Similarly, cable television companies will market through television, newspaper, radio and mailings reduced rates and other enticements in an attempt to persuade former customers to return to utilize their products and services. As another example, NetFlix, which is one of the nation's largest providers of DVD rental and video streaming, routinely makes offers to new and former customers involving discounting (usually one month free) to lure former customers back (*See*, attached Exhibit "B").

(c)   Coupon settlements, or settlements that are mere marketing promotions, have been roundly criticized by the courts, legal commentators and consumer groups for their lack of value to class members, leaving only class counsel and class representatives with any real benefits from the settlement. *E.g., G.M. Trucks*, 55 F.3d 768, 803 (3rd Cir. 1995) ("The settlement arguably did not maximize the class members' interests. Every owner received a coupon whose value could only be realized by purchasing a new truck. The fact that the settlement involves only non-cash relief, which is recognized as a prime indicator of suspect settlement, increases our sense that the class' interests were not adequately vindicated."); CACF § 2 [Congressional Findings] ("Class members often receive little or no benefit from class actions  and are sometimes harmed, such as where counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value and unjustified awards are made to certain plaintiff's at the expense of other class members.") 118 STAT. 5.

(d)   No attorneys' fees should be awarded until the actual value of the benefit to Class Members is determined. The Federal Class Action Fairness Act (CAFA) requires that the Court

make a determination after the redemption period as to the "actual value" of the benefit to the class and thereafter base any attorneys' fees on a percentage of such value. 28 U.S.C. § 1712. Moreover, value is not necessarily the face value of the vouchers redeemed, but should be discounted for the benefit to the Defendant in utilizing a coupon to promote its services and products. *G.M. Trucks*, at 808.

(e)    Even though Class Counsel asserts that the settlement has a value of $180,000,000.00, there is no cash fund and all benefits to Class Members are equivalent to similar marketing promotions that benefit Defendant more than Class Members. Based on the nominal actual benefit to Class Members, the $13,000,000.00 claimed attorneys' fees (which will not be contested by the Defendant under the "clear sailing" provision contained in the Settlement Agreement) are totally unjustified and excessive. Furthermore, at a minimum, the Court is required to hold a separate hearing with regard to attorneys' fees after a complete determination can be made as to the number of Class Members that received the benefit of the purported settlement consideration and what the actual value of such benefit is after taking into consideration the marketing benefit to Defendant in light of the fact that similar marketing techniques are used as incentives for customer retention and/or to "win back" former customers. The Court must be give extra scrutiny to the attorneys' fee request, not only for the reason stated above, but also due to the fact that the Settlement Agreement specifically provides that even if the case is appealed, Class Counsel will be entitled to access to 100% of the fee award while the appeal is pending. This is strong evidence that the settlement is driven exclusively by Class Counsel's desire to be paid a large cash fee while Class Members receive no cash and only an illusory minimal market-driven discount.

6.    Your Objector adopts any other bona fide Objections by other Class Members. For all the foregoing reasons, Objector respectfully submits that the terms of the Proposed Settlement are insufficient, unfair, unjust, unreasonable and inadequate to the absent Class Members.

WHEREFORE, having demonstrated the unfairness, inadequacy and unreasonableness of the Proposed Settlement, Objector requests appropriate general relief as follows:

    (a)    That the Court not approve the Settlement as proposed.

    (b)    That the Court not approve the requested attorneys' fees.

    (c)    That the Court enters such other further Orders as may be necessary and just, to affect substantial justice in this cause between the parties and the absent Class Members.

R. Stephen Griffis, PC
R. Stephen Griffis
2100 Riverhaven Drive, Suite 1
Hoover, AL 35244
Ph: 205-402-7476 (ext 6)
Fax: 205-402-7292
rsglaw@bellsouth.net


## NOTICE OF APPEARANCE AND INTENT TO BE HEARD

1. Notice is hereby given that the undersigned counsel for Randy Lyons intends to appear on behalf of said Class Member/Objector at the Fairness Hearing scheduled on August 8, 2011 at 10:00 a.m. and requests to be heard. Any presentation will take no longer than 30 minutes.

2. For purposes of this proceeding said Class Member/Objector's address, phone number and contact information should be c/o undersigned counsel.

Respectfully submitted,

R. Stephen Griffis

# CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of July, 2011, I have forwarded a true and correct copy of the foregoing via First Class US Mail, properly addressed and postage pre-paid, to the following:

Clerk of the Court:
Clerk of the Court
United States District Court for the Southern
District of New York
500 Pearl Street
New York, NY 10007-1312

Settlement Class Counsel:
James S. Sabella, Esq.
Grant & Eisenhofer, PA
485 Lexington Ave
New York, NY 10017


R. Stephen Griffis



Geographic and service restrictions apply to AT&T U-verse services. Call or go to att.com/uverse to see if you qualify. High Speed Internet from AT&T Promotion: Quoted prices after bill credit with 1-year term commitment. First two bill credits will be applied on same first bill within the first three bill cycles. After 12 months existing standard rates apply. Early termination fee applies. Qualifying wireless, U-verse TV, or U-verse voice through AT&T required. Existing U-verse TV customers cannot add new High Speed Internet with intro price until 60 days after TV service is ordered. Residential customers only. Other conditions and restrictions apply. Offer expires 7/16/11. Prices and offers subject to change without notice. Internet speed claim(s) represent maximum downstream speed capabilities. Speeds may vary and are not guaranteed. Many factors can affect actual speeds including the use of other U-verse services. Credit and other restrictions apply. A $4 monthly High Speed Internet equipment fee applies. U-verse Internet price includes 250 GB at desc/mo. For more information go to https://tinybaggg.att.com. AT&T employees or retirees not eligible for promotional offers. © 2011 AT&T Intellectual Property. All rights reserved. AT&T, the AT&T logo and all other AT&T marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies.

Offer Code: AE16-0302                                                                        214112-JV

Exhibit "A"



# Have another FREE trial on us!

Dear robert,



It's been a while since you experienced all that Netflix has to offer. Come get unlimited TV episodes & movies. And, if you come back now, you can try us again for FREE.

Come back for FREE today!

## More ways to watch instantly right on your TV!

- Always something great to watch instantly
- TV episodes & movies instantly over the Internet
- Right to your TV via Wii™, PS3™, Xbox 360 and other devices that stream instantly from Netflix
- Plus, watch instantly on your computer, iPad & iPhone, too!
- Watch as much as you want, anytime you want

Come try us again for free for 1 month today!



~Your friends at Netflix

Free Trial Offer: Expires January 31, 2011. Trial offer is available to first time and certain former members of the Netflix service and cannot be combined with other offers. One month free trial offer is only for the Watch Instantly (Unlimited) plan and the 1 DVD out at-a-time (Unlimited) plan, which are $7.99 and $9.99 a month plus applicable tax, respectively. Netflix will begin to bill your payment method for the Netflix plan selected at sign-up at the completion of the free trial unless you cancel prior to the end of the free trial. Your Netflix membership is a month-to-month subscription that you can cancel at any time. Click on the "Your Account" link at the top of any page on the Netflix website for cancellation instructions. No refunds or credits for partial monthly subscription periods. Members may watch instantly only within the 50 United States and the District of Columbia. A computer or other device that streams from Netflix (manufactured and sold separately) and a broadband Internet connection are required to watch instantly. Additional monthly fees apply for DVD and Blu-ray access. Please see our Terms of Use for complete details.

This email has been sent to you as a former Netflix member. If you would like to stop receiving these emails, please click here to unsubscribe. Please do not reply to this email, as we are unable to respond from this address. If you need help or would like to contact us, please visit our Help Center.

This message was mailed to [rsglaw@bellsouth.net] by Netflix.

SRC: US_20101207_RJC24
Use of the Netflix service and website constitutes acceptance of our Terms of Use and Privacy Policy.
©1997-2010 Netflix, Inc.  100 Winchester Circle, Los Gatos, CA 95032

7/12/2011

Exhibit "B"

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARL BLESSING, *et al.*, on behalf of themselves and all others similarly situated, | Case No: 09-cv-10035 (HB) (RLE) |
| Plaintiffs, | |
| v. | Date:  August 8, 2011 |
| | Time:  10:00 a.m. |
| SIRIUS XM RADIO INC., | |
| Defendant. | |

---

## OBJECTION OF NICOLAS MARTIN AND NOTICE OF INTENT TO APPEAR

---

David Stein
SAMUEL & STEIN
38 West 32nd St. Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Email: dstein@samuelandstein.com

Theodore H. Frank (*pro hac vice* pending)
CENTER FOR CLASS ACTION FAIRNESS LLC
1718 M Street NW, No. 236
Washington, DC 20036
Phone: (703) 203-3848
Email: tedfrank@gmail.com

Attorneys for Objector Nicolas Martin

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................I

TABLE OF AUTHORITIES.........................................................................III

INTRODUCTION..........................................................................................1

I.    Objector Nicolas Martin Is a Class Member. ........................................3

II.   A Court Owes a Fiduciary Duty to Unnamed Class Members.............5

    A.    *Grinnell* Is Not By Itself Dispositive. ..........................................5

    B.    The Silence of the Class Should Not Be Construed as Acquiescence. ...............6

    C.    The Third *Grinnell* Factor Is Not a Reason to Approve This Settlement. ..........8

    D.    Class Counsel's Recommendation Is Superfluous. ......................8

    E.    The Court Can Apply Section 3.05 of the ALI Principles Consistently With Second Circuit Precedent. ..............9

III.  The Settlement Is Unfair Because the Relief to the Class Is Disproportionately Small Relative to Either the Size of the Attorneys' Fees or, in the Alternative, to the Size of the Value of the Case. .......9

    A.    Class Counsel Fails to Carry Its Burden to Show That the Injunctive Relief Is Not Worthless. .....12

        1.    Sirius XM Is Judicially Estopped From Claiming That It Has the Market Power to Raise Prices. .....12

        2.    Market Pressure Has Forced Sirius XM to Engage in Deep Discounting, Demonstrating Both Lack of Market Power and the Worthlessness of the Injunctive Relief. .....13

        3.    Class Counsel's Expert Evidence of Injunction Value Flunks *Daubert*. .......14

    B.    The Worthless Injunctive Relief Is Thus Inadequate as a Matter of Law. .......17

    C.    If Sirius XM Has Sufficient Market Power to Make the Injunction Worth More Than Zero, Then the Settlement Is Inadequate. .......17

IV.     The Fee Arrangement Breaches the Attorneys' Duty to the Class. ...............................18

V.      The Notice Violates Rule 23(h)...........................................................................................20

VI.     The Class Certification Order Violates Rule 23(a)(4),  Rule 23(g), and the
        Constitution..........................................................................................................................21

VII.    The Fee Request Does Not Comply With 28 U.S.C. § 1712. .........................................23

CONCLUSION...................................................................................................................................24

PROOF OF SERVICE.......................................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................................................22

*Bridgeway Corp. v. Citibank,*
  201 F.3d 134 (2d Cir. 2000) ................................................................15

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993) ............................................................................16

*Central States SE & SW Areas Health & Welfare Fund v.*
  *Merck-Medco Managed Care, LLC,*
  504 F.3d 229 (2d Cir. 2007) ..................................................................5

*City of Detroit v. Grinnell Corp.,*
  495 F.2d 448 (2d Cir. 1974) ..........................................5–6, 8, 9, 16, 17

*Daubert v. Merrell Dow Pharmaceuticals,*
  509 U.S. 579 (1993) ................................................................1, 15, 17

*Denney v. Deutsche Bank AG,*
  443 F.3d 253 (2d Cir. 2006) ..................................................................5

*First Savs. Bank, v. U.S. Bancorp,*
  117 F. Supp. 2d 1078 (D. Kan. 2000)....................................................15

*Fleury v. Richemont North Am., Inc.,*
  No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Aug. 6, 2008)................23

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ........................................................................15–16

*Grant v. Bethlehem Steel Corp.,*
  823 F.2d 20 (2d Cir. 1987) ....................................................................5

*Grove v. Principal Mut. Life Ins. Co.,*
  200 F.R.D. 434 (S.D. Iowa 2001)........................................................6–7

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ............................................................................22

*In re Brand Name Prescription Drugs Antitrust Litigation,*
    1999 U.S. Dist. Lexis 550 (N.D. Ill. Jan. 19, 1999),
    *aff'd on other grounds,* 186 F.3d 781 (7th Cir. 1999) ............................................15

*In re Corrugated Container Antitrust Litig.,*
    643 F.2d 195 (5th Cir. 1981) ..................................................................................7

*In re Dreyfus Aggressive Growth Mut. Fund Litig.,*
    No. 98-cv-4318 (HB), 2001 WL 709262 (S.D.N.Y. June 22, 2001) .........................17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995).................................................................6–8, 19

*In re GMC Engine Interchange Litig.,*
    594 F.2d 1106 (7th Cir. 1979) ..................................................................................7

*In re J.P. Morgan Chase Cash Balance Litig.,*
    242 F.R.D. 265 (S.D.N.Y. 2007) ...........................................................................21

*In re Mercury Interactive Corp. Sec. Lit.,*
    618 F.3d 988 (9th Cir. 2010) ..................................................................................20

*Johnson v. Comerica,*
    83 F.3d 241 (8th Cir. 1996) ....................................................................................19

*Kelco Disposal, Inc. v. Browning-Ferris Industries of Vermont, Inc.,*
    845 F. 2d 404 (2d Cir. 1988) .............................................................................17–18

*Kumho Tire v. Carmichael,*
    526 U.S. 139 (1999) ...............................................................................................15

*Lobatz v. U.S. West Cellular of Cal., Inc.,*
    222 F.3d 1142 (9th Cir. 2002) ................................................................................19

*Major League Baseball Properties v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008) ...................................................................................15

*Masters v. Wilhelmina Model Agency Inc.,*
    473 F.3d 423 (2d Cir. 2007) .....................................................................................9

*Mirfasihi v. Fleet Mortg. Corp.,*
    356 F.3d 781 (7th Cir. 2004) ....................................................................................5

*Mitchell v. Washingtonville Cent. Sch. Dist.,*
    190 F.3d 1 (2d Cir. 1999)........................................................................................13

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ...................................................................................... 13

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ...................................................................................... 22

*SEC v. Bear, Stearns & Co.,*
    626 F. Supp. 2d 402 (S.D.N.Y. 2009) ......................................................... 9

*Silber v. Mabon,*
    957 F.2d 697 (9th Cir. 1992) ......................................................................... 5

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.,*
    427 F. Supp. 2d 1022 (D. Kan. 2006) ....................................................... 15

*Synfuel Technologies, Inc. v. DHL Express, Inc.,*
    463 F.3d 646 (7th Cir. 2006) ...................................................................... 23

*True v. American Honda Motor Co.,*
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) ..................................................... 23

*United States v. Hays,*
    515 U.S. 737 (1995) ............................................................................... 22–23

*Wal-Mart Stores, Inc. v. Visa USA, Inc.,*
    396 F.3d 96 (2d Cir. 2005) ............................................................................ 5

*Weinberger v. Great N. Nekoosa Corp.,*
    925 F.2d 518 (1st Cir. 1991) ....................................................................... 18

*Weisgram v. Marley Co.,*
    528 U.S. 440 (2000) ..................................................................................... 16

## Rules and Statutes

28 U.S.C. § 1712 ....................................................................... 1–3, 23, 25

28 U.S.C. § 1712(a) ............................................................................... 24

Fed. R. Civ. Proc. 23 ............................................................................... 1

Fed. R. Civ. Proc. 23(a)(4) ..................................................... 2, 19, 21–22

Fed. R. Civ. Proc. 23(e) ................................................................. 3, 11

Fed. R. Civ. Proc. 23(e)(2) ................................................................................... 19

Fed. R. Civ. Proc. 23(g) ........................................................................................21

Fed. R. Civ. Proc. 23(h).............................................................................. 2, 20, 25

Pub. L. 109-2, § 2(a)(3)(A) ....................................................................................23


**Other Authorities**

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. Chapter 3 (2010)...............................9

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05 (2010)..........................6, 9, 17

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(a) (2010) ................................6

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(b) (2010)................................6

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ................................5

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05, comment *a* (2010)... 4, 5, 8–9

*Court Awarded Attorney Fees, Report of the Third Circuit Task Force,*
    108 F.R.D. 237 (1985).................................................................................19

FTC and Dept. of Justice,
    *Horizontal Merger Guidelines* § 2.1.1 (2010) .........................................11

FTC and Dept. of Justice,
    *Horizontal Merger Guidelines* § 4.1.1 (2010) .........................................10

Frankel, Allison,
    "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and
    Grant & Eisenhofer to Modify Apple Securities Class Action Deal,"
    AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010)..............................................3

Jacobson, Jeffrey S.,
    "Defining 'Coupon' Under the Class Action Fairness Act,"
    PRODUCT LIAB. LAW 360 (Jan. 15, 2008) .................................................................. 23

Law Professors,
    Letter to Stephen Crane (Sep. 17, 2007) .................................................................. 19

Leslie, Christopher R.,
    *The Significance of Silence: Collective Action Problems and Class Action Settlements,*
    59 FLA. L. REV. 71 (2007) .................................................................................... 7

MCARTHUR, TOM, *ed.,*
    THE OXFORD COMPANION TO THE ENGLISH LANGUAGE (1992) .............................. 11

ORWELL, GEORGE,
    1984 (1948) .......................................................................................................... 11

Pettit, Robert L.,
    Letter to William Lake (Jan. 20, 2011) .......................................................... 12–13

Raymond, Nate,
    "Judge's Unusual Order Revives Law Firm Diversity Issue,"
    N.Y.L.J. (Oct. 28, 2010) ...................................................................................... 22

Reply Comments of Sirius XM Radio Inc. (March 11, 2011) .............................. 12–13

Silver, Charles,
    *Due Process and the Lodestar Method,*
    74 TULANE L. REV. 1809 (2000) .................................................................... 18–19

Zahorsky, Rachel M.,
    "Unsettling Advocate," ABA J. (Apr. 2010) ........................................................ 3

## INTRODUCTION

This settlement—which provides nothing to the class other than a gratuitous pricing promise, but $13 million of cash to the attorneys—must be rejected for four independent reasons.

*First*, the relief to the class is either entirely illusory or insufficient. The promise not to raise prices is not a benefit to the class unless Sirius/XM has the market power to raise prices—but if Sirius/XM has the market power to raise prices, then the allegations of antitrust violations in the complaint are true, and the settlement cannot be considered adequate. If, on the other hand, Sirius/XM does not have the market power to raise prices (as Sirius/XM has claimed to the Federal Communications Commission in recent filings), then the promise not to raise prices is entirely superfluous. Under either scenario, the proposed settlement relief is inadequate. Sirius XM does not contend that it *will* raise prices, only that it is has considered it. The main evidence class counsel presents of settlement value is a conclusory expert report that is inadmissible because it flunks *Daubert*.

*Second*, the attorney-fee structure of the settlement should be viewed as a breach of the fiduciary duty to the class, and inherently unfair and unreasonable. If the court reduces the fee request, the difference reverts to the defendant, rather than the class. In conjunction with the "clear sailing" provisions of the settlement, this should be considered an impermissible attempt to protect the fee award at the expense of the class, and should never be permitted in a class action settlement. If the parties do not agree to modify the settlement to provide any reversion of any reduction in the fee request to the class, the settlement

should be rejected.

*Third*, the notice and scheduling of the case violates Fed. R. Civ. Proc. 23(h). Objections are due Tuesday, July 19, 2011, but the legal support for the settlement and the fee request was not filed until Friday, July 15—and was not posted to the settlement website until July 18. Because of the artificial objection deadline, class members have not had a fair opportunity to evaluate the fairness of the fee request.

