```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
CARL BLESSING ET AL.,                        :
                                             :
        Plaintiffs,                          :
                                             :              09 CV 10035 (HB)
             - against -                     :
                                             :              OPINION &
SIRIUS XM RADIO INC.,                        :              ORDER
                                             :
        Defendant.                           :
-----------------------------------------------------------------x
```

**Hon. Harold Baer, Jr., District Judge:**

At the eve of trial, the parties in this class action antitrust litigation executed a settlement agreement dated May 12, 2011 (the "Settlement" or "Settlement Agreement"). Class counsel now moves for final approval of the Settlement Agreement and for an award of attorneys fees and costs. I held a final approval hearing on August 8, 2011 at which class counsel, Defendant's counsel, and numerous class members presented their views. I have considered their oral and written submissions and for the reasons described below the motions are GRANTED.

## I.  The legal standard

Class action settlements are subject to court approval. Fed. R. Civ. P. 23(e). Approval hinges on whether the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Wal-Mart Stores Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044.  A court must consider both the substantive and procedural aspects of the settlement, *i.e.* "the settlement's terms and the negotiating process leading to settlement." *Id.* The analysis is framed by the "strong judicial policy in favor of settlements, particularly in the class action context." *Id.*

## II.  A presumption of fairness is appropriate

The Settlement merits a presumption of fairness where it was the culmination of a complicated litigation over the course of several years between "experienced, capable counsel after meaningful discovery." *Id*. As noted in a previous opinion, class counsel has experience in class action antitrust litigation, and undeniably "engaged in the discovery necessary [for] effective representation of the class's interests." *McReynolds v. Richards-Cantave*, 588 F3d 790, 804 (2d Cir. 2009) (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)). The discovery process involved the exchange of literally millions of documents, several instances of court intervention to resolve adversarial differences, numerous third-party subpoenas, depositions of 17 fact witnesses and 6 expert witnesses, and interrogatories. Sabella Decl. ¶ 22-31. The parties first began settlement

discussions in November 2010, but were unable to reach an accord. Sabella Decl. ¶ 50. They then, in concert with the pretrial schedule, went on to brief a number of substantive motions, and on the eve of trial, after substantial efforts towards trial preparation, finally settled. The Settlement is entitled to a presumption of fairness.

### III. The Settlement's terms favor approval

I have reviewed the Settlement's substantive terms and conclude that they demonstrate sufficient fairness, adequacy, and reasonableness. While each of the "*Grinnell*" factors considered by the Circuit as the path to fairness supports this conclusion,[1] I address only those factors that relate to the main objections raised in opposition to final approval.[2] I also note that all class members had the opportunity to opt out of the settlement.

*The risk of establishing liability was significant*

One might conclude that class counsel did well to reach a settlement at all in view of the questionable liability in this case. More than one government agency assessed the merger and concluded that it did not have unlawful anti-competitive effects. The Department of Justice Antitrust Division closed its investigation by saying that "[a]fter a careful and thorough review of the proposed transaction, the Division concludes that the evidence does not demonstrate that the proposed merger of XM and Sirius is likely to substantially lessen competition, and that the transaction therefore is not likely to harm consumers." Sabella Decl. Ex. 9. The Federal Communications Commission (FCC) approved the merger – albeit with limited precautions such as the 3-year price cap. On July 27, 2011, however, the FCC concluded that it was *not* necessary to extend the price cap, in part because numerous competitive alternatives have arisen since 2008 which allayed any antitrust concerns that had previously justified the price-cap. *See* Sabella Reply Decl. Ex. 1. While these findings are not dispositive, Plaintiffs' case would have at least in part required convincing a jury that two federal agencies were wrong. Even had I concluded that the agencies' opinions were inadmissible, Defendant would doubtless have proffered the same underlying admissible evidence that led the agencies to conclude that there was no antitrust violation, or put another way, the merger did not lessen

---

[1] These include "(1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of defendants to withstand greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of the attendant risks of litigation." *Authors Guild v. Google, Inc.*, 770 F.Supp.2d 666, 674, (S.D.N.Y. 2011) (Chin, J.) (citing *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)).

[2] The Court counted a total of 85 objectors (not all of whom properly submitted objections), which comprises less than 0.0005% of the class, a fact that favors approval. *See Banyai*, 2007 WL 927583, at *9 ("[A] small number of objections received when compared to the number of notices sent weighs in favor of approval.") (citing *D'Amato*, 236 F.3d at 86-7).

competition. Perhaps more important is whether the settlement was a fair one or whether it serves in large measure to do little for the class and a lot for counsel.

*The award is reasonable and not illusory*

Most of the objectors complain that the Settlement provides no meaningful relief. This assumes that they suffered a meaningful injury. "Such assumption cannot stand as a proper basis to evaluate the proposed settlement's fairness." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 66 (S.D.N.Y. 2003) (citing *Grinnell,* 495 F.2d at 458–59). As discussed above, it is far from certain that Plaintiffs would have prevailed on the merits. Even had they succeeded, there was a real risk that damages, split between over 15 million class members, would be so little that many members may not even have bothered to cash their checks.[3]

Many objectors argued that their award is similar to a disfavored "coupon" settlement. Unlike coupon settlements, however, it does not require class members to purchase something they might not otherwise purchase to enjoy its benefits; rather, the vast majority of class members will benefit in the course of their normal subscription payments, and former subscribers may benefit from a month of free radio or internet service. *See Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 237 (E.D.N.Y. 2010) (approving settlement that awarded additional months on existing Costco memberships or temporary membership for those whose Costco membership had expired).

