# EXHIBIT 1

# SiriusXM Provides 2012 Financial Guidance

## 2011 Guidance is Affirmed

NEW YORK, Sept. 14, 2011 /PRNewswire/ -- Sirius XM Radio (Nasdaq: SIRI) today provided 2012 financial and subscriber guidance and affirmed its previous guidance for 2011.

(Logo: http://photos.prnewswire.com/prnh/20101014/NY82093LOGO)

SiriusXM's guidance for 2012 includes:

- Revenue growth of 10% to approximately $3.3 billion,
- Adjusted EBITDA growth of 20% to approximately $860 million, and
- Free cash flow growth of 75% to approximately $700 million.

"Our new guidance for 2012 demonstrates our expectation of robust growth next year," said Mel Karmazin, Chief Executive Officer, SiriusXM.  "SiriusXM's outstanding financial performance in the midst of considerable economic uncertainty will continue in 2012 as we grow our subscriber base and free cash flow and anticipate that our revenue and adjusted EBITDA growth will accelerate."

The company also affirmed its existing 2011 guidance, including:

- Net subscriber additions of approximately 1.6 million,
- Revenue of approximately $3 billion,
- Adjusted EBITDA of about $715 million, and
- Free cash flow approaching $400 million.

"In the 10 years since SiriusXM launched service, we have expanded our programming line-up to provide an unparalleled listening experience.  On January 1, 2012, we will increase the base price of Sirius and XM Select from $12.95 to $14.49 per month and will adjust prices on many of our other programming packages.  This is the first price increase on our basic service packages since the addition of the NFL, NASCAR, Howard Stern, Martha Stewart and many college sports to our programming line-up.  Through continued investments in technology, the best and most diverse programming in radio is available to our subscribers in cars, homes, offices, business establishments, on the internet and smartphones.  We will expand our programming and technology further with the launch of SiriusXM 2.0 in the coming months," said Karmazin.

## About Sirius XM Radio

Sirius XM Radio is America's satellite radio company.  SiriusXM broadcasts more than 135 satellite radio channels of commercial-free music, and premier sports, news, talk, entertainment, traffic, weather, and data services to over 21 million subscribers. SiriusXM offers an array of content from many of the biggest names in entertainment, as well as from professional sports leagues, major colleges, and national news and talk providers.

SiriusXM programming is available on more than 800 devices, including pre-installed and after-market radios in cars, trucks, boats and aircraft, smartphones and mobile devices, and consumer electronics products for homes and offices. SiriusXM programming is also available at siriusxm.com, and on Apple, BlackBerry and Android-powered mobile devices.

SiriusXM has arrangements with every major automaker and its radio products are available for sale at shop.siriusxm.com as well as retail locations nationwide.

*This communication contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements include, but are not limited to, statements about future financial and operating results, our plans, objectives, expectations and intentions with respect to future operations, products and services; and other statements identified by words such as "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "intend," "plan,"  "projection," "outlook" or words of similar meaning.  Such forward-looking statements are based upon the current beliefs and expectations of our management and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are difficult to predict and generally beyond our control.  Actual results may differ materially from the results anticipated in these forward-looking statements.*

*The following factors, among others, could cause actual results to differ materially from the anticipated results or other*

*expectations expressed in the forward-looking statement:  our competitive position versus other forms of audio and video entertainment; our ability to retain subscribers and maintain our average monthly revenue per subscriber;  our dependence upon automakers and other third parties; our substantial indebtedness; and the useful life of our satellites, which, in most cases, are not insured.  Additional factors that could cause our results to differ materially from those described in the forward-looking statements can be found in our Annual Report on Form 10-K for the year ended December 31, 2010, which is filed with the Securities and Exchange Commission (the "SEC") and available at the SEC's Internet site ([http://www.sec.gov](http://www.sec.gov)).  The information set forth herein speaks only as of the date hereof, and we disclaim any intention or obligation to update any forward looking statements as a result of developments occurring after the date of this communication.*

[Follow SiriusXM on Twitter](#) or [like the SiriusXM page on Facebook](#).

**E - SIRI**

Contact Information for Investors and Financial Media:

Investors:

Hooper Stevens
212 901 6718
[hooper.stevens@siriusxm.com](mailto:hooper.stevens@siriusxm.com)

Media:

Patrick Reilly
212 901 6646
[patrick.reilly@siriusxm.com](mailto:patrick.reilly@siriusxm.com)

SOURCE SIRIUS XM Radio

News Provided by Acquire Media

# EXHIBIT 2

Case 1:09-cv-10035-HB -RLE   Document 184-1   Filed 10/05/11   Page 5 of 28
Case 1:09-cv-10035-HB -RLE   Document 150-1   Filed 08/03/11   Page 55 of 111
Page 1 of 1

