1883BLESC

 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    BLESSING,

 4                    Plaintiff,

 5              v.                        09 CV 10035 (HB)

 6    SIRIUS XM RADIO, INC.,

 7                    Defendant.

 8    ------------------------------x
                                         New York, N.Y.
 9                                       August 8, 2011
                                         10:15 a.m.
10
      Before:
11
                          HON. HAROLD BAER, JR.,
12
                                         District Judge
13
                              APPEARANCES
14
      GRANT & EISENHOFER P.A.
15         Attorneys for Plaintiff
      BY:  JAMES J. SABELLA
16            SHELLY L. FRIEDLAND
                  -and-
17    MILBERG LLP
           Attorneys for Plaintiff
18    BY:  PAUL F. NOVAK
              ANNE FORNECKER
19                -and-
      COOK, HALL & LAMPROS
20         Attorneys for Plaintiff
      BY:  EDWARD S. COOK
21            CHRISTOPHER B. HALL

22    JONES DAY
           Attorneys for Defendant
23    BY:  JOHN M. MAJORAS
              THOMAS DEMITRACK
24            TODD R. GEREMIA

25

1883BLESC

1           (In open court)

2           MR. SABELLA:  Jim Sabella from Grant & Eisenhofer for

3      the plaintiffs.  With me is my colleague Shelly Friedland.

4           MS. FORNECKER:  Anne Fornecker from Milberg on behalf

5      of the plaintiff class.

6           MR. NOVAK:  Paul Novak from Milberg.

7           MR. LEON:  Jeff Leon from Freed & Weiss on behalf of

8      the plaintiff class.

9           MR. HALL:  Chris Hall, Cook, Hall & Lampros.

10          MR. MAJORAS:  John Majoras from Jones Day along with

11     my colleagues Thomas Demitrack and Todd Geremia.

12          THE COURT:  Good morning, everybody.  We are here to

13     listen to a motion to approve this proposed class settlement

14     and to hear any objections to that settlement.  So I think the

15     first thing that I'd like to do is to listen to the plaintiff

16     lay out why he thinks the settlement should be approved.  We

17     have a limited amount of time, so I'd appreciate it if the

18     movant took no more than 10 or 12 minutes, and if the defendant

19     has anything to add or subtract, takes five, and then we go on

20     to listen to the objectors.  So you're up.

21          MR. SABELLA:  Thank you, your Honor.  James Sabella.

22     This is a complex antitrust case which settled on the eve of

23     trial.  The terms of the settlement are as follows:  Sirius XM

24     agrees not to raise any of its prices until the end of this

25     year.  This is highly valuable because numerous documents

1883BLESC

1    produced by Sirius XM in the litigation as well as public

2    statements by Sirius XM officials show that Sirius XM had made

3    plans and contemplated implementing a $2 a month increase in

4    the base subscription price after the FCC imposed price cap

5    expired at the end of July 2011.

6            THE COURT:  Two questions about your opening thought.

7    One is you indicated in your memorandum that there were like

8    1.3 million documents that you looked at or that were

9    presented.  I'd like to know something about what they

10   consisted of.  And then I'd like to make sure I understand that

11   what we're talking about here is some 10 or $12, the $2 a month

12   period through the end of the year.

13           Can you take the second question first.

14           MR. SABELLA:  Yeah.  The expectation was that the

15   price would increase $2 a month.  So, for people who are on a

16   month to month subscription, which is a substantial number of

17   people, they would save that $2 for August, September, October,

18   November, December, for five months.  For people who are on an

19   annual subscription, if their subscription comes due in that

20   period, they can renew at the current price, lock in the

21   current price, and potentially save $22 they get -- when you

22   are on an annual subscription you pay 11 months.

23           THE COURT:  They can lock it in for the whole period.

24           MR. SABELLA:  If they are on a longer subscription,

25   they can lock it in for a longer period.  If their subscription

1883BLESC

1    didn't come due during the last five months, they can still

2    renew during that five months and lock in the price.  Say their

3    subscription was going to be up in February or March, they can

4    renew now for 12 months or 24 months, and lock in the price.

5        THE COURT:  This didn't include those people who have

6    lifetime.

7        MR. SABELLA:  It does not include people who had

8    lifetime.  The only injury really to the lifetime people had is

9    some of them paid the music royalty fee.  As your Honor --

10   first of all, lifetime subscription people are like one percent

11   of the class so it is sort of the tale wagging the dog.  But

12   their only damage is the music royalty fee, and even on the

13   antitrust claims, even our expert admitted since the royalties

14   that Sirius was paying had gone up, even in the but-for world

15   without the merger, the music royalty fee would have gone up.

16   There is a dispute over how much it would have gone up.  But

17   that's not a clean, under the antitrust claim, just complaining

18   about the music royalty fee was not a particularly clean item

19   of damages.  It would have been a much better item of damages

20   under the breach of contract and consumer fraud claim, but your

21   Honor dismissed them earlier and really gutted that -- not

22   gutted, but took away a lot of the sting out of the music

23   royalty claim.  So that's the way that the $2 works.

24       Your Honor's other question about the documents.  A

25   substantial portion of the documents were e-mails, as is often

1883BLESC

|  |  |
|---|---|
| 1 | the case.  In any case you have a substantial volume of e-mails |
| 2 | which have to be reviewed.  Another substantial volume of |
| 3 | documents are all of the financial documents, the budgets, the |
| 4 | draft budget, the presentations back and forth, not only to the |
| 5 | board but to management showing how the company is doing, how |
| 6 | it expects to be doing, what it expects to be doing.  Then |
| 7 | there is a substantial number of marketing documents that |
| 8 | showed how the competition was shaping up between Sirius and |
| 9 | XM, how they were doing each month in the marketplace, what |
| 10 | they were doing to try to gain a competitive advantage |
| 11 | vis-a-vis their competitors, and also taking a look at emerging |
| 12 | technologies, Pandora, the iPods and cell phones. |
| 13 | THE COURT:  You think somebody actually looked at a |
| 14 | million three documents? |
| 15 | MR. SABELLA:  We actually came pretty close to that, |
| 16 | yes, your Honor. |
| 17 | THE COURT:  I ask because part of the way we judge the |
| 18 | attorneys' fees aspect here is the work that was done in |
| 19 | contemplation of settlement. |
| 20 | MR. SABELLA:  Right. |
| 21 | THE COURT:  So a million three stuck out. |
| 22 | MR. SABELLA:  It is a lot of documents.  And we spent |
| 23 | an enormous amount of time looking at them.  We loaded them on |
| 24 | a database.  We had people at all the various firms, a lot of |
| 25 | the other plaintiffs firms that had filed cases and |

1883BLESC

1   participated in the case.  They could review them from remote

2   computer terminals.  They could code them and review them.  And

3   see whether or not they were relevant to the case.

4         Ultimately, on summary judgment, what did we submit,

5   100 documents?  We had made a thousand or 2,000 on our trial

6   list.  But they don't just pop out at you.  You've got to hunt

7   for those documents as you know.  A million three documents is

8   a lot of documents, and we had a lot of people doing document

9   review that had to be completed.  There was no alternative

10  around it.

11        This wasn't a case where there was, say, a government

12  case to piggyback on.  The government's already identified all

13  the key documents and they filed a case.  And they filed a

14  complaint and maybe there has been government depositions and a

15  government trial and all that kind of stuff.

16        We had to hunt for the good documents and I think we

17  found what was there.  But it was a very time-consuming

18  project.  We brought it to the eve of trial.

19        Our economic expert Dr. Langenfeld along with an

20  officer of Sirius XM Ms. Brook did calculations on the value of

21  the settlement, assuming the $2 increase had gone into effect

22  in August, and they took a look at how many subscriptions come

23  up for renewal in the period, how many people are on a

24  month-to-month basis, and taking into account the fact that

25  there is a small number of subscribers who don't know renew

1883BLESC

1   from month to month, it is really in the order of one to

2   2 percent.  They added those things together and they created a

3   fairly detailed analysis of why this settlement, the price

4   freeze value of the settlement is between 180 and 200 million

5   dollars.  In addition, the settlement provides a benefit for

6   former subscribers in the form of one free month of service,

7   either on a radio or over the Internet, with no activation fee.

8   In addition, Sirius XM agreed to pay all of the notice related

9   expenses, which are close to $2 million, and Sirius agreed to

10  pay attorneys' fees and expenses up to $13 million, subject to

11  the Court's approval.