*Fourth*, the class certification order violates the United States Constitution. The Court required class counsel to "ensure that the lawyers staffed on the case fairly reflect the class composition in terms of relevant race and gender metrics." But to comply with this mandate would require class counsel to base their litigation decisions on the impermissible basis of race and gender, rather than by staffing on the basis of merit and what is best for the class. Class counsel failed to protest or to seek *mandamus* to remove this unconstitutional requirement. Mr. Martin must object on Rule 23(a)(4) grounds if this Court-imposed requirement is not vacated.

If the Court nevertheless approves the settlement, it cannot yet approve the attorneys' fees. True: if the settlement were worth the $180 million that class counsel claims, a $13 million request for fees and expenses would be reasonable. But this is effectively a coupon settlement that requires class members to do continued business with the defendant in order to obtain (as yet uncertain) benefits. As such, the Class Action Fairness Act requires the fees to be based upon the actual value of the coupons redeemed. Until the Court knows how many class members agree to effectively redeem the coupon offer by agreeing to a new subscription under the terms of the Settlement Agreement, and until the Court knows how

much that coupon is actually worth by comparing the coupon offer of the Settlement
Agreement with the rates paid by non-class members who were not eligible for the rates
made available to class members, the Court cannot set a fee award.

## I.        Objector Nicolas Martin Is a Class Member.

Since June 3, 2010, Objector Nicolas S. Martin (7916 Meadowbrook Dr.,
Indianapolis, IN 46240-2659, (317) 255-5425) has been a subscriber to the XM Select service
offered by Sirius/XM. He has paid the U.S. Music Royalty Fee at least three times. He is
thus a member of the class with standing to object to the settlement and fee request. Fed. R.
Civ. Proc. 23(e); Dkt. No. 96-1 ¶ 1.

Mr. Martin's attorney, Theodore H. Frank of the non-profit Center for Class Action
Fairness LLC, is representing him *pro bono*, has a *pro hac vice* motion pending, and will appear
at the Fairness Hearing. Mr. Martin does not plan to attend the Fairness Hearing, or to call
any witnesses, but reserves the right to cross-examine any witnesses who testify in support of
the settlement.

The Center, founded in 2009, represents class members *pro bono* in class actions where
class counsel has acted to benefit themselves at the expense of the class; it has won millions
of dollars on behalf of class members. *See, e.g.*, Rachel M. Zahorsky, "Unsettling Advocate,"
ABA J. (Apr. 2010); Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest,
Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal,"
AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010).

It is perhaps relevant to distinguish the Center's mission from the agenda of those
who are often styled "professional objectors." A number of "professional objectors" are for-

profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in good faith. *See* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG § 3.05 comment *a* (2010) (discussing "lawyers who may seek private gain from interposing strategically motivated objections") ("*ALI Principles*"); Dkt. No. 188 at 21-22 (making *ad hominem* attack on objector's counsel as professional objector). This is not the business model of the Center, which is funded entirely through charitable donations and court-awarded attorneys' fees. The Center refuses to engage in *quid pro quo* settlements to extort attorneys; and has never settled an objection in exchange for payment.

Because the Center does not object indiscriminately, it has an excellent track record of success. In 21 cases to date where the Center has objected 22 times, courts have rejected the settlement or materially modified the settlement and fee request ten times; on two other occasions, parties responded to the Center's objection before the fairness hearing to modify settlements to provide millions of dollars more of cash to the class. The Center has lost two objections with finality and has twelve objections pending in trial or appellate courts (including four where its objection was upheld in part).

In short, Mr. Martin brings this objection through the Center in good faith to protect the interests of the class.[1]

---

[1] Nevertheless, it is the experience of the Center that class counsel will often falsely accuse the Center of seeking to extort class counsel. If this Court has any doubt whether Mr. Martin is objecting in good faith, Mr. Martin and the Center are willing to stipulate to an injunction prohibiting them from settling this objection in exchange for a cash payment.

## II.      A Court Owes a Fiduciary Duty to Unnamed Class Members.

"In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." *ALI Principles* § 3.05(c) (2010). The burden of proving settlement fairness rests with the moving party. *Id.*

A "district court ha[s] a fiduciary responsibility to the silent class members." *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992).

## A.      *Grinnell* Is Not By Itself Dispositive.

"The current case law on the criteria for evaluating settlements is in disarray." *ALI Principles* § 3.05 comment a at 205. The Second Circuit asks courts to follow a nine-factor test from *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A, Inc.*, 396 F.3d 96, 117 (2d Cir. 2005). But the Second Circuit has also repeatedly reviewed the approval of class action settlements applying broad notions of fairness without reference to the *Grinnell* factors. *E.g., Central States SE and SW Areas Health and Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229 (2d Cir. 2007) (reviewing settlement and remanding for modification without reference to *Grinnell* factors); *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) (same). Class counsel also argues that this

Court should consider factors not listed in *Grinnell*. Dkt. No. 116 at 16-17.

Mr. Martin suggests that some of the *Grinnell* factors are not helpful to evaluating a settlement, not least because the cases gives no guidance to how to weight the various factors. A proper test would be for courts to follow § 3.05 of the American Law Institute's *Principles of the Law of Aggregate Litigation*, which, rather than an indeterminate balancing test of factors, asks courts to submit settlements to several tests that demonstrate unfairness. Under § 3.05(a), there is first an initial four-part test that all settlements must meet: the court must consider whether

> (1) the class representatives and class counsel have been and currently are adequately representing the class;
>
> (2) the relief offered to the class… is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal;
>
> (3) class members are treated equitably (relative to each other) based on their facts and circumstances and are not disadvantaged by the settlement considered as a whole; and
>
> (4) the settlement was negotiated at arm's length and was not the product of collusion.

In addition to these four mandatory requirements, a "settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case." *Id.* § 3.05(b).

**B.     The Silence of the Class Should Not Be Construed as Acquiescence.**

*Grinnell* asks courts to consider the class's reaction to the settlement. But a court should not infer anything from the relatively low number of objectors. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001), *citing In re*

*GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 789 (3d Cir. 1995). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007). Without *pro bono* counsel to look out for the interests of the class, filing an objection is economically irrational for any individual. Indeed, because this is a lawsuit over a price increase of a few dollars per class member that wouldn't even add up to $10 once trebled, it is economically irrational even to spend the $0.88 in postage to object *pro se*.

"[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re GMC Pick-Up Litig.*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement).

All of this is especially true in this case, where there is a nationwide class, but any objector wishing to be represented by an attorney must incur the burden of hiring local counsel admitted to the Southern District of New York. Such an expensive burden is unfair to unnamed class members who may have no connection to this venue but are involuntarily

forced to appear in an inconvenient forum by the class action process to preserve their rights. Mr. Martin objects to the lack of a procedure permitting out-of-state objectors in a national class from easily retaining out-of-state *pro bono* counsel.

The reason this case is being pursued as a class action is because individual class members cannot economically pursue this case without aggregation. That there are at least fifty objectors is extraordinary. This is a relatively large number of objections, and the Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors. *GM Pick-Up Trucks*, 55 F.3d at 812-13; *ALI Principles* § 3.05 comment *a* at 206.

## C.  The Third *Grinnell* Factor Is Not a Reason to Approve This Settlement.

The "mere fact that a settlement occurred many months (or even many years) after the case was originally filed does not in itself ensure that the agreement is fair and reasonable." *Id.* While certainly the lack of discovery might be evidence of a shoddy settlement counting against approval (*contra id.* ("an early settlement might reflect a realistic appraisal of a case")), the presence of discovery is not in itself evidence that the parties are treating the class fairly relative to how the parties treat class counsel.

## D.  Class Counsel's Recommendation Is Superfluous.

Class counsel argues that the opinion of experienced counsel who agreed to the settlement is evidence in favor of settlement approval. Dkt. No. 116 at 16-17. But this makes no sense: counsel negotiated the settlement, and are never going to go to the Court and ask them to disregard what they negotiated, regardless of the underlying fairness of the settlement. "[T]he lawyers who negotiated the settlement will rarely offer anything less than a

strong favorable endorsement." *Principles* § 3.05, comment *a*. The fact that class counsel approves of the settlement can hardly be evidence that the settlement fairly treats the class relative to the benefits received by class counsel.

**E.   The Court Can Apply Section 3.05 of the ALI Principles Consistently With Second Circuit Precedent.**

One can use the Section 3.05 standards as a consistent complement to the *Grinnell* nine-factor test, which also asks courts to examine the risks of the case and the reasonableness of the settlement fund in relation to those risks. The Second Circuit has previously endorsed the use of Chapter 3 of the *ALI Principles* with reference to the evaluation of a settlement. *Masters v. Wilhelmina Model Agency Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (taking note the draft of *ALI Principles*); *accord SEC v. Bear, Stearns & Co.*, 626 F. Supp. 2d 402, 416 (S.D.N.Y. 2009). Mr. Martin recognizes that this court is bound by Second Circuit precedent on the question, but asks the Court to adopt ALI's *Principles* § 3.05 in evaluating the settlement, and downplay the importance of *Grinnell* factors that do nothing to distinguish between good settlements and bad ones. That said, the settlement is unfair under *Grinnell*.

**III.   The Settlement Is Unfair Because the Relief to the Class Is Disproportionately Small Relative to Either the Size of the Attorneys' Fees or, in the Alternative, to the Size of the Value of the Case.**

Because of the unique structure of the proposed injunctive relief, there is no state of the world in which the class recovery in the proposed settlement is reasonable.

Certainly, if the value of the successful claim was $260 million, and the parties estimated the chances of success in the 20% range, it would be reasonable to settle for $52

million in cash, with $13 million of that to the attorneys.

But the parties did not settle for cash for the class. They settled for injunctive relief—a promise not to raise prices for a short time—that has only an uncertain and unlikely contingent value. To wit: we do not know for certain (though we can infer from existing evidence and admissions) whether Sirius XM has the market power to raise prices. If Sirius XM does not have that market power, then Sirius XM's promise not to raise prices is gratuitous.

Note that the Declaration of Catherine Brooker does not state that Sirius XM *will* raise prices; it just states that Sirius *contemplated* raising prices and modeled the effect. Dkt. No. 119. The fact that Sirius XM contemplated raising prices is necessary, but not sufficient, to conclude that Sirius XM will raise prices, or would have raised prices absent an injunction. Businesses model possible scenarios all of the time, but do not engage in every strategy they contemplate; rather, they have to respond to market realities. Too, the fact that, as of July 18, the FCC has not yet decided whether to extend the rate freeze suggests that the rates would not have increased August 1: as class counsel admits, Sirius XM "need[s] to know *in advance* of the July 28 expiration of the rate freeze" whether it can raise prices. Sabella Decl. ¶ 62 (Dkt. No. 123).

The only way the promise not to raise prices has value to the class is if Sirius XM has the market power to profitably engage in a "small but significant and nontransitory increase in price"—what the plaintiffs in their Second Amended Complaint call the "SSNIP test." Dkt. No. 46 at, *e.g.*, ¶¶ 59, 106. But if Sirius XM has that market power, then the Sirius XM merger is illegal under the Clayton Act, and the class is entitled to much broader injunctive

relief than what is agreed to here. *Id.* ¶¶ 106, 280-99; *see, e.g.*, FTC and Dept. of Justice, *Horizontal Merger Guidelines* §§ 2.1.1, 4.1.1 (2010). Nowhere in its papers does class counsel address this issue. Rather, class counsel simultaneously asks the Court to believe that it can assume that Sirius XM will raise rates (Langenfield Decl. ¶ 3 (Dkt. No. 122)), but that settlement is acceptable because it is too risky to try to prove that Sirius XM will have the market power to raise rates (Dkt. No. 116 at 10 and Dkt. No. 118 at 16). This act of simultaneously accepting two mutually contradictory beliefs was called "doublethink" by George Orwell in *1984*. *See* TOM MCARTHUR, *ed.*, THE OXFORD COMPANION TO THE ENGLISH LANGUAGE 321 (1992). We submit that a settlement that requires a court to engage in doublethink to find it has value is inherently unreasonable under Rule 23(e).

The settlement, as structured, is thus by definition inadequate. Class counsel cannot prove that the settlement's injunctive relief has any value unless they engage in the same analysis that they claim is too difficult to prove at trial. Plaintiffs cannot have it both ways: if it is possible to prove the existence of the value of the injunctive relief, then it is possible to prove the violation of the Clayton Act. If class counsel cannot prove the existence of market power permitting a SSNIP such that there is a violation of the Clayton Act, then they cannot carry their burden of demonstrating that the settlement has any value to the class meriting a $13 million attorney fee, and the settlement is thus unfair because class counsel receives 100% of the benefit.

Class counsel might protest that this analysis puts them in a Catch-22 where they can never settle the case, but this is not so. The problem arises solely because of the choice of this particular injunctive relief, which has only uncertain contingent value. The parties can

certainly agree to a compromise settlement—but the compromise has to be pecuniary in nature rather than having value contingent upon the very premises that plaintiffs claim they cannot risk litigating.

**A.      Class Counsel Fails to Carry Its Burden to Show That the Injunctive Relief Is Not Worthless.**

Sirius XM's promise not to raise prices only has value if it *can* raise prices. But the evidence shows that it cannot.

**1.      Sirius XM Is Judicially Estopped From Claiming That It Has the Market Power to Raise Prices.**

Sirius XM's filings to this Court have artfully avoided saying that Sirius XM would raise prices; the Brooker declaration only acknowledges that Sirius XM contemplated a price increase. But businesses contemplate strategies all the time without necessarily engaging in them. Given the fact that the parties have the burden of demonstrating the fairness of the settlement, the negative pregnant is dispositive: the refusal of Sirius XM to put forward evidence that they would definitively raise prices in 2011 requires the Court to infer no such evidence exists. But, even if Sirius XM were to belatedly claim otherwise, they are judicially estopped from doing so.

In multiple filings before the Federal Communications Commission, Sirius XM has argued that it does not have the market power to raise prices. *See* January 20, 2011 Letter of Robert L. Pettit to William Lake (attached as Exhibit 1); Reply Comments of Sirius XM Radio Inc. (March 11, 2011) (attached as Exhibit 2) ("Sirius XM's pricing is constrained by a wide variety of market competitors.").

If the FCC extends the price cap over Sirius XM's objection, then the settlement

injunction is of no value, because Sirius XM would not have had the legal power to raise prices. But if the FCC allows the price cap to expire, then Sirius XM is judicially estopped from claiming that it has the market power to raise prices after obtaining favorable action from the FCC based on the claim that it does not have the market power to raise prices.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted). Statements to administrative agencies can give rise to judicial estoppel. *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999). Sirius XM is precluded from arguing to this Court that it has the market power to raise prices; thus, one of the settling parties is communicating to this Court that the injunctive relief is worthless.

> ### 2. Market Pressure Has Forced Sirius XM to Engage in Deep Discounting, Demonstrating Both Lack of Market Power and the Worthlessness of the Injunctive Relief.

Sirius XM's satellite radio product has already been overtaken by technological innovation. The promise of 180 channels of radio from which one can make personalized choices has been outstripped by the cheap availability of portable music devices that can carry dozens of hours of even more personalized music and podcasts—not to mention free Internet services like Pandora and Last.fm or premium music-on-demand services like Spotify that allow a customer to personalize a playlist from a choice of 13 million songs. *See generally* Jan. 20 Letter (Ex. 1); Reply Comments of Sirius (Ex. 2).

We know that Sirius XM faces market pressure and competition, because it is lowering its prices, rather than keeping them at the maximum that its agreement with the

---

Martin Objection
Case No: 09-cv-10035 (HB) (RLE)      13

FCC permits. On December 6, 2010, after the merger, as class counsel admits, Sirius XM lowered the Royalty Fee from $1.98 to $1.40 per month. And, as discussions on several Internet bargain-hunter forums such as fatwallet.com discuss, Sirius XM will discount their $12.95/month price to as low as under $3.99/month to anyone who calls up and asks for special offers, a 69% discount. *See* http://is.gd/sirius_discount. Others report the availability of a $77/year price for the premium $16.99/month XM Premier package, a 62% discount. *See* http://is.gd/sirius_discount77. (Including the Royalty Fee, Mr. Martin himself paid only $46.10 for his first ten months of XM Select service.) It is market competition, not the existing voluntary arrangement with the FCC, that is constraining prices; the same will be true if this injunction is issued under the settlement.

The injunctive relief requires Sirius XM to offer current subscribers renewals at current rates. But if current subscribers and class members (such as Mr. Martin) can continue to obtain deep discounts through negotiation with Sirius XM, then the injunctive relief does not provide any benefit to them. Class counsel has failed to present any evidence that Sirius XM will end its existing discounting program, and thus has failed to prove that the injunctive relief is not entirely superfluous.

3.    **Class Counsel's Expert Evidence of Injunction Value Flunks** *Daubert.*

The only evidence to the contrary presented to the Court is the Langenfeld Declaration—but Langenfeld provides no basis for the claim. He simply *assumes* that Sirius XM will raise prices: "It is my understanding." Langenfeld Decl. ¶ 3. But he gives no basis for that conclusory understanding, and neither does class counsel. Nor does Langenfeld even acknowledge the existence of the discounting offers in his analysis, meaning that it is based

entirely on an incorrect view of the world. Garbage in, garbage out: an expert opinion that assumes the conclusion and provides no evidence for the bases of its premises does not meet *Daubert* standards, and cannot be evidence of the value of the settlement.

Such a flimsy economic model would not pass muster in peer-reviewed economic literature, and, after *Daubert* and *Kumho Tire*, it does not pass muster in federal court, either. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993); *Kumho Tire v. Carmichael*, 526 U.S. 139 (1999); *Major League Baseball Properties v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (conclusory expert opinion not admissible); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000) (same); *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006) (excluding economic expert testimony calculating damages where entire calculation based on "underlying assumptions" without independent analysis of basis for assumptions); *First Savs. Bank, v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084 (D. Kan. 2000) (excluding expert testimony on damages where expert "based his opinion on an assumption of the very fact that his report is intended to prove").

Simply claiming one's expertise and then asserting a conclusion without performing the economic analysis that experts in the field would perform precludes admission of proposed expert evidence—even if the testifying expert is a Nobel Prize winner. *In re Brand Name Prescription Drugs Antitrust Litigation*, 1999 U.S. Dist. Lexis 550 (N.D. Ill. Jan. 19, 1999) (excluding testimony of Nobel Prize-winning economist Robert Lucas when opinions not based on evidence), *aff'd on other grounds*, 186 F.3d 781 (7th Cir. 1999); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by

the *ipse dixit* of the expert").

Expert testimony that is speculative is not competent proof and contributes "nothing to a 'legally sufficient evidentiary basis.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 445, 454 (2000) (*citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Group Ltd.*, 509 U.S. at 242.

Moreover, Langenfeld's testimony is wildly implausible and inadmissible for a second independent reason. We know with certainty that the settlement is not actually worth $180 million in cash. Why? Because if this settlement were actually worth $180 million in cash, both Sirius XM and class counsel would have preferred a different settlement. If the settlement at bar were worth $180 million in cash, the two sides would have preferred to agree to an actual settlement of $120 million in cash as a common fund.[2] Sirius XM would have preferred the $120 million common fund because it would be $60 million cheaper; class counsel would have preferred the $120 million common fund because then they could have asked for a percentage of the common fund that would give them more than $13 million. To claim that this settlement is worth $180 million is to claim that sophisticated lawyers on both sides left tens of millions of dollars on the table. The claim is insulting to the intelligence of class members and the Court. There "is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. at 146.

---

[2] Class counsel essentially concedes that Sirius XM could pay $180 million in cash by asking the Court to disregard the *Grinnell* factor of whether Sirius XM "may have possessed some ability to pay more." Dkt. No. 116 at 13.