Some object that the award is illusory because Sirius XM would not have raised prices even without the Settlement. This theory fails because the evidence demonstrates that Sirius XM had every intention of raising prices beginning in August of this year, and had the go-ahead from the FCC to do so. In fact, the Settlement Agreement requires Sirius XM to forego some $180 million in fees. *See* Langenfeld Decl.; Brooker Decl. Speculation to the contrary is not grounds to reject the Settlement. The declarations and other material submitted to this Court strongly suggest that the $180 million calculation is not illusory, and represents, at a conservative estimate, 40% of the Plaintiffs' estimated best possible recovery – a result that is fair and reasonable in the antitrust context.[4] *See, e.g.*, *In re Warfarin Sodium Anitrust Litig.*, 391 F.3d 561, 538 (3d Cir. 2004) (upholding approval of settlement equal to 33% of estimated damages).

---

[3] *See* Sabella Decl. ¶¶ 71-72; Potter Decl. ¶3-7. Plaintiffs calculate that, if they could have convinced Defendant to provide a $180 million cash settlement (the rough equivalent of the Settlement value), the average class member would have received $12, depending on their subscription plans. *See* Docket Entry 116 at 20.  Of course, this is not the most a verdict could have awarded.

[4] In antitrust cases, although plaintiffs would be entitled to treble damages, courts assess the value of the settlement as it compares to single, not treble, damages. *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2009 WL 4403185, at *5 n.3 (S.D.N.Y. Dec. 1, 2009) (citing *Grinnell*, 495 F.2d at 459).

Other objectors raised concerns about the adequacy of the award as compared to the requested $13 million in attorneys fees and costs. There appeared some suspicion that, once class counsel was assured that it would recover fees and costs, they lost their incentive to pursue the class claims. This theory overlooks the fact that our legal system relies upon attorneys to uphold their ethical obligations to do everything reasonable in support of their clients' cause, regardless of their compensation scheme. Nothing in the record supports the proposition that Class Counsel fell below that basic professional standard, nor that the attorneys relaxed their pursuit of class interests with the promise of payment. Indeed, the amount of attorneys fees was not negotiated and agreed upon until after the Settlement was finalized. Sabella Decl. ¶ 55. The Settlement here has been compared to a "shakedown" by more than one objector, and there appears some suspicion that class actions are mere vehicles for attorneys to seek large fee awards. However, nothing suggests that Class Counsel here went beyond what the law allows. Whatever abuse the objectors believe the class action scheme works or indeed has worked here, it is a legislative problem and not a ground which permits this Court to set aside the settlement.

*The Settlement's release is not overbroad*

The Settlement Agreement releases Defendant from all claims by class members "arising out of, based on or relating to the merger that formed Sirius XM." Docket Entry 96 ¶ 8(a). It includes claims that class members did not or could not know were available at the time of the Settlement Agreement – the type of claim that some state laws preserve unless expressly waived (*i.e.* it cannot be released through a "general" release). *See* Docket Entry 96 ¶ 8(b). The scope of the release is consistent with the parameters established in this Circuit. A class action settlement may release "claims not presented and even those which could not have been presented as long as the released conduct arises out of the identical factual predicate as the settled conduct." *Wal-Mart*, 396 F.3d at 106.[5] The released claims here are limited to those claims that arise out of the merger that formed Sirius XM – a common factual predicate that defines the scope of the release with acceptable breadth.

The objectors also argue that "released claims" is referred to as a defined term, but nowhere is it defined. It is true that there is no official definition, but it is clear from the text – and both Defendant and Class Counsel agree – that "released claims" refers to those claims described in paragraph 8(a). I would be remiss to assume that other courts are unable to understand what is clear from the text of the release. This technical drafting oversight threatens no real risk to future litigants, and is insufficient to hold up the approval process.

---

[5] Indeed, "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country." *Wal-Mart*, 396 F.3d at 106.

4

### IV. The request for attorneys fees and costs is reasonable

The motion for attorneys fees and costs provoked numerous and impassioned objections. The requested $13 million award understandably raised concerns, especially when compared to the very modest award provided to each class member. However, upon closer inspection, the award when compared to the Settlement as a whole is not unfair. I have reviewed the attorney expense sheets as well as the attorney time-keeping records, and found nothing to suggest exorbitant rates nor double billing nor padding of any kind. The award, as noted above, may well signal a defect in the system, but if so the Congress has to fix it. Perhaps they should, but for now, under the law as I read it, the settlement is reasonable under both the lodestar and percentage method of calculation, and appropriate in view of the criteria established in *Goldberger v. Gleason*, 160 F.3d 858 (2d Cir. 1998). Again, the fee is a separate obligation that will not come out of the Settlement amount, and was negotiated after the terms of the Settlement had been agreed upon. *See McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006) (Lynch, J.) (where "money paid to the attorney is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members").

The Clerk of the Court is instructed to close this matter and remove it from my docket.

**SO ORDERED**

August 24, 2011
New York, New York

Hon. Harold Baer, Jr.
U.S.D.J.

5