Edward F. Siegel - Attorney At Law - 216-831-3424



# EDWARD F. SIEGEL
### ATTORNEY AT LAW

## Practice Areas

- Class Action Objections

- Business and Real Estate Transactions

- Kenmore Group Asset Protection

Edward F. Siegel
27600 Chagrin Blvd Ste 340
Cleveland, Ohio 44122

Office: 216-831-3424
Fax: 216-831-6584
email: efsiegel@efs-law.com

# EXHIBIT 3

Edward Siegel is on a quest to either stop exorbitant lawyer payouts — or score some easy mone...   Page 1 of 2

SUBSCRIBE TO THE E-NEWSLETTER: enter your email address subscribe

LOG IN   REGISTER   CONTACT

   Cleveland Scene   

Twilight at the ZOO   ★ AUGUST 5th  ★CLEVELANDZOOSOCIETY.ORG   Twilight at the ZOO

NEWS - NEWS FEATURES

June 04, 2008

## Edward Siegel is on a quest to either stop exorbitant lawyer payouts — or score some easy money

by Rebecca Meiser



FRANK MILLER
A New Jersey judge once called Edward Siegel's objections "wasteful litigation."

Frankie Hamilton vs. The Ohio Savings Association was one of the longest-running cases in state history.

In the early 1980s, Francine Hamilton discovered that the bank was overcalculating the interest on her mortgage — and was doing the same to hundreds of others. Though individual customers took a barely noticeable nick, it amounted to a lucrative skim for the bank when spread across its mortgage portfolio.

Hamilton filed suit in 1985. But navigating the morass of the state judicial system would take 22 years before Ohio Savings finally settled for $14 million in 2007.

For her lawyer, Steven Weiss, the long-awaited victory was short-lived. Only a few weeks later, Beachwood lawyer Edward Siegel filed a motion to block the payout. The settlement, he noted, would pay Weiss more than $5 million, while customers only got $60,000 apiece.

In Siegel's eyes, it was a classic case of legal plundering.

He's what's known as a professional objector. They're lawyers who make their money challenging settlements in class-action suits. Their role, ostensibly, is to make sure lawyers aren't screwing their clients with agreements that charge exorbitant legal fees. After all, class-action suits are ripe for rip-offs.

Once a case is settled, competing lawyers suddenly have a mutual interest: They just want it over with. But defense attorneys don't care how the money is distributed. Their concern is the final total — and not getting sued again.

That chumminess allows plaintiffs' lawyers to get creative, sometimes writing in their own fees worth 40 to 50 percent of the total payout. That money, naturally, comes directly from their clients' pockets.

So people like Siegel sweep in, essentially to protect plaintiffs from their own lawyers, serving as the salt that repels the leeches from their skin.

"In theory, the system works," says Theodore Eisenberg, a law professor at Cornell. "In practice, no, it doesn't."

To the rest of the bar, objectors aren't Robin Hoods. They'd be more inclined to use the term "shakedown artists." Objectors jump into cases long after settlements are agreed upon, they say, only to raise last-minute issues in hopes of generating easy fees of their own.

When an objection is filed, the payout is inevitably delayed. And unless a deal is worked out, the case is once again thrown into the court system, where it can languish for years. So a large percentage of lawyers opt for the pain-free solution: Kick the objector some side money, so he — and his objections — goes away.

"The larger the settlement, the more cost-effective it is to pay the objectors, rather than suffer the delay of waiting for an appeal to be resolved," explains U.S. District Judge Nancy Gertner. "Because of these economic realities, professional objectors can levy what is effectively a tax on class-action settlements — a tax which has no benefit to anyone other than the objectors."

Which leaves Edward Siegel, one of the nation's most prolific serial objectors, not exactly popular among members of the bar.

He entered the field four years ago, when his sister received notice saying she was eligible for a settlement. In 2003, FirstEnergy shareholders sued the company, claiming illicit deeds ranging from misleading disclosures to illegal accounting. A separate suit accused officers and directors of negligent management. The company settled.

But the notice Siegel's sister received could have been written in Togolese. She asked her brother to explain. In most cases, says Siegel, those who receive such notices merely throw them away.

The two cases had two sets of lawyers, and they were to receive two separate payouts totaling $26.25 million. Siegel believed they were gouging their clients and objected on his sister's behalf.

Edward Siegel is on a quest to either stop exorbitant lawyer payouts — or score some easy mone...   Page 2 of 2

Rather than risk further fighting, the lawyers agreed to reduce their fees by 3 percent — resulting in a few extra million for shareholders. The Beachwood lawyer didn't receive payment for his work, but he did find his calling. Even if objectors are mostly unsuccessful, it can still amount to a "nice side source of income," says Siegel.

Last year, wireless insurance company Asurion settled a case in which it was accused of demanding unreasonable deductibles and providing shoddy service. Siegel objected, contending the payout was cheap and lawyers were siphoning too much. He then asked for $24,615 for his own work on the case.