12          I think this is a favorable settlement for the class

13  considering the risks of going forward.  As I said before, the

14  Court dismissed the breach of contract and the consumer fraud

15  claims, which in a lot of ways we thought would have been

16  stronger claims because they were easier for the jury to

17  understand than a complicated antitrust claim.  And the

18  difficulty of prevailing just on the antitrust claim alone is

19  shown by the fact that neither the Department of Justice nor

20  the Federal Communications Commission chose to try to stop this

21  merger.  They didn't think it posed a sufficient threat to

22  competition.  And we would have needed to persuade the jury

23  that the government was wrong and that we were right.  Not an

24  easy task.

25          Prevailing on the antitrust claim would have been

1883BLESC

```
 1   difficult in light of the emerging technologies that I referred
 2   to before.
 3            And I think the value and the wisdom of the settlement
 4   are confirmed just a week ago when the Federal Communications
 5   Commission decided not to extend its price cap beyond July 28.
 6   So except for the price cap in this settlement, nothing would
 7   be preventing Sirius XM from raising its prices today.
 8            Now, we've laid out in our brief the various Grinnell
 9   factors.  I don't think I have to go through all of them.
10   There's a couple of them I would highlight for your Honor.
11            First, the reaction of the class.  We have 67
12   objections out of 15 million class members, less than a
13   thousandth of 1 percent.  This Court and other courts have
14   found that kind of a percentage to be highly probative.
15            The case was settled on the eve of trial.  This was
16   not a case where we didn't know the strengths and unfortunately
17   the weaknesses of the claim.  We took the case all the way to
18   the eve of trial.
19            There were enormous risks with respect to liability
20   and you can't assume that the plaintiffs would have won.  Your
21   Honor said that in Thompson v. Metropolitan Life, and that's
22   clearly the law.
23            You also have to consider the range of reasonableness
24   of the settlement.  Our expert estimated that the maximum
25   damages were about $450 million on the antitrust claim.  A
```

1883BLESC

1   settlement valued at $180 million is 40 percent of the maximum.

2   And the recovery obviously could have been much, much less.

3           THE COURT:  Mr. Sabella, this is just an academic

4   inquiry because I don't know the answer.  It is not a trick

5   question.  But isn't it true that in antitrust actions such as

6   this, should you have prevailed, there is the likelihood that

7   the amount would be trebled?

8           MR. SABELLA:  Yes, your Honor.  But for purposes of

9   settlement you look at single damages.  The Second Circuit said

10  that in the Grinnell case, 495 F.2d 458.  And there's been

11  numerous District Court cases that cite Grinnell for that

12  proposition.

13          THE COURT:  I know what they say.  What I'm trying to

14  understand is they say you shouldn't think about it in terms of

15  settlement, but let's think about it.  And let's say that

16  indeed there was a settlement of $450 million for the sake of

17  argument.  Would you have then applied to treble that amount?

18          MR. SABELLA:  We would have.

19          THE COURT:  That wouldn't have been illegal.

20          MR. SABELLA:  No, we would have done that.

21          THE COURT:  Just a settlement ploy, essentially.

22  That's the way the courts come out with this kind of

23  resolution.

24          MR. SABELLA:  When the courts look at the settlement,

25  they look at actual damages as opposed to looking at punitives

1   or anything else that might have happened in trial.  They look

2   at how much were you really injured.  That's what the Second

3   Circuit said to do.

4           Your Honor, if I could turn perhaps to our fee

5   application.  And I think it make sense to briefly go through

6   that as well because the objectors are going to cover both.  If

7   I may.

8           THE COURT:  Yes, I think you ought.

9           MR. SABELLA:  We're requesting $13 million in fees and

10  expenses which would be paid directly by Sirius XM.  The fee

11  was agreed to only after the terms of the settlement had been

12  decided.  The fee is a negotiated amount.  It does not come out

13  of what the class receives.  This Court has specifically stated

14  that it looks favorably on this type of arrangement where the

15  fee does not reduce what the class gets, and that was in

16  Thompson v. Metropolitan Life.

17          It is important to point out if the fee is reduced,

18  whatever is left out of the 13 million goes back to Sirius XM.

19  It doesn't go to the class.  That's the law.  So to reduce the

20  fee would be rewarding what we consider to be the wrongdoer,

21  but not the class.

22          If the Court is in any way dissatisfied with the

23  settlement, if the Court thinks the settlement is insufficient,

24  I would suggest to your Honor the remedy is not to deny fees.

25  If the settlement is inadequate, you deny approval the

1883BLESC

1    settlement.  But if the settlement is approved here, then a $13

2    million fee considering the value to the class is certainly

3    justified.

4            You can look at it in terms of a percentage of the

5    recovery, in which case 13 million out of 180 million is far

6    less than 10 percent.  And usually percentage fees are in the

7    area of 20 percent.  Or you can look at it in terms of the

8    lodestar.  We spent something like 37,000 hours on this case.

9    The time amounted to 17 million in expenses.  Out-of-pocket

10   expenses are 3 million.  A $13 million fee provides

11   approximately slightly more than half, less than 60 percent of

12   our time charges.  Normally in a case like this, counsel

13   applies for a multiple of the time charges.  We're applying for

14   a fraction of our time charges.  We've submitted evidence

15   showing that our hourly rates are consistent with the hourly

16   rates charged in New York.  And I believe your Honor would

17   agree that there was an enormous amount of work done here.  Not

18   only document review, motion to dismiss, motion for class

19   certification, motion for summary judgment, merits deposition,

20   expert depositions, getting the pretrial order in order.  For

21   doing that kind of work in an antitrust case, a fee which is

22   going to amount to $10 million in legal fees and $3 million in

23   expenses is truly reasonable.

24           There is another aspect that we believe supports the

25   fee, and that is that during the course of the litigation the

1883BLESC

1    music royalty fee was in fact significantly reduced in December

2    of last year.  Now I understand that the defendant takes the

3    position that reduction had nothing to do with the litigation.

4    Your Honor doesn't have to resolve that.  But I would point out

5    that reduction took place earlier than it had originally been

6    scheduled by Sirius XM and only after we were well under way in

7    litigation.  So I would suggest your Honor take into account

8    that additional benefit that the class has received.

9              THE COURT:  Is that the $56 million item?

10             MR. SABELLA:  That's a $56 million item.

11             In terms of the Goldberger factors that support a fee.

12    As I mentioned, this wasn't a case where all we did was file

13    the complaint and had a settlement.  We took it all the way to

14    the eve of the trial.  In terms of the risk of the case, there

15    was no government indictment.  We had to do it all ourselves

16    and we had to overcome the fact that the Department of Justice

17    and the FCC decided not to block the merger, and the jury would

18    have had to consider whether we can prove the government was

19    wrong.

20             This was a complex case.  The quality of

21    representation I think speaks for itself.  I am not going to go

22    into that any further.

23             I would hope that your Honor would see that a fee

24    which is around 7 or 8 percent of the value of the settlement

25    and barely more than 50 percent of time charges is reasonable

1883BLESC

1   under the circumstances.  I submit your Honor should grant the

2   motion.

3              THE COURT:  All right.  I am convinced that at least

4   it's worth thinking about.

5              MR. SABELLA:  I can't ask for more than that.

6              THE COURT:  Are there any other plaintiffs that want

7   to say a word or should we ask the defendant whether they have

8   anything to say.  All right.  The defendant has something to

9   say, I gather.  Don't force yourself.

10             MR. MAJORAS:  No, sir, your Honor.  I've learned that

11  lesson here.

12             Your Honor, John Majoras for defendant.  Sirius XM

13  believes this settlement is appropriately scaled to the scope

14  of this case and the issues that remain to be tried.

15             It was a hard-fought litigation, it was a hard-fought

16  negotiation that led to the settlement.  And up until that

17  settlement, Sirius XM fully expected to go to trial, and fully

18  expected to prevail.  It is Sirius XM's view that this

19  settlement is fair, adequate and reasonable and should be

20  approved.  Thank you.

21             THE COURT:  All right.  I gather there are several

22  people who don't share that view.  I have a list.  I think

23  probably we'll just go down it.  Let me suggest to you that

24  we've read all of these, and we only need to hear it once.  We

25  don't need to hear it from each of the objectors.  So, but for

1883BLESC

1    something new and different, which we're always glad to hear,

2    why don't we start with Mr. Marris.  Are you ready, willing and

3    able to give us -- come right up.

4         MR. MORRIS:  It's Morris, your Honor.  I have very

5    poor handwriting and I apologize.  M-O-R-R-I-S.

6         Your Honor, I am used to sitting where these fine

7    lawyers are sitting in the front row.  I'm a plaintiff's

8    contingency class action attorney, not an objector type

9    attorney, and I don't go around typically objecting to other

10   people's settlements.  And also my client is not a typical

11   objector.  This is his first time objecting to a case.  I

12   represent him in a matter pending in the Southern District of

13   Southern California in San Diego against XM, and should your

14   Honor approve this settlement with the breadth of the release

15   that's proposed, it would wipe out his claims in that matter.