Dr. Langenfeld's testimony does not meet *Daubert* standards, and is not admissible. It cannot be used to claim that the injunctive relief has any value.

**B.     The Worthless Injunctive Relief Is Thus Inadequate as a Matter of Law.**

The settlement is structured to make an illusory claim of $180 million value to the class, when the entire cost is actually $13 million to be received by class counsel. Here, the evidence shows that Sirius XM faces extensive competition, and is forced into deep discounting, and that the proposed injunctive relief will have no effect on Sirius XM's pricing behavior. The total settlement is thus worth only $13 million—and class counsel is to receive all of that $13 million. A settlement where class counsel receives all of the economic value and their clients receive none is by definition unfair and inadequate, under the ALI Principles, under *Grinnell*, or under any other meaningful standard.

Note that Mr. Martin is not claiming that the parties are required to provide $180 million in cash, or even $18 million in cash. In the abstract, the parties are entitled to propound a settlement with $13 million value, as they have here: but if they do, the class is entitled to the majority of that amount, rather than zero. *Cf. e.g., In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-cv-4318 (HB), 2001 WL 709262, at *6 (S.D.N.Y. June 22, 2001) (reducing fee from requested 30% to 15% of common fund).

**C.     If Sirius XM Has Sufficient Market Power to Make the Injunction Worth More Than Zero, Then the Settlement Is Inadequate.**

If, notwithstanding the evidence and admission of a lack of market power, the Court finds that Sirius XM has sufficient market power to make the injunction worth more than zero, then the settlement is inadequate because it settles the case too cheaply. One can win a

cause of action for Sherman Act monopolization on the theory that *years* of predatory price *decreases* can sustain a lifetime of monopoly profits. *Kelco Disposal, Inc. v. Browning-Ferris Industries of Vermont, Inc.,* 845 F. 2d 404 (2d Cir. 1988). A five-month forbearance from raising prices to permanently preclude class members from seeking an injunction against an illegal monopoly is small potatoes by comparison. This Court cannot find that the injunctive relief has value unless it finds that Sirius XM has market power—but if it finds that Sirius XM has market power, then it must also find that the merger is illegal and that a five-month injunction against price increases is an inadequate settlement of that claim.

## IV.    The Fee Arrangement Breaches the Attorneys' Duty to the Class.

By virtue of the notice provided to the class, Sirius XM understood that they were agreeing to a settlement that might require them to pay up to $13 million in attorneys' fees and expenses, indicating that this was money that they were willing to pay to settle the case. They further agreed to a "clear sailing" provision not to challenge the request, a sign that the settlement requires additional scrutiny. *Weinberger v. Great Northern Nekoosa Corp.,* 925 F. 2d 518, 525 (1st Cir. 1991). But under this settlement, if the Court reduces the attorneys' fee request in any way, the money reverts to the defendants, rather than to the class. Class counsel breached their duty to the class by segregating the potential fee award.

Such an arrangement has three purposes: (1) to inflate the fee at the class's expense; (2) to discourage class-member objections to the fee award; and (3) to reduce the court's incentive to carefully scrutinize the fee for unreasonableness, since any reduction benefits *only* the defendant. Indeed, class counsel explicitly makes this last argument, demonstrating the improper purpose of the arrangement. Dkt. No. 118 at 6. Professor Charles Silver has

stated that this type of fee arrangement is "a strategic effort to insulate a fee award from attack." *Due Process and the Lodestar Method*, 74 TULANE L. REV. 1809, 1839 (2000).

Any fee that a defendant agrees to pay directly to class counsel is an amount that it would have been willing to include as part of the payment to the class. The arrangement effectively reduces the recovery that the class would have received. "The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source." *GM Pickup Truck Litig.*, 55 F.3d at 820-21. "[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case." *Id.* at 821. "[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal." *Johnson v. Comerica*, 83 F.3d 241, 246 (8th Cir. 1996).

Courts have recognized that "such an agreement has the potential to enable a defendant to pay class counsel excessive fees and costs, in exchange for counsel accepting an unfair settlement on behalf of the class." *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2002). Even where, as here, there is no explicit collusion against the class, "[e]ven if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985). While some district court decisions cited by class counsel have *ipse dixit* dicta to the contrary, they do not explain why they value form

over economic reality, nor do they mention (much less explain why they disagree with) contrary authority: they cannot be considered persuasive.

Negotiating a settlement that elevates an attorney's financial interests over that of the class—no matter how much money is involved—cannot be a "fair" or "adequate" settlement under Rule 23(e)(2); at a minimum, it is a breach of the Rule 23(a)(4) requirement that "the representative parties … fairly and adequately protect the interests of the class." Twenty law professors have argued in a letter to the ABA that the arrangement should be considered *per se* unethical. Law Professors Letter to Stephen Crane (Sep. 17, 2007) (attached as Ex. 3). This Court should follow their lead. (Class counsel incorrectly state that the letter is concerned only with agreements contingent upon approval of the fee request and the simultaneous negotiation of fees with relief. Dkt. No. 118 at 22-23. This is not so. *See* Law Professors at 3 ("It is *per se* unethical for plaintiffs' attorneys to agree to any provision in such agreements that in any way compromises the right of the clients or classes to recover fees deemed excessive or unethical by such review.").)

## V.    The Notice Violates Rule 23(h).

Under the plain language of Fed. R. Civ. Proc 23(h), class counsel is required to submit their basis for attorneys' fees well before objections are due so that the class has a full and fair opportunity to address the claims made. *In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988 (9th Cir. 2010). (Mr. Martin incorporates by reference and joins Section I of the objection of Lange Thomas. Dkt. No. 120 Ex. 43.) Objections were due Tuesday, July 19, but the legal basis and evidence for the settlement and fee request was not filed until late in the day Friday, July 15. Class counsel's argument that notice is sufficient fails to explain why

this Court should disregard *Mercury Interactive*.

Mr. Martin was actually prejudiced by the sandbagging. Class counsel did not file their evidence in support of their attorney fee until Friday, July 15, giving Mr. Martin effectively one business day to respond with his objections. (Moreover, the materials were not made available on the settlement website until July 18, and S.D.N.Y. PACER was unavailable for much of July 17.) Had Mr. Martin had a reasonable time to respond, he would have been able to scrutinize the lodestar evidence; he might also have chosen to retain an economic expert to more fully demonstrate why Dr. Langenfeld's declaration was unreasonable.[3] The Court cannot approve the settlement because of the failure to meet due process requirements.

## VI. The Class Certification Order Violates Rule 23(a)(4), Rule 23(g), and the Constitution.

Mr. Martin objects to the class certification order, which requires class counsel to "ensure that the lawyers staffed on the case fairly reflect the class composition in terms of relevant race and gender metrics. *See In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 277 (S.D.N.Y. 2007)." Dkt. No. 85 at 14. *J.P. Morgan* requires class counsel to appoint members of the litigation team on the basis of race and gender. In an antitrust case, this is not a "matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," and is thus an impermissible requirement under Fed. R. Civ. Proc. 23(g). The

---

[3] Mr. Martin submits, however, that the Court can read paragraph 3 of the Langenfeld Declaration and see on its face that it is assuming without any evidentiary basis the controversial premise on which its conclusions rest, and is thus inadmissible. But if the Court were to nevertheless credit the Langenfeld Declaration, Mr. Martin would have been prejudiced by his inability to secure expert testimony with one day's notice.

interests of the class are to obtain the best result possible at the lowest cost in attorneys' fees. The fact that class counsel must comply with quotas and choose case staffing based on race or gender rather than merit and the best interests of the class may interfere with their ability to provide the best representation for the class, and thus brings into question the Rule 23(a)(4) adequacy of class counsel.

Moreover, the requirement is simply unconstitutional. Facial racial classifications imposed by federal entities are subject to strict-scrutiny review. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). A race-based classification to reflect the racial makeup of the community is not a sufficiently compelling interest to survive strict scrutiny; only "remedying the effects of past intentional discrimination" justifies a cure of racial quotas. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007). "[D]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Adarand*, 515 U.S. at 214 (internal quotation marks omitted). While the Supreme Court has held that promoting diversity is a permissible rationale for affirmative action, this only permits the consideration of race as a "plus factor"; it does not permit quotas. *Grutter v. Bollinger*, 539 U.S. 306 (2003).

Mr. Martin agrees with Stuart Grant, founder of class counsel law firm Grant & Eisenhofer: "I think the judge's heart is in the right spot, but I don't think he has the authority and I don't think he's going to accomplish the goal he's trying to achieve." Nate Raymond, "Judge's Unusual Order Revives Law Firm Diversity Issue," N.Y.L.J. (Oct. 28, 2010). As a class member, Mr. Martin is entitled to representation that is absent of illegal racial classifications. *Cf. United States v. Hays*, 515 U.S. 737 (1995) (voters in racially

gerrymandered district have standing to challenge its constitutionality without showing of personal harm). He thus requests that the Court vacate that part of its class certification order as unconstitutional.

## VII.   The Fee Request Does Not Comply With 28 U.S.C. § 1712.

Congress has expressed its distaste for coupon settlements in the Class Action Fairness Act. Pub. L. 109-2, § 2(a)(3)(A); *Synfuel Technologies, Inc. v. DHL Express, Inc.*, 463 F.3d 646, 654 (7th Cir. 2006).

The injunctive relief is an offer by Sirius XM to provide particular pricing to class members who do future business with it. It is thus indistinguishable from a coupon settlement. Although the proposed settlement carefully avoids calling the offer a "coupon," the injunctive relief offers identically to that disfavored instrument: that is, the only beneficial use of the injunctive relief lies in a class member supposedly getting a lower price for Sirius XM services. The relief is thus "coupon" relief. *See True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1069 (C.D. Cal. 2010) (a coupon settlement's relief consists of "a discount on another product or service offered by the defendant in the lawsuit" (*quoting Fleury v. Richemont North Am., Inc.*, No. C-05-4525 EMC, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008)); Jeffrey S. Jacobson, "Defining 'Coupon' Under the Class Action Fairness Act," PRODUCT LIAB. LAW 360 (Jan. 15, 2008) ("If class members can receive nothing more than the ability to buy a new product from the defendant at a discounted price, that is clearly a 'coupon settlement.'"). Indeed, the only difference between a coupon and the injunctive relief here is that the injunctive relief is *worse* than a coupon: a coupon is an unmistakable discount, while here there is no information how much Sirius XM will raise its prices, or

even cognizable evidence that Sirius XM will raise its prices or cease offering discount programs with lower prices than the injunctive relief offers.

Because this is a coupon settlement, attorneys' fees *"**shall** be based on the value to class members of the coupons that are redeemed"* rather than the theoretical value of the coupons available for redemption. 28 U.S.C. § 1712(a) (emphasis added). But we can only know that value when we know (1) the number of class members who subscribe to Sirius XM using the injunctive relief; and (2) the amount by which Sirius XM raises its prices on January 1, 2012. (The Court also needs to know (3) whether Sirius XM ceases its discounting program between now and December 31, 2011. If Sirius XM continues its discounting program to subscribers who ask the right salespeople the right questions, then the coupons are superfluous, because better prices are available to class members without the injunctive relief.) Without that knowledge, we cannot ascribe a redemption value to the coupons, and attorneys' fees cannot be legally calculated. The fee request cannot be approved until after this information is available in January, and calculations can be made. Mr. Martin strongly suspects that if the Court were to wait for that information, the ultimate redemption value will be zero: competition will require Sirius XM to continue to offer deep discounts to customers and class members who have the savvy to negotiate such rates.

## CONCLUSION

The parties have failed to carry their burden that the injunctive relief has any value; the only evidence in support is an expert report that assumes its conclusion. One hundred percent of the settlement value is going to the class counsel (with no hope of reversion of

excessive fees to the class), and that is inherently unfair and unreasonable. Moreover, the failure to provide reasonable Rule 23(h) notice and the unconstitutionality of the class certification order each require rejection of the settlement.

Should the Court nevertheless approve the settlement, it must adhere to 28 U.S.C. § 1712, and calculate the attorneys' fees only when the redemption value of the *de facto* coupons is known.

Dated:  July 19, 2011

Respectfully submitted,

*/s/ David Stein*
David Stein
SAMUEL & STEIN
38 West 32nd St. Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Email: dstein@samuelandstein.com

*/s/ Theodore H. Frank*
Theodore H. Frank (*pro hac vice* pending)
CENTER FOR
CLASS ACTION FAIRNESS LLC
1718 M Street NW, No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tedfrank@gmail.com

Attorneys for Nicolas Martin

## PROOF OF SERVICE

The undersigned hereby certifies that on this date, I caused the foregoing document, including exhibits, to be served upon all counsel of record via ECF, and that I additionally caused the foregoing document to be served by first class mail on July 18, 2011, with exhibits following under separate cover on July 19, 2011, upon the following:

James J. Sabella, Esq.                   Clerk of the United States District Court
Grant & Eisenhofer P.A.                  Southern District of New York
485 Lexington Avenue                     500 Pearl Street
New York, NY 10017                       New York, NY 10007

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
David Stein

Dated:  July 19, 2011

# EXHIBIT 1



**Wiley Rein** LLP

1776 K STREET NW
WASHINGTON, DC  20006
PHONE    202.719.7000
FAX        202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA  22102
PHONE    703.905.2800
FAX        703.905.2820

www.wileyrein.com

January 20, 2011

Robert L. Pettit
202.719.7019
rpettit@wileyrein.com

**VIA ECFS**

Mr. William Lake
Chief, Media Bureau
Federal Communications Commission
445 12th Street, S.W.
Washington, DC  20554

> Re:   Consolidated Application for Authority to Transfer Control of XM
>        Satellite Radio Holdings Inc. and Sirius Satellite Radio Inc.,
>        MB Docket No. 07-57

Dear Mr. Lake:

In approving the merger of Sirius Satellite Radio Inc. ("Sirius") and XM
Satellite Radio Holdings Inc. ("XM," or jointly, the "Applicants"), the Commission
accepted the Applicants' voluntary commitment not to raise the retail price of
certain satellite radio programming packages for thirty-six months after
consummation of the merger.[1]  The Applicants consummated the merger on July 28,
2008.[2]  Accordingly, this voluntary commitment ends on July 28, 2011.

The *Sirius XM Merger Order* also stated that six months prior to the
expiration of the commitment period, the FCC would seek public comment and then
determine whether this price limitation should be modified, removed, or extended.[3]
As the Commission acknowledged, the concept of a subsequent pricing proceeding
and the possibility that the FCC would either extend the price cap or set an entirely
new subscription rate were not part of the Applicants' voluntary commitment.[4]

---

[1]    *Applications for Consent to the Transfer of Control of Licenses, XM Satellite Radio
Holdings Inc., Transferor, to Sirius Satellite Radio Inc., Transferee*, Memorandum Opinion and
Order and Report and Order, 23 FCC Rcd 12,348, 12,395 (¶ 108) (2008) ("*Sirius XM Merger
Order*").

[2]    *See* Letter from Jennifer D. Hindin to Marlene H. Dortch, Notification of Consummation of
Transfer of Control, MB Docket No. 07-57 (filed Aug. 20, 2008).  Sirius is now Sirius XM Radio
Inc. ("Sirius XM").

[3]    *Sirius XM Merger Order*, 23 FCC Rcd at 12,395 (¶ 108).

[4]    *Sirius XM Merger Order*, 23 FCC Rcd at 12,395 (¶ 108, n.328) ("Although it is not part of
Applicant's voluntary commitment, we are conditioning our approval of the merger on the
Commission's ability to modify or extend the price cap beyond three years.").  The companies,
individually or combined, never acceded to this condition; since it imposed no obligation on them,
there was nothing to "accept or reject" in connection with the statement. *See* 47 C.F.R. § 1.110.
Moreover, any appellate challenge at that time to potential future Commission action would likely



January 20, 2011
Page 2

        The Commission believed that this review of Sirius XM's rates may be
needed because the agency did "not know what the competitive landscape will be
like in three years."[5]  However, it is clear that the audio entertainment market is
even more robustly competitive today than it was in 2008 when the FCC granted the
merger applications. Satellite radio competes for listeners with an expanding array
of audio entertainment choices—most of which are available to consumers for free.
These choices include terrestrial AM/FM radio, HD radio, iPods and other portable
audio devices, and they increasingly include Internet-based services, such as
Pandora, Rhapsody, Slacker, Lastfm and iheartradio.[6]  Pandora alone is reportedly
available on over 200 devices in addition to the computer.[7]  This competition for
audio entertainment is especially acute in vehicles, with several automakers
introducing features integrating Internet-based services, further reducing any
remaining arguable hurdles to the seamless use of smartphones, iPods and other
portable audio devices in vehicles.[8]  In early January 2011, Toyota announced it
would introduce "Entune" in its vehicles, an integrated multimedia system designed
to compete with Ford's SYNC system and the products introduced by BMW and
Mini.[9]  Such marketplace changes confirm precisely what the United States

_____

(Continued . . .)

have faced significant ripeness and finality issues. *See, e.g., CTIA—The Wireless Ass'n v. FCC*, 530
F.3d 984, 987 (D.C. Cir. 2008) ("The 'basic rationale' of the ripeness doctrine 'is to prevent the
courts, through avoidance of premature adjudication, from entangling themselves in abstract
disagreements over administrative policies, and also to protect the agencies from judicial interference
until an administrative decision has been formalized and its effects felt in a concrete way by the
challenging parties.") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).