The judge wasn't exactly impressed, calling that work "generic." But Siegel was nonetheless granted $4,742 from the settlement pot.

He estimates that 30 percent of his practice comes from objecting, and he revels in his outsider status. "Lots of people don't like me because of what I do," he says. "I see it as a badge of honor."

In Siegel's eyes, class-action lawyers are the true snake charmers. "I'm the one standing up for the little guy," he says. "I've had judges thank me for bringing things to their attention."

One of Siegel's proudest moments involves a Qwest case in Denver. Lawyers accused the telecommunications giant of intentionally inflating share prices. Qwest agreed to settle for $400 million. But attorneys were scheduled to take a $98 million cut. Siegel and other objectors argued that the fee was too high. The court agreed, slashing it to $60 million.

"That meant an extra $38 million went to the class," Siegel says. "I'm quite proud of that outcome. I believe I added to the case."

The judge, however, didn't see it that way. He refused to award Siegel any fees for his work.

In the past two years, he's had a less–than–stellar success rate. A judge in an AT&T suit in New Jersey called his objection "wasteful litigation." In a Texas case against Allstate, his work was deemed "another attempt by objectors counsel to dip into the attorneys' fee trough."

Moreover, his objections in two recent cases contain eerily similar arguments, as if he simply cut and pasted his case together without bothering to change the language.

In the Ohio Savings case, lawyer Weiss viewed Siegel's interference as "frivolous" and asked the court to impose economic sanctions. Siegel withdrew his objection, and the penalty was dropped.

After 22 years in court, Ohio Savings customers will soon receive payment for the bank's deception. But Edward Siegel has already moved on, searching for new shysters among his fellow barristers.

Like

News Features archives »

# EXHIBIT 4

UNITED STATES DISTRICT COURT          RECEIVED NOV 3 0 2009
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X  MDL No. 1409
In Re                                                       :  M 21-95

CURRENCY CONVERSION FEE
ANTITRUST LITIGATION                                        :

------------------------------------------------------------X  **NOTICE OF APPEAL**
THOMAS CARDER, JUDY SARGEANT, DYLAN L.                      :
WHISENHUNT and GLORIA E. WHISENHUNT

    Plaintiffs in coordinated action-Appellants,        :

              v.                                      :

ROBERT ROSS, RANDAL WACHSMUTH,                             :
CAMILLE LAPLACA-POST, MICHAEL H. OSHRY,
CHERIE R. DONALD, ANDREA KUN, HERVE                        :
SENEQUIER, LESLIE COOPER, BYRON
BALBACH, JR., JEANNE H. BALBACH,                           :
WOODROW CLARK, PAMELA MEYERSON,
DAVID SHRIEVE, TARA RADO, ANTHONY                          :
RALPHS, KAYTA GEORGE, DAVID ULTAN,
SHANNON MATTINGLY, TIMOR NUSRATTY,                         :
and JEFFREY ZAKEM, on behalf of themselves
and all others similarly situated,

       Plaintiffs-Appellees,                             :

VISA U.S.A INC., VISA INTERNATIONAL SERVICE                :
ASSOCIATION, MASTERCARD INTERNATIONAL
INCORPORATED, MASTERCARD INCORPORATED,                     :
MASTERCARD INTERNATIONAL, LLC, CITIGROUP
INC., CITIBANK (SOUTH DAKOTA) N.A.,                        :
UNIVERSAL BANK, N.A., UNIVERSAL FINANCIAL
CORP., CITICORP DINERS CLUB INC., BANK OF                  :
AMERICA CORPORATION, BANK OF AMERICA,
N.A., JPMORGAN CHASE & CO., CHASE BANK                     :
USA, N.A., JPMORGAN CHASE BANK, N.A.,
WASHINGTON MUTUAL BANK, NEW AMERICAN                       :
CAPITAL, INC., HSBC FINANCE CORPORATION,
HSBC BANK NEVADA, N.A., HOUSEHOLD                          :
INTERNATIONAL, INC., HOUSEHOLD BANK (SB)
N.A., MBNA AMERICA N.A. and MBNA AMERICA                   :

      Defendants-Appellees.

1

Objectors Thomas Carder, Judy Sargeant, Dylan L. Whisenhunt and Gloria E. Whisenhunt hereby appeal to the United States Court of Appeals for the Second Circuit from the Order of this Court, dated and filed October 22, 2009 and the final judgment, filed November 4, 2009, which gives final approval of the class action settlement in this cause.