16   So that's what first of all brings me here on behalf of

17   Mr. Broida who has an actual pending case as opposed to some

18   objector who may be in a different position.

19        THE COURT:  Tell me more about what will happen if I

20   approve.  What will happen to your case in California, it will

21   disappear?  Why is that?  Because it is the same case and this

22   will resolve the matter?  That's a good thing, isn't it?

23        MR. MORRIS:  Depends where you're standing, your

24   Honor.  And whether one has been included in discussions of

25   settlement or not.

1883BLESC

1          What really brings us here is the scope of the

2     release, your Honor.  That's why I'm standing here.  And

3     primarily, if one looks at the settlement agreement itself, it

4     does make reference, as one would expect, to the release

5     claims, and that reference is on page 13, and it refers to a

6     defined term, "the released claims."  And for whatever reason,

7     that term actually wasn't defined in the settlement agreement.

8     We've got the "release parties" defined, we've got the

9     "defendants released claims" defined, but we don't have the

10    "plaintiffs release claims" defined.

11         The release language begins on page 11 and runs

12    through page 13, at least most of it.  And I'm guessing that's

13    probably an oversight in drafting.

14         In any event, though, it seems to me that since we

15    have reference to a defined term, the term should in fact be

16    defined.  So I would propose that on page 12, in paragraph A,

17    prior to the last sentence, one would insert "the released

18    claims."  At least then we would know specifically which claims

19    are the subject of the release.

20         THE COURT:  Have you broached this with the parties?

21         MR. MORRIS:  I haven't.  I wasn't sure whether to

22    contact plaintiffs' counsel and or defense counsel.  It seems

23    like a matter that shouldn't be much in dispute.

24         THE COURT:  That's why we could have saved you a trip,

25    it would seem to me.  Be that as it may, what else?

1883BLESC

1              MR. MORRIS:  That's a housekeeping matter essentially,

2      your Honor.  Coming from California and having practiced there

3      for 25 years and handled class actions for about 20 of those

4      years, I have tried from time to time to present to judges,

5      because defendants try on insisting on it that the civil code

6      section 1542 release language be included in the class action

7      agreement.  Most good judges in California will not let that

8      occur.  It's a general release that really releases every known

9      and unknown claim of any type.  So most courts don't authorize

10     that 1542 civil code general release, which comprises most of

11     what paragraph B is about on page 12.

12             There is a distinction to be made, though, between the

13     plaintiffs in the case releasing all known and unknown claims.

14     There is nothing wrong with that whatsoever.  It is the way

15     this particular release is written, we have the class releasing

16     every known and unknown claim, and that's just not proper, your

17     Honor.  For those courts that have allowed a reference to the

18     1542 language in class action settlements, the typical -- first

19     of all, as I said before, most judges just won't allow it.  But

20     there have been a few cases where it has been allowed, but the

21     language has been modified.  And I found the best language to

22     present to your Honor here today.  And it's referenced in a

23     class action settlement which was Munoz v. J.C. Penney

24     Corporation, Central District of California.  It is a 2009 case

25     and I have extra copies for counsel and the Court.

1883BLESC

1          THE COURT:  All right.

2          MR. MORRIS:  The language there says "the citation to

3    Section 1542 is not intending to effectuate a general release

4    of all claims by settlement class members.  Instead, the

5    citation to Section 1542 is intended to ensure that settlement

6    class members release, to the greatest extent possible, by

7    operation of law those claims subsumed by the released claims,"

8    and again, released claims is a defined term.

9          So, the two things that I would ask for, first of all,

10   we have the released claims defined by inserting that language

11   that I referred to previously.  Secondly, certainly the

12   preference of my client and the typical practice in California

13   is to not have a 1542 general release at all.  But, if the

14   Court is inclined to allow it to be included, it needs to have

15   the modification made to it to make clear that the released

16   claims only pertain to the released matter as defined in the

17   settlement agreement, not for example to some poor slob who

18   tripped and fell in connection with or in related to the merger

19   of Sirius XM.

20          So obviously we don't want to be releasing every

21   single known claim or unknown claim that could possibly exist

22   that's related to the merger.  I would understand why Sirius

23   and XM would want that.  Realistically, from a fairness point

24   of view, that's not appropriate.

25          That's all I have, your Honor.  In the interest of

1883BLESC

```
 1    brevity, I think it's clear the release is overbroad as
 2    drafted.  It needs to be modified.  I certainly wish I could
 3    have broached that subject earlier, but it seemed as though
 4    this case was on a pretty quick trip here.  So it seemed
 5    worthwhile just to appear and hopefully make the corrections.
 6              THE COURT:  That's fine.  You can leave a copy with my
 7    clerk of the language that you would like not to even have, but
 8    if you have to have language, you would buy it.
 9              MR. MORRIS:  I do, your Honor.
10              THE COURT:  Mr. Erlanger.
11              MR. MORRIS:  Just for your convenience, that language
12    is quoted at page nine of 27 in the case that I handed your
13    clerk.  Thank you, your Honor, for your time.
14              THE COURT:  Thank you.
15              MR. ERLANGER:  Good morning, your Honor.  Robert
16    Erlanger.  I'll try to keep this as brief as possible.  Our
17    primary objection was that how do we evaluate the value of the
18    class settlement without actually knowing what the benefit was
19    to Sirius of the illegal price increase, and there is nothing
20    that we've seen in any documents that indicate what it was.
21    Sirius claims that it was going to increase prices by $2, but
22    $2 on top of the original illegal price increase which wasn't
23    rolled back.  Had they not increased prices and only increased
24    prices after the FCC said they could, then are we just talking
25    about $2 or something more?  Because again, it is $2 on top of
```

1883BLESC

1   the illegal price increase.

2              Just technically, is the 40 percent of the subscribers

3   who would have to renew prior to the end of the year.  This is

4   essentially forcing people who might not otherwise renew to

5   renew.  And what does this mean, if they -- let's say their

6   subscription were to end in March 2012, they have to tell

7   Sirius, well, I want to renew my subscription December 2011, do

8   their subscriptions restart and do they lose those months or do

9   their subscriptions continue from where they were?  Let's say a

10  class member decides, all right, I committed to a subscription

11  but it is now March.  My subscription is going to expire, and

12  for whatever he's lost my job.  I don't want to renew.  Is

13  Sirius going to hold their feet to the fire and say sorry you

14  can't not renew because you're locked in.  And then in that

15  case, that may force a subscriber to put a stop payment on the

16  credit card or cancel the debit card.  So that kind of scenario

17  has not been fleshed out and really needs to be.  Thank you.

18             THE COURT:  I think I know the answer, but when we're

19  finished here maybe we'll give the parties an opportunity to

20  tell me their thinking.

21             Marguerite Willis.

22             MS. WILLIS:  Good morning, your Honor.  Marguerite

23  Willis all the way from Florence, South Carolina.  I'm a

24  purchaser of Sirius XM satellite radio services.  And I'm also

25  a member of the certified class in this case and for the past

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1883BLESC

1    30 years I've been a lawyer who specializes in antitrust law.

2    We all know what they say, a person who represents themselves

3    may have a fool for a lawyer and a fool for a client.  And I

4    may be a fool appearing here on behalf of myself, but one thing

5    I'm not, I'm not what the class counsel called a professional

6    objector in this case.  I've never filed an objection in over

7    30 years in connection with any proposed class action

8    settlement.

9          So why did I spend my own nickel to get here to appear

10    before your Honor today?

11          THE COURT:  Everybody wants to come to the Big Apple.

12          MS. WILLIS:  Well, especially if you live in Florence,

13    South Carolina, that's certainly true.  But the reason I've

14    come today is to appear before your Honor and express my

15    concerns about this class action settlement from my own

16    personal perspective, so let me get to those concerns first.

17          As I said I live in Florence, South Carolina, and

18    satellite radio is important to me.  And why is that?  Because

19    10 years ago when I married my husband, the mayor of Florence,

20    South Carolina, I moved from Washington and agreed to commute

21    180 miles a day to work through rural South Carolina.  That's

22    love.  I'd just like to say that for the record.

23          But in addition what it means is I rely on satellite

24    radio every day for weather and news and sometimes

25    entertainment.  There are no viable commercial substitutes in

1883BLESC

1    rural South Carolina for satellite radio.  Internet and cell

2    phone coverage is spotty, so if you need any kind of commuting

3    information, you are stuck with satellite radio.