[5]       *Sirius XM Merger Order*, 23 FCC Rcd at 12,395 (¶ 108).
[6]       Sirius XM Radio Inc., 2009 SEC Form 10-K (filed Feb. 25, 2010), *available at*
http://www.sec.gov/Archives/edgar/data/908937/000095012310017181/c96811e10vk.htm (last
visited Jan. 18, 2011).
[7]       Elliot Van Buskirk, "CES 2011: It's a Pandora World After All", Jan. 8, 2011 *available at*:
http://evolver.fm/2011/01/08/ces-2011-its-a-pandora-world-after-all/ (last visited Jan. 18, 2011).
[8]       Mike Ramsey, "Auto Makers Tie Mobile Networks to In-Car Systems," Wall St. J., Jan. 5,
2011, *available at*:
http://online.wsj.com/article/SB10001424052748704405704576064080514279232.html?KEYWOR
DS=Mike+ramsey (last visited Jan. 7, 2011). *See also* Press Release, CEA, Ford and Intel Keynotes
and Major Product Innovation Launch the 2010 International CES (Jan. 8, 2010), *available at
http://www.cesweb.org/news/releaseDetail.asp?id=11864* (last visited Jan. 18, 2011); Paul Leroux,
"Automakers Take a Smart Approach to Smartphones," CEA Digital Dialogue, Jan. 6, 2011,
*available at*: http://blog.ce.org/index.php/2011/01/06/automakers-take-a-smart-approach-to-
smartphones/ (last visited Jan. 18, 2011).
[9]       Press Release, Toyota Announces Entune Multimedia System at the 2011 Consumer
Electronics Show (Jan. 4, 2011), *available at*: http://pressroom.toyota.com/pr/tms/toyota/toyota-



January 20, 2011
Page 3

Department of Justice found when it closed its investigation of the Sirius-XM merger nearly three years ago.[10]  In granting its consent to the merger, DOJ identified "competitive alternative services available to consumers" and noted, in particular, that "a number of technology platforms are under development that are likely to offer new or improved alternatives to satellite radio [including] . . . the expected introduction within several years of next-generation wireless networks capable of streaming Internet radio to mobile devices."[11]  DOJ's findings have been confirmed by independent parties in the FCC's rulemaking regarding HD Radio technology and through subsequent technological developments.[12]

Finally, even if the Commission determined that it had the authority to extend or modify the expiring price cap,[13] numerous practical considerations

_____

(Continued . . .)
announces-entune-multimedia-189969.aspx (last visited Jan. 18, 2011).  *See also* Eric A. Taub, "Toyota Puts Entertainment in the Cloud," New York Times, Jan. 20, 2011, at B8.
[10]      Department of Justice, *Statement of the Department of Justice Antitrust Division on its Decision to Close its Investigation of XM Satellite Radio Holdings Inc.'s Merger with Sirius Satellite Radio Inc.* (press release) (March 24, 2008), available at http://www.justice.gov/opa/pr/2008/March/08_at_226.html (last visited Jan. 18, 2011).
[11]      *Id.*
[12]      The *Sirius XM Merger Order* acknowledged that "[c]omments filed as part of the rulemaking regarding HD Radio technology will help inform [the agency's] decision regarding the level of competition in the radio market and the continuing need for a price cap." *Sirius XM Merger Order*, 23 FCC Rcd at 12,395 (¶ 108,, n.329).  Comments filed by independent parties in this proceeding highlight that "there is adequate competition for Satellite radio from CD, MP3 Audio, Bluetooth Streamed Audio, internet streamed audio and HD radio and that additional regulation is not necessary nor in the best interest of the consumer."  Comments of Ford Motor Company, MB Docket No. 08-172 at 2 (dated Nov. 18, 2010 but posted Nov. 19, 2008).  Similarly the Recording Industry Association of America noted that "[c]onsumers today can choose to listen to music by purchasing a CD or digital downloads of music; by listening to music played via satellite radio, analog radio, or webcasting; or through a growing variety of other web-based services that offer consumers sound recordings with varying degrees of interactivity, portability, permanence and sound quality."  Comments of the Recording Industry Association of America, MB Docket No. 08-172 at 1 (filed Nov. 7, 2008).  Members of the public agreed "that all forms of Audio Entertainment compete for listenership, regardless of the business model."  Comments of Brian Rayl, MB Docket No. 08-172 at 2 (filed Sept. 11, 2008).
[13]      The FCC has no direct or ancillary authority to regulate satellite radio rates.  "As the Supreme Court has recognized, 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).  The *Sirius XM Merger Order* cited no direct statutory authority for the Commission to regulate satellite radio rates, and there appears to be none.  Likewise, there appears to be no underlying basis for the agency to assert ancillary authority to regulate satellite radio rates.  47 U.S.C. § 154(i); 47 U.S.C. § 303(r).  *See Am.*



January 20, 2011
Page 4

militate against doing so.[14]  For example, the price cap was suggested by the applicants for a defined period of time.  Government-set rates are something quite different.  How would the FCC independently justify setting $12.95 – or any other particular rate – as the appropriate rate for basic satellite subscriptions?  And for what period of time?  Moreover, what process would the Commission employ for determining subscription rates or the period of time they would be in effect?

For the foregoing reasons, and, in particular, in light of the increasingly competitive landscape for audio entertainment, there is no need for the Commission to seek to extend or modify the subject rate cap and Sirius XM requests that the FCC take no steps to do so.[15]

Sincerely,

/s/ Robert L. Pettit

Robert L. Pettit
*Counsel for Sirius XM Radio Inc.*

cc:     Marcia Glauberman

---

(Continued . . .)
*Library Ass'n v. FCC*, 406 F.3d 689, 700 (D.C. Cir. 2005); *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010).
[14]     No precedent appears to exist for the Commission to extend Sirius XM's voluntary merger commitment not to raise rates for three years.  The three cases the Commission cited in n. 328 of the *Sirius XM Merger Order* are inapposite for a variety of reasons; in one, the Commission extended its program access rules pursuant to direct statutory authority, and in the other two, the Commission established a framework for relieving applicants of a merger condition earlier than would otherwise have occurred.  None of the cases involved extension of a voluntary commitment beyond the parameters that the applicants agreed to.
[15]     Since the inception of commercial satellite radio service in 2001, there has been just one basic subscription rate price increase for the XM platform and none for the Sirius platform.

# EXHIBIT 2

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Consolidated Application for Authority to | ) | MB Docket No. 07-57 |
| Transfer Control of XM Satellite Radio | ) | |
| Holdings Inc. and Sirius Satellite Radio Inc. | ) | |

**REPLY COMMENTS OF SIRIUS XM RADIO INC.**

Richard E. Wiley
Robert L. Pettit
Jennifer Hindin
Wiley Rein LLP
1776 K Street N.W.
Washington, DC 20006
*Counsel for Sirius XM Radio Inc.*

March 11, 2011

## SUMMARY

The record of this proceeding provides no basis for the Commission to continue to impose a price cap on Sirius XM. The record demonstrates robust and rapidly growing competition for audio entertainment services. Internet-based services in particular have made dramatic gains in popularity since the time of the Sirius-XM merger, in large part due to the advent of smartphone "apps," which allow users to stream Internet-based music services in their cars. Commenters also overwhelmingly agree that Sirius XM's pricing is constrained by the variety of market competitors, making a price cap unnecessary. Moreover, the Administrative Procedure Act requires an agency to offer a factual basis for any regulation it promulgates, and the record in this proceeding contains no information sufficient to support imposing a cap on Sirius XM's rates after July 28, 2011.

The comments filed by the WCS Coalition and the plaintiffs' counsel in the *Carl Blessing et al v. Sirius XM Radio Inc.* litigation represent an attempt to use this proceeding to leverage decisions in unrelated proceedings. The WCS Coalition's comments argue that the FCC should impose a price cap on Sirius XM unless and until the Coalition gets its way in an unrelated proceeding on WCS service rules. The *Blessing* counsel ask the Commission to withhold action in this proceeding until the Commission reviews a myriad of documents relating to irrelevant issues in a wholly unrelated litigation. The Commission should flatly reject the efforts of both the WCS Coalition and the *Blessing* counsel.

No basis exists for imposing a new price cap after July 28, 2011, and the Commission should allow the existing cap to expire as scheduled.

## TABLE OF CONTENTS

Page

I.   THE RECORD OF THIS PROCEEDING PROVIDES NO BASIS FOR
     IMPOSING A FURTHER PRICE CAP BUT INSTEAD
     DEMONSTRATES ROBUST COMPETITION FOR AUDIO
     ENTERTAINMENT ........................................................................................ 1

II.  THE COMMISSION SHOULD NOT ALLOW THE WCS COALITION
     AND PLAINTIFFS' COUNSEL IN THE BLESSING CASE TO USE
     THIS PROCEEDING TO LEVERAGE DECISIONS IN UNRELATED
     PROCEEDINGS ............................................................................................ 8

III. CONCLUSION ............................................................................................. 12

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Consolidated Application for Authority to | ) | MB Docket No. 07-57 |
| Transfer Control of XM Satellite Radio | ) | |
| Holdings Inc. and Sirius Satellite Radio Inc. | ) | |

## REPLY COMMENTS OF SIRIUS XM RADIO INC.

Sirius XM Radio Inc. ("Sirius XM"), by counsel, replies to comments filed in
response to the Media Bureau's Public Notice asking whether the FCC should allow
Sirius XM's price cap to expire on July 28, 2011, consistent with Sirius XM's voluntary
commitment in connection with its merger application filed four years ago.[1] Nothing in
the record responding to the Public Notice supports continuing this price cap in any form.
Sirius XM respectfully requests that the Commission close this proceeding and take no
further action affecting the rates for satellite radio service.

**I.     THE RECORD OF THIS PROCEEDING PROVIDES NO BASIS FOR
IMPOSING A FURTHER PRICE CAP BUT INSTEAD DEMONSTRATES
ROBUST COMPETITION FOR AUDIO ENTERTAINMENT.**

The existing price cap arose from a voluntary commitment Sirius XM made in the
context of its 2007 merger application and applied only to specific Sirius XM

---

[1]     Public Notice, *Media Bureau Seeks Comment on Extension, Modification or
Removal of Cap on Sirius XM Retail Prices*, MB Docket No. 07-57 (rel. Jan. 25, 2011)
("*Public Notice*").  Sirius XM voluntarily committed to a price cap in the context of the
merger of Sirius Satellite Radio Inc. and XM Satellite Radio Holdings Inc. *Applications
for Consent to the Transfer of Control of Licenses From XM Satellite Radio Holdings
Inc., Transferor to Sirius Satellite Radio Inc., Transferee*, MB Docket No. 07-57,
Memorandum Opinion and Order and Report and Order, 23 FCC Rcd 12348, 12433-41,
Appendix B-C (2008) ("*Sirius XM Merger Order*").

- 1 -

programming packages for three years, expiring July 28, 2011.[2]  To impose a continuing

price cap, the Commission would need to find that record evidence justifies imposing

such a cap, even before it establishes the appropriate price, extent, and duration of any

cap.[3]  The record in this proceeding provides no such evidence.  The comments

demonstrate that competition and consumer choice dictate Sirius XM's rates.

      The record evidences a market for audio entertainment that is highly competitive

and growing, with new entrants emerging on an almost daily basis.  Just as the United

States Department of Justice predicted when it closed its investigation of the Sirius-XM

merger nearly three years ago,[4] Sirius XM today faces intense competition from an array

of services including AM/FM radio, HD radio, and iPods—all of which are available to

consumers with no subscription charges.[5]

---

[2]     The *Public Notice* questioned whether any new price cap should apply to fees
clearly not included in the voluntary price cap, including "rates charged for online access,
additional outlets, or any other fees related to Sirius XM's service." *Public Notice* at 2.
None of the comments addressed this issue, and the Commission should decline to extend
a price cap to these services for the same reasons it should decline to extend the voluntary
price cap.

[3]     The Commission acknowledged in the *Sirius XM Merger Order* that a price cap
of more than three years "is not part of Applicants' voluntary commitment." *Sirius XM
Merger Order* at ¶ 108, n. 328.  Any price cap beyond July 28, 2011 would not represent
an "extension" of a voluntary price cap but rather the imposition of an entirely new price
cap by the FCC, the adoption of which would be governed by the requirements of the
Administrative Procedure Act (the "APA").  Necessarily, then, the agency requires record
evidence to justify the imposition of a cap, the choice of a particular price and the
selection of a specific time period. *See infra* at 7-8.

[4]     Press Release, Department of Justice, *Statement of the Department of Justice
Antitrust Division on its Decision to Close its Investigation of XM Satellite Radio
Holdings Inc.'s Merger with Sirius Satellite Radio Inc.*, (Mar. 24, 2008) *available at*
http://www.justice.gov/opa/pr/2008/March/08_at_226.html.

[5]     Letter from Robert L. Pettit, Counsel for Sirius XM Radio Inc., to William Lake,
Chief, Media Bureau, MB Docket No. 07-57 (filed Jan. 20, 2011) ("Sirius XM January
20, 2011 Letter").

Increasingly, however, this competition also includes new Internet-based radio services. While some of these applications were available on computers prior to the Sirius-XM merger in July 2008, their tremendous growth—and their increasing availability in automobiles and on smartphones—has been driven by the advent of smartphone "apps."[6] These "apps" allow smartphone users to stream Internet-based music services on the go, including in their cars, through a cellular data network or WiFi network. Among others, these include:

- **Pandora Media, Inc.** Pandora is a leader in Internet radio in the United States.[7] The Pandora "app" for iPhone, released in 2008, became the fourth most popular free "app" on iTunes after only one week.[8] Pandora still has one of the top five most popular "apps" across all smartphone platforms,[9] and, "[t]hanks to the iPhone, Pandora now has 80 million listeners."[10]

---

[6]     The Apple "app" store was launched in July 2008 and the Android Market was launched in October 2008. iPod+iTunes Timeline, http://www.apple.com/pr/products/ipodhistory/ (last visited Mar. 8, 2011); Android Market: Now Available for Users, Android Developers Blog, Oct. 22, 2008, http://android-developers.blogspot.com/2008/10/android-market-now-available-for-users.html.

[7]     Pandora, launched in 2005, offers music content both on a free and a paid subscription basis. Pandora Media, Inc., Registration Statement (Form S-1), at 1-2 (Feb. 11 2011) ("Registration Statement").

[8]     Fred Krueger, *Pandora is the Killer Music App*, AppCraver, July 25, 2008, http://www.appcraver.com/pandora/; Jason Kincaid, *Pandora Usage Stats Prove It's iPhone's Killer App*, TechCrunch, July 15, 2008, http://techcrunch.com/2008/07/15/pandora-usage-stats-prove-its-iphones-killer-app/#; Apple recently listed its most downloaded app and found Pandora to be number one among the free apps for iPad and number two for iPhone. Additionally, Pandora added 35 million listeners in 2010. Jefferson Graham, *Pandora Radio App Cruises Into Cars*, USA Today, Jan. 26, 2011 *available at* http://www.usatoday.com/money/industries/technology/2011-01-26-pandora26_ST_N.htm.

[9]     Registration Statement at 1-2.

[10]     Jefferson Graham, *Pandora Radio App Cruises Into Cars*, USA Today, Jan. 26, 2011 *available at* http://www.usatoday.com/money/industries/technology/2011-01-26-pandora26_ST_N.htm. Pandora's recent Registration Statement, related to an expected

- **Rhapsody International Inc.** Rhapsody is another streaming on-demand music subscription service offering unlimited access to a library of digital music for a monthly fee.[11] Rhapsody launched its smartphone "app" in 2009.[12]

- **Slacker, Inc.** Slacker offers both free and subscription services accessible over the web and on portable devices and has offered the Slacker Radio "app" since January 2009.[13]

- **Last.fm Ltd.** Last.fm offers free and paid subscription streaming radio and delivers music recommendations. A Last.fm "app" for the iPhone was first released in July 2008.[14]

- **iheartradio.** iheartradio delivers AM and FM stations from across the country and exclusive digital stations to subscribers.[15] By the end of 2009, iheartradio had "apps" available for iPhone, Blackberry and Android platforms.[16]

Competition with Sirius XM will continue to increase as automakers, including

Ford, Toyota, MINI, GM, Mercedes-Benz, and Hyundai, introduce features that integrate

---

initial public offering, notes that Pandora competes against a variety of audio entertainment sources, including satellite radio. Registration Statement at 14.

[11]   Eliot Van Buskirk, *Rhapsody Shrugs Off Real, Viacom to Become a Startup*, Wired, Apr. 6, 2010, *available at* http://www.wired.com/epicenter/2010/04/rhapsody-shrugs-off-real-viacom-to-become-a-start-up/#.

[12]   John Cook, Tech Flash, *Rhapsody App Off to a "Good Start" With 200,000 iPhone Downloads*, Oct. 1, 2009 *available at* http://www.techflash.com/seattle/2009/10/real_unveils_rhapsody_app_for_android_updates_iphone_numbers.html.

[13]   Press Release, Slacker, Slacker Introduces Personalized Radio Everywhere, Mar. 15, 2007, http://www.slacker.com/company/pressreleases/03152007.jsp.; *Slacker iPhone App Now Available, Users Go Wild*, Orbitcast, January 14, 2009 *available at* http://www.orbitcast.com/archives/slacker-iphone-app-now-available-users-go-wild.html.

[14]   Posting of Jono Cole to Last.fm—the Blog, http://blog.last.fm/2011/03/03/lastfm-30-for-the-iphone (Mar. 3, 2011).

[15]   FAQ, Help With iheartradio, http://www.iheartradio.com/faq/ (last visited Mar. 8, 2011). Press Release, Clear Channel Radio, iheartradio App Sees One Million iPhone Downloads; Blackberry is Next, Mar. 16, 2009, http://www.clearchannel.com/Radio/PressRelease.aspx?PressReleaseID=2378.

[16]   Andrew Kameka, *Clear Channel's iheartradio App Coming to Android by Christmas*, Androinica, Dec. 4, 2009 *available at* http://androinica.com/2009/12/clear-channels-iheartradio-app-coming-to-android-by-christmas/.

Internet-based services in vehicles.[17]  One of the latest dashboard innovations is the

development of vehicles with their own LTE data connections to enable functions such as

a WiFi hotspot and various Internet applications without relying on a mobile phone for

the in-car data connection.[18]  This enables drivers to choose traditional radio, satellite

radio, or Internet radio simply by pushing a dashboard button.

This increasingly competitive landscape for audio entertainment eliminates any

competitive concern.[19]  Sirius XM's pricing is constrained by a wide variety of market

---

[17]     Press Release, Ford, Openbeak, Pandora and Stitcher Are First to Use Ford Sync
API, Bringing Twitter, Internet Radio Control Into Vehicles (Jan. 7, 2010),
http://media.ford.com/article_display.cfm?article_id=31712; Press Release, Toyota
Vehicles, Toyota Entune Receives Two Prestigious Awards at 2011 Consumer
Electronics Show (Jan. 31, 2011), http://pressroom.toyota.com/pr/tms/toyota/toyota-
entune-receives-two-prestigious-191474.aspx; Radio, You-ified,
http://www.miniusa.com/#/play/pandora-m (stating Pandora now available in all 2011
MINI models) (last visited Mar. 7, 2011); The collaboration between Pandora and MINI
is also highlighted on the front page of the MINI website,
http://www.miniusa.COM-m (last visited Mar. 8, 2011); Kevin
Krolicki, *General Motors Co Will Launch a New System to Stream Online Radio from
Pandora in Upcoming Chevrolets Starting with the Volt and Equinox*, Reuters, Feb. 17,
2011; Mercedes Benz Media Interface Plus,
http://www.mbusa.com/mercedes/service_and_parts/accessories (last visited Mar. 7,
2011) (describing plug and play entertainment solution that enables Pandora streaming);
Press Release, Hyundai, Hyundai Revolutionizes the Coupe with the All-New Velostar at
the Detroit International Auto Show (Jan. 10, 2011), http://www.hyundaiusa.com/about-
hyundai/news/Veloster_at_detroitautoshow-20110110.aspx.

[18]     Wayne Cunningham, *Alcatel-Lucent Puts Big Data Pipes in Prius*, CNET, Jan. 9,
2010, http://ces.cnet.com/8301-31045_1-10431713-269.html; Christopher
Hammerschmidt, *Audi, Alcatel-Lucent demo LTE-equipped car*, EE Times, Feb. 20,
2011, http://www.eetimes.com/electronics-news/4213311/Audi--Alcatel-Lucent-demo-
LTE-equipped-car.

[19]     As the Department of Justice stated in 2008:

Any inference of a competitive concern was further limited by the fact that
a number of technology platforms are under development that are likely to
offer new or improved alternatives to satellite radio.  Most notable is the
expected introduction within several years of next-generation wireless
networks capable of streaming Internet radio to mobile devices.... [A]
significant number of consumers in the future are likely to consider one or
more of these platforms as an attractive alternative to satellite radio.

competitors. This conclusion is borne out anecdotally by comments filed by consumers

in this proceeding.[20] One commenter stated that the price cap on Sirius XM interferes

with the free market, harms the public interest, and "serves no legitimate purpose when

Sirius XM competes in a marketplace rife with free services provided by other

competitors . . . ."[21]  In the words of another consumer, if Sirius XM were to raise prices,

subscribers and the marketplace would "decide a fair price with a continued subscription,

or cancel and use one of the many other up and coming services."[22] One commenter

summarized the pricing reality: "[i]n the end, consumers themselves will dictate a fair

market value for their Satellite Radio service.  With a growing number of free

alternatives available, consumers have the final say."[23]  Indeed, even those public

commenters favoring a continued price cap do not dispute their ability to cancel their

satellite radio service or select an alternative listening option.[24]

---

Press Release, Department of Justice, *Statement of the Department of Justice Antitrust Division on its Decision to Close its Investigation of XM Satellite Radio Holdings Inc.'s Merger with Sirius Satellite Radio Inc.*, Mar. 24, 2008 *available at* http://www.justice.gov/opa/pr/2008/March/08_at_226.html.  Three years later, the Department's prediction has become a reality.