Dated:  November 18, 2009

Respectfully submitted,

By

Charles M. Thompson
Attorney for Objectors/Appellants
5615 Canongate Lane
Birmingham, Alabama 35242
Tel 205-995-0068
Fax 205-995-0078
cmtlaw@aol.com

R. Stephen Griffis
Attorney for Objectors/Appellants
2100 Riverhaven, Suite 1
Hoover, Alabama 35244
Tel 205-402-7476
Fax 205-402-7292
rsglaw@bellsouth.net

2

**Counsel to be Served:**

George A. Cumming, Jr., Esquire
MORGAN, LEWIS & BOCKIUS LLP
One Market Street, Spear Tower
San Francisco, CA 94105

David F. Graham, Esq.
Eric H. Grush, Esq.
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

Charles E. Buffon, Esq.
Robert D. Wick, Esq.
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004

Daniel H. Squire, Esq.
Christopher R. Lipsett, Esq.
WILMER CUTLER PICKERING HALE
and DORR, LLP
2445 M. Street, N.W.
Washington, DC 20037

Peter E. Greene, Esq.
Cyrus Amir-Mokri, Esq.
SKADDEN, ARPS, SLATE,
MEAGHER
& FLOM, LLP
Four Times Square
New York, NY 10036

Mark P. Ladner, Esq.
William R. Wade-Gery, Esq.
MORRISON & FOERSTER, LLP
1290 Avenue of the Americas
New York, NY 10104

Edward D. Rogers, Esq.
BALLARD, SPAHR, ANDREWS &
INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Edward C. Fitzpatrick, Esq.
Randall A. Hack, Esq.
LOCKE LORD BISSELL &
LIDDELL LLP
111 South Wacker Drive
Chicago, IL 60606

Jay N. Fastow, Esq.
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY 10019

Brian P. Brosnahan, Esq.
KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
101 California Street, Suite 2050
San Francisco, CA 94111

Dennis Stewart, Esq.
HULETT HARPER STEWART, LLP
525 B. Street, Suite 760
San Diego, CA 92101

Allen H. Steyer, Esq.
STEYER LOWENTHAL
BOODROOKAS ALVAREZ & SMITH
LLP
One California Street, Third Floor
San Francisco, CA 94111

Merrill G. Davidoff, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6305

Bonny E. Sweeney
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Thomas F. Schrag, Esq.
James S. Baum, Esq.
Michael L. Schrag, Esq.
SCHRAG & BAUM, P.C.
280 Panoramic Way
Berkeley, CA 94704

John J. Pentz, Esq.
CLASS ACTION FAIRNESS GROUP
2 Clock Tower Place, Suite 260G
Maynard, MA 01754

Edward Siegel, Esq.
27600 Chagrin Boulevard, #340
Cleveland, OH 44122

R. Stephen Griffis, Esq.
R. STEPHEN GRIFFIS, P.C.
2100 Riverhaven Drive, Suite 1
Hoover, AL 35244

Edward W. Cochran, Esq.
LAW OFFICE OF EDWARD W.
COCHRAN
20030 Marchmont Road
Shaker Heights, OH 44122

Frank H. Tomlinson, Esq.
15 North 21st Street, Suite 302
Birmingham, AL 35203

BISHOP & ASSOCIATES, PSC
6520 Glenridge Park, Suite 6
Louisville, KY 40222

Kenneth E. Nelson, Esq.
NELSON LAW FIRM, P.C.
2900 City Center Square
1100 Main Street
Kansas City, MO 64105

Paul S. Rothstein, Esq.
626 N.E. First Street
Gainesville, FL 32601

J. Scott Kessinger, Esq.
7304 Michigan Avenue
St. Louis, MO 63111

N. Albert Bacharach, Jr., P.A.
115 Northeast 6th Avenue
Gainesville, FL 32601

4

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

THE AMERICAN MEDICAL ASSOCIATION et al.

                  Plaintiffs,

    -against-

UNITED HEALTHCARE CORPORATION et al.,

                  Defendants.

------------------------------------------------------------------x

Civil Action

Master File No.

00 CIV 2800 (LMM)(GWG)


# MEMORANDUM OF LAW IN SUPPORT OF THE OBJECTIONS OF CLASS MEMBERS AND OBJECTORS RICHARD NEITZEL, MARC RISSE AND LAURA FORTMAN TO THE PRELIMINARILY APPROVED CLASS SETTLEMENT


ERLANGER LAW FIRM PLLC
Attorneys for Class Members and Objectors
Richard Neitzel, Marc Risse and Laura Fortman
122 East 42 Street, Suite 519
New York, New York 10011-6903
(212) 686-8045

# TABLE OF CONTENTS

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    POINT I.