4         Hence, if Sirius XM decides to raise its prices, I

5    have no alternative.  And in antitrust terms, that means that

6    combination of Sirius and XM creates a firm with market power,

7    monopoly power, as far as I am concerned, in rural South

8    Carolina.

9         THE COURT:  Wait a minute.  Ms. Willis, I'm not even

10   sure it is admissible, but the facts here as you I think heard

11   is that both the DoJ and the FCC examined -- that's what they

12   do for a living, well, the FCC does and hopefully to a degree

13   the Department of Justice.  That may be overstating it.  But in

14   any event they looked at this, they analyzed it, and they

15   concluded just the opposite of what you're telling me.  Indeed,

16   this was not a competitive problem.  And indeed, that's why

17   we're here today.  Otherwise they would have gone forward at

18   least first.

19        MS. WILLIS:  I respectfully disagree as I have in the

20   past with both the Department of Justice and the FCC on this

21   matter.  And I do not believe they significantly considered the

22   possibility of small rural markets.  Because truly, where I am,

23   there is no alternative to satellite radio for weather and

24   news.  For example, if I wanted to listen to songs, I can

25   certainly download them on an iPod or something and listen to

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1883BLESC

```
 1    those in the car for sure.  But for weather and news, there is

 2    no decent Internet connection, and there is very little

 3    commercial radio.  So in the case of rural South Carolina I'm

 4    here to tell the Court the facts as I know them represent a

 5    specific problem.

 6            So, getting to the terms of the settlement, if from my

 7    perspective, from the rural South Carolinian's perspective,

 8    that the merger created a company with market power, then the

 9    proposed relief here, the settlement, the five months price

10    freeze really doesn't do any real good for me long term.  Come

11    January 1, this company can raise its prices and I don't have a

12    viable commercial alternative.

13            If in the alternative the combined company, as your

14    Honor suggests the DoJ and the FCC have found, doesn't have

15    market power, then the relief in this case, the price cap or

16    the five months of no price increase, is really illusory.  And

17    why is that?  Because economic theory tells you that if a firm

18    doesn't have market power, then competition is going to keep

19    prices down.  So, regardless of what the folks planned at

20    Sirius XM, I've been planning to lose five pounds for a long

21    time and haven't done it.

22            THE COURT:  I don't think so.  Don't think about it.

23            MS. WILLIS:  Yes, your Honor.  In any event, where I

24    live in South Carolina the settlement is not fair for two

25    purposes or two reasons.  One, it doesn't give me the relief I
```

1883BLESC

1      need.  And two, alternatively, it doesn't give me anything of

2      value.

3              Quickly to address the issue of the attorneys' fees,

4      I'm worried about the attorneys' fees provision as well.  We

5      just heard class counsel say, as they said in their papers,

6      that the damages in this case, the maximum single damages are

7      $450 million as calculated by the experts.  After trebling,

8      which happens as a matter of law under the Clayton Act, your

9      Honor, it just happens, if there is an award of single damages,

10     under the Clayton Act those damages would be $1.3 billion.

11             THE COURT:  You understand then the question I raised

12     I think goes to that issue.  The law is that we don't think

13     about that at this juncture.  Whether that's illusory as you

14     would say or fair, is really beside the point.  You only think

15     at this juncture about the $450 million and not the likelihood,

16     possibility, or even reality of trebling it.

17             MS. WILLIS:  I understand that the law may suggest in

18     certain circumstances and cases that's appropriate.  But the

19     reality is that these folks tiptoed up to trial and had they

20     been successful that's what they would have recovered for me.

21             THE COURT:  I'm with you.  I quite agree.

22             MS. WILLIS:  In any event, now, the class counsel said

23     in their filing that despite the fact there are $450 million

24     maximum single damages, and I wrote this down, the defendant

25     was, quote, unwilling to consider any settlement that would

1883BLESC

1    have required an outlay of cash to class members.  Unwilling to

2    consider any settlement that would have required an outlay of

3    cash to class members.  But, the defendant is willing to pay

4    class counsel up to $13 million in fees and costs here.  And

5    the defendant has agreed not to contest those fees in what is

6    called a fair sailing provision.  What this suggests to me, as

7    an experienced antitrust lawyer, is neither class counsel nor

8    the defendants think much of the antitrust claims here.

9    Indeed, the class counsel has said this morning, and they said

10   in their briefing that the best claims, quote, the class had

11   were the consumer protection claims that your Honor dismissed

12   on summary judgment.

13        So, class counsel in this matter are without question

14   good and respected lawyers, but they're faced with a case they

15   think they can't win at trial.  Not only that, I heard them say

16   this morning they think it will be hard to convince a jury that

17   the government was wrong.  I'm not so sure that's true anymore

18   given the recent things that have happened in Congress, but in

19   any event, they don't think they can win this case.

20        So what they've done in the face of that reality is

21   they've agreed to a deal that gives them a decent attorneys'

22   fees, but it gives me, as a rural class member, virtually no

23   real relief much less any cash.

24        So I say this:  If there is money on the table, it

25   ought to be given to the class members, plain and simple.  Then

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1883BLESC

 1    this Court can decide what portion of that money should go to

 2    class counsel in this case.

 3            And then finally, your Honor, if I might on a personal

 4    note, I'd read the filings in this case and I noted that there

 5    was some issue with regard to your Honor's initiative with

 6    regard to the diversity of class counsel.  I'd like to say for

 7    the record that this year marks the 30th anniversary of the

 8    year that I was made the first female partner in one of this

 9    nation's largest and most respected antitrust firms.  It has

10    been an exciting ride, but it is often been a lonely journey.

11    So as a person, as a lawyer who is often the only woman in the

12    courtroom, I want to thank you, your Honor, for this initiative

13    of trying to make sure that the face of class counsel reflects

14    the faces of their clients.  And as I reflect upon it this

15    morning, your Honor, it may be what your Honor's initiative in

16    that regard is the only fair thing about this proceeding.

17    Thank you so much.

18            THE COURT:  Thank you.  Mr. Griffis.

19            MR. GRIFFIS:  Thank you, your Honor.  I appreciate the

20    opportunity to be here and speak today.  My client is Randy

21    Lions.  I've also been asked to speak for attorney Charles

22    Thompson whose client is Tom Carden.

23            Your Honor, in class counsel's opening statements

24    there were two things that stuck out to me.  One, he said this

25    is a very favorable settlement for the class members.  He also

1883BLESC

```
 1    talked about the supposed $180 million value of the class.

 2    Neither of those things are true, your Honor.  This is a case

 3    that he also admitted in his opening statement was at the eve

 4    of trial and it looked unlikely that they would prevail.

 5         The only value to this settlement is the $13 million.

 6    When Sirius agreed to freeze prices, they didn't give any

 7    benefit to existing class members that isn't available to the

 8    general public.  And my objection, I liken this to a coupon

 9    cases.  There are cases, Netflix has a one month free deal that

10    runs continuously.  It is out in the marketplace.  Electronic

11    media entertainment deals.  Another --

12         THE COURT:  The coupon concept is worth a moment in

13    time.  Obviously -- well not obviously, but it is fair to say

14    that the courts frown on that kind of a resolution.  But in

15    this instance, unless they were able to extract the kind of

16    dollars that Ms. Willis thinks are available, I don't see what

17    the alternative was offhand.  But if you do, you ought to let

18    me know what it is.  It's easy to object, you know.

19         MR. GRIFFIS:  I understand.  In this case, even though

20    I likened it to a coupon case, it is not as good as a coupon

21    case.  There really is no discount.  Very easily we might find

22    in six or seven months with the economy, with the market being

23    what it is, there is no rise in prices.  If there is no rise in

24    prices, the class members have gotten absolutely nothing in

25    this settlement, but class counsel is getting $13 million.  And
```

1883BLESC

          1    I don't dispute the incredible amount of work they did or the
          2    reputation of this firm.  But if they get $13 million and in
          3    effect we find out in January, February, that there is
          4    absolutely nothing that class members get that aren't available
          5    to all subscribers, then there has been no benefit to the
          6    class.  So the $180 million seems purely speculative, but in
          7    January or February this Court can look at that and make a
          8    factual determination as to whether or not there has been
          9    value.

         10          THE COURT:  When you say speculative, I thought it
         11    was, and I don't have chapter and verse, but I thought it was
         12    fairly clear in the papers that the defendant was indeed
         13    committed to raising the price $2 a month.  So the economy may
         14    go to hell in a handbag, but the fact of the matter is this
         15    $180 million, as I understood it and you're here to correct me
         16    if I'm wrong, was a fait accomplis.  It wasn't like it's going
         17    to change because there are 19 million people out of work.