[20]     A total of 37 separate consumer comments were filed in response to the *Public Notice*; 32 of the commenters opposed any continued price cap.

[21]     Comments of Patrick Sharpless at 3, MB Docket No. 07-57 at 1 (filed Feb. 24, 2011).

[22]     Comments of John Lynch, MB Docket No. 07-57 at 1 (filed Feb. 23, 2011). *See also* Comments of Zafar Sharif, MB Docket No. 07-57 at 1 (filed Feb. 23, 2011) ("If it's too expensive consumers have a free choice to just drop the subscription."); Comments of Vincent Brumfield, MB Docket No. 07-57 at 1 (filed Feb. 23, 2011) ("Any consumer that can't afford a long-term contract or is n't willing to pay more for this service is free to cancel their subscription at any time.  I feel the board of directors will keep this in mind when deciding if, or how much, to raise prices.").

[23]     Comments of Dr. Alan Diaz, MB Docket No. 07-57 at 1 (filed Feb. 23, 2011).

[24]     *See* Comments of Edmund Harris, MB Docket No. 07-57 at 1 (filed Jan. 27, 2011); Comments of Virginia Houser, MB Docket No. 07-57 at 1 (filed Feb. 14, 2011);

Moreover, any decision to impose a continued price cap based on this record would be legally infirm. First, as Sirius XM has shown, the FCC fundamentally lacks authority to impose a cap on Sirius XM's rates. Congress has not conveyed authority, express or ancillary, to the FCC to regulate the rates of the satellite radio services offered by Sirius XM.[25] Moreover, the APA requires an agency to offer a factual basis for any regulation it promulgates. When reviewing the factual basis for an agency's action under the APA's arbitrary and capricious standard,[26] the "lodestar is the question whether the record as a whole provides substantial evidence to support the agency action."[27] "[T]he court must be able to conclude that the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[28] The record contains no information sufficient to support imposing a cap on Sirius XM's rates after July 28, 2011.[29]

---

Comments of John Pavlica, Jr., MB Docket No. 07-57 at 1 (filed Feb. 24, 2011); Comments of Albert Morris, MB Docket No. 07-57 at 1 (filed Jan. 31, 2011).

[25]   *See* Sirius XM January 20, 2011 Letter at 6, n. 13.

[26]   Judicial review of agency action includes scrutiny of the agency's asserted factual predicate because, as the D.C. Circuit has explained, "review would be a relatively futile exercise in formalism if no inquiry were permissible into the existence or nonexistence of the condition which the Commission advances as the predicate for its regulatory action. A regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." *City of Chicago v. Fed. Power Comm'n*, 458 F.2d 731, 742 (D.C. Cir. 1972). *See also ALLTEL Corp. v. FCC*, 838 F.2d 551, 559 (D.C. Cir. 1988) ("We cannot defer to the Commission's selection of a precise point on a scale when the scale itself has no relationship to the underlying regulatory problem.") (internal quotation marks omitted); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) (same).

[27]   *Moral v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005); *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 606 (D.C. Cir. 2007) ("In sum, because the agency's decision . . . finds no support in the evidence the agency considered, we find it arbitrary and capricious.").

[28]   *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dept. of Health & Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005) (internal quotation marks and alterations omitted). *See also Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. Aug. 28, 2009) ("We conclude the Commission has failed to examine the relevant data and

## II.    THE COMMISSION SHOULD NOT ALLOW THE WCS COALITION AND PLAINTIFFS' COUNSEL IN THE *BLESSING* CASE TO USE THIS PROCEEDING TO LEVERAGE DECISIONS IN UNRELATED PROCEEDINGS.

Two parties invite the FCC to help them use this proceeding to leverage the outcomes in two unrelated proceedings.  The Commission should flatly reject their efforts.

First, some members of the WCS Coalition[30] argue that the FCC should impose a price cap on Sirius XM unless and until the Coalition gets its way in an unrelated proceeding seeking to revamp the WCS service rules in a manner that would cause interference to satellite radio customers.[31]  The issues in the WCS Interference Decision have nothing to do with those addressed in the Public Notice.  The former proceeding involves modifying the WCS service rules and how to minimize the likelihood these

---

articulate a satisfactory explanation for its action, and hold the 30% subscriber cap is arbitrary and capricious.") (quotation, citation, and alterations omitted).

[29]    Even if the record could support extending a rate cap in the abstract, which it cannot, given the paucity of facts in the record there is no basis on which the Commission could make a principled decision about where to set that cap, which services it should apply to, or how long to keep the cap in place.  A typical rate case involves detailed information about a company's costs and what rate of return on those costs is reasonable, *see, e.g., Virgin Islands Tel. Corp. v. FCC*, 989 F.2d 1231, 1235-36 (D.C. Cir. 1993) (discussing rate of return and cost data in determining reasonableness of interim rates); it is obvious that no such data exists in this proceeding.  Thus, any rate cap imposed by the Commission would be arbitrary and capricious in the purest sense of that term, because it would be based on nothing more than guesswork and supposition, rather than actual facts in the record.

[30]    Comments of the WCS Coalition, MB Docket No. 07-57 at 3 (filed Feb. 24, 2011) ("Coalition Members' Comments").  According to this pleading, WCS Coalition member AT&T "did not participate in the preparation of, and does not join in . . . these comments." *Id.* at note 1.

[31]    *Communications Services in the 2.3 GHz Band, Establishment of Rules and Policies for the Digital Audio Radio Satellite Service in the 2310-2360 MHz Frequency Band*, WT Docket No. 07-293, IB Docket No. 95-91, GEN Docket No. 90-357, RM-8610, Report and Order and Second Report and Order, FCC 10-82 (May 20, 2010); ("WCS Interference Decision").

changes will interfere with the reception of satellite radio.  The issues, which are

technically complex and have the potential to affect tens of millions of Sirius XM

listeners, were addressed in the WCS Interference Decision, which remains the subject of

petitions for reconsideration by both Sirius XM and WCS licensees.[32]

Sirius XM will not burden the record of this proceeding with extended comment

on the unrelated WCS interference proceeding.[33]  Throughout that proceeding, Sirius XM

has urged the Commission to modify its rules to allow mobile use of WCS frequencies

only if such changes could be justified through sound engineering analysis, and Sirius

XM continues to do so here.  The Commission should reject the WCS Coalition

---

[32]     Public Notice, *Petitions for Reconsideration of Action in Rulemaking Proceeding*,
Report No. 2917 (Sept. 22, 2010).

[33]     As the Commission is aware, WCS licensees acquired their spectrum nearly 14
years ago and, with the exception of AT&T, have largely let the spectrum lie fallow.  By
contrast, Sirius XM has invested billions of dollars to develop the satellite radio
spectrum, which now serves over 20 million customers.  The Reply Comments filed on
March 9, 2011 by Patrick Sharpless extensively detail the actions of WCS Coalition
members:

> poaching the adjacent bandwidth to SDARS, squatting on the bandwidth
> for 14 years, refusing to construct mandatory buildouts as required by the
> substantial service requirements embedded within the license agreements,
> lying in wait until the sequestered SDARS bandwidth was fully deployed
> before executing a strategic response which just happens to employ a new
> technology (WIMAX) and requires the Commission to modify their
> technical rules for WCS operations in the 2.3 GHz band from fixed
> terrestrial operations to allow mobile broadband services in 25 MHz of the
> WCS band (and increasing the interference on adjacent SDARS in the
> process). . . And now the WCS Coalition argues continuing the price cap
> scheme is necessary until the WCS Coalition is successful launching their
> service?  A service the WCS Coalition had the opportunity to launch for
> 14 years now, but squandered every opportunity to do so? . . . And now
> the WCS Coalition wants the Commission to punish competitors who
> delivered consumer driven products and services that satisfied the public
> interest because those competitors (Sirius XM) timely executed an
> effective business plan, and consumers (over 20 million) are rewarding the
> company by subscribing to their service.

Reply Comments of Patrick Sharpless, MB Docket No. 07-57 at 2, 7, 9 (filed March 9,
2011).

members' self-serving attempt to induce the FCC to resolve the reconsideration petitions

of the WCS Interference Decision on anything other than the merits of the interference

potential at issue there.  To the extent the WCS Coalition members urge the Commission

to promptly address those petitions, Sirius XM agrees.

As further detailed above, with or without whatever services the WCS licensees

finally decide to offer, Sirius XM currently faces significant competition from Internet-

based service providers and will face increasing competition in the future.

Moreover, the 25 MHz of WCS spectrum that the FCC has made available for mobile

broadband use in the WCS Interference Decision is a relatively small component of

available spectrum compared to the hundreds of megahertz allocated to the commercial

mobile services, much of which is farther along in its commercial development than

WCS spectrum.[34]

Second, two letters have been filed by interim lead plaintiffs' counsel in *Carl*

*Blessing et al v. Sirius XM Radio Inc.*[35]  The *Blessing* case involves claims that certain

price increases by Sirius XM, particularly the pass-through of performance rights fees,

violated various state and federal statutes.  Sirius XM has vigorously contested this

---

[34]      In addition to the hundreds of megahertz of existing allocations, more spectrum is
on the way.  The National Broadband Plan tasked the Commission with making 500 MHz
newly available for broadband use within the next ten years, and President Obama
recently set the goal of freeing up 500 MHz of spectrum for everything from smartphones
to wireless broadband connectivity for laptops to new forms of machine-to-machine
communication within the next decade.  *Connecting America: The National Broadband
Plan*, Federal Communications Commission, at Chapter 5 (March 2010); Press Release,
the White House, President Obama Details Plan to Win the Future Through Expanded
Wireless Access, Feb. 10, 2011, *available at* http://m.whitehouse.gov/the-press-
office/2011/02/10/president-obama-details-plan-win-future-through-expanded-wireless-
access.

[35]      Comments of Paul F. Novak, James J. Sabella, Christopher B. Hall, MB Docket
No. 07-57 (filed Feb. 24, 2011); Letter from Paul F. Novak, James J. Sabella, Christopher
B. Hall to William Lake, Chief, Media Bureau, FCC, MB Docket No. 07-57 (filed Mar.
3, 2011) ("*Blessing* Counsel Comments").

allegation and will continue to do so.  Now, the *Blessing* counsel essentially ask the

Commission to provide leverage to the plaintiffs in the litigation by withholding action in

this proceeding until the Commission reviews various documents related to the *Blessing*

case.[36]  Such litigation documents are not germane to the Bureau's request for comments

on "whether to extend, modify, or remove the price cap,"[37] and the *Blessing* counsel offer

no reason for delaying a resolution of the issues raised in the *Public Notice*.

The *Blessing* counsel letters also illustrate why the Commission, through long-

standing precedent, has refused to allow its regulatory processes to advance private

commercial goals.  As the FCC has stated repeatedly, the agency "has consistently

refused to interject itself into private matters, finding that a court, and not the

Commission, is the proper forum for resolving such disputes."[38]  The *Blessing* case

should not be litigated at the FCC in the guise of a proceeding regarding the Sirius XM

rate cap.  As with the Coalition Members' Comments, the Commission should reject the

transparent attempt by the *Blessing* counsel to use the agency's processes to influence the

outcome of unrelated litigation.

---

[36]      In the first letter, the Blessing counsel ask the FCC to hold the Sirius XM rate
proceeding in abeyance while they seek the right to disclose to the Commission
documents filed under seal in the Blessing litigation.  In the second letter, Blessing
counsel, reminded that they would be prevented by a protective order that they sought
from sharing any of the documents with anyone, backed off of their original offer, but
nonetheless "invite[d]" the Commission "to review the public filings in connection with
this matter." *Id.*

[37]      *Public Notice* at 1; *see Blessing* Counsel Comments.

[38]      *Vodafone AirTouch, PLC, and Bell Atlantic Corp.*, Memorandum Opinion and
Order, 15 FCC Rcd 16507, 16515 n. 37 (WTB, IB 2000) (citing *Applications of
WorldCom and MCI Communications Corp.*, Memorandum Opinion and Order, 13 FCC
Rcd 18,148 ¶ 214; *PCS 2000, L.P.*, 12 FCC Rcd 1681, 1691 (1997) (citing *United Tel.
Co. of Carolinas v. FCC*, 599 F.2d 720, 732 (D.C. Cir. 1977)).

### III.   CONCLUSION

For all these reasons, Sirius XM respectfully submits that there is no basis for imposing a price cap of any kind after July 28, 2011 and that the FCC should close this proceeding and take no action to impose a the price cap beyond that date.

Respectfully submitted,

_/s/ Jennifer D. Hindin_
Richard E. Wiley
Robert L. Pettit
Jennifer Hindin
Wiley Rein LLP
1776 K Street N.W.
Washington, DC 20006
*Counsel for Sirius XM Radio Inc.*

March 11, 2011

# EXHIBIT 3

September 17, 2007

Steven C. Krane, Chairman
Standing Committee on Ethics and Professional Responsibility
c/o George Kuhlman
Ethics Counsel and Associate Director
Center for Professional Responsibility
American Bar Association
321 North Clark Street
Chicago, Illinois 60610

To the Committee:

A troubling practice, whereby attorneys in contingency fee representations are negotiating their fees directly with settling defendants, is occurring with increasing frequency and on an increasing scale.[1]  The potential ethical improprieties of this practice -- one that has now become commonplace in mass tort contingency fee representations[2] -- are clear and considerable, as are the

---

[1] While the 1998 Master Settlement Agreement (MSA) entered into between the tobacco companies and the states remains the best known example of counsel for claimants separately negotiating with the settling defendants or respondents for the amount and the manner of payment of claimant counsels' legal fees, this practice has been documented in the following newspaper and magazine articles. *See,* Alex Berenson, *Class-Action Lawyer's Fee Under Scrutiny,* N.Y. TIMES, March 12, 2003 (reporting on a $20 million fee paid by defendant to prominent class-action lawyer for brokering a settlement between his clients and the defendant); Margie Hyslop, *Md. Looks to Up Tobacco* Ante, WASHINGTON TIMES, Nov. 25, 1998 (reporting on lawyer Peter Angelos' intention to secure part of his 25% fee in negotiating Maryland's stake in the MSA directly from the tobacco companies); Adam Liptak, *Big Litigation Firm Found To Have Acted Unethically,* N.Y. TIMES, July 4, 2003 (reporting on a $36 million jury award against a prominent law firm for unethical conduct in a class action lawsuit.); Mike McKee, *Enriching the Record: FeeAward Leaves Justices Hungry for Answers, available at* http://www.law.com/jsp/article.jsp?id=1052440784047 (last visited Oct 2, 2003)(reporting on $16 million in legal fees that are to be divided among 50 class action law firms nationwide upon settlement of a suit against nutritional and vitamin supplement companies).

[2] *See generally,* John C. Coffee, *Class Wars: The Dilemma of the Mass Tort Class Action,* 95 COLUM. L. REV.1343, 1355-67 (1995).

- 1 -

consequences of its continuation.  As a result, we believe that the Standing Committee's attention to this matter is warranted.

We write this letter in two capacities.  First, we write as members of the Bar and legal academics concerned with maintaining the integrity of the fiduciary relationship between attorneys and clients that is essential for an effective and meaningful adversarial legal system in this country.  We strongly believe, and ethics norms and rules mandate, that it is the obligation of every attorney, wherever and to the extent possible, to avoid conflicts of interest that undermine the fiduciary relationship between attorneys and clients and undermine the public's confidence in and respect for our profession.  Secondly, we write as and on behalf of taxpayers and citizens from whom substantial funds have been taken, well in excess of $15 billion in the tobacco cases alone, through a process that both in appearance and substance exemplifies the dangers inherent when claimants' counsel negotiate their fee payments with their adversaries' principals.  We submit that the Model Rules call for a *per se* ban on the practice; in the alternative, we believe that the Rules require steps that will curtail the practice's most ethically problematic dangers.

Regarding the practice, we present the following propositions for the Committee's consideration:

## *Proposition 1*

In the absence of statutory authority, attorneys who seek recovery on behalf of clients or classes and negotiate for the direct payment of their fees by defendant adverse parties and/or their counsel do so in what, at a minimum, is a presumptive but rebuttable violation of their fiduciary duty to their clients; more preferably, such practice should be deemed *per se* unethical.

## *Proposition 2*

In the absence of a *per se* ban against such agreements, attorneys should submit a reviewable, written submission to their clients demonstrating that no practicable alternative form of fee payment was available and that, in practice and in fact, counsel had been faithful to their clients' interests at the expense of their own.

## *Proposition 3*

Any provision in such agreements that in any way limits, insulates or precludes judicial or ethics-based review of the propriety of the fees should be *per se* unethical.

### *Proposition 4*

More specifically:  It is *per se* unethical for plaintiffs' attorneys to agree to any provision in such agreements that in any way compromises the right of the clients or classes to recover fees deemed excessive or unethical by such review.

### *Proposition 5*

More specifically:  Any provision in such agreements that in any way makes the validity or enforceability of the agreements contingent on the payment of the fees negotiated between defendants and plaintiffs' attorneys should be *per se* unethical.

### *Proposition 6*

More specifically:  All such agreements should be expressed in terms of a single settlement sum payable to the plaintiffs from which the plaintiffs' attorney fees are to be deducted, and any representation that expresses or implies that payment by defendants of the plaintiffs' attorneys fees does not limit the recoveries of the plaintiffs should be unethical.

## RULES INVOLVED

- The Model Rules of Professional Conduct (Model Rules) are the governing set of ethical standards.[3]

    o  Model Rule 1.5(a) bars "unreasonable" fees.

    o  Model Rule 1.7 provides that:

    "(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if…

---

[3] The Model Rules are the governing standards of the ABA and have been adopted by more than 40 states. Model Rules are available at http://www.abanet.org (last visited May 11, 2007).  *See* Nathan M. Crystal, PROFESSIONAL RESPONSIBILITY: PROBLEMS OF PRACTICE AND THE PROFESSION, 10-13 (2d ed. 2000) (hereafter Crystal).

> (2) there is a significant risk that the representation of one or
> more clients will be materially limited by the lawyer's
> responsibilities to another client, a former client or a third
> person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under
paragraph (a), a lawyer may represent a client if:

> (1) the lawyer reasonably believes that the lawyer will be able to
> provide competent and diligent representation to each affected client;

> (2) the representation is not prohibited by law;

> (3) the representation does not involve the assertion of a claim by one
> client against another client represented by the lawyer in the same
> litigation or other proceeding before a tribunal; *and*

> (4) each affected client gives informed consent, confirmed in writing."

o   Model Rule 1.8 provides in relevant parts:

"(f) A lawyer shall not accept compensation for representing a client
from one other than the client unless:

> (1) the client gives informed consent;

> (2) there is no interference with the lawyer's independence of
> professional judgment or with the client-lawyer relationship; and

> (3) information relating to representation of a client is protected as
> required by Rule 1.6 . . . ."

### DISCUSSION

Consider an example that goes to the heart of the issue. An attorney comes
to her client and indicates that she has received a settlement offer in the amount of
$100,000. Having hoped for a higher recovery, the client expresses his

-4-

disappointment, especially considering that his net recovery after the contingency fee will be two-thirds of that amount. The attorney tells the client that he should not be concerned with the fee because she and the defendant's insurance company have privately negotiated an agreement establishing the size and mode of payment of her fee, so that the client will not have to pay any fee at all. "It's all been taken care of by me and the defendant," the attorney tells her client. "There's nothing for you to worry about." Clearly, the client in such a scenario does have something to worry about, and will and should be less confident in his attorney's loyalty to him.