    THE PRELIMINARILY APPROVED CLASS SETTLEMENT
    MUST NOT BE APPROVED BY THE COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.    The Interests of the Subscribers and Providers Conflict. . . . . . . . . . . . . . . . . . 1

    2.    Class A Subscribers are Unfairly Treated. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    3.    Ten Percent of the Fund's Value is More Than
         Adequate Compensation to Class Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    4.    Continued Operation of the Ingenix Database is Unfair. . . . . . . . . . . . . . . . . . 7

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

i

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods. v. Windsor,* 521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Boucher v. Syracuse University,* 164 F.3d 113 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 3

*Bowling v. Pfizer, Inc.,* 922 F.Supp. 1261 (S.D. Ohio 1996). . . . . . . . . . . . . . . . . . . . . . . . . 5

*Branch v. F.D.I.C.,* No. Civ. A. 91-CV-13270, 1998 WL 151249
(D. Mass. March 24, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir. 1998) . . . . . . . . . . . . . 2

*Bussie v. Allamerica Fin'l Corp.,* No. Civ. A. 97-40204, 1999 WL 342042 (D. Mass. May 19,
1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Dynegy, Inc., Sec. Litig.,* No. H-02-1571 (S.D. Tex. July 8, 2005). . . . . . . . . . . . . . . . . . 5

*In re Austrian and German Bank Holocaust,* 317 F.3d 91 (2d Cir. 2003). . . . . . . . . . . . . . . . 1

*In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722 (3d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 5

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768 (3d Cir.
1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Raytheon Co. Sec. Litig.,* No. 99-12142 (PBS) (D. Mass. Dec. 6, 2004). . . . . . . . . . . . . 5

*In re Waste Management Inc., Sec. Litig.,* No. H-99-2183 (S.D. Tex. 2003) . . . . . . . . . . . . . . 5

*Local 56, United Food & Comm'l Workers Union v. Campbell Soup Co.,* 954 F.Supp. 1000
(D.N.J. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072 (2d Cir. 1995) . . . . . . . . . . . . . . 1

*Petrovic v. Amaco Oil Company,* 200 F.3d 1140 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . 3

*Ramah Navajo Chapter v. Babbitt,* 50 F.Supp.2d 1091 (D.N.M.1999) . . . . . . . . . . . . . . . . . . 5

*Sylvester v. CIGNA Corp.,* 369 F. Supp. 2d 34, 50-53 (D. Me. 2005). . . . . . . . . . . . . . . . . . . 6

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005).. . . . . . . . . . . . . . . 6

## OTHER AUTHORITIES

*Managing Class Action Litigation: A Pocket Guide for Judges"* Rothstein, Barbara J, &
Willging, Thomas E., (2d ed., Federal Judicial Center 2009) . . . . . . . . . . . . . . . . . . . . . . . . 4, 6-8

Notice of Proposed Settlement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3- 4, 7, 9

## STATEMENT OF FACTS

As set forth in the accompanying Declaration of Robert K. Erlanger.

## LEGAL ARGUMENT

### POINT I.

### THE PRELIMINARILY APPROVED CLASS SETTLEMENT MUST NOT BE APPROVED BY THE COURT

1.     **The Interests of the Subscribers and Providers Conflict**

The Court must create a subclass for Subscribers and appoint separate counsel.

"In some circumstances a court itself might well have an obligation on its own motion, especially when called upon to approve a class action settlement, to designate a subclass and assure proper representation for the subclass or to take other appropriate steps to lessen if not eliminate the potential for a conflict among class members. *In re Austrian and German Bank Holocaust*, 317 F.3d 91, 104 (2d Cir. 2003)(citing *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995)("The ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court").

The Second Circuit has held that a court can created subclasses to curtail, or avoid the appearance of conflict. The Court reviewed insurance plans and noted some were part of a self-insured plan; "[i]n our view, this conflict among the Plans does not represent a simple disagreement over potential differences in the computation of damages, since the relationship of the Plans to Medco and its effect on each Plan goes to the very heart of the litigation. While we do not here decide whether the self-funded Plans in fact suffered greater injury, we think it proper

1

to allow them to raise their claims as part of a separate subclass. The Self-Funded Plans dispute any recovery to the insured or capitated Plans, yet none of the class representatives is part of an exclusively self-funded plan that could adequately advance this position. Because the antagonistic interests apparent in the class should be adequately and independently represented, we remand to the District Court for certification of a subclass encompassing the self-funded plans in order to better protect their claims in this litigation." *Central States Southeast v. Merck-Medco*, 504 F.3d 229, 246 (2d Cir. 2007)(citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 604, 626 (1997) (holding that in a class action, including both claimants who already had incurred an asbestos-related injury and claimants who merely had been exposed to asbestos, adequacy was not established because "the interests of those within the single class are not aligned [as] for the currently injured, the critical goal is generous immediate payments [but for the] exposure-only plaintiffs [, there is an interest] in ensuring an ample, inflation-protected fund for the future"); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338, 340 (4th Cir. 1998) (class certification was improper because "plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts" when there are "manifest conflicts of interest" in their claimed recovery); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995)(class certification improper because the named plaintiffs "had no incentive to maximize the recovery" of the other class members in light of the disparity in settlement benefits).

Class Counsel cannot represent both Subscribers and Providers. Either new counsel is appointed for the Subscribers, or the class should not be certified. A district court must reconsider a ruling certifying a class, for instance, if a subsequent development creates a conflict

2

of interest that prevents the representative party from fairly and adequately protecting the interests of all of the class members. *Petrovic v. Amaco Oil Company,* 200 F.3d 1140, 1145 (8th Cir. 1999); *Boucher v. Syracuse University,* 164 F.3d 113, 118-19 (2d Cir. 1999).