         18          MR. GRIFFIS:  I think if the settlement had been just
         19    for class members they would have a strong argument that class
         20    members are getting the benefit.  If I go on the Internet this
         21    morning, the prices are exactly the same if I'm a brand new
         22    customer.  So to me, that's strong evidence of what Sirius has
         23    done is made a marketing decision that everyone continues to
         24    have the same rates.  That's part of the settlement.  If in
         25    January, they don't raise the rates, and part of my objection

1883BLESC

1    is, is this Court should wait until we see how many renewals

2    there are, and January or February to determine if there is a

3    raise in the rates.  If they don't raise the rates to anyone,

4    there has been no benefit to the class.  It would be extremely

5    strong evidence that the market would not have borne out a $2

6    increase.

7            If it was a true benefit of a $2 reduction, then yes,

8    it would be just a matter of doing the math.  But if everyone

9    gets this.  If I I've never subscribed to XM radio and I sign

10   up today, then I pay the same price.  If in January, if that's

11   still the facts, then there has been no benefit at all.

12           THE COURT:  I don't think that's really true.  There

13   has been no benefit that others can't piggyback on.  But there

14   has been a benefit.  You were paying X dollars and you were

15   going to pay X plus two, and now you're still paying X.

16           MR. GRIFFIS:  So is the rest of the world.  If

17   everybody in the world is paying X, that means how can there be

18   a benefit.  If Macy's tomorrow says credit card customers get

19   10 percent off, but by the way, we are extending 10 percent off

20   to the whole world, there is no benefit.  And believe it or

21   not, that happens all the time.  I think that's exactly what's

22   happening here.

23           The decision wasn't made to go ahead and do the $2

24   increase except for class members.  The decision was made we

25   are not going to have any price increases right now.  So that's

1883BLESC

1   strong evidence that an economic decision was made that with

2   today's economy and with the price of entertainment and

3   everything else, the market really just wouldn't go with the $2

4   increase.  And by January, today was a pretty bad day, last

5   week was a pretty bad week, by January it may very well be that

6   there is no price increase.  If that happens, then there has

7   been no benefit to anyone except the 13 million being paid to

8   the attorneys.

9           THE COURT:  Thank you very much.

10          MR. GRIFFIS:  That's the argument, your Honor.  Thank

11  you.

12          THE COURT:  Michael Hartlieb.

13          MR. HARTLEIB:  Good morning, your Honor.

14          THE COURT:  Good morning.

15          MR. HARTLEIB:  I'd like to respond to a couple of

16  things that plaintiff counsel said.  The primary reason I'm

17  here, I flew in from California as well.  So I'm a little jet

18  lagged so forgive me.  But the breadth of this release is in my

19  opinion way overly broad, and we have a unique situation here

20  where the class encompasses many more than just subscribers.

21  And that would be shareholders as well.  I happen to be one of

22  those who happens to own multiple radios and is a shareholder.

23  Many of my colleagues that are shareholders, they're involved

24  in litigation against this company, were also subscribers since

25  the merger.  So, our concerns are -- and in fact I've talked

1883BLESC

1    with Mr. Sabella on a number of occasions to try to rein in the

2    breadth of this release.  And Mr. Sabella even stated to me

3    that there were plaintiffs removed from this antitrust case

4    prior to the announcement of the settlement stipulation because

5    they own stock and Mr. Sabella did not want to, quote, confuse

6    or cloud that issue.

7              As far as the Department of Justice approving this

8    merger, the Department of Justice approved this merger without

9    having all of the facts.  There were documents that were

10   submitted to the FCC after the antitrust division had approved

11   this merger.  And interestingly, they approved the merger based

12   on the fact that consumers did not have access to

13   intra-operable devices.  That was a federal mandate by the FCC

14   that consumers have access to ubiquitous devices that would

15   allow them to receive either service without the need or

16   purchase of new hardware.

17             So I'm not certain why these firms, all of which, your

18   Honor, for the record, I've had multiple communications with.

19   Virtually every lawyer at this table I have spoken to over the

20   course of the last year and a half.  And tried to get them to

21   address the broader picture of the antitrust claims which go

22   back to collusion between the two companies to fail to market

23   an intra-operable radio.  In fact, sir, there are indeed

24   documents that irrefutably prove this.  And why plaintiff

25   counsel chose not to bring these issues up, I don't know.

1883BLESC

1          In fact, I would like to give the Court a copy of a

2     letter from Senator Brownback, in which Senator Brownback was

3     able to see the same unredacted versions of the documents that

4     I have.  And he says that every member of the Judiciary

5     Committee should receive a copy of these documents as our

6     nation's antitrust laws are at stake.  So, what troubles me is

7     the opportunity was here to finally address these issues --

8          THE COURT:  What is the date of Senator Brownback's --

9          MR. HARTLEIB:  June 10, 2008.

10         THE COURT:  At that juncture you are saying that DoJ

11    didn't really know what it had in its craw.

12         MR. HARTLEIB:  That's correct.  I filed many other

13    documents with the FCC, and basically, demanded the FCC turn

14    these documents over at least to the Department of Justice,

15    otherwise they could become complicit in this whole conspiracy

16    to violate the Clayton and Sherman Act.  So I was very troubled

17    by this.  And unfortunately Chairman Martin chose not to turn

18    these documents over.

19         So ironically, ironically, the merger was granted,

20    because in the very first paragraph of the Department of

21    Justice ruling they said because consumers are locked into

22    exclusive OEM deals, which by the way are in violation of a

23    consent decree and their licensing mandate, and in violation of

24    a joint development agreement in which there was previous

25    litigation between Sirius and XM and they said no OEM deal

1883BLESC

1      would be exclusive.  So somehow that was just pushed aside.

2      Then they violated their former consent decree.  And one of the

3      main requirements to have these licenses was that all consumers

4      have devices that would allow them to access both services

5      without the need to purchase new hardware.

6              THE COURT:  I thought I saw, and I may be wrong about

7      this.  I thought I saw a governmental agency release as of late

8      last month that essentially reiterated the position of DoJ and

9      the Federal Trade Commission.

10             MR. HARTLEIB:  I'm not familiar with that, your Honor.

11             THE COURT:  Do you have a copy of that?  It ought to

12     be available, Solomon.

13             MR. HARTLEIB:  Your Honor, if I may, as far as the

14     damages or the benefit to the class in this case, with all due

15     respect to Mr. Sabella, Grant & Eisenhofer is a very good firm.

16     With all due respect to Mr. Sabella, his comments, these

17     benefits are all supposed and they're all subjective at best.

18     I receive no less than three times a month a solicitation from

19     Sirius, because I have two radios and I canceled the third, to

20     come back on board for $5 a month, your Honor.  So, it kind of

21     is a little contradictory to say they are going to raise prices

22     and supposed price increase or proposed price increase, it is

23     basically smoke and mirrors.  There really is no benefit

24     whatsoever to the class.

25             THE COURT:  I think you ought to take a look at -- I'm

1883BLESC

1    not going to read it because it is five or six pages long.  But

2    you ought to take a look at the FCC release July 27 when I

3    presume all the information you talk about being hidden or

4    unavailable or both was obviously available, and they come out

5    to the same way indicating that this is not an anticompetitive

6    merger.  In any event, it is a memorandum opinion and order.

7    I'm sure I'm not the only one with a copy.

8              MR. HARTLEIB:  Your Honor, can I address that?

9              THE COURT:  I thought you didn't know what it was.

10             MR. HARTLEIB:  Yeah.  I assume it has to do with the

11   ruling where they removed the price freezes just recently.  The

12   timing of this was all very consistent, obviously.  And now you

13   understand that they reached this memorandum of proposed

14   settlement prior to knowing whether or not the FCC was –– prior

15   to them –– plaintiff counsel and defense counsel knowing

16   whether or not the FCC was going to remove those price

17   constraints.  Why not?  They violated their consent decree to

18   begin with.  So, it is interesting when I reach out to the FCC,

19   who I've had numerous conversations and correspondence with the

20   FCC, how can they not be concerned about the antitrust case in

21   this courtroom, when that antitrust case is at the heart of the

22   violation of their consent decree which mandated no price

23   increases for three years.

24             So I just ask your Honor to take that with a grain of

25   salt, because this is the same agency that was not interested

1883BLESC

1    in this proceeding in this courtroom which led to antitrust

2    claims.

3        THE COURT:  I hear you.  I certainly am anxious to

4    make sure that you understand that I, just like one of the

5    former speakers, I'm not wedded to either what the FCC or the

6    DoJ do, but I thought it would round out your argument to make

7    sure you understood.