Such cases are occurring with increasing frequency and upon a dramatically increasing scale, with the legal stakes often totaling millions and even billions of dollars.[4] The problem is amplified in the class action context where the class is even more dependent on the judgment of the attorney when it comes to accepting the terms of a settlement. "Within the context of negotiating for a common fund settlement on behalf of a class, class counsel would have a direct conflict with the class in negotiating for or accepting the defendant's offer for a specific fee award to be paid by the settling defendant, simultaneously with negotiating for a sum for a common recovery for the class. Class counsel would be placed in the position of wearing two hats with contrary interests . . . ."[5] Failure to police the ethical violations inherent in these arrangements undermines public confidence in the Bar as well as the ability of attorneys to offer their undivided loyalties to their clients. As a result, the appearance of impropriety is now commonplace, and in many cases clients may not be represented adequately by counsel. Attorneys, particularly those in class actions, clearly appear to have come more and more -- and to be seen by the public as coming more and more -- to represent their own interests rather than the interests of their clients.[6]

Although we significantly focus in this submission on the problems raised in the tobacco MSA settlements, we do so only because they constitute paradigm examples of the problems of ethics observance and monitoring that we believe increasingly endemic.[7] The negotiations that led to the tobacco case MSA

---

[4] See, supra note 1.

[5] Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS, § 15.31 (3d ed. 1992). We note that the conflicts of interest occur whether the client is a class or an individual.

[6] See, e.g., text and notes at footnotes at pp. 10, 23-28.

[7] E.g. Ortiz v. Fibreboard Corp., 119 S. Ct. 2295 (1999). (Inviting Congress to deal with asbestos case settlements, in part because "the interests of the parties ostensibly represented in the negotiations" may be hindered by "the potential for gigantic fees." Id. at 2317). See also Lester Brickman, Ethical Issues in Asbestos Litigation, 33 HOFSTRA L. REV. 833, 840-843 (2005) (hereafter, Ethical Issues).

settlement go to the heart of the issues we raise in this submission. In the MSA settlement, the tobacco industry and the plaintiffs' attorneys fixed the latter's fees and thereby gave rise to what at a minimum were appearances that led sophisticated observers to claim, on clearly colorable bases, that collusion and unethical practices permeated the MSA agreement and its settlement process. Note, for example, the comments of Joseph Califano, a distinguished attorney and former Secretary of Health and Human Services, in an article entitled *Tobacco: The Moral Issues:*

> The most sordid piece of money-changing in the temple of the American bar is the side deal – kept secret for months -- that plaintiffs' lawyers crafted with the tobacco companies they sued. Normally, defendants in a class action suit raise hell about the fees that plaintiffs' lawyers try to charge them. But not Big Tobacco. To get their sweetheart deal, the companies signed on the dotted line promising plaintiffs' lawyers not to "take any position adverse to the size of the fee award requested." Big Tobacco even promised not to "express an opinion if asked" about the fees. This side deal helps explain why lawyers, hired to represent states, sold out their colleagues at the plaintiffs' bar by agreeing to the prohibition against future class actions.[8]

In a profession where appearances are matters of fundamental concern to the Bar's ethics rules and norms,[9] the above comment makes clear why fee arrangements similar to those entered into in the tobacco MSA merit the consideration of, and action by, the Committee.

* * * * *

A fundamental premise of the American legal system is that lawyers must be undividedly loyal to their clients' interests, even above their own.[10] That is,

---

[8] Joseph A. Califano, *Tobacco: The Moral Issues*, THE NATIONAL CATHOLIC WEEKLY, Aug. 15, 1998, *available at* http://www.americamagazine.org/articles/tobaccoCalifano.cfm (last visited May 20, 2007).

[9] *E.g.*, Canon 9, MODEL RULES OF PROFESSIONAL RESPONSIBILITY. *See also* EC 9-6.

[10] Newberg & Conte, *supra* note 5, §15.03 ("[A]ttorneys . . . seeking to represent the class assume fiduciary responsibilities to the class . . .") (quoting MANUAL FOR COMPLEX LITIGATION, §30 (2d ed. 1985)). Crystal, *supra* note 3, at 2-4. In the class action context, this means that the attorney is a fiduciary of the entire class.

attorneys are fiduciaries of their clients. This is an uncontested state of affairs,[11] one that generally exists "as a matter of law," and was recently reiterated by the ABA in its Formal Opinion 06-438 regarding Model Rule of Professional Conduct 1.8(g).[12] It is the duty of attorneys under fiduciary principles, the law of agency, and the rules of ethics to achieve the best possible results for their clients. Through this mechanism, the basic structure of lawsuits in an adversarial system is established and maintained—a plaintiff has a dispute with another party, hires an attorney for representation, and brings a claim against that party. For the justice system to resolve the dispute properly the attorneys for each party cannot act on their own behalves nor on behalf of adversarial interests; instead, attorneys must act only on behalf of their clients, and are charged with doing their utmost to resolve the dispute in their clients' favor. Anything that interferes with the relationship between attorneys and their clients thus strips it of the public trust that the Bar must enjoy and, in fact, damages the ability of the system to resolve disputes properly and hinders its capacity to achieve the best possible resolutions of clients' cases.

Recognizing the importance of this trust relationship,[13] this Committee and other ethics resolution and enforcement bodies have generally recognized that if lawyers are compensated by parties other than their clients, they are, at a minimum, placed at grave risk of becoming fiduciaries of their clients *in name only*. As such, the American Bar Association has taken numerous steps to prevent such interference with the fiduciary relationship, including drafting the Model Rules. For example, Model Rule 1.8(f) contains specific guidelines providing the narrow circumstances under which payments by third parties are allowed. Even with this specific rule, however, both this Committee and State bar associations have seen fit to expand those requirements in various cases – most specifically

---

[11] *See, e.g., Garnick & Scudder, P.C. v. Dolinsky*, 701 N.E.2d 357, 358 (Mass. App. Ct. 1998).

[12] American Bar Association (ABA), Formal Opinion 06-438, *Lawyer Proposing to Make or Accept an Aggregate Settlement or Aggregated Agreement*, Feb. 10, 2006. (hereinafter ABA 2006 Op.).

[13] It is axiomatic in American jurisprudence that a lawyer's relationship to a client is one of trust: "There are few of the business relations of life involving a higher trust and confidence than that of attorney and client . . . ." *Stockton v. Ford*, 52 U.S. (11 How.) 232, at 247(1850); "The relationship of client and attorney is one of trust, binding an attorney to the utmost good faith in dealing with his client. In the discharge of that trust, an attorney must act with complete fairness, honor, honesty, loyalty, and fidelity in all his dealings with his client. An attorney is held to strict accountability for the performance and observance of those professional duties and for breach or violation thereof, the client may hold the attorney liable or accountable." *Beal v. Mars Larsen Ranch Corp., Inc.*, 586 P.2d 1378, at 1383-84 (Idaho Sup. Ct. 1978); "The term 'fiduciary' itself was adopted to apply to situations falling short of 'trusts,' but in which one person was nonetheless obliged to act *like* a trustee." Deborah A. DeMott, *Beyond Metaphor: An Analysis of Fiduciary Obligation*, 1988 DUKE L. J. 879, at 880 (1988) (emphasis original).

where insurance companies pay for their insureds' representation.[14]  The legal profession has been very careful about not allowing insurer payments to interfere with attorneys' representation of insureds.

An even more troubling situation has largely escaped significant ethics scrutiny and review, ***one in which third-party payers are the defendants -- i.e.***, adverse parties whose interests are diametrically opposed to those of the plaintiffs and who therefore have the most incentive to interfere with the fiduciary relationship between claimants and their counsel.

Some may suggest that the February 10, 2006, ABA Formal Opinion 06-438, addressed this issue; this is clearly not the case.  In its February 2006 opinion, this Committee addressed various issues pertaining to counselors' fiduciary duties to their clients in light of mass tort contingency fee agreements, specifically pertaining to Rule 1.8(g) of the Annotated Model Rules of Professional Conduct 146 (5th ed. 2002).  Rule 1.8(g) states as follows:

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement as to guilty or nolo contendere pleas, unless each client gives informed consent, in a writing signed by the client.  The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement.[15]

In its opinion, the Committee addressed and concluded that under Model Rule 1.8(g), an attorney must obtain informed consent and approval from multiple parties in order to render an aggregate settlement agreement to be valid.  The focus of the Committee's opinion was on ensuring that an attorney's clients have the

---

[14] *See, e.g.*, ABA Comm. on Ethics and Professional Responsibility, Formal Op. 01-421 (2001) (discussing a lawyer's ethical obligations when working under guidelines imposed by an insurance company); Utah State Bar Ethics Advisory Op. Comm., Op. 02-03 (2002) (citing opinions); Ky. Bar Ass'n, Ethics Op. E-416 (2000) (attorney may not agree to abide by insurer-prescribed guidelines in representing the insured, unless certain requirements are met; certain guidelines are unacceptable in any case); Phila. Bar Ass'n Professional Guidance Comm., Ethics Op. 92-4 (1992) (attorney is not barred from representing patient in workers' compensation claim where doctor pays for the attorney and the recovery will go to the doctor, but the attorney must follow several rules and disclosure provisions).

[15] Rule 1.8(g), Model Rules of Professional Conduct.

final say in determining whether to accept a settlement agreement.[16]  The opinion further emphasized the need for candor between attorneys and their clients in order to prevent any favoritism of some clients over others.[17]  In addition, the Committee briefly noted that in the event someone other than the attorney's client was paying his legal fees, the attorney should comply with Model Rule 1.6(f).[18]  Clearly, the opinion did not purport to analyze the issue we raise in this submission:  Whether the negotiation process for the payment of attorneys' fees between a defense attorney and plaintiffs' counsel, which occurs independently of the settlement agreement itself and between individuals whose interests are diametrically opposed, is an ethical practice – and, even if this is not so on *per se* grounds, whether it is unethical to:

- in any way limit, inhibit or preclude judicial or ethics-based reviews of the propriety of the attorney fees set out in the agreement;

- in any way make the validity or enforcement of the agreement itself contingent on the payment of its attorney fee provisions;

- in any way limit, inhibit or preclude the ability of clients or classes to receive any fees deemed unethical or excessive pursuant to such reviews; or

- in any way seek to deny or obscure the fact that the payment of attorney fees necessarily reduces the recoveries of their clients.

Through silence on the above issues, where plaintiffs' counsel neither seeks nor is concerned about receiving compensation for her fees from her clients but rather relies for such fees on the very parties she has brought suit against in the ostensible interest of her clients, a dangerous practice is being permitted to thrive.

Such, as noted, was the case in the tobacco MSA settlement, where plaintiffs' counsel negotiated directly with the defendant tortfeasors over the

---

[16] ABA 2006 Op., *supra* note 12.

[17] *Id.*

[18] *Id.* at n.13.

amount and manner in which the fees of the former were to be paid. Further, a particularly dangerous legal fiction was created by the settlement when the defendants' total payments were allowed to be artificially bifurcated into allegedly separate payments made to the plaintiffs and to their counsel – as if the size and character of the agreement's fee payments to the plaintiffs' attorneys did not negatively affect what their clients ultimately received. When they are directly responsible for paying them, clients are aware of their attorneys' fees and know that such fee payments reduce their net recoveries. On the other hand, the fiction openly and, for the most part, successfully propagated in the MSA settlement and comparable cases -- that the defendants were paying the plaintiffs' attorneys fees and that such fees were of no concern to the plaintiffs -- is one that the Bar must zealously undermine.

We cite, as an example of the above, the extraordinary statement made by then-Attorney General of New York State Eliot Spitzer in defending the MSA settlement: "[O]ne of the underlying misconceptions about the tobacco settlement is that the attorneys' fees are coming out of the public's pocket. That is not the case . . . ."[19] As further discussed herein, the Spitzer statement, which served to politically shield State Attorneys General from accountability for the MSA settlement fees, is inaccurate as a matter of economics, ethics and reality.

The above claim of the then-New York Attorney General has been powerfully rebutted in a number of quarters, but none more so than by the testimony of former Congressman, now SEC Chairman Christopher Cox, given before the House Subcommittee on Courts and Intellectual Property:

> It is specious to argue that these $45-55 billion in [attorneys'] fees are not being diverted out of the funds available for public health and taxpayers. The tobacco industry is willing to pay a certain sum to get rid of these cases. That sum is the total cost of the payment to the plaintiffs and their lawyers. It is a *matter of indifference* to the industry how the sum is divided – 75% for the plaintiffs and 25% for their lawyers, or vice versa. That means that every penny paid to the plaintiff's lawyers – whether it is technically 'in the settlement or not' – is money that the industry could have paid to the states or the private plaintiffs.

---

[19] Ctr. for Legal Policy at the Manhattan Inst., Manhattan Inst. Conference Series vol. 1, *Regulation by Litigation: The New Wave of Government-Sponsored Litigation*, at 23 (1999) (Statement of the Honorable Eliot Spitzer).

Excessive attorneys' fees in this case will not be a victimless crime.[20] (emphasis added)

Ultimately it is of no consequence to defendants how claimants and their counsel divide up the total settlement dollars that the former must pay. But when the defendant has an opportunity to minimize his total losses by allocating a greater sum to fees in exchange for the plaintiff's attorney recommending that his client accept a lesser settlement, the defendant has no incentive not to take that course. Precisely for this reason, we submit, guidance from the Committee is very much in order.

In mass tort cases, in particular, it is in the defendant's interest for the allocation to swing more favorably toward the plaintiffs' lawyers, who exercise great control over the outcome of the case, including the effective power to offer and accept settlements. For example, it is routinely acknowledged that class action clients often have little ability to control their counsel, especially given the large number of clients – often geographically diverse – and the typical complexity of such litigation. A similar situation arises in cases involving government claimants where private, outside counsel have been retained – a setting in which government counsel and other government officials have a clear political self-interest in masking from constituents and the public the amounts paid to the outside counsel.[21]

One court aptly described the situation as follows: "The class members are not at the table; class counsel and counsel for the defendants are. Unlike in the non-class action context, most of class counsel's clients cannot be consulted individually about the terms of the settlement, nor is the resulting decree submitted to the class members for approval (although there is an opportunity to object)."[22] If the way to ensure the lowest total payout is to increase the lawyers' fees and reduce the clients' recoveries, defendants will not hesitate to do so. While settlement itself may be more likely where the defendants are ethically free to negotiate for the payment of and pay the fees of the plaintiffs' attorneys, permitting this to occur will make attorney-client fiduciary standards and optimal net recoveries by clients more difficult to achieve.

---

[20]  Testimony of Honorable Chris Cox, Subcommittee on Courts and Intellectual Property, Dec. 12, 1997, *available at* http://www.afn.org/~afn54735/tob971210a.html, (last visited May 17, 2007).

[21] *See,* pp. 9-10, *supra.*

[22]  *Staton v. Boeing Co.,* 313 F.3d 447, 469 (9th Cir. 2002) (*opinion withdrawn and superceded on denial of rehearing for other reasons, Staton v. Boeing Co.,* 327 F.3d 938 (9th Cir. 2003)); *see, e.g.,* Liptak, *supra* note 1.

> *In light of the above, we take the adamant view that the practice of direct negotiation between plaintiffs counsel and defendants over the former's fees, where not sanctioned and governed by legislation, should at a minimum be treated as presumptively impermissible. As a further minimum, therefore, we believe that such practice should be deemed allowable only after the attorneys meet a clear burden of demonstrating, in a written submission to their clients or, in class action litigation, to the court, that there was no practicable alternative form of payment available to them and that, in practice and in fact, they had been faithful to their clients' interests at the expense of their own.*

\*\*\*\*\*

In taking the above position, we first note the law of agency. Since the relationship between a lawyer and a client is a classic illustration of agency – a lawyer acts on behalf of the client, representing the client, with consequences that bind the client,"[23] – lawyers are subject to the legal consequences that proceed from such a relationship.[24] As Duke University Law Professor Deborah A. DeMott explains, "the defining elements of the [agency] relationship are mutual manifestation of consent, the agent's undertaking to act on behalf of the principal, and the principal's right to control the agent. The relationship between a lawyer and a client is generally assumed by courts and commentators to be an agency relationship and therefore a relationship in which these defining elements are present."[25]

Applying the above elements to settlements where the merits and fees are negotiated simultaneously, it is evident that in such cases the attorney has turned the agency relationship on its head. Because "many clients lack the expertise to supervise the lawyer's actions" and generally do not understand their import, even more stringent adherence to fiduciary and agency principles is necessary,[26]

---

[23] Deborah A. DeMott, *The Lawyer as Agent*, The Lawyer as Agent, 67 FORDHAM L. REV. 301 (1998). *See* RESTATEMENT (SECOND) OF AGENCY § 1 (1958) ("[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.").

[24] *See generally*, Deborah A. DeMott, *The Lawyer as Agent*, 67 FORDHAM L. REV. 301, at 301-03 (1998).

[25] *Id.* at 302-03 (internal citations omitted).

[26] *See generally, id.* at 303. ("An important starting point is the realization that the law of agency contains its own definition of control. The concept of control as defined by agency is not the same as a generalized capacity to monitor or the actual exercise of influence. In agency, 'control' means prescribing on an ongoing basis what the

particularly those requiring the agent to receive the client's consent regarding matters related to settlement.[27]

Accompanying the lawyer's role as a fiduciary is the duty of loyalty to her client, which encompasses "more specific constraints on self-dealing, representation of adverse interests, competition, and the use of information acquired in connection with the agency."[28] When an attorney acts in a manner that breaches the duty of loyalty such as "nondisclosure of an adverse interest, or other material facts or matters," the attorney has committed fraud[29] with remedies available to the client of fee forfeiture or disgorgement[30] that oftentimes do not require proof of injury or causation.[31] At its core, the duty of loyalty requires an attorney to put his client's interests above all others, including his own.

Consistent with upholding the duty of loyalty, the Supreme Court held in *Evans v. Jeff D.*,[32] a major decision regarding statutory fee-shifting, that an attorney may waive a fee to which he is entitled under a statutory fee-shifting statute if doing so results in a settlement that advances the best interests of his client.[33] The majority summed up the ethical issue in the opinion's footnote 14: "Generally speaking, a lawyer is under an ethical obligation to exercise independent professional judgment on behalf of his client; he must not allow his own interests,

---

agent shall or shall not do. Much in the common law of agency turns on the distinction between a right of control and the actual exercise of control." *Id.*)

[27] Crystal, *supra* note 3, at 251(citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 38 and cmt. *d.*) (Model Rule 1.2(a) provides "[a] lawyer shall abide by a client's decision whether to settle a matter.")

[28] DeMott, *supra* note 24, at 307.

[29] 7A C.J.S. ATTORNEY & CLIENT § 251 (1980).

[30] *Hendry v. Pelland*, 73 F.3d 397, 399 (D.C. Cir. 1996).

[31] *Id.* at 402. ("[C]lients suing their attorney for breach of the fiduciary duty of loyalty and seeking disgorgement of legal fees as their sole remedy need prove only that their attorney breached that duty, not that the breach caused them injury."); *Arce v. Burrow*, 997 S.W. 2d 229 (TX 1999), *rev'g in part and aff'd in part, Arce v. Burrow*, S.W.2d 239 (Tex.App.-Houston 1997) (The Supreme Court of Texas held that former clients could pursue a cause of action for fee forfeiture for breach of fiduciary duty even in the absence of actual harm to the clients); *In re Estate of Corriea*, 719 A.2d 1234, at 1241 (D.C. 1998) (holding that the plaintiff's inability to quantify the damages suffered did "not disqualify the profits ordered disgorged as 'just compensation for the wrong'") (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940)); *Eriks v. Denver*, 824 P.2d 1207, 1213 (Wash. 1992) (en banc) (rejecting the argument that a finding of damages and causation is required to order fee forfeiture); *Rice v. Perl*, 320 N.W.2d 407, 411 (Minn. 1982)(holding that the client need not prove actual harm to obtain fee forfeiture).