**2.     Class A Subscribers are Unfairly Treated**

Subscribers who elect to file their claims through Group A are barred or prohibited from submitting claims under Groups B and C, despite the fact that only Group A claims are subject to a pro rata pay out if the number of claims exceeds the $50 million cap.

> If you elect to be a Group A Claimant you may *not* elect to be
> included in Groups B or C even if you satisfy the conditions for
> inclusion in such group(s). However, if you elect to make a Group
> B or C claim you will receive a Recognized Loss of not less than
> what you would have received had you made a Group A claim."
> and "If valid claims under Group A require a distribution of more
> than $50,000,000.00 the recognized loss of Group A claims will be
> paid on a pro rata basis up to a cap of 50 Million in total for all
> Group A Claims, except as specified below.

Notice of Proposed Settlement, "Subscriber Options" at 5.

The result could be that Group A would receive far less than the $50.00 per year (of membership to the health plan) as represented by Class Counsel.

Subscribers who elect to file their claims through Group A are barred or prohibited from submitting claims under Groups B and C, despite the fact that only Group A claims are subject to a pro rata pay out if the number of claims exceeds the $50 million cap.

> If you elect to be a Group A Claimant you may *not* elect to be
> included in Groups B or C even if you satisfy the conditions for
> inclusion in such group(s). However, if you elect to make a Group
> B or C claim you will receive a Recognized Loss of not less than
> what you would have received had you made a Group A claim."
> and "If valid claims under Group A require a distribution of more
> than $50,000,000.00 the recognized loss of Group A claims will be

3

Case 1:09-cv-10035-HB -RLE   Document 184-1   Filed 10/05/11   Page 22 of 28
Case 1:09-cv-10035-HB -RLE   Document 150-2   Filed 08/03/11   Page 17 of 65
Case 1:00-cv-02800-LMM -GWG   Document 462   Filed 07/27/10   Page 8 of 14

> paid on a pro rata basis up to a cap of 50 Million in total for all
> Group A Claims, except as specified below.

Notice of Proposed Settlement, "Subscriber Options" at 5.

The result could be that Group A would receive far less than the $50.00 per year (of
membership to the health plan) as represented by Class Counsel.

Because Group B and Group C Subscriber can only prove their claims through
documentation, with no documents to be provided by defendants prior to 2002, it is highly
unlikely that they can substantiate pre-2002 claims. Pre-2002 Subscribers, who cannot
substantiate their claims, will become, in fact, Group A Subscribers with a limited fund.

The Court's ". . .appraisal of the settlement should focus on the value actually distributed
to the class-based on the number and percentage of class members who have filed a claim."
Pocket Guide, at 14, sec. 5. Appraisal of Settlement. Accordingly, attorneys' fees should not be
awarded until the Court reviews the claims data, and understands the number of class members
who have filed claims.

The courts are advised that such disparities are evidence of an unfair settlement:

> . . .strict eligibility requirements and claims procedures often
> discourage class claims and might reduce the total amount paid in
> class members, making the stated value of the settlement fund
> illusory. Because there is no clear standard for predicting class
> response rates, consider calculating any attorney fee award as a
> percentage of the amount of the settlement fund that has already
> been distributed to the claimants-even if that means deferring final
> determination of all or part of the fee award until the claims
> process is complete.

*Managing Class Action Litigation: A Pocket Guide for Judges*" Rothstein, Barbara J, &
Willging, Thomas E., (2d ed., Federal Judicial Center 2009) at 14, section 5, Appraisal of

4

Case 1:09-cv-10035-HB -RLE   Document 184-1   Filed 10/05/11   Page 23 of 28
Case 1:09-cv-10035-HB -RLE   Document 150-2   Filed 08/03/11   Page 18 of 65
Case 1:00-cv-02800-LMM -GWG   Document 462   Filed 07/27/10   Page 9 of 14

Settlement ("Pocket Guide").

3.   **Ten Percent of the Fund's Value is More Than**
     **Adequate Compensation to Class Counsel**