8        MR. HARTLEIB:  I appreciate that, your Honor.  As to

9    the breadth of this release.  This is a unique situation --

10   your Honor, so, the big concern for me, with the exception of

11   this being illusory at best as far as the benefits to the

12   class, is that what happens to absent class members and what

13   happens to others.  They're literally trying to release claims

14   that would cover anything from shareholder claims -- even

15   Howard Stern is suing, the radio personality is suing Sirius

16   XM, and potentially his claims could be extinguished by the

17   breadth of this release.

18       THE COURT:  Would that be good or bad?

19       MR. HARTLEIB:  I guess you'd have to ask him, sir.

20   So, my concern is, and in working with Mr. Sabella and also

21   Mr. Geremia, my goal was to get the breadth of this release

22   reined in and get a carve-out for shareholder claims, because

23   this case had absolutely nothing to do with shareholder claims.

24   This is a consumer antitrust case.  The fact that there happens

25   to be a lot of crossover between subscribers and shareholders,

1   I understand, your Honor there are over one million individual

2   shareholders in this company.  And I lost a million dollars in

3   this company myself investing in this company.  Many of those

4   shareholders like the product so much, it is a great product,

5   your Honor.  It is horrible management.

6         So, my concern is that with the breadth of this

7   release, those claims could be potentially extinguished, which

8   there was nothing even pled.  It is outside the scope of their

9   pleadings and there is no consideration for the release of

10  those claims in this settlement either.

11        THE COURT:  I have that point and I believe with you

12  and your colleague that it has to be looked at carefully.

13        MR. HARTLEIB:  I have a declaration here that I

14  neglected to include with my opposition.  So I'm wondering if I

15  could submit that to the Court as well.

16        THE COURT:  Bring it up.  Give us a copy as well as.

17        MR. HARTLEIB:  And the Senator Brownback letter which

18  accuses Mr. Karmazin with being less than candid to members of

19  Congress in regard to these very antitrust issues.

20        THE COURT:  Thank you.  Mr. Frank?

21        MR. HARTLEIB:  Thank you, your Honor for your time.

22        MR. FRANK:  Theodore H. Frank of the non-profit Center

23  for Class Action Fairness for objector Nicholas Martin.  You've

24  heard from a lot of objectors, but the opposition to the

25  objections, half of that brief was dealt with our objection so

1883BLESC

```
 1    I hope your Honor isn't too tired.

 2              THE COURT:  I'm not tired.  You're not the only case

 3    on my calendar.

 4              MR. FRANK:  I'll go quickly.  The fundamental point of

 5    our objection is that if you have a class action against Gray's

 6    Papaya and it is resolved by giving every class member a coupon

 7    that allows them to buy a hot dog for $16, that's worthless.

 8    The settlement is the same thing here.  Class members already

 9    have access to a $5 a month Sirius plan.  My client has that

10    plan.  Anybody who calls in has that plan.  In fact, I've heard

11    from lawyers who read my brief and said I called up Sirius and

12    I got my rate reduced.  So, the idea that they're going to

13    raise prices is illusory.  The idea that this agreement that

14    they are only going to charge $16 a month, it is meaningless

15    because anybody can call up and get a better rate.  There is no

16    evidence that they are going to stop offering that $5 a month

17    rate.  So, nor is there evidence that Sirius is, quote unquote,

18    committed to raising prices.  The evidence is that Sirius

19    planned to raise prices.  And corporations plan things all the

20    time that they don't do.  They look at possible scenarios.  And

21    they plan them out.  What happens if we do X.  What happens if

22    we do Y.  What happens if we lower prices.  And then they make

23    a decision based on their analyses and their plans.  But the

24    fact that they had a plan to raise prices $2 is not evidence

25    that they were going to raise prices $2.  And we can resolve
```

1   this question very easily because the defendants are right

2   here.  All you have to do is ask them.  Did this merger give

3   you market power to have a significant non-transitory increase

4   in price?  If the answer is yes, which it has to be to show

5   that they are capable of doing this $2 price increase, or if

6   the answer is there is a greater than 50 percent chance that we

7   do, then the settlement is clearly unfair because you can take

8   that answer, that admission, and grant summary judgment on the

9   antitrust claims, which is worth $1.3 billion.  And if Grinnell

10  says differently, Grinnell is wrong.

11          But what they will say is either no, or I don't know,

12  or probably not, and if they say that, then there isn't

13  evidence that they can raise the prices.  And if there isn't

14  evidence that they can raise the prices, then the entire

15  underpinning of the expert reports that say this is worth $180

16  million falls away and the settlement is worth zero.

17          I have no complaint if the parties say this is a

18  worthless case because the DoJ and the FCC said there is no

19  market power, and there is lots of evidence that there's no

20  market power, and this case is only worth $13 million.  But if

21  that's the case, the class is entitled to a majority of that

22  $13 million, not zero percent of it.

23          And I found it fascinating that the argument they made

24  for the attorneys' fees, your Honor, if you reduce the $13

25  million attorney fee, it goes to the defendants, therefore you

1883BLESC

 1    shouldn't reduce it.  It doesn't go to the class.  It goes to

 2    the defendant.  That is very much the argument we made for why

 3    they have breached their duty to the class.  It would have been

 4    just as easy to negotiate an attorney fee payment of $13

 5    million, and if there was reversion, it goes to the class.

 6    Completely indistinguishable to Sirius because they're out $13

 7    million either way.  But they structured the attorney fee

 8    payment so that it would go to the defendants instead of the

 9    class, and they did that so that they can make that argument to

10    you, please grant us our full fee so that it doesn't go back to

11    the defendants.

12         THE COURT:  I don't think this is the first time, as

13    he mentioned, in this Metropolitan Life case I had, must have

14    been five years ago, we did the same thing and nobody thought

15    there was anything wrong with it.  Actually they thought it was

16    a benefit to do it that way, benefit to the class.

17         MR. FRANK:  That's exactly my point.  Your Honor did

18    not consider this argument in Metropolitan Life.

19         THE COURT:  I'm not sure that's true.

20         MR. FRANK:  If there was an objector who raised it,

21    I'm not aware of it.  First I saw of it was the Lester Brookman

22    letter that we attached to our brief making that argument to

23    the ABA and I think it is a serious issue.  I think it is not

24    something class counsel should be doing to structure their fee

25    so that it can't be challenged by the class.  And there is a

1883BLESC

1  case out of the Ninth Circuit that just came down, Glasser v.

2  Volkswagen, that says class members don't even have standing to

3  challenge the attorney fee when it doesn't come back to the

4  class members.

5          THE COURT:  I got it.  Anything else?

6          MR. FRANK:  Finally, this is a coupon settlement.  The

7  benefit requires class members to do business with the

8  defendants at a particular price.  And the way to value that is

9  28 U.S.C. 1712 is quite clear.  You have to do it after you

10  know what the redemption rate is.  We need to know whether they

11  are going to end their $5 a month plan, in which case the value

12  is zero.  We need to know if they are going to raise the prices

13  in January.  If they don't, the answer is zero.  If you have

14  any questions, I'm happy to hear them.

15          THE COURT:  I don't think so.

16          We'll listen to Dan Atchley who I think is the last

17  objector who asked to speak.

18          MR. ATCHLEY:  Dan Atchley.  I'm of counsel with

19  Matthew Weiss who is of counsel for Crutchfield plaintiffs.

20  Stephen Crutchfield, Scott Krueger, Asset Strategies

21  Incorporated, Charles Zuravin and Jennifer Deachin.

22          THE COURT:  Now I don't think it is working at all.  I

23  can hear you.  It is just unfortunate.

24          MR. ATCHLEY:  Most of the points have already been

25  covered.  The basic point is this settlement's value is

1   illusory.  The assumption is we can look, did they have market

2   power to raise prices?  Which is the basis for saying there was

3   a value to not raising prices.  Well, time value of money

4   principles, if they had the power to raise it this year, they

5   could have forborne to do that and raise the price next year

6   sufficiently greater than the $2 to make up for whatever they

7   would have obtained if they'd raised the price this year.  In

8   which case, they can, A, completely undo whatever claimed

9   benefit they are saying they have given to the class members by

10  not raising their prices this year.

11        THE COURT:  As long as your thoughts are repetitious

12  of others, why don't you answer a couple of questions for me

13  instead.

14        MR. ATCHLEY:  I will do my best.

15        THE COURT:  Let's assume for the sake of argument that

16  in fact -- as I said before, I'm not even sure it's

17  admissible -- but let's assume that both past and recent DoJ

18  and FCC pronouncements came into evidence.  And let's suggest,

19  which I think is not farfetched, that as a consequence of that

20  they lost.  The plaintiff lost the case.  There was no

21  antitrust violation according to the jury.  Then we have to

22  assume that there is a good chance that would happen or let us

23  assume there is a good chance that would happen.  Then how

24  would you feel about settlement?  In other words, there

25  wouldn't have been any.