[32] 475 U.S. 717 (1986).

[33] *Id.* at 729-38.

financial or otherwise, to influence his professional advice."[34]  This position tracks
Rule 1.2(a) of the Model Rules of Professional Conduct:

> [A] a lawyer is required to evaluate a settlement offer on the
> basis of his client's interest, without considering his own
> interest in obtaining a fee; upon recommending settlement, he
> must abide by the client's decision whether or not to accept the
> offer.[35]

The Court went on to state that "[p]lainly [the lawyer] had no *ethical*
obligation to seek a statutory fee award. Her ethical duty was to serve her clients
loyally and competently.  Since the proposal to settle the merits was more
favorable than the probable outcome of the trial, [her] decision to recommend
acceptance was consistent with the highest standards of our profession . . .
[A]pproval of the settlement involved no breach of ethics . . . ."[36]

Some may argue that *Evans* illustrates precisely why fee payments by
defendants are in fact beneficial: that they encourage settlement.  The difficulty
with this view is that it ignores the fact that, while settlements generally may be
more likely, settlements that are favorable to claimants may be distinctly *less likely*
because of the economic realities of the litigation and settlement process.  As
noted, the primary interest of defendants is minimizing the total payment they must
make.  In the context of this submission, the point cannot be stressed enough that
the *Evans* case involved a statutorily defined process while the questions posed by
this submission involve private party conduct bereft of authoritative authorization
and, as noted, largely not subject to ethics review.

Where the defendants and the plaintiffs' counsel are negotiating not only the
recovery but, as if unrelated, the fees to be paid to plaintiffs' counsel, the interests
of the plaintiffs and their attorneys sharply diverge and are subject to strikingly
perverse incentives to diverge.  Courts and commentators have noted these
perverse incentives, as does the Manual for Complex Litigation, which has been
found to "condemn . . . fees that are paid separate and apart from the settlement
funds paid to the class . . . ."[37]  This concern arises because, "[when the defendant

---

[34] *Id.* at 728, n. 14.

[35] MODEL RULES OF PROFESSIONAL CONDUCT, Rule 1.2.

[36] *Evans*, 475 U.S. at 728 (emphasis added).

[37] *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.* 55 F.3d 768, at 802 (3rd Cir. 1995).

pays the attorneys' fees from its own funds,] the defendant's adversarial role with regard to the attorneys' fees is . . . diminished . . . ."[38] Courts have further noted that the "plaintiffs' attorneys and defendants will team up to further parochial interests at the expense of the class"[39] and have noted that the dynamic between plaintiffs' lawyers and the defense "creates incentives for collusion – the temptation for the lawyers to agree to a less than optimal settlement 'in exchange for red-carpet treatment on fees.'"[40] Attorneys, even those with the best of intentions, will feel this pressure when negotiating their fees with the opposing parties.

As aptly stated by one court:

> The incentives for the negotiators to pursue their own self-interest and those of certain class members are implicit in the circumstances and can influence the result of the negotiations without any explicit expression or secret cabals.[41]

And as further elaborated by a Third Circuit Panel on Court Awarded Attorney Fees:

> Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations."[42]

In sum: any time a plaintiff's attorney negotiates fees directly with the defendant, these conflicts of interest and the ethical concerns that accompany them

---

[38] *Strong v. BellSouth Telecom., Inc.*, 137 F.3d 844, at 850 (5th Cir. 1998).

[39] *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, at 524 (1st Cir. 1991).

[40] *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, at 52-53(2nd Cir. 2000) (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991) (quoting John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 Law & Contemp. Probs. 5, 26-33 (1985)); *See also, Staton*, 313 F.3d 447, 469 (9th Cir. 2002) ("We have characterized these inherent dangers of class settlements as encompassing the possibility that 'the agreement . . . is the product of fraud or overreaching by, or collusion between, the negotiating parties . . . .'") (citing *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, at 625 (9th Cir. 1982)).

[41] *Staton*, 313 F.3d at 469.

[42] REPORT OF THE THIRD CIRCUIT TASK FORCE, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985).

will inevitably be present and, we submit, should be openly dealt with by all who bear responsibility for the maintenance and preservation of Bar ethics.

*****

An acutely disturbing add-on set of practices has emerged of late in class and mass tort litigation in the form of provisions that insulate directly negotiated fees from judicial or ethics-based review.   These practices go to the heart of our submission to the Committee and what we ask of it; we call on the Committee to declare them *per se* unethical.

Aware of the potential for challenge to the fee awards, plaintiffs' counsel and defendants often draft settlement agreements that include provisions inhibiting or precluding review of the attorney fee arrangements.  In some cases, the agreements specify that the entire settlement must be negated if the fees are reduced or in any way successfully challenged.  Such agreements dramatically increase the likelihood of collusion, and do so in inverse proportion to the capacity of plaintiffs to avail themselves of the intended protections of Rule 1.5.  In this context, concerns over such treatment of fees are aggravated because the agreements eliminate a primary means and critical incentive for challenging fee requests.  In *Lobatz v. U.S. West Cellular of California, Inc.*,[43] "where the defendant had agreed that it would not contest a fee request of $1 million that was apart from the settlement fund, [and the court] noted that '[s]uch an agreement has the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class.'"[44]

In fact, "[t]he effect of such an arrangement is to neutralize the court's power and responsibility to pass upon the reasonableness of the amounts to be paid to plaintiff's counsel . . . ."[45]  Unfortunately, courts are under significant pressure to accept settlements despite questions regarding fee provisions.[46]  As one court put it,

---

[43] 222 F.3d. 1142 (9th Cir. 2000).

[44] *Staton*, 313 F.3d 447, at 474 (citing *Lobatz*, 222 F.3d at 1148).

[45] *In re Gen. Motors Engine Interchange Litig.*, 594 F.2d 1106, at 1130-31 (7th Cir. 1979) (citing the MANUAL FOR COMPLEX LITIGATION, §1.46).

[46] *See, e.g., Staton*, 313 F.3d at 481 ("The parties' all-or-nothing approach imposes pressure to approve otherwise acceptable and desirable settlements in spite of built-in attorneys' fees provisions."); *In re Gen. Motors Engine Interchange Litig.*, 594 F.2d at 1131 ("This court has previously declined to upset a settlement agreement merely because some problems regarding fees and expenses remain unresolved.").

"[j]udicial review . . . takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk."[47]

Even where reviewing courts are willing to subject fees to scrutiny, such settlement agreements often structure powerful disincentives to contest fees because the plaintiffs would stand to lose more than they would gain were they to accept determinations that the fees were unethical.  Even further disincentives are created when, as is at times the case, they put plaintiffs at risk of paying significant refunds of case proceeds that have already been paid and spent.

As noted, the paradigmatic example of such an arrangement is the 1998 Master Settlement Agreement reached between the tobacco companies and the states.  When a New York judge questioned the amount and reasonableness of the fees paid to New York attorneys under the MSA,[48] its Attorney General argued against New York's receipt of what would have been the significant portion of the $625 million, $13,000 per hour fee award that the Court had made clear it would award to the State.  Nonetheless, New York's Attorney General noted that payment of any portion of the MSA fee award to the State would threaten the overall New York MSA settlement itself and thereby jeopardize the even larger payments that the State badly needed.[49]

Recognizing the risk of loss that his own state faced if the fees were successfully challenged, West Virginia Attorney General Darrell McGraw similarly defended his decision not to ask a court to review the attorneys' fees, declaring, "Why in the world would we try to unsettle the settlement and have to give back the money?"[50]

---

[47] *Staton*, 313 F.3d at 461.

[48] *State of N.Y. v. Philip Morris, Inc.*, N.Y.L.J., October 28, 2002, p. 26, col.4, *modified in part, rev'd in part* at 308 A.D. 2nd 57, 763 N.Y.S. 2nd 32, (1st Dept. 2003).  *See,* Jonathan D. Glater, *Judge Questions Legal Fees in New York Tobacco Case,* N.Y. TIMES, Mar. 27, 2003.

[49] *Id.*

[50] Sam Tranum, *McGraw Decided Against Review of Pay,* CHARLESTON DAILY MAIL, Oct. 21, 2001. However, for a successful attempt by a state to challenge the reasonableness of contingency fees under the MSA, *see* Alex Beam, *Renegade Lawyer Challenges Fees,* ATLANTIC MONTHLY, June 1, 2004 (describing how the state of Massachusetts which had received the largest attorneys' fees of all states covered by the tobacco MSA, convinced a jury to decrease the 25% contingency fee the lawyers had negotiated with the tobacco companies to 10.5% with the aid and testimony of a dissatisfied lawyer from one of the firms contracted to represent the state in the tobacco litigation).

One may for purposes of this letter fully assume that both Attorneys General acted in the best interests of their states in light of the terms of the MSA and the circumstances before them; under the MSA, a successful challenge to the fees that resulted in a major award of excess fees to their States could have resulted in lesser, not greater recoveries for their States, and would have required the refund of billions of dollars of already expended case proceeds.  That this might have been so, however, only demonstrates the profoundly troubling effect of such agreements on the prospects for review of attorney fees and the incentives for collusion that direct negotiation of those fees creates.  As a result, in the MSA case, plaintiffs' outside counsel and the tobacco companies have largely been able to evade meaningful judicial review of attorney fees despite the fact that the MSA explicitly subjected payment of the fees "to the Code of Professional Responsibility of the American Bar Association."[51]  Incorporating the Code into the fee agreement did little more than maintain the façade of ethical propriety, because, as noted, other provisions of the MSA insulated the fees from effective reviews that might have been brought under the Code.[52]

Statutory fee-shifting regimes offer an example of how the legal system has more effectively acted to protect the attorney-client fiduciary relationship from interference, even in cases where the opponents pay the attorneys' fees.  Two mechanisms exist to this end: (1) rules requiring or proscribing certain attorney conduct; and (2) clear ownership of fee award by clients and not their attorneys.

In statutory fee-shifting cases, plaintiffs' lawyers are generally allowed to bargain with the defendants over the fee award.[53]  Prior to the Supreme Court's decision in *Evans v. Jeff D.*, some State bars had determined that such negotiations were unethical.[54]  While, since *Evans*, State bar ethics opinions generally have

---

[51]  Master Settlement Agreement, Exhibit O: Model State Fee Payment Agreement, Section 2: Agreement to Pay Fees, 1998.

[52]  Nor do F.R.C.P Rule 23(e) or comparable State provisions deal with the issue posed by this petition. Under Rule 23(e), courts are limited to either approving or disapproving settlement agreements as a whole, thus returning the dilemma to the square one position confronted by the New York and West Virginia Attorneys General: Either challenge the fees and cause the parties to return to the table with no settlement at all, or forfeit the challenge to the fee agreement notwithstanding its seemingly unethical character.  Richard. A. Givens, RULE & MANUAL OF FEDERAL PRACTICE, vol. 1, ch. 3, Sec. 3.145 (3d Ed. 1987); J. W. Moore, MOORE'S FEDERAL PRACTICE, Vol. 5, §23.160 (3rd Ed., 2004).

[53]  *Evans*, 475 U.S. 717 (1986).  The Supreme Court expressly stated that it did not base its decision on attorneys' ethical duties but on the language of the federal fee-shifting statute in question.  *Id.* at 727-28.

[54]  *See, e.g.*, Maine Grievance Comm'n of the Overseers of the Bar, Op. 17 (1981) (such negotiations are unethical if they occur prior to or simultaneous with the settlement of the underlying action.).  Other states held that such negotiations were permissible, but only if the attorney was careful to ensure that a lawyer disclose all potential

allowed plaintiffs' lawyers to negotiate with defendants over fee awards in statutory fee-shifting cases, they have always also strictly cautioned attorneys to be aware of and to disclose the conflicts of interest between them and their clients.[55] Many opinions make clear that clients always have the right to make final decisions regarding settlement, and that the attorneys may not prohibit the clients from accepting settlements that waive attorneys' fees.[56] Some have even required that attorneys in fee-shifting cases must inform their clients that "[they] may be able effectively to win [their] lawsuit[s] by waiving their attorney's fees."[57] Thus, even where statutes make defendants liable for the plaintiffs' attorneys' fees, courts and the Bar have been careful to protect clients from the clear conflicts of interest with their counsel.

*****

> ***Even more important than the procedural protections of client interests in fee-shifting cases is the need to make unambiguously clear that, in all such cases, fee awards belong to clients and not their attorneys.***

In statutory fee-shifting cases, attorneys' fee awards essentially are a form of special damages.[58]  The Manual for Complex Litigation states that the sum of the attorneys' fees and the settlement fund "ordinarily should be treated as a settlement fund for the benefit of the class."[59]  Critically, the courts have regularly confirmed that fee awards, including fees awarded pursuant to both federal and state statutes

---

conflicts of interest at the outset of the case, and continue such disclosures as the case progressed.  State Bar of Mich., Formal Ethics Op. C-235 (1985).  Likewise, the Board of Professional Responsibility of the Supreme Court of Tennessee went a step further by requiring plaintiffs' counsel to advise the client that independent legal advice may be obtained regarding the negotiations.  Formal Ethics Op. 85-F-96(a) (1986).

[55] *See, e.g.,* Utah State Bar Ethics Advisory Op. Comm., Op. 98-05 (1998) (noting that attorneys can generally deal with the conflicts inherent in such negotiations through appropriate arrangements with their clients).

[56] *See, e.g.,* Utah State Bar Ethics Advisory Op. Comm., Op. 98-05 (1998) (attorneys cannot contract away the clients' right to determine whether a settlement offer that waives such fees will be accepted); D.C. Bar Legal Ethics Comm., Op. 289 (1999) (citing opinions); *but see* The State Bar of Cal. Standing Comm. on Professional Responsibility and Conduct, Formal Op. 1994-136 (1994) (stating that the right to recover fees awarded pursuant to 42 U.S.C. § 1988 may be contractually assigned from the client to the attorney, and such contracts may bar the client from waiving such fees, but the contract terms must be fair and reasonable to the client and the attorney must meet certain disclosure requirements).

[57] The State Bar of Cal. Standing Comm. on Professional Responsibility and Conduct, Formal Op. 1989-114 (1989).

[58] Geoffrey C. Hazard, Jr. & W. William Hodes, THE LAW OF LAWYERING: A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT, § 1.5:104 (2d ed. 1998 Supplement).

[59] MANUAL FOR COMPLEX LITIGATION, § 30.42 (3d ed. 1995).

other than 42 U.S.C. § 1988, are property of the client and not the attorney.[60]  The
Ninth Circuit has held that class members have standing to challenge class
counsel's fee, even when they had been paid separately by the defendants, because
if "class counsel agreed to accept excessive fees and costs to the detriment of class
plaintiffs, then class counsel breached their fiduciary duty to the class.  If that were
the case, any excessive award could be considered property of the class plaintiffs,
and any injury they suffered could be redressed at least partially by allocating to
them a portion of that award."[61]  Notable here is the explicit reference to the
fiduciary duty that must form the basis of attorney-client relations.

       In contrast to the open contractual arrangement of fee-shifting statutes, when
attorneys negotiate their fees with the defendants in non-statutory fee-shifting
cases, clients often are not presented with choices regarding the fee amount and the
means of payment for their own attorneys.  In fact, there are many situations in
which one is hard-pressed to find a purpose of such negotiations other than
preventing clients from deciding how and what to pay their attorneys – *i.e.*, from
deciding what their net recovery should be.  There is a fundamental difference
between negotiating fee awards under statutory provisions and negotiating fees
through private agreements separate and apart from negotiations for common funds
or other recoveries.  In the former case, part of the plaintiffs' total recovery
consists of a fee award that is separately negotiated between the plaintiffs'
attorneys and the defendants.  Whether that award will go to attorneys or their
clients, however, is a matter of negotiation between the two and no one else.  On
the other hand, the cases that are the subject of this submission, where attorneys
effectively establish their fees with parties whose interests join with them in
maximizing those fees, effectively remove from their clients the capacity to
negotiate fees and thereby establish net recoveries.

---

[60] *See, e.g., Venegas v. Mitchell*, 495 U.S. 82, at 87 (1990) ("Section 1988 makes the prevailing *party* eligible for a
discretionary award of attorney's fees . . . [I]t is the party, rather than the lawyer, who is so eligible . . . .") (citations
omitted); *Evans*, 475 U.S. at note 19 (extensive case citations); *Carlton v. Owens*, 443 So.2d 1227, at 1232 (Ala.
1983) ("An award of attorney's fees belongs to the client and not the attorney."); *Alfred J.L. v. Leo J.R.*, 1986 WL
9919, at *4 (Del. Super. Ct. 1986) ("[The] attorneys' fee provision exists for the benefit of parties and not the
attorneys . . . .  Several jurisdictions have noted that the real party in interest with regard to fees is the client and not
the attorney."); *Carmichael v. Iowa State Highway Comm'n*, 219 N.W.2d 658, at 664 (Iowa 1974) (citing 7 C.J.S.
*Attorney and Client* § 163) ("The allowance of attorney fees in a judgment gives the attorneys no interest and
ownership in the judgment to the extent of the amount of the fee allowed, but the judgment in its entirety is the
property of the client . . . The award for fees is for the client, not the attorney . . . ."); *In the Matter of Estate of
Robinson*, 690 P.2d 1383, at 1388 (Kan. 1984) ("[T]he award of attorney fees [is] made not to the attorneys but to
the litigant who was personally liable to the attorneys."); *In re McRoberts' Estate*, 43 A.2d 910, at 911 (Pa. Super.
1945) (attorneys' fees awarded pursuant to section 35(a) of the Orphans' Court Partition Act "belong, and are
awarded, to the petitioner, not counsel . . . .").

[61] *Lobatz*, 222 F.3d at 1147.

This is precisely what happened in the case of the tobacco MSA settlements, and is occurring with increasing frequency in class action and mass tort cases. Not only did the New York Attorney General come out against judicial review of the fee arrangement for fear of losing State funds, but he stated affirmatively that, "one of the underlying misconceptions about the tobacco settlement is that the attorneys' fees are coming out of the public's pocket. That is not the case . . . The tobacco companies are paying the attorneys' fees and, therefore, these fees are not state property."[62] In terms of the MSA as written and intended, these comments are factually accurate. But this is precisely the problem. The State was cut out of the process of determining the fees to be paid to its own attorneys, a fact that rendered it more likely, not less, that the money paid to plaintiffs' private attorneys effectively came directly out of the public's pocket. Unless plaintiffs own the entirety of a separately negotiated settlement fund, there is no protection against the direct conflict of interest between the client and her attorney on the issue of fees. And unless there are clear ethical norms protecting clients (and, in cases involving government claimants, also protecting the public) from the fraudulent misrepresentation that fees paid to counsel do not detract from fees paid to claimants, such misrepresentations are certain to continue.

✱✱✱✱✱

The concerns raised by this submission are made particularly acute by the multibillion dollar character of many of the cases which caused the submission to be made.

In *Matter of Rhone-Poulenc Inc.*,[63] Judge Posner well described the significance of this phenomenon in deciding a class action certification appeal where the potential liability of the defendants exceeded the net worth of each. In such cases, Judge Posner wrote, where "[o]ne jury ... [can] hold the fate of an industry in the palm of its hand ... and hurl [it] into bankruptcy ... the industry is likely to settle – whether or not it really is liable."[64] The *Rhone-Poulenc* court understood that the "small probability of an immense judgment in a class action"[65] will generally make litigating it on the merits an imprudent course of action for defendants.[66]

---

[63] 51 F. 3d 1293 (7th Cir. 1995).