The attorneys' fees requested by Class Counsel from the $350 million fund are excessive, constituting up to 25% of the value of the fund, or $87.5 million, without interest or expenses. Such a result should not be approved by this Court, and is not in step with current jurisprudence. *In re Waste Management Inc., Sec. Litig.,* No. H-99-2183 (S.D. Tex. 2003) ($457 Million Fund; awarded fees of 7.9%); *In Re Raytheon Co. Sec. Litig.,* No. 99-12142 (PBS) (D. Mass. Dec. 6, 2004)($460 Million Fund; 9% of fund is recovered as fees); *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722 (3d Cir. 2001)($298 Million Dollar Fund; 7.8% awarded as attorney's fees); *In re Dynegy, Inc., Sec. Litig.,* No. H-02-1571 (S.D. Tex. July 8, 2005)($474 Million Dollar Fund; fee award is 8.725%); *Bussie v. Allamerica Fin'l Corp.,* No. Civ. A. 97-40204, 1999 WL 342042 (D. Mass. May 19, 1999) ($108 Million Dollar Fund; fees awarded are 7.1%); *Ramah Navajo Chapter v. Babbitt,* 50 F.Supp.2d 1091 (D.N.M.1999) ($76 Million Dollar Fund; 11% awarded as attorney's fees); *Branch v. F.D.I.C.,* No. Civ. A. 91-CV-13270, 1998 WL 151249 (D. Mass. March 24, 1998) ($75 Million Dollar Fund- 8.6% attorney's fee); *Local 56, United Food & Comm'l Workers Union v. Campbell Soup Co.,* 954 F.Supp. 1000 (D.N.J. 1997) (115 Million Dollar Fund; awarded 2.8%); *Bowling v. Pfizer, Inc.,* 922 F.Supp. 1261 (S.D. Ohio 1996)($103 Million Dollar Fund- fees awarded of 10%).

Group A Subscribers, mostly likely the largest group of claimants, are limited to $50 million (or less if the class is over-subscribed) while Class Counsel would pull down approximately $87.5 million in fees off the top. Because of the serious potential dilution to the

5

Group A Subscribers, either this Court should not award any attorneys' fees or only a percentage

of fees, with the balance held in the fund, until claims data is returned to the Court showing the

number of Subscribers who submitted claims in each of the Groups. Only after clams data is

provided to this Court and an analysis of the number of class members who participate can a

proper determination of the appropriate fee be fashioned for Class Counsel.

     The Pocket Guide encourages judicial review of claims data before awarding attorneys'

fees:

> In cases involving monetary benefits, do not be misled by party
> valuations of the settlement that presume a 100% claims rate by
> class members.  Insist on actual information on claims filed to
> determine the benefit to class members and use that information
> both to place a value on the settlement and to award attorney fees,
> as the district djudge did in _Sylvester v. CIGNA Corp., 369 F._
> _Supp. 2d 34, 50-53 (D. Me. 2005)._ That value- plus the value of
> any nonmonetary relief – serves as the starting point for applying
> the percentage-of-value method in determining appropriate
> attorney's fees.

Pocket Guide at 28.

     The Second Circuit has embraced the percentage-of-value method.. _Wal-Mart Stores, Inc._

_v. Visa U.S.A., Inc.,_ 396 F.3d 96, 121 (2d Cir. 2005).  As Class Counsel is well aware of the

percentage-of-value method having it applied in _Walmart_ after they had objected to the amount

of attorneys' fees in that case.  According to Second Circuit panel in _Wal-Mart,_ "the trend in this

Circuit is toward the percentage method, which "directly aligns the interests of the class and its

counsel and provides a powerful incentive for the efficient prosecution and early resolution of

litigation." _Id._ at 122.

     This Court should require presentation and review of the claims data, before determining

Case 1:09-cv-10035-HB -RLE   Document 184-1   Filed 10/05/11   Page 25 of 28
Case 1:09-cv-10035-HB -RLE   Document 150-2   Filed 08/03/11   Page 20 of 65
Case 1:00-cv-02800-LMM -GWG   Document 462   Filed 07/27/10   Page 11 of 14

the percentage of the attorney's fees.

Compensating Class Counsel in the amount of 10% of the total fund, would be more than adequate compensation and fair to the class members.

**4.     Continued Operation of the Ingenix Database is Unfair**

The proposed settlement is further unfair because it continues to permit defendants to continue to operate the Ingenix database for an unlimited period of time, until third party reaches agreement with the Office of the (New York) Attorney General (OAG) for implementation of such new database.  Thus, claims for out of network will continue to be evaluated in an unlawful manner ("Consistent with the terms of the OAG Assurance of Discontinuance, the Company shall agree to contribute Fifty Million Dollars ($50,000,000) toward the funding of the development and implementation of the New Database. Other terms concerning the creation, funding, operation, management, and control of the New Database shall be contained in the OAG Assurance of Discontinuance, and shall be specified further in a separate agreement to be entered into between the OAG and the School." Notice of Proposed Settlement Agreement, p. 14, Section 4.2.