1883BLESC

1        MR. ATCHLEY:  Right.  And I think standing here now,

2   what we're doing essentially is saying okay, what is the

3   present value of the risk weighted potential recovery.  In

4   other words, if there is a 50 percent chance of nothing,

5   50 percent chance of 450, then we would have risk weighted it

6   at 225.

7        THE COURT:  I'm assuming it is a loss.  There is no

8   money whatsoever coming to the class and no coupons, whatever

9   else you want to characterize this settlement as providing.

10       MR. ATCHLEY:  Okay.  If we went that direction.

11       THE COURT:  It is a loss, which I gather is not an

12   unfair assumption.

13       MR. ATCHLEY:  If we assume there is a loss, then

14   clearly what they get now would arguably be a windfall you can

15   call it.  But they are essentially getting paid for relieving

16   the defendants from the continued expense of having to go

17   forward and having to prove their case.  It is not really just

18   a windfall, it is compensation for a release of a claim which

19   the defendants apparently think is worth the savings in not

20   having to continue pursuing the litigation.  It is not a

21   complete windfall.  If there is value, then presumably it's a

22   good exchange.  It is a good payment for release of the claims

23   and for release from having to pay additional money to

24   otherwise esteemed counsel to defend them.

25       THE COURT:  What about the release situation that we

1883BLESC

1    heard about from two people.  Are you familiar at all with that

2    problem?

3              MR. ATCHLEY:  In general outline I've read through the

4    settlement agreement.  I looked at the issue of the released

5    claims.  It does seem a rather broad language.  I think it

6    would be prudent for the individuals who feel that they need a

7    carve-out to discuss that in particular.  I do think that the

8    fact that there isn't an expressly definition for the term

9    "released claims" should be remedied.  It makes a settlement

10   clear and easier to go back and reinforce if that becomes

11   necessary.

12             THE COURT:  All right.  Why don't we hear from

13   Mr. Sabella as to some of these concerns and what the class

14   counsel thinks about them.  I'm interested, as you may have

15   gathered, about the release.  Also about whether this, as many

16   of the objectors suggest, that this is nothing but illusory,

17   this settlement that you've crafted.

18             MR. SABELLA:  Okay.

19             THE COURT:  Or anything else you'd like to tell me.

20             MR. SABELLA:  I thought I'd make a couple of general

21   responses that cut across a bunch of them and maybe go through

22   some of the individual ones that raised points.

23             With respect to the scope of the release I'd say a

24   couple of things.  First, the language of the release makes

25   clear that it is only for the class.  It is only releasing

1    claims arising out of, based on, or related to the merger.  So,

2    it is not releasing a slip and fall.  It is not releasing other

3    kinds of conduct that are occurring post-merger that don't

4    arise out of the merger.  It is only releasing things that

5    arise out of the merger.

6         Now, the law in the Second Circuit is, in the Wal-Mart

7    case and a lot of other cases, that a release can be broad.  It

8    can release all claims that arise out of the same factual

9    predicate.  Obviously, that's an ambiguous or a vague phrase.

10   And I don't think in any particular case can be defined better

11   than that.  The fact of the matter is I believe the law is

12   rather clear that a court that enters a judgment doesn't

13   predetermine the res judicata effect of that judgment.  It is

14   supposed to be determined in a later case if the issue arises.

15   I think by limiting the release to claims that arise out of the

16   merger, I think we've fairly limited it to the same factual

17   predicate, which is what the Second Circuit says you are

18   allowed to do.

19        THE COURT:  The California contingent suggests we

20   shouldn't be putting this release in at all.  Or at least the

21   carve-out is essential.

22        MR. SABELLA:  Well, the language from the California

23   statute that he wants to excise out of the release doesn't

24   extend the scope of the release.  That California statute made

25   it illegal to release claims that you don't know about.  And by

1883BLESC

1    sort of putting in what we put in, we say you can release

2    claims you don't know about.  In and of itself, that release

3    doesn't extend the scope of the release beyond what it is in

4    point A in section 8 of the agreement.

5          A couple of other points on the release that I think

6    are important.  One is, if people have a separate case and they

7    are afraid that their claim is going to be released, they could

8    have opted out.  Mr. Morris's client could have opted out.

9    Mr. Hartlieb could have opted out.  I don't know why they

10   didn't do that.

11         I'd also make the point with respect to Mr. Morris's

12   client that he didn't talk too much about what his case in

13   California actually involves.  But it relates to false

14   advertising related to the family friendly plan and some

15   violations of the Internet Tax Fairness Act.  That doesn't seem

16   to me to arise out of the merger, so my guess would be that if

17   and when that issue arises in his case, that he's probably

18   okay.  But again, I don't know why he didn't opt out.  I think

19   the release that we've done, everything related to the merger,

20   is fair.

21         THE COURT:  What about the shareholders?  Do they

22   stand in a different position in your release or are they just

23   part of a group?

24         MR. SABELLA:  Well, that's an interesting point.  I'm

25   really not sure.  I don't why Mr. Hartlieb didn't opt out.  One

1883BLESC

1    of the other plaintiffs in a separate case, a gentlemen named

2    Goad, did opt out.  We didn't have any shareholder plaintiffs,

3    named plaintiffs ultimately in the case.  They had dismissed --

4    they had withdrawn as named plaintiffs.  And the negotiations

5    didn't involve shareholders.  But I don't know in this case

6    whether one predetermines what is going to happen in

7    Mr. Hartlieb's case.  It may be that defense counsel would want

8    to address that more.  They are more familiar with those other

9    cases that have been brought against them than I am.

10          Let me respond also in general to the point about this

11   being a coupon settlement.  I think that's key to a lot of

12   these objections.  Satellite radio involves a continuing

13   company subscriber relationship.  The vast majority of

14   subscribers renew monthly, annually, whatever it is, without

15   doing anything.  They just renew.  This is not like the kind of

16   coupon that is criticized in the coupon cases where, like in

17   the General Motors case, you settle a case with General Motors,

18   and you get a coupon towards your next purchase of a truck.

19   Well, you may go five or 10 years the next time before you are

20   going to buy a truck.  Here people are going to go one month

21   and they are going to renew.  And the statistics are that all

22   but 1 or 2 percent are going to renew.

23          THE COURT:  I am not sure that's a plus, but I gather

24   you do.  In terms of the definition of a coupon case, whether

25   it takes five years or one month doesn't seem to me to make a

1  big difference.  But the concept is the same.

2  　　　　MR. SABELLA:  The concept isn't the same.  Because you

3  don't have to go and buy something different than what you were

4  going to buy.  This is like your telephone bill, your New York

5  Times subscription, your cable bill.  To say the price is going

6  to be frozen next month.  I suppose the whole world could

7  decide not to have telephones, not to have satellite radio, not

8  to have cable TV, not to have The New York Times, but it is

9  pretty unlikely.  It is not a coupon that makes you do anything

10  other than keep doing what you are doing anyway.  I think it's

11  very, very different and the cases recognize that.  We cited

12  two cases one involving Costco, the store, and one involving

13  Nextel, the cell telephone company.  In the Costco case they

14  got additional free months of Costco membership.  That was the

15  settlement.  In the wireless telephone case they got free cell

16  minutes.  And some long distance calling cards.  Neither court

17  considered that to be a coupon.  Never even thought of it as

18  being a coupon.  And they went ahead and approved it based on

19  the value of those benefits to class members because they know

20  people keep renewing their membership.

21  　　　　THE COURT:  Here the body of opinion to the effect

22  there is no contribution at all by the defendants, that this is

23  all illusory.

24  　　　　MR. SABELLA:  Okay.  Well, what I would suggest on

25  that score is, number one, we have the documentary evidence

1883BLESC

 1    that shows this is what they were budgeting.  This is what they

 2    were planning on do.

 3          THE COURT:  What they were about to do?  Is what you

 4    what you said?

 5          MR. SABELLA:  I didn't say "about to do."  I didn't

 6    say "about to do."  I said these were plans.  They made these

 7    plans in 2008, 2009, and 2010, you can see that this is what

 8    they're thinking about doing.  Now, could a company have

 9    decided not to do it?  Of course.  And that's true in any case

10    in which you get an injunction.  The defendant could always

11    decide I wasn't going to do it anyway.  That doesn't mean

12    injunction settlements are valueless.  You have to base it on

13    what do you think they are going to do.  Sirius hasn't raised

14    the base subscription price since they came into existence

15    almost 10 years ago.  XM raised the price once five or six

16    years ago.  That's it.  And in the interim they've lost

17    billions and billions of dollars.  Their expert put in expert

18    testimony to say to the effect that when a company is losing

19    money like that, it is going to raise prices.  The FCC, when

20    the merger was approved, thought the risk of a price increase

21    was significantly real that they imposed a three-year cap.