[64] *Id.* at 1300.

[65] *Id.* at 1299, *citing* Henry J. Friendly, FEDERAL JURISDICTION: A GENERAL VIEW at 120 (1973)

Where private party negotiations become the means of resolving the fees payable in major cases where both strong pressures and incentives exist for defendants to offer windfall fee payments to opposing counsel, the need is acute for ethics rules and procedures permitting effective review and monitoring of those fees.

*****

The Trial Court ruling opposed by the New York Attorney General because it sought to give the State of New York a significant share of a $625 million MSA fee award was reversed by the Appellate Division.  This was done on a number of procedural grounds, including the fact that the New York MSA agreement had previously been affirmed in a prior judicial proceeding.  For purposes of this submission, however, the critical element of the Appellate Division opinion in *State of N.Y. v. Philip Morris*[67] was its reversal of the Trial Court's determination that his action was justified on grounds of his "inherent authority over attorneys."[68]  In terms significant for the Committee, the Appellate Division decision reads as follows:

> There is a difference between the power of courts in general and an individual judge's power to conduct the legal fee inquiry at issue here.  Thus, courts have inherent authority to promulgate rules of general applicability regarding lawyers' fees (*Matter of First Natl. Bank of East Islip v Brower,* 42 NY2d 471; *Gair v Peck,* 6 NY2d 97, *cert denied* 361 US 374), to respond to a complaint from bar associations that "ambulance chasing" was spreading to a demoralizing extent (*People ex rel. Karlin v Culkin,* 248 NY 465), and to set legal fees in connection with the settlement of an estate (*matter of Stortecky v Mazzone,* 85 NY2d 518; *Matter of Lafferty,* 297 AD2d 469).  However, neither Justice Ramos nor independent counsel has cited any authority for the proposition that a court has inherent authority to haul

---

[66] The court did not explicitly note other considerations that strengthen its finding.  Such considerations include the fact that the mere bringing of such actions is likely to depress stock values and to diminish corporate and industry goodwill with both the public and public officials, thereby further and greatly exacerbating the pressure on defendants to settle cases without regard to their merits.

[67] 308 A.D.2d 57 (N.Y.A.D. 1 Dept. 2003).

[68] *Id.* at 67.

- 22 -

before it lawyers who last appeared before a different judge of coordinate jurisdiction some two-and-a –half years earlier, to start a *sua sponte* inquiry into the appropriate amount of attorneys' fees when no fee application was pending before it, or to review an arbitral award when no party has moved to modify or vacate such award.

The cases relied upon by Judge Ramos merely hold that a court has "control over attorneys *appearing before it*" *(Chang v Chang,* 190 AD2d 311, 319 … and that a judge "may regulate *the conduct of attorneys in his courtroom" (Matter of dePerno v Garramone,* 120 Misc 2d 881, 882…   [Emphasis added].

What the Appellate Division made clear in *Philip Morris,* and rightly so, was that clearly articulated rules of ethics rather than case-by-case trial court adjudications are the best means of protecting client rights and avoiding conflicts of interest and excess fee payments in cases such as the one before it – yet another reason why we have petitioned the Committee to issue a formal ruling herein.


## CONCLUSION

In examining the tobacco MSA settlement cases that we believe demonstrates the need for a Committee ruling,[69] we believe it clear that in many of the State proceedings the fees paid to plaintiffs' counsel were excessive if not literally shocking and in violation of the fiduciary standard of reasonableness set forth in Rules 1.5 and 1.8 of the Model Rules – both in terms of appearances and realities.  Thus, the inhibitions and effective barriers against ethics reviews contained in the MSA agreement – their provisions inhibiting judicial review of the fees and their companion provisions calling for unethically excess fees be remitted to the defendant tobacco companies – make the need for ethics rules and monitoring and, in our view, for Committee action, manifest and compelling.

In making the above assertion, we begin by citing a mere sample of comments made by persons generally known to seek limits on the reach and

---

[69] The fact that the MSA agreement was entered into a number of years ago will not render any Committee opinion moot with regard to its terms; fee payments under the agreement continue on an annual basis into the foreseeable future.

character of present-day tort and class action law.[70]  We further cite the earlier
noted comments of former HHS Secretary Joseph Califano[71] or those of such anti-
smoking advocates as former FDA Commissioner David Kessler, who deemed the
fees "outrageous."[72]  By further example, we cite economists such as Paul
Klemperer and Jeremy Bulow, the latter later appointed as Director of the Bureau
of Economics of the Federal Trade Commission, who wrote of the "very
dangerous" and "terrible examples" set by the tobacco settlements and their
capacity to "open up unprecedented opportunities for collusion throughout the
economy."[73]  For purposes of this submission, however, the above comments and
many like them need only be seen as evidence of the appearance problems
associated with the fee payments in the tobacco MSA settlements.  While ethics
law is of course deeply attentive to such considerations,[74] we here cite far more
compelling findings regarding the tobacco MSA settlement fees -- those made by
attorneys who participated in the tobacco litigation and by leaders of the trial bar
itself:

- Michael Ceresi, a pioneer in the tobacco litigation who
  represented the State of Minnesota in its tobacco lawsuit,
  deemed the Texas, Florida, and Mississippi lawyers' fee
  awards "far in excess of these lawyers' contribution to
  any of the state results."[75]

- John Coale, a major trial bar leader, denounced the
  tobacco fee awards as "beyond human comprehension"
  and flatly stated that "the work does not justify them."[76]

---

[70] *E.g.*, Michael Barone, *Trying the Lawyers*, U.S. NEWS AND WORLD REPORT, June 28, 1999, p. 34; Jon Kyl, *The Trial Lawyer's Dirty Secret*, available at http://kyl.senate.gov/record_print.cfm?id=205496 (last visited May 20, 2007); Robert A. Levy, *The Great Tobacco Robbery: Lawyers Grab Billions*, Mar. 6, 1999, available at http://www.cato.org/dailys/03-06-99.html (last visited May 21, 2007). James Freeman, *Ever Heard of a Rapacious Lawyer*, USA TODAY, 9/22/99, at http://www.usatoday.com/news/comment/columnists/freeman/ncjf40.htm; Stuart Taylor Jr., *How a Few Rich Lawyers Tax the Rest of Us*, NATIONAL JOURNAL, June 26, 1999, p. 1866.

[71] *See,* Califano, *supra* note 8.

[72] *See,* Jon Kyl, *The Trial Lawyer's Dirty Secret,* available at http://kyl.senate.gov/record_print.cfm?id=205496 (last visited May 20, 2007).

[73] Jeremy Bulow and Paul Klemperer, *The Tobacco Deal,* BROOKINGS PAPERS ON ECONOMIC ACTIVITY, Nov., 1998.

[74] *E.g.* Canon 9, MODEL RULES OF PROFESSIONAL RESPONSIBILITY, *and see*, EC 9-6.

[75] *See* Kyl, *supra* note 72.

[76] *Cited in*, Robert A. Levy, *Hired Guns Corral Contingent Fee Bonanza,* LEGAL TIMES, Feb. 1, 1999.

- An ultimate expression of the above came from Richard
  D. Hailey, President of the American Trial Lawyers
  Association. Hailey's finding was as follows:

  > Common sense suggests that a one billion
  > dollar fee is excessive and unreasonable and
  > certainly should invite the scrutiny [of the
  > courts. ATLA] generally refrains from
  > expressing an institutional opinion regarding
  > a particular fee in a particular case, but we
  > have a strong negative reaction to reports that
  > at least one attorney on behalf of the plaintiffs
  > in the Florida case is seeking a fee in excess of
  > one billion dollars.[77]

The record in the tobacco MSA case settlements is rife with such seemingly
manifest abuses as multibillion dollar fees,[78] $3,000 per hour fees to read
newspapers and associated lavish expenses,[79] $350 million in fees to attorneys with
no class action experience who made limited contributions to the case outcome,[80] a
rejected fee offer of $500 million to an attorney who represented the State under
law that "changed centuries of precedent to ensure a win in th[e] case,"[81] an alleged
"bargain fee" of $50 million that included a $310 per hour charge for reading the

---

[77] Letter from Richard D. Hailey, President, Association of Trial Lawyers of America to Rep. Richard Coble,
quoted in  Fla. Lawyers Attacked by Peers; Trial Association Says Fees Excessive; Smoke Under Fire, RICHMOND
TIMES DISPATCH, Dec. 10, 1997, at A7. See also generally, Lester Brickman, The Tobacco Litigation and
Attorneys' Fees, 67 FORDHAM L. REV. 2827 (1999).

[78] See Statement of Sen. John Cornyn, CONGRESSIONAL RECORD, April 10, 2003, p. S. 5246.

> As for the five law firms that actually did represent Texas in the tobacco
> litigation, they filed relatively late lawsuits that were based on other lawyers'
> work – and were awarded $3.3 billion in attorneys' fees. This award amounts to
> compensation that, even had these attorneys worked all day every day during the
> entire period of the litigation, is well in excess of $100,000 an hour. [Emphasis
> in original].

[79] See Tax Those Lawyer Fees, MADISON CAPITAL TIMES, July 14, 1999 (editorial); Mike Ivey, Tobacco Suit
Lawyers Traveled in Style: Hotels, Limos, Flights Add Thousands to Bill, July 13, 1999, MADISON CAPITAL TIMES,
July 13, 1999; Phil Brinkman, Law Firms Put Hours at 24,733: At $75 Million, It's $3,032 an Hour, WISCONSIN
STATE JOURNAL, July 13, 1999.

[80] Tim O'Brien, A $350M Boardwalk Bonanza, NEW JERSEY LAW JOURNAL, Sept. 27, 1999.

[81] Daniel LeDuc, Angelos, Md. Feud Over Tobacco Fee, WASHINGTON POST, Oct. 15, 1999.

*Wall Street Journal* and a $290 per hour fee for identifying and ordering books,[82] fees in the $50,000 per hour range for a late filed case,[83] and a large number of comparably problematic payments. [84]

> ***In the face of the above, and going to the heart of this submission, is the fact that these and comparable fee payments were not subject to serious if any ethics review under prevailing ethics standards. This unacceptable reality results from the fact of negotiations conducted between the defendants and the plaintiffs' attorneys over the latter's fees and, even more significantly, from the built-in barriers to fee reviews created by the negotiating parties.***

A 2003 asbestos case described by the *New York Times* further illustrates the nature and degree of the problem, and sets out the ultimate issue posed by this submission: Whether fiduciary or ordinary business standards are to govern the attorney-client relationship. In the case, an attorney for a class was paid $20 million by the parent company of the defendant for crafting a settlement with his client class and additional classes represented by other attorneys. [85] Commenting on this arrangement, one legal ethics expert stated, "[T]hey're taking money from the other side to get a deal through that the other side wants too? What does one need to say?"[86] The attorney in the case defended his actions, stating, "I did a business transaction," while counsel for the parent company paying him stated, "Why shouldn't he get paid for brokering a deal?"[87]

The defenses posed in the above case were echoed during the

---

[82] Glen Justice, *In Tobacco Suit, Grumblings Over Lawyer Fees*, PHILADELPHIA INQUIRER, Oct. 4, 1999.

[83] Ted Wendling, *Bonanza for 3 Lawyers: Ohio Trio Could Split Up to $1Billion in Tobacco-Case Fees*, CLEVELAND PLAIN DEALER, Feb. 29, 2000, *Lucky Strike: Ohio's Lawyers Came Late to the Trough, But They'll Get Their Fill – And Then Some*, CLEVELAND PLAIN DEALER, Mar. 1, 2000.

[84] That the tobacco cases call for special ethical attentiveness is heightened by the fact that they were litigated by private counsel representing State governments on a contingency fee basis. *See, County of Santa Clara v. Atlantic Richfield Co.*, Case No. 1-00-CV-788657 (Cal. Superior Ct., Santa Clara County 2007), *citing People ex rel Clancy v. Superior Court*, 39 Cal. 3rd 740 (Cal. Supreme Ct. 1985) (contingency fee arrangement "is antithetical to the standard of neutrality that an attorney representing the government must meet." *Id.* at 750.); *Cf., Berger v. U.S.* 295 U.S. 78, at 88 (1935) (criminal prosecutor's obligation "is not [to] win a case, but that justice shall be done."); *Tumey v. Ohio*, 273 U.S. 510 (1927).

[85] The case is *In re Combustion Engineering Inc.*, 295 B.R. 459 (Bankr. D. Del. 2003), and the details of the arrangement are set out in *Ethical Issues, supra* note 7 at 886-889.

[86] Berenson, *supra* note 1 (quoting Susan P. Koniak, Boston University law professor and legal ethics expert).

[87] *Id.*

tobacco legislation debate by then-Senate Minority Leader Tom
Daschle. Opposing a Senate amendment that would have awarded
legal fees in the tobacco cases on a risk-based sliding scale capped at
$4,000 per hour, Senator Daschle argued that "a lawyer is a legal
businessperson."[88]

It is of course true that lawyers are engaged in commercial activities, but as
one State Supreme Court noted,

> We realize that business contracts may be enforced between
> those in equal bargaining capacities, even though they turn
> out to be unfair, inequitable or harsh. However, *a fee
> agreement between lawyer and client is not an ordinary
> business contract.* The profession has both an obligation of
> public service and duties to clients which transcend ordinary
> business relationships and prohibit the lawyer from taking
> advantage of the client.[89]

---

[88] *Quoted in* Lester Brickman, *Will Legal Ethics Go Up in Smoke?* WALL STREET JOURNAL, June 16, 1988.

[89] *In re Swartz*, 686 P.2d 1236, at 1243 (Ariz. 1984) (internal citations omitted) (emphasis added). *See also,*
Brickman, *supra* note 88:

> What kind of business is it from which the public is excluded? Actually, the law
> isn't a business – it's a profession. As such it is governed by professional rules
> of ethics. The governing ethics rule once stated that lawyers' fees could not be
> "clearly excessive." This wasn't restrictive enough, so the profession
> promulgated a stricter rule: Fees have to be *reasonable.* If the standard of
> reasonableness has any meaning, it is surely violated by fees of tens of
> thousands of dollars an hour.

> If Mr. Daschle prevails, he and his colleagues will have stripped the requirement
> of reasonable fees from lawyers' codes of ethics. Maybe they're on to
> something. Eliminating legal ethics may have some appeal. Lawyers' rules of
> ethics are pretty messy – all this stuff about conflicts of interest and
> confidentiality. Why not just get rid of them altogether? Well, lawyers
> wouldn't like that, because it would undermine the principal basis for their right
> of self-governance....

> The public has a compelling interest in preserving legal ethics, including that
> rule that fees must be reasonable. The higher the fees tort lawyers get, the
> greater the share they take of injured clients' recoveries. Moreover, the higher
> the fees, the more tort litigation and the more costs that are imposed on society.
> The civil justice system, which generates the fees that Mr. Daschle does not
> want curbed, exists to serve citizens. Lawyers are not businesspeople; they are
> professionals entrusted with the people's business.

The same point was well made by another court dealing with the issue:

> An attorney is only entitled to fees which are fair and just and which adequately compensate him for his services. This is true *no matter what fee is specified in the contract,* because an attorney, as a fiduciary, cannot bind his client to pay a greater compensation for his services than the attorney would have the right to demand if no contract had been made. Therefore, as a matter of public policy, *reasonableness is an implied term* in every contract for attorney's fees.[90]

Accordingly, we ask the Committee to address the troubling and growing practice of plaintiffs' attorneys negotiating their fees directly with defendants in the absence of statutory authorization.

As noted above, we believe that a *per se* ban should apply against such practices against such practices in the absence of express statutory authorization. In the absence of such a ban, however, and as we have noted, we believe that affirmative mechanisms must be put in place that allow clients or classes to fairly gauge the ethical propriety of their attorneys' fees, to be able to challenge those fees before a suitable forum, and to receive any fees found to be excessive.

In conjunction with the above concerns, we ask that the Committee issue a Formal Opinion setting forth its views on these important matters.[91] As noted, the Committee's Formal Opinion 06-438 limited its analysis to emphasizing the importance of full disclosure of the terms of aggregate settlement agreements by attorneys with their individual clients. While the Committee directed attorneys to Rule 1.8(f) in the event they were to be compensated by a third party, the issue here raised – whether attorney fee negotiations should be permitted defendants and plaintiffs' counsel whose necessarily opposing interests create clear conflicts in ethics issues, and whether agreements that limit or effectively preclude ethics reviews and determinations of the fiduciary propriety of the fees— remains open for exploration and comment by the Committee.

---

[90] *Missouri ex rel. Chase Resorts, Inc. v. Campbell,* 913 S.W. 2d 832, at 835 (Mo. App. 1996) (internal citations omitted) (emphasis added).

[91] We note that the Committee has the authority to issue opinions that may contradict state court holdings, as has been done in disclosure and screening cases.

\*\*\*\*\*

We thus reiterate our request to the Committee for a Formal Opinion covering cases where defendants and plaintiffs' counsel engage in direct negotiations to establish the fees of the latter, that:

1.  In the absence of statutory authorization, establishes a *per se* ban against such conduct.

2.  In the alternative, establishes a requirement that attorneys provide a written submission to their clients, or in class actions to the courts, demonstrating that no practicable alternative form of fee payment was available and that, in practice and in fact, the attorneys had been faithful to their clients' interests at the expense of their own.

3.  In all circumstances, establishes a *per se* ban on any agreement that in any way limits, inhibits or precludes judicial or ethics-based reviews of the propriety of the fees.

4.  In all circumstances, establishes a *per se* ban on any agreement that in any way makes its validity or enforceability contingent on the payment of its fee provisions.

5.  In all circumstances, establishes a *per se* ban on any agreement that in any way inhibits or precludes the right of clients to recover any fees deemed excessive or unethical by such reviews.

6.  In all circumstances, establishes a requirement that all settlement agreements should be expressed in the form of a single sum payable to the plaintiffs, from which plaintiffs' attorney fees are to be deducted.

Given the significant number of cases, many of which involve numerous clients and in which millions and billions of dollars are at stake, the fundamental relationship between attorneys and their clients is undergoing a major shift.  We

thus believe it vital, now more than ever, for the Committee to provide clear guidance on the issues raised herein.  We submit that such guidance is necessary to ensure that client rather than attorney interests remain at the heart of all representations, that fiduciary standards apply to such representations, and that the process of enforcing legal ethics and fiduciary standards will become serious and operational.


Respectfully submitted,


| | |
|---|---|
| Richard Abel | UCLA Law School |
| David Barnhizer | Cleveland-Marshall College of Law |
| Lester Brickman | Cardozo School of Law |
| Robert Cochran | Pepperdine University School of Law |
| Roger Cramton | Cornell University Law School |
| Leonard Gross | Southern Illinois University School of Law |
| Allison Hayward | George Mason University School of Law |
| Michael Horowitz | Hudson Institute |
| Michael Krauss | George Mason University School of Law |
| Lisa G. Lerman | The Catholic University of America |
| Judith Maute | University of Oklahoma Law Center |
| Tom Morgan | George Washington University Law School |
| Jeffrey O'Connell | University of Virginia School of Law |
| Deborah Rhode | Stanford Law School |
| Howard Rosenberg | University of Denver Sturm College of Law |
| Ronald Rotunda | George Mason University School of Law |
| George Schatzki | Arizona State University College of Law |
| Peter H. Schuck | Yale Law School |
| William Simon | Columbia University School of Law |
| Bradley Wendel | Cornell University Law School |