The Pocket Guide advises the judiciary that:

> In cases in which the benefit to the class is non-monetary (coupons,
> discounts, warrants and the like), determining the actual value to
> the class requires looking beyond the face value of nonmonetary or
> contingent benefits.  Redemption data, or evidence of class use is
> essential.  In some cases, particularly settlements involving
> injunctive or declaratory relief, you might use expert valuations
> based on reliable, objective standards.  In other cases, perhaps the
> majority, the only reliable test of the benefit to the class will be
> evidence of class members' use or redemption of the coupons,
> warrants, or other non-monetary scrip. . . In such cases, it is
> especially important to link the amount of any attorney fees with

7

Case 1:09-cv-10035-HB -RLE  Document 184-1  Filed 10/05/11  Page 26 of 28
Case 1:09-cv-10035-HB -RLE  Document 150-2  Filed 08/03/11  Page 21 of 65
Case 1:00-cv-02800-LMM -GWG  Document 462  Filed 07/27/10  Page 12 of 14

the actual benefit to the class.

Pocket Guide at 29, par. 1.

Here, Class Counsel makes no representations concerning when the newly developed
database will be utilized, nor do they contemplate the number of subscribers who cannot benefit
from this new database because they have a different insurance carrier now.

Because the new database is a "benefit" that is not within Class Counsel's control, this
Court should certainly reduce the amount of attorney's fees by at least $50 million, since that is
the amount paid to a third party to create and maintain this new database, that will not be realized
by any of the class members.  In the alternative, until this Court determines the value this new
database has for the class members, it should withhold a percentage of the attorney's fees until
the value of the new data base can be determined  "by calculating class members' actual use."
See Pocket Guide at 29, par. 2.

The new "database" that Class Counsel represents that defendants will use to
establish the basis for the rates of various services are non-compulsory, and not required to be
followed by defendants.  This provides no benefit to subscribers:

> Further, nothing in this Settlement Agreement shall be construed to
> limit the authority of the Company or any sponsor of any health
> care benefit plan or arrangement administered by the Company: (a)
> to adopt, amend, change, or terminate any Benchmarking Standard
> used or to be used in any employee benefit plan or arrangement; (b)
> to use any particular Benchmarking Standard such as "usual and
> customary" or "prevailing," or to use a Benchmarking Standard not
> based on provider charge databases; or (c) to the extent the
> Company uses the New Database in making Out-Or-Network
> benefit determinations, to choose the percentile of any New
> Database as satisfying any health care benefit plan's Benchmarking
> Standard, including, but not limited to, "reasonable and
> customary," "usual, customary and reasonable," or "usual and

8

Case 1:09-cv-10035-HB -RLE   Document 184-1   Filed 10/05/11   Page 27 of 28
Case 1:09-cv-10035-HB -RLE   Document 150-2   Filed 08/03/11   Page 22 of 65
Case 1:00-cv-02800-LMM -GWG   Document 462   Filed 07/27/10   Page 13 of 14

> prevailing." Furthermore, to the extent the Company uses the New
> Database in making Out-Of-Network benefit determinations,
> nothing in this Section shall be construed to require the Company
> to use modules or any aspect of the New Database as satisfying any
> health care benefit plan's Benchmarking Standard, including, but
> not limited to, "reasonable and customary," "usual, customary and
> reasonable," or "usual and prevailing," when the Company did not
> use the corresponding modules or other corresponding aspect of
> the Ingenix Database at the time of entering into this Settlement
> Agreement.

Notice of Proposed Settlement Agreement, section 4.4- Benchmarking Standards.

This "remedy" has no value, based upon the release language quoted above, and the "new

database" should not be considered in calculating the attorney's fees.  Judges are advised that

"hot button indicators include any remedy to which you cannot confidently assign a cash value."

Pocket Guide at 16.  Here, the "new database" has zero value, and based on the release language

quoted above, defendants are not obligated or bound to use the new database, and appear free to

go about their business without utilizing such system to avoid future problems.

## CONCLUSION

Class Members and Objectors Richard Neitzel, Marc Risse & Laura Fortman, personally

and on behalf of her minor child, respectfully ask that the Court to reject the Preliminarily

Approved Class Settlement and: (1) appoint separate class counsel for the Subscribers; (2) defer

its ruling on the application for Class Counsel's attorneys' fees until it has reviewed actual claims

data showing the benefit that Class Counsel has actually provided to the Class; (3) not assign a

cash benefit, or value to the "new database," or in the alternative withhold $50 million in

attorney fees until such time that it can determine the number of class members who benefit from

such database, in what amount, and then is able to assign such benefit a cash value; (4) deny the

9

attorney's fee application for 25% of the Settlement Fund as excessive, and instead award a 10%

fee; (5) deny Class Counsel's application for attorneys' fees based upon the new database that the

Company is allegedly involved in creating with the OAG and School; (6) and the difference

between the attorneys' fees sought and granted to Group A Subscribers; and (7) for such further

and other relief this Court deems just and proper.

Dated: July 27, 2010
      New York, New York

                      ERLANGER LAW FIRM PLLC
                      Attorneys for Plaintiff

                      By: s/ Robert K. Erlanger
                           Robert K. Erlanger (RE-0886)

                      122 East 42 Street, Suite 519
                      New York, New York 10168
                      (212) 686-8045
                      rke@erlangerlaw.com

10