22    That cap has now expired.

23          Now, maybe they were never going to raise prices so

24    maybe the FCC got that wrong, didn't need to do the price cap.

25    But I suggest to you that to presuppose that a company that has

1883BLESC

```
 1    lost billions of dollars is never going to raise prices is

 2    absurd.

 3              And while we are on that topic, I'd like to address,

 4    if I could, the comments that I guess Mr. Frank made and maybe

 5    also Ms. Willis to the effect that either the company has

 6    market power to raise prices in which case it is a monopoly, or

 7    it has no power to raise prices, in which case they won't raise

 8    prices.  Every day there are thousands of companies that raise

 9    prices and they are not monopolies.  Companies raise prices all

10    the time without having monopoly power.  It is entirely

11    possible we could have lost this case on the grounds they don't

12    have monopoly power, but they would nevertheless go ahead and

13    raise prices.  It happens all the time.  And the documentary

14    evidence suggests that's what they were thinking of doing in

15    this case as well.

16              I would like to suggest to your Honor, while I'm

17    talking about the injunction, it is really more proper to

18    evaluate this settlement as an injunction and not a coupon.

19    And 28 U.S.C. 1712 says in the case of coupon settlements you

20    evaluate fees one way.  But in the case of injunctions, you do

21    it differently and you look at lodestar.  This is an injunction

22    just like the FCC imposed a three-year injunction on prices.

23    This is not a coupon.  The wireless case and the Costco case

24    support that position.

25              THE COURT:  You don't believe in the $16 hot dog
```

1883BLESC

1  theory.

2         MR. SABELLA:  No, I don't, your Honor.  I'm not even

3  sure what he was driving at, other than fact that in this case,

4  these people are going to renew.  If everyone chooses not to

5  renew, if everyone cancels next month, Sirius is out of

6  business.  Unlikely to happen.  And the FCC thought it was

7  significant enough to impose the three-year price cap.  The

8  documents we've seen suggest a very substantial risk of a price

9  increase of $2 a month.  If the price increase happens, the

10  subscribers are going to pay a great deal of money.

11         Now, a couple of the objectors suggested, well, they

12  really would have preferred cash, and I guess Mr. Frank said

13  the $13 million, at least the company was willing to pay $13

14  million, that should go to the class.  15 million class

15  members, $13 million is less than a dollar a class member.

16  We've put in an affidavit that shows that the administrative

17  costs of cutting and mailing a check is something like $56 per

18  check.  So the shareholder get checks about 20 cents, nobody

19  bothers to cash them.  It is absurd to think that a $13 million

20  cash settlement here would have been preferrable to a price

21  freeze for five months in which all class members can

22  participate.

23         Mr. Erlanger raised a point about Sirius forcing

24  people to renew.  I don't understand his point.  People can

25  choose to renew or not renew.  But 80, 90 percent are going to

1    renew and get the benefit.  I don't understand his point.

2         Ms. Willis made a couple of interesting points.  She

3    said because she lives in a rural area, the settlement provides

4    no benefit to her.  I think she said she has a separate or

5    different market that has to be treated differently.  I found

6    the argument interesting, because it sounded exactly like the

7    arguments that Sirius XM made against us on class

8    certification.  It talked about it's not a nationwide class.

9    If Ms. Willis is right, we lose on class certification.  We

10   don't get as far as we did.  I think she's wrong.  I think it

11   is a national market.  I think that if she wants news, she can

12   get news from her local over-the-air station if that's all

13   she's interested in.  She can get music from a variety of other

14   sources.  So I don't think the point she personally is not

15   benefiting is enough to take away the value of this settlement

16   from the millions of members of the class who are going to

17   benefit.

18        She also made the point about the clear sailing

19   provision, that somehow the provision that says that Sirius

20   isn't going to object to the fee is somehow wrong.  The

21   advisory committee notes to Rule 23 say that an agreement not

22   to oppose the fee is worthy of consideration.  The cases say

23   that.  Judge Berman said that in the Excess Value case.  It is

24   still up to the Court to approve it.  As far as I'm aware,

25   there is no cases in this circuit that say it is improper to

1883BLESC

1     have a provision along those lines.

2             Mr. Griffis.  He argues that somehow there is

3     something wrong if the benefit goes not only to class members

4     but also to members of the general public who want to sign up

5     and get the benefit of the lower price.  I would have thought

6     that was a public policy consideration favoring the settlement.

7             THE COURT:  I tried, but it didn't work for me either.

8             MR. SABELLA:  But, there you have it.  He also argued

9     that there may be no price increase in January, so therefore

10    there is not going to be any value.  But as I said before, the

11    FCC thought there was a value in a three-year price cap and

12    what we've done is extended it.

13            I think I've covered what Mr. Hartlieb had to say.

14            Now Mr. Frank.  Couple of interesting arguments.  He

15    says that there are $5 rates available in the marketplace.  And

16    I think Sirius XM, like any company, does promotions.  From

17    time to time they have special deals out there.  Plus if people

18    call up and complain enough and cajole enough, sometimes people

19    get a better deal.  Happens all the time with any company.

20    That doesn't change the fact that most subscribers pay the

21    listed price.  Most subscribers renew when they get the bill in

22    the mail.  And if the squeaky wheel complains enough and

23    happens to be able to get a discount, more power to them.  But

24    it doesn't take away the power of the price freeze.  He also

25    argued a little bit about what he thinks is improper to

1883BLESC

1    negotiate a separate fee.  I won't belabor the point.  Your

2    Honor talked about it in Thompson.  Judge lynch talked about it

3    in McBean.  Mr. Frank made that very same argument in a case in

4    Ohio called Leonardo and it was rejected.  He keeps trying that

5    argument but he keeps losing it.  He goes back to the false

6    dichotomy that either the company was a monopoly or they have

7    no power to raise prices and therefore they can't raise prices

8    next year.  As I said before, I think it's quite clear that

9    companies that don't have monopoly power raise prices.

10          So I would suggest to your Honor that there really is

11   no merit to what he has to say.

12          Mr. Atchley made one different point.  He said come

13   January, they might put in a big price increase which could

14   undo the value of the price freeze.  I would suggest to your

15   Honor again that argument proves too much.  If we had a $100

16   million cash settlement in this case, which would have been

17   impossible, they could still raise prices in January enough to

18   recoup it.  Any company, any time you have a consumer claim or

19   a claim against a company, whether they do a price freeze,

20   whether they pay a cash settlement, you can always make the

21   point sometime in the future, they'll jack up their prices and

22   make it back.  You can't enjoin them from doing that forever.

23   So your Honor, unless your Honor has further questions, I think

24   I'm done.

25          THE COURT:  Very well.  Does the defendant have

1883BLESC

1    anything they'd like to say in response to all these

2    objections?  I will be glad to listen for about three minutes.

3           MR. MAJORAS:  Mr. Sabella was very thorough, your

4    Honor.  The only point I would add is with respect to the

5    release.  Clearly the Wal-Mart case the Second Circuit held

6    about having broad releases, supports broad releases, and I

7    would submit to the Court in an antitrust case, especially one

8    that is based on a merger, and the merger allegedly having

9    created a monopoly or monopoly power, without having a broad

10   release, looking forward, these cases would never be able to

11   settle.  Because anything that happened after a settlement

12   without the release would then just reignite the same claim

13   saying that the new action is related back to the merger.  If

14   you look at the language in our release, it directly relates to

15   that.  The parties that have complained about the release, it

16   is my understanding that Mr. Hartlieb filed a case nearly a

17   year ago.  He hasn't even served the complaint yet.  Another

18   party who has a derivative case did file a complaint and opted

19   out.  Opt-out is the answer if people have a problem with the

20   release.  Particularly where we have what amounts to injunctive

21   relief.  Where these parties will be able to still benefit from

22   the value that the class members are obtaining, whether they

23   opt out or not.

24          THE COURT:  You are not arguing that the slip and fall

25   victim ought to be included in the release.

1883BLESC

1          MR. MAJORAS:  No, sir.  If you look at the release in

2     the settlement, it relates back to the merger.

3          THE COURT:  Okay.  Thank you all.  I think probably it

4     is over, and I have another matter that I really have to

5     address.  But thank you and I'll reserve decision, but I got a

6     lot of learning for which I am grateful.  Next case.

7          MR. SABELLA:  Thank you, your Honor.

8          MR. MAJORAS:  Thank you, your Honor